**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ALEX HERNANDEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RCI HOSPITALITY HOLDINGS, INC., ERIC S. LANGAN, and BRADLEY CHHAY,<br><br>Defendants. | No. 4:25-cv-04477-KPE<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................ 4

II.     JURISDICTION AND VENUE ............................................................................... 11

III.    PARTIES ..................................................................................................................... 12

        A.    Lead Plaintiffs ................................................................................................ 12

        B.    Defendants ...................................................................................................... 12

        C.    Non-Defendant Entities and Individuals ..................................................... 14

IV.     OVERVIEW OF THE FRAUD ............................................................................... 15

        A.    Background ...................................................................................................... 15

              1.    RCI's Operations .................................................................................. 15

        B.    Defendants' Assurances Regarding RCI's Compliance Policies, Internal
              Controls, and GAAP Compliant Financial Statements ........................................ 16

        C.    In Truth, RCI's Tax Fraud Scheme Rendered Defendants' Representations
              About Comprehensive Policies, Internal Controls, and Sound Financial
              Reporting Materially Misleading ................................................................... 18

              1.    Prior to and during the Class Period, Defendants Carried Out the
                    Tax Fraud Scheme, Which Was Revealed by the Indictment ................... 19

                    i.      Structure of the Tax Fraud Scheme ................................................ 20

                    ii.     Specific Acts of Bribery Set Forth in the Indictment .................... 21

                    iii.    Fraudulent Tax Audit Settlements ................................................. 25

                    iv.     Falsification of RCI's Business Records ........................................ 25

        D.    Plaintiffs' Investigation Confirms a Widespread Practice of Tax Fraud and
              RCI Executives' Involvement at RCI-Owned Strip Clubs ................................ 26

        E.    The Truth Begins to Emerge ........................................................................ 28

        F.    The Truth Fully Emerges .............................................................................. 32

        G.    Events After the Class Period Further Confirm the Fraud ...................................... 33

              1.    Langan and Chhay Resign ................................................................. 33

              2.    RCI's Untimely 10-K and 10-Qs .......................................................... 34

              3.    RCI's 2025 10-K and Q4 FY2025 Financial Results ............................ 34

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS ...................................................................................................... 36

i

     A.     Misleading Risk Disclosures and Compliance Policy Statements........................ 37

     B.     Misleading Internal Controls Statements................................................ 40

     C.     Misleading Statements About Accounting Policies and Estimates...................... 42

     D.     Misleading SOX Certifications................................................................ 44

     E.     RCI's Misleading Code of Ethics ............................................................ 46

     F.     Misleading Statements During RCI Earnings Calls.............................................. 47

     G.     Item 303 Requirements ........................................................................... 50

VI.     DEFENDANTS' GAAP VIOLATIONS AND MISLEADING FINANCIAL
     STATEMENTS ................................................................................................. 51

     A.     General GAAP and Accounting Provisions............................................. 51

     B.     Defendants' GAAP Violations and Materially Overstated Revenue ................... 52

     C.     Defendants' GAAP Violations and Material Understatement of Accrued
     Liabilities .............................................................................................. 54

     D.     Defendants' GAAP Violations Related to Recorded Expenses ........................... 55

VII.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 56

     A.     Defendants' Participation in and Concealment of the Tax Fraud Scheme............ 57

     B.     Resignations of Langan and Chhay ....................................................... 59

     C.     Witnesses Confirm RCI's Tax Fraud Practices and Executives' Direct
     Involvement at Strip Clubs ..................................................................... 60

     D.     Individual Defendants' SOX Certifications ............................................. 61

     E.     SEC Investigation ................................................................................. 62

VIII.     LOSS CAUSATION ....................................................................................... 62

IX.     PRESUMPTION OF RELIANCE.................................................................... 66

X.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
     BESPEAKS CAUTION DOCTRINE ................................................................ 68

XI.     CLASS ACTION ALLEGATIONS ................................................................. 68

XII.     CLAIMS FOR RELIEF ................................................................................. 70

XIII.     PRAYER FOR RELIEF ................................................................................. 75

XIV.     JURY DEMAND ........................................................................................... 75

Lead Plaintiffs Paul Stroub and William J. Neylan III, in his capacity as Co-Trustee and on behalf of WJ Neylan III, T A Neylan TTEE, William J Neylan III REV Living TR, U/A 12/5/12 Trust ("Plaintiffs" or "Lead Plaintiffs"), by and through the undersigned counsel, bring this securities class action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against RCI Hospitality Holdings, Inc. ("RCI" or the "Company"), Eric S. Langan ("Langan"), and Bradley Chhay ("Chhay") (the "Individual Defendants," and together with RCI, the "Defendants"), on behalf of all persons and entities that purchased or otherwise acquired publicly traded RCI securities between December 15, 2020 and September 16, 2025, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Lead Counsel's investigation included, among other things: (a) interviews with former employees and independent contractors of RCI and its subsidiaries; (b) review and analysis of public filings made by RCI with the Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications disseminated by Defendants and other parties; (d) review of news articles, shareholder communications, conference calls, and postings on RCI's website; and (e) review of other publicly available information about the Company and the Individual Defendants, including but not limited to *People v. Eric Langan, et al.*, Indictment No. 73671/2025 (Sup. Ct. N.Y. Cnty.) (the "Indictment").

Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known

only by Defendants or are exclusively within Defendants' custody or control.

## I.    INTRODUCTION

1.    Based in Houston, Texas, RCI is a holding company that operates live adult entertainment venues and bar and restaurant establishments across the United States through its wholly owned subsidiaries.  Its most profitable and highest revenue segment is "Nightclubs," comprising RCI's portfolio of adult nightclubs, otherwise known as strip clubs.  RCI's strip clubs operate under roughly two dozen brands, with Rick's Cabaret as the flagship brand.

2.    The Nightclubs segment generates revenue from three different sources: service revenue; alcoholic beverages, food, and merchandise revenue; and other revenues such as ATM commissions and vending income.  As a component of service revenues, RCI's highest margin revenue source, RCI charges a 20%-25% service surcharge on purchases of its in-house currency system known as "Dance Dollars."  Dance Dollars are deployed across RCI's strip clubs and are integral to its operations, as customers who wish to pay by credit card purchase Dance Dollars and redeem them for entertainment such as private dances.  In the State of New York, Dance Dollars and the associated surcharge constitute an "admission charge" to a "place of amusement" and are therefore subject to the combined sales tax rate of 8.875% under New York tax law.

3.    **RCI Knew Compliance Was Critical:** Because strip clubs tend to invite unlawful conduct, regulators scrutinize RCI closely and often.  RCI's lawful operation of its strip clubs is essential to maintain the necessary business licenses and to avoid legal and reputational harm.

4.    Indeed, throughout the Class Period, Defendants acknowledged these risks could hypothetically occur, as investors were told that conduct at RCI's strip clubs "***may***" cause the Company to "lose necessary business licenses, expose [it] to liability, or result in adverse publicity."  RCI assured investors that it took these risks seriously, claiming to implement "comprehensive" policies for ensuring that its strip clubs operated in "conformance with local,

state and federal laws." According to Defendants, they "continually" monitored conduct at RCI's strip clubs and opined that their compliance policies were "***reasonably effective***." Additionally, RCI's own Code of Ethics explicitly required Chief Executive Officer ("CEO") Langan and Chief Financial Officer ("CFO") Chhay to "[c]omply with applicable governmental laws, rules, and regulations[,]" and to bring to the Audit Committee of the Board of Directors (the "Audit Committee") "any information" they "might have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and its operations."

5.      **RCI's Internal Control Weaknesses Drew Investor Attention:** Throughout the Class Period, RCI disclosed that its internal controls over financial reporting were ineffective due to various material weaknesses. Investors kept a close eye on these deficiencies, as weak internal controls render a company vulnerable to inaccurate financial reporting and internal misconduct. Defendants even addressed investors' concerns during earnings calls. For example, during RCI's first-quarter fiscal year 2024 earnings call on February 8, 2024, Langan responded to a question about RCI's material weaknesses by deflecting blame from RCI, stating that "[i]t's like our auditors are continually trying to find some new material weakness every single year[,]" but he nonetheless assured investors that "***we immediately make changes and adjust and correct them***."

6.      To further ease investors' concerns, RCI's annual reports during the Class Period provided remediation plans and assured investors that Defendants took seriously the integrity of RCI's disclosure controls and procedures. Importantly, RCI's annual reports consistently claimed that there had been "***no other changes in our internal control over financial reporting***" during each respective fiscal year. Pursuant to Sarbanes-Oxley Act of 2002 ("SOX") Langan and Chhay certified the Company's financial statements and the foregoing representations filed with its periodic SEC reports during the Class Period.

7.    Moreover, with Langan and Chhay directly responsible for establishing and maintaining adequate internal controls over financial reporting, RCI's Code of Ethics required that they "promptly" report "significant deficiencies" in the "design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data."

8.    **RCI Assured Investors of GAAP Compliance:** Throughout the Class Period, RCI opined that its consolidated financial statements complied, in all material respects, with U.S. Generally Accepted Accounting Principles ("GAAP"), despite the deficiencies in its internal controls over financial reporting.  To purportedly ensure its financial statements were presented fairly and in accordance with GAAP, the Company assured investors that it regularly evaluated its "accounting policies, assumptions, estimates and judgments[.]"  With these assurances, RCI claimed that its financial statements were prepared "***using the accrual basis of accounting in accordance with [GAAP]***"—encompassing the recognition of accrued sales tax liabilities.  RCI also explained its policy for recognizing revenue, stating that "[s]ales and liquor taxes collected from customers and remitted to governmental authorities are presented on a net basis[,]" with RCI "recogniz[ing] revenue when it satisfies a performance obligation (point in time of sale) by transferring control over a product or service to a customer."

9.    **The Concealed Tax Fraud Scheme and its Unraveling:** Unbeknownst to investors, prior to and during the Class Period, RCI was engaged in an illicit tax fraud and bribery scheme designed to evade payment of sales taxes owed in New York (the "Tax Fraud Scheme"). The Tax Fraud Scheme specifically involved the evasion of sales taxes owed on Dance Dollars at RCI's New York City-based clubs: Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and Sports

6

Bar (collectively, the "NYC Strip Clubs"). Astoundingly, RCI's Tax Fraud Scheme was not the work of rogue employees—rather, it was personally overseen and facilitated by Langan and Chhay.

10. For a time, the Tax Fraud Scheme was a resounding success. Over the course of more than a decade, RCI was able to settle audits for amounts substantially below what the NYC Strip Clubs owed in sales taxes, facilitated by Defendants' repeated bribes to Alton Plunkett,[1] a New York Department of Taxation and Finance ("DTF") auditor ("Plunkett" or the "DTF Auditor"). These bribes included free entertainment at RCI-owned strip clubs—including, in certain instances, private dances valued at up to $5,000 per day—as well as complimentary hotel stays and restaurant outings. In an effort to conceal the Tax Fraud Scheme, Defendants falsified Company books and records by recording the bribes as promotional expenses.

11. On May 30, 2024, the Tax Fraud Scheme began to unravel. That day, during trading hours, *The Bear Cave*, a financial newsletter authored by Edwin Dorsey on Substack, published an article reporting that "The Bear Cave believes Rick's New York City club was raided last night, as well as potentially other RCI Hospitality locations." The article included an image of law enforcement outside one of the NYC Strip Clubs and noted that "numerous law enforcement agents were both outside and within public view inside of Rick's property," though no emergency vehicles were observed. On this news, the Company's stock price fell $2.67 per share, or 5.8%, to a closing price of $43.01 per share on May 30, 2024.

12. It was not until August 8, 2024, when RCI filed its quarterly report on Form 10-Q for the period ended June 30, 2024[2] (the "Q3 2024 10-Q"), that RCI formally acknowledged the raids, confirming the reporting within *The Bear Cave* article. In its Q3 2024 10-Q, RCI disclosed

---

[1] Alton Plunkett's identity was publicly revealed after the Class Period, on September 30, 2025, when the Office of the New York State Attorney General announced his indictment.

[2] RCI's fiscal year ends on September 30.

7

that, "on or about May 29, 2024," the New York State Attorney General and the DTF executed search warrants on "the Company's corporate headquarters in Houston, Texas, three separate clubs in New York, New York, and for the mobile phone of three individuals," including "two executive officers and a non-executive corporate employee."  RCI further disclosed that on June 7, 2024, the Company "received a subpoena" from the New York State Attorney General "requesting documents and other information with respect to certain clubs in New York and Florida," and that "[t]he investigation appears to be related to the Company's New York State tax filings and possible entertainment benefits provided to [] DTF personnel."  RCI also stated that "a non-executive corporate employee" had been placed "on administrative leave during the pendency of an internal review."

