# Exhibit 1

# *In re Alta Mesa Res., Inc. Sec. Litig.*

United States District Court for the Southern District of Texas, Houston Division

August 12, 2024, Decided; August 12, 2024, Filed, Entered

CIVIL ACTION NO. 4:19-CV-957

**Reporter**
2024 U.S. Dist. LEXIS 142669 *; 2024 WL 3760481

IN RE ALTA MESA RESOURCES, INC. SECURITIES LITIGATION

**Prior History:** *In re Alta Mesa Res., Inc. Sec. Litig., 676 F. Supp. 3d 485, 2023 U.S. Dist. LEXIS 98907 (S.D. Tex., June 7, 2023)*

**Counsel:** **[*1]** For Camelot Event Driven Fund, A Series of Frank Funds Trust, Plaintiff: David Schwartz, Ira A Schochet, Jonathan Gardner, LEAD ATTORNEYS, Alec Coquin, Christopher J Keller, David Saldamando, Francis P McConville, Labaton Sucharow LLP, New York, NY; John Saul Edwards, Jr, Ajamie LLP, Pennzoil Place - South Tower, Houston, TX; Thomas Robert Ajamie, Ajamie LLP, Houston, TX.

For FNY Partners Fund LP, Plaintiff: Andrew J. Entwistle, LEAD ATTORNEY, Entwistle & Cappucci LLP, Austin, TX; Andrew M Sher, Joshua K Porter, Entwistle Cappucci LLP, New York, NY; Brendan Brodeur, Robert N Cappucci, Entwistle & Cappucci LLP, New York, NY; Callie Danielle Crispin, Entwistle & Cappucci, Austin, TX.

For FNY Managed Accounts, LLC, Plaintiff: Andrew J. Entwistle, LEAD ATTORNEY, Entwistle & Cappucci LLP, Austin, TX; Brendan Brodeur, Robert N Cappucci, Entwistle & Cappucci LLP, New York, NY; Callie Danielle Crispin, Entwistle & Cappucci, Austin, TX.

For Paul J. Burbach, Jr., Plaintiff: Andrew J. Entwistle, LEAD ATTORNEY, Entwistle & Cappucci LLP, Austin, TX; Brendan Brodeur, Entwistle & Cappucci LLP, New York, NY; Callie Danielle Crispin, Entwistle & Cappucci, Austin, TX.

For Plumbers and Pipefitters National **[*2]** Pension Fund, Individually and on behalf of all others similarly situated, Consol Plaintiff: David Avi Rosenfeld, Vincent Michael Serra, LEAD ATTORNEYS, Robbins Geller et al, Melville, NY; Lonnie A Browne, LEAD ATTORNEY, Robbns Geller Rudman Dowd LLP, San Diego, CA; Trig R. Smith, LEAD ATTORNEY, Robbins Geller et al, San Diego, CA; Jason Anthony Richardson, McDowell Hetherington LLP, Houston, TX; John M. Kelley, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Samuel H Rudman, Lerach Coughlin et al, Melville, NY; Sean McGuire, Robbins Geller et al, Ste.1900, San Diego, CA.

For Alyeska Master Fund, LP, Consol Plaintiff: Matthew A. Peller, LEAD ATTORNEY, Joseph R Sparacio, Rolnick Kramer Sadighi LLP, New York, NY; Jules Peter Slim, Attorney at Law, Irving, TX.

For Alyeska Master Fund 2, LP, Alyeska Master Fund 3, LP, Consol Plaintiffs: Matthew A. Peller, LEAD ATTORNEY, Rolnick Kramer Sadighi LLP, New York, NY; Jules Peter Slim, Attorney at Law, Irving, TX.

For Orbis Global Equity LE Fund, Consol Plaintiff: Matthew A. Peller, LEAD ATTORNEY, Frank T. M. Catalina, Rolnick Kramer Sadighi LLP, New York, NY; Jules Peter Slim, Attorney at Law, Irving, TX.

For Orbis Global Equity Fund, Orbis Global **[*3]** Balanced Fund, Orbis SICAV, Orbis Institutional Global Equity LP, Orbis Global Equity Fund Limited, Orbis Institutional Funds Limited, Allan Gray Australia Balanced Fund, Orbis OEIC, Orbis Institutional US Equity LP, Consol Plaintiffs: Matthew A. Peller, LEAD ATTORNEY, Rolnick Kramer Sadighi LLP, New York, NY; Jules Peter Slim, Attorney at Law, Irving, TX.

For Alta Mesa Resources, Inc., formerly known as, Silver Run Acquisition Corporation II, Defendant: James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM &

WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Heather Ann Waller, Latham and Watkins LLP, Chicago, IL; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For Harlan H. Chappelle, Defendant: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins [*4] LLP, Chicago, IL; James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Aaron C. O'Dell, PRO HAC VICE, Winston Strawn LLP, Los Angeles, CA; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; John E Schreiber, PRO HAC VICE, Winston & Strawn LLP, Los Angeles, CA; Katherine A. Preston, Winston Strawn LLP, Houston, TX; Walter Moreau Berger, Winston & Strawn LLP, Houston, TX; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For James T. Hackett, Thomas J. Walker, Defendants: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, [*5] Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For Michael A. McCabe, Defendant: James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Latham & Watkins LLP, Washington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY.

For William D. Gutermuth, Jeffrey H. Tepper, Diana J. Walters, Defendants: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, [*6] DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For Riverstone Investment Group LLC, Defendant: James Christian Word, Matthew J. Peters, LEAD ATTORNEYS, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Heather Ann Waller, Latham and Watkins LLP, Chicago, IL; Herman Heng Yue, Latham & Watkins LLP, New York, NY.

For ARM Energy Holdings LLC, Defendant: Bruce M Bettigole, LEAD ATTORNEY, Eversheds Sutherland LLP, Washington, DC; David Andrew Baay, LEAD ATTORNEY, Eversheds Sutherland (US) LLP, Houston, TX; Adam Pollet, Eversheds Sutherland (US) LLP, Washington, DC; Tanvi Shah, Eversheds Sutherland (US) LLP, San Diego, CA.

For Bayou City Energy Management LLC, Defendant: Gianni Mascioli, Kirkland & Ellis LLP, New York, NY; Kenneth Alan Young, Kirkland and Ellis LLP, Houston, TX; Nicholas Michael Brown, Sydney Elizabeth Corry, Kirkland & Ellis LLP, Houston, TX.

For Stephen Coats, Defendant: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, LEAD ATTORNEY, PRO HAC VICE, Emani [*7] Verlynne Walks, Laura Elizabeth Bladow, Matthew J. Peters, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

2024 U.S. Dist. LEXIS 142669, *7

For Don Dimitrievich, Defendant: Christopher Darnell Porter, Quinn Emanuel et al, Houston, TX; Emily Couture, Quinn Emanuel Urquhart & Sullivan, Austin, TX; Karl S Stern, Quinn Emanuel Urquhart Sullivan, Houston, TX.

For Michael E. Ellis, Defendant: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, LEAD ATTORNEY, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Matthew J. Peters, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Aaron C. O'Dell, **[*8]** PRO HAC VICE, Winston Strawn LLP, Los Angeles, CA; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; John E Schreiber, PRO HAC VICE, Winston & Strawn LLP, Los Angeles, CA; Katherine A. Preston, Winston Strawn LLP, Houston, TX; Walter Moreau Berger, Winston & Strawn LLP, Houston, TX; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For HPS Investment Partners, LLC, Defendant: Christopher Darnell Porter, Quinn Emanuel et al, Houston, TX; Emily Couture, Quinn Emanuel Urquhart & Sullivan, Austin, TX; Karl S Stern, Quinn Emanuel Urquhart Sullivan, Houston, TX.

For Pierre F. Lapeyre, David M. Leuschen, Defendants: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, LEAD ATTORNEY, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Matthew J. Peters, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham **[*9]** & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley Horton, Latham and Watkins, Costa Mesa, CA.

For William W. McMullen, Defendant: Stefan Atkinson, LEAD ATTORNEY, Kirkland Ellis LLP, New York, NY; Gianni Mascioli, Kirkland & Ellis LLP, New York, NY; Kenneth Alan Young, Kirkland and Ellis LLP, Houston, TX; Nicholas Michael Brown, Sydney Elizabeth Corry, Kirkland & Ellis LLP, Houston, TX.

For Donald Sinclair, Ronald Smith, Defendants: Heather Ann Waller, LEAD ATTORNEY, Latham and Watkins LLP, Chicago, IL; James Christian Word, LEAD ATTORNEY, PRO HAC VICE, Emani Verlynne Walks, Laura Elizabeth Bladow, Matthew J. Peters, Morgan Rachel Hoffman, Latham & Watkins LLP, Washington, DC; Jansen M. VanderMeulen, LEAD ATTORNEY, Henry Zaytoun, Roberto J. Borgert, Stephen T. Nasko, William Tazewell Jones, LATHAM & WATKINS LLP, Washington, DC; Ashley Gebicke, Latham & Watkins, San Diego, CA; Daniel J. Robinson, LATHAM & WATKINS LLP, Chicagp, IL; Eunice M. Kabuga, LATHAM & WATKINS LLP, Wahsington, DC; Herman Heng Yue, Latham & Watkins LLP, New York, NY; Wesley **[*10]** Horton, Latham and Watkins, Costa Mesa, CA.

For Bayou City Energy, LLC, Defendant: Kenneth Alan Young, LEAD ATTORNEY, Kirkland and Ellis LLP, Houston, TX; Nicholas Michael Brown, Kirkland & Ellis LLP, Houston, TX.

**Judges:** GEORGE C. HANKS, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE C. HANKS, JR.

# Opinion

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this consolidated securities class action are 36 motions. The Court rules on those motions as set forth in this order.

## BACKGROUND

This case arose out of the collapse of Alta Mesa Resources, Inc. ("Alta Mesa"), which began as a special purpose acquisition company ("SPAC") called Silver Run Acquisition Corporation II ("Silver Run II"). In two previous opinions, the Court, in denying several motions to dismiss, extensively discussed the facts that are alleged in Plaintiffs' pleadings[1] as well as many facts that are contained within judicially noticeable SEC filings. (Dkt. 160; Dkt. 343). Familiarity with those facts and familiarity with the Court's legal analysis in its prior opinions are presumed, and the Court will only include additional facts and analysis as necessary in this opinion.

Having reviewed the summary judgment record and the parties' thorough **[*11]** briefing, the Court reaches the following conclusions:

(1) All claims arising out of Alta Mesa's March 29, 2018 Form 10-K are **DISMISSED WITH PREJUDICE**;

(2) All control person claims against Defendants Don Dimitrievich ("Dimitrievich"); David Leuschen ("Leuschen"); Pierre Lapeyre ("Lapeyre"); Stephen Coats ("Coats"); Thomas Walker ("Walker"); Donald Sinclair ("Sinclair"); and William McMullen ("McMullen") are **DISMISSED WITH PREJUDICE**;

(3) All control person claims against Defendants HPS Investment Partners, LLC ("HPS"); Bayou City Energy Management, LLC ("BCE"); and ARM Energy Holdings, LLC ("ARM") are **DISMISSED WITH PREJUDICE**, except for claims arising out of statements made by Defendant Harlan Chappelle ("Chappelle") before the SPAC transaction[2] while Chappelle was Chief Executive Officer of Alta Mesa Holdings, LP ("AMH");

(4) The following motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**: docket entries 423, 432, 518, 520, 688, 689, and 690;

(5) The following motions for summary judgment are **GRANTED**: docket entries 422, 424, 427, 428, 431, and 433;

(6) All claims against Dimitrievich, Leuschen, Lapeyre, Coats, Walker, Sinclair, and McMullen are **DISMISSED WITH PREJUDICE [*12]** ;

(7) All *Daubert* motions and motions to exclude (docket entries 508, 509, 510, 511, 512, 513, 514, 516, 519, 522, 525, 535, 537, 538, 539, 540, 541, 543, 582, and 671) are **DENIED** without prejudice to being reasserted at trial;

(8) The motion to seal portions of the summary judgment record filed by Dimitrievich and HPS (Dkt. 425) is **GRANTED**; and

(9) The motion for separate trials filed by the Class Plaintiffs (Dkt. 698) is **DENIED**.

To the extent that a motion for summary judgment is denied, that motion may be reasserted at trial as a motion for judgment as a matter of law.

## LEGAL STANDARDS

---

[1] The term "Plaintiffs" refers to all plaintiffs in this case collectively. Elsewhere in this opinion, the Court will use the terms "Class Plaintiffs" and "Opt-out Plaintiffs" when necessary to clarify that only one group of plaintiffs has made a particular claim.

[2] The SPAC transaction will sometimes be referred to in this opinion as the "business combination."

The balance of this order will focus on the Court's dismissal of certain claims under *Federal Rule of Civil Procedure 56*. The Court analyzed the plaintiffs' claims, whether those claims were dismissed or allowed to go forward, using the standards set forth below.

—*Summary judgment standard*

*Federal Rule of Civil Procedure 56* mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. In deciding a motion for summary judgment, the Court must determine whether the pleadings, **[*13]** the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id. at 322-23*.

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 349 (5th Cir. 2005)*. The movant, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)*. The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir. 1995)*. However, if the movant will carry the burden of proof at trial, as is the case when the movant is either the plaintiff or a defendant asserting an affirmative defense, then the movant can only carry its initial burden by establishing beyond peradventure all of the essential elements of its claim or defense. *Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986)*.

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001)*. "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such **[*14]** that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson, 420 F.3d 532, 536 (5th Cir. 2006)* (citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 412 (5th Cir. 2003)*. However, factual controversies are resolved in favor of the non-movant "only when both parties have submitted evidence of contradictory facts." *Alexander v. Eeds, 392 F.3d 138, 142 (5th Cir. 2004)* (citation and quotation marks omitted). The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Diamond Offshore Co. v. A & B Builders, Inc., 302 F.3d 531, 545 n.13 (5th Cir. 2002)*. Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399 (5th Cir. 2008)*. Instead, the non-movant must present specific facts which show the existence of a genuine issue concerning every essential component of its case. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 343 F.3d 401, 405 (5th Cir. 2003)*. In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (en banc). And *Rule 56* does not impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly **[*15]** before the Court, even if it exists in the summary judgment record. *Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003)*.

—*Section 10(b)*

*Section 10(b) of the Securities Exchange Act* states that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for

the protection of investors." *15 U.S.C. § 78j(b)*. *Rule 10b-5* then implements *Section 10(b)*, disallowing the making of an "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *17 C.F.R. § 240.10b-5*.

To establish liability under *Section 10(b)* and *Rule 10b-5*, the plaintiff "must prove that the defendant made an untrue statement of material fact or omitted a material fact and did so with an intent to deceive, manipulate or defraud or severe recklessness such that the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Securities and Exchange Commission v. Blackburn, 15 F.4th 676, 680 n.3 (5th Cir. 2021)* (quotation marks, brackets, and ellipsis omitted); *see also Southland Securities Corp. v. INSpire Insurance Solutions Inc., 365 F.3d 353, 366 (5th Cir. 2004)*. Omissions are material when there **[\*16]** is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re BP p.l.c. Sec. Litig., 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012)* (quoting *Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*). Scienter requires "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 207 (5th Cir. 2009)*. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (quotation marks omitted).

—*Section 14(a)*

*Section 14(a) of the Securities Exchange Act* prohibits false statements in proxy solicitations associated with registered securities. *See 15 U.S.C. § 78n(a)*; *17 C.F.R. § 240.14a-9*. The elements of a *section 14(a)* claim are: (1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions. *In re Browning-Ferris Industries, Inc. Shareholder Derivative Litigation, 830 F. Supp. 361, 365 (S.D. Tex. 1993)*. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would **[\*17]** consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*.

—*Section 18*

*Section 18 of the Securities Exchange Act* provides an explicit private right of action to investors for damages arising from the purchase or sale of a security in actual reliance upon a false or misleading statement contained in any document or report filed with the SEC in compliance with the Exchange Act. *In re Enron Corporation Securities, Derivative & "ERISA" Litigation, 540 F. Supp. 2d 800, 812 (S.D. Tex. 2007)* ("*Enron II*"). To establish liability under *Section 18*, the plaintiff must show that: "(1) a document filed pursuant to the Exchange Act, or any rule or regulation promulgated under it, contained a false or misleading statement; (2) the defendant made or caused to be made the false or misleading statement; (3) the plaintiff actually relied on the false statement; and (4) that reliance caused loss to the plaintiff." *Id. at 813*.

"There is no requirement of scienter" for a plaintiff who seeks to recover under *Section 18*. *Id.* However, the defendant can rebut liability by proving "that he acted in good faith and had no knowledge that such statement was false or misleading." *15 U.S.C. § 78r(a)*; *see also Enron II, 540 F. Supp. 2d at 816*.

—*Section 20(a)*

*Section 20(a)* of the Exchange Act imposes derivative liability upon any person who controlled another person who committed securities fraud in violation of the Exchange Act. *See 15 U.S.C. § 78t(a)*. "Control person liability does not require participation in the fraudulent **[\*18]** transaction." *Heck v. Triche, 775 F.3d 265, 283 (5th Cir. 2014)*. "But a plaintiff must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Id.* (quotation marks omitted).

—*Common law and statutory fraud under Texas law*

Under Texas common law, "[t]o prevail on [a] fraud claim, [the plaintiff] must prove that: (1) [the defendant] made a material representation that was false; (2) [the defendant] knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) [the defendant] intended to induce [the plaintiff] to act upon the representation; and (4) [the plaintiff] actually and justifiably relied upon the representation and thereby suffered injury." *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co., 51 S.W.3d 573, 577 (Tex. 2001)*. Under Texas statutory law, *Section 27.01 of the Texas Business and Commerce Code* applies to "[f]raud in a transaction involving . . . stock in a corporation or joint stock company[,]" which the statute defines as a "false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person in entering into that contract[.]" *Tex. Bus. & Com. Code § 27.01(a)*.

In fraud cases involving misrepresentations **[*19]** that were not directly transmitted by the defendant to the plaintiff, fraudulent intent is not established by "even an obvious risk that a third person will rely on a misrepresentation[.]" *Ernst & Young, 51 S.W.3d at 581*. Rather, to be found liable to a third person under Texas fraud law, the "maker of the misrepresentation *must have information* that would lead a reasonable man to conclude that there is *an especial likelihood* that it will reach th[at] person[] and will influence their conduct." *Id.* (emphasis in *Ernst & Young*); *see also Exxon Corp. v. Emerald Oil & Gas Co., L.C., 348 S.W.3d 194, 217-19 (Tex. 2011)* ("We do not hold that public filings, such as Railroad Commission reports, alone satisfy the intent-to-induce reliance element of fraud[.] Therefore, if the evidence shows only that Exxon made material misrepresentations in its plugging reports to the Railroad Commission and knew that lessors and operators in the future may rely on the filings, such evidence would fail as a matter of law[.]").

## ANALYSIS

On this summary judgment record, several of Plaintiffs' claims must be dismissed.

—*Alta Mesa's March 29, 2018 Form 10-K*

Plaintiffs have sued several defendants because those defendants signed Alta Mesa's March 29, 2018 Form 10-K. On this record, Plaintiffs have not created a triable fact issue on the **[*20]** claims arising out of that Form 10-K because the evidence does not show that Alta Mesa's March 29, 2018 Form 10-K made an untrue statement of material fact or omitted a material fact.

Class Plaintiffs contend that two statements contained in Alta Mesa's March 29, 2018 Form 10-K were "materially false and misleading and omitted material facts when made." (Dkt. 218 at pp. 71-72). The Opt-out Plaintiffs have joined the Class Plaintiffs' summary judgment response and have characterized as "materially false and misleading" five additional statements contained in Alta Mesa's March 29, 2018 Form 10-K. (Dkt. 448; Dkt. 460 at p. 15). *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, pages 43-44, 50-51, 54; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, pages 46-47, 55-56, 59. Plaintiffs have not cited any evidence showing that the statements drawn from Alta Mesa's March 29, 2018 Form 10-K were false or misleading when made.

i. The third-party midstream facilities disclosure

The first statement from Alta Mesa's March 29, 2018 Form 10-K that Plaintiffs cast as false or misleading is a risk disclosure that reads:

*If third-party pipelines or other midstream [*21] facilities interconnected to our gathering, processing, storage or transportation systems become partially or fully unavailable, or if the volumes we gather, process, store or transport do not meet the quality requirements of the pipelines or facilities to which we connect, our gross profit and cash flow could be adversely affected.*

Our gathering, processing, storage and transportation assets connect to other pipelines or facilities owned and operated by unaffiliated third parties. The continuing operation of, and our continuing access to, such third-party pipelines, processing facilities and other midstream facilities is not within our control. These pipelines, plants and other midstream facilities may become unavailable because of testing, turnarounds, line repair, maintenance, reduced operating pressure, lack of operating capacity, regulatory requirements and curtailments of receipt or deliveries due to insufficient capacity or because of damage from severe weather conditions or other operational issues. In addition, if our costs to access and transport on these third-party pipelines significantly increase, our profitability could be reduced. If any such increase in costs occurs, **[\*22]** if any of these pipelines or other midstream facilities become unable to receive, transport or process product, or if the volumes we gather or transport do not meet the product quality requirements of such pipelines or facilities, our gross profit and cash flows could be adversely affected.

Dkt. 218 at p. 71; Dkt. 444-9 at p. 123.

Plaintiffs argue that this disclosure ("the third-party midstream facilities disclosure") is misleading because "the stated 'risks' had already materialized—rendering those purported risk factors plainly false and misleading." (Dkt. 449 at p. 28).

The Court disagrees with Plaintiffs. "[A] number of courts have found that cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results because such cautionary language is not misleading." *In re FBR Inc. Securities Litigation, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008)* (some quotation marks omitted) (collecting cases); *see also Bondali v. Yum! Brands, Inc., 620 Fed. App'x 483, 491 (6th Cir. 2015)*. On the other hand, several other courts have held that "a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman v. Mueller Water Products, Inc., 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020)* (collecting cases); *see also Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 138 (1st Cir. 2021)*; *Williams v. Globus Medical, Inc., 869 F.3d 235, 242-43 (3d Cir. 2017)*; *Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 85-86 (2d Cir. 2021).*

The Fifth **[\*23]** Circuit appears to fall into the latter camp. *See Lormand v. US Unwired, Inc., 565 F.3d 228, 246-47 (5th Cir. 2009)*; *see also Carlton v. Cannon, 184 F. Supp. 3d 428, 492 (S.D. Tex. 2016)* ("*Carlton I*") ("The [*Lormand*] court then addressed in the alternative whether a cautionary statement was itself misleading because it did not correct other allegedly false or misleading statements."). In *Lormand*, a company provided risk disclosures that "only warned the public" that certain programs "may cause a limited, general, and vague risk to customer satisfaction and to [the company's] independent discretion in business decisions in limited areas on a case-by-case basis." *Id.* The Fifth Circuit panel concluded that those risk disclosures did not qualify as meaningful cautionary language under the safe harbor provisions of *15 U.S.C. § 78u-5(c)(1)(A)(i)* because, when the risk disclosures were made, the "entire management team of the company knew that disastrous effects would result" from the programs "but continued to tout [the programs'] benefits publicly." *Id. at 246-47, 250, 254* ("These warnings failed to correct the false impression created by the defendants' public statements or to supply the truth that they omitted, viz., that the defendants knew that the no-deposit programs and affiliation conversion threatened to severely harm the company financially by increasing churn and **[\*24]** bad debt; that this insidious damage process had already begun; and that US Unwired was unable to contain it because its core operations had been transferred to Sprint.").

Assuming that risk disclosures can themselves constitute material misrepresentations, Plaintiffs have not presented evidence showing that the third-party midstream facilities disclosure presented as a risk an event that had already transpired when Alta Mesa filed its March 29, 2018 Form 10-K. Put another way, Plaintiffs provide no evidence showing that any pipeline or midstream facility to which Alta Mesa's gathering, processing, storage, or transportation assets were connected had become unavailable for any of the listed reasons (such as testing, line repair, severe weather, and Alta Mesa's failure to meet those facilities' product quality requirements) when Alta Mesa filed its March 29, 2018 Form 10-K.

In contending that this risk disclosure is nevertheless "false and misleading," Plaintiffs cite a ten-page excerpt of the deposition of an Alta Mesa employee named Phillip Negron ("Negron"). (Dkt. 449 at p. 28). In the excerpt, Negron

testifies that some unidentified customers of Alta Mesa's midstream division were, **[\*25]** at some unidentified point in time, concerned about the amount of methanol that Alta Mesa's upstream division was adding to its natural gas to prevent methane gas from creating water methane hydrates at high pressure. (Dkt. 444-12 at pp. 225-36). However, Negron's deposition does not include testimony showing that pipelines or midstream facilities to which Alta Mesa's gathering, processing, storage, or transportation assets were connected ever became unavailable as a result of the added methanol. Accordingly, the deposition does not constitute evidence of facts showing that the third-party midstream facilities disclosure was false or misleading.

Plaintiffs also cite to press releases showing that, in 2017, one of Alta Mesa's midstream division's upstream producer customers delayed its drilling of additional wells and another upstream customer decided to form its own midstream company. (Dkt. 449 at pp. 20-21). The Court is not convinced that this fact, which has nothing to do with third-party pipelines or other midstream facilities, made the third-party midstream facilities disclosure false or misleading. For one thing, when it filed its March 29, 2018 10-K, Alta Mesa disclosed that **[\*26]** its midstream division had received less product than expected from upstream customers in late 2017 and early 2018; Chappelle, Alta Mesa's CEO, disclosed in an earnings call that Alta Mesa had suffered "setbacks in late 2017 and early 2018," the "[m]ost significant" of which was the fact that "large third-party producers ha[d] delayed drilling on [its] dedicated acreage[.]" (Dkt. 130-12 at p. 4). Chappelle added that "it ha[d] really become evident [in the first quarter of 2018] that there were compounding effects of delays in business development, and very importantly, third-party drilling" that had resulted in both a reduction in estimated earnings for Alta Mesa's midstream division and a "six-month shift in the calendar" regarding the timing of a possible spinoff and initial public offering for the midstream division. (Dkt. 130-12 at pp. 4, 5, 10). Regarding the reduction in estimated earnings, Chappelle further stated that "a lot of things become evident today in the first quarter about decisions that others, the third-party customers make for how they deploy capital, maybe even in the fourth quarter of 2017 and early this quarter." (Dkt. 130-12 at p. 5).

Moreover, Alta Mesa's March **[\*27]** 29, 2018 Form 10-K contains thorough risk disclosure language[3] explaining that Alta Mesa's midstream division relies to a large extent on upstream producers for its revenue; that Alta Mesa must continually compete for those upstream producers' business and has no control over those upstream producers; and that a decrease in the volume of crude oil, natural gas, and natural gas liquids provided by upstream producers would adversely affect Alta Mesa's financial condition and cash flow (highlighting added by the Court):

> **Risks Related to our Midstream Business**
>
> ***We must continually compete for crude oil, natural gas and NGL supplies, and any decrease in supplies of such commodities could adversely affect our financial condition, results of operations or cash flows***.
>
> In order to maintain or increase throughput levels in our gathering system and asset utilization rates at our processing plant, we must continually contract for new product supplies. We may not be able to obtain additional contracts for crude oil, natural gas and NGL supplies. The primary factors affecting our ability to connect new wells to our gathering facilities include our success in contracting for existing supplies that are **[\*28]** not committed to other systems and the level of drilling activity near our gathering system. If we are unable to maintain or increase the volumes on our system by accessing new supplies to offset the natural decline in reserves, our business and financial results could be adversely affected. In addition, our future growth will depend in part upon whether we can contract for additional supplies at a greater rate than the rate of natural decline in our current supplies.
>
> Fluctuations in energy prices can greatly affect production rates and investments by third parties in the development of new crude oil and natural gas reserves. During 2016, we saw lower drilling activity due to low commodity prices. Although drilling activity improved during 2016 and 2017, we could see downward pressure on future drilling activity in the STACK play if commodity prices decline, which may result in lower volumes. Tax

---

[3] The Opt-out Plaintiffs contend that this additional risk disclosure language is also misleading. (Dkt. 460 at p. 15). The Court discusses that contention below.

policy changes or additional regulatory restrictions on development could also have a negative impact on drilling activity, reducing supplies of product available to our system and assets. We have no control over producers and depend on them to maintain sufficient levels of drilling activity. **[*29]** A continued decrease in the level of drilling activity or a material decrease in production in our area of operation for a prolonged period, as a result of continued depressed commodity prices or otherwise, likely would adversely affect our financial condition, results of operations and cash flow.

***Any decrease in the volumes that we gather, process, store or transport would adversely affect our financial condition, results of operations or cash flows***.

Our financial performance depends to a large extent on the volumes of crude oil, natural gas and NGLs gathered, processed, stored and transported on our assets. Decreases in the volumes of crude oil natural gas and NGLs we gather, process, store or transport would directly and adversely affect our financial condition, results of operations or cash flows. These volumes can be influenced by factors beyond our control, including:

- environmental or other governmental regulations:

- weather conditions;

- increases in storage levels of crude oil, natural gas and NGLs:

- increased use of alternative energy sources:

- decreased demand for crude oil, natural gas and NGLs;

- continued fluctuation in commodity prices, including the prices of crude oil, **[*30]** natural gas and NGLs;

- economic conditions;

- supply disruptions;

- availability of supply connected to our systems; and

- availability and adequacy of infrastructure to gather and process supply into and out of our systems.~

The volumes of crude oil natural gas and NGLs gathered, processed and transported on our assets also depend on the production from the region that supplies our systems. Supply of crude oil, natural gas and NGLs can be affected by many of the factors listed above, including commodity prices and weather. In order to maintain or increase throughput levels on our system, we must obtain new sources of crude oil, natural gas and NGLs. The primary factors affecting our ability to obtain non-dedicated sources of crude oil, natural gas, and NGLs include (i) the level of successful leasing, permitting and drilling activity in our areas of operation, (ii) our ability to compete for volumes from new wells and (iii) our ability to compete successfully for volumes from sources connected to other pipelines. We have no control over the level of drilling activity in our area of operation, the amount of reserves associated with wells connected to our system or the rate at which production **[*31]** from a well declines. In addition, we have no control over producers or their drilling or production decisions, which are affected by, among other things, the availability and cost of capital levels of reserves, availability of drilling rigs and other costs of production and equipment.

***We may not be able to retain existing midstream customers or acquire new customers, which would reduce our revenues and limit our future profitability***.

The renewal or replacement of our existing contracts with our midstream customers at rates sufficient to maintain or increase current revenues and cash flows depends on a number of factors beyond our control, including competition from other midstream service providers and the price of, and demand for, crude oil, natural gas and NGLs in the markets we serve. The inability of our management to renew or replace our

current contracts as they expire and to respond appropriately to changing market conditions could have a negative effect on our profitability.

Dkt. 444-9 at pp. 120-21, 124.

In short, Alta Mesa's March 29, 2018 Form 10-K disclosed the risk that a decrease in the volume of crude oil, natural gas, and natural gas liquids provided by upstream producers **[\*32]** would adversely affect its financial condition and cash flow; and, when the March 29, 2018 10-K was filed, Chappelle disclosed that Alta Mesa's midstream division had received less product than expected from upstream customers in late 2017 and early 2018 and that estimated earnings for Alta Mesa's midstream division had been reduced as a result.

Plaintiffs have not presented evidence showing that the third-party midstream facilities disclosure presented as a mere risk an event that had already transpired when Alta Mesa filed its March 29, 2018 Form 10-K. To the contrary, there is no evidence that any event listed in the third-party midstream facilities disclosure had occurred when the March 29, 2018 Form 10-K was signed or filed. And to the extent that Plaintiffs are arguing that the third-party midstream facilities disclosure is misleading because it does not discuss the possible adverse effect on Alta Mesa's earnings of a decrease in the volume of crude oil, natural gas, and natural gas liquids provided by upstream producers, other risk disclosure language in the March 29, 2018 Form 10-K discusses that effect. Furthermore, Chappelle disclosed the fact that Alta Mesa's midstream division **[\*33]** had received less product from upstream producers than anticipated in late 2017 and early 2018 and that estimated earnings for Alta Mesa's midstream division had been reduced as a result. The Court concludes that the additional risk disclosure language and Chappelle's statements "distinguish this case from *Lormand*, in which the cautionary statements failed to disclose certain dangers that had already begun to materialize." *Carlton I, 184 F. Supp. 3d at 492* (quotation marks omitted). Accordingly, Plaintiffs have not presented evidence showing that the third-party midstream facilities disclosure was false or misleading when Alta Mesa filed its March 29, 2018 Form 10-K.

ii. The internal control statement

The second statement contained in Alta Mesa's March 29, 2018 Form 10-K that Plaintiffs contend was false and misleading is this one:

> This annual report does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of the company's registered public accounting firm due to a transition period established by rules of the Securities and Exchange Commission for newly public companies. During the most recently completed fiscal quarter, there has been no change in our **[\*34]** internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Dkt. 218 at p. 71; Dkt. 444-9 at p. 136.

Plaintiffs argue that this statement ("the internal control statement") is misleading because "Alta Mesa did not disclose that it had ineffective internal control over financial reporting, which, as announced on February 25, 2019, would cause [Alta Mesa] to record material, non-cash asset impairment charges totaling $3.1 billion." (Dkt. 218 at p. 72).

The Court disagrees with Plaintiffs. Assuming that there were deficiencies in Alta Mesa's internal controls when Alta Mesa filed its March 29, 2018 Form 10-K, Plaintiffs "are incorrect insofar as they appear to assume that the mere existence of the internal control deficiencies is sufficient to establish liability." *Chen v. Missfresh Limited, No. 22-CV-9836, 701 F. Supp. 3d 236, 2023 U.S. Dist. LEXIS 198765, 2023 WL 7289750, at \*10 (S.D.N.Y. Nov. 6, 2023).* "[I]t bears emphasis that *§ 10(b)* and *Rule 10b-5(b)* do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011).* "Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (quotation marks and ellipsis omitted). **[\*35]** "Silence, absent a duty to disclose, is not misleading under *Rule 10b-5.*" *Basic, 485 U.S. at 239 n.17*; *see also*

*Masel v. Villarreal, 924 F.3d 734, 749 (5th Cir. 2019)* ("To plead an omission with sufficient particularity, plaintiff must specifically plead when a given disclosure should have been made."). In other words, in order for the internal control statement to be actionable under Plaintiffs' theory, Plaintiffs must point to evidence establishing that Alta Mesa had a duty to disclose existing deficiencies in its internal controls in the March 29, 2018 Form 10-K. *Chen, 2023 U.S. Dist. LEXIS 198765, 2023 WL 7289750 at *12*.

Plaintiffs have not provided that evidence. As the internal control statement itself explains, Alta Mesa, being a newly public company, "was under no express obligation to make disclosures about [its] internal controls" in the March 29, 2018 Form 10-K. *2023 U.S. Dist. LEXIS 198765, [WL] at *10*; *see also* *17 C.F.R. § 229.308*, Instruction No. 1. Accordingly, Alta Mesa was only required to "disclose the internal control deficiencies if doing so was necessary to render another statement in the [March 29, 2018 Form 10-K] not misleading." *Chen, 2023 U.S. Dist. LEXIS 198765, 2023 WL 7289750 at *10*. "More fundamentally, the question is not whether the [March 29, 2018 Form 10-K] effectively disclosed the internal control deficiencies that were later identified [but] whether the [March 29, 2018 Form 10-K] misleadingly suggested that the **[*36]** subsequently-identified deficiencies *did not exist*." *2023 U.S. Dist. LEXIS 198765, [WL] at *12* (emphasis in *Chen*); *see also* *Rok v. Identiv, Inc., No. 15-CV-5775, 2017 U.S. Dist. LEXIS 1019, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017)* ("[E]ven assuming that such a weakness existed, Cunningham has not sufficiently alleged that, by not disclosing it, the 10-Q and 10-K statements in 2013 and 2014 made misleading, rather than merely incomplete, statements.") (quotation marks omitted).

The internal control statement does not misleadingly suggest that Alta Mesa's subsequently-identified internal control deficiencies did not exist when Alta Mesa filed its March 29, 2018 Form 10-K. To the contrary, the first sentence of the internal control statement—the one that reads, "This annual report does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of the company's registered public accounting firm due to a transition period established by rules of the Securities and Exchange Commission for newly public companies"—"candidly acknowledg[es,]" using language expressly required by the Securities and Exchange Commission, "that [Alta Mesa] had not conducted a comprehensive assessment of [its internal] controls" when it filed the March 29, 2018 Form 10-K. *Chen, 2023 U.S. Dist. LEXIS 198765, 2023 WL 7289750 at *12*; *see also* *17 C.F.R. § 229.308*, Instruction **[*37]** No. 1. When one considers its meaning in light of the SEC regulations that prescribe it, the first sentence of the internal control statement was not rendered misleading by Alta Mesa's failure to disclose existing deficiencies in its internal controls in the March 29, 2018 Form 10-K.

The second sentence of the internal control statement—the one that reads, "During the most recently completed fiscal quarter, there has been no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting"—was included in Alta Mesa's March 29, 2018 Form 10-K pursuant to *17 C.F.R. § 229.308(c)*. All evidence in the record indicates that the second sentence of the internal control statement is factually accurate; Plaintiffs have not provided any evidence showing that, when the internal control statement was made, there had been a change in Alta Mesa's internal control over financial reporting during the most recently completed fiscal quarter—in this case, the fourth quarter of 2017. As Alta Mesa's March 29, 2018 Form 10-K explains, in the fourth quarter of 2017, Alta Mesa was still a special purpose acquisition company **[*38]** called Silver Run Acquisition Corporation II. (Dkt. 444-9 at p. 87). Because it did not complete its SPAC transaction until February 9, 2018, Silver Run II "had no business operations during 2017" except for "fund raising transactions, searching for an appropriate business combination and entering into agreements necessary to consummate a business combination[.]" (Dkt. 444-9 at p. 87). The record reflects that Silver Run II neither completed its SPAC transaction nor conducted business operations in 2017, and Plaintiffs have not presented evidence of any material change in Silver Run II's internal control over financial reporting during the fourth quarter of 2017.

Plaintiffs concede that Silver Run II's internal control over financial reporting did not undergo a material change in 2017; but they contend that it is "clear that [the internal control statement] is referring to the internal controls of the predecessor operating companies," AMH and Kingfisher Midstream LLC ("Kingfisher"), which respectively became Alta Mesa's upstream and midstream divisions after the SPAC transaction, and "not Silver Run II." (Dkt. 449 at pp. 28-29). The Court finds this argument unconvincing. Alta Mesa's **[*39]** March 29, 2018 Form 10-K explains that,

"since this report is as of December 31, 2017, the businesses of [AMH] and Kingfisher are not described herein in detail." (Dkt. 444-9 at p. 87). Moreover, the definition section of Alta Mesa's March 29, 2018 Form 10-K stipulates that the terms "Company" and "our" refer to AMH only when the document discusses Alta Mesa's upstream division in isolation and refer to Kingfisher only when the document discusses Alta Mesa's midstream division in isolation; such isolated discussions of the upstream and midstream divisions are confined to risk disclosures specific to the upstream and midstream businesses. (Dkt. 444-9 at pp. 98, 120). In all other contexts, the terms "Company" and "our" refer to Alta Mesa and its predecessor, Silver Run II:

> • "Company," "we," "our," or "us" and similar terms, (i) in the context of AMRI's E&P Business, refer to Alta Mesa prior to the Business Combination and to AMRI subsequent to the Business Combination, (ii) in the context of AMRI's Midstream Business, refer to Kingfisher prior to the Business Combination and to AMRI subsequent to the Business Combination, and (iii) in all other contexts refers to AMRI (formerly Silver **[\*40]** Run Acquisition Corporation II) and its subsidiaries;

Dkt. 444-9 at p. 83.

Alta Mesa's March 29, 2018 Form 10-K is rife with statements that discuss Alta Mesa as a whole and out of necessity also include Silver Run II. For example, when describing the SPAC transaction, Alta Mesa's March 29, 2018 Form 10-K states that, "[o]n February 9, 2018 . . . *we* consummated the acquisition of [AMH] and Kingfisher" and that, "[f]ollowing the Business Combination, *we* changed *our* name from 'Silver Run Acquisition Corporation II' to 'Alta Mesa Resources, Inc.'" (Dkt. 444-9 at pp. 87, 89; emphasis added). And when describing Alta Mesa's pre-SPAC-transaction activities, the March 29, 2018 Form 10-K states that "*[o]ur* only activities from inception through December 31, 2017 related to *our* formation, the [initial public offering for Silver Run II in March of 2017,] and efforts directed toward locating and consummating a suitable initial business combination." (Dkt. 444-9 at p. 130; emphasis added). Similarly, the internal control statement refers to Alta Mesa as a whole and does not discuss either its upstream division or its midstream division in isolation. Accordingly, the Court concludes that the language **[\*41]** of the internal control statement unambiguously refers to Silver Run II's internal controls when it says that there was no change in "our" internal control over financial reporting in the fourth quarter of 2017. As a result, Plaintiffs' summary judgment evidence "fails to point to any statement in the [March 29, 2018 Form 10-K] that was rendered misleading due to the nondisclosure of the alleged [internal control] weakness." *Rok, 2017 U.S. Dist. LEXIS 1019, 2017 WL 35496 at \*7*.

iii. The upstream risk factors

The Opt-out Plaintiffs contend that five additional statements from Alta Mesa's March 29, 2018 Form 10-K are false or misleading. *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, pages 43-44, 50-51, 54; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, pages 46-47, 55-56, 59. The Opt-out Plaintiffs refer to the first two of those five statements as "the upstream risk factors." (Dkt. 460 at p. 15). The first upstream risk factor is this one:

> ***Our business strategy involves the use of the latest available horizontal drilling, completion and production technology, which involve risks and uncertainties in their application***.

> Our operations involve the use of the latest horizontal drilling, completion **[\*42]** and production technologies, as developed by us and our service providers, in an effort to improve efficiencies in recovery of hydrocarbons. Use of these new technologies may not prove successful and could result in significant cost overruns or delays or reduction in production, and in extreme cases, the abandonment of a well. The difficulties we face drilling horizontal wells include:

> > • landing our wellbore in the desired drilling zone;

> > • staying in the desired drilling zone while drilling horizontally through the formation;

> > • running our production casing the entire length of the wellbore; and

• running tools and other equipment consistently through the horizontal wellbore.

The difficulties that we face while completing our wells include the following:

• designing and executing the optimum fracture stimulation program for a specific target zone;

• running tools the entire length of the wellbore during completion operations; and

• cleaning out the wellbore after completion of the fracture stimulation.~

In addition, certain of the new techniques we are adopting may cause irregularities or interruptions in production due to offset wells being shut in and the time required to drill and complete **[\*43]** multiple wells before any such wells begin producing. Furthermore, the application of technology developed in drilling, completing and producing in one productive formation may not be successful in other prospective formations with little or no horizontal drilling history. If our use of the latest technologies does not prove successful, our drilling and production results may be less than anticipated or we may experience cost ovemms, delays in obtaining production or abandonment of a well. As a result, the return on our investment will be adversely affected, we could incur material write-downs of unevaluated properties or undeveloped reserves and the value of our undeveloped acreage and reserves could decline in the future.

Dkt. 444-9 at p. 100.

The second upstream risk factor is this one:

> ***We depend on successful exploration, exploitation, development and acquisitions to maintain reserves and revenue in the future***.
>
> In general, the volume of production from oil and natural gas properties declines as reserves are depleted, with the rate of decline depending on each reservoir's characteristics. Except to the extent that we conduct successful exploration and development activities or acquire **[\*44]** properties containing proved reserves, or both, our proved reserves will decline as reserves are produced. Our future oil and natural gas production is, therefore, highly dependent on our level of success in finding or acquiring additional reserves. Additionally, the business of exploring for, developing or acquiring reserves is capital intensive. Recovery of our reserves, particularly undeveloped reserves, will require significant additional capital expenditures and successful drilling operations. To the extent cash flow from operations is reduced and external sources of capital become limited or unavailable, our ability to make the necessary capital investment to maintain or expand our asset base of oil and natural gas reserves would be impaired. In addition, we are dependent on finding partners for our exploratory activity. To the extent that others in the industry do not have the financial resources or choose not to participate in our exploration activities, we may be adversely affected.

Dkt. 444-9 at p. 102.

In their summary judgment briefing, the Opt-out Plaintiffs contend that the upstream risk factors are "materially false and misleading because they failed to disclose that Alta **[\*45]** Mesa possessed internal data contradicting the feasibility of its drilling program, including data related to well spacing and parent-child well interference." (Dkt. 460 at p. 15).

A risk disclosure can be actionably misleading if it frames "as merely hypothetical" a risk that "had a near certainty of causing financial disaster to the company." *Karth, 6 F.4th at 138-39* (quotation marks omitted). "Of course, the defendant company must have understood the near certainty of the risk at the time it made the statements at issue—[a] risk disclosure is not fraudulent simply because a company makes reasonable assumptions that, in retrospect, prove incorrect." *Id. at 138, 140*. The Opt-out Plaintiffs do not explain how, much less provide evidence that, the upstream risk factors frame as merely hypothetical a risk that had a near certainty of causing financial disaster to Alta Mesa when the upstream risk factors were disclosed. Moreover, the Opt-out Plaintiffs do not provide any evidence showing that Alta Mesa understood the near certainty of any such risk at the time that it disclosed the

upstream risk factors. *Cf. Lormand, 565 F.3d at 254* ("[T]he plaintiff provides numerous contemporaneous documents, such as internal emails and memos, [and] also provides **[*46]** admissions from the defendants themselves regarding their state of mind at the time of their representations [that] consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly."). Presumably, the Opt-out Plaintiffs are arguing that Alta Mesa's drilling program caused a financial disaster for the company and that the company knew that its drilling program would cause a financial disaster when it filed its March 29, 2018 Form 10-K. However, their summary judgment papers cite to no record evidence to support their contentions, and "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. NLRB, 613 F.2d 1328, 1337 (5th Cir. 1980)*.

The Opt-out Plaintiffs also claim in their pleadings that the upstream risk factors are false and misleading because: (1) "Alta Mesa's drilling techniques were not the latest available horizontal drilling technology, but were instead work-arounds designed to increase short-term production while jeopardizing future reserves and revenues[;]" and (2) "nearly all of Alta Mesa's STACK wells had improperly drilled vertical bores **[*47]** that would dramatically increase the cost of oil extraction while at the same time eliminating about a third of the well's revenue generating capabilities over the course of its life." *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, pages 43-44; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, pages 46-47. These contentions are not mentioned in the Opt-out Plaintiffs' summary judgment briefing. In any event, the Opt-out Plaintiffs do not cite any evidence to support these allegations; and one of the Opt-out Plaintiffs' corporate representatives agreed in his deposition that Alta Mesa did in fact use "the latest drilling technology" when its proxy was published:

> Q   And is -- was it true at the time the
>
> Page 149
>
> proxy was published, that Alta Mesa's operations "involved the use of the latest horizontal drilling, completion, and production technologies"?
> A   Yes.
> Q   And this is similar, this risk disclosure, to the one we discussed in the context of the form 10-K, correct?
> A   I believe so.
>      You said it's -- you said:
>      "It's true that they use the latest drilling technology", right?
> Q   Uh-huh.
> A   I believe that's true, yes.

Dkt. 529-11 at p. 157.

The corporate representative also stated in his deposition that the risk disclosures contained in Alta Mesa's March 29, 2018 Form 10-K did not mislead the Opt-out Plaintiffs for whom he was testifying:

Q -- in the form 10-K.

So focusing on risk disclosures in the form 10-K --

A Yes, correct.

Q -- is it fair to say that the risk disclosures in the form 10-K, are not statements that --

A Correct.

Q -- would have or did mislead Orbis in connection with an investment in Alta Mesa Resources?

A That's correct.

Dkt. 529-11 at p. 157.

On this record, the Court concludes that the Opt-out Plaintiffs have not created a triable fact issue on the question of whether the upstream risk factors were false or misleading when Alta Mesa filed its March 29, 2018 Form 10-K.

iv. The **[*48]** midstream risk factors

The Opt-out Plaintiffs refer to two other statements from Alta Mesa's March 29, 2018 Form 10-K as "the midstream risk factors." (Dkt. 460 at p. 15). *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, pages 50-51; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, pages 55-56. The first midstream risk factor is this one:

> *We must continually compete for crude oil, natural gas and NGL supplies, and any decrease in supplies of such commodities could adversely affect our financial condition, results of operations or cash flows*.
>
> In order to maintain or increase throughput levels in our gathering system and asset utilization rates at our processing plant, we must continually contract for new product supplies. We may not be able to obtain additional contracts for crude oil, natural gas and NGL supplies. The primary factors affecting our ability to connect new wells to our gathering facilities include our success in contracting for existing supplies that are not committed to other systems and the level of drilling activity near our gathering system. If we are unable to maintain or increase the volumes on our system by accessing **[*49]** new supplies to offset the natural decline in reserves, our business and financial results could be adversely affected. In addition, our future growth will depend in part upon whether we can contract for additional supplies at a greater rate than the rate of natural decline in our current supplies.
>
> Fluctuations in energy prices can greatly affect production rates and investments by third parties in the development of new crude oil and natural gas reserves. During 2016, we saw lower drilling activity due to low commodity prices. Although drilling activity improved during 2016 and 2017, we could see downward pressure on future drilling activity in the STACK play if commodity prices decline, which may result in lower volumes. Tax policy changes or additional regulatory restrictions on development could also have a negative impact on drilling activity, reducing supplies of product available to our system and assets. We have no control over producers and depend on them to maintain sufficient levels of drilling activity. A continued decrease in the level of drilling activity or a material decrease in production in our area of operation for a prolonged period, as a

result of continued depressed **[*50]** commodity prices or otherwise, likely would adversely affect our financial condition, results of operations and cash flow.

Dkt. 444-9 at p. 120.

The second midstream risk factor is this one:

> ***We may not be able to retain existing midstream customers or acquire new customers, which would reduce our revenues and limit our future profitability***.
>
> The renewal or replacement of our existing contracts with our midstream customers at rates sufficient to maintain or increase current revenues and cash flows depends on a number of factors beyond our control, including competition from other midstream service providers and the price of, and demand for, crude oil, natural gas and NGLs in the markets we serve. The inability of our management to renew or replace our current contracts as they expire and to respond appropriately to changing market conditions could have a negative effect on our profitability.

Dkt. 444-9 at p. 124.

In their summary judgment briefing, the Opt-out Plaintiffs contend that the midstream risk factors are "materially false and misleading because they failed to disclose that Alta Mesa was projecting third-party business that it not only did not have under contract, but also had no **[*51]** reasonable basis to assume would come under contract in the future." (Dkt. 460 at p. 15). However, as was the case with the upstream risk factors, the Opt-out Plaintiffs do not explain how, much less provide evidence that, the midstream risk factors frame as merely hypothetical a risk that had a near certainty of causing financial disaster to Alta Mesa when the midstream risk factors were disclosed. Moreover, the Opt-out Plaintiffs do not provide any evidence showing that Alta Mesa understood the near certainty of any such risk at the time that it disclosed the midstream risk factors. When the Opt-out Plaintiffs do provide evidence, it fails to establish the proposition for which it is cited. For instance, the Opt-out Plaintiffs assert that the midstream risk factors are actionable because, "[e]ven if the risk factors were not particularly noteworthy or memorable as written, had they not omitted material information, they would have been not only remarkable, but screaming red lights not to proceed." (Dkt. 460 at p. 21). To support that statement, the Opt-out Plaintiffs cite this excerpt from the deposition of one of their corporate representatives:

```
Q.   Is that a risk that Alyeska understood at
the time that this 10-K was filed in March of 2018?
     A.   I don't recall this specific risk factor
in the 10-K in 2018.
     Q.   Is the risk that's disclosed here, though,
something that Alyeska understood at the time?
     A.   If they lost customers or couldn't renew
customers, then, yes, I would be aware that that
would be an issue.  What was communicated to us was
momentum in signing new customers and in the
pipeline of signing new customers and that was what
was communicated by management to us.
```

Dkt. 461-10 at p. 20.

This testimony **[*52]** does not explain how the midstream risk factors "omitted material information[;]" it simply establishes that, at some point before Alta Mesa filed its March 29, 2018 Form 10-K, the company told the Opt-out Plaintiffs that it had "momentum in signing new customers[.]" The Opt-out Plaintiffs point to no evidence showing that, for instance, Alta Mesa had lost all of its midstream customers when it disclosed the midstream risk factors

and knew that it would never sign another one. Without such evidence, the record reflects that Alta Mesa's statements about momentum in signing new customers "are merely expressions of past optimism that [the Opt-out Plaintiffs] may not turn into fraud by hindsight[,]" *Karth, 6 F.4th at 139* (quotation marks omitted)—particularly in light of the fact that, when it disclosed the midstream risk factors, Alta Mesa also disclosed that its midstream division had received less product from upstream producers than anticipated in late 2017 and early 2018 and that estimated earnings for its midstream division had been reduced as a result. *Cf. Lormand, 565 F.3d at 247* ("These warnings failed to correct the false impression created by the defendants' public statements or to supply the truth that they omitted[.]"). **[*53]**

The Opt-out Plaintiffs also claim in their pleadings that the midstream risk factors are false and misleading because: (1) "Kingfisher and Alta Mesa had entered into gathering agreements that were unfair to Alta Mesa, effectively looting Alta Mesa for Kingfisher's benefit, and that Kingfisher was not even abiding by the terms of those lopsided agreements;" (2) "Defendants knew that Alta Mesa could not produce the advertised amount of oil;" and (3) "beginning in 2017, Kingfisher knew that the other 'third party customers' had delayed drilling on acreage served by Kingfisher." *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, pages 50-51; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, pages 55-56. In their summary judgment briefing, the Opt-out Plaintiffs do not mention these assertions, let alone cite any evidence showing that Alta Mesa understood that these specific issues had a near certainty of causing financial disaster to the company when the midstream risk factors were disclosed; "and the time for simply presenting allegations" that Alta Mesa's risk disclosures were false or misleading "has long since passed." *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation, 905 F. Supp. 2d 63, 79 (D.D.C. 2012)*.

On this record, the **[*54]** Court concludes that the Opt-out Plaintiffs have not created a triable fact issue on the question of whether the upstream risk factors were false or misleading when Alta Mesa filed its March 29, 2018 Form 10-K.

v. The disclosure control statement

Finally, the Opt-out Plaintiffs contend that this statement ("the disclosure control statement") from Alta Mesa's March 29, 2018 Form 10-K is false or misleading:

> As required by *Rules 13a-15* and *15d-15* under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2017. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in *Rules 13a-15 (e)* and *15d-15 (e)* under the Exchange Act) were effective.

Dkt. 444-9 at p. 136.

In their summary judgment briefing, the Opt-out Plaintiffs contend that the disclosure control statement is "misleading in that it contained a certification that [Alta Mesa's] CEO and CFO concluded that [Alta Mesa's] 'disclosure controls and procedures . . . were effective,' when they were not." (Dkt. 460 at p. 15). The Opt-out **[*55]** Plaintiffs do not cite any evidence to support this contention; but, in their pleadings, they allege that the disclosure control statement is false or misleading "because Alta Mesa did not have effective disclosure controls and procedures, as demonstrated by the Company's February 25, 2019 announcement, which resulted in, among other things, a $3.1 billion write-down." *See* Southern District of Texas case number 4:22-CV-1189 at docket entry 1, page 54; Southern District of Texas case number 4:22-CV-2590 at docket entry 1, page 59. The "February 25, 2019 announcement" is a reference to the following announcement contained in a press release issued by Alta Mesa on February 25, 2019:

Alta Mesa Resources has determined that it had an ineffective internal control over financial reporting due to an identified material weakness in both the design of its controls and the execution of its control procedures. As a result of this determination, the Company is performing extensive additional analyses and other procedures to ensure that its consolidated financial statements to be included in the Annual Report are prepared in accordance

with US GAAP. Accordingly, the Company expects it will need to **[\*56]** file a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission indicating a delay in the filing of its Annual Report. The extension period provided by Form 12b-25 will give the Company until March 18, 2019 to file its Annual Report. While the Company is targeting that timeframe, there can be no assurance that the Company will complete the preparation and filing of the Annual Report within the extension period.

Alta Mesa Resources expects to record material, non-cash asset impairment charges to both of its upstream and midstream segments in the fourth quarter of 2018. The Company does not expect the impairment charge to have any impact on future operations, its liquidity, cash flows from operating activities, or affect compliance with provisions set forth in its debt instruments. The impairment charge will reduce future depreciation, depletion and amortization expense. The impairment expense is estimated to be approximately $2.0 billion for the upstream segment and approximately $1.1 billion for the midstream segment.

*See* Alta Mesa Form 8-K filed on February 25, 2019, Exhibit No. 99.1.

The Opt-out Plaintiffs appear to be taking the position that Alta Mesa's **[\*57]** February 25, 2019 announcement that it had an ineffective internal control over financial reporting and would be taking a $3.1 billion write-down, standing alone, constitutes both evidence that Alta Mesa had deficient disclosure controls and procedures generally and evidence that Alta Mesa had deficient disclosure controls and procedures when it filed its March 29, 2018 Form 10-K a year before the write-down. The Court disagrees.

To the extent that the Opt-out Plaintiffs are conflating "disclosure controls and procedures" with "internal control over financial reporting," such conflation is improper; the two terms are distinct. *Compare 17 C.F.R. § 240.13a-15(e)* (defining "disclosure controls and procedures") *with 17 C.F.R. § 240.13a-15(f)* (defining "internal control over financial reporting"). "Disclosure controls are processes 'designed to ensure that information required to be disclosed' by a business in SEC filings 'is recorded, processed, summarized and reported, within the time periods specified in the [SEC's] rules and forms.'" *Linenweber v. Southwest Airlines Co., 693 F. Supp. 3d 661, 2023 WL 6149106, at \*9 (N.D. Tex. 2023)* (quoting *17 C.F.R. § 240.13a-15(e)*). On the other hand, "an 'internal control over financial reporting' is a term of art describing processes directly related to financial reporting and 'does not encompass . . . effectiveness **[\*58]** and efficiency of a company's operations and a company's compliance with applicable laws and regulations, with the exception of compliance with the applicable laws and regulations directly related to the preparation of financial statements.'" *Id.* (quoting *68 Fed. Reg. 36636, 36640 (June 18, 2003)*). The Opt-out Plaintiffs do not cite any authority indicating that highlighting a deficiency in internal control over financial reporting is synonymous with highlighting a deficiency in disclosure controls and procedures.

Moreover, the Opt-out Plaintiffs cite no evidence linking the $3.1 billion write-down to a deficiency in Alta Mesa's disclosure controls and procedures, and they do not explain exactly what the purported deficiencies in Alta Mesa's disclosure controls and procedures were. Accordingly, to the extent that the Opt-out Plaintiffs are arguing that the write-down alone proves that the disclosure control statement was false or misleading, the Court finds that argument unconvincing. *In re PetroChina Co. Ltd. Securities Litigation, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015)* ("Even if PetroChina officials were engaging in bribery, the [complaint] does not make any allegations that would imply that the Company had flawed internal controls over *financial reporting.* Therefore, Plaintiffs have not established that the **[\*59]** Company's statements concerning its internal control over financial reporting were false.") (footnotes omitted; emphasis in *PetroChina*); *see also Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430, 2012 U.S. Dist. LEXIS 47125, 2012 WL 1080306, at \*8-9 (S.D.N.Y. Mar. 30, 2012)* ("The Complaint contains no facts explaining how the revisions to the 4Q 2009 financials revealed that CSI's internal controls were not effective during any earlier period of time, and the Complaint alleges no other facts to support the assertion that CSI's internal controls were deficient. Plaintiffs have failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why.").

On this record, the Court concludes that the Opt-out Plaintiffs have not created a triable fact issue on the question of whether the disclosure control statement was false or misleading when Alta Mesa filed its March 29, 2018 Form 10-K.

vi. Conclusion

Plaintiffs have not created a triable fact issue on the claims arising out of the above-described statements in Alta Mesa's March 29, 2018 Form 10-K because the evidence does not show that the above-described statements were false or misleading when made.

*—Control person liability*

Plaintiffs have also sued numerous defendants under *Section 20(a)* as control persons. On this record, **[*60]** Plaintiffs have not created a triable fact issue on their control person claims against several of the defendants.

i. Don Dimitrievich

The Court concludes that Plaintiffs have failed to create a triable fact question on their claims against Don Dimitrievich under *Section 20(a)*. Dimitrievich was a member of Alta Mesa's Board of Directors and a managing director at Defendant HPS Investment Partners, LLC ("HPS").

"The precise legal standard" for ascertaining liability under *Section 20(a)* "remains somewhat unclear." *Carlton v. Cannon, No. 4:15-CV-12, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164, at *4 (S.D. Tex. July 22, 2016)* ("*Carlton II*"). However, "[t]he legislative history of *§ 20(a)* demonstrates that Congress enacted that section to address the specific evil of persons seeking to evade liability under the securities laws by organizing 'dummies,' that, acting under their control, would commit the prohibited acts." *2016 U.S. Dist. LEXIS 96305, [WL] at *4* (brackets omitted) (quoting *Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111, 1118 (5th Cir. 1980)*); *see also* 78 Cong. Rec. 8095 (1934) (remarks of Rep. Lea) ("The object of this provision is to catch the man who stands behind the scenes and controls the man who is in a nominal position of authority. . . . The man who stands behind the scenes and dominates the dummy ought to be responsible because he is the real party in interest.").

With that goal in mind, in order to create a triable **[*61]** fact issue on *Section 20(a)* liability, Plaintiffs must prove "some facts beyond [Dimitrievich's] position or title from which it can reasonably be inferred that [Dimitrievich] had actual power or control over [a controlled person's] allegedly fraudulent actions[.]" *In re Dynegy, Inc. Securities Litigation, 339 F. Supp. 2d 804, 913 (S.D. Tex. 2004)* ("[A]n officer's status alone will not subject him to liability under *§ 20(a)*[.]"). At a minimum, Plaintiffs must "show that [Dimitrievich] had an ability to control the specific transaction or activity upon which [a] primary violation is based." *Heck, 775 F.3d at 283* (quotation marks omitted). And "[g]eneral allegations about day-to-day participation in corporate affairs are insufficient to allege the ability to control the *specific* transaction identified as the basis for primary liability." *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *7* (emphasis in *Carlton II*; quotation marks omitted); *see also In re ArthroCare Corp. Securities Litigation, 726 F. Supp. 2d 696, 731-32 (W.D. Tex. 2010)* ("[B]ecause there is no allegation Applegate signed any of the press releases or SEC forms which contained the misstatements or omissions, or had final authority over any of ArthroCare's public statements or filings—in other words, because there is no allegation that Applegate had substantial control over the dissemination of any false information to the public, which is the basis of Plaintiff's *§ 10(b)* claims—he cannot **[*62]** be held liable as a control person simply due to his involvement in the underlying activities about which the Individual Defendants are alleged to have misled investors."); 78 Cong. Rec. 8095 (1934) (remarks of Rep. Lea) ("The man charged with control is only responsible to the extent he did control the action complained of, and his actual control must be established.").

Plaintiffs' summary judgment evidence falls short of showing that there is a triable fact issue on the question of whether Dimitrievich had the ability to control the specific transaction or activity upon which a primary violation is based. Plaintiffs cite to two pieces of evidence in the record to support their *Section 20(a)* claims against Dimitrievich. The first is a copy of the minutes from the meeting at which the Alta Mesa Board of Directors approved Alta Mesa's March 29, 2018 Form 10-K. (Dkt. 446 at p. 26; Dkt. 444-9 at pp. 43-44). The second is an email chain in which Dimitrievich asks for HPS to be mentioned as an "equity sponsor" of Defendant ARM Energy Holdings, LLC in the August 16, 2017 press release from Silver Run II announcing the SPAC transaction that turned Silver Run II into Alta Mesa. (Dkt. 446 at p. 29; Dkt. **[*63]** 444-4 at pp. 13-14). These pieces of evidence do not establish that Dimitrievich had the ability to control any specific transaction or activity upon which a primary violation is based. The meeting minutes simply show that Dimitrievich (who is not specifically mentioned in the minutes) was one of

the 10 board members[4] who voted to approve Alta Mesa's March 29, 2018 Form 10-K, while the email chain only shows that Dimitrievich requested the inclusion in a press release of a statement that Plaintiffs do not allege is false and have not made a part of their lawsuit. Notably, the press release ultimately did not include Dimitrievich's proposed language. *See* Silver Run Acquisition Corporation II Form 8-K dated August 16, 2017.

Plaintiffs' only additional support for their contention that Dimitrievich is "subject to *Section 20(a)* liability" comes in the form of unsubstantiated statements about Dimitrievich's involvement in "due diligence" and "significant corporate decisions[.]" (Dkt. 446 at pp. 28-29). For instance, Plaintiffs contend that Dimitrievich can be held liable under *Section 20(a)* because "significant corporate decisions were first considered by Dimitrievich, McMullen and [Defendant Jim] Hackett before being brought to the full [Alta Mesa] board [of **[*64** directors] for discussion." (Dkt. 446 at p. 29). Plaintiffs do not cite to any evidence to support this allegation, but it appears to be a reference to a February 2019 email to Hackett in which McMullen proposes "an on-call standing committee" consisting of McMullen, "a rep from HPS and a rep from [Defendant Riverstone Holdings, LLC ("Riverstone")] to be able to propose, react and vote on action items for the company so it can respond in real time to major business decisions that need to be made now rather than to overly formalize and slow down decisions through [Board of Directors] protocols." (Dkt. 444-10 at p. 146). The email, which does not mention Dimitrievich, does not constitute evidence that such a committee, assuming that it was formed, had actual power or control over any specific actions that allegedly caused any of the misrepresentations underlying this lawsuit. The existence of the committee alone proves nothing. *Cf. Dynegy, 339 F. Supp. 2d at 913* ("Foster reported directly to Doty[.] Foster told Doty 'that if we wanted to get this deal done, we're not going to be able to give all the documents to Arthur Andersen.' Doty responded he understood. Thereafter, the 'tear up' provisions were drafted as an **[*65** amendment to the original swap confirmation documents regarding Project Alpha and concealed from Andersen. Because from these allegations it can reasonably be inferred that Doty had actual power or control over Dynegy's 'deal team' that caused the Companies' statements about Project Alpha to be false, the court concludes that these allegations are sufficient to state a *§ 20(a)* claim against Doty.").

Plaintiffs provide little to support their *Section 20(a)* claims beyond the fact that Dimitrievich, who was one of 11 Alta Mesa board members, signed Alta Mesa's March 29, 2018 Form 10-K. Numerous courts have held that *Section 20(a)* control person liability cannot be based solely on the allegation that the defendant was a director or officer who signed SEC filings. *See, e.g., id. at 895, 900, 904, 913* (dismissing *Section 20(a)* claims against the company's CEO, COO, and Controller even though those executives "signed SEC filings that incorporated [the company's] admittedly false financial statements" and "publicly defended [the company's] accounting practices when they were questioned by the media"); *Patriot Exploration, LLC v. SandRidge Energy, Inc., 951 F. Supp. 2d 331, 362 (D. Conn. 2013)* ("[T]he complaint merely recites that they are directors of the company and states that they signed the annual 10-K report. These facts could not establish control **[*66** person liability."); *Batwin v. Occam Networks, Inc., No. CV-07-2750, 2008 U.S. Dist. LEXIS 52365, 2008 WL 2676364, at *25 (C.D. Cal. July 1, 2008)* ("In the complaint, plaintiff does no more than allege that these defendants are directors, who served on the Audit Committee, and who signed Occam's SEC filings."); *In re Tyco International, Ltd., No. 04-CV-1336, 2007 U.S. Dist. LEXIS 42401, 2007 WL 1687775, at *8 (D.N.H. June 11, 2007)* ("[P]laintiffs allege that Ashcroft was a director and major shareholder [who] signed false SEC filings on Tyco's behalf and, by virtue of his position with the company, possessed the power and authority to control the contents of Tyco's publicly filed financial reports, press releases, and presentations to securities analysts. Although plaintiffs conclusorily state that 'each of the Individual Defendants had direct involvement in the day-to-day operations of the Company,' they do not allege how Ashcroft exercised any control at Tyco or explain why his position as an outside director establishes him as a control person.") (citation to record omitted). On this record, the Court will follow those decisions. Plaintiffs' *Section 20(a)* claims against Dimitrievich are not supported by sufficient evidence to create a triable fact issue.

ii. <u>David Leuschen</u>

---

[4] The minutes indicate that the vote to approve Alta Mesa's March 29, 2018 Form 10-K was unanimous. (Dkt. 444-9 at p. 43). Defendant Michael Ellis was not present at the board meeting, and it does not appear that he cast a vote. (Dkt. 444-9 at p. 43).

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant David Leuschen under *Section 20(a)*. Leuschen is a senior **[*67]** managing director at, and co-founder of, Riverstone who served on Alta Mesa's board of directors. (Dkt. 218 at p. 21).

Plaintiffs cite little to support *Section 20(a)* liability against Leuschen beyond his position on Alta Mesa's board of directors and his involvement in Silver Run II's SPAC transaction. (Dkt. 676 at p. 27). Although Plaintiffs assert that "Leuschen personally contributed to the August 2017 releases containing the misstatements[,]" their only support for this statement is an email, on which Leuschen was carbon-copied, from Defendant Pierre Lapeyre to Defendant James Hackett and Olivia Wassenaar (a non-defendant who was a managing director at Riverstone) in which Lapeyre suggests edits to the August 16, 2017 press release from Silver Run II announcing the SPAC transaction that turned Silver Run II into Alta Mesa. (Dkt. 676 at p. 27; Dkt. 569-7 at pp. 27-32). The email reads, "Some thoughts/comments take as you wish—I think the RSH #'s may need to be updated but not sure[.]" (Dkt. 569-7 at p. 27). The record does not contain any responsive emails from Leuschen. Leuschen is not quoted or mentioned in the body of the press release, though he is listed at the bottom as a co-founder of **[*68]** Riverstone. *See* Silver Run Acquisition Corporation II Form 8-K dated August 16, 2017.

Plaintiffs have not pointed to any evidence showing that Leuschen had final authority over the August 16, 2017 press release or over any of Silver Run II's or Alta Mesa's other public statements or filings. It is not enough to argue, as Plaintiffs do, that Leuschen "had the opportunity to review and comment on [Alta Mesa] press releases and other public statements in advance of them being publicly issued and could have—but chose not to—stop the false and misleading information statements from being issued." (Dkt. 676 at p. 29). There is no evidence showing that Leuschen personally had the ability to stop any other party from making statements; and, even if it can be accurately said that he breached a duty to correct any false or misleading statements made by another party, that alone is not sufficient to hold him liable under *Section 20(a)*. *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *8* ("The plaintiffs also argue that Karnes is liable as a control person because he had a 'duty' to 'correct promptly any public statements issued by KiOR which had become materially false or misleading.' *Section 20(a)* liability is based on the power to control, not on a duty to correct. Even **[*69]** if Karnes had this duty, and breached it, that does not show that he had the ability to control Cannon's statements, imputed to KiOR, that violated *§ 10(b)*.").

Accordingly, the Court concludes that Plaintiffs have failed to create a genuine issue of material fact on their *Section 20(a)* claims against Leuschen. *ArthroCare, 726 F. Supp. 2d at 731-32*; *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *7*.

iii. Pierre Lapeyre

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant Pierre Lapeyre under *Section 20(a)*. Like Leuschen, Lapeyre is a senior managing director at, and co-founder of, Riverstone who served on Alta Mesa's board of directors. (Dkt. 218 at p. 21).

Plaintiffs' evidence against Lapeyre is largely duplicative of their evidence against Leuschen, the one notable difference being that Lapeyre wrote the above-mentioned email suggesting edits to the press release announcing the SPAC transaction that turned Silver Run II into Alta Mesa. (Dkt. 569-7 at pp. 27-32). Although Lapeyre's authorship of the email makes the case against him a slightly closer call, the email states that Lapeyre's suggestions were "thoughts/comments" that Hackett and Wassenaar could "take as [they] wish[ed.]" (Dkt. 569-7 at p. 27). Moreover, Lapeyre activated the **[*70]** track-changes feature in Microsoft Word; and the copy of the August 16, 2017 press release attached to Lapeyre's email reveals that the suggestions Lapeyre made were insubstantial:

> Founded in 1987 by Michael E. Ellis and based in Houston, Texas, Alta Mesa is a leading pure-play exploration and production company focused on the prolific STACK play in the Anadarko Basin. With approximately 120,000 contiguous net acres and about 4,200 gross identified drilling locations, Alta Mesa is among the largest and most active operators in the STACK. Since 2012, Alta Mesa has ~~reached~~ drilled to total depth en 204 STACK horizontal wells to further delineate and de-risk its approximate 300 square mile position in the up-dip oil window of the STACK. As of the end of the second quarter of 2017, Alta Mesa had completed 160 of

these STACK wells with 156 on production. Of these, 114 have production history greater than [X] days, and reflect an average well result of over 650 MBOE per well, or approximately 140 BOE per foot of lateral.

At consummation of the transaction, Silver Run II is expected to be renamed Alta Mesa Resources, Inc. and trade on the NASDAQ stock exchange under the ticker symbol "AMR". **[\*71]** James T. Hackett, Chairman and Chief Executive Officer of Silver Run II, will serve as Executive Chairman following the consummation of the business combination, while Harlan H. Chappelle, Michael E. Ellis, and Michael A. McCabe will continue as Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of Alta Mesa Resources, Inc., respectively.

Mr. Hackett commented, "We formed Silver Run with the objective of acquiring low-breakeven, stacked-pay oil weighted assets, preferably with an integrated related midstream platform vehicle. The combination of Alta Mesa and Kingfisher is a perfect strategic match for our desired integrated platform search-criteria. Alta Mesa's highly contiguous core acreage position in Northeast Kingfisher County has among the lowest break-evens in the U.S at around $25 per barrel. Kingfisher adds a highly strategic and synergistic midstream subsidiary with significant additional third party growth potential. We are excited about the possibilities for the combined company, including a potential future midstream IPO. Importantly, the current owners of Alta Mesa and Kingfisher are investing alongside Silver Run II's stockholders by committing **[\*72]** to hold significant amounts of equity in the combined company. I am very excited about the opportunity to work alongside Hal Chappelle, Mike Ellis, Mike McCabe and the Alta Mesa team in this pure-play STACK upstream and midstream company. It is the first of its kind in the public markets, and we believe it creates significant competitive advantages for both organic and inorganic growth for our stockholders"

Mr. Chappelle stated, "We see this as a tremendous way to continue our evolution progress as a low-cost, high-value producer in the STACK. We have been fortunate to have strong financial partners in FIPS Investment Partners and Bayou City Energy during a pivotal stage of growth, and we are well-positioned for this next stage. Mike Ellis and I are excited about the opportunity to work with Jim Hackett, Silver Run II and Riverstone to continue and build building a great enterprise. Kingfisher Midstream is a creative smart addition, as it has been an important factor in our growth, providing effective gathering, efficient processing, and assurance that our production will continue to flow as the activity in the basin expands."

Riverstone Holdings LLC is an energy and power-focused private **[\*73]** investment firm founded in 2000 by David M. Leuschen and Pierre F. Lapeyre, Jr. with over $[36][is this the current # post vista etc] billion of capital raised. Riverstone conducts buyout and growth capital investments in the exploration & production, midstream, oilfield services, power, and renewable sectors of the energy industry. With offices in New York, London, Houston, and Mexico City, Riverstone has committed over $1351 billion to more than 11301 investments in North America, Latin America, Europe, Africa, Asia and Australia.

Dkt. 569-7 at pp. 27-32.

And like Leuschen, Lapeyre is not quoted or mentioned in the body of the press release, though he is listed at the bottom as a co-founder of Riverstone. *See* Silver Run Acquisition Corporation II Form 8-K dated August 16, 2017.

Although the record reflects that Lapeyre may have had some input into the August 16, 2017 press release, that input does not equate to control over any person who committed an alleged primary violation. *In re BP p.l.c. Securities Litigation, No. 4:13-CV-1393, 2014 U.S. Dist. LEXIS 138920, 2014 WL 4923749, at \*6 (S.D. Tex. Sept. 30, 2014)* ("[T]he question is whether Mr. Rainey possessed or exercised control over those persons or entities who made actionable misstatements under *Section 10(b)*, not whether the substance of the alleged falsehoods originated with him."). Plaintiffs have not pointed to any **[\*74]** evidence showing that Lapeyre had final authority over the August 16, 2017 press release or over any of Silver Run II's or Alta Mesa's other public statements or filings. Accordingly, the Court concludes that Plaintiffs have failed to create a genuine issue of material fact on their *Section 20(a)* claims against Lapeyre. *ArthroCare, 726 F. Supp. 2d at 731-32*; *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at \*7*.

iv. Stephen Coats

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant Stephen Coats under *Section 20(a)*. Coats is a partner, general counsel, and chief administrative officer at Riverstone who served as the corporate secretary for Silver Run II. (Dkt. 218 at p. 19).

Plaintiffs have sued Coats solely under *Section 20(a)*; they do not allege that he personally made any misleading statements. (Dkt. 218 at pp. 19-20). Plaintiffs contend that Coats "had control over all actions taken by Silver Run II, including the false and misleading statements the company issued." (Dkt. 570 at p. 23). However, Plaintiffs cite little evidence to support that contention beyond Coats's position within Silver Run II.

The only specific assertion made by Plaintiffs regarding Coats's supposed control of any other person or entity is that Coats "had the ability to **[*75]** review" Silver Run II's proxy statement "for accuracy before it was filed." (Dkt. 570 at p. 24). As previously mentioned, *Section 20(a)* liability cannot be based solely on a party's purported duty to correct someone else's false or misleading statements. *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *8*.

Plaintiffs have not pointed to any evidence showing that Coats had final authority over any of Silver Run II's or Alta Mesa's public statements or filings. Accordingly, the Court concludes that Plaintiffs have failed to create a genuine issue of material fact on their *Section 20(a)* claims against Coats. *ArthroCare, 726 F. Supp. 2d at 731-32*; *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *7*.

v. Thomas Walker

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant Thomas Walker under *Section 20(a)*. Walker is a partner at Riverstone who served as the CFO of Silver Run II. (Dkt. 218 at p. 19).

Plaintiffs have sued Walker solely under *Section 20(a)*; they do not allege that he personally made any misleading statements. (Dkt. 218 at pp. 19-20). As was the case with Coats, Plaintiffs contend that Walker "had control over all actions taken by Silver Run II, including the false and misleading statements the company issued." (Dkt. 570 at p. 23). However, again as with Coats, Plaintiffs cite little evidence to support **[*76]** that contention beyond Walker's position within Silver Run II.

Plaintiffs first assert that Walker is subject to *Section 20(a)* liability because he "had the ability to review" Silver Run II's proxy statement "for accuracy before it was filed." (Dkt. 570 at p. 24). As previously mentioned, *Section 20(a)* liability cannot be based solely on a party's purported duty to correct someone else's false or misleading statements. *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *8*.

Plaintiffs further assert that Walker is subject to *Section 20(a)* liability simply because he signed two Form 8-K SEC filings for Silver Run II. (Dkt. 570 at p. 23). Beyond the bare fact that Walker signed those two SEC filings, Plaintiffs do not provide any evidence showing that Walker had any actual power or control over any other person's allegedly fraudulent actions. As it did with Plaintiffs' claims against Dimitrievich, on this record the Court will follow the cases holding that *Section 20(a)* control person liability cannot be based solely on the allegation that the defendant was a director or officer who signed SEC filings. *See Dynegy, 339 F. Supp. 2d at 895, 900, 904, 913* (dismissing *Section 20(a)* claims against the company's CEO, COO, and Controller even though those executives "signed SEC filings that incorporated [the company's] admittedly false financial statements" **[*77]** and "publicly defended [the company's] accounting practices when they were questioned by the media"). Plaintiffs' *Section 20(a)* claims against Walker are not supported by sufficient evidence to create a triable fact issue.

vi. Donald Sinclair

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant Donald Sinclair under *Section 20(a)*. Sinclair served as a member of Alta Mesa's board of directors. (Dkt. 218 at p. 21).

Plaintiffs cite no evidence to support their *Section 20(a)* claims against Sinclair apart from his seat on Alta Mesa's board of directors and the fact that he signed Alta Mesa's March 29, 2018 Form 10-K. (Dkt. 573 at pp. 25-31). In the section of their summary judgment briefing that discusses their *Section 20(a)* claims against members of the Alta Mesa board of directors, Plaintiffs do not even specifically mention Sinclair. (Dkt. 573 at pp. 25-31). Accordingly, on this record the Court will again follow the cases holding that *Section 20(a)* control person liability cannot be based solely on the allegation that the defendant was a director or officer who signed SEC filings. *See id.* Plaintiffs' *Section 20(a)* claims against Sinclair are not supported by sufficient evidence to create a triable **[*78]** fact issue.

vii. William McMullen

The Court also concludes that Plaintiffs have failed to create a triable fact question on their claims against Defendant William McMullen under *Section 20(a)*. McMullen served as a member of Alta Mesa's board of directors and is the founder and managing partner of BCE. (Dkt. 218 at p. 21).

Plaintiffs contend that McMullen can be held liable under *Section 20(a)* because: (1) BCE had a joint well development agreement with Alta Mesa; (2) McMullen sat on the board of the company that owned AMH before the SPAC transaction; (3) McMullen invested in Kingfisher before the SPAC transaction; (4) McMullen was on Alta Mesa's board of directors; (5) McMullen signed Alta Mesa's March 29, 2018 Form 10-K; and (6) "McMullen/BCE, Dimitrievich/HPS and Riverstone effectively acted as 'super' board members that pre-vetted all major issues before presentation to the board as a whole, including the removal of Chappelle post de-SPAC[.]" (Dkt. 449 at p. 30). However, Plaintiffs do not present evidence showing that McMullen had any actual power or control over any other person's allegedly fraudulent actions.

The Court discussed Plaintiffs' "super board members" allegation when it addressed their claims against **[*79]** Dimitrievich, and, indeed, to support their *Section 20(a)* claims against McMullen Plaintiffs cite the previously-mentioned February 2019 email from McMullen to Hackett in which McMullen proposes "an on-call standing committee" consisting of McMullen, "a rep from HPS and a rep from [Riverstone] to be able to propose, react and vote on action items for the company so it can respond in real time to major business decisions that need to be made now rather than to overly formalize and slow down decisions through [Board of Directors] protocols." (Dkt. 444-10 at p. 146). As the Court previously stated, the email does not constitute evidence that such a committee, assuming that it was formed, had actual power or control over any specific actions that allegedly caused any of the misrepresentations underlying this lawsuit. The same is true of three other email chains cited by Plaintiffs in which McMullen suggests to Dimitrievich and Hackett that the Alta Mesa board of directors "may need an emergency board meeting" to install Hackett as interim CEO in order to restore the markets' confidence in Alta Mesa's management. (Dkt. 444-10 at pp. 57-62). Those emails do not demonstrate that McMullen had the ability **[*80]** to control some specific transaction or activity upon which a primary violation is based; they simply show that he was one of eleven Alta Mesa board members and that he was talking to two other board members in an attempt to get a proposal to an emergency board vote.

Plaintiffs also fail to explain how the existence of a joint well development agreement between BCE and Alta Mesa proves that McMullen personally had the ability to control some specific transaction or activity upon which a primary violation is based. Plaintiffs argue that the agreement gave McMullen "significant operational involvement in [Alta Mesa] through the joint wells." (Dkt. 449 at pp. 29-30). However, Plaintiffs' evidence does not show that the well development agreement gave BCE, let alone McMullen, the power to control Alta Mesa's statements to investors or potential investors.

Plaintiffs' remaining allegations against McMullen show, at most, McMullen's day-to-day participation in Alta Mesa's corporate affairs. To reiterate, "[g]eneral allegations about day-to-day participation in corporate affairs are insufficient to allege the ability to control the *specific* transaction identified as the basis for primary liability." **[*81]** *Carlton II, 2016 U.S. Dist. LEXIS 96305, 2016 WL 3959164 at *7* (emphasis in *Carlton II*; quotation marks omitted).

Plaintiffs' *Section 20(a)* claims against McMullen are not supported by sufficient evidence to create a triable fact issue.

viii. <u>HPS, BCE, and ARM</u>

The Court also concludes that Plaintiffs have failed to create a triable fact question on most of their claims under *Section 20(a)* against HPS, BCE, and ARM. However, the Court concludes that a reasonable jury could return a verdict for Plaintiffs on their *Section 20(a)* claims against HPS, BCE, and ARM for statements made by Chappelle that predate the SPAC transaction.

HPS is an investment firm; BCE is a private equity firm; and ARM is a producer services firm. (Dkt. 218 at pp. 22-23). Prior to the SPAC transaction that turned Silver Run II into Alta Mesa, HPS, BCE, and ARM owned portions of Kingfisher; and HPS and BCE owned portions of AMH. (Dkt. 218 at pp. 22-23, 44-45). After the SPAC transaction, HPS, BCE, and ARM became minority owners of Alta Mesa—HPS ultimately owned a 31.9% interest, BCE a 17.93% interest, and ARM a 4.8% interest. (Dkt. 423-12 at p. 4; Dkt. 423-10 at p. 3; Dkt. 423-13 at pp. 5-6). HPS and BCE each appointed one director to Alta Mesa's eleven-member board of directors; ARM did not appoint any. (Dkt. 218 at **[*82]** pp. 22-23, 47).

Plaintiffs have sued HPS, BCE, and ARM solely under *Section 20(a)* and have not alleged that any of the three firms made any misleading statements. (Dkt. 218 at pp. 22-23, 117, 123). Plaintiffs contend that "the record developed in discovery amply demonstrates that HPS, BCE and ARM each had the ability to control, and did control, the false statements of Alta Mesa and its CEO, Defendant Chappelle, both before and after the de-SPAC transaction closed, and each had the ability to control, and did control, the false and misleading statements in the Proxy issued by the SPAC and the Proxy Defendants." (Dkt. 445 at pp. 8-9). In support of this contention, Plaintiffs claim that "HPS and BCE exerted control through their ownership interests, board seats, historical operational and financial relationships, and involvement in the company's operations." (Dkt. 445 at p. 9). As for ARM, Plaintiffs claim that it "had control because it operated [Alta Mesa's midstream division], including providing all the financial modeling and reporting leading to the misstatements about that business." (Dkt. 445 at p. 9).

The Court concludes that Plaintiffs' evidence does not create a triable fact issue on most **[*83]** of their *Section 20(a)* claims against HPS, BCE, and ARM. It is undisputed that neither HPS nor BCE nor ARM owned any interest in Silver Run II. (Dkt. 423 at p. 14; Dkt. 445 at p. 23). Although HPS, BCE, and ARM did own portions of AMH and Kingfisher prior to the SPAC transaction, Plaintiffs have not accused either AMH or Kingfisher of making false statements. Plaintiffs also fail to present evidence showing that HPS, BCE, or ARM had the ability to control statements made by Alta Mesa after the SPAC transaction.

However, there is evidence in the record showing that representatives of HPS, BCE, and ARM worked extensively with Chappelle to craft public statements regarding AMH and Kingfisher before the SPAC transaction, while Chappelle was AMH's CEO. (Dkt. 444-7). Given the large ownership stakes held by HPS, BCE, and ARM in AMH and Kingfisher, the close relationship between AMH and Kingfisher, and Chappelle's position as AMH's CEO, the Court concludes that a reasonable jury could return a verdict for Plaintiffs on their *Section 20(a)* claims against HPS, BCE, and ARM for statements made by Chappelle that predate the SPAC transaction.

**CONCLUSION**

Having reviewed the summary judgment record and the parties' thorough **[*84]** briefing, the Court reaches the following conclusions:

(1) All claims arising out of Alta Mesa's March 29, 2018 Form 10-K are **DISMISSED WITH PREJUDICE**;

(2) All control person claims against Defendants Don Dimitrievich ("Dimitrievich"); David Leuschen ("Leuschen"); Pierre Lapeyre ("Lapeyre"); Stephen Coats ("Coats"); Thomas Walker ("Walker"); Donald Sinclair ("Sinclair"); and William McMullen ("McMullen") are **DISMISSED WITH PREJUDICE**;

(3) All control person claims against Defendants HPS Investment Partners, LLC ("HPS"); Bayou City Energy Management, LLC ("BCE"); and ARM Energy Holdings, LLC ("ARM") are **DISMISSED WITH PREJUDICE**,

2024 U.S. Dist. LEXIS 142669, *84

except for claims arising out of statements made by Defendant Harlan Chappelle ("Chappelle") before the SPAC transaction[5] while Chappelle was Chief Executive Officer of Alta Mesa Holdings, LP ("AMH");

(4) The following motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**: docket entries 423, 432, 518, 520, 688, 689, and 690;

(5) The following motions for summary judgment are **GRANTED**: docket entries 422, 424, 427, 428, 431, and 433;

(6) All claims against Dimitrievich, Leuschen, Lapeyre, Coats, Walker, Sinclair, and McMullen are **DISMISSED WITH PREJUDICE [*85]** ;

(7) All *Daubert* motions and motions to exclude (docket entries 508, 509, 510, 511, 512, 513, 514, 516, 519, 522, 525, 535, 537, 538, 539, 540, 541, 543, 582, and 671) are **DENIED** without prejudice to being reasserted at trial;

(8) The motion to seal portions of the summary judgment record filed by Dimitrievich and HPS (Dkt. 425) is **GRANTED**; and

(9) The motion for separate trials filed by the Class Plaintiffs (Dkt. 698) is **DENIED**.

To the extent that a motion for summary judgment is denied, that motion may be reasserted at trial as a motion for judgment as a matter of law.

SIGNED at Houston, Texas on August 12, 2024.

/s/ George C. Hanks, Jr.

GEORGE C. HANKS, JR.

UNITED STATES DISTRICT JUDGE

---

**End of Document**

---

[5] The SPAC transaction will sometimes be referred to in this opinion as the "business combination."