# Exhibit 6

## *In re KBR, Inc. Secs. Litig.*

United States District Court for the Southern District of Texas, Houston Division

August 31, 2018, Decided; August 31, 2018, Filed, Entered

CIVIL ACTION NO. H-17-1375

**Reporter**
2018 U.S. Dist. LEXIS 221137 *

IN RE KBR, INC. SECURITIES LITIGATION

**Counsel:  [*1]** For Susan Denenberg, Plaintiff: Brenda Szydlo, LEAD ATTORNEY, Jeremy A Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY USA; Willie C Briscoe, The Briscoe Law Firm, PLLC, Dallas, TX USA.

For Kuberbhai M. Patel, Kanti K Patel, Plaintiffs: Brenda Szydlo, LEAD ATTORNEY, Jeremy A Lieberman, Pomerantz LLP, New York, NY USA; Willie C Briscoe, The Briscoe Law Firm, PLLC, Dallas, TX USA.

For Barry Porter, Plaintiff: Jeremy A Lieberman, Brenda Szydlo, Pomerantz LLP, New York, NY USA.

For Kbr, Inc., Stuart J. Bradie, Mark W. Sopp, Brian Ferraioli, William P. Utt, Susan K. Carter, Jan Egil Braendeland, Robert D. Zelinski, Defendants: Michael C Holmes, LEAD ATTORNEY, Vinson & Elkins, Dallas, TX USA; Allison Lee Fuller, Vinson & Elkins, Houston, TX USA; Amy Tankersley Perry, Vinson Elkins, Dallas, TX USA; Jeffrey S Johnston, Vinson Elkins LLP, Houston, TX USA.

**Judges:** EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** EWING WERLEIN, JR.

# Opinion

MEMORANDUM AND ORDER

Pending is Defendants KBR, Inc., Stuart J. Bradie, William P. Utt, Mark W. Sopp, Brian K. Ferraioli, Susan K. Carter, Jay Ibrahim, Jan Egil Braendeland, and Robert D. Zelinski's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint **[*2]**  (Document No. 25). Having carefully considered the motion, response, reply, supplemental notices, and applicable law, the Court concludes for the reasons that follow that the motion should be granted.

I. Background

Lead Plaintiffs Kuberhai M. Patel and Kanti K. Patel, together with named plaintiffs Barry Porter and Susan Denenberg, (collectively, "Plaintiffs"), bring this action individually and on behalf of a putative class of investors who acquired shares of stock in Defendant KBR, Inc. ("KBR") between February 20, 2013, and April 27, 2017 (the "Class Period").[1] Plaintiffs allege claims for securities fraud against KBR and several of its current and former officers and directors[2] (the "Individual Defendants" and, together with KBR, "Defendants") under *Section 10(b)* of

---

[1] Document No. 24 ¶¶ 1, 23-26 (Consolidated Class Action Complaint).

[2] Specifically, Plaintiffs allege claims against Defendant Stuart J. Bradie, KBR's CEO, President, and Director since June 2014; Defendant William P. Utt, KBR's CEO and President from March 2006 to June 2014 and a Director from 2007 to 2014; Defendant Mark W. Sopp, KBR's CFO since February 2017; Defendant Brian K. Ferraioli, KBR's CFO and Executive Vice President from October 2013 to February 2017; Defendant Susan K. Carter, KBR's CFO and Executive Vice President from

the Securities Exchange Act of 1934 (the "Exchange Act"), *15 U.S.C. § 78j(b)*, and SEC *Rule 10b-5*, *17 C.F.R. § 240.10b-5*. Plaintiffs also allege claims for control person liability against the Individual Defendants under *Section 20(a)* of the Exchange Act, *15 U.S.C. § 78t(a)*.

Kellogg Brown & Root, Inc. was formed by the 1998 merger of M.W. Kellogg Company with Brown & Root Engineering and Construction.[3] It was a wholly-owned subsidiary of Halliburton Co. ("Halliburton") until it was incorporated as KBR in 2006 and **[*3]** spun off from Halliburton in a transaction completed in 2007.[4] KBR's common stock now trades on the New York Stock Exchange under the "KBR" ticker symbol.[5]

In February 2009, Halliburton and KBR resolved SEC charges against Kellogg Brown & Root LLC's predecessor entities, Kellogg, Brown & Root, Inc. and the M.W. Kellogg Company, which engaged in a scheme to bribe Nigerian officials to obtain contracts over a ten-year period beginning in 1994.[6] KBR and Halliburton agreed to pay $177 million in disgorgement and to install an independent monitor to review KBR's Foreign Corrupt Practices Act ("FCPA") compliance program for three years.[7] Kellogg Brown & Root LLC pled guilty to a five-count criminal information alleging FCPA violations arising from the same conduct and agreed to pay a $402 million fine. The former CEO of Kellogg Brown & Root LLC's predecessor entities also pled guilty to criminal charges.[8] KBR's U.K. subsidiary, M.W. Kellogg Ltd., agreed to disgorge $11.2 million to resolve related charges brought by British regulators.[9]

Plaintiffs allege that KBR and its subsidiaries in the United Kingdom a number of years later engaged in a separate bribery scheme in Kazakhstan **[*4]** and Azerbaijan, using Monaco-based Unaoil as an intermediary.[10] Plaintiffs further allege that Defendants defrauded investors by knowingly or recklessly making false and misleading statements and omissions that concealed that (1) KBR and its U.K. subsidiaries violated U.K. anti-bribery laws and (2) the profits from the contracts illegally obtained would be subject to disgorgement. Specifically, Plaintiffs allege that, over the course of the Class Period, Defendants made misrepresentations falling into six categories: (1) reports of KBR's net income and revenue, (2) statements about anti-bribery laws and KBR's Code of Business Conduct (KBR's "Code"), (3) statements about the awards of specific contracts, (4) statements about the charges relating to the Nigerian bribery scheme, (5) statements disclosing the Unaoil investigations, and (6) certifications required by the Sarbanes-Oxley Act of 2002, *15 U.S.C. § 7201 et seq.* ("SOX certifications").[11] Plaintiffs allege that

---

October 2009 to September 2013; Defendant Jan Egil Braendeland, KBR's Executive Vice President, Global Sales since mid-2016, and holder of various other positions at KBR since July 2013; Defendant Jay Ibrahim, President of KBR's Engineering and Construction for Europe, Middle East, and Asia since May 2015; and Defendant Robert D. Zelinski, KBR's President, Onshore for Engineering and Construction, Americas since May 2012. Id. ¶¶ 28-35.

[3] Id. ¶ 37.

[4] Id.

[5] Id. ¶¶ 2, 37.

[6] Id. ¶ 43.

[7] Id.

[8] Id. ¶¶ 43, 45, 46.

[9] Id. ¶ 47.

[10] Id. ¶ 6.

[11] Defendants propose the organization of the alleged misrepresentations into these six categories in Appendix A to their Motion to Dismiss. *See* Document No. 25, ex. A. Plaintiffs submitted with their response a modified appendix, which alters the attribution of certain statements but does not dispute the categorization of the alleged misrepresentations. See Document No. 30, ex. A; Document No. 30 at 3 (noting that Defendants' Appendix A "parses out with relative ease the statements at issue"). Plaintiffs' Appendix A with their identifications of alleged speakers is attached hereto as Appendix A.

all of these statements were misleading for failing to disclose that KBR and its U.K. subsidiaries engaged Unaoil to obtain contracts through bribery in violation of U.K. anti-bribery laws and that the proceeds of those contracts were therefore subject **[*5]** to disgorgement.[12]

Plaintiffs further allege that, as a result of the misrepresentations, Plaintiffs acquired KBR securities at artificially inflated prices during the Class Period and were ultimately injured when the truth emerged, causing the price of KBR securities to fall.[13] Plaintiffs allege that the truth emerged in a series of partial disclosures between July 2016 and April 2017. On July 29, 2016, KBR announced that the DOJ and SEC were investigating news reports "related to Unaoil . . . and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR," and KBR's share price fell $0.60 (4.1%).[14] On November 1, 2016, KBR issued a quarterly report stating that the DOJ and SEC were investigating "activities Unaoil . . . may have engaged in related to international projects involving several global companies, as well as KBR's interactions with Unaoil," and KBR's share price fell $0.24 (2%).[15] On January 17, 2017, Rolls Royce--which is not alleged to have any relationship to KBR--"admitted to paying Unaoil to bribe people on its behalf to secure contracts in Azerbaijan, Kazakhstan, Iraq, Angola, and elsewhere," and agreed **[*6]** to pay $800 million to settle charges by various authorities.[16] KBR's share price fell $0.18 (1%).[17] On April 28, 2017, the U.K. Serious Fraud Office ("SFO") "confirmed that it had opened an investigation into the activities of KBR's UK subsidiaries, their officers, employees and agents for suspected offences of bribery and corruption" relating to Unaoil.[18] That same day, KBR reported that KBR's "interactions with Unaoil are a subject of" investigations by the DOJ, SEC, and SFO, and KBR's share price fell $1.43 (9.24%).[19]

Plaintiff Susan Denenberg filed this action five days later.[20] Defendants now move to dismiss under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u-4*.

II. Legal Standard

*Rule 12(b) (6)* provides for dismissal of an action for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b) (6)*. When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. *See Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)*, *abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id.

In considering a motion to **[*7]** dismiss under *Rule 12(b) (6)*, the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint. *See Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997)*. To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct.*

---

[12] Document No. 25, ex. A; Document No. 30, ex. A.

[13] Document No. 24 ¶¶ 8, 18, 23-26.

[14] Id. ¶¶ 199-200.

[15] Id. ¶¶ 201-202.

[16] Id. ¶ 203.

[17] Id. ¶ 204.

[18] Id. ¶ 205.

[19] Id. ¶¶ 206-207.

[20] Document No. 1.

*1955, 1974, 167 L. Ed. 2d 929 (2007)*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*. While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly, 127 S. Ct. at 1964-65*.

Plaintiffs alleging securities fraud must also satisfy heightened pleading standards under *Rule 9(b)* and the PSLRA. In alleging fraud, a plaintiff "must state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. Furthermore, for securities fraud, "[t]he PSLRA has raised the pleading bar even higher and enhances *Rule 9(b)*'s particularity requirement for pleading fraud in two ways." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 956 (5th Cir. 2016)*. "First the plaintiff must specify each statement alleged to have been misleading, **[*8]** and the reason or reasons why the statement is misleading. Second, for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." Id. (internal quotation marks and citations omitted).

III. Discussion

A. *Section 10(b)* and *Rule 10b-5*

The elements of a claim for securities fraud under *§ 10(b)* and *Rule 10b-5* are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011)*. Defendants argue that Plaintiffs have not adequately alleged material misrepresentations or omissions, scienter, or loss causation.

1. Material Misrepresentation or Omission

One observes initially that Plaintiffs' conclusory allegation--which recurs in a variety of iterations--that KBR was directly or indirectly engaged in bribery to obtain contracts in Azerbaijan and Kazakhstan is only that: a conclusory allegation. Plaintiffs wholly fail to meet the heightened pleading requirements of *Rule 9(b)* and the PSLRA. Nowhere in Plaintiffs' **[*9]** Complaint of 68 pages are the "particulars" of any bribe alleged. Plaintiffs have simply assumed the worst based on the fact that certain governmental agencies have announced the opening of investigations of Unaoil related to international projects involving several global companies, including KBR. No investigative findings have been announced, but Plaintiffs act as if the opening of an investigation is all they need to make wholesale allegations of bribery against KBR. The law requires more. *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig., 166 F. Supp. 3d 822, 863 (S.D. Tex. 2016)* (stating, "An investigation is not a violation," and rejecting plaintiffs' argument that "because Key and the SEC wre investigating possible FCPA violations, such FCPA violations must have occurred and Individual Defendants must have known about them at the time the statements issued); *Shoemaker v. Cardiovascular Systems, Inc., 2017 U.S. Dist. LEXIS 47972, 2017 WL 1180444 at *8 (D. Minn. 03/29/17)* ("Allowing shareholders to sue based on conclusory allegations that a company has engaged in widespread illegal conduct without adequately pleading facts that demonstrate illegal conduct would just allow strike suits by another name.")

a. Reports of Net Income and Revenue

KBR reported its net income and revenue in numerous quarterly and annual reports over the course of the four-year long Class Period. **[*10]** [21] Some of the reports attributed certain income to "projects in Azerbaijan," among other things.[22] Defendants argue that Plaintiffs do not adequately allege that these reports were false or misleading.[23]

---

[21] *See* Document No. 30, ex. A. at 1-7.

Plaintiffs respond that the reports were misleading because investors "were led to believe that KBR's reported net income and revenue were attributable to legitimate contracts when, in reality, reported net income and revenue were partially attributable to contracts tainted by bribery."[24]

"[I]t bears emphasis that *§ 10(b)* and *Rule 10b-5(b)* do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.' Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx, 131 S. Ct. at 1321-22* (quoting *Rule 10b-5*); see *also Basic Inc. v. Levinson, 485 U.S. 224, 108 S. Ct. 978, 987 n.17, 99 L. Ed. 2d 194 (1988)* ("Silence, absent a duty to disclose, is not misleading under *Rule 10b-5*.").

Bare reports of net income and revenue are not actionable for failing to disclose alleged misconduct. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2006)* ("Absent an allegation **[*11]** that [the defendant] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose *Section 10(b)* liability.").

On the other hand, statements about revenue and income are actionable where the income is derived from misconduct and the defendants' statements put the source of the corporation's success at issue. *See, e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005)* ("[A]lthough a defendant does not have a *Rule 10b-5* duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success[.]") (internal quotation marks and citations omitted); *In re Providian Fin. Corp. Sec. Litig., 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001)* ("[T]he statements attribute Providian's good fortunes to its 'customer focused approach.' Indeed, this assertion puts the topic of the cause of Providian's success in play. Having put the issue in play, Providian is obligated to disclose information concerning the source of its success[.]") .

In <u>Van der Moolen</u>, the plaintiffs alleged that one of Van der Moolen's businesses, VDM Specialists, generated its revenue, at least **[*12]** in part, through trading practices that violated NYSE rules. *405 F. Supp. 2d at 400*. The court held that the defendants' statements about revenue were actionable because the statements put the source of VDM Specialists' success in play by attributing its success and the development of its NYSE business to "trading volumes and price volatility." *Id. at 401*. In <u>Providian</u>, the plaintiffs alleged that Providian grew its revenue through various deceptive business practices, such as charging groundless late fees and charging customers for products without their consent. *152 F. Supp. 2d at 820-21*. The court held that the defendants' statements about revenue were actionable because the statements put the source of Providian's success in play by attributing its success to its "customer focused approach." <u>Id.</u> at 824-25.

Plaintiffs' authorities follow similar reasoning. Plaintiffs cite *In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668 (S.D.N.Y. 1990)*, in which the defendants paid bribes to FDA officials to expedite approval of their products and delay approval of competitors' products. The court held that the plaintiffs alleged actionable misrepresentations where the defendants attributed the quick approvals to the company's "legitimate business acumen and ingenuity," and, after Congress and a U.S. Attorney initiated investigations, **[*13]** the defendants specifically denied wrongdoing. *Id. at 673*. Similarly, Plaintiffs cite *In re Gentiva Sec. Liticr., 932 F. Supp. 2d 352 (E.D.N.Y. 2013)*, in which the plaintiffs alleged that the defendants systematically billed Medicare for medically unnecessary services. The court held that the defendants' statements about Gentiva's revenues were actionable because Gentiva "put the

---

[22] *See, e.g.*, Document No. 24 ¶¶ 102, 106, 110, 116, 120, 124, 125, 128, 145, 169.

[23] Document No. 25 at 11-12.

[24] Document No. 30 at 9.

source of its Medicare revenue at issue" by stating that Gentiva was growing revenue "in compliance with Medicare standards and regulations." *Id. at 367-69*.

In short, statements about revenue and net income are actionable only where such statements "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Indiana Elec. Workers' PensionTr. Fund IBEW v. Shaw Grp., Inc., 537 F.3d 527, 541 (5th Cir. 2008)*. Unlike the statements about revenue in *Van der Moolen*, *Providian*, *gentiva*, and *Par*, the reports of revenue and net income here do not put the source of KBR's success at issue. More precisely, the statements of revenue and net income do not put the circumstances surrounding the awards of the contracts "in play"--by, for instance, touting some legitimate competitive advantage or specifically denying wrongdoing--but instead merely report the facts that some of the reported revenue and income came from "increased progress," or **[*14]** "increased activity on" "projects in Azerbaijan,"--or "the U.S., the North Sea and Azerbaijan," or "Azerbaijan and Uzbekistan," and the like--reports that Plaintiffs do not contend were false.

Plaintiffs therefore have not pled adequately that any of the statements reporting revenue and net income were misleading, and Defendants are entitled to dismissal of Plaintiffs' claims based on those statements.

b. Statements about Anti-Bribery Laws and KBR's Code

KBR's periodic SEC filings over the course of the Class Period routinely disclosed that KBR was subject to anti-bribery laws and to KBR's own Code. Defendants argue that Defendants' alleged statements about anti-bribery laws and KBR's Code are not misleading because all such statements are either true or immaterial puffery.[25] Plaintiffs argue that these statements were misleading because they did not disclose that KBR violated anti-bribery laws by hiring Unaoil to bribe officials in Kazakhstan and Azerbaijan.[26] Plaintiffs further argue that the statements were material because they were made against the backdrop of the Nigeria bribery prosecutions and the Unaoil investigation.[27]

"It is well-established that general statements about reputation, **[*15]** integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014)*. Codes of conduct, in particular, are "inherently aspirational." *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1276 (9th Cir. 2017)*; *see also* *Key Energy, 166 F. Supp. 3d at 872*) (noting that courts have held codes of conduct and FCPA compliance manuals to be "aspirational and immaterial puffery"). "Such a code expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations" and is "not capable of objective verification." *Hewlett-Packard, 845 F.3d at 1276*.

As Defendants correctly argue, Defendants' public statements about KBR's Code and anti-bribery laws are either aspirational or indisputably true. On several occasions throughout the Class Period, KBR stated that "conducting [its] business with ethics and integrity is a key priority," that its Code "is a guide for every employee in applying legal and ethical principles," and that its Code "describes not only [its] standards of integrity but also some of the specific principles and areas of the law that are most likely to affect [its] business."[28] KBR's Code provides that it was adopted "to establish a common set of ethical **[*16]** standards that the Company expects every Employee to exhibit when dealing with clients, communities and each other."[29] It further provides that "kickbacks, bribes or payoffs made in order to influence favorably some decision affecting a company's business or for the personal gain of an

---

[25] Document No. 25 at 12-13.

[26] Document No. 30 at 7-9.

[27] Id.

[28] Id.

[29] Document No. 24 ¶ 101; Document No. 30, ex. 28 at 1.

individual" are "illegal, unethical and prohibited by this Code."[30] These statements are aspirational, incapable of objective verification, and therefore not actionable under the federal securities laws. *Hewlett-Packard, 845 F.3d at 1276*. "A contrary interpretation ... is simply untenable, as it could turn all corporate wrongdoing into securities fraud." Id.

KBR also stated on several occasions that it is "subject to numerous compliance-related laws and regulations," and that it is "governed by [KBR's Code] and other compliance-related corporate policies and procedures that mandate compliance with these laws."[31] KBR further stated that its employees are regularly trained regarding KBR's Code and anti-bribery laws.[32] Plaintiffs argue that Defendants' compliance-related statements were misleading because they omitted that "KBR violated UK bribery and corruption laws by hiring Unaoil as its agent to bribe corrupt officials in Kazakhstan and **[*17]** Azerbaijan in order to win contracts on KBR's behalf."[33] Statements about compliance may be actionable where the speaker affirmatively--and falsely--represents that the corporation complies with the relevant laws or regulations. *See, e.g.*, *Gentiva, 932 F. Supp. 2d at 367* (the defendants "publicly represented that Gentiva's revenues and margins . . . were growing, and [were] doing so in compliance with Medicare standards and regulations"). Here, however, the alleged misrepresentations do not affirmatively state that KBR complies with the relevant laws, but merely state the indisputably true fact that KBR is "subject to" and "governed by" these laws and corporate policies. Thus, even assuming *arguendo* that Plaintiffs have adequately pled that KBR violated anti-bribery laws, Plaintiffs have not adequately alleged that these statements were false or misleading, and Defendants are entitled to dismissal of Plaintiffs' claims based on these statements.

c. Award of Specific Contracts

In several press releases and earnings calls, KBR and certain Individual Defendants announced the award of contracts to KBR for work in Azerbaijan and Kazakhstan.[34] Plaintiffs allege that the statements were false and misleading because they failed **[*18]** to disclose that the contracts were "the result of illicit bribes arranged by Unaoil on behalf of KBR."[35] Defendants argue that Plaintiffs have not adequately pled that the contracts were the result of bribes, as Plaintiffs' allegations rely on "leaked" emails from before 2009', and the contracts at issue were awarded many years later between 2013 and 2017. Plaintiffs respond that they allege "more than pre-2009 conduct" and that "[b]ribe payments over the course of many years helped to cultivate relationships and paved the way for the award of contracts both then and now."[36]

Plaintiffs allege that KBR pledged $10 million to Unaoil by 2008 and that Unaoil paid its Managing Director in Azerbaijan $4.5 million between 1996 and 2005, but do not offer any non-conclusory allegations plausibly linking those payments to the award of contracts to KBR beginning eight years later in 2013.[37] Similarly, Plaintiffs make no

---

[30] Document No. 30, ex. 28 at 7.

[31] Document No. 24 ¶¶ 100, 122, 128, 143, 167, 189.

[32] Id.

[33] Document No. 30 at 9.

[34] Document No. 24 ¶¶ 112-13, 149, 152-54, 158-59, 161, 164, 171, 185, 193, 195.

[35] Id. ¶¶ 114, 155, 160, 165, 172, 186, 198. Plaintiffs also allege that Defendant Jay Ibrahim's statement that a particular contract award "continues KBR's long time work in the Caspian region and our enduring relationship with the operators on these off-shore developments" was misleading because "far from reflecting the Company's 'enduring relationship' with Kazakhstan, the contract in the Caspian Sea was awarded to KBR as a result of its payment of bribes to government officials through Unaoil." Id. ¶¶ 195, 198. Regardless of Plaintiffs' conclusory allegations that bribes were paid, so long as KBR had in fact worked previously in the region and with the operators, it would be true that the contract "continue[d]" KBR's work in that region and its relationship with those operators. Plaintiffs have not alleged with particularity how this specific statement made by Ibrahim was false or misleading.

[36] Document No. 30 at 7.

[37] See Document No. 24 ¶¶ 85-98.

non-conclusory allegations plausibly connecting Kazakhstan-related payments from 2008 and earlier to the awards of contracts in 2013 and later.[38] *See* Pillard v. Platform Specialty Prods. Corp., 2016 WL 10586301 at *5-6 (S.D. Fla. 2016) (holding that plaintiffs failed to plead a material misrepresentation or omission where "[t]here are no allegations as to when the **[*19]** illegal payments were made, by whom and to whom, and when and how the illegal payments were discovered"); *Shoemaker v. Cardiovascular Svs. , Inc., No. CV 16-568 (DWF/KMM), 2017 U.S. Dist. LEXIS 47972, 2017 WL 1180444, at *8 (D. Minn. Mar. 29, 2017)* ("Plaintiffs must plead particular facts that, if true, would constitute illegal conduct.") (citing *Key Energy, 166 F. Supp. 3d at 863, 872)*.

Furthermore, even if Plaintiffs had alleged a plausible connection between the alleged bribes and the specific contracts awarded nearly a decade later, the statements reporting the award of specific contracts are not misleading because, as with the reports of net income and revenue, they do not put the reasons for the award of the contracts at issue.

d. Disclosures of the Proceedings relating to the Nigerian Bribery Scheme

Several of KBR's periodic SEC filings during the Class Period included discussions of a 2013 investigation newly opened by the African Development Bank Group regarding corruption related to the same Nigerian bribery scheme which had culminated in the 2009 settlements and guilty pleas. Defendants argue that Plaintiffs fail to plead adequately a connection between Defendants' disclosures about the Nigerian bribery scheme proceedings and the current investigation of Unaoil.[39] Plaintiffs offer no argument in **[*20]** response to defend this disconnect. The alleged statements about the Nigerian bribery scheme did not put at issue other uncharged, unadjudicated wrongdoing, and Defendants did not have a duty to disclose the alleged Unaoil-related conduct. The statements about the Nigerian bribery scheme are not alleged to have been false, were not misleading, and Defendants are entitled to dismissal of Plaintiffs' claims based on those statements.

e. Unaoil Investigation Disclosure

Certain Defendants made statements about the Unaoil investigation in periodic SEC filings and on an earnings call.[40] Plaintiffs argue that the statements were misleading because they "fail to fully describe the nature of the investigation and KBR's connection to Unaoil," as they do not "mention that the news reports stated that Unaoil engaged in bribes for contracts on behalf of KBR[.]"[41]

"Defendants cannot be held liable for not preempting the SEC process and issuing a public confession." *Parker v. Hyperdynamics Corp., 126 F. Supp. 3d 830, 843 (S.D. Tex. 2015)* (Harmon, J.); *see also City of Pontiac, 752 F.3d at 184* ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."). Plaintiffs cite two cases where courts held that statements about pending investigations **[*21]** were misleading because they were not accurate and complete, but both are easily distinguished. In Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, the defendant stated multiple times that it was "not currently subject to any pending regulatory, administrative or arbitration proceedings that [it] expect[s] to have a material impact on [its] results of operations or financial condition." *164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016)*. The court found the statements misleading because the defendant had, in fact, received an SEC subpoena and requests for information from the DOJ, and the defendant subsequently restated its SEC filing to disclose that the defendant was subject of government investigations and that an adverse outcome could have a material effect. Id. In In re BioScrip, Inc. Sec. Litiq., the defendant made "statements suggesting it routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request." *95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015)*. The court held that the statements were misleading because the defendant had, in fact, received a civil investigative demand relating to a government investigation. *Id. at 725-27*.

---

[38] *See* id. ¶¶ 58-84.

[39] Document No. 25 at 14-15.

[40] Document No. 24 ¶¶ 174, 176, 179, 183, 188.

[41] Document No. 30 at 11.

Unlike *Menaldi* and *BioScrip*, here Plaintiffs do not allege that Defendants concealed the existence **[\*22]** of the investigations. In fact, KBR's SEC filings disclosed not only that investigations were being conducted in 2016 by the U.S. DOJ and the SEC of Unaoil's activities involving several global companies, including KBR, but also that KBR was cooperating in those investigations "which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena." Plaintiffs do not claim any falsity in these disclosures, but argue that Defendants' disclosures were misleading because they referred to "an investigation of Unaoil related to the information reported in . . . news articles" without reciting the information publicly available in those news articles. This is not actionable. *See, e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 617 (S.D.N.Y. 2017)* (plaintiffs "at most plead[] that the defendants disclosed an investigation was ongoing, but refused to provide details. Accordingly, these statements are not actionable.") (quoting *In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 16 (S.D.N.Y. 2016)* (internal citation omitted)). Defendants are therefore entitled to dismissal of Plaintiffs' claims based on the statements disclosing the Unaoil investigation.

f. SOX Certifications

Plaintiffs argue that the SOX certifications are false because they certified **[\*23]** that KBR's financial statements were accurate.[42] As already observed, Plaintiffs have not alleged an actionable misstatement in KBR's financial statements periodically filed with the SEC. It follows that Plaintiffs have not adequately alleged that the certifications of these financial statements were false. Moreover, Plaintiffs allege nothing that is false or misleading about the content of the certifications themselves, and therefore have not alleged an actionable claim.

2. Scienter

Plaintiffs additionally fail to state a claim for securities fraud because they fail to plead adequately that any alleged misstatements were made with the requisite state of mind. The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference" of scienter. *Diodes, 810 F.3d at 956*. A "strong inference" of scienter must be "cogent and compelling" and not merely "reasonable" or "permissible." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509-11, 168 L. Ed. 2d 179 (2007)*. Plaintiffs argue that their allegations of (1) various "red flags," (2) the Individual Defendants' high-ranking corporate positions at KBR, (3) the investigations, and (4) Defendants' Sarbanes-Oxley ("SOX") certifications each contribute to, and collectively give rise to, a strong inference of scienter.[43]

 **[\*24]** In the Fifth Circuit, the state of mind that satisfies the scienter element for a claim under *§ 10(b)* comprises "an intent to deceive, manipulate, defraud or severe recklessness." *Owens v. Jastrow, 789 F.3d 529, 535-36 (5th Cir. 2015)* (internal quotation marks and citation omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id. at 536* (quoting *Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th cir. 2002))*.

To determine whether a complaint gives rise to a "strong inference of scienter," courts should not "scrutinize each allegation in isolation," but rather must "assess all the allegations holistically." *Tellabs, 127 S. Ct. at 2511*. The Supreme Court has prescribed a three-step framework to guide the holistic analysis of scienter allegations. *Id. at 2509*. First, the court accepts all the factual allegations as true. Id. Second, the court considers the entire complaint, including those documents incorporated into the complaint by reference and matters subject to judicial notice. Id. Third, the court considers competing inferences for and against scienter to determine whether the allegations support an inference of scienter that is "cogent and compelling" and not merely "reasonable" or "permissible." *Id. at 2509-11*. This third step may be performed in two parts, first considering each allegation individually to determine whether it contributes to an inference of scienter, then considering the totality of the allegations holistically. *Diodes, 810 F.3d at 956*.

---

[42] Document No. 30 at 10.

[43] *Id. at 16-20*.

2018 U.S. Dist. LEXIS 221137, *24

The Fifth Circuit "requires more than allegations of motive and opportunity to withstand dismissal," *Goldstein v. MCI WorldCom, 340 F.3d 238, 250-51 (5th Cir. 2003)*, but "[a]ppropriate **[*25]** allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter." *Nathenson v. Zonagen Inc., 267 F.3d 400, 412 (5th Cir. 2001)*. Here, Plaintiffs make a broadside allegation that "Defendants were personally motivated to make false statements . . . in order to personally benefit from the sale of KBR securities from their personal portfolios."[44] This conclusory accusation, however, is not supported by any allegations that any of the Individual Defendants sold KBR securities at suspicious times or in suspicious amounts during the Class Period. *SeeSouthland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 368 (5th Cir. 2004)* (holding that allegations of insider trading support an inference of scienter "only when in suspicious amounts or at suspicious times.") (internal quotation marks and citation omitted). Indeed, Plaintiffs do not specifically allege that any Individual Defendant made a single sale, suspicious or otherwise. Nor do Plaintiffs offer any other allegation suggesting an actual motive for the alleged misrepresentations. "Where, as here, the plaintiffs have not alleged a clear motive for the alleged misstatements or omissions, the strength of the circumstantial evidence of scienter must be correspondingly greater." *Neiman v. Bulmahn, 854 F.3d 741, 748 (5th Cir. 2017)*. As will be seen, Plaintiffs simply fail to plead circumstantial **[*26]** evidence of scienter that has merit, much less "correspondingly greater" strength.

a. "Red Flags"

Plaintiffs argue that the Nigerian bribery scheme, together with some other "red flags," should have alerted Defendants to inquire further into KBR's relationship with Unaoil. First, citing *Reese v. Malone, 747 F.3d 557 (9th Cir. 2014)*, Plaintiffs argue that the Nigerian bribery scheme a decade earlier "should have alerted Defendants to the risk of another bribes-for-contracts scandal."[45] In Reese, two weeks after an oil spill due to corrosion of a pipeline, the defendant stated that a previous inspection had shown the pipeline was corroding at a low, manageable rate, when in fact the inspection data showed the opposite. *Id. at 571*. In finding that plaintiffs had adequately pled scienter, the court stated, "In the wake of a crisis that has the potential to repeat itself, [the defendant] had every reason to review the results of [the company's] corrosion monitoring to understand what happened as well as to assess the possibility of future leaks in similar pipelines." Id. Plaintiffs in their brief compare the corrosion monitoring in Reese to the independent monitor for FCPA compliance to which KBR agreed in its 2009 settlement with the SEC.[46] Here, **[*27]** however, Plaintiffs never allege that KBR's independent FCPA monitor generated any report determining or even suggesting that Unaoil was engaged in bribery--let alone that any of Defendants specifically referred to and contradicted any such report.

Moreover, unlike *Reese*, where the statements were made within two weeks of the oil spill, the public SEC filings and statements here were made between February 2013 and April 2017, four years and more after the decade-old Nigerian bribery scheme charges had been fully resolved and substantial and relevant personnel turnover and other changes were made in the corporation. KBR's subsidiary's predecessor entities and the predecessor entities' then-CEO engaged in a bribery scheme in Nigeria "over a ten-year period beginning as early as 1994."[47] In the intervening period after the Nigerian bribery scheme ended in 2004, KBR was spun off from Halliburton. The former CEO, who "met with high-ranking Nigerian government officials . . . to arrange bribe payments," was criminally convicted and sentenced to a term of imprisonment (and obviously was no longer employed at KBR).[48] KBR's settlement with the SEC in 2009 had "impose[d] an independent monitor for **[*28]** KBR for a period of three years to review its FCPA compliance program,"[49] which term of monitoring KBR successfully completed. Furthermore, Plaintiffs do not allege that any of Individual Defendants was involved in the conduct in Nigeria, nor even that any of

---

[44] Document No. 24 ¶ 223.

[45] Document No. 30 at 16.

[46] Id. at 17.

[47] Document No. 30 at 16; *see also* Document No. 24 ¶ 43.

[48] Document No. 24 ¶¶ 43, 46.

[49] Id. ¶ 43.

Individual Defendants was employed by KBR prior to 2006.[50] See _In re Maxwell Techs., Inc. Sec. Litig., 18 F. Supp. 3d 1023, 1043 (S.D. Cal. 2014)_ (finding that a previous FCPA investigation did "little to increase" the plausibility of scienter where the individual defendants were not directly implicated in the previous conduct). Moreover, this kind of "circumstantial evidence," where the predecessor entity was convicted of bribery, its CEO was convicted and sent to prison, and KBR's ongoing activities were monitored pursuant to formal SEC orders, would seem to be the strongest of deterrents to Defendant pursuing bribery instead of constituting a "red flag" to Individual Defendants that new criminal conduct was afoot.

Plaintiffs argue that several other "red flags" also should have alerted Defendants to investigate the relationship between KBR and Unaoil.[51] Plaintiffs identify as "red flags" KBR's reliance on Unaoil for contracts in Kazakhstan and Azerbaijan, KBR's millions of dollars of payments to **[*29]** Unaoil, emails using code words to refer to bribing officials, and the investigations of Unaoil and its interactions with KBR.[52]

As Plaintiffs themselves concede in their Complaint, "it is fairly common for large companies to partner with smaller companies with local expertise to win contracts from state-owned oil corporations," and "many international corporations relied on Unaoil to secure lucrative contracts" in many nations.[53] Plaintiffs do not allege that any of Defendants was aware of any further facts about Unaoil--for instance, that KBR relied disproportionately on Unaoil relative to other business partners--that would alert them to inquire further into this "fairly common" arrangement. Nor do Plaintiffs allege facts suggesting that KBR's payments to Unaoil were unusually large. Although Plaintiffs allege that "[b]y 2008, KBR pledged over $10 million in commissions to Unaoil," Plaintiffs' allegations indicate that those commissions were attributable to several years of KBR's dealings with Unaoil.[54] The amount itself spread over several years would at most be a rounding error in proportion to KBR's overall international operations, which Plaintiffs allege resulted in annual revenue **[*30]** of $7.92 billion at the beginning of the Class Period. The Court cannot infer that such is a "red flag" deserving of further inquiry by the Individual Defendants.

Plaintiffs also contend that the use of code words to refer to bribes in an email chain of four or five emails exchanged during two days in February 2005 between Unaoil and a couple of KBR employees should have alerted Defendants to the bribery scheme. But Plaintiffs do not allege any facts to permit an inference that any Individual Defendant, none of whom according to the Complaint was a KBR officer in 2005, had access to these emails before they were "leaked" and published in news articles in March 2016. Moreover, the emails referenced in Plaintiffs' allegations are almost exclusively between Unaoil personnel. Only two emails are alleged to have been sent to or from one of two KBR employees, neither of whom was an Individual Defendant. Plaintiffs allege that one of the two email recipients was a confidential witness who worked at one of KBR's UK subsidiaries until December 2005, and that he emailed a Unaoil employee "to discuss KBR's 'Nigerian agent problem'," stating, "A part of the fall-out [sic] from [the DOJ Nigeria **[*31]** investigation] is a considerable tightening of our US management's approach to controlling the whole arena of agent payments."[55] The other emailer, according to Plaintiffs, was Richard Stuckey, a "senior manager" at KBR, who sent his email February 23, 2005. Plaintiffs do not allege that Stuckey or the confidential witness made any false statement on KBR's behalf back in 2005 or even worked at KBR during the Class Period that did not begin until 2013.

Fifth Circuit precedent "indicates that for allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients and (2) the corporate reports [must] be connected to the speaking executive in

---

[50] _See_ id. ¶¶ 28-35.

[51] Document No. 30 at 17.

[52] Id. at 17-18.

[53] Document No. 24 ¶ 56.

[54] Id. ¶¶ 87, 90.

[55] Document No. 24 ¶ 61.

a persuasive way." *Neiman, 854 F.3d at 748* (internal quotation marks and citations omitted); *see also Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 71 (S.D.N.Y. 2010)* ("This theory [of inferring scienter from alleged 'red flags'] has been routinely rejected where, as here, Plaintiffs offer no evidence Defendants were aware of most red flags, and those of which Defendants were aware, were not so serious as to infer intent to defraud."), *aff'd sub nom. Saltz v. First Frontier, L.P., 485 F. App'x 461 (2d Cir. 2012)*. As Plaintiffs do not allege **[\*32]** that any Individual Defendant received any of these emails (or that the emails were otherwise "connected to [a] speaking executive in a persuasive way"), the emails alone are insufficient to support a strong inference of scienter.

Moreover, several considerations prevent the emails from making any significant contribution to an inference of scienter. The KBR-connected emails were sent two years before KBR was spun off from Halliburton, four years before KBR agreed to the installation of an independent monitor to review its FCPA compliance, and eight years before the beginning of the Class Period. And although Plaintiffs' allegations based on the emails support an inference that Unaoil engaged in wrongdoing, they also support an inference that Unaoil took steps to conceal such wrongdoing from KBR.[56]

Plaintiffs further argue that the government investigations into Unaoil constitute "red flags" supporting an inference of scienter. However, KBR's disclosure to the public of such "red flags" "negates the inference that defendants acted with scienter." *Owens, 789 F.3d at 540*; *see also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1211 (11th Cir. 2001)* (finding that inference of scienter was undermined by Defendant's disclosure of "the substance of the alleged 'red flags.'"). Plaintiffs **[\*33]** themselves concede that Defendants disclosed the investigations when they were announced, and, as discussed above, Plaintiffs have not adequately alleged that those disclosures were misleading.[57]

b. Individual Defendants' Positions at KBR

Plaintiffs argue that the Individual Defendants' senior management positions at KBR and access to inside information support an inference of scienter.[58] In general, "a pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Neiman, 854 F.3d at 742*. However, the Fifth Circuit has held that allegations of Defendants' positions in the company may support scienter under "special circumstances." Id.

> The "special circumstances" cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter. First, the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations. Second, the transaction at issue may have been critical to the company's continued vitality. Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker. **[\*34]** Fourth, the defendant's statements were internally inconsistent with one another.

*Diodes, 810 F.3d at 959* (internal citations omitted). Plaintiffs do not allege the size of KBR's workforce or offer any other facts from which to determine KBR's size. However, KBR's 2012 annual report--issued on February 20, 2013, and portions of which are included as an exhibit to Plaintiffs' response--indicates that KBR was a large corporation engaged in business worldwide with approximately 27,000 employees at the beginning of the Class Period. Plaintiffs likewise do not allege that the transactions at issue were critical to KBR, that the allegedly misrepresented information would have been readily apparent to any speaker, or that any defendant's statements were internally inconsistent. Defendants' management positions within KBR therefore do not support an inference of scienter. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc., 273 F. Supp. 3d 650, 671 (N.D. Tex. 2017)* (Fitzwater, J.)

---

[56] Plaintiffs allege that Unaoil's finance manager determined that Unaoil needed a bank account in Kazakhstan in order to comply with KBR's goverance rules and "limit the access [Unaoil] give[s] them to information about [Unaoil's] company activity." Document No. 24 ¶¶ 66-69.

[57] *See* id. TT 174, 176, 179, 183, 188.

[58] Document No. 25 at 18-19.

(holding that allegations of defendants' positions as CEO and CFO did not support inference of scienter where corporation had 24,000 employees).

c. Investigations

Plaintiffs argue that the investigations into Unaoil and KBR support a strong inference of scienter. "Although a government investigation is not altogether irrelevant **[*35]** to the scienter analysis, a decision by government agencies to investigate a company is not sufficient to meet the heightened Tellabs standard on its own." *Carlton v. Cannon, 184 F. Supp. 3d 428, 479-80 (S.D. Tex. 2016)* (Rosenthal, J.) (quoting *Konkol v. Diebold, Inc., 590 F.3d 390, 402 (6th Cir. 2009))*. Here, where Plaintiffs allege that the investigations into Unaoil began in March 2016 and that Defendants disclosed--in KBR's next following quarterly report the very next month--the investigations and the DOJ's request for information, the investigations contribute little to an inference of scienter.[59]

d. SOX Certifications

SOX certifications are probative of scienter only where there are "glaring accounting irregularities" or "red flags." *Dawes v. Imperial Sugar Co., 975 F. Supp. 2d 666, 693 (S.D. Tex. 2013)* (Rosenthal, J.); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007)* ("We hold that the Sarbanes-Oxley certifications at issue here do not permit an inference of scienter."). Because Plaintiffs' alleged "red flags" do not meaningfully contribute to an inference of scienter, neither do the SOX certifications.

e. Plaintiffs' allegations *in toto*

Plaintiffs' allegations, considered holistically, fail to give rise to a strong--that is, cogent and compelling--inference of scienter. The inference that Defendants were unaware of Unaoil's alleged misconduct is far more compelling. Defendants are therefore entitled to dismissal. **[*36]**

B. Section 20(a)

Plaintiffs allege claims against the Individual Defendants for control person liability under *Section 20(a)* of the Exchange Act, which extends to "[e]very person who, directly or indirectly, controls any person liable" for violation of the Exchange Act. *15 U.S.C. § 78t*. "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland, 365 F.3d at 383*. Because Plaintiffs have not adequately pled a violation of *Section 10(b)*, their *Section 20(a)* claims must also be dismissed.

C. Leave to Amend

Plaintiffs request leave to amend their Complaint. "The court should freely give leave [to amend the pleadings] when justice so requires." *Fed. R. Civ. P. 15(a) (2)*. Defendants have not offered any compelling reason to deny Plaintiffs' request, which request is therefore granted. If Plaintiffs elect to amend, they should bear in mind the requirements of Federal *Rule 9(b)*, the PSLRA, and other requirements discussed hereinabove. It is not necessary to plead longer (observing Plaintiffs' reference to its Complaint of 68 pages in length), but rather--if such can be done consistent with Federal *Rule 11(b)*--with greater substance, focus, and particularity. *See 15 U.S.C. § 78u-4(c)*.

IV. Order

Accordingly it is

ORDERED that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint **[*37]** (Document No. 25) is GRANTED and Plaintiffs' claims are DISMISSED, Plaintiffs' request for leave to amend their consolidated complaint is GRANTED, and Plaintiffs are granted leave within twenty-one (21) days after the entry of this Order to file an Amended Consolidated Complaint. If Plaintiffs choose not to file an Amended Consolidated Complaint within such period, a Final Judgment of dismissal will then be entered.

---

[59] Document No. 24 ¶¶ 54,

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 31st, day of August, 2018.

/s/ Ewing Werlein, Jr.

EWING WERLEIN, JR.

UNITED STATES DISTRICT JUDGE


APPENDIX A


***In re KBR, Inc. Securities Litigation***


**Alleged Misrepresentations in the Consolidated Class Action Complaint** [1]

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| **Category A: Statements Reporting KBR's Net Income Revenue** [3] | | | | |
| 1 | 99 | 2012 Form 10-K (filed 2/20/2013) | *Unattributed* | "For the quarter, KBR reported net income of $30 million, or $0.20 per diluted share, on revenue of $1.87 billion, compared to net income of $90 million, or $0.60 per diluted share, on revenue of $2.1 billiOt on for the same period in the prior year. For fiscal year 2012, KBR reported net income of $144 million, **[*38]** or $0.97 per diluted share, on revenue of $7.92 billion, compared to net income of $480 million, or $3.16 per diluted share, on revenue of $9.26 billion for fiscal year 2011." |
| | | | Carter Utt | |
| 2 | 102 | 2012 Form 10-K (filed 2/20/2013) | *Unattributed* | "Oil & Gas. Oil & Gas revenue decreased by $5 million and job income increased by $11 million in 2012 compared to 2011. The decrease in revenue is primarily due to the completion or near-completion of several long term projects in late 2011 |

---

[1] Defendants do not admit the content of any of the allegations in the Consolidated Class Action Complaint ("CAC" or "Complaint") or this Appendix A. The purpose of Appendix A is to organize the alleged misrepresentations in the Complaint for the Court.

2  Language is quoted directly from the press releases, the financial reports, and the investor presentations rather than from the excerpts given in the Complaint unless otherwise noted. Bolded terms are those emphasized by Plaintiffs in their Complaint.

3  Language for Category A is quoted from the Complaint.

2018 U.S. Dist. LEXIS 221137, *38

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | and during 2012. **These project completions were offset by other long term technical service projects and increased progress on existing projects primarily located in the North Sea and Azerbaijan**, as well as the recognition of $8 million in license fee revenue for several semi-submersible hulls. **The increase in job income is primarily due to increased progress for projects in the North Sea and Azerbaijan**, as well as the recognition of the license fees, partially offset by the completion or near completion of other projects." |
| 3 | 105 | Q1 2013 Form 10-Q (filed 4/25/2013) | Carter Utt *Unattributed* | "For the quarter, KBR reported net income of $88 million, or $0.59 per diluted share, on revenue of $1.86 billion, compared to net income **[*39]** of $91 million, or $0.61 per dilated share, on revenue of $2 billion for the same period in the prior year." |
| 4 | 106 | Q1 2013 Form 10-Q (filed 4/25/2013) | Carter Utt *Unattributed* | "Oil & Gas. Oil & Gas revenue decreased by $10 million and job income increased by $2 million in the first quarter of 2013 compared to the same period of the prior year. The decrease in revenue is primarily due to the completion or near-completion of several long term projects including a project in the North Sea. **The impact from these project completions was offset by new projects awarded, as well as other long term technical service projects and increased progress on existing projects including a project in Azerbaijan. The increase in job income is primarily due to increased progress on** |

2018 U.S. Dist. LEXIS 221137, *39

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | **new awards and for a project in Azerbaijan**, partially offset by the completion or near completion of other projects." |
| | | | Carter | |
| 5 | 109 | Q2 2013 Form 10-Q (filed 7/25/2013) | *Unattributed* | "For the quarter, KBR reported net income of $90 million, or $0.61 per diluted share, on revenue of $2 billion, compared to net income of $104 million, or $0.70 per diluted share, on revenue of $2.06 billion for the same period in the prior year." |
| | | | Carter | |
| 6 | 110 | Q2 2013 **[*40]** Form 10-Q (filed 7/25/2013) | *Unattributed* | "Oil & Gas. Oil & Gas revenue and job income decreased by $22 million and $12 million, respectively, in the second quarter of 2013 compared to the same period of the prior year. The decreases in revenue and job income were primarily due to the completion or near-completion of several long term projects including a project in the North Sea, as well as recognition of approximately $8 million of license fee revenue and income in 2012 for several semi-submersible hulls. **These decreases were partially offset by** new project awards including a FEED project in Iraq, **other long term technical service projects and progress on existing projects including a project in Azerbaijan**." |
| | | | Carter | |
| 7 | 115 | Q3 2013 Form 10-Q (filed 10/24/2013) | *Unattributed* | "For the quarter, KBR reported net income of $24 million, or $0.16 per diluted share, on revenue of $1.81 billion, compared to a net loss of $81 million, or ($0.55) per diluted share, on revenue of $1.99 billion for the same period in the prior year." |

2018 U.S. Dist. LEXIS 221137, *40

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | Utt | |
| 8 | 116 | Q3 2013 Form 10 — Q (filed 10/24/2013) | *Unattributed* | "Hydrocarbons revenue increased by $53 million in the third quarter of2013 compared to the same period of the prior year. **[*41]** The increase was primarily due to new ammonia project awards at the end of 2012 and during 2013 for EPC, licensing and proprietary equipment on the Dyno Nobel ammonia plant and other projects in North America. Also **contributing to the increase in revenue** was an increase in ammonia technology licenses revenue on other projects worldwide, including the associated basic engineering scope and proprietary equipment, and **increased activity on existing projects, including an oil and gas project in Azerbaijan**. These increases were partially offset by a decline in revenue due to the completion or near completion of several long term oil and gas projects including the Quad 204 and Chirag projects. |
| | | | Utt | Hydrocarbons job income decreased by $3 million in the third quarter of 2013 compared to the same period of the prior year. This decrease was due to the completion or near completion of several long term oil and gas projects including Quad 204 and Chirag, as well as a non-recurring item in the third quarter of 2012 which contributed $8 million to job income associated with the completion of an ammonia license and basic engineering contract in Venezuela. **These declines were partially offset by** increases **[*42]** due to a $5 million favorable arbitration award on an Egyptian project completed in a prior year, progress on EPC and |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | ammonia plants in North America which are in the early stages, **as well as progress on pro_iects in Azerbaijan and Uzbekistan.**" |
| 9 | 119 | 2013 Form 10 — K (filed 2/27/2014) | *Unattributed* | "For the quarter, KBR reported, net income of $27 million, or $0.18 per diluted share, on revenue of $1. 72 billion, compared to net income of $30 million, or $0.20 per diluted share, on revenue of $1.83 billion for the same period in the prior year. For fiscal year 2013, KBR reported net income of $229 million, or $1.54 per diluted share, on revenue of $7.28 billion, compared to net income of $144 million, or $0.97 per diluted share, on revenue of $7.77 billion for fiscal year 2012." |
| | | | Ferraioli Utt | |
| | 128 | 2013 Form 10 — KIA (filed 5/30/2014)[4] | | |
| 10 | 120 | 2/27/2014 — Press Release | *Unattributed* | "Net income attributable to KBR was $27 million, or $0.18 per diluted share, compared to net income attributable to KBR of $30 million, or $0.20 per diluted share, in the fourth quarter of 2012. Consolidated revenue in the fourth quarter of 2013 was $1. 7 billion compared with $1.8 billion in the fourth quarter of 2012. Gross **[*43]** profit in the fourth quarter of 2013 was $84 million compared to gross profit of $60 million in the prior year fourth quarter." |
| 11 | 120 | 2/27/2014 — Press Release | *Unattributed* | Hydrocarbons revenue was $432 million, up $107 million. Hydrocarbons gross profit was $44 million, down $13 million. Fourth quarter 2012 included a $14 million gain related to a project settlement that did not reoccur in 2013. **Revenue growth is the result of** increased downstream |

---

4  On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 119 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *43

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | activity on ammonia, urea and ethylene projects in North America, an ethylene project in Uzbekistan, and **an oil and gas project in Azerbaijan**." |
| 12 | 124 | 2013 Form 10 — K (filed 2/27/2014) | *Unattributed* | "2012 net income attributable to KBR decreased to $144 million from $480 million in 2011. This decline in performance was related to the December 2011 decline in government operations in Iraq, project completions or near completions on three significant projects in the Gas Monetization segment, project losses in the IGP and Services business segments, and a $178 million charge in 2012 related to the impairment of a portion of the goodwill from our acquisition of R&S in 2010. Partially offsetting these items were new awards and increased activity in several **[*44]** market segments. |
| | 128 | Q3 2013 Form 10 — Q (filed 5/30/2014)[5] | Ferraioli Utt | ... <br><br> The Hydrocarbons business segment had a strong year in 2012 with **revenues up slightly** compared to 2011 and gross profit increasing 15% from $161 million to $185 million driven by an increase in the number of long-term technical service and engineering projects, recognition of license fee renewals, **increased progress on existing projects primarily located in** the U.S., the North Sea and **Azerbaijan**, as well as recognition of amounts related to the settlement of the Fina Antwerp Olefins ("FAO") claim." |
| 13 | 125 | 2013 Form 10-K (filed 2/27/2014) | *Unattributed* | "Hydrocarbons revenue increased $222 million and gross profit decreased $8 million in 2013 compared to 2012. **The increase in** |

5 On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 124 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *44

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | **revenue was primarily due to** an increase in large EPC contracts for downstream ammonia, urea and ethylene projects utilizing natural gas feedstock in North America, progress on an ethylene project in Uzbekistan and **a services project in Azerbaijan.**" |
| | 128 | 2013 Form 10-K/A (filed 5/30/2014)[6] | Ferraioli | |
| 14 | 127 | ~~2014 Form 10-K (filed 5/30/2014)~~ | *Unattributed* | "For the quarter, KBR reported, as amended, net loss of $56 million, or ($0.38) per diluted share, on revenue **[*45]** of $1.68 billion, compared to net income of $30 million, or $0.20 per diluted share, on revenue of $1.87 billion for the same period in the prior year. For fiscal year 2013, KBR reported net income of $75 million, or $0.50 per diluted share, on revenue of $7.21 billion, compared to net income of $144 million, or $0.97 per diluted share, on revenue of $7.77 billion for fiscal year 2012." |
| | | 2013 Form 10-K/A | Ferraioli | |
| 15 | 130 | Q1 2014 Form 10-Q (filed 6/19/2014) | *Unattributed* | "For the quarter, KBR reported a net loss of $43 million, or ($0.29) per diluted share, on revenue of $1.63 billion, compared to net income of $88 million, or $0.59 per diluted share, on revenue of $1.83 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 16 | 134 | Q2 2014 Form 10-Q (filed 7/31/2014) | *Unattributed* | "For the quarter, KBR reported a net loss of $8 million, or ($0.06) per diluted share, on revenue of $1.71 billion, compared to net income of $90 million, or $0.61 per diluted share, on revenue of $2 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 17 | 138 | Q3 2014 Form 10-Q (filed 11/4/2014) | *Unattributed* | "For the quarter, KBR |

---

6  On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 125 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *45

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | reported net income of $30 million, or $0.21 per diluted share, on revenue of $1.66 billion, **[*46]** compared to a net loss of $47 million, or ($0.32) per diluted share, on revenue of $1.79 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 18 | 142 | 2014 Form 10-K (filed 2/27/2015) | *Unattributed* | "For the quarter, KBR reported, a net loss of $1.24 billion, or ($8.57) per diluted share, on revenue of $1.42 billion, compared to a net loss of $56 million, or ($0.38) per diluted share, on revenue of $1.68 billion for the same period in the prior year. For fiscal year 2014, KBR reported a net loss of $1.26 billion, or ($8.66) per diluted share, on revenue of $6.37 billion, compared to net income of $75 million, or $0.50 per diluted share, on revenue of $7.21 billion for fiscal year 2013." |
| | | | Bradie Ferraioli | |
| 19 | 145 | 2014 Form 10-K (filed 2/27/2015) | *Unattributed* | "E&C revenue decreased by $372 million, or 8%, to $4.6 billion in 2014 compared to $5.0 billion in 2013. This decrease was primarily due to lower activity on EPC projects in our LNG/GTL markets, as they neared completion in 2014, and reduced construction projects in the U.S. market. **These decreases were partially offset** by increased activity on EPC contracts for downstream projects in North America, increased activity on several Canadian pipe **[*47]** fabrication and module assembly and construction projects, **increased activity on an upstream project in Azerbaijan** and an increase in KBR services on an LNG project joint venture in Australia." |
| | | | Bradie Ferraioli | |
| 20 | 150 | Q1 2015 Form 10-Q (filed 4/29/2015) | *Unattributed* | "For the quarter, KBR reported net income of $44 |

2018 U.S. Dist. LEXIS 221137, *47

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | million, or $0.30 per diluted share, on revenue of $1.44 billion, compared to a net loss of $43 million, or ($0.29) per diluted share, on revenue of $1.63 billion for the same period in the prior year." |
| 21 | 154 | 4/29/2015 — Press Release | *Ferraioli* | |
| | | | *Unattributed* | "Net income attributable to KBR was $44 million or $0.30 per diluted share ($0.33 per diluted share excluding $5 million in pre-tax U.S. Government legacy legal fees), in the first quarter of 2015 compared to a net loss of $43 million or a net loss of $0.29 per diluted share, in the first quarter of 2014. Consolidated revenue in the first quarter of 2015 was $1.4 billion compared to $1.6 billion in the first quarter of 2014." |
| 22 | 156 | Q2 2015 Form 10-Q (filed 8/4/2015) | *Unattributed* | "For the quarter, KBR reported net income of $62 million, or $0.43 per diluted share, on revenue of $1.38 billion, compared to a net loss of $8 million, or ($0.06) **[*48]** per diluted share, on revenue of $1.71 billion for the same period in the prior year." |
| 23 | 162 | Q3 2015 Form 10-Q (11/2/2015) | *Ferraioli* | |
| | | | *Unattributed* | "For the quarter, KBR reported net income of $55 million, or $0.38 per diluted share, on revenue of $1.2 billion, compared to net income of $30 million, or $0.21 per diluted share, on revenue of $1.66 billion for the same period in the prior year." |
| 24 | 166 | 2015 Form 10-K (filed 2/26/2016) | *Ferraioli* | |
| | | | *Unattributed* | "For the quarter, KBR reported net income of $42 million, or $0.29 per diluted share, on revenue of $1.08 billion, compared to a net loss of $1.24 billion, or ($8.57) per diluted share, on revenue of $1.41 billion for the same period in the prior year. For fiscal year 2015, KBR reported net income of |

2018 U.S. Dist. LEXIS 221137, *48

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | $203 million, or $1.40 per diluted share, on revenue of $5.09 billion, compared to a net loss of $1.26 billion, or ($8.66) per diluted share, on revenue of $6.36 billion for fiscal year 2014." |
| | | | Bradie Ferraioli | |
| 25 | 169 | 2015 Form 10-K (filed 2/26/2016) | *Unattributed* | "E&C revenues decreased by $372 million, or 8%, to $4.6 billion in 2014 compared to $5.0 billion in 2013. This decrease was primarily due to lower activity on LNG projects, as they neared completion **[*49]** in 2014, and reduced activity in the Construction market. **These decreases were partially offset by** increased activity on contracts for downstream projects in the U.S., on several Canadian pipe fabrication, module assembly and construction projects, **on an upstream project in Azerbaijan** and an increase in KBR services on an LNG project joint venture in Australia." |
| | | | Bradie Ferraioli | |
| 26 | 173 | Q1 2016 Form 10-Q (filed 4/29/2016) | *Unattributed* | For the quarter, KBR reported net income of $42 million, or $0.30 per diluted share, on revenue of $996 million, compared to net income of $44 million, or $0.30 per diluted share, on revenue of $1.43 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 27 | 178 | Q2 2016 Form 10-Q (filed 7/29/2016) | *Unattributed* | "For the quarter, KBR reported net income of $47 million, or $0.32 per diluted share, on revenue of $1 billion, compared to net income of $62 million, or $0.43 per diluted share, on revenue of $1.38 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 28 | 182 | Q3 2016 Form 10-Q (filed 11/1/2016) | *Unattributed* | "For the quarter, KBR reported a net loss of $63 million, or ($0.44) per diluted |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | share, on revenue of $1.07 billion, compared to net income of $55 million, [*50] or $0.38 per diluted share, on revenue of $1.19 billion for the same period in the prior year." |
| | | | Ferraioli | |
| 29 | 187 | 2016 Form 10-K (filed 2/24/2017) | *Unattributed* | "For the quarter, KBR reported a net loss of $87 million, or ($0.61) per diluted share, on revenue of $1.19 billion, compared to net income of $42 million, or $0.29 per diluted share, on revenue of $1.08 billion, for the same period in the prior year. For fiscal year 2016, KBR reported a net loss of $61 million, or ($0.43) per diluted share, on revenue of $4.26 billion, compared to net income of $203 million, or $1.40 per diluted share, on revenue of $5.09 billion for fiscal year 2015." |
| | | | Bradie Ferraioli | |
| 30 | 196 | Q1 2017 Form 10-Q (filed 4/28/2017) | *Unattributed* | "For the quarter, KBR reported net income of $37 million, or $0.26 per diluted share, on revenue of $1.10 billion, compared to net income of $42 million, or $0.30 per diluted share, on revenue of $996 million for the same period in the prior year." |
| | | | Sopp | |

**Category B: Statements Regarding Compliance with Bribery Laws and KBR's Code of Business Conduct**

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 31 | 100 | 2012 Form 10-K (filed 2/20/2013) | *Unattributed* | "We are subject to numerous compliance-related laws and regulations, including the Foreign [*51] Corrupt Practices Act, the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Conducting our business with ethics and integrity is a key priority for KBR. Our |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct." |
| | | | Carter Utt | |
| 32 | 101 | Company's Code of Business Conduct ("COBC") | *Unattributed* | COBC prohibiting employees from making improper payments and requiring high-risk third parties acting on behalf of KBR to be subject to due diligence.[7] |
| | | | Bradie | |
| 33 | 122 | 2013 Form 10-K (filed 2/27/2014) | *Unattributed* | "We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery **[*52]** Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Conducting our business with ethics and integrity is a key priority for KBR. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. |

7 The Complaint quotes over a page of material from KBR's COBC. For purposes of Appendix A, Defendants have summarized the content of the quoted COBC sections.

2018 U.S. Dist. LEXIS 221137, *52

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct." |
| | 128 | 2013 Form 10-K/A (filed 5/30/2014)[8] | Ferraioli Utt | |
| 34 | 123 | COBC | *Unattributed* | COBC prohibiting employees from making improper payments and requiring high-risk third parties acting on behalf of KBR to be subject to due diligence. |
| | | | Bradie | |
| 35 | 143 | 2014 Form 10-K (filed 2/27/2015) | *Unattributed* | Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices **[*53]** Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct." |
| | | | Bradie Ferraioli | |
| 36 | 144 | COBC | *Unattributed* | COBC prohibiting employees from making improper payments and requiring high-risk third parties acting on behalf of KBR to be subject to due |

---

8 On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 122 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *53

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | diligence. |
| | | | Bradie | |
| 37 | 167 | 2015 Form 10-K (filed 2/26/2016) | *Unattributed* | "Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery **[*54]** legislation and laws and regulations regarding trade and exports. We are also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding anti-bribery issues and our Code of Business Conduct." |
| | | | Bradie Ferraioli | |
| 38 | 168 | COBC | *Unattributed* | COBC prohibiting employees from making improper payments and requiring high-risk third parties acting on behalf of KBR to be subject to due diligence. |
| | | | Bradie | |
| 39 | 189 | 2016 Form 10-K (filed 2/24/2017) | *Unattributed* | "Conducting our business with ethics and integrity is a key priority for KBR. We are subject to numerous compliance-related laws and regulations, including the U.S. Foreign Corrupt Practices Act (the "FCPA"), the U.K. Bribery Act, other applicable anti-bribery legislation and laws and regulations regarding trade and exports. We are **[*55]** |

2018 U.S. Dist. LEXIS 221137, *55

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | also governed by our own Code of Business Conduct and other compliance-related corporate policies and procedures that mandate compliance with these laws. Our Code of Business Conduct is a guide for every employee in applying legal and ethical practices to our everyday work. The Code of Business Conduct describes not only our standards of integrity but also some of the specific principles and areas of the law that are most likely to affect our business. We regularly train our employees regarding our Code of Business Conduct and other specific areas including anti-bribery compliance and international trade compliance." |
| | | | Bradie Ferraioli | |
| 40 | 190 | COBC | *Unattributed* | COBC prohibiting employees from making improper payments and requiring high-risk third parties acting on behalf of KBR to be subject to due diligence. |
| | | | Bradie | |

**Category C: Statements Regarding the Award of Specific Contracts**

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 41 | 112 | 3/7/2013 — Press Release | *Unattributed* | "KBR . . . today announced it was awarded a contract by the State Oil Company of the Azerbaijan Republic (SOCAR) to provide PMC services for the FEED phase of the Gas Processing Plant (GPP) within the new Oil-Gas Processing and Petrochemical Complex (OGPC) in Azerbaijan. This award **[*56]** marks the first direct engagement between SOCAR and KBR on a large world-scale capital project. ... The OGPC will consist of a gas processing plan, currently in FEED phase, with throughput capacity of 10-12 billion cubic meters per annum and a refinery plant with a capacity of 10 |

2018 U.S. Dist. LEXIS 221137, *56

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | million tonnes per annum. Oil products are being developed as strategic domestic assets and the petrochemical plant is being developed mostly for the export market. The GPP FEED completion is expected circa October 2013, with the overall OGPC expected to begin operating in late 2020." |
| 42 | 113 | 3/7/2013 — Press Release | Zelinski | "KBR is proud to support SOCAR on their flagship onshore OGPC world-scale facility. . . . This award confirms KBR's presence as one of the top engineering contractors in the region, specifically Azerbaijan." |
| 43 | 149 | 3/27/2015 — Press Release | *Unattributed* | "With support from KBR and SOCAR, the new company will provide design, engineering, technical, procurement, construction supervision and project management service for projects across the upstream, midstream and downstream oil and gas sectors, primarily in the Republic of Azerbaijan.<br><br>...<br><br>Additionally, it will train and develop the local workforce and **[*57]** supervise contractors throughout all stages of a project." |
| 44 | 149 | 3/27/2015 — Press Release | Bradie | "KBR is proud to continue our successful history in Azerbaijan. . . . This joint agreement represents KBR's ability to bring consistent and valuable training and educational programs to the region. We look forward to mobilizing our expertise, systems and procedures to support SOCAR's success with these new projects." |
| 45 | 149 | 3/27/2015 — Press Release | Non-Party Rovnag Abdullayev | "We are confident that this strong JV will help to realise our ambition to create a world class Azerbaijan-based engineering company." |
| 46 | 149 | 3/27/2015 — Press Release | *Unattributed* | "The JV will be located in |

2018 U.S. Dist. LEXIS 221137, *57

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | Baku. Bookings from the JV will be recognized as projects are awarded in the future." |
| 47 | 152 | 4/29/2015 — Earnings Call | Bradie | "We continue to win in strategically important areas, the Yara BASF we announced full EPC in that we also announced the JV with the National Oil Company of Azerbaijan and SOCAR. Strategy around reimbursable construction base them through in the quarter and I guess our positioning in LNG with Dragon LNG EPC and boil-off liquefaction project in the UK was pleasing win in that period. |
| | | | | ... |
| | | | | Low cost development **[*58]** in the Middle-East and Caspian are driving onshore upstream opportunities and I think the JV with SOCAR where we've got a strong footprint in country that plays to national content and the local seen positions as well for offshore ground field projects."[9] |
| 48 | 153 | 4/29/2015-Investor Presentation | *Unattributed* | "Continued wins in strategically important areas - e.g., . . . SOCAR JV in Azerbaijan, reimbursable construction project. |
| | | | Bradie Ferraioli | ... |
| | | | | JV with SOCAR-National Oil Company of Azerbaijan also positions us well for offshore brown field. |
| | | | | ... |
| | | | | "Continued success in strategically important areas - . . . SOCAR JV in Azerbaijan, major reimbursable construction project." |
| 49 | 153 | 6/1/2015-Investor Presentation | *Unattributed* | "Continued wins in strategically important areas - e.g.....SOCAR JV in Azerbaijan, reimbursable construction project. |

_____

9  This quote is taken entirely from Plaintiffs' CAC.

2018 U.S. Dist. LEXIS 221137, *58

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | Bradie Ferraioli | ...<br><br>JV with SOCAR - National Oil Company of Azerbaijan also positions us well for offshore brownfield.<br><br>...<br><br>"Continued success in strategically important areas - . . . SOCAR JV in Azerbaijan, major reimbursable construction project." |
| 50 | 154 | 4/29/2015-Press Release | Bradie | "While oil prices remain depressed, KBR's technology and project delivery capability for natural **[*59]** gas derivative products and associated downstream facilities positions us well for project awards during 2015. We are also in sole source negotiations for two major U.K. Ministry of Defence (MoD) contracts where awards are expected by the end of 2015. In recent months we have continued to win a number of key contracts that reflect our strategy, **including a new engineering JV with the State Oil Company of Azerbaijan Republic (SOCAR) to establish a new engineering and supportservices company in Azerbaijan**, the Black Sea LNG FEED award, a major U.S. construction award and pre-FEED work for two world-scale ammonia facilities." |
| 51 | 158 | 8/4/2015 — Earnings Call | Bradie | "Onshore opportunities in the Middle East and Caspian do remain positive. We've formed a joined venture in Azerbaijan with SOCAR, the national oil company. We've been in Azerbaijan for many, many years and been involved in most of the developments, particularly in the offshore side in and around Azerbaijan, so we feel this sort of plays to the national content push and strengthens our position |

2018 U.S. Dist. LEXIS 221137, *59

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | there particularly for brownfield work."[10] |
| 52 | 159 | 8/4/2015 — Investor Presentation | *Unattributed* | "JV with National Oil Company of Azerbaijan (SOCAR) **[*60]** announced in 1Q15 also positions us well for offshore brownfield." |
| | | | Bradie Ferraioli | |
| 53 | 159 | 8/31/2015 — Investor Presentation | *Unattributed* | "JV with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield." |
| | | | Bradie Ferraioli | |
| 54 | 159 | 9/10/2015 — D.A. Davidson 14th Annual E&C Conference Presentation | *Unattributed* | "JV with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield." |
| | | | Bradie Ferraioli | |
| 55 | 161 | 10/22/2015 — Earnings Call | Bradie | Good pipeline of near-term and long-term prospects focused on the Middle East as we're identifying a number of opportunities in that market, onshore upstream opportunities in the Middle East and Caspian and our joint venture in Azerbaijan with SOCAR is tendering heavily for some good opportunities in the offshore brownfield arena. As many of you know, we've been in Azerbaijan for many, many years and have a very good reputation there. Offshore developments continue, some in the Gulf of Mexico, some in the North Sea, obviously in Azerbaijan as previously mentioned, and some in Thailand, but again, very specific opportunities that we're targeting in those markets."[11] |
| 56 | 164 | 11/2/2015 **[*61]** — Investor Presentation | *Unattributed* | "JV with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield." |
| | | | Bradie Ferraioli | |

---

10  This quote is taken entirely from Plaintiffs' CAC.
11  This quote is taken entirely from Plaintiffs' CAC.

2018 U.S. Dist. LEXIS 221137, *61

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 57 | 164 | 11/30/2015 — Investor Presentation | *Unattributed* | "JV with National Oil Company of Azerbaijan (SOCAR) announced in 1Q15 also positions us well for offshore brownfield." |
| | | | Bradie Ferraioli | |
| 58 | 171 | 3/8/2016 — Press Release | *Unattributed* | KBR . . . announced its SOCAR-KBR joint venture was awarded a significant project management consultancy (PMC) Contract for the Heydar Aliyev Baku oil refinery modernization project in Azerbaijan. This award marks the first major award to the joint venture, SOCAR-KBR Limited Liability Company (SOCAR-KBR LLC), since its inception in mid-2015." |
| 59 | 171 | 3/8/2016 — Press Release | Abdullayev | "The Heydar Aliyev refinery reconstruction project is currently one of the most important investments for SOCAR globally, and 1 am very happy that this project is in the capable hands of one of SOCAR's own entities-namely the SOCAR-KBR joint venture." |
| 60 | 171 | 3/8/2016 — Press Release | *Unattributed* | "The overall refinery capacity will be increased from 6 to 7.5 million tons per year (MYPY). The catalytic cracking unit capacity will **[*62]** be increased from 2 to 2.5 MTPY, and Euro 5 standards will be established for all refined products. The modernization of the Heydar Aliyev Baku oil refinery will begin immediately and will be completed by late 2018, with an estimated capital cost of $1 billion USD for the total project." |
| 61 | 171 | 3/8/2016 — Press Release | Braendeland | "KBR is proud to support our long term partner SOCAR on this project. It is very significant that SOCAR-KBR LLC, as an Azerbaijani Company, takes on the PMC role for this key project for Azerbaijan . . . KBR has worked on various projects in Azerbaijan since 1994, achieving more than 17 million man-hours. At peak |

2018 U.S. Dist. LEXIS 221137, *62

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | times, KBR employed nearly 400 Azerbaijani workers-expending more than 4 million man-hours in country. We are very proud of our track record to the Azeri economy." |
| 62 | 171 | 3/8/2016 — Press Release | *Unattributed* | "The value of the PMC contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in Q1 of 2016." |
| 63 | 185 | 11/7/2016 — Press Release | Abdullayev | "The modernization project will make it possible to increase the production facilities at Azerikimya, ensure the supply of raw materials to polyethylene **[*63]** and polypropylene production installations and to meet the demand in the country. It will also increase the country's export potential, enhance the security of the technological process and the quality of raw materials and finished products." |
| 64 | 185 | 11/7/2016 — Press Release | Braendeland | "SOCAR-KBR LLC, combines KBR's extensive experience in the oil and gas sector with SOCAR's strong vision and leadership in the region to perform the program management role for this key project for Azerikimya . . . . We have passionate and talented Azerbaijani and international team members who are dedicated to Azerbaijan and our partner SOCAR and I am confident SOCAR KBR LLC will deliver successfully on this project and others in region." |
| 65 | 185 | 11/7/2016 — Press Release | *Unattributed* | "The value of the contract is undisclosed and will be booked into the backlog of unfilled orders for KBR's Engineering & Construction business segment in 04 of 2016." |
| 66 | 193 | 3/1/2017 — Wire Release | *Unattributed* | "KBR . . . announced today it has been awarded a two-year engineering services call-off contract by the North |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | Caspian Operating Company (NCOC) . . . for its projects in the Kazakhstan zone of the Caspian Sea." |
| 67 | 195 | 3/1/2017 — Wire [*64] Release | Ibrahim | "KBR is pleased to have the opportunity to provide our renowned front-end expertise, and engineering and execution excellence, for these significant projects for NCOC . . . . This award continues KBR's long time work in the Caspian region and our enduring relationship with the operators on these off-shore developments to deliver economic and innovative solutions to further the development of these challenging projects . . . ." |

**Category D: Statements Regarding the Prior, Unrelated Nigeria FCPA Investigation**

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 68 | 102 | 2012 Form 10-K (filed 2/20/2013) | *Unattributed* | "Foreign Corrupt Practices Act ("FCPA") investigations |
| | | | Carter Utt | . . . |
| | | | | In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA . . . related to the Bonny Island investigation . . . . In addition, we settled a civil enforcement action by the SEC . . . . We also agreed to a period of organizational probation . . . over a three year period that ended on February 17, 2012 . . . . In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office. . . . With the settlement of the DOJ, SEC, SFO and other investigations, all known investigations in the Bonny Island project [*65] have been concluded. We are not aware of any other corruption allegations against us by governmental authorities in foreign jurisdictions." |
| 69 | 106 | Q1 2013 Form 10-Q (filed 4/25/2013) | *Unattributed* | "Foreign Corrupt Practices Act ("FCPA") investigations |
| | | | Carter | . . . |
| | | | | In February 2009, KBR LLC, entered a guilty plea to |

2018 U.S. Dist. LEXIS 221137, *65

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | violations of the FCPA . . . related to the Bonny Island investigation . . . . In addition, we settled a civil enforcement action by the SEC . . . . We also agreed to a period of organizational probation . . . over a three year period that ended on February 17, 2012 . . . . In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office. |
| | | | | . . . |
| | | | | On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working **[*66]** with the ADBG to resolve the issue. At this time because we only recently received the letter from the ADBG and are still in the process of evaluating the matter, it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investigation." |
| 70 | 110 | Q2 2013 Form 10-Q (filed 7/25/2013) | *Unattributed* | "Foreign Corrupt Practices Act ("FCPA") investigations |
| | | | Carter | . . . |
| | | | | In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA ... related to the Bonny Island investigation .... In addition, we settled a civil |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | enforcement action by the SEC .... We also agreed to a period of organizational probation ... over a three year period that ended on February 17, 2012 .... In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office.<br><br>. . .<br><br>On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that **[*67]** the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working with the ADBG to resolve the issue. At this time we are still in the process of evaluating the matter and it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investigation." |
| 71 | 116 | Q3 2013 Form 10-Q (filed 10/24/2013) | *Unattributed*<br><br>Utt | "Foreign Corrupt Practices Act ("FCPA") investigations<br><br>. . .<br><br>In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA ... related to the Bonny Island investigation .... In addition, we settled a civil enforcement action by the SEC .... We also agreed to a period of organizational probation ... over a three year period that ended on February 17, 2012 .... In February 2011, M.W. |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office. |
| | | | | . . . |
| | | | | On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. **[*68]** In accordance with the indemnity clauses under the MSA, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We are working with the ADBG to resolve the issue. At this time we are still in the process of evaluating the matter and it is not possible to determine the outcome, financial implications or possible debarment of one or more KBR related entities arising from this investiization." |
| 72 | 121 | 2013 Form 10-K (filed 2/27/2014) | Unattributed | "Foreign Corrupt Practices Act ("FCPA") investigations |
| | 128 | 2013 Form 10-K/A (filed 5/30/2014)[12] | Ferraioli Utt | . . . |
| | | | | In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA . . . related to the Bonny Island investigation . . . . In addition, we settled a civil enforcement action by the U.S. Securities and Exchange Commission ("SEC"). We also agreed to a period of organizational probation over a three year period that ended on February 17, 2012. . . . In February 2011, M.W. Kellogg Limited ("MWKL") |

---

12  On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 121 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *68

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | reached a settlement with the U.K. Serious Fraud Office. <br><br> . . . <br><br> On March 18, 2013, we received **[*69]** a letter from the African Development Bank Group ("ADBG") stating that they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. In accordance with the indemnity clauses under the master separation agreement, we notified Halliburton and they have responded that the matter does not fall within the scope of their indemnity. We disagree with Halliburton's position and have taken necessary actions to preserve our rights. We have been working with the ADBG to resolve the issue and have now reached an agreement in principle with the ADBG. The Negotiated Resolution Agreement with the ADBG will likely include a financial assessment equivalent to approximately $6.6 million as well as a three-year debarment from ADBG sponsored contracts of three Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project. We have accrued the financial penalty in "accounts payable" on our consolidated balance sheets. There can be no assurances that such an agreement with the ADBG will be reached, and the final terms of the agreement are subject to the negotiation and execution **[*70]** of definitive agreements with the ADBG." |
| 73 | 131 | Q 2014 Form 10-Q (filed 6/19/2014) | Unattributed <br><br> Ferraioli | "Foreign Corrupt Practices Act ("FCPA") investigations <br><br> . . . |

2018 U.S. Dist. LEXIS 221137, *70

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA . . . related to the Bonny Island investigation . . . . In addition, we settled a civil enforcement action by the U.S. Securities and Exchange Commission. We also agreed to a period of probation for a three year period that ended on February 17, 2012. . . . In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office. <br><br> . . . <br><br> On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million, of which $0.3 million has been paid and the remainder is in progress, having been delayed awaiting approval from the National Bank of Ethiopia. We have also agreed to a three-year debarment from ADBG-sponsored contracts of three inactive **[\*71]** Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project." |
| 74 | 135 | Q2 2014 Form 10-Q (filed 7/31/2014) | *Unattributed* <br><br> Ferraioli | "Foreign Corrupt Practices Act ("FCPA") investigations <br><br> . . . <br><br> In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA . . . related to the Bonny Island investigation. . . . In addition, we settled a civil |

2018 U.S. Dist. LEXIS 221137, *71

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | enforcement action by the U.S. Securities and Exchange Commission. We also agreed to a period of probation for a three year period that ended on February 17, 2012. . . . In February 2011, M.W. Kellogg Limited ("MWKL") reached a settlement with the U.K. Serious Fraud Office.<br><br>. . .<br><br>On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million , of which $0.3 million has been paid and the remainder is in progress, having been delayed awaiting approval from the National Bank of Ethiopia. **[*72]** We have also agreed to a three-year debarment from ADBG-sponsored contracts of three inactive Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project." |
| 75 | 139 | Q3 2014 Form 10-Q (filed 11/4/2014) | *Unattributed*<br><br>Ferraioli | "Foreign Corrupt Practices Act ("FCPA") investigations<br><br>. . .<br><br>In February 2009, KBR LLC, entered a guilty plea to violations of the FCPA . . . related to the Bonny Island investigation. . . . In addition, we settled a civil enforcement action by the SEC. We also agreed to a period of probation for a three year period that ended on February 17, 2012. . . . In February 2011, M.W. Kellogg Limited ("MWKL") |

2018 U.S. Dist. LEXIS 221137, *72

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | reached a settlement with the U.K. Serious Fraud Office.<br><br>. . .<br><br>On March 18, 2013, we received a letter from the African Development Bank Group ("ADBG") stating they are in the process of opening a formal investigation into corruption related to the Bonny Island project discussed above. We have entered into a Negotiated Resolution Agreement with the ADBG that includes a financial penalty equivalent to approximately $6.6 million of which $0.3 million has been paid and the remainder is in process. We have also agreed **[*73]** to a three-year debarment from ADBG sponsored contracts of three inactive Madeira, Portugal-based companies that KBR and its three joint venture partners used to participate in the Bonny Island project." |

**Category E: Disclosure of Unaoil Investigation**

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 76 | 174 | Q1 2016 Form 10-Q (filed 4/29/2016) | *Unattributed* | "[T]here have been news reports related to Unaoil . . . and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR. It has also been reported that the U.S. DOJ is conducting an investigation of Unaoil related to the information reported in these news articles. The DOJ has contacted the Company in connection with that investigation and the Company is cooperating with its requests for information." |
| | | | Ferraioli | |
| 77 | 176 | 4/29/2016 — Earnings Call | Bradie | "It's also been reported that the U.S. Department of Justice has conducted an investigation of Unaoil related to information reported in these news articles. It is our |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | understanding that, in connection with the investigation, the DOJ has contacted several companies, including KBR and we're, of course, responding to the DOJ's request for information. I'd like to reiterate that KBR is committed **[*74]** to conducting its business honestly, with integrity and in compliance with all applicable laws. We certainly do not tolerate illegal or unethical practices by our employees or others working on behalf of the Company."[13] |
| 78 | 179 | Q2 2016 Form 10-Q (filed 7/29/2016) | ~~Unattributed~~ | The U.S. DOJ and the SEC are conducting investigations of news reports related to Unaoil . . . and activities Unaoil may have engaged in related to international projects involving several global companies, including KBR. We have been, and intend to continue, cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena." |
| | | Ferraioli | | |
| 79 | 183 | Q3 2016 Form 10-Q (filed 11/1/2016) | ~~Unattributed~~ | The U.S. DOJ and the SEC are conducting investigations of activities Unaoil . . . may have engaged in related to international projects involving several global companies, **as well as KBR's interactions with Unaoil**. KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request **[*75]** from the SEC |

---

13  This quote is taken entirely from the Complaint.

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | by subpoena." |
| | | Ferraioli | | |
| 80 | 188 | 2016 Form 10-K (filed 2/24/2017) | ~~Unattributed~~ | "The U.S. DOJ and the SEC are conducting investigations of activities Unaoil . . . may have engaged in related to international projects involving several global companies, **as well as KBR's interactions with Unaoil**. KBR is cooperating with the DOJ and the SEC in their investigations, which includes the voluntary submission of information and compliance with document requests, including a formal request from the SEC by subpoena." |
| | | Bradie Ferraioli | | |

**Category F: Certification Statements - Required by Sarbanes Oxley** [14]

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| 81 | 103 | 2012 Form 10-K (filed 2/20/2013) | Utt and Carter | "The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Utt and Carter, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 82 | 107 | Q1 2013 Form 10-Q (filed 4/25/2013) | Utt and Carter | The Q1 2013 10-Q contained signed certification[s] pursuant to SOX by Defendants Utt and Carter, stating that the financial information in the Q1 2013 10-Q was accurate and disclosed any material **[*76]** changes to the Company's internal control over financial reporting." |
| 83 | 111 | Q2 2013 Form 10-Q (filed 7/25/2013) | Utt and Carter | The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Utt and Carter, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material |

14 Plaintiffs do not quote directly from the SOX certifications, so the statements in Category F are taken directly from the Complaint, not the Alleged Source.

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | changes to the Company's internal control over financial reporting." |
| 84 | 117 | Q3 2013 Form 10-Q (filed 10/24/2013) | Utt | "The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendant Utt in his capacity as both CEO and acting CFO, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 85 | 126 | 2013 Form 10-K (filed 2/27/2014) | Utt and Ferraioli | "The 2013 10-K contained signed certifications pursuant to SOX by Defendants Utt and Ferraioli, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| | 128 | 2013 Form 10-K/A (filed 5/30/2014)[15] | | |
| 86 | 132 | Q1 2014 Form 10-Q (filed 6/19/2014) | Bradie and Ferraioli | "The Q1 2014 10-Q contained signed certifications [*77] pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 87 | 136 | Q2 2014 Form 10-Q (filed 7/31/2014) | Bradie and Ferraioli | "The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 88 | 140 | Q3 2014 Form 10-Q (filed 11/4/2014) | Bradie and Ferraioli | "The Q3 2014 10-Q contained signed certifications pursuant to |

---

15  On May 30, 2014, KBR filed an amended Form 10-K restating certain of its financial statements for the year ending December 31, 2013. CAC ¶ 127. The misstatement alleged in ¶ 126 was repeated therein and not modified. CAC ¶ 128.

2018 U.S. Dist. LEXIS 221137, *77

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 89 | 146 | 2014 Form 10-K (filed 2/27/2015) | Bradie and Ferraioli | "The 2014 10-K contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal **[*78]** control over financial reporting. However, they are not signed." |
| 90 | 151 | Q1 2015 Form 10-Q (filed 4/29/2015) | Bradie and Ferraioli | "The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 91 | 157 | Q2 2015 Form 10-Q (filed 8/4/2015) | Bradie and Ferraioli | "The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 92 | 163 | Q3 2015 Form 10-Q (filed 11/2/2015) | Bradie and Ferraioli | "The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 93 | 170 | 2015 Form 10-K (filed 2/26/2016) | Bradie and | "The 2015 10-K contained |

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | Ferraioli | signed certifications pursuant to SOX **[\*79]** by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over |
| 94 | 175 | Q1 2016 Form 10-Q (filed 4/29/2016) | Bradie and Ferraioli | "The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 95 | 180 | Q2 2016 Form 10-Q (filed 7/29/2016) | Bradie and Ferraioli | "The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 96 | 184 | Q3 2016 Form 10-Q (filed 11/1/2016) | Bradie and Ferraioli | "The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." **[\*80]** |
| 97 | 191 | 2016 Form 10-K (filed 2/24/2017) | Bradie and Ferraioli | "The 2016 10-K contained signed certifications pursuant to SOX by Defendants Bradie and Ferraioli, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting." |
| 98 | 197 | Q12017 Form 10-Q (filed 4/28/2017) | Bradie and Sopp | "The Q1 2017 10-Q contained signed |

2018 U.S. Dist. LEXIS 221137, *80

| # | CAC ¶ | Alleged Source | Speaker | Statement [2] |
|---|---|---|---|---|
| | | | | certifications pursuant to SOX by Defendants Bradie and Sopp, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting." |

**End of Document**