# Exhibit 11

# *Shen v. Exela Techs., Inc.*

United States District Court for the Northern District of Texas, Dallas Division

June 24, 2021, Decided; June 24, 2021, Filed

Civil Action No. 3:20-CV-0691-D

**Reporter**

2021 U.S. Dist. LEXIS 118164 *; 2021 WL 2589584

BO SHEN, et al., Plaintiffs, VS. EXELA TECHNOLOGIES, INC., et al., Defendants.

**Subsequent History:** Motion denied by *Shen v. Exela Techs., Inc., 2022 U.S. Dist. LEXIS 11489, 2022 WL 198402 (N.D. Tex., Jan. 21, 2022)*

Later proceeding at *Bo Shen v. Exela Techs., Inc., 2023 U.S. Dist. LEXIS 220450 (N.D. Tex., Dec. 7, 2023)*

**Prior History:** *Manichaean Capital, LLC v. SourceHOV Holdings, Inc., 2020 Del. Ch. LEXIS 38, 2020 WL 496606 (Del. Ch., Jan. 30, 2020)*

**Counsel:  [*1]** For Bo Shen, Individually and on behalf of all others similarly situated, Plaintiff: R Dean Gresham, LEAD ATTORNEY, Steckler Gresham Cochran, Dallas, TX.

For Exela Technologies Inc, Ronald Cogburn, James G Reynolds, Defendants: Gerard G Pecht, LEAD ATTORNEY, Fulbright & Jaworski, Houston, TX; Ellen B Sessions, Norton Rose Fulbright US LLP, Dallas, TX; Peter A Stokes, Norton Rose Fulbright US LLP, Austin, TX.

For Par Chadha, Defendant: Peter A Stokes, LEAD ATTORNEY, Norton Rose Fulbright US LLP, Austin, TX.

For Deep Amin, Movant: R Dean Gresham, Steckler Gresham Cochran, Dallas, TX.

For Insur Shamgunov, Elena Shamgunova, Movants: Joe Kendall, LEAD ATTORNEY, Kendall Law Group PLLC, Dallas, TX; Charles H Linehan, PRO HAC VICE, Glancy Prongay & Murray LLP, Los Angeles, CA; Kara M Wolke, PRO HAC VICE, Glancy Prongay & Murray LLP, Los Angeles, CA; Pavithra Rajesh, PRO HAC VICE, Glancy Prongay & Murray LLP, Los Angeles, CA; Raymond D. Sulentic, PRO HAC VICE, Glancy Prongay & Murray LLP, Los Angeles, CA.

**Judges:** SIDNEY A. FITZWATER, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIDNEY A. FITZWATER

# Opinion

MEMORANDUM OPINION AND ORDER

In this putative class action alleging claims for securities fraud and control person liability **[*2]** under *§§ 10(b)* and *20(a)* of the Securities Exchange Act of 1934 ("Exchange Act"), *15 U.S.C. §§ 78j(b)* and *78t(a)*, and Securities and Exchange Commission ("SEC") *Rule 10b-5* ("*Rule 10b-5*"), *17 C.F.R. § 240.10b-5*, promulgated thereunder, the court must decide whether plaintiffs have adequately pleaded a claim under the heightened pleading standards of *Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u-4*. Concluding that they have not, the court grants defendants' motion to dismiss but also permits plaintiffs to replead.

I

A

Lead plaintiffs Insur Shamgunov and Elena Shamgunova (collectively, "plaintiffs") bring this putative class action against defendants Exela Technologies, Inc. ("Exela"), Ronald Cogburn ("Cogburn"), James G. Reynolds ("Reynolds"), and Par Chadha ("Chadha"). Plaintiffs allege in their amended class action complaint ("complaint") that all defendants violated *§ 10(b)* of the Exchange Act and *Rule 10b-5* promulgated thereunder, and that Cogburn, Reynolds, and Chadha are liable as control persons under *§ 20(a)* of the Exchange Act. Plaintiffs sue "on behalf of persons or entities who or which purchased or acquired Exela securities between March 16, 2018 and March 16, 2020, inclusive (the 'Class Period') and who were damaged thereby." Compl. ¶ 1.

Exela is a global business process automation provider that combines **[*3]** industry-specific and multi-industry enterprise software and solutions worldwide.[1] It was formed in July 2017 when two companies, SourceHOV[2] and Novitex Holding, Inc. ("Novitex"),[3] merged into a special purpose acquisition company, Quinpario Acquisition Corp. ("Quinpario"), which then became Exela (the "Business Combination"). As a result of the preliminary merger and Business Combination, Quinpario (later re-named Exela) became the parent company of SourceHOV and Novitex.

Prior to the Business Combination, SourceHOV bought out the minority interest of one of SourceHOV's minority shareholders, Manichaean Capital, LLC ("Manichaean"), at a price of $1,600 per share.[4] In September 2017 Manichaean, suspecting that it had received inadequate consideration for its minority interest, petitioned the Delaware Court of Chancery ("Chancery Court") for an appraisal determination ("Appraisal Action"). The Chancery Court heard testimony in June 2019 and found on January 30, 2020 that, as of the closing date, the fair value of SourceHOV was $4,591.00 per share.[5] The Supreme Court of Delaware affirmed the Chancery Court's judgment on January 22, 2021, after the instant lawsuit was filed. *See [*4] SourceHOV Holdings, Inc. v. Manichaean Capital, LLC, 246 A.3d 139, 2021 WL 225817, at *1 (Del. 2021)* (unpublished table decision).

According to plaintiffs' complaint, the truth about Exela's financial condition—including previously-concealed risks that had partially materialized—was revealed to the market through a series of disclosures between November 8, 2018 and March 16, 2020, causing Exela's stock to fall from $6.24 per share on the day before the first alleged Class Period drop on November 8, 2018, to just $0.15 per share on March 18, 2020, the day after the last day in the Class Period.

On March 17, 2020 Exela filed a Form 8-K in which it acknowledged that liability relating to the Appraisal Action should have been recorded in September 2017 at the fair value of the shares tendered, but was not. Accordingly, in

---

[1] In deciding defendants' *Rule 12(b)(6)* motion, the court construes the complaint in the light most favorable to plaintiffs, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in plaintiffs' favor. *See, e.g., Lovick v. Ritemoney Ltd., 378 F.3d 433, 437 (5th Cir. 2004)*. "The court's review [of a *Rule 12(b)(6)* motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010)*.

[2] SourceHOV, Exela's largest subsidiary, provides process outsourcing and financial technology solutions, with a focus on digital solutions. It performs back office support for banks, mortgage originators, healthcare entities, and law firms, among others, by processing payments in a faster and more efficient way through the use of automation technology.

[3] Novitex, Exela's second largest subsidiary, was a provider of back office support before the Business Combination. Novitex was smaller than SourceHOV from a headcount and financial standpoint, however, and focused on analog (or paper-based) support services.

[4] The complaint alleges that Manichaean invested $1.5 million in the company, at a price of $1,600 per share, to prevent the dilution of its equity stake.

[5] On December 11, 2020 plaintiffs asked this court to take judicial notice of six exhibits. Two exhibits are documents filed with the SEC, and the other four are documents filed in the Appraisal Action. Because all six documents appear to be matters of public record, *see, e.g., Norris v. Hearst Trust, 500 F.3d 454, 461 n.9 (5th Cir. 2007)* ("[I]t is clearly proper in deciding a *12(b)(6)* motion to take judicial notice of matters of public record."), the court grants plaintiffs' request and judicially notices these exhibits.

early 2020 Exela re-issued its financial statements for 2017, 2018, and the interim periods through September 30, 2019, to record liabilities ranging from $37.8 to $43.1 million for the periods ending December 31, 2017, 2018, and 2019.

B

On March 23, 2020 this putative class action was filed against Exela; Cogburn, who served as the Chief Executive Officer ("CEO") of Exela and a member of Exela's Board of Directors throughout the Class period; Reynolds, who served **[*5]** as Exela's Chief Financial Officer ("CFO") throughout the Class Period; and Chadha, who was Chairman of Exela's Board of Directors and was Co-Chariman of the Board and principal stockholder of SourceHOV prior to the Business Combination.

Plaintiffs allege that defendants are liable for securities fraud under the Exchange Act and *Rule 10b-5* based on four categories of misstatements:

• first, that Exela's financial statements for the annual periods ending 2017, 2018, and three quarterly statements in 2019 were admittedly materially false and misleading as a result of defendants' omission of a known litigation liability, i.e., the Appraisal Action;

• second, that defendants falsely assured the market as to the predictability of Exela's revenue, stating that the company had 90% visibility due to recurring contracts when, in fact, defendants never had such visibility because at least 20% of Exela's revenues came from unpredictable postage revenue;

• third, that defendants misleadingly touted adjusted EBITDA[6] figures ("Adjusted EBITDA"), engaging in "accounting shenanigans" that added back supposedly non-routine expenses when, in fact, the expenses were routine, recurring expenses, improperly added back **[*6]** into EBITDA, with the effect of misleadingly showing higher profits; and

• fourth, that defendants misleadingly touted Exela's supposed success in expanding customer margins by implementing automation and digital transformation, only to reveal later that there was no chance to expand margins for a substantial number of Exela's customers.

Defendants now move to dismiss plaintiffs' action. The court has heard oral argument.

II

A

"In deciding a *Rule 12(b)(6)* motion to dismiss, the court evaluates the sufficiency of [the] complaint by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff[s]." *Bramlett v. Med. Protective Co. of Fort Wayne, Ind., 855 F.Supp.2d 615, 618 (N.D. Tex. 2012)* (Fitzwater, C.J.) (internal quotation marks and brackets omitted) (quoting *In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)*). The court does not, however, "strain to find inferences favorable to the plaintiff[]." *Goldstein v. MCI WorldCom, 340 F.3d 238, 244 (5th Cir. 2003)* (quoting *Westfall v. Miller, 77 F.3d 868, 870 (5th Cir. 1996)*). "Nor [does the court] accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 361 (5th Cir. 2004)* (citing *Nathenson v. Zonagen Inc., 267 F.3d 400, 406 (5th Cir. 2001)*).

To survive a motion to dismiss under *Rule 12(b)(6)*, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.

---

[6] EBITDA is a GAAP metric that stands for earnings before interest, taxes, depreciation, and amortization. According to plaintiffs, some investors use GAAP EBITDA as an approximation for cash flow available to a business before creditors are paid (before interest) and before the government is paid (before taxes). Adjusted EBITDA, on the other hand, is a non-GAAP metric that is understood by investors to be an approximation of the normalized earnings power of a business excluding non-cash expenses and excluding, or adding back, non-recurring cash (or non-cash) expenses.

"A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant **[\*7]** is liable for the misconduct alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly, 550 U.S. at 556*); *see also Twombly, 550 U.S. at 555* ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal, 556 U.S. at 679* (brackets omitted) (quoting *Rule 8(a)(2)*). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id. at 678* (citation omitted).

B

Because the complaint alleges fraud, plaintiffs must plead the elements of their claim with the heightened particularity required by *Rule 9(b)*. *See, e.g., Coates v. Heartland Wireless Commc'ns, Inc., 26 F.Supp.2d 910, 914 (N.D. Tex. 1998)* (Fitzwater, J.). "*Rule 9(b)* imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc., 2011 U.S. Dist. LEXIS 91173, 2011 WL 3606688, at \*2 (N.D. Tex. Aug. 16, 2011)* (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp., 343 F.3d 719, 724 (5th Cir. 2003)*), *aff'd*, *514 Fed. Appx. 513 (5th Cir. 2013)*. "At a minimum, *Rule 9(b)* requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person **[\*8]** making the misrepresentation and what he obtained thereby." *Turner, 2011 U.S. Dist. LEXIS 91173, 2011 WL 3606688, at \*2* (quoting *Benchmark Elecs., 343 F.3d at 724*). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc., 417 F.3d 450, 453 (5th Cir. 2005)* (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)*). Because *Rule 9(b)* must be "read in conjunction with *[Rule] 8* which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp., 734 F. Supp. 269, 273 (N.D. Tex. 1990)* (Fitzwater, J.) (internal quotation marks omitted) (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 892 F.2d 1238, 1264 (5th Cir. 1990)*). "The court's key concern in assessing a complaint under *Rule 9(b)* is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C., 2007 U.S. Dist. LEXIS 63432, 2007 WL 2428572, at \*4 (N.D. Tex. Aug. 28, 2007)* (Fitzwater, J.) (citation omitted).

C

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the PSLRA. *See 15 U.S.C. § 78u-4(b)*. "The PSLRA has raised the pleading bar even higher and enhances *Rule 9(b)*'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn, 854 F.3d 741, 746 (5th Cir. 2017)* (quoting *Local 731 I.B. of T.Excavators & Pavers Pension Trust Fund v. Diodes, Inc., 810 F.3d 951, 956 (5th Cir. 2016)*). "First the plaintiff must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Id.* (internal quotation marks and citation omitted); *see also 15 U.S.C. § 78u-4(b)(1)*. "Second, for each act or omission alleged to be **[\*9]** false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Neiman, 854 F.3d at 746* (internal quotation marks and citation omitted); *see also 15 U.S.C. § 78u-4(b)(2)(A)*.

D

To state a claim under *Rule 10b-5*, "a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson, 267 F.3d at 406-07* (quoting *Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994)*); *see also Neiman, 854 F.3d at 746*.

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a *section 10(b)* and *Rule 10b-5* securities fraud claim must, to avoid dismissal pursuant to *Rule 9(b)* and *15 U.S.C. §§ 78u-4(b)(1)* & *78u-4(b)(3)(A)* [the PSLRA]: (1) specify . . . each statement alleged to have been misleading, i.e., contended to be

fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Neiman, 854 F.3d at 746* (alterations and ellipses in original) (quoting *Goldstein, 340 F.3d at 245*).

III

The court **[*10]** first considers whether plaintiffs have plausibly alleged a claim based on defendants' statements and omissions relating to the Appraisal Action.

A

Defendants move to dismiss this basis for plaintiffs' Exchange Act and *Rule 10b-5* claim on the ground that plaintiffs have failed to tie their allegations about the Appraisal Action to any specific misstatement by any defendant. Defendants contend that Exela disclosed the existence of the Appraisal Action throughout the Class Period and made clear that Exela could not assure against the possibility of an adverse outcome; that plaintiffs do not allege with particularity that Exela's cautious, customary litigation disclosures were false, let alone fraudulent; that courts routinely reject allegations that standard litigation disclosures, like the ones here, are actionable or fraudulent; that plaintiffs plead no particularized facts showing that defendants had a duty to "confess" that Exela was likely to lose the Appraisal Action, which, at the time defendants filed the instant motion to dismiss was still on appeal; that given plaintiffs' own allegations that SourceHOV was on the brink of insolvency prior to the Business Combination, plaintiffs can hardly **[*11]** assert that defendants were reckless in believing that SourceHOV was worth less than what Manichaean was claiming; and that, at a minimum, the allegations do not support a strong inference that the individual defendants knew that Exela's cautious litigation disclosure was so blatantly and indefensibly misleading as to be fraudulent.

To the extent plaintiffs base their claim on statements made by the Chancery Court, defendants maintain that plaintiffs have failed to allege how the Chancery Court's criticism of Chadha's testimony or SourceHOV's governance practices renders any statement by Chadha or Exela fraudulent; that the complaint does not allege that Exela made misstatements to the *investing public* regarding the "backdated" valuation or that Exela relied on that valuation at trial; that plaintiffs do not otherwise tie Chadha's testimony to any specific misstatement by defendants to Exela's investors; and that plaintiffs have failed to identify any specific instances in which Exela misrepresented to its investors SourceHOV's corporate governance practices, financial metrics, or internal controls.

Plaintiffs respond that Exela's restated financials ("Restatement")—which revealed that **[*12]** Exela overstated its income and Adjusted EBITDA and understated its liability during the Class Period—constitute an admission that the previously-reported information is materially false and misleading, and the only remaining question is whether plaintiffs have alleged scienter; that the Appraisal Action proceedings reveal a plethora of facts that support scienter as to defendants' misrepresentation and omission of Exela's known litigation liability during the Class Period; that defendants knew about the litigation liability that prompted the Restatement well before that liability was belatedly disclosed to investors on March 17, 2020; that, at the latest, defendants would have estimated Exela's litigation liability by the time they submitted Exela's expert report in the Appraisal Action on December 13, 2018; that Exela's expert testified on June 6, 2019 at the trial of the Appraisal Action that Exela was liable for at least $29,030,592.00; that Exela misrepresented in its 2018 Form 10-K (filed on March 20, 2019) and subsequent SEC filings that it was unable to estimate any loss or range of loss that may arise from the Appraisal Action; that "[n]ot only was Defendants' omission of **[*13]** the liability from Exela's financial statements reckless, their affirmative statements that they were unable to even estimate the liability were knowingly false and misleading [because] Exela did have a way to estimate the loss, and it had in fact already done so," Ps. Br. 10 (emphasis omitted); that the Chancery Court found Chadha to be "simply not credible" with respect to his statement that he believed Exela actually owed less than its expert had estimated; that these facts, including factual findings made by a judge, informed by evidence and expert testimony after a three-day trial, are more than sufficient to allege a strong inference of scienter as to defendants' omission of, and misrepresentations relating to, the Appraisal Action liability during the

Class Period here; and that defendants cannot rely on the opinion of Exela's auditor, KPMG, because Chadha testified under oath that he concealed material facts from KPMG, including his belief that SourceHOV's equity was essentially worthless at the time of the Business Combination, and, accordingly, defendants' reliance on KPMG's opinion is meaningless.[7]

In reply, defendants maintain, *inter alia*, that the complaint does not contain **[*14]** specific allegations regarding the calculations of Exela's appraisal expert and does not plead with specificity the "unable to predict" disclosure as an alleged misstatement; that plaintiffs plead no facts disputing that the valuation of SourceHOV's shares was an uncertain, subjective, and complex undertaking and that Exela disagreed with the expert and vigorously advocated for a lower valuation during the Appraisal Action; that plaintiffs' own allegations support the inference that Exela had a colorable basis for genuinely believing SourceHOV was worth little and would be found to be worth less than the merger price; that to the extent plaintiffs allege that Exela misstated the likelihood of a future adverse outcome in the Appraisal Action, such a statement is forward-looking and protected by the PSLRA safe harbor; and that there are no particularized allegations about the specifics of the underlying accounting rules that led to the Restatement, or particularized facts showing that Exela misled its auditor or otherwise violated an accounting or disclosure rule that was so obvious as to support a strong inference of fraud.

B

To the extent that plaintiffs base their claim on allegations **[*15]** that Exela did not adequately disclose the existence of the Appraisal Action, or that Exela's representations regarding the Appraisal Action were false or misleading, the court concludes that plaintiffs have failed to plausibly plead a claim.

1

Regarding whether Exela adequately disclosed the existence of the Appraisal Action, plaintiffs allege that Exela "failed to account for liability associated with an Appraisal Litigation arising out of a dispute among shareholders of legacy SourceHOV about the fair value of their shares which should have been recorded in 2017 at the fair value of the shares tendered." Compl. ¶ 8. But in the "Legal Proceedings" section of Exela's 2017 Form 10-K,[8] dated March 16, 2018, it stated:

> [o]n September 21, 2017, former stockholders of SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to *8 Del. C. § 262* in the Delaware Court of Chancery[.] The Appraisal Action arises out of the Business Combination, which gave rise to appraisal rights pursuant to *8 Del. C. § 262*. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; **[*16]** an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses. . . . At this stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action. Pursuant to the terms of the Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our Common Stock issued to Ex-Sigma 2 LLC, our principal stockholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. The Company intends to vigorously defend against the Appraisal Action.

---

[7] Plaintiffs also contend that, as of January 10, 2020, Exela entered into a $160 million accounts receivable securitization facility with various lenders that referenced a $65 million liability regarding the Appraisal Action. Plaintiffs do not plead this in their complaint, however, so the court has not considered it in deciding whether plaintiffs have pleaded a strong inference of scienter.

[8] In deciding defendants' motion, the court is permitted to consider this document, which is "attached to the motion to dismiss" and "central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), 594 F.3d at 387*.

Ds. App. 39.[9] This language expressly discloses the pending Appraisal Action and clearly acknowledges the possibility of an adverse judgment in that action. Absent an allegation that Exela knew at the time of the litigation disclosures how the Chancery Court would ultimately rule (an allegation that the complaint does not make), the law does not require more of Exela. *See, e.g., Eshelman v. Orthoclear Holdings, Inc., 2008 U.S. Dist. LEXIS 6826, 2008 WL 171059, at *5 (N.D. Cal. Jan. 18, 2008)* (holding that disclosure that company had been sued and **[*17]** that "[i]f a final determination is rendered against the Company . . . such an outcome could have a substantial adverse effect on the Company and on any investments in the Shares" was "sufficient warning to investors about the pending litigation against the company"); *Crowell v. McCormick, 2007 U.S. Dist. LEXIS 115423, 2007 WL 9735010, at *5 (N.D. Cal. Nov. 16, 2007)* (holding that litigation disclosures were not misleading where defendant "was careful to state that it could not predict the outcome of the litigation[,] was also careful to not imply that the impact of the litigation would be positive[, and] issued a relatively neutral statement accurately describing the nature of the suit and its procedural history, without giving an impression either way that the litigation would necessarily succeed or fail"); *In re SeaChange Int'l, Inc., 2004 U.S. Dist. LEXIS 1687, 2004 WL 240317, at *8-9 (D. Mass Feb. 6, 2004)* (concluding that, "given the well understood vagaries of litigation," company was only obligated to mention pending lawsuit in "general descriptive terms" and "was not obligated to predict the outcome or estimate [its] impact.").[10] *19 (D.N.J. Dec. 27, 2019)* (rejecting plaintiff's argument that "because Defendants knowingly engaged in a fraudulent scheme to conceal the truth about its . . . products, none

2

Turning to whether plaintiffs have plausibly pleaded **[*18]** that Exela made representations regarding the Appraisal Action that were false or misleading, plaintiffs posit that defendants' statement in several SEC filings that Exela was "unable to . . . estimate any loss or range of loss that may arise from the Appraisal Action," Ps. Br. 10 (emphasis omitted) (quoting Ds. App. 471), was false and misleading because Exela's expert in the Appraisal Action estimated Exela's liability in his expert report and opined on June 9, 2019 that Exela was liable for at least $29,030,592.00. Plaintiffs acknowledged at oral argument that Exela was not *required* to estimate a range of liability, but they maintain that because defendants "went a step further" and told investors that Exela could not estimate a range, this demonstrates scienter in omitting the Appraisal Action liability.

Plaintiffs have not plausibly pleaded a securities fraud claim based on the statement that Exela was unable to estimate any loss or range of loss that may arise from the Appraisal Action. As a threshold matter, it is notable that the complaint does not actually plead that Exela's statement that it was unable to estimate any loss or range of loss was false or misleading. Nor does **[*19]** the complaint allege any facts regarding the liability estimates of Exela's expert in the Appraisal Action. Regardless, and more important, the mere fact that Exela's *expert* estimated Exela's

---

[9] Exela included a similar disclosure in each of its annual and quarterly SEC filings while the Appraisal Action was pending. *See, e.g.*, Ds. App. at 471 (disclosing Appraisal Action in 2018 Form 10-K, dated March 20, 2019, and stating "[a]t this stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action.").

[10] Plaintiffs asserted at oral argument that defendants knew they were liable to Manichaean based on Chadha's orchestration of the backdated valuation and lack of candor and credibility during the Appraisal Action, and based on Cogburn's and Reynolds' intimate involvement in the Business Combination. But even if defendants knew that they had improperly valued Manichaean's shares, plaintiffs have not plausibly pleaded that Cogburn and Reynolds knew their valuation was legally indefensible, or, prior to January 30, 2020, that the Chancery Court would definitely rule in Manichaean's favor. *See, e.g., Crutchfield v. Match Grp., Inc., ___ F.Supp.3d ___, 2021 U.S. Dist. LEXIS 57811, 2021 WL 1167578, at * 15 (N.D. Tex. Mar. 26, 2021)* (Scholer, J.) (dismissing securities claim based on litigation disclosures where plaintiffs "have not asserted any facts regarding Defendants' actual knowledge of the viability of [legal challenges against them] or of Match's ability (or inability) to vigorously defend against such claims. It may well be that Match has certain legal defenses shielding it from liability separate and apart from disputing head-on the truthfulness of the FTC's factual allegations." (citations omitted)); *Hall v. Johnson & Johnson, 2019 U.S. Dist. LEXIS 221513, 2019 WL 7207491*, at of the statements regarding the viability of the lawsuits against the Company could have possibly been in good faith" because plaintiff "has not identified any specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits against the Company or suggesting that Defendants knew they had no viable defenses against the lawsuit").

liability does not permit the court to draw the reasonable inference that, at the time of the relevant SEC filings, any *defendant* was able to estimate any loss or range of loss that might actually arise from the Appraisal Action, such that defendants' statement that they could *not* provide this estimate was false or misleading. In fact, the complaint alleges that Exela "*disagreed with its own expert* over which revenue projections to use in the DCF analysis and ultimately separated from its expert with respect to SourceHOV's fair value." Compl. ¶ 78 (emphasis added).[11] In other words, although Exela's expert may have provided a liability estimate, plaintiffs have not plausibly alleged that any defendant agreed that the estimate was accurate or that any defendant was able to independently predict whether, and in what amount, Exela would ultimately be held liable in the Appraisal Action. The court therefore concludes that plaintiffs have failed to plausibly plead that Exela's representations regarding **[*20]** the Appraisal Action were false or misleading.

C

To the extent plaintiffs allege that Exela violated the securities laws by "failing to record liability for the shares at issue in the Appraisal Litigation since 2017," and that, in doing so, Exela "misrepresented its financial condition," Compl. ¶ 17,[12] the court grants defendants' motion to dismiss on the ground that plaintiffs have not plausibly alleged scienter.

1

Scienter is a required element of any securities fraud action. *Nathenson, 267 F.3d at 406-07*. Scienter consists of "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips, 401 F.3d 638, 643 (5th Cir. 2005)* (citation omitted). "[P]laintiffs may establish scienter by demonstrating either intent or severe recklessness." *Fin. Acquisition Partners LP v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006)* (emphasis omitted); *see also Southland Sec. Corp., 365 F.3d at 365* ("[T]he PSLRA state of mind requirement is severe recklessness or actual knowledge.").

The standards for pleading scienter are governed by the PSLRA. "The PSLRA pleading standard for scienter is especially challenging for plaintiffs." *Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005)*. "[T]o survive a motion to dismiss a securities-fraud action, plaintiffs **[*21]** must, *inter alia*, plead specific facts establishing a strong inference of scienter." *Fin. Acquisition Partners, 440 F.3d at 287* (citing *Nathenson, 267 F.3d at 407*). "To qualify as 'strong' within the intendment of [the PSLRA,] an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. To allege scienter based on defendant's conscious conduct, "a plaintiff must plead strong circumstantial evidence of misbehavior." *Mortensen v. AmeriCredit Corp., 123 F.Supp.2d 1018, 1025 (N.D. Tex. 2000)* (Fitzwater, J.), *aff'd*, *240 F.3d 1073 (5th Cir. 2000)*. To plead scienter based on recklessness, a plaintiff must demonstrate "an extreme departure from the standard of ordinary care . . . that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Owens v. Jastrow, 789 F.3d 529, 536 (5th Cir. 2015)* (quoting *Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th Cir. 2002)*).

2

---

[11] The Chancery Court noted in its January 30, 2020 opinion that "[n]ot only does Respondent disagree with Petitioners' expert, it disagrees with its *own expert*—it has rested on a fair value for SourceHOV ($1,633 per share) that comes in well below even its own expert's appraisal." *Manichaean Capital, LLC v. SourceHOV Holdings, Inc., 2020 Del. Ch. LEXIS 38, 2020 WL 496606 (Del. Ch. Jan. 30, 2020)*, *aff'd*, *246 A.3d 139, 2021 WL 225817 (Del. Jan. 2021)*.

[12] *See also* Compl. ¶ 206 (alleging 2017 Form 10-K, filed March 16, 2018, was misleading because Exela failed "to account for liability for the Appraisal litigation and other fraudulent accounting that was revealed by the Restatement[, which] resulted in Exela overstating adjusted EBITDA . . . which was—even absent the Restatement—not indicative of Exela's normalized, or steady-state earnings[.]").

In the complaint, plaintiffs quote Exela's Form 8-K, filed on March 17, 2020, in which Exela stated:

> [a]fter evaluating the current and historical accounting treatment of the Appraisal Action with the Company's independent registered public accounting firm, KPMG, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' **[\*22]** shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. The liability should have been recorded in 2017 at the fair value of the shares tendered.

Compl. ¶ 187 (emphasis omitted). Plaintiffs allege that Exela's "failure to account for liability for the Appraisal litigation and other fraudulent accounting that was revealed by the Restatement resulted in Exela overstating adjusted EBITDA and which was—even absent the Restatement—not indicative of Exela's normalized, or steady-state earnings." *Id.* ¶ 206 (citation omitted). In response to the motion to dismiss, plaintiffs maintain that the Restatement—which was filed on June 9, 2020 and revealed that Exela had overstated its income and Adjusted EBITDA and understated its liabilities during the Class Period—"constitutes an admission that the previously reported information is materially false or misleading." Ps. Br. 9.

The court will assume *arguendo* that plaintiffs have plausibly pleaded that the financial information that Exela reported during the Class Period was materially false or misleading because it did not include liability related to the Appraisal Action.[13] But to state a claim under the **[\*23]** *Exchange Act* and *Rule 10b-5* based on Exela's allegedly false or misleading financial statements, plaintiffs must plead specific facts that establish a strong inference of scienter.[14]

> [A] restatement of previous financial reports filed with the SEC demonstrates that those financial statements which it covers were erroneous when made, but a restatement alone does not prove scienter or fraudulent intent on the part of those who prepared them. Additional factual allegations giving rise to an inference of, or demonstrating intent or severe recklessness, depending on the cause of action, are necessary to satisfy *Rule 9(b)* for fraud-based claims.

*In re Enron Corp. Sec., Derivative & "ERISA" Litig., 762 F.Supp.2d 942, 1020 (S.D. Tex. 2010)*.

Plaintiffs have failed to plausibly plead that, prior to the issuance of Exela's Form 8-K on March 17, 2020, any defendant knew, or was severely reckless in not knowing, that Exela's accounting practices with respect to the Appraisal Action were in error. *See, e.g., Abrams, 292 F.3d at 432* ("[T]he mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information." (footnotes omitted)).

Plaintiffs **[\*24]** contend that the Chancery Court's findings show that defendants knew about the litigation liability that prompted the Restatement well before that liability was belatedly disclosed to investors on March 17, 2020. But they do not plausibly plead sufficient facts to support this assertion. Even accepting as true the complaint's allegation that Exela's expert testified on June 6, 2019 that Exela was liable for at least $29,030,592.00 (a fact that plaintiffs have not pleaded), this establishes only that Exela's *expert* believed Exela was liable for $29,030,592.00. It does not permit the court to draw the reasonable inference that any defendant agreed with the expert's opinion, or knew that the Chancery Court would ultimately find for Manichaean, or that any defendant knew or should have

---

[13] *See, e.g., In re ArthroCare Corp. Secs. Litig., 726 F. Supp. 2d 696, 710 (W.D. Tex. 2010)* ("[T]here is no question Plaintiff has successfully plead falsity in the [complaint], as the sweeping Restatement filed by ArthroCare operates as an admission its public filings from 2004 through the first quarter of 2008 were false in many material respects."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Supp.2d 474, 486 (S.D.N.Y. 2004)* ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

[14] Plaintiffs appear to acknowledge that they are required to plead scienter with respect to their allegations regarding the Restatement. *See* Ps. Br. 9.

known in what amount the Chancery Court would enter a judgment against Exela. Nor do the complaint's allegations regarding the Chancery Court's various findings, including plaintiffs' assertions regarding Chadha's lack of credibility, enable the court to draw the reasonable inference that, before January 30, 2020, any defendant knew, or was severely reckless in not knowing, what the ultimate outcome of the **[*25]** Appraisal Action would be.[15]

Plaintiffs assert in their response that "[t]he Restatement itself, which spanned a period of more than two-and-a-half years, lends support to a strong inference of scienter." Ps. Br. 9 (citation omitted). They cite _In re ArthroCare Corp. Securities Litigation, 726 F.Supp.2d 696 (W.D. Tex. 2010)_, in which the court held that the "magnitude" of a restatement of financial information could, in some instances, "contribute" to a finding of scienter. _Id. at 722_ ("[T]he magnitude of the Restatement in this case, the fact it occurred over a substantial period of time, the relative simplicity of the issues involved—while perhaps not sufficient on their own to establish scienter—do significantly contribute to a finding of scienter on the part of the Individual Defendants."); _see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Supp.2d 474, 488-89 (S.D.N.Y. 2004)_ ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter."). But in this case—at least as the allegations of the complaint relate to the Appraisal Action— the magnitude of the Restatement is a function of the amount of the award (which was not known until 2020), and the period of time covered by the Restatement directly correlates with when the Appraisal **[*26]** Action was submitted (2017) and when the Chancery Court issued its ruling (2020). So something more than allegations regarding the amount and time period covered by restated financial disclosures is necessary to support a strong inference of scienter: together with the Restatement, there must be "[a]dditional factual allegations giving rise to an inference of, or demonstrating intent or severe recklessness." _In re Enron Corp. Sec., Derivative & "ERISA" Litig., 762 F.Supp.2d at 1020_; _see In re Dell Inc., Sec. Litig., 591 F.Supp.2d 877, 902 (W.D. Tex. 2008)_ ("[T]he existence of a restatement does not by itself satisfy the scienter requirement, although it can tip the scales in favor of finding scienter when it is viewed with the totality of the circumstances surrounding the restatement.").

The complaint alleges that Exela "fail[ed] to account for liability for the Appraisal litigation" and engaged in "other fraudulent accounting." Compl. ¶ 206. The court has already explained why plaintiffs have failed to plead a strong inference of scienter with regard to defendants' alleged failure to account for liability for the Appraisal Action.

As for plaintiffs' reliance on "other fraudulent accounting," the complaint does not allege, with the specificity that the PSLRA requires, that any defendant knew, or was severely reckless in not **[*27]** knowing, prior to Exela's issuing the Restatement that Exela's financial statements were misleading. The conclusory allegation that defendants engaged in "other fraudulent accounting" is insufficient of itself to support a strong inference of scienter. _See, e.g., Alaska Elec. Pension Fund v. Asar, 768 Fed. Appx. 175, 186 (5th Cir. 2019)_ (holding that allegation that defendant "engaged in inappropriate historical accounting practices relating to management estimates and certain accruals" based on audit committee findings as reported in company's June 8-K was insufficient allegation of scienter because, _inter alia_, "the June 8-K does not identify [defendant's] particular inappropriate practices, stating only that he engaged in inappropriate accounting 'in some instances.'"); _In re Dell Inc., Sec. Litig., 591 F.Supp.2d at 903_ (holding that scienter was not pleaded where plaintiffs alleged "no facts about [auditor's] audit, what it entailed, or how it was deficient. Plaintiffs simply make the bare assertion [that the auditor] violated GAAS rules, but without a shred of evidence about what [the auditor's] procedures or audits actually entailed, how the procedures specifically violated the standards, or that the alleged violations were purposeful or negligent."); _cf. Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 552 (5th Cir. 2007)_ ("[W]hen significant GAAP violations are **[*28]** described _with particularity_ in the complaint, they may provide powerful indirect evidence of scienter." (emphasis added) (quoting _In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)_)).

D

---

[15] In their response, plaintiffs also argue that Exela's entering into a $160 million accounts receivable securitization facility with various lenders that referenced a $65 million liability regarding the Appraisal Action supports an inference of scienter. But the court declines to consider this unpleaded fact. _See supra_ note 7.

Accordingly, the court grants defendants' motion to dismiss plaintiffs' Exchange Act and *Rule 10b-5* claim to the extent it is based on alleged misstatements and omissions regarding the Appraisal Action.

IV

The court now considers whether plaintiffs have plausibly pleaded their Exchange Act and *Rule 10b-5* claim based on defendants' visibility or other forward-looking statements.

A

Exela contends that plaintiffs have failed to plead particularized facts showing that its forward-looking estimates, statements of belief, and opinions were fraudulent; that plaintiffs have not offered any particularized factual allegation showing that Exela's financial projections and optimistic statements regarding further revenue, margin, and cost savings opportunities were knowingly, recklessly, or negligently false; that the allegations and disclosures instead depict a company that made acquisitions and investments with a sincere belief that they would bear fruit in future quarters; that plaintiffs do not plead particularized facts showing that Exela's statements about revenue visibility were **[*29]** fraudulent; that plaintiffs fail to plead particularized facts disputing Exela's statements about its high historical renewal rates and stable customer base, which are borne out by Exela's actual revenue performance; that Exela's statements are protected by the PSLRA safe harbor, the "bespeaks caution" doctrine, and the common law protections for statements of opinion; and that plaintiffs have failed to allege particularized facts showing that any of the forward-looking statements were made with knowledge of falsity.

B

To the extent plaintiffs base their Exchange Act and *Rule 10b-5* claim on defendants' statements regarding Exela's plan to expand customer margins by implementing automation and digital transformation, the court holds that these statements fall within the PSLRA's safe harbor provision.

1

The PSLRA establishes a "safe harbor" that protects forward-looking statements[16] from liability unless plaintiffs are able to prove that the statements were made with actual knowledge of falsity. *See 15 U.S.C. § 78u-5(c)(1)*. The statute provides:

> in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, **[*30]** a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—

---

[16] Under the PSLRA, the term "forward-looking statement" means, *inter alia*:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; [or]

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission[.]

*15 U.S.C. § 78u-5(i)(1)*.

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity[,] was--

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

*Id.* § 78u-5(c)(1). The safe-harbor analysis requires "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland Sec. Corp., 365 F.3d at 371*. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward looking and accompanied by "meaningful cautionary statements" **[*31]** or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove a defendant's "actual knowledge" that it was false or misleading when made. *Id.*

2

Plaintiffs contend that Cogburn and Reynolds repeatedly touted their success in expanding customer margins by implementing automation and digital transformation; that in November 2018, when Exela warned that it had low margin contracts that it would exit, Reynolds maintained that Exela was still "looking to change that margin profile," Ps. Br. 24 **[*32]** (quoting Compl. ¶ 146); and that even after Exela disclosed that it was exiting low margin contracts, Cogburn continued to recklessly assure investors that Exela would be able to "put automation where there is no automation" and that "transformation efforts are working and it'll take another 12 to 18 months to complete," *id.* at 25 (quoting Compl. ¶¶ 173, 174). Plaintiffs posit that these statements were false or misleading because they omitted that many of Exela's customers had no path to automation or digital transformation and that these customers comprised $150 million of Exela's annual revenue. Regarding defendants' "actual knowledge" that their statements were false or misleading when made, plaintiffs maintain that "Cogburn was aware of the lack of a path to automation because he tracked and reported the Company's progress in expanding margins, [but] omitted that many customers had no path to automation or digital transformation, which further supports scienter." *Id.* at 25.

Defendants do not specifically respond to plaintiffs' arguments, although they do reiterate in their reply that plaintiffs' allegations fail to show that defendants had actual knowledge of falsity regarding **[*33]** any forward-looking statement.

3

Assuming *arguendo* that defendants' forward-looking statements[17] regarding Exela's plans to expand customer margins by implementing automation and digital transformation were false or misleading, the court nevertheless concludes that defendants are entitled to dismissal of plaintiffs' claim based on these statements because plaintiffs have failed to plausibly allege "actual knowledge," as required to remove these statements from the PSLRA's safe harbor.

---

[17] Plaintiffs do not dispute that defendants' statements regarding Exela's plan to expand customer margins by implementing automation and digital transformation are "forward-looking statements," as that term is defined in the PSLRA. *See 15 U.S.C. § 78u-5(i)(1)*.

Plaintiffs allege that, during a March 15, 2018 earnings call, Cogburn stated that Exela was "actively pursuing and offering our automation technology to the customers and locations that came with [the] business combination," Compl. ¶ 115; that Exela was "sharing with [its largest customers] the proposition of business process automation," *id.* ¶ 116; and that "it's a very exciting time for us and we are seeing some early adoption," *id.* ¶ 116. Plaintiffs allege that, during a May 2018 earnings call, Reynolds stated that Exela is "continuing down the path to transform our lower margin business" and that it is "making good progress, and we expect this transformation to take about 12 to 15 months." *Id.* ¶ 138 **[*34]** (bold font omitted). The complaint alleges that, on a March 19, 2019 earnings call, Reynolds stated that Exela's "strategy to grow within our existing customers is resonating as they're seeking solutions to drive change, realizing the benefits of digital transformation. . . . We have a broad and sticky revenue base." *Id.* ¶ 153.

Plaintiffs have not plausibly alleged, however, that either Reynolds or Cogburn *actually knew* at the time Exela's future plans to pursue its business process automation platforms within its existing customer base were described to investors that a significant number of Exela's customers (i.e., enough to make the representations false or misleading) had no path to automation or digital transformation.[18] That Cogburn "tracked and reported the Company's progress in expanding margins," Ps. Br. 25, is insufficient of itself to allege "actual knowledge" under the PSLRA. Accordingly, because plaintiffs do not point to any other allegations that, at the time of the alleged misrepresentations, the defendant in question had actual knowledge that Exela would not be able to expand customer margins by implementing automation and digital transformation, the court grants defendants' **[*35]** motion to dismiss plaintiffs' claim based on these forward-looking statements.

C

The court next considers whether plaintiffs have plausibly pleaded their Exchange Act and *Rule 10b-5* claim based on defendants' repeated representations that Exela had 90% revenue visibility due to recurring contracts.

1

Plaintiffs contend that, during the Class Period, defendants stated that Exela had 90% revenue visibility due to auto-renewing customer contracts, when, in reality, at least 20% of Exela's revenue was derived from unpredictable and non-recurring postage charges; that Reynolds' March 19, 2019 statement that "[a]s we've discussed historically, we typically have 90% visibility," Am Compl. ¶ 152 (alteration in original), constituted a present tense assessment, not a statement only about the **[*36]** past; that defendants' visibility statements were devoid of any cautionary language, as is required to invoke safe harbor protection; that Reynolds' statements were not forward-looking but were, instead, present tense; that even if Exela's visibility statements were forward looking, the safe harbor does not apply to omissions, and defendants omitted that highly unpredictable postage revenue made up about 20% of Exela's total revenue, "a fact that they had a duty to disclose when assuring investors as to the 'visibility' of Exela's revenue," Ps. Br. 13; that it is irrelevant that Exela included postage in its revenue because it did not disclose until August 8, 2019 the *percentage* of its revenue that came from postage, omitting before that date that at least 20% of its revenue came from unpredictable postage; and that Exela's omission, had it been disclosed, would have squarely contradicted Exela's repeated representation of 90% visibility.

---

[18] Plaintiffs allege that, on June 30, 2020, Cogburn informed investors:

[d]uring 2020, we will continue to exit certain contracts and statements of work with little or no margin contribution and no opportunity to improve their contribution through digital transformation and automation. We refer to revenues from these contracts as transition revenue. As of January 1, we had approximately $150 million of annual transition revenue that we will exit over the course of the year.

Compl. ¶ 198 (emphasis omitted). But Exela's "admission" on June 30, 2020 that "for a substantial portion of these existing customers there was 'no opportunity to improve their contribution through digital transformation and automation,'" *id.* ¶ 202, does not support the inference that Cogburn or Reynolds was aware of this fact previously when it was represented that Exela planned, *in the future*, to expand customer margins by implementing automation and digital transformation.

Plaintiffs contend next that they have sufficiently alleged scienter as to their visibility claim: when asked about the effect of postage revenue on the company's margins, Reynolds gave evasive responses; as CFO, Reynolds knew that postage contributed [*37] 20% to Exela's full year 2018 revenue, but did not disclose this fact to investors until August 2019; Reynolds' admission that Exela had not been good at predicting postage "historically" shows that Reynolds historically monitored postage revenue; Reynolds concealed the extent of postage revenue and the impact it actually had on Exela's visibility when he thought that information did not look good for Exela, but disclosed it when he needed a scapegoat for Exela's deteriorating EBITDA margins; Reynolds' May 21, 2020 resignation, just a few months after the Restatement, shows scienter; scienter is sufficiently alleged as to Cogburn because he participated in many earnings calls through the Class Period, touted Exela's "strong visibility," and admitted in discovery responses that he prepared projections and forecasts for the company; and scienter is alleged as to all defendants because "[w]hen liquidity dries up and a company can barely cover debt service, predictability becomes paramount important to investors—providing even more motive for Exela to continue to misrepresent its purported 'high visibility,'" Ps. Br. 17.

Defendants reply that plaintiffs have not explained how Exela's forward-looking [*38] guidance and statements about revenue "visibility" were untrue when made; that defendants' use of the word "typically" when discussing visibility makes clear that this statement was based on what visibility the company had seen historically, and plaintiffs fail to plead any facts showing that Exela had not "typically" seen 90% visibility up to that point; that Exela did not admit that 100% of pass-through postal revenue was completely unpredictable; that Exela's actual results were well within 90% of its original projections and were fully consistent with a company that drew the vast majority of its revenue from predictable long-term contracts; that plaintiffs ignore Exela's numerous cautionary statements and fail to show that defendants had actual knowledge of falsity regarding any forward-looking statement; and that plaintiffs' "motive" argument is implausible because postage revenue was a pass-through reimbursement of postage expenses that had no net liquidity impact.

2

The court will assume *arguendo* that defendants' visibility statements are not forward-looking statements protected by the PSLRA's safe harbor.[19] It will also assume *arguendo* that the visibility statements constitute [*39] misrepresentations of material fact, as opposed to accurate assessments of Exela's revenue visibility at the time they were made. Even with these assumptions, however, defendants are still entitled to a dismissal of plaintiffs' claim to the extent it is based on defendants' visibility statements. This is so because plaintiffs have not pleaded specific facts establishing a strong inference of scienter with respect to these statements.

Plaintiffs allege that, on several occasions between March 2018 and March 2019, Exela's officers represented to investors that Exela had 90% revenue visibility due to the long-term nature of its customer contracts,[20] when, in reality, at least 20% of Exela's revenue during this time period was derived from unpredictable and non-recurring postage charges.[21] But plaintiffs do not plead any specific facts establishing that, *at the time defendants*

---

[19] In *Spitzberg v. Houston American Energy Corp., 758 F.3d 676 (5th Cir. 2014)*, the Fifth Circuit "join[ed] [several other circuits] in concluding that a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Id. at 692* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008)*).

[20] *See, e.g.*, Compl. ¶ 118 (quoting Reynolds' statement during a March 15, 2018 earnings call that "[w]e have over 90% visibility in revenue and have incorporated our total contracted revenue since . . . January 1. So we feel really good with our visibility." (emphasis omitted); *id.* ¶ 130 (Exela's 2017 Form 10-K, noting "approximately 90% [of revenue] is recurring in nature and supported by long-term customer contracts."); *id.* ¶ 132 (quoting Reynolds' statement during a May 2018 earnings call that "we have good visibility into our revenue, typically just over 90% at any point in time." (emphasis omitted)); *id.* ¶ 145 (quoting Reynolds' statement during a November 2018 earnings call that "we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts."); *id.* ¶ 152 (quoting Reynolds' statement during a March 19, 2019 earnings call that "[a]s we've discussed historically, we typically have about 90% visibility into the next 12 months.").

[21] The court does not address in this decision whether Exela's visibility statements constituted material misrepresentations.

*represented that Exela had 90% revenue visibility* (i.e., before March 2019), defendants knew that approximately 20% of Exela's revenue for 2018 and 2019 came from unpredictable postage and postage handling.

Exela updated its 2019 revenue guidance on August 8, 2019 based, in part, on the "unpredictable **[*40]** nature of [its] postage revenue." Compl. ¶ 169 (emphasis omitted). On November 12, 2019 Reynolds announced that Exela was again lowering its 2019 guidance, in part due to "the continued unpredictable nature of [its] revenue from postage." *Id.* ¶ 178 (emphasis omitted); *see also id.* ¶ 179 (quoting Reynolds' statement during a November 12, 2019 earnings call that postage "is low-margin business. It's just really not predictable for us. And when that postage comes through, it will fluctuate significantly between quarters. That's something we haven't been very good at predicting historically, so we're working on improving that." (emphasis omitted)). Exela did not issue the Restatement until June 9, 2020. Plaintiffs allege that the Restatement revealed that Exela's

> revenues attributable to postage and postage handling and the LMCE for 2019 and 2018 . . . together accounted for $338.1 million and $277.4 million respectively. These revenues, which the Company described as unpredictable, amounted to more tha[n] 21% of the Company's restated 2018 revenue, and approximately 18% of its 2019 revenue, refuting the Company's assertions throughout the Class Period that it had visibility into over 90% **[*41]** of its revenue.

*Id.* ¶ 195. Although defendants' statements in August and November 2019 would support the reasonable inference that defendants knew, at least as of those dates, that postage revenue was unpredictable, they do not permit the reasonable inference that defendants knew or must have been aware, *on or prior to March 19, 2019,*[22] that at least 20% of Exela's revenue in 2018 and 2019 came from (or would come from) postage, that postage revenue was completely unpredictable, and that Exela therefore did not actually have 90% revenue visibility.

When asked during a May 2018 earnings call about the impact of postage on Exela's margins, Reynolds stated, "we don't really break out postage separately. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue." *Id.* ¶ 133. Plaintiffs contend that this "evasive response[] . . . is strong evidence of scienter." Ps. Br. 15. The court disagrees. The court can only draw the reasonable inference from Reynolds' response that, as of May 2018, Exela did not separately account for postage revenue. This statement does not permit the reasonable inference that Reynolds knew then that postage revenue was completely **[*42]** unpredictable or that at least 20% of Exela's revenue for that year would come from this unpredictable source.

Plaintiffs allege that, when asked on August 8, 2019 "if [Exela] reported revenue ex-postage in the [second quarter of 2019]," Reynolds responded "No, we did not. We wanted to discuss it this quarter. We thought it was important that we show what the true margins look like. Obviously we're being penalized by pass-through of revenue with little or no margin." Compl. ¶ 170 (emphasis omitted). Plaintiffs maintain in support of scienter that, at the time of Reynolds' August 8, 2019 response, "postage contributed 20% to Exela's full year 2018 revenue, a fact Reynolds, as CFO, knew—but investors did not until August 2019." Ps. Br. 15. But plaintiffs have not plausibly alleged that Reynolds knew *at the time he represented 90% revenue visibility* that postage revenue was completely unpredictable, that unpredictable postage contributed 20% to Exela's full year 2018 revenue, or that as a result of this unpredictable revenue source Exela did not actually have 90% revenue visibility. In fact, as discussed above, Reynolds specifically stated in May 2018 that the company did *not* "break out **[*43]** postage separately." Compl. ¶ 133. Reynolds' status as CFO is alone insufficient to plead a strong inference of scienter.[23]

---

[22] On March 19, 2019 Reynolds stated that Exela "typically ha[s] about 90% visibility." Compl. ¶ 152. Plaintiffs do not allege any actionable visibility statement occurring after this date.

[23] Nor is scienter established by the fact that Reynolds is a CPA with an extensive background in finance and accounting, or the fact that Reynolds resigned just a few months after the Restatement. *See, e.g., Abrams, 292 F.3d at 432* ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Crutchfield, 2021 U.S. Dist. LEXIS 57811, 2021 WL 1167578, at *21* ("Corporate resignations are generally 'unavailing as proof of the commission of fraud.'" (quoting *Southland Sec. Corp., 365 F.3d at 383*)). In the cases on which plaintiffs rely, there were extensive allegations of scienter *in addition to* the defendant CFO's experience and accounting background or resignation. *See In re PainCare Holdings Secs. Litig., 541 F.Supp.2d 1283, 1293 (M.D. Fla. 2008)* (holding,

Plaintiffs next contend that Reynolds' admission on November 12, 2019 that "we haven't been very good at predicting [postage] historically," Compl. ¶ 179 (emphasis omitted), "further shows Reynolds historically monitored postage revenue," Ps. Br. 15. Although it is true that Reynolds' November 12, 2019 statement suggests that defendants "historically" monitored postage revenue, "historically" is a vague term. Nothing in Reynolds' statement supports the inference that the company was monitoring postage revenue on March 19, 2019 (or earlier), or that Reynolds knew or was severely reckless in not knowing, in March 2019, that Exela was "[not] very good" at predicting postage revenue.

Finally, Plaintiffs contend that scienter can be inferred from the fact that when Reynolds finally disclosed postage's contribution to revenue,

> he did so to try to claim that his strategy of improving margins on legacy Novitex contracts . . . was working. In other words, Reynolds concealed the extent of postage revenue and the impact it actually had on Exela's **[\*44]** visibility when he though that information did not look good for Exela but disclosed it when he needed a scapegoat for Exela's deteriorating EBITDA margins.

Ps. Br. 16. The court disagrees.

Even if defendants' motivation for disclosing postage's contribution to revenue in August 2019 was because Reynolds "needed a scapegoat for Exela's deteriorating EBITDA margins,"—an argument that is not pleaded and is purely speculative—this fact would not permit the inference that, *at the time Reynolds represented that Exela had 90% revenue visibility*, he knew or was severely reckless in not knowing that Exela's postage revenue was completely unpredictable, that 20% of Exela's revenue came from postage, and that Exela did not actually have 90% revenue visibility.

Regarding Cogburn, plaintiffs contend that scienter is sufficiently alleged because he participated in many earnings calls throughout the Class Period, including the March 2019 earnings call; he touted Exela's "strong visibility"; and he prepared projections and forecasts for Exela. The court again disagrees. None of these alleged facts is sufficient to permit the reasonable inference that Cogburn knew or should have known, during or before **[\*45]** the March 2019 earnings call, that Exela did not have 90% revenue visibility or that approximately 20% of Exela's revenue for 2018 and 2019 came from completely unpredictable postage and postage handling.

Accordingly, the court grants defendants' motion to dismiss to the extent plaintiffs base their Exchange Act and *Rule 10b-5* claim on defendants' visibility or other forward-looking statements.

V

The court now considers plaintiffs' Exchange Act and *Rule 10b-5* claim based on Exela's Adjusted EBITDA figures.

A

Defendants contend that there is no merit to plaintiffs' argument that Exela misled investors regarding its calculation of Adjusted EBITDA, let alone acted with scienter, because Exela disclosed what the optimization and restructuring costs were, made clear that they were added back to Adjusted EBITDA, and disclosed that such costs would continue for the foreseeable future.

---

based on CEO and CFO's positions within the company, access to insider information, experience and accounting backgrounds, the fact that their bonuses were tied to the company's earnings, "and, significantly, that they knew of the GAAP violations prior to informing the public," that plaintiffs had pleaded scienter with respect to CEO and CFO); *ArthroCare Corp. Sec. Litig, 726 F .Supp. 2d at 725* (holding that facts pleaded, "including the presence of significant, repeated red flags, the role of the Individual Defendants in the company, the magnitude and duration of the Restatement and the fraud, the allegations of insider trading, and the Sarbanes-Oxley certifications," collectively gave rise to strong inference of at least severe recklessness, but noting "the resignations in this case bear little, if at all, on the scienter analysis."). In the instant case, for the reasons discussed, plaintiffs have not plausibly alleged scienter and cannot rely on Reynolds' job title, experience as a CPA, or resignation alone to plead scienter under the PSLRA's high standards.

2021 U.S. Dist. LEXIS 118164, *45

Plaintiffs respond that Exela made a combination of misleading affirmative statements and omissions about its Adjusted EBITDA that it had a duty to disclose under Regulation S-K *Item 10(e)(ii)(B)* and Regulation G[24]; that Exela's description of its optimization and restructuring expenses as "non routine" expenses that "do not truly reflect **[\*46]** [Exela's] past, current or future operating performance," Ps. Br. 18 (quoting Compl. ¶¶ 120, 121), was misleading because, in reality, Exela's optimization and restructuring expenses were "ordinary operating costs," *id.* at 19 (emphasis omitted); that the SEC provides issuers interpretive guidance with respect to non-GAAP financial measures and has secured judgments in enforcement actions for violations much like those here; that the Restatement, which revealed that Exela had improperly added back optimization and restructuring expenses to its Adjusted EBITDA, constitutes an admission that previously-reported information was false or misleading; that actual investors (including at Morgan Stanley, Cantor Fitzgerald, and Jefferies) were misled by Exela's Adjusted EBITDA presentation based on its violation of Regulation G and *Item 10(e)*; and that, under *17 C.F.R. § 229.10(e)(ii)(B)*, defendants never should have adjusted Exela's EBITDA as they had, either by adding optimization and restructuring costs back to earnings or by labeling such add-backs as "nonroutine" once Exela took its second charge in any given two-year period.

Exela replies that its Adjusted EBITDA disclosures were not false or fraudulent; that the **[\*47]** SEC's May 2016 interpretive guidance merely recognizes that excluding normal, recurring, cash operating expenses necessary to operate a registrant's business *could be* misleading, and that "'[c]ould be misleading' is a far cry from 'is always misleading,'" Ds. Reply 8; that nothing in the guidance states that a company may never exclude expenditures from a non-GAAP metric merely because they continue in future quarters, especially when, as here, the company specifically tells investors that the expenditures at issue will occur in future periods; that analysts' disappointment in the *amount* of subsequent optimization and restructuring costs does not show that they were misled into believing that such costs would never occur again; that the SEC's guidance permits a registrant to adjust for a charge or gain if the company states, as Exela did here, that the expenses may continue in future periods; that the continued occurrence of optimization and restructuring charges does not automatically transform them into ordinary or routine operating expenses, particularly where, as here, Exela was undergoing a significant business transformation following the Business Combination and made clear that **[\*48]** it would incur substantial costs; and that, "[i]n sum, Plaintiffs allege no facts supporting a strong inference that Exela's disclosures were so blatantly and beyond-the-pale misleading as to be fraudulent," the Fifth Circuit has not held that Regulation S-K can even be the predicate for a *§ 10(b)* claim, and, regardless, plaintiffs allege no facts showing that the rule is so clear-cut and "obvious," as applied to these facts, that it would support a strong inference of scienter, Ds. Reply 9.

B

Throughout the Class Period, Exela disclosed standard GAAP financial metrics (such as total revenue and net profits or losses) as well as non-GAAP financial metrics, including EBITDA and "Adjusted EBITDA." Regarding its non-GAAP financial measures, Exela stated:

> [w]e view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integration costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment **[\*49]** charges; and management fees and expenses.

Ds. App. 54; *see also id.* at 185-86, 248-49, 317-18, 415, 538, 584, 650. Exela warned investors that "EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP," and that

---

[24] Plaintiffs concede that the Fifth Circuit has not yet addressed whether Item 10(e)(1) or Regulation G may serve as a *§ 10(b)* predicate, but they maintain that district courts within this circuit have found similar rules violations to constitute actionable *§ 10(b)* claims. *See* Ps. Br. 18 (citing *Zagami v. Natural Health Trends Corp., 540 F.Supp.2d 705, 709 (N.D. Tex. 2008)* (Fitzwater, C.J.); **Ramirez v. Exxon Mobil Corp., 334 F.Supp.3d 832, 849 (N.D. Tex. 2018)** (Kinkeade, J.)).

[o]ur non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. These non-GAAP financial measures are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP.

*Id.* at 54-55.

C

Non-GAAP metrics, as the name suggests, are "metrics that are 'calculated and presented on the basis of methodologies other than in accordance with' GAAP." *Ironworkers Local 580-Joint Funds v. Linn Energy, LLC, 29 F. Supp. 3d 400, 412 (S.D.N.Y. 2014)* (citation omitted). Therefore, "there is no uniform GAAP rule governing how these metrics are calculated." *Id.* Courts have held that "[i]t is not fraudulent for a reporting entity to calculate metrics that are not defined under GAAP . . . taking (or not taking) **[*50]** into account whatever factors the reporting entity thinks appropriate—as long as the public is told exactly what the company is doing." *Id. at 426* (citing *In re Netflix, Inc. Secs. Litig., 2005 U.S. Dist. LEXIS 30992, 2005 WL 3096209, at *11 (N.D. Cal. Nov. 18, 2005)*); *see also, e.g.,* N. *Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., 2016 U.S. Dist. LEXIS 136929, 2016 WL 5794774, at *12 (S.D.N.Y. Sept. 30, 2016)* ("Unless Plaintiffs can show that [the defendant] somehow misled investors about how it actually calculated EBITDA, which they have not, there can be no claim for fraud.").

The disclosures cited above demonstrate that, "at all times, [Exela] told the whole truth and nothing but about how [it was] calculating [EBITDA and] adjusted EBITDA . . . non-GAAP metrics for which there is no 'right' formula because, unlike GAAP metrics, they have no uniform definition." *Linn Energy, LLC, 29 F. Supp. 3d at 426*. Exela expressly disclosed that optimization and restructuring expenses were added back into Adjusted EBITDA and disclosed the precise amounts of these expenses each quarter. Exela also cautioned investors that EBITDA and Adjusted EBITDA "should not be considered as alternatives to the most directly comparable GAAP financial measures," have "important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial metrics," "are not required to be uniformly applied, are not audited and should not **[*51]** be considered in isolation or as substitutes for results prepared in accordance with GAAP," and that "[b]ecause EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility." Ds. App. 54-55, 186, 249, 318, 416, 539, 585, 650.

Plaintiffs posit that, despite the described disclosures, defendants nevertheless *implied* that Exela's optimization and restructuring expenses were "non-recurring," and that "[b]y pointing to a particular transaction as the source of continued O&R expenses, investors were led to believe that these were not routine operating expenses, but would instead arise only in connection with discrete deals—because routine operating expenses would persist *with or without* a transaction." Ps. Br. 19. But plaintiffs have failed to plausibly allege any instance in which defendants represented that Exela's optimization and restructuring expenses were "non-recurring." In fact, plaintiffs allege that Exela specifically told investors that the reason it excluded optimization and restructuring expenses **[*52]** in Adjusted EBITDA was not because these expenses were non-recurring, but was due, instead, to their "significant variability." Compl. ¶¶ 123, 126.

Plaintiffs also allege that Exela told analysts that these expenses would continue "on a go-forward basis," *id.* ¶ 125, and that Cogburn told investors that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline," which "will result increasingly in the convergence of adjusted EBITDA and EBITDA," *id.* ¶ 122 (emphasis omitted); *see also id.* ¶ 128 ("[A]s we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will—and the percentage of adjustments will shrink in the future." (emphasis omitted)). But the court agrees with defendants' assertion that

"[t]elling investors that 'we believe' optimization and restructuring expenses 'will gradually decline' over time and 'will shrink in the future' is vastly different from telling investors that such expenses would not occur.'" Ds. Br. 7-8.[25]

D

Plaintiffs posit that Exela's Adjusted EBITDA disclosures violated two SEC Regulations: Regulation **[*53]** G and Item 10(e) of Regulation S-K.

1

Regulation G has two requirements: (1) a general disclosure requirement, and (2) a reconciliation requirement. Plaintiffs maintain that Exela violated Regulation G's general disclosure requirement, which provides:

> [a] registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

17 C.F.R. § 244.100(b). The court disagrees.

First, "SEC regulations explicitly provide that a violation of Regulation G does not constitute an independent basis for liability under the securities laws." Linn Energy, LLC, 29 F. Supp. 3d at 429 (citing 17 C.F.R. § 244.102); see also 17 C.F.R. § 244.102 ("Neither the requirements of this Regulation G . . . nor a person's compliance or non-compliance with the requirements of this Regulation shall in itself affect any person's liability under Section 10(b) . . . . of the Securities Exchange Act of 1934 or § 240.10b-5 of this chapter."); Graves v. AECOM, 2017 U.S. Dist. LEXIS 222299, 2017 WL 5502774, at *8 (C.D. Cal. June 19, 2017) ("Regulation G does not govern **[*54]** the standards for determining a material misstatement sufficient to state a claim for securities fraud.").

Second, plaintiffs have not plausibly alleged a violation of Regulation G. As explained above, defendants' disclosures relating to Adjusted EBITDA were not false or misleading. They clearly explained how they calculated this non-GAAP metric and adequately warned investors about its limitations.

To the extent plaintiffs rely on the SEC's 2016 interpretive guidance ("2016 Interpretation") regarding non-GAAP financial measures to argue that defendants were obligated to disclose that Exela's optimization and restructuring expenses were normal operating costs, the court is not persuaded. This guidance only states that "presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business *could be misleading.*" Ps. Br. 19 (emphasis added) (quoting 2016 Interpretation). It does not enable the court to draw the reasonable inference that Exela's Adjusted EBITDA figures were, in fact, misleading. For the reasons explained above, plaintiffs have not plausibly pleaded that Exela's disclosures regarding the calculation and limitations **[*55]** of its Adjusted EBITDA figures were false or misleading.

2

Item 10(e) of Regulation S-K sets forth requirements for non-GAAP financial disclosures that are similar to those of Regulation G. Relevant to plaintiffs' claim, Item 10(e) states:

---

[25] At oral argument, plaintiffs asserted that the court should infer from the improper add-back amount, as disclosed in the Restatement, that plaintiffs improperly used add-backs to meet their 2017 and 2018 guidance. But plaintiffs specifically allege that the sums of $43.1 million, $40.6 million, and $37.8 million for the periods ending December 31, 2019, December 31, 2018, and December 31, 2017, respectively, related to "the understatement of a liability *related to the Appraisal Action.*" Compl. ¶ 189 (emphasis added). They do not plead that these amounts were related to Adjusted EBITDA add-backs.

[a] registrant must not . . . [a]djust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur within two years or there was a similar charge or gain within the prior two years.

17 C.F.R. § 229.10(e)(ii)(B).

Based on this regulation, plaintiffs contend that "[d]efendants never should have adjusted its EBITDA in the way that it did—either by adding O&R costs back to earnings or by labeling such addbacks as 'nonroutine'—once it took its second charge in any given two-year period." Ps. Br. 22 (citation omitted). The court disagrees that plaintiffs have plausibly alleged a claim under the Exchange Act and Rule 10b-5 based on defendants' alleged violation of Item 10(e) of Regulation S-K .

There is no private right of action under SEC Regulation S-K. See Oran v. Stafford, 226 F.3d 275, 287 (3d Cir. 2000) ("Neither the language of the regulation nor the SEC's interpretive releases construing it suggest that [*56] it was intended to establish a private cause of action[], and courts construing the provision have unanimously held that it does not do so."); Stephens v. Uranium Energy Corp., 2016 U.S. Dist. LEXIS 91897, 2016 WL 3855860, at *21 (S.D. Tex. July 15, 2016) (Rosenthal, J.) ("The case law is clear as to the absence of an express private right of action under Regulation S-K, and courts may not imply a private right of action under Regulation S-K where Congress has not established one." (citation omitted)). Accordingly, plaintiffs must allege more than the mere violation of Item 10(e) of Regulation S-K to state a plausible claim. See, e.g., Stephens, 2016 U.S. Dist. LEXIS 91897, 2016 WL 3855860, at *21 ("[I]f a plaintiff can establish all of the elements of a Rule 10b-5 claim such as scienter and reliance, a Regulation S-K violation may be relevant in establishing such a claim." (citation omitted)); Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F.Supp.2d 571, 583 (E.D. Va. 2006) ("[T]here is no private right of action under SEC Regulation S-K," and "because the materiality standards for Rule 10b-5 and Regulation S-K 303 differ significantly, a violation of Regulation S-K does not lead to a failure to disclose under 10b-5."); Alfus v. Pyramid Tech. Corp. 764 F. Supp. 598, 608 (N.D. Cal. 1991) ("Thus, demonstration of a violation of the disclosure requirements of Item 303 [of Regulation S-K] does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. Such a duty to disclose must be separately [*57] shown."). Because plaintiffs have failed to plead any actionable misrepresentation or omission under the Exchange Act or Rule 10b-5, Item 10(e) of Regulation S-K cannot provide an independent basis for liability. Oran, 226 F.3d at 288 (holding that "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" and that "[b]ecause plaintiffs have failed to plead any actionable misrepresentation or omission under that Rule, SK-303 cannot provide a basis for liability.").[26]

---

[26] Plaintiffs state in their response that "investors were misled by Exela's Adjusted EBITDA presentation based on its violation of Reg G and Item 10(e)." Ps. Br. 21. But the allegations of the complaint that they cite do not support their argument. Plaintiffs contend that Morgan Stanley was misled, citing their allegation that its analysts noted that "Exela's 2017 adjusted EBITDA was lowered by 'one-time charges related to the company's business transformation efforts, including $48 million of restructuring expenses and $99 million of transaction related costs' which it expects to moderate moving forward." Compl. ¶ 129 (emphasis omitted). But plaintiffs have not alleged that the actual charges to which Morgan Stanley refers in its 34-page analysis were *not* "one-time charges." In other words, there is no indication that any analyst at Morgan Stanley believed that the entire "optimization and restructuring" category (as opposed to the specific charges included in that category) was a "one-time" adjustment. Nor do the other statements by analysts at Morgan Stanley, Cantor Fitzgerald, or Jefferies permit the reasonable inference that investors were misled by Exela's Adjusted EBITDA presentation. See Compl. ¶ 144 (quoting Morgan Stanley analyst asking "how one time-ish are these investments or impact items, and how do we think about expansion from here on out?" (emphasis omitted)); id. ¶ 166 (quoting Morgan Stanley report stating that Exela's "optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved." (emphasis omitted)); id. ¶ 125 (quoting Cantor Fitzgerald analyst asking Reynolds "what can we consider to be, I guess, onetime in nature in 2Q?," and Reynolds responding that he expected Exela's one-time charges to "fall off in 3Q" (emphasis omitted)); id. ¶ 164 (quoting Jefferies analyst noting that Exela's "restructuring and optimization costs . . . [have] been persistently high." (emphasis omitted)). To the extent Exela incorrectly predicted that Adjusted EBITDA and EBITDA would converge, this forward-looking statement is not misleading absent an allegation (not present here) that defendants had actual knowledge that it was not true.

E

Even if plaintiffs had plausibly alleged that Exela's Adjusted EBITDA figures were false or misleading, the court would still grant defendants' motion to dismiss plaintiffs' claim based on Exela's Adjusted EBITDA figures because plaintiffs have not plausibly pleaded a strong inference of scienter.

Plaintiffs contend that testimony in the Appraisal Action establishes actual knowledge as to Chadha and Reynolds regarding the impropriety of their Adjusted EBITDA calculations. This is so, according to plaintiffs, because Chadha was questioned about Adjusted EBITDA during his February 26, 2019 deposition, Exela's expert witness testified to the issue at trial, and "[t]hus, throughout the Class **[*58]** Period, Defendants knowingly presented misleading non-GAAP measures to investors." Ps. Br. 23. But allegations that Chadha was questioned about Adjusted EBITDA during his deposition in the Appraisal Action and that Exela's expert in the Appraisal Action testified to the issue do not support a strong inference of scienter with respect to *Exela*'s Adjusted EBITDA figures. Plaintiffs have not alleged that Exela's Adjusted EBITDA figures—which added back optimization and restructuring expenses that were unique to Exela—and corresponding disclosures and explanations in its SEC filings were at issue in the Appraisal Action. In fact, plaintiffs specifically allege that trial testimony in that action "demonstrated *SourceHOV's* improper inclusion of expenses within *SourceHOV's* adjusted EBITDA." Compl. ¶ 163 (emphasis added).[27] Plaintiffs are essentially asking the court to infer, based on testimony regarding SourceHOV's Adjusted EBITDA practices, that Chadha and Reynolds had actual knowledge that *Exela's* Adjusted EBITDA practices—which were based on entirely different circumstances—were false or misleading. *See* Ps. Br. 23 ("That SourceHOV consistently received criticism about its Adjusted EBITDA **[*59]** and Chadha ran SourceHOV, shows scienter as to him, and thus Exela."). But this is too great an inferential leap to satisfy the PSLRA's "strong inference" requirement.

Nor do plaintiffs' other arguments—i.e., that Exela only met its EBITDA guidance by adding back optimization and restructuring expenses; that Chadha had a "desire to access 'desperately needed funds,'" *id.* at 23; that Chadha owns approximately 50% of Exela's stock; that SourceHOV admitted in the Appraisal Action that Chadha, Reynolds, and Cogburn prepare projections and forecasts for the company; and that Adjusted EBITDA was the key metric on which investors focused—support a strong inference of scienter. In short, plaintiffs have not plausibly alleged that any defendant knew, or was severely reckless in not knowing, at the time Exela disclosed its Adjusted EBITDA figures that these figures and the corresponding disclosures and explanations were misleading. Accordingly, the court concludes on this basis that defendants are entitled to a dismissal of plaintiffs' claim based on Exela's Adjusted EBITDA figures.

VI

Plaintiffs also seek to hold Reynolds, Cogburn, and Chadha liable as control persons under *§ 20(a)* of the Exchange Act. **[*60]**

"Under *Section 20(a)*, a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 206 n.4 (5th Cir. 2009)*. Nonetheless, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp., 365 F.3d at 383* (citing *Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)*).

Because plaintiffs have failed to plausibly plead a primary violation under *§ 10(b)* of the Exchange Act and *Rule 10b-5*, the court also dismisses plaintiffs' *§ 20(a)* claim against Reynolds, Cogburn, and Chadha.

VII

Having granted defendants' motion to dismiss, the court must decide whether to allow plaintiffs to replead.

---

[27] The complaint contains a ¶ 163 on page 47 and another ¶ 163 on page 39. This ¶ 163 is the one on page 47.

This court's approach in cases decided under the PSLRA has been to allow plaintiffs at least one opportunity to replead after the court has filed an opinion identifying defects in a complaint.

> Although *§ 78u-4(b)(3)(A) of the PSLRA* states that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met," there is nothing in this language that indicates that district courts are required to dismiss securities fraud claims without first granting leave to amend. . . . Because a more **[*61]** carefully drafted complaint might state a claim upon which relief may be granted, the court grants plaintiffs an opportunity to amend their complaint.

*Coates, 26 F.Supp.2d at 923*.

Additionally, at oral argument, plaintiffs' counsel stated that, in preparing for the hearing, she had discovered a "massive amount" of insider stock sales by Chadha. The court does not suggest that the information plaintiffs' counsel has in mind will make a difference if included in a second amended complaint. "'Insider' trading must be 'unusual' to have meaningful probative value." *Nathenson, 267 F.3d at 420-21* (quoting *Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995)*). "Only insider trading in suspicious amounts or at suspicious times is probative of scienter." *Abrams, 292 F.3d at 435*. But the availability of such information does inform the court's decision whether to permit plaintiffs to amend their complaint.

Accordingly, the court grant plaintiffs leave to file a second amended complaint.

* * *

Defendants' motion to dismiss is granted. The court grants plaintiffs 42 days from the date of this memorandum opinion and order to file a second amended complaint.

**SO ORDERED**.

June 24, 2021.

/s/ Sidney A. Fitzwater

SIDNEY A. FITZWATER

SENIOR JUDGE

---