13.     Despite these revelations, during the Company's earnings call later that day on August 8, 2024, Defendants continued to mislead investors, concealing the full scope of the Tax Fraud Scheme.  In response to an investor question about *The Bear Cave* article, Langan stated, "I cannot make any comments on [] any type of ongoing investigation . . . .  But there are disclosures in the 10-Q if you want to see," while assuring investors that "***you'll see that [Edwin Dorsey] was a little off base on accusations [] he made***."

14.     Then, on August 11, 2025, the Company filed on Form 10-Q its quarterly report for the period ended June 30, 2025 (the "Q3 2025 10-Q"), in which the Company disclosed that, on or about July 2, 2025, it "received a second subpoena from the NY AG requesting additional documents and information" related to the Tax Fraud Scheme.  RCI further disclosed that on or about May 20, 2025, it received a received a subpoena from the SEC "seeking certain documents and information related to the NY AG investigation and NY DTF issues."

8

15.     Finally, on September 16, 2025, during market trading hours at 3:30 P.M. EST, the Tax Fraud Scheme fully unraveled, and Defendants' misrepresentations were brought to light, when the New York State Attorney General announced and unsealed the Indictment of Defendants, as well as the NYC Strip Clubs, other RCI employees, and Plunkett.[3]  The Indictment revealed critical aspects of the Tax Fraud Scheme, which was the product of an extensive investigation that included emails and text messages seized pursuant to court-authorized search warrants, other documents, and instances of Defendants' overt acts.  The Indictment asserts that, as a result of the Tax Fraud Scheme, Defendants deliberately avoided the payment of at least $8 million in sales taxes owed on the sale of Dance Dollars and the related service surcharge.

16.     The Indictment sets forth in considerable detail Langan's and Chhay's direct involvement, including: (1) facilitating and authorizing bribes to Plunkett; (2) directing that those bribes be falsely recorded as promotional expenses; and (3) personally signing DTF Statements of Proposed Audit Change for Sales and Use Tax in connection with the fraudulent resolution of the NYC Strip Clubs' sales tax audits.  Present in the Indictment are Langan's own words, which powerfully underscore his knowledge that Dance Dollars were subject to sales tax—and that the Scheme was designed to evade those obligations well before and during the Class Period.  Indeed, in April 2018, when presented with a proposal to increase the price of Dance Dollars to account for sales taxes, Langan bluntly rejected the idea, stating: "***We need to change the way we book this shit. So[,] we only book the Net and not all of the dance dollars***."

17.     On this news, within a thirty-minute window between the announcement of the Indictment and the market's closure, RCI common stock sharply declined $5.53 per share, or 16%, to a closing price of $28.79 per share on September 16, 2025.  The following day, RCI common

---

[3] The September 16, 2025 Indictment redacted Plunkett's name and certain counts related to him.

9

stock fell an additional $2.99 per share, or 10%, to close at a price of $25.80 per share on September 17, 2025.

18. **Revelations After the Class Period:** Only a few months after the Class Period and the unsealing of the Indictment, on November 28, 2025, RCI abruptly announced that Langan and Chhay were stepping down from their positions as President and CEO and CFO, respectively.

19. Then on March 19, 2026, after previously informing investors that RCI would be unable to timely file its annual report with the SEC on Form 10-K for the year ended September 30, 2025 (the "2025 10-K"), RCI belatedly filed such report. Among other revelations described herein, in the 2025 10-K, RCI conceded the existence of a material weakness with respect to "ineffective design and operation of controls, which include management review controls," over the accounting for "contingent liabilities." RCI also confessed the need to "improve the clarity and quality of documentation supporting review of legal contingencies, including related legal fees and unasserted claims."

20. That same day, investors also learned that the Tax Fraud Scheme, and the related material weakness in accounting for contingent liabilities, had a material impact on the Company's financial results for the fourth quarter of fiscal year 2025. During the related earnings call, Langan admitted that RCI set aside a "legal reserve" of "about $9 million" in the fourth quarter, which "drastically affected" profitability for the quarter.

21. As a result of Defendants' Tax Fraud Scheme, the foregoing representations, among other representations detailed herein, were rendered materially false and misleading because: (1) RCI's policies were not "reasonably effective" at preventing unlawful conduct because Defendants' used RCI-owned strip clubs to perpetrate the Tax Fraud Scheme, resulting in the materialization of the very legal and reputational risks those policies aimed to avoid; and

10

(2) Defendants concealed an additional, then-existing material weakness in RCI's internal controls over financial reporting with respect to accounting for contingent liabilities. Defendants' Tax Fraud Scheme also rendered RCI's financial statements materially false and misleading and noncompliant with GAAP because RCI: (1) failed to accrue sales tax liabilities incurred from the sale of Dance Dollars and the related surcharge, both of which were subject to New York sales tax; (2) improperly recognized revenue on Dance Dollars; and (3) mischaracterized bribe payments as legitimate business expenses.

## II.    JURISDICTION AND VENUE

22.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

25.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of the national securities exchanges.

III.    PARTIES

A.    Lead Plaintiffs

26.    As reflected in his PSLRA certification, Lead Plaintiff Paul Stroub ("Stroub")—and Olga K. Stroub and Concord BK, LLC, on whose behalf Stroub is authorized to seek recovery of investment losses pursuant to assignments of claims—purchased RCI securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

27.    As reflected in his PSLRA certification, Lead Plaintiff William J. Neylan III ("Neylan"), in his capacity as Co-Trustee and on behalf of WJ Neylan III, T A Neylan TTEE, William J Neylan III REV Living TR, U/A 12/5/12 Trust (the Neylan Trust), purchased RCI securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

B.    Defendants

28.    Defendant RCI is incorporated in Texas and its principal executives offices are located at 10737 Cutten Road, Houston, Texas 77066.  RCI common stock trades on the Nasdaq Global Market (the "NASDAQ") under the ticker symbol "RICK."

29.    Defendant Eric S. Langan served as the Company's CEO, President, and Chairman of the Board of Directors at all relevant times.

30.    Defendant Bradley Chhay served as the Company's CFO and Principal Accounting Officer at all relevant times.

31.    During the Class Period, Defendants Langan and Chhay, as senior executive officers and/or directors of RCI, were privy to confidential, proprietary and material adverse non-public information about RCI, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with

12

other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because they possessed such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

32.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, due to their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of RCI's business.

33.    The Individual Defendants, because of their positions in the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

34.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information about RCI's financial condition and performance, growth, operations, financial statements, business, products,

13

markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Company's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### C.    Non-Defendant Entities and Individuals

35.    Peregrine Enterprises, Inc. (d/b/a Rick's Cabaret) ("Rick's Cabaret" or "Rick's") is a wholly owned and operated subsidiary of RCI, located at 50 West 33rd Street in New York County.  Rick's Cabaret is named as a defendant in the Indictment.

36.    RCI Dining Services (37th Street), Inc. (d/b/a Vivid Cabaret) ("Vivid Cabaret" or "Vivid") is a wholly owned and operated subsidiary of RCI, located at 61 West 37th Street in New York County.  Vivid Cabaret is named as a defendant in the Indictment.

37.    RCI 33rd Street Ventures, Inc. (d/b/a Hoops Cabaret and Sports Bar) ("Hoops Cabaret") is a wholly owned subsidiary of RCI, located at 48 West 33rd Street in New York County.

38.    Ahmed "Ed" Anakar ("Anakar") served as Director of Operations for the Company and President for RCI Management Services, Inc. ("RCIMS") at all relevant times.  Anakar is named as a defendant in the Indictment, which describes Anakar as high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

39.    Shaun Kevlin ("Kevlin") served as Regional Manager and Vice President of Nightclub Operations for the Northeast for RCIMS from 2013 until October 2023, with supervision over the daily operations of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.  Kevlin is named as a defendant in the Indictment.

14

40.     Timothy Winata ("Winata") served as a Controller and Accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret at all relevant times.  Winata is a named defendant in the Indictment.

41.     Alton Plunkett was employed by the DTF in Brookyln, New York as an auditor, who retired in April 2024.  Plunkett is named in the Indictment for receiving bribes from Defendants in connection with role in Tax Fraud Scheme.

## IV.     OVERVIEW OF THE FRAUD

### A.     Background

#### 1.     RCI's Operations

42.     As a publicly traded operator of strip clubs and sports bars, RCI has two reportable segments—Nightclubs and Bombshells—while all other operations are aggregated and presented as "Other."

43.     The Nightclubs segment, through RCI's wholly owned subsidiaries, operates adult entertainment venues, commonly referred to as strip clubs, throughout the United States under approximately two dozen brands, including the NYC Strip Clubs.  Throughout the Class Period, Langan and Chhay served as President and CFO, respectively, of the NYC Strip Clubs, maintaining direct control of the operations of each club.

44.     The Nightclubs segment is the dominant driver of RCI's financial performance.  In fiscal year 2025, the Nightclubs segment generated approximately $242.5 million of the Company's total revenues of about $279.4 million, representing roughly 86%.  Notably, the Company touts Rick's Cabaret as "one of RCI's top revenue-generating clubs," and a club where management hosts investors following quarterly earnings calls.  The Nightclubs segment generates revenue from three sources: service revenue; alcoholic beverages, food, and merchandise revenue; and other revenues such as ATM commissions and vending income.

15

45. RCI employs an in-house currency system, *i.e.*, Dance Dollars. Dance Dollars play an integral role in RCI's operations. Customers seeking to pay for entertainment with credit cards, including payment for private dances, purchase Dance Dollars using credit cards and then redeem the Dance Dollars for in-club entertainment. RCI charges customers a service surcharge of 20% to 25% to purchase Dance Dollars. The Dance Dollars system is deployed throughout RCI's national strip club portfolio, including the NYC Strip Clubs. In New York State, Dance Dollars and the associated surcharge qualify as an "admission charge" to a "place of amusement" and are therefore subject to the combined sales tax rate of 8.875% under New York tax laws.

46. Dance Dollars also play a significant role in RCI's reported financial results. For example, Dance Dollars sales are a component of the Company's reported service revenues, the Company's highest margin revenue source. Throughout the Class Period, service revenue accounted for approximately 40% to 46% percent of the Nightclubs segment's total sales mix, making Dance Dollars sales and the associated service surcharges a material component of the revenue stream that drove a significant portion of RCI's operating income.

**B.** **Defendants' Assurances Regarding RCI's Compliance Policies, Internal Controls, and GAAP Compliant Financial Statements**

47. RCI, and in particular its strip club business, is subject to frequent and intensive regulatory scrutiny. Indeed, RCI's reputation, financial success, and the value of its publicly traded securities depend on the Company's ability to credibly assure investors that illegal conduct is not occurring at its places of business. Because the strip club environment is known to invite unlawful conduct, strict regulatory compliance is essential—both to retain the licenses RCI needs to operate and to avoid legal and reputational harm. Prior to and during the Class Period, both Defendants and investors understood that RCI's ability to operate its strip clubs hinged on RCI operating the clubs lawfully.

16

48.     **Compliance with Laws:** Throughout the Class Period, RCI informed investors of risks associated with operating strip clubs that could hypothetically occur, stating that conduct at its strip clubs "*may* cause us to lose necessary business licenses, *expose us to liability, or result in adverse publicity*."  Accordingly, to supposedly mitigate these risks, Defendants made repeated affirmative representations that RCI had developed "comprehensive policies" specifically designed to ensure that the operation of its strip clubs was "conducted in conformance with local, state and federal laws," and that the Company "continually monitor[ed]" conduct at its clubs to ensure compliance.  Defendants opined that these policies were "*reasonably effective*."  RCI's Code of Ethics likewise obligated Langan and Chhay to "comply" with all applicable laws and regulations, and to alert the Audit Committee to any evidence of material violations of "laws, rules or regulations applicable to the Company and its operations."

49.     **Internal Controls Over Financial Reporting:** In filings with the SEC during the Class Period, RCI disclosed that the Company suffered from various material weaknesses rendering its internal controls over financial reporting ineffective.  As CEO and CFO, Langan and Chhay were responsible for establishing and maintaining adequate internal controls over financial reporting and specifically addressed investors' concerns regarding the reported material weaknesses.  For example, during RCI's first-quarter fiscal year 2024 earnings call on February 8, 2024, Langan flippantly responded to an investor inquiry regarding the material weaknesses, remarking, "It's like our auditors are continually trying to find some new material weakness every single year[,]" while simultaneously assuring investors that "*we immediately make changes and adjust and correct them*."

50.     In addition to the executives' assurances during earnings calls, each of the Company's annual reports filed with the SEC on Form 10-K during the Class Period explained

17

RCI's remediation plans for its material weaknesses and consistently reassured investors that there had been "***no other changes in our internal control over financial reporting***" during each respective fiscal year.  Langan and Chhay filed SOX certifications in connection with each of the Company's periodic SEC reports during the Class Period.  Moreover, RCI's Code of Ethics required that Langan and Chhay "promptly" report "significant deficiencies" in the "design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data."

51.    **Conformity with GAAP:** Notwithstanding the Company's reported material weaknesses in internal controls over financial reporting, RCI's SEC filings expressed a belief that the consolidated financial statements contained therein conformed in all material respects with GAAP.  Investors were further assured that RCI regularly evaluated its "accounting policies, assumptions, estimates and judgments to ensure that our financial statements are presented fairly and in accordance with GAAP."  With these assurances, RCI claimed that its consolidated financial statements were prepared "using the accrual basis of accounting in accordance with GAAP[,]" which included the recognition of accrued sales tax liabilities.  Notably, RCI also stated that "[s]ales and liquor taxes collected from customers and remitted to governmental authorities are presented on a net basis in the accompanying consolidated statements of income[,]" and that it "recognizes revenue when it satisfies a performance obligation (point in time of sale) by transferring control over a product or service to a customer."

C.    **In Truth, RCI's Tax Fraud Scheme Rendered Defendants' Representations About Comprehensive Policies, Internal Controls, and Sound Financial Reporting Materially Misleading**

52.    As alleged in detail below, from the outset of the Class Period, Defendants knew these representations were false because of Langan's and Chhay's direct participation in the Tax Fraud Scheme.  The Tax Fraud Scheme rendered Defendants' opinion that RCI's "comprehensive"

18

polices were "reasonably effective" at preventing unlawful conduct illusory and not honestly held, given the exact risks those policies sought to mitigate had already materialized.

53.    Further, while Defendants disclosed material weaknesses in RCI's internal controls over financial reporting, investors could not know the material weaknesses included in the Tax Fraud Scheme.  In fact, it was only after the Indictment was made public and after the Class Period that RCI revealed to investors that it had a material weakness related to "management review controls" over the accounting for "contingent liabilities."  This belated disclosure stated the obvious—that the Company needed to "improve clarity and quality of documentation supporting review of legal contingencies, including related legal fees and unasserted claims."  After the Class Period, as a result of the Tax Fraud Scheme, RCI was forced to increase its legal reserves, which Langan further admitted "drastically affected" profitability in the fourth quarter of fiscal year 2025.

54.    The Tax Fraud Scheme also rendered RCI's financial reporting misleading and noncompliant with GAAP.  Specifically, RCI: (1) failed to accrue at least $8 million in sales tax liabilities associated with the sale of Dance Dollars and the related surcharge, both of which were subject to New York sales taxes; (2) improperly recognized revenue on Dance Dollars; and (3) mischaracterized bribe payments as legitimate business expenses.

### 1.    Prior to and during the Class Period, Defendants Carried Out the Tax Fraud Scheme, Which Was Revealed by the Indictment

55.    Defendants' Tax Fraud Scheme was exposed in extraordinary detail by the 79-count Indictment, which was unsealed on September 16, 2025 (as discussed in Section IV.F below).  The Indictment names: RCI, Langan, and Chhay; the three RCI subsidiaries that operate the NYC Strip Clubs; three other RCI employees (Anakar, Winata, and Kevlin); and Plunkett.  Importantly, the Indictment charges Defendants (RCI, Langan, and Chhay) with criminal tax fraud, conspiracy, bribery, and offering of a false instrument.

56.    According to the Indictment, from at least 2010 to 2024, RCI willfully refused to collect and remit at least $8 million in sales tax on Dance Dollars and the 20% to 25% service charges sold at the NYC Strip Clubs, both of which qualified as an "admission charge" to "a place of amusement" subject to a combined 8.875% sales tax rate under New York's tax laws.   The Indictment asserts that, to "conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to [Plunkett,]" and that in exchange for those bribes, Plunkett "agreed to and did aid and further the ongoing commission of criminal tax fraud in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the state of New York over $8 million in sales taxes."   In other words, Defendants systematically refused to collect sales tax legally due on Dance Dollars and then bought the cooperation of the DTF Auditor to conceal the tax fraud.

57.    Internal communications and overt acts in furtherance of the Tax Fraud Scheme confirm that the underpayment of sales tax obligations was deliberate and known by Defendants. For example, on April 12, 2018, Langan texted Anakar with a candid acknowledgement of the Company's exposure, stating, "We need to talk about New York and dance dollars" as the Company was "going to be hit by 3m in sales taxes soon."   In October 2018, Winata raised with Langan the lawful solution to this exposure, which was "to increase the price of dance dollars to cover sales tax."   Langan, however, rejected that approach and instead insisted that the Company alter the manner in which it recorded its Dance Dollars sales, stating, "We can't Tim.  ***We need to change the way we book this shit.  So[,] we only book the Net and not all of the dance dollars***."

### i.    Structure of the Tax Fraud Scheme

58.    In furtherance of the Tax Fraud Scheme, and to insulate the NYC Strip Clubs from an honest assessment of their tax obligations, Defendants provided illegal bribes to Plunkett for favorable tax audit settlements.  Between September 2006 and October 2023, Plunkett conducted

20

and supervised at least six audits of the NYC Strip Clubs. The Indictment explains that RCI, "from 2012 through 2023 . . . provided Plunkett with at least 13 different complementary [sic] multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret." On such trips, Winata would accompany Plunkett and provide him with "complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs." From 2010 through 2021, "on at least 10 occasions[,]" Plunkett was provided similar bribes by Winata at the NYC Strip Clubs.

59.     The Indictment alleges that Langan, Chhay, and Anakar "authorized and directed" Winata to travel to New York and Florida to bribe Plunkett. Moreover, Langan, Anakar, and Kevlin provided (or directed employees and managers to provide) Winata with cash and Dance Dollars for the purpose of bribing Plunkett. The bribes provided to Plunkett were concealed through the falsification of business records of the NYC Strip Clubs and RCI-owned strip clubs in Florida, which were recorded as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

### ii.  Specific Acts of Bribery Set Forth in the Indictment

60.     The Indictment recites many instances illustrating the operation of the Tax Fraud Scheme. The pattern was established at the outset. On September 6, 2010, Plunkett sent an email to Winata that stated, "Let me know when you[] are coming up to New York to review the workpapers and to confirm the final amount. We will close the case in Miami." This email captures the nature of the relationship that would continue for more than a decade. In other words, Defendants provided Plunkett with free private dances, among other bribes, to favorably settle audits of the NYC Strip Clubs, resulting in the Company avoiding at least $8 million in sales taxes over the course of the Tax Fraud Scheme.

61.    The Tax Fraud Scheme continued through the years.  For example, on June 15, 2017, after meeting Plunkett at Rick's Cabaret, Winata texted Anakar the following: "Ed, we are at Rick's, just finished preliminary discussions on audit scope and lunch.  They said they would work with me, but at the same time, gave me copies of court rulings???  He has his staff with him." Winata further texted that "He had to play tough, I guess.  He would stay after his staff left.  *We may need to pamper him more this time*."

62.    Internal communications in April 2018, among others, establish Langan's direct involvement in the Tax Fraud Scheme.  On April 10, 2018, Winata texted Anakar from Rick's Cabaret, stating, in relevant part, "I made a mistake informing [Plunkett] that I got here today so I am here at Rick's with him.  Would you approve $1000 for tonight?"  The Indictment alleges that Kevlin provided Winata with $1,000 cash the next day.  Only two days later, after Langan had indicated the need to discuss  "New York and dance dollars" with Anakar as the Company was going to be "hit by [$]3m in sales tax soon[,]" Langan texted Anakar on April 12, 2018, that "I think I got the sales taxes in New York to 350 plus interest possibly.  Tim is discussing with the auditor tonight ;)[.]"  Also, on April 12, 2018, Kevlin communicated to Langan, in relevant part, "Tim['s] guest would like another $1500," and that they "would do a promo pay out in cage."  In response, Langan texted Kevlin: "*That's fine.  Go ahead*."  After receiving approval from Langan, Anakar and Kevlin falsely recorded the $1,500 bribe to Plunkett as a promotional expense.

63.    The bribery trips continued in lockstep with audit-related developments.  On December 12, 2018, in congratulating RCI on the December 2018 settlement of a Vivid Cabaret audit (described below), Plunkett texted Winata the following:

> Congratulations to you my friend, you have done a wonderful job.
> Thanks for your consent and today we received your down payment
> check.  That's the way people do business in this country.  Everyone
> is happy.  You deserve a promotion keep the good work and we will

22

> Clebbrate [sic] in Florida early next year.    Thanks for your cooperation.

64.    Soon thereafter, Plunkett pressed for another trip.  On February 13, 2019, Winata texted Langan: "Eric, Alton (NY sales tax auditor) asked if we can go to FL at end of month.  He reminded me that I have been too quiet after the settlement.  I told him I have been busy with K and Q.  Is it OK?  Please inform."  Langan responded: "Whatever you think is fine."  The Indictment asserts that, on February 16, 2019, Winata booked and paid for hotel rooms in Florida for Plunkett and himself between February 26, 2019 and March 1, 2019.  During the trip, Winata coordinated Plunkett's entertainment with Anakar, texting Anakar: "Hi, Ed.  We are planning to go to club.  Whom (which manager) should I ask to take care of Alton?"  The following day, Plunkett texted Winata that he was "back from dancing[,]" and that he "need[ed] some more dancing dollars."  To accommodate Plunkett, Anakar texted an individual not disclosed in the Indictment, stating, "Give Tim $1,000 from the safe."

65.    The Tax Fraud Scheme continued during the Class Period and after Chhay joined RCI as its new CFO in September 2020.  Chhay's own communications show that he, too, was personally directing the Tax Fraud Scheme.  For example, on June 13, 2023, Chhay texted Langan and Anakar that "New York sales tax []  Auditor asked to meet in FL next week to discuss audit result.  What do you think?"  The Indictment alleges that Langan immediately called Chhay in response.  About thirty minutes later, Chhay sent Anakar an email with the subject line "Sales Tax Florida Guy[,]" which stated:

> Let me know what you think.  Its still in audit under that guys purview.  ***Historicallly hes 1/3 of the initial he sends.  So 200k - try to land at 70k***.  Once this is done 37th street [Vivid Cabaret] should be out of the way for a while if we can get him to write us in the good guys bucket list. [all typographical errors appear in original]

23

66.    That same day, on June 13, 2023, Anakar replied: "No more than 70." Winata later texted Chhay, "Should I meet with him next week?," to which Chhay responded by text, "Yes" and "*Try to get him under 70*."

67.    The bribery efforts in June 2023 discussed above succeeded. On September 1, 2023, Chhay sent an email to Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit," which stated, "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type." That same day, Chhay texted Langan and Anakar that "*Tim got the guy to $47k in [V]ivid New York*." In that same text, Chhay also stated that Winata "*owes him a couple trips* []. And he said he has to keep his word."

68.    On October 6, 2023, according to the Indictment, Langan emailed Winata a single word—"Approved"—authorizing RCI to reimburse Winata for the cost of bribing Plunkett during a Florida trip from September 26 through September 29, 2023. Similarly, on January 10, 2024, Langan again emailed Winata "Approved," authorizing the reimbursement of Winata's costs in connection with another Florida bribery trip from December 12 through December 15, 2023.

69.    Finally, Winata's December 6, 2023 text message to Anakar described the essence of RCI's cost-benefit analysis of the Tax Fraud Scheme:

> Hi Ed. [Plunkett] called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform.

24

### iii.  Fraudulent Tax Audit Settlements

70.    The Indictment asserts that the Tax Fraud Scheme produced four sales tax audit settlements, each substantially below RCI's true sales tax liability.  In each case, Defendants or an RCI employee personally signed the Statement of Proposed Audit Change submitted to the DTF, and Plunkett thereafter signed the corresponding Field Audit report adopting the same understated sales tax amount.  The four sales tax audit settlements were as follows:

a)  On or about July 12, 2012: Winata signed a Statement of Proposed Audit Change for Sales and Use Tax to settle a Rick's Cabaret audit for $6,342.72.  On or about November 21, 2012, Plunkett signed the corresponding Field Audit Report settling the audit of Rick's Cabaret.

b)   On December 4, 2018: Langan signed a Statement of Proposed Audit Change for Sales and Use Tax to settle a Vivid Cabaret audit for $838,888.82.  On January 29, 2019, Plunkett signed the corresponding Field Audit Report for the same amount.

c)  On January 18, 2022: Chhay signed a Statement of Proposed Audit Change for Sales and Use Tax, which settled a Hoops Cabaret audit for $200,773.91.  On February 7, 2022, Plunkett signed the corresponding Field Audit Report for the same amount.

d)  On September 20, 2023: Chhay signed a Statement of Proposed Audit Change for Sales and Use Tax to settle another Vivid Cabaret audit for $47,342.92.  On October 13, 2023, the Auditor signed the corresponding Field Audit Report for the same amount.

### iv.  Falsification of RCI's Business Records

71.    Central to the Tax Fraud Scheme is the Indictment's allegation that Defendants systematically falsified business records to conceal their conduct.

25

72.     Defendants and other conspirators agreed with each other and others to falsify the business records of the NYC Strip Clubs and other RCI-owned strip clubs in Florida by recording bribe payments to Plunkett as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.  For example, as discussed above, on April 12, 2018, Kevlin texted Langan to obtain authorization for a particular bribe and described, in advance, how it would be booked, stating, in relevant part, "Tim['s] guest would like another $1500.  Would do a promo pay out in cage.  We did $2k yesterday."  Langan responded: "That's fine.  Go ahead."  Between April 12 and April 13, 2018, Anakar and Kevlin, with Langan's consent, falsely recorded the $1,500 bribe as an expense for a club promotion.  On December 15, 2021, Anakar similarly directed an individual unnamed in the Indictment to give Winata $500, intended as a bribe to Plunkett and to be falsely recorded for Tootsie's Cabaret as a promotional expense.

**D.      Plaintiffs' Investigation Confirms a Widespread Practice of Tax Fraud and RCI Executives' Involvement at RCI-Owned Strip Clubs**

73.     Plaintiffs' investigation has confirmed that RCI's deliberate avoidance of its sales tax obligations with respect to Dance Dollars was a common practice at RCI-owned strip clubs. Moreover, RCI's executives and co-conspirators in the Tax Fraud Scheme were directly involved in the strip clubs' operations, establishing Defendants' knowledge of the failure to collect sales taxes across other RCI-owned clubs.

74.     Between 2021 and March 2026, FE[4] 1 was an independent contractor as a Hospitality Professional.  While based in Denver, in this role, she was a traveling performer that often worked at RCI strip clubs in the Houston market, among other areas.  FE 1's role rendered

---

[4] Individuals referred to herein as "FE #" are former employees or independent contractors of RCI and its subsidiaries.  All FEs provided the information described herein to counsel for use in this Complaint.  In order to help preserve the anonymity of the FEs, female gender pronouns are used in connection with all FEs regardless of their gender.

her familiar with Dance Dollars because she was often tipped by customers with the in-house currency.

75.    FE 1 asserted that many workers at RCI suspected that the Company was not paying taxes on Dance Dollars because RCI provided income statements to performers for tax purposes that did not accurately reflect the amount of income performers received based on tips paid in Dance Dollars.  Specifically, FE 1 explained that the numbers were "weird and random numbers" and much less than the performers actually received.  FE 1 further explained that some of the performers kept their own records of Dance Dollars, and the numbers that RCI provided were significantly lower than their personal recorded numbers.  She added, "We all suspected, including an agency the performers spoke to, that there is some tax fraud going on there with the Dance Dollars."  FE 1 added that she believed RCI was also not reporting income on the fees that they charged at their ATM machines.

76.    Similarly, FE 2[5] explained that while RCI charged a 20%-30% fee for each Dance Dollar sold, RCI did not pay taxes on Dance Dollars since RCI did not charge the customers sales tax on them.  Indeed, FE 2 confirmed that RCI "didn't charge any type of tax on Dance Dollars." FE 2 added that RCI did not pay taxes on the fees that RCI charged at their ATM machines.

77.    FE 2 and FE 3[6] confirm that RCI executives and Anakar were directly involved with operations of each strip club in RCI's portfolio.  For example, FE 3 described Anakar as a micro manager, stating, "We had to go through Ed [Anakar] for any type of decision to be made." FE 3 further explained that she would normally go direct to Anakar with issues and questions, as

[5] FE 2 was a Hospitality Manager in Texas from May 2025 until October 2025.  FE 2 reported to a Regional Manager, who FE 2 described as being close with RCI's executive management.

[6] FE 3 was an Assistant Manager at RCI-owned Rick's Cabaret located in Colorado from October 2021 until February 2024.

he requested this direct communication. Indeed, she stated that "Ed [Anakar] wanted to know everything that was going on always[;]" for example, "[i]f someone was spending close to $10,000 dollars, Ed [Anakar] wanted us to call or text him immediately."

78. FE 3 also noted that, at the end of each night, the strip club's balance was sent to Langan and Anakar via the RCI Portal called "Club Tracks." FE 3 highlighted that Club Tracks would record cover charges, alcohol purchased, and the amount of Dance Dollars bought and spent, and that she would input the sales for the night, among other things, with the report going directly to Langan and Anakar. FE 3 further explained that she witnessed numerous violations that occurred at her strip club that were reported to Anakar and Langan, but such reports fell on deaf ears. FE 3 stated that some of the violations related to liquor laws, allowing performers to be fully naked, and illegal sexual activities. In fact, FE 3 highlighted that these violations would often occur when Langan would "bring in investors."

79. FE 3 further explained that "[w]e would have monthly Zoom meetings with the managers from each club, roughly 70, on the second Tuesday of each month," and that Anakar attended those meetings. FE 3 also confirmed that both Anakar and Langan would visit all the clubs every other month or every three months. She further added that, at times, Langan's and Anakar's visits would last a week. Likewise, FE 2 emphasized that she was surprised how "hands on" RCI executives were with every strip club, explaining that Langan had monthly conference calls with each strip club's management to discuss trends and strategies.

E.     **The Truth Begins to Emerge**

80. The truth was partially revealed to investors on May 30, 2024. That day, during regular trading hours, *The Bear Cave* published a Substack article, asserting that "The Bear Cave believes Rick's New York City club was raided last night, as well as potentially other RCI Hospitality locations." The article provided an image showing law enforcement outside of one

28

RCI's New York nightclubs and highlighted that "numerous law enforcement agents were both outside and within public view inside of Rick's property, although there did not appear to be any emergency or emergency vehicles in the area."



81.    Immediately following *The Bear Cave* article, the Company's stock price fell 5.8%, from a closing price of $45.68 per share on May 29, 2024, to a closing price of $43.01 per share on May 30, 2024.

82.    The following day, on May 31, 2024, Edwin Dorsey, the author of *The Bear Cave* article, posted on X (formerly Twitter), setting forth a timeline of the raids and the accounts of performers, who asserted that raids were "IRS related."



**Edwin Dorsey** ✔
@StockJabber

Timeline of $RICK raids and allegations

~12pm Wednesday, May 29, $RICK Texas home office allegedly raided

~1pm Wednesday, May 29, large number of police spotted outside of $RICK NYC location

Night of May 29, dozens of agents are viewed both inside and outside of $RICK NYC day, May 30, The Bear Cave publishes photo and raises concerns about potential raids at other clubs

Thursday May 30, dancers in r/Stripper begin talking about the raids. Dancers allege it was IRS related, happened at multiple $RICK clubs (and potentially one non $RICK club), claim undercover cops had been visiting in the weeks prior, and allege that the $RICK's home office in Texas was also raided on Wednesday

The company has not denied any allegation of these raids, disclosed anything to investors, or commented on the stated reasons for the raids. Instead @ricksCEO has said the NYC club is now open and retweeted promo photos from other clubs and external IR @itsMarkMoran has been hurling person insults

The relevant questions:

1/ How many $RICK locations/offices were raided on Wednesday?
2/ Which Federal and/or State agencies were involved in the raids?
3/ What was the stated purpose of the raids?
4/ What, if anything, was taken during the raids?

IMO $RICK management loses credibility the longer they go without disclosure




83.    Although Defendants failed to publicly address these developments reported by *The Bear Cave* in the days that followed, RCI later confirmed the nature of the law enforcement raids at the NYC Strip Clubs in the Q3 2024 10-Q on August 8, 2024.  In the Q3 2024 10-Q, RCI stated that "on or about May 29, 2024," the New York State Attorney General and the NY DTF executed search warrants "on the Company's corporate headquarters in Houston, Texas, three separate clubs in New York, New York, and for the mobile phone of three individuals[,]" including "two executive officers and a non-executive corporate employee[.]"

84.    In the same 10-Q, RCI revealed that, "[o]n June 7, 2024, the Company received a subpoena from the NY AG requesting documents and other information with respect to certain clubs in New York and Florida[,]" and that "[t]he investigation appears to be related to the Company's New York State tax filings and possible entertainment benefits provided to NY DTF personnel."  As a result, RCI had placed "a non-executive corporate employee . . . on administrative leave during the pendency of an internal review process," and claimed that it was "not possible at this time to determine whether the Company will incur (or to reasonably estimate the amount of) any fines, penalties, or liabilities in connection with the investigation."

85.    Nonetheless, during the Company's third-quarter fiscal 2024 earnings call that same day, on August 8, 2024, Defendants continued to mislead investors and conceal the full truth of its Tax Fraud Scheme.  Specifically, in response to an investor's question about *The Bear Cave* article on May 30, 2024, Langan stated, "I cannot make any comments on [] any type of ongoing investigation . . . .  But there are disclosures in the 10-Q if you want to see," while assuring investors that "***you'll see that [Edwin Dorsey] was a little off base on accusations [] he made.***"

86.    Then, on August 11, 2025, the Company filed the Q3 2025 10-Q.  In the Q3 2025 10-Q, the Company disclosed that, on or about July 2, 2025, it "received a second subpoena from

the NY AG requesting additional documents and information related to" the tax fraud and bribery scheme, while reiterating that it was "not possible at this time to determine whether the Company will incur (or to reasonably estimate the amount of) any fines, penalties, or liabilities in connection with the investigation."  Additionally, the Q3 2025 10-Q disclosed:

> On or about May 20, 2025, ***the Company received a subpoena from the U.S. Securities and Exchange Commission ("SEC") seeking certain documents and information related to the NY AG investigation and NY DTF issues***.  The Company is cooperating with the SEC and its investigation.  It is not possible at this time to determine whether the Company will incur (or to reasonably estimate the amount of) any fines, penalties, or liabilities in connection with the SEC investigation.

### F.    The Truth Fully Emerges

87.    Not until September 16, 2025—when the Tax Fraud Scheme came to light—did investors fully learn that RCI's policies for ensuring the lawful operation of its strip clubs were far from "reasonably effective."  The very risks those policies purported to mitigate had already materialized, through Defendants' own illegal conduct.  It was further revealed that RCI's internal controls weaknesses extended beyond what Defendants disclosed, and that the Tax Fraud Scheme had severe ramifications for RCI's previously reported financials.  That day, during regular trading hours, at approximately 3:30 P.M. EST, the Office of the New York Attorney General announced and unsealed the Indictment of Defendants and the other conspirators.  The New York Attorney General's press release summarized Defendants' Tax Fraud Scheme detailed in the Indictment, stating that: (a) "RCI executives bribed an auditor with the New York Department of Taxation and Finance (DTF) to avoid paying over $8 million in sales taxes to New York City and the state from 2010 to 2024"; (b) "The trips and bribes were authorized, directed, and overseen by Eric Langan, RCI's President and Chief Executive Officer, Bradley Chhay, RCI's Chief Financial Officer, Ahmed Anakar, RCI's Director of Operations, and Shaun Kevlin, a Regional Manager for RCI's

New York City strip clubs and later RCI's Assistant Director of Nightclub Operations"; and (c) "The defendants also falsified the business records of RCI strip clubs to conceal their crimes and recorded the cash payments used to bribe the auditor as 'promotional' expenses for the clubs."

88.    On this news, RCI's common stock sharply declined within a thirty-minute window between the announcement of the Indictment and the market's closure.  Specifically, RCI common stock fell $5.53 per share, or 16%, from a closing price of $34.32 per share on September 15, 2025, to a closing price of $28.79 per share on September 16, 2025.

89.    That same day, after markets closed, RCI issued a press release acknowledging that, among other things, "RCI, two executives, three employees, and three clubs were indicted today in New York on state charges alleging non-payment of sales taxes and bribery of a state sales tax auditor."

90.    With the announcement of the Indictment occurring near the close of markets on September 16, 2025, and the Company addressing the Indictment during post-market hours, RCI common stock continued to decline the following day as investors fully digested and reacted to the news.  On September 17, 2025, RCI common stock fell an additional $2.99 per share, or 10%, to close at a price of $25.80 per share on September 17, 2025.

G.    **Events After the Class Period Further Confirm the Fraud**

1.    **Langan and Chhay Resign**

91.    Shortly after the Class Period, on November 28, 2025, RCI filed an 8-K with the SEC announcing that Langan and Chhay "notified RCI . . . that, effective November 28, 2025, each was stepping down from his position as President and Chief Executive Officer and Chief Financial Officer, respectively."  Although the Company provided no explanation for the departures, the abrupt management changes shortly followed both Langan and Chhay being named as criminal defendants in the Indictment.  Media outlets noted that the management changes

33

coincided with the indictment; for example, the *Houston Business Journal* reported that RCI "has appointed new interim leadership following criminal charges against its former top executives[,]" and that "Eric Langan and Bradley Chhay abruptly stepped down from the Houston-based parent company of Bombshells Restaurant & Bar and dozens of adult nightclubs, including Rick's."

### 2.    RCI's Untimely 10-K and 10-Qs

92.    On December 15, 2025, RCI filed with the SEC on Form 12b-25 a notice of late filing for its annual report for the year ended September 30, 2025 (the 2025 10-K).  In the filing, the Company disclosed that RCI "has not had sufficient time to complete its Form 10-K" for the fiscal year 2025, revealing that "the delays are primarily due to additional procedures that are being performed to complete the audit in connection with the state indictment in New York on September 16, 2025."  Then, on February 9, 2026, because of the delayed filing of the 2025 10-K, RCI filed with the SEC on Form 12b-25 a notice of late filing for its quarterly report ended December 31, 2025.  Similarly, RCI filed a notice of late filing for its quarterly report ended March 31, 2026.

### 3.    RCI's 2025 10-K and Q4 FY2025 Financial Results

93.    **The Material Weakness:** RCI finally revealed to investors the full extent of the Company's internal controls failures on March 19, 2026, when it filed its untimely 2025 10-K with the SEC.  In the 2025 10-K, RCI admitted that it had a material weakness related to "ineffective design and operation of controls, *which include management review controls*," over the accounting for "*contingent liabilities*."  RCI further disclosed that "[t]hese deficiencies may have an impact on our financial statements, account balances, and disclosures."  In discussing the remediation efforts to cure the material weakness related to contingent liabilities, RCI confessed that it needed to "*improve the clarity and quality of documentation supporting review of legal contingencies*, including related legal fees and *unasserted claims*."  Due to this known but

undisclosed material weakness, Defendants were able to perpetuate the Tax Fraud Scheme during the Class Period.

94.     **The Independent Auditor's Opinion:** In connection with the 2025 10-K, CBIZ CPAs P.C., RCI's independent auditor (the "Independent Auditor"), expressed an "adverse opinion on the effectiveness of the Company's internal control over financial reporting because of the existence of material weaknesses." The Independent Auditor also provided an opinion on RCI's consolidated financial statements. While the Independent Auditor opined that such financial statements were fairly presented and in accordance with GAAP, the impact of the Indictment on RCI's financial statements was not estimable, "***but could be material***[,]" and thus its opinion was not modified with respect to the Indictment.

95.     **Clarification on Langan's and Chhay's Departures:** The 2025 10-K confirmed that Langan and Chhay resigned because of the Indictment. Under Note 11. Commitments and Contingencies of the 2025 10-K filed on March 19, 2026, RCI's description of the Indictment and "Related Matters" highlights that "the board of directors convened and approved a resolution for Eric Langan and Bradley Chhay to step down as CEO and CFO of the Company, respectively, effective November 28, 2025." The 2025 10-K notes that Langan stepped down as Chairman of the Board of Directors on January 29, 2026.

96.     **The Q4 FY2025 Results:** The Tax Fraud Scheme and RCI's material weakness with respect to contingent liabilities also had a material impact on RCI's fourth-quarter fiscal year 2025 financial results. On the same day the 2025 10-K was filed, RCI issued a press release to announce the fourth quarter results, in which RCI disclosed a net loss of $5.5 million for the fourth quarter, representing a decrease of $5.3 million year-over-year. In the press release, Interim CEO Travis Reese acknowledged that "[f]ourth quarter results primarily reflect ***higher non-cash legal***

*accrual*, increased taxes, and lower non-cash impairment."  The press release noted that corporate expenses for the fourth quarter of fiscal year 2025 was $15.4 million (21.8% of total revenues), compared to $7.1 million (9.7% of total revenues) in the fourth quarter of fiscal year 2024, as "most of the year over year change reflected the establishment of a legal accrual."  During RCI's related earnings call held that day, an attendee asked about the "large" amount "set aside in reserves for this legal thing."  In response, Langan effectively conceded that the Tax Fraud Scheme and related material weakness internal controls had severely impacted the fourth quarter, stating that "***reserves have drastically affected the numbers for this quarter***."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

97.     The Class Period begins on December 15, 2020.  The day before, after markets closed, the Company filed its annual report on Form 10-K with the SEC for the fiscal year 2020 (the "2020 10-K"), signed and certified by Langan and Chhay.  During the Class Period, RCI filed four other annual reports with the SEC on Form 10-K, each signed and certified by Langan and Chhay.  These annual reports were filed on: December 14, 2021 (the "2021 10-K"); December 14, 2022 (the "2022 10-K"), December 14, 2023 (the "2023 10-K"), and December 16, 2024 (the "2024 10-K") (together with the 2020 10-K, the "RCI 10-Ks").

98.     The Company also filed 15 quarterly reports with the SEC on Form 10-Q, each signed and certified by Langan and Chhay.  The quarterly reports were filed on February 9, 2021, May 10, 2021, August 5, 2021 (the "2021 10-Qs), February 9, 2022, May 9, 2022, August 9, 2022 (the "2022 10-Qs"), February 9, 2023, May 10, 2023, August 9, 2023 (the "2023 10-Qs"), February 8, 2024, May 9, 2024, August 8, 2024 (the "2024 10-Qs"), February 10, 2025, May 12, 2025 , and August 11, 2025 (the "2025 10-Qs") (together, the "RCI 10-Qs").

36

### A.   Misleading Risk Disclosures and Compliance Policy Statements

99.   Under Item 1A. Risk Factors, the RCI 10-Ks stated risks the Company faced, including that "[a]ctivities or conduct at our nightclubs *may cause us to lose necessary business licenses, expose us to liability, or result in adverse publicity*, which may increase our costs and divert management's attention from our business."  The RCI 10-Ks further stated, "We are subject to risks associated with activities or conduct at our nightclubs that are illegal or violate the terms of necessary business licenses . . . . *Illegal activities or conduct at any of our nightclubs may result in negative publicity or litigation*[,]" while highlighting that "[s]uch consequences may increase our cost of doing business, divert management's attention from our business and make an investment in our securities unattractive to current and potential investors, thereby lowering our profitability and our stock price."

100.   The statements in ¶ 99 were materially false and/or misleading or omitted material facts necessary to make such statements not misleading.  Specifically, the statements omitted that the risk of illegal conduct at its nightclubs had already materialized.  For years, RCI's executives used the Company's strip clubs to facilitate the Tax Fraud Scheme.  As detailed herein, Langan, Chhay, and others repeatedly bribed Plunkett with private dances and other benefits at RCI-owned strip clubs in Florida and New York.  Accordingly, it was misleading to warn of only unfounded concerns related to activities or conduct at the Company's strip clubs that "may" "expose [RCI] to liability" and/or "result in negative publicity or litigation," while concealing that Defendants' own illegal conduct had already triggered that exposure, making such consequences not merely hypothetical, but actual and inevitable.

101.   To purportedly mitigate such risks, the RCI 10-Ks assured investors that RCI had "developed comprehensive policies aimed at ensuring" that operation of every Company-owned strip club was in a manner that conformed with "local, state and federal laws," stating:

37

*We have developed comprehensive policies aimed at ensuring that the operation of each of our nightclubs is conducted in conformance with local, state and federal laws*. We have a "no tolerance" policy on illegal drug use in or around our facilities. *We continually monitor the actions of entertainers, waitresses and customers to ensure that proper behavior standards are met*. However, such policies, no matter how well designed and enforced, can provide only reasonable, not absolute, assurance that the policies' objectives are being achieved. Because of the inherent limitations in all control systems and policies, there can be no assurance that our policies will prevent deliberate acts by persons attempting to violate or circumvent them. *Notwithstanding the foregoing limitations, management believes that our policies are reasonably effective in achieving their purposes*.

102. The statements in ¶ 101 about the Company's "comprehensive" policies for ensuring its strip clubs were operating in "conformance with local, state and federal laws" were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because, at the time these representations were made, Defendants used the Company's strip clubs to facilitate the Tax Fraud Scheme. As detailed herein, Langan, Chhay, and others repeatedly bribed Plunkett through private dances and other benefits at RCI-owned strip clubs in Florida and New York. Accordingly, Defendants could not sincerely, and had no reasonable basis to, hold the opinion that RCI's policies were "reasonably effective."

103. In the RCI 10-Ks, RCI also identified risks related to various material weaknesses in its internal controls over financial reporting, as "[m]anagement, including our Chief Executive Officer and our Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting . . . and concluded that we did not maintain effective internal control over financial reporting." The RCI 10-Ks stated that the material weaknesses identified by management were limited in scope to the following:

a) 2020 10-K: "a material weakness in internal control related to the proper design and implementation of controls over our income tax provision, specifically over management's review of the income tax provision."

b) 2021 10-K: "a material weakness in internal control related to the proper design and implementation of controls over our estimates relating to the impairment of goodwill, indefinite-lived intangibles and long-lived assets, specifically over the precision of management's review of certain assumptions."

c) 2022 10-K: "a material weakness in internal control related to the proper design and implementation of controls over management's review of the Company's accounting for business combinations, specifically related to the identification of and accounting for, intangible assets acquired in a business combination."

d) 2023 10-K: "material weaknesses in internal control related to (1) proper design and implementation of controls over management's review of the Company's accounting for business combinations, specifically related to the identification of and accounting for, intangibles assets acquired in a business combination and over the precision of management's review of certain valuation assumptions; (2) the impairment of goodwill, indefinite-lived intangibles, and long-lived assets, specifically over the precision of management's review of certain assumptions; and (3) ineffective information technology general controls ("ITGCs") in the areas of user access and program change-management over certain information technology ("IT") systems that support the Company's financial reporting processes."

e) 2024 10-K: "material weaknesses in internal control related to (1) ineffective design and operation of controls over certain information technology general controls

39

("ITGCs"), including program change management, user access, and vendor management controls; (2) ineffective design and operation of controls, which include management review controls, over the accounting for business combinations; and (3) ineffective design and operation of controls, which include management review controls, over the Company's assessments of potential impairment."

104. The statements above in ¶ 103 were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because Defendants: (1) portrayed the internal controls weaknesses as confined to the material weaknesses discussed in ¶ 103, masking the true extent of the Company's internal controls failures; and (2) failed to disclose an additional, then-existing material weakness in the Company's internal controls over financial reporting—specifically, the now-admitted weakness in accounting for contingent liabilities, resulting from the failure of the Company's controls to detect or prevent the Tax Fraud Scheme, a known scheme perpetrated by Langan and Chhay.

**B.   Misleading Internal Controls Statements**

105. Under Item 9A. Controls and Procedures in the RCI 10-Ks, RCI stated that "[d]ue to a material weakness in internal control over financial reporting . . . management concluded that the Company's disclosure controls and procedures were not effective[.]"  The RCI 10-Ks each disclosed the material weaknesses discussed in ¶ 103 during their respective reporting periods. The RCI 10-Ks also similarly stated that "[m]anagement is committed to the remediation of the material weakness," with each 10-K establishing remediation efforts to correct RCI's material weaknesses in its internal controls, and that it was "our belief that these added controls will effectively remediate the existing material weakness."

106.    The RCI 10-Ks further stated that, other than the respective changes disclosed in each of the RCI 10-Ks, "there have been *no other changes* in our internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

107.    Similarly, the 2021 10-Qs stated that, other than the changes in RCI's internal controls disclosed in the 2020 10-K, there were "*no changes* in the Company's internal control over financial reporting that occurred . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 2022 10-Qs stated that, other than the changes in RCI's internal controls disclosed in the 2021 10-K and changes related to the acquisition of several gentlemen's clubs, "*there were no changes* in the Company's internal control over financial reporting that occurred . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 2023 10-Qs stated that, other than the changes in RCI's internal controls disclosed in the 2022 10-K, "*there were no changes* in the Company's internal control over financial reporting that occurred . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 2024 10-Qs stated that, other than the changes in RCI's internal controls disclosed in the 2023 10-K, "*there were no changes* in the Company's internal control over financial reporting that occurred . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  The 2025 10-Qs stated that, other than the changes in RCI's internal controls disclosed in the 2024 10-K, "*there were no changes* in the Company's internal control over financial reporting that occurred . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

41

108.   The statements in ¶¶ 105-107 about RCI's internal controls and Defendants' remedial measures to resolve the weaknesses were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because: (1) Defendants portrayed the internal controls weaknesses as confined to the deficiencies discussed in ¶ 103, masking the true extent of the Company's internal control failures; (2) Defendants failed to disclose an additional, then-existing material weakness in the Company's internal controls over financial reporting—specifically, the now-admitted weakness in accounting for contingent liabilities, resulting from the failure of the Company's controls to detect or prevent the Tax Fraud Scheme, a known scheme perpetrated by Langan and Chhay; and (3) despite assurances of implementing remedial measures, Defendants continued to conceal and exploit such material weakness to further the Tax Fraud Scheme.

### C.   Misleading Statements About Accounting Policies and Estimates

109.   Under Item 7. Critical Accounting Policies and Estimates, the RCI 10-Ks made a series of representations to investors about the integrity of its financial reporting.  Specifically, the Company represented that its financial statements had been "***prepared in accordance with accounting principles generally accepted in the United States (GAAP)***[,]" and that the preparation of its financial statements required management to make "assumptions and estimates about future events" and "apply judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities."  The Company further claimed that those estimates were "based on management's historical and industry experience and on various other assumptions that are believed to be reasonable under the circumstances."  RCI further stated that it "evaluate[d] these accounting policies, assumptions, estimates and judgments" on "a regular basis" "to ensure that our financial statements are presented fairly and in accordance with GAAP."

110. In Note 2. Summary of Significant Accounting Policies of the RCI 10-Ks, RCI stated that "[t]he accounts are maintained and the consolidated financial statements have been prepared using the accrual basis of accounting in accordance with [GAAP]."

111. The statements in ¶¶ 109 and 110 were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because, at the time they were made, Defendants knowingly failed to accrue at least $8 million in sales tax liabilities as a result of the Tax Fraud Scheme. Specifically, under New York tax laws, Dance Dollars and the associated surcharge constituted an "admission charge" to a "place of amusement" and were therefore subject to a combined tax rate of 8.875%. Accordingly, RCI's obligation to collect and remit sales tax arose by operation of law at the time of each transaction, leaving no uncertainty that RCI incurred a sales tax liability with each taxable sale. The favorable audit outcomes Defendants secured through the Tax Fraud Scheme did not extinguish the at least $8 million in sales tax that RCI owes on Dance Dollars. As a result, as detailed below in Section VI.C, RCI's financial statements were not prepared on an accrual basis that conformed with GAAP.

112. Also, in Note 2. Summary of Significant Accounting Policies of the RCI 10-Ks for fiscal years 2020 through 2023[7], the Company described its revenue recognition policy, claiming RCI's collection and payment of sales tax was consistent with GAAP, stating in relevant part:

> The Company recognizes revenue from the sale of alcoholic beverages, food and merchandise, service and other revenues at the point-of-sale upon receipt of cash, check, or credit card charge, net of discounts and promotional allowances based on consideration specified in implied contracts with customers. **Sales and liquor taxes collected from customers and remitted to governmental authorities are presented on a net basis in the accompanying consolidated statements of operations**. The Company recognizes

---

[7] The 2023 10-K is substantively identical in all material respects but states that sales and liquor taxes are presented on a net basis in the "accompanying consolidated statements of income."

revenue when it satisfies a performance obligation (point in time of sale) by transferring control over a product or service to a customer.

113.    Although RCI's 2024 10-K updated its disclosures regarding revenue recognition, RCI's disclosures related to sales tax remained unchanged:

> The Company recognizes revenue from the sale of alcoholic beverages, food and merchandise, service (which include cover charges, dance dollar surcharges, membership fees, and facility use fees, among others), and other revenues (which include commissions from vending and ATM machines, real estate rental, valet parking, and other products and services for both nightclub and restaurant/sports bar operations, among others) at the point-of-sale upon receipt of cash, check, or credit card charge, net of discounts and promotional allowances based on consideration specified in implied contracts with customers. ***Sales and liquor taxes collected from customers and remitted to governmental authorities are presented on a net basis in the accompanying consolidated statements of income***. The Company recognizes revenue when it satisfies a performance obligation (point in time of sale) by transferring control over a product or service to a customer.

114.    The statements in ¶¶ 112 and 113 were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because RCI's reported revenue included sales tax that RCI was not entitled to retain as a result of the Tax Fraud Scheme. Specifically, Defendants' failure to collect sales tax on the sale of Dance Dollars and the associated service surcharge did not relieve RCI of its obligation to remit the tax to the taxing authorities. Because RCI did not collect sales tax from its customers, it was required to pay the New York combined sales tax rate of 8.875% from its own receipts.  Accordingly, as detailed below in Section VI.B, Defendants' improperly recognized revenue in violation of GAAP.

### D.    Misleading SOX Certifications

115.    Pursuant to SOX, Langan and Chhay executed certifications in connection with RCI's 10-Ks and 10-Qs, attesting that the respective reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light

of the circumstances under which such statements were made," and that financial statements, and other financial information included in each such report, "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." Langan and Chhay also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [our] supervision," and had disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal year that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." Langan and Chhay further attested that they had disclosed to RCI's independent registered public accounting firm and audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

116.    The statements in ¶ 115 were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because: (1) Defendants failed to disclose an additional distinct existing material weakness in the Company's internal controls over financial reporting—specifically, the now-admitted weakness in accounting for contingent liabilities resulting from the failure of the Company's controls to detect or prevent the Tax Fraud Scheme, a known scheme perpetrated by Langan and Chhay; (2) in light of Langan and Chhay participating in the Tax Fraud Scheme, they were aware of and failed to disclose a material fraud that directly involved management; (3) these certifications contained numerous materially false and misleading statements and omissions, and (4) Defendants knew that the financial statements did not fairly and accurately reflect RCI's financial condition.

45

### E.      RCI's Misleading Code of Ethics

117.      The RCI 10-Ks also adopted the Company's Code of Ethics, which applies to "Principal Executive and Senior Financial Officers."  RCI's Code of Ethics states the following, in relevant part:

> Each Officer shall adhere to and advocate the following principles and responsibilities governing professional and ethical conduct:
>
> 1. Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.
>
> 2. *Provide information that is full, fair, accurate, complete, objective, relevant, timely, and understandable to the Company's Board of Directors, the Securities and Exchange Commission, the Company's stockholders, and the public*.
>
> 3. *Comply with applicable governmental laws, rules, and regulations*.
>
> 4. *Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing your independent judgment to be subordinated*.
>
> 5. Take all reasonable measures to protect the confidentiality of non-public information about the Company acquired in the course of your work except when authorized or otherwise legally obligated to disclose such information and to not use such confidential information for personal advantage.
>
> 6. Assure responsible use of and control over all assets and resources employed or entrusted to you.
>
> 7. Promptly report to the Chairman of the Audit Committee:
>
> a. *any information you may have regarding any violation of this Code*;
>
> b. any actual or apparent conflict of interest between personal and/or professional relationships involving management or any other employee with a role in financial reporting disclosures or internal controls;

46

c. *any information you might have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and its operations*;

d. *significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data*; or

e. *any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls*.

118.    The statements in ¶ 117 about RCI's Code of Ethics were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because of Langan's and Chhay's direct participation in the Tax Fraud Scheme.  Specifically, Langan and Chhay: (1) did not provide information that was "full, fair, accurate, complete, objective, relevant, timely, and understandable" to the Board, the SEC, or investors; (2) violated governmental laws, rules, and regulations; (3) failed to act "in good faith responsibly, with due care, competence and diligence" and misrepresented material facts described herein;  and (4) concealed (i) violations of RCI's Code of Ethics, (ii) evidence of material violations of securities laws and other laws, rules or regulations applicable to RCI's strip clubs operations, (iii) a significant material weakness in RCI's internal controls, and (iv) fraud that involved RCI's management.

F.    **Misleading Statements During RCI Earnings Calls**

119.    On May 9, 2022, RCI held an earnings call in connection with its financial results for the second quarter of fiscal year 2022, during which an attendee asked about the Company's internal controls weaknesses, stating:

> [S]o[,] I've done some reading of the past few Ks, past few Qs, I see some chatter here about this material weakness that I believe originated in 2020.  It was discussed in the K that there would be provisions put in place and they used the wording saying that something along the lines of, I'm paraphrasing here, that we believe this will get resolved sometime soon.  And I see that it's popped up in your most recent Q.  So, could you possibly give us some

additional color on what that revolves around and sort of how the process is on correcting that issue?

120. In response, Chhay stated the following:

Yes. So, it started off, as you say, in 2020, we took a stance and our auditors took a stance on it. And at that time, Congress and IRS couldn't agree on whether the PPP should be deemed as a discrete item or a non-discrete item, whether it should be counted as forgiveness item or not. So[,] that being said, it was just a material weakness on difference of opinion. And then as you fast forward it, we had another material weakness because we have to make an adjustment to our tax provision entry. All of these are just noncash estimates that come up as accrual entries. ***So, I mean we have instilled more of a review process. We have hired more CPAs, and we're going to be doing a lot more reviews with a fine-tooth comb***.

121. On February 8, 2024, RCI held an earnings call in connection with its financial results for the first quarter of fiscal year 2024. During the call an attendee asked RCI to explain the "warnings in the 10-Qs and 10-Ks over the years about internal controls." In response, Langan stated:

Yes, sure. If you noticed, they continuously change, right. ***It's like our auditors are continually trying to find some new material weakness every single year***. And typically, when they're found, whether by us, whether by our internal third-party independent auditors or by the auditing companies or by auditors ourselves, ***we immediately make changes and adjust and correct them***.

\* \* \* \*

***I will say that none of the weaknesses they've ever found have ever caused restatement of financials, they've never found any fraud or anything like that***.

\* \* \* \*

And as a growing company in the beginning, it was software, as our software—our software didn't—did we put an ERP system in. We corrected the majority of those what ifs with our other stuff. I mean, at the end of the day, you have to have somebody in IT that's responsible for monitoring the system, keeping the system up and alive, running the backups. That's a very high paid employee who has to have that access. And just like the company has to have a CEO that has the ability to make certain decisions and whatnot.

48

And so basically, what they say with our IT stuff, I think, is basically is—basically one guy had powers to change and do things and where was the check system on him.  And I think we've resolved all of that now through notifications to certain people if things are changed and whatnot, *but you don't know what you don't know until they come in and say, "Oh, this is could* [sic] *happen or this could happen*." Even though it's never happened, obviously once it happens, we've always taken, or anything has ever happened, we've always been able to fix and adjust the system.  *But we can't think of every little detail and every little thing constantly that could happen when it does never happen or has never happened, or hasn't even happened to somebody else*.  So[,] those are the things we deal with, and we just keep working on that.

122.    The statements in ¶¶ 120-21 about RCI's internal controls and Defendants' remedial measures to resolve the weaknesses were materially false and/or misleading or omitted material facts necessary to make such statements not misleading because Defendants: (1) masked the true extent of the Company's internal controls failures; (2) failed to disclose an additional, then-existing material weakness in the Company's internal controls over financial reporting—including the now-admitted weakness in accounting for contingent liabilities resulting from the failure of the Company's controls to detect or prevent the Tax Fraud Scheme, a known scheme perpetrated by Langan and Chhay; and (3) despite assurances of implementing remedial measures, they continued to concealed and exploit the material weakness to perpetuate the Tax Fraud Scheme.

123.    On August 8, 2024, RCI held an earnings call in connection with its financial results for the third quarter of fiscal year 2024, during which an attended asked about *The Bear Cave* article and if RCI could "comment on any of this BS stuff that they were trying to make it seem like you guys were like up to no good with whatever that police thing was about."  In response, Langan stated, "I cannot make any comments on [] any type of ongoing investigation . . . .  But there are disclosures in the 10-Q if you want to see," while assuring investors that "*you'll see that [Edwin Dorsey] was a little off base on accusations [] he made*."

49

124.     The statement in ¶ 123 asserting that Edwin Dorsey's accusations were "a little off base" was materially false and/or misleading or omitted material facts necessary to make such statements not misleading, because: (1) Defendants continued to downplay the severity and scope of the Tax Fraud Scheme; and (2) Defendants' possessed additional information supporting the veracity of *The Bear Cave* article and Edwin Dorsey's related reporting.

### G.     Item 303 Requirements

125.     In addition to the materially false and misleading statements and omissions identified above, Defendants violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable and unfavorable impact on the sales or revenues or income from continuing operations."

126.     In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
> * * *
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

127.     Further, the 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

50

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

128.    Item 303 required RCI's 10-Ks and 10-Qs issued during the Class Period to disclose the involvement of the Company and its senior executives in the Tax Fraud Scheme. Defendants' failure to disclose the Tax Fraud Scheme violated Item 303 because these activities represented known trends and uncertainties that were likely to and did have a material negative impact on the Company's business and financial results.

## VI.    DEFENDANTS' GAAP VIOLATIONS AND MISLEADING FINANCIAL STATEMENTS

### A.    General GAAP and Accounting Provisions

129.    GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB"). In 2009, the FASB announced the launch of its Accounting Standards Codification ("ASC"), declaring it to be "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." The FASB has also established its Statement of Financial Accounting Concept No. 8 "Conceptual Framework for Financial Reporting" ("Concept Statement 8") (superseding the previous FASB Accounting Concept Nos. 1 & 2) that sets forth, among other things, accounting principles and assumptions that guide

51

recognition, de-recognition, and disclosure, as well as the classification and presentation of information in financial statements.

130.   As a domestic issuer, RCI was required to prepare its financial statements in accordance with GAAP, as codified in the ASC.  That obligation is established by Rule 4-01(a)(1) of Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which provides that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  Additionally, the SEC's *Staff Accounting Bulletin No. 99 – Materiality* ("SAB No. 99") provides several considerations "that may well render material a quantitatively small misstatement of a financial statement item," including: (1) "whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate"; (2) "whether the misstatement affects the registrant's compliance with regulatory requirements"; and (3) "whether the misstatement involves concealment of an unlawful transaction."

131.   The GAAP provisions violated by Defendants, discussed in detail below, were not new or untested provisions of GAAP and did not involve complex accounting issues.  Defendants failed to accrue RCI's sales tax obligations with respect to the NYC Strip Clubs and caused RCI's revenue, net income, assets, and stockholders' equity to be materially overstated and its liabilities to be materially understated in the materially misleading financial statements included in the RCI 10-Ks and 10-Qs at each reporting period during the Class Period.

**B.      Defendants' GAAP Violations and Materially Overstated Revenue**

132.   Defendants improperly recognized revenue on the sale of Dance Dollars and the related service surcharge.  ASC Topic 606 *Revenue from Contracts with Customers*, requires that recognized revenue depict the transfer of promised goods or services to customers in an amount

that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. *See* 606-10-05-3. More specifically, ASC 606-10-32-2 states:

> An entity shall consider the terms of the contract and its customary business practices to determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties (for example, some sales taxes). The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both.

133. During the Class Period, Defendants asserted that its revenue recognition practices, including RCI's collection and payment of sales tax, were consistent with GAAP. Specifically, RCI's 10-Ks stated that "Sales and liquor taxes collected from customers and remitted to governmental authorities are presented on a net basis in the accompanying consolidated" financial statements.

134. According to the indictment, RCI failed to collect sales tax on the sale of Dance Dollars and on the 20–25% service charge it imposed. But RCI's failure to collect such sales tax from its customers did not relieve it of its obligation to remit the tax to the taxing authorities. Instead, because the sales tax was not separately collected from customers, RCI was required to pay the applicable 8.875% New York sales tax rate—including the New York City, New York State, and Metropolitan Commuter Transportation District components—from its own receipts. Thus, the uncollected sales tax reduced the net revenue RCI was entitled to retain and resulted in RCI improperly recognizing revenue in violation of GAAP. Accordingly, in RCI's 10-Ks and 10-Qs at each reporting period during the Class Period, RCI materially overstated its revenue as a result of the Tax Fraud Scheme.

C.    **Defendants' GAAP Violations and Material Understatement of Accrued Liabilities**

135.    Defendants failed to accrue RCI's sales tax labilities with respect to Dance Dollars and the related service surcharge in violation of GAAP. FASB Concepts Statement No. 8 explains that accrual accounting:

> [A]ttempts to record the financial effects on an entity of transactions and other events and circumstances in the periods in which those transactions, events, and circumstances occur. *Accrual accounting thus provides information about an entity's assets and liabilities and changes in them that cannot be obtained by accounting for only cash receipts and outlays*. Accrual accounting includes using accrual, deferral, and allocation procedures, the result of which is the recognition of revenues, expenses, gains, and losses in periods that depict an entity's performance during a period instead of merely listing its cash receipts and outlays.

136.    RCI's obligation to collect and remit sales tax arose by operation of law at the time of each sale, leaving no uncertainty that RCI incurred a sales tax liability with each taxable sale. RCI thus incurred liability as each taxable sale occurred and continued to owe it. The favorable audit outcomes Defendants obtained through the Tax Fraud Scheme did not extinguish the at least $8 million in sales tax owed on Dance Dollars and the related service surcharges.

137.    Moreover, these sales tax liabilities were capable of precise measurement and did not depend on estimates. RCI was required to remit the applicable combined 8.875% New York sales tax rate—including the New York State, New York City, and Metropolitan Commuter Transportation District components—from sales to customers, whether collected from customers or not. In fact, the Indictment makes clear that Defendants did measure RCI's sales tax liabilities associated with the NYC strip clubs, but then ultimately settled RCI's obligations for reduced amounts as part of the Tax Fraud Scheme. For example, in 2018, Langan expressed the need to talk to Anakar about "New York and dance dollars" and measured that RCI was "going to be hit by 3m in sales taxes soon." Then, in 2023, the DTF Auditor informed Defendants that RCI owed

54

$200,000 in sales taxes related to an audit of Vivid Cabaret, which was later fraudulently settled for $47,000. Chhay's June 13, 2023 email is evidence of this:

> Let me know what you think. Its still in audit under that guys purview. ***Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k***. Once this is done 37th street [Vivid Cabaret New York] should be out of the way for a while if we can get him to write us in the good guys bucket list. [all typographical errors appear in original]

138.    RCI was therefore required to accrue these liabilities but failed to do so in violation of GAAP. Accordingly, in RCI's 10-Ks and 10-Qs at each reporting period during the Class Period, RCI materially understated its accrued sales tax liabilities as a result of the Tax Fraud Scheme.

### D.    Defendants' GAAP Violations Related to Recorded Expenses

139.    Defendants improperly recording of illegal bribes to Plunkett as "promotional expenses" in RCI's financial statements violated GAAP and SEC Rule 13(b)2-1, 17 CFR § 240.13b2-1. GAAP requires that financial information faithfully represents the transaction it purports to depict. Specifically, FASB's Concepts Statement 8, ¶ QC12 states that:

> Financial reports represent economic phenomena in words and numbers. ***To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent***. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error. Of course, perfection is seldom, if ever, achievable. The Board's objective is to maximize those qualities to the extent possible.

140.    SEC Rule 13(b)2-1 further provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." Section 13(b)(2)(A), in turn, requires issuers such as RCI to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect their transactions.

141.    Defendants violated these requirements by recording illegal bribes as advertising and marketing expenses in its quarterly and annual reports during the Class Period, which, according to RCI's 10-Ks, include "promotional expenses."  As set forth in SAB No. 99, even if such inaccurate recording of promotional expenses represented a quantitatively small misstatement, it was nonetheless material because it involved the "concealment of an unlawful transaction."  It was Defendants' common practice to record the bribes paid to Plunkett as promotional expenses within that line item.  For example, on October 6, 2023, Langan approved Winata's request that RCI reimburse him for costs incurred in connection with bribing Plunkett between September 26 and September 29, 2023.  Langan approved a similar reimbursement on January 10, 2024, related to Winata bribing Plunkett from December 12 through December 15, 2023.  At a minimum, RCI's 2024 10-K and quarterly report for the period ended December 31, 2023 (Q1 2024 10-Q) improperly recorded bribes as advertising and marketing expenses.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

142.    As alleged herein, Defendants acted with scienter in that they: (i) knew or recklessly disregarded that their public documents and statements issued or disseminated were materially false and misleading; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As described in detail above, the Individual Defendants, by virtue of their receipt of information reflecting the true facts about RCI, their control over and/or receipt and/or modification of RCI's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning RCI, participated in the fraudulent scheme and knew of the materially adverse facts alleged herein.

A.      Defendants' Participation in and Concealment of the Tax Fraud Scheme

143.    Defendants' direct roles in the Tax Fraud Scheme confirm their scienter of the adverse facts detailed herein.  As described in the Indictment and above in Section IV.C, Langan and Chhay did not simply fail to detect the illegal Tax Fraud Scheme—they personally facilitated it.  Both of the Individual Defendants held senior positions at RCI with responsibility for directing and managing the Company's business, regulatory and compliance activities, and/or financial functions, among other aspects of RCI operations directly implicated in the Tax Fraud Scheme, and both Langan and Chhay are defendants in the Indictment, as well as RCI.

144.    Langan and Chhay orchestrated the scheme to provide Plunkett with repeated bribes, including complimentary hotel stays, restaurant meals, and up to several thousands of dollars' worth of private dances per day at RCI's strip clubs.  Specifically, in furtherance of the Tax Fraud Scheme, Langan and Chhay directed Winata to travel on multiple occasions to both Florida and New York to provide these bribes to Plunkett.  Langan also ensured that RCI employees and managers provided Winata with cash and Dance Dollars to give to the DTF Auditor. To conceal the Tax Fraud Scheme, Defendants falsified business records of the NYC Strip Clubs and RCI strip clubs in Florida to record the bribe payments as promotional expenses.

145.    The Indictment makes clear that Langan and Chhay together orchestrated the Tax Fraud Scheme.   The Indictment asserts, for example, that Langan and Chhay had direct involvement in the fraudulent 2023 audit settlement of Vivid Cabaret.  The groundwork of this fraudulent audit settlement began to be laid on June 13, 2023, when Chhay communicated to Langan and Anakar that the "New York sales tax [] Auditor asked to meet in FL to discuss audit result."  The Indictment asserts that, in response, Langan immediately called Chhay.  Less than an hour later, Chhay emailed Anakar, noting that RCI's sales tax liability was approximately $200,000, and that the target was to "land at 70k" in settlement.  In that email, Chhay explained

57

that "once this is done 37th street [Vivid Cabaret] should be out of the way for a while if we can get him to write us in the good guys bucket list."  These efforts succeed, as Chhay's September 1, 2023 text to Langan and Anakar boasted that "Tim got him to $47k in Vivid New York," while also noting that Winata "owes" Plunkett "a couple of trips."

146.    **Langan:** As RCI's CEO, Langan was the ultimate head of the Company's Tax Fraud Scheme.  As evidenced by Defendants' internal communications revealed in the Indictment, Langan knew that Dance Dollars were subject to sales tax and that the purpose of the Tax Fraud Scheme was to avoid that tax liability.  This is most clearly demonstrated by Langan's acknowledgement in April 2018 that RCI would be "hit by $3m in sales tax soon," and his subsequent text to Anakar just days later, stating, "I think I got the sales taxes in New York to 350 plus interest possibly.  Tim is discussing with the auditor tonight ;)[.]"  Langan's involvement and understanding of the Tax Fraud Scheme's purpose are also elucidated by his October 2018 response to Winata's proposal to "increase the price of dance dollars to cover sales tax," to which Langan plainly responded: "We can't Tim.  *We need to change the way we book this shit.  So[,] we only book the Net and not all of the dance dollars*."

147.    Langan backed up these words with overt acts in support of the Tax Fraud Scheme.  Indeed, only months later, on December 4, 2018, Langan signed the Statement of Proposed Audit Change for Sales and Use Tax to fraudulently settle a Vivid Cabaret New York audit for $838,888.82.

148.    Langan's direct approval of the bribes paid to Plunkett, which were ultimately booked as promotional expenses, further establish that he acted with scienter.  For example:

58

a) April 12, 2018: After Kevlin informed Langan that Winata's "guest [Plunkett] would like another $1500," Langan approved the bribing of Plunkett, texting Kevlin, "That's fine.  Go ahead."

b) February 13, 2019: Winata relayed to Langan that Plunkett asked for another trip to Florida.  Langan responded: "Whatever you think is fine."

c) October 6, 2023 and January 10, 2024: Langan emailed Winata "[a]pproved," authorizing RCI to reimburse Winata for expenses incurred as a result of bribing Plunkett on two separate occasions in September 2023 and December 2023.

149.    **Chhay:** As RCI's CFO since September 2020, Chhay had direct oversight and responsibility for RCI's accounting, financial planning, internal auditing, corporate risk, and investor disclosures.  Nonetheless, he facilitated the Tax Fraud Scheme.  In addition to Chhay's internal communications about the 2023 audit of Vivid Cabaret described above, he signed the corresponding Statement of Proposed Audit Change for Sales and Use Tax, thereby settling the audit for $47,342.92.  Likewise, Chhay signed a Statement of Proposed Audit Change for Sales and Use Tax on January 18, 2022, settling a Hoops Cabaret audit for $200,773.91.

### B.    Resignations of Langan and Chhay

150.    Langan and Chhay abruptly and suspiciously resigning from their respective positions with RCI in the wake of the Indictment reinforces an already-compelling inference of scienter.  Their resignations followed only about two months after they were named in the Indictment, which extensively detailed Langan's and Chhay's direct involvement in the Tax Fraud Scheme.  RCI acknowledged that the resignations were a result of the Indictment.  Specifically, under Note 11. Commitments and Contingencies of the 2025 10-K, RCI's description of Indictment and "Related Matters" highlights that "the board of directors convened and approved a resolution for Eric Langan and Bradley Chhay to step down as CEO and CFO of the Company,

respectively, effective November 28, 2025." There were no signs that Langan's and Chhay's departures were previously planned. The circumstances surrounding these resignations are only compatible with a determination that Langan and Chhay acted with scienter.

### C. Witnesses Confirm RCI's Tax Fraud Practices and Executives' Direct Involvement at Strip Clubs

151. While Defendants' internal communications and overt acts described in the Indictment are sufficient on their own to establish scienter, the witness accounts detailed in Section IV.D above provide additional factual support for the falsity of Defendants' material misstatements and omissions, further reinforcing that inference.

152. Accounts from former employees and independent contractors of RCI's strip clubs confirm that the Company's failure to collect and pay sales taxes on Dance Dollars was not isolated to the NYC Strip Clubs but reflected a broader practice across multiple clubs within RCI's portfolio. Because these witnesses include former managers and performers—who were tipped in Dance Dollars—they were well positioned to know that RCI's strip clubs were not collecting sales tax on those transactions. As detailed in Section IV.D above, FE 2, a former Hospitality Manager in Texas, explained RCI did not pay taxes on Dance Dollars since RCI did not charge the customers sales tax on them, confirming that RCI "didn't charge any type of tax on Dance Dollars." FE 1, a former Hospitality Professional, also explained that some of the performers kept their own records of Dance Dollars, and the numbers that RCI provided were significantly lower than their personal recorded numbers. She further stated, "We all suspected, including an agency the performers spoke to, that there is some tax fraud going on there with the Dance Dollars."

153. The witness accounts confirm that RCI's executives and high-level employees, including Langan and Anakar, were intimately involved in the strip club's operations and had access to detailed information about the accounting of Dance Dollars sales. For example, FE 3

60

described Anakar as a micro manager, stating, "We had to go through Ed [Anakar] for any type of decision to be made."  FE 3 further noted that Club Tracks, the RCI Portal, would record cover charges, alcohol purchased, and the amount of Dance Dollars bought and spent, and that she would input the sales for the night, among other things, with the report going directly to Langan and Anakar.  FE 3 also explained that Anakar would attend the "monthly Zoom meetings with the managers from each club, roughly 70, on the second Tuesday of each month."  FE 3 also confirmed that both Anakar and Langan would visit all the clubs every other month or every three months, with some visits lasting a week.  Similarly, FE 2 explained that RCI executives were "hands on" with every strip club, explaining that Langan had monthly conference calls with each strip club's management to discuss trends and strategies.

### D.     Individual Defendants' SOX Certifications

154.    In connection with RCI's public financial statements filed with the SEC during the Class Period, Langan and Chhay executed certifications pursuant to SOX, attesting that the respective reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made," and that financial statements, and other financial information included in each such report, "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

155.    Langan and Chhay also attested that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [our] supervision," and had disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal year that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting."  Langan and Chhay further attested that they had disclosed to RCI's independent

61

registered public accounting firm and audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud . . . that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

156.    Despite Langan's and Chhay's SOX certifications, they knowingly concealed an additional material weakness throughout the Class Period.  Langan and Chhay leveraged this weakness to perpetuate the Tax Fraud Scheme, exposing RCI to heightened legal and reputational risk, materially understating accrued liabilities, and causing further inaccuracies in the Company's financial statements.  Accordingly, these certifications provide additional evidence of scienter.

### E.    SEC Investigation

157.    The SEC's initiation of an investigation into RCI concerning the Tax Fraud Scheme, to determine whether U.S. federal securities laws were violated, further supports that Defendants acted with scienter.  As RCI disclosed in its Q3 2025 10-Q, in May 2025, the SEC subpoenaed RCI requesting "certain documents and information related to the NY AG investigation and NY DTF issues."  At the time, RCI explained that it was cooperating with the SEC investigation.

## VIII.   LOSS CAUSATION

158.    During the Class Period, shares of RCI's publicly traded securities traded on the NASDAQ.  The market for shares of RCI's securities was open, well-developed, and efficient at all relevant times.

159.    Throughout the Class Period, the price of RCI's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of RCI securities, by failing to disclose and misrepresenting the adverse facts detailed herein.  These material misstatements and omissions

62

had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiffs and the other members of the Class purchasing the company's securities at artificially inflated prices.

160.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, beginning on May 30, 2024, the price of RCI securities fell, as the prior artificial inflation came out.  As a result of their purchases of RCI securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of RCI's business.  Defendants' false and misleading statements had the intended effect and caused RCI's securities to trade at artificially inflated levels throughout the Class Period.

161.    The first corrective disclosure proximately related to Defendants' misrepresentations occurred during regular trading hours on May 30, 2024.  That day, *The Bear Cave* revealed that "The Bear Cave believes Rick's New York City club was raided last night, as well as potentially other RCI Hospitality locations."  While providing photo evidence, the article stated that "numerous law enforcement agents were both outside and within public view inside of Rick's property, although there did not appear to be any emergency or emergency vehicles in the area."  On this news, the Company's stock price fell 5.8%, from a closing price of $45.68 per share on May 29, 2024, to a closing price of $43.01 per share on May 30, 2024.  This price decline

63

occurred as RCI common stock traded on extremely high volume of over 600,000 shares traded on May 30, 2024.

162.    News outlets directly attributed the stock price decline to *The Bear Cave*'s reporting.  For example, media outlet Benzinga published an article titled "RCI Hospitality Shares Swing Wildly Following Raid Allegations From Short Report: What Investors Should Know."  In detailing *The Bear Cave*'s reporting, the article highlighted that "[s]hares of RCI Hospitality Holdings [] fell on Thursday . . . on above average volume.  The increase in trading comes with allegations shared by Bear Cave Research's Edwin Dorsey."

163.    However, the May 30, 2024 disclosure was insufficient on its own to fully remove the artificial inflation from RCI's securities, as such disclosure only partially revealed the facts that Defendants had concealed from investors.  The corrective impact of the May 30, 2024 disclosure alleged herein was tempered by Defendants' continued misstatements and omissions related to the Tax Fraud Scheme.  The misrepresentations that followed, alleged herein, inflated and maintained the price of RCI securities at levels that were artificially inflated, inducing members of the Class to continue purchasing RCI securities even after the truth began to partially enter the market.

164.    On September 16, 2025, during regular trading hours, at approximately 3:30 P.M. EST, the Office of the New York Attorney General announced and unsealed the Indictment of RCI, Langan, Chhay, and others, as the press release asserted that: (a) "RCI executives bribed an auditor with the New York Department of Taxation and Finance (DTF) to avoid paying over $8 million in sales taxes to New York City and the state from 2010 to 2024"; (b) "The trips and bribes were authorized, directed, and overseen by Eric Langan, RCI's president and Chief Executive Officer, Bradley Chhay, RCI's Chief Financial Officer, Ahmed Anakar, RCI's Director of Operations, and

64

Shaun Kevlin, a Regional Manager for RCI's New York City strip clubs and later RCI's Assistant Director of Nightclub Operations; and (c) "The defendants also falsified the business records of RCI strip clubs to conceal their crimes and recorded the cash payments used to bribe the auditor as 'promotional' expenses for the clubs."

165.    On this news, RCI common stock fell $5.53 per share, or 16%, from a closing price of $34.32 per share on September 15, 2025, to a closing price of $28.79 per share on September 16, 2025.  This price decline occurred as RCI common stock traded on extremely high volume of over 1.6 million shares traded on September 16, 2025.

166.    News outlets cited the announcement of the Indictment in explaining RCI's share price decline.  For example, on September 16, 2025, *CNBC* published an article that stated "RCI shares dropped nearly 17% in late afternoon trading after the 79-count indictment alleging conspiracy, bribery, criminal tax fraud, and other charges was announced."  Similarly, an *Investing.com* article stated that "[s]hares of RCI [] are trading sharply lower late on Tuesday, after New York Attorney General Letitia James announced indictments of top executives for their roles in a multimillion-dollar criminal tax fraud and bribery scheme."  *Seeking Alpha* published an article noting that "[a]s a result of the indictments, RCI . . . shares fell as much as 16% during Tuesday's regular session, falling to their lowest level in more than 5 years.  The stock continues to decline in after-hours trading, currently down another 4.5%."

167.    That same day, after markets closed, RCI issued a press release acknowledging that "RCI, two executives, three employees, and three clubs were indicted today in New York on state charges alleging non-payment of sales taxes and bribery of a state sales tax auditor."

168.    As the press release announcing the Indictment was issued approximately thirty minutes before the closing of markets on September 16, 2025, and the Company addressed the

Indictment during post-market hours, RCI common stock declined further the following day as investors continued to digest and react to the news.  On September 17, 2025, RCI common stock fell an additional $2.99 per share, or 10%, to close at a price of $25.80 per share on September 17, 2025.  This price decline occurred as RCI common stock traded on extremely high volume of over 1.9 million shares traded on September 17, 2025.

169.    News outlets again attributed the Company's decline in share price to the Indictment. The *Houston Business Journal*, for example, published an article titled "RCI Hospitality Executives Indicted in Multimillion-dollar Tax Fraud and Bribery Scheme."  In detailing the nature of the Indictment, the article further explained that, "[f]ollowing the news, RCI . . . stock fell sharply and has continued to dip since then.  At just after 2 p.m. Sept. 17, it was trading around $26 per share, down about 9.7% from the closing price the day before."

170.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiffs and the Class.

171.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market.  This artificially inflated the prices of RCI's securities and operated as a fraud or deceit on the Class.  When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of RCI's securities fell precipitously as the prior artificial inflation came out of the price.

## IX.    PRESUMPTION OF RELIANCE

172.    At all relevant times, the market for the Company's securities was an open, efficient, and well-developed market for the following reasons, among others:

       a)    RCI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

66

b)      As a regulated issuer, RCI filed periodic reports with the SEC and the NASDAQ;

c)      RCI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)      RCI was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace.

173.    As a result of the foregoing, the market for RCI's securities reasonably and promptly digested current information about the Company from all publicly available sources and reflected such information in the price of the Company's securities.  All investors who purchased the Company's securities during the Class Period suffered similar injury through their purchase of RCI's securities at artificially inflated prices, and a presumption of reliance applies.

174.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding RCI's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making

67

investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

175.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  To the extent any of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

176.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of RCI who knew that such statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

177.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise acquired publicly traded RCI securities between December 15, 2020 and

68

September 16, 2025, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of RCI at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

178.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RCI's shares were actively traded on the NASDAQ, an open and efficient market, under the symbol "RICK." As of May 22, 2026, the Company had more than 7 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

179.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

180.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

181.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

69

a)     whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of RCI;

d)     whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of RCI;

e)     whether the market price of RCI securities during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)     the extent to which the members of the Class have sustained damages and the proper measure of damages.

182.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## XII.    CLAIMS FOR RELIEF

### <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants**

183. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

184. Defendants violated Rule 10b-5(b) ("misstatement and omission" liability) and Rule 10b-5(a) and (c) ("scheme" liability under *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71 (2019)). During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of RCI securities; and (c) cause Plaintiffs and other members of the Class to purchase RCI securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took actions set forth herein.

185. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for RCI securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

186. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about RCI's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of RCI's

71

business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about RCI and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

187.   Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (a) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (b) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (c) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (d) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

188.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the

72

purpose and effect of concealing RCI's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

189.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of RCI securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and the other members of the Class purchased RCI securities during the Class Period at artificially inflated prices and were damaged thereby.

190.   At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that RCI was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their RCI securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

191.　By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

192.　As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

193.　Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

194.　The Individual Defendants acted as controlling persons of RCI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

195.　In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

196. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII. PRAYER FOR RELIEF

197. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIV. JURY DEMAND

198. Lead Plaintiffs demand a trial by jury.

75

Dated: June 12, 2026

Respectfully submitted,

**AJAMIE LLP**

By: */s/ Thomas R. Ajamie*
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 1600
Houston, TX 77002
Tel.: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
Nicholas Corso (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
ncorso@saxenawhite.com

Marco A. Dueñas (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 200-3263
Fax: (888) 631-3611
mduenas@saxenawhite.com

*Counsel for Lead Plaintiffs, and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.


*/s/ Thomas R. Ajamie*
Thomas R. Ajamie

77