**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ALEX HERNANDEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RCI HOSPITALITY HOLDINGS, INC., ERIC S. LANGAN, and BRADLEY CHHAY,<br><br>Defendants. | Case No. 4:25-cv-04477-KPE<br><br>Hon. Keith P. Ellison<br><br><u>CLASS ACTION</u> |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................ 1

II. NATURE AND STAGE OF PROCEEDINGS ........................................ 2

III. STATEMENT OF ISSUES ........................................ 3

IV. STATEMENT OF FACTS ........................................ 3

A. Defendants' Internal Communications And Overt Acts Confirm Their Tax Fraud Scheme ........................................ 4

B. Plaintiffs' Investigation Confirms Defendants' Tax Fraud and Lack of Meaningful Compliance Efforts ........................................ 6

C. Revelations of Defendants' Fraudulent Scheme ........................................ 7

D. Post-Class Period Events Confirm The Fraud ........................................ 7

V. STANDARD OF REVIEW ........................................ 8

VI. THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE EXCHANGE ACT ........................................ 8

A. The Complaint Is Replete With Detailed Allegations Of Defendants' Deceit ........................................ 8

1. Defendants Misleadingly Warn Of The Risk Of Illegal Conduct While Simultaneously Bribing A Government Official ........................................ 9

2. Defendants Touted Adherence To A Code Of Ethics Prohibiting Unlawful Conduct While Bribing A Government Official ........................................ 15

3. Defendants Admit That Their Statements About The Adequacy Of RCI's Internal Controls Were False ........................................ 16

4. Defendants' False And Misleading Financial Reporting and GAAP Violations ........................................ 17

B. "We Need To Change The Way We Book This Sh*t": Scienter Cannot Be Credibly Contested ........................................ 19

1. Langan's And Chhay's Orchestration Of The Scheme Alone Raises A Strong Inference Of Scienter ........................................ 20

2. Plaintiffs' Additional Allegations Further Support A Compelling Inference Of Scienter ........................................ 21

C. The Complaint Adequately Pleads Loss Causation ........................................ 23

D. The Complaint Adequately Pleads Section 20(a) Claims ........................................ 25

VII. CONCLUSION ........................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ........ 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 8

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ........ 9, 19

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex 2016) ........ 20

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ........ 14

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ........ 16

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase*,
553 F.3d 187 (2d Cir. 2009) ........ 18

*Edwards v. McDermott Int'l., Inc.*,
2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ........ 19

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ........ 13

*Greenberg v. Crossroads Sys. Inc.*,
364 F.3d 657 (5th Cir. 2004) ........ 25

*Hall v. Rent-A-Center, Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ........ 21

*Hoffman v. RCI Hosp. Holdings, Inc.*,
2021 WL 1232782 (S.D. Tex. Mar. 31, 2021) ........ 17

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........ 13

*In re Apache Corp.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ........ 21

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ........ 22

*In re AT&T Inc. Sec. Litig.*,
2025 WL 1685840 (N.D. Tex. June 16, 2025) ........ 12, 13

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ........ 10, 11

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
403 F. Supp. 3d 712 (D. Minn. 2019) ........ 15

*In re Cobalt Int'l Energy, Inc.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ........ 8

*In re El Paso Elec. Co. Sec. Litig.*,
2004 WL 377555 (W.D. Tex. Feb. 23, 2004) ........ 13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ........ 12

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........ 9

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ........ 13

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004) ........ 19

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011) ........ 18

*In re Inotiv, Inc. Sec. Litig.*,
2024 WL 1344784 (N.D. Ind. Mar. 29, 2024) ........ 20

*In re Lumen Technologies, INc. Sec. Litig. II*,
2025 WL 978229 (W.D. La. Mar. 14, 2025) ........ 14

*In re Plains All Am. Pipeline L.P Sec. Litig.,*
307 F. Supp. 3d 583 (S.D. Tex. 2018) ........ 12

*In re Seagate Tech. Holdings PLC Sec. Litig.*,
2025 WL 1744505 (N.D. Cal. May 12, 2025) ........ 10, 12

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016) ........ 13

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ........ 17

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........ *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.,*
601 U.S. 257 (2024) ........ 9

*McNamara v. Bre-X Mins. Ltd.*,
197 F. Supp. 2d 622 (E.D. Tex. 2001) ........ 13

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ........ 10, 11

*Nathenson v. Zonagen, Inc.*,
267 F.3d 400 (5th Cir. 2001) ........ 19

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ........ 9, 14, 18, 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........ 12

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
9 F.4th 247 (5th Cir. 2021) ........ 3

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
2019 WL 3336119 (D. Minn. July 25, 2019) ........ 15

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ........ 23, 24, 25

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........ 14

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018) ........ 12, 22

*Schott v. Nobilis Health Corp.*,
211 F. Supp. 3d 936 (S.D. Tex. 2016) ........ 24

*Smith v. Reg'l Transit Auth.*,
756 F.3d 340 (5th Cir. 2014) ........ 8

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ........ 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 310 (2007) ........ 19

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .......... 10

*Villella v. Chem. & Mining Co. of Chile Inc.*,
2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .......... 12, 18, 20

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
28 F. Supp. 3d 93 (D. Mass. 2014) .......... 12

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) .......... 9

**SECONDARY SOURCES**

*SEC Staff Accounting Bulletin No. 99*,
64 Fed.Reg. 45150 (1999) .......... 19

Lead Plaintiffs Paul Stroub and William J. Neylan III, in his capacity as Co-Trustee and on behalf of WJ Neylan III, T A Neylan TTEE, William J Neylan III REV Living TR, U/A 12/5/12 Trust ("Plaintiffs" or "Lead Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Amended Class Action Complaint.[1]

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

This securities class action stems from Defendants' repeated assurances concerning the strength of RCI's business practices and legal compliance, fabrications that began to unspool as Defendants were forced to reveal that the New York State Attorney General (the "NY AG") had indicted RCI and its top officers in a tax and bribery fraud.[2] For more than a decade, Defendants Langan and Chhay exploited RCI strip clubs to funnel bribes to a government official in exchange for fraudulent audit settlements, evading more than $8 million in sales taxes. RCI investors were left in the dark as Defendants touted that RCI had implemented "comprehensive" compliance measures that management deemed "reasonably effective" in preventing illegal conduct at its strip clubs. Not only did the scheme directly contradict Defendants' representations regarding the effectiveness of RCI's compliance measures, but it also rendered the Company's Class Period financial reporting materially false and misleading.

The Complaint is replete with detailed allegations supported by ***dozens*** of highly incriminating internal emails and text messages obtained by the NY AG in connection with the Indictment. These communications unequivocally establish that Defendants orchestrated the

---

[1] References to "MTD" or "Motion" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 32). Citations to "¶_" are to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF No. 31). All terms not otherwise defined herein have the same meanings as in the Amended Complaint. Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.

[2] Copies of the redacted and unredacted Indictment are provided in Plaintiffs' Appendix as Exhibits A and B. In the redacted version, New York Department of Taxation and Finance Auditor Plunkett's identity and the charges against him were withheld from public disclosure. Following his indictment, on September 30, 2025, an unredacted version was publicly released.

scheme.

Defendants acknowledge that they promised investors that there were procedures in place to monitor their clubs and comply with legal requirements, but repeatedly insist that they never guaranteed that the Company wouldn't engage in illegal conduct. MTD at 8, 10-11. That distinction is meaningless. Liability exists here because Defendants made public representations that were clearly contradicted by facts that existed at the time—not because Defendants did or didn't guarantee the Company wouldn't violate the law. Indeed, courts routinely hold that representations about compliance are actionable where a defendant company makes such representations while simultaneously engaging in unlawful conduct.

While Defendants contend that their conduct was "at most" negligent, scienter cannot be credibly challenged. MTD at 1. The Indictment reflects an ongoing scheme, orchestrated by RCI's very top officers (who subsequently resigned) and depicts in vivid detail bribes to a government tax official and Defendants' use of the bribes to evade tax liabilities. The Indictment's specific emails and communications reflecting the fraud are buttressed by the accounts of former RCI employees, and an SEC investigation into the veracity of Defendants' public statements to investors.

Defendants' loss causation argument fares no better. The Complaint alleges significant declines in the price of RCI stock caused by the disclosures of risks and information previously concealed by the fraud. Defendants are therefore provided "with some indication of the loss and the causal connection that the plaintiff has in mind." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256 (5th Cir. 2009). Nothing more is required.

Therefore, Defendants' Motion should be denied.

## II. NATURE AND STAGE OF PROCEEDINGS

On June 12, 2026, Plaintiffs filed the Complaint alleging Defendants' violations of §§ 10(b)

and 20(a) of the Exchange Act and SEC Rule 10b-5. ECF No. 31. On August 11, 2026, Defendants filed the Motion and supporting materials. ECF Nos. 32-33.

## III. STATEMENT OF ISSUES

1. Whether the Complaint adequately pleads materially false or misleading statements, scienter, and loss causation for Plaintiffs' claims under § 10(b) of the Exchange Act.[3]

2. Whether the Complaint adequately states control person claims under § 20(a) of the Exchange Act against the Individual Defendants.

## IV. STATEMENT OF FACTS[4]

RCI's strip clubs operate in a highly regulated environment. Compliance with regulations and laws is a prerequisite to RCI's ability to operate and therefore essential to its financial success and reputation. ¶47. Strip club operations account for most of RCI's revenue (more than 80%), with Rick's Cabaret in New York City being one of RCI's top revenue-generating clubs. ¶44. RCI uses an in-house currency system, *i.e.*, Dance Dollars, which customers purchase to use for in-club entertainment. ¶45. In New York State, Dance Dollars and the associated surcharge are subject to the combined sales tax rate of 8.875% under New York tax laws. *Id*.

To highlight risk-management measures to investors, Defendants repeatedly touted that RCI had implemented "comprehensive" compliance measures, such as "continual[]" monitoring of its customers' and RCI employees' conduct at RCI strip clubs. ¶48. Defendants further assured that RCI's policies were "reasonably effective" at preventing illegal conduct. *Id*.

---

[3] Defendants concede in a footnote that the Complaint alleges a fraudulent "scheme," but they err in arguing that the Complaint does not plead scheme liability under Rule 10b-5(a) or (c). MTD at 6 fn.3. Here, the Individual Defendants masterminded the unlawful bribery and tax fraud scheme to further a fraudulent "course of business." Rule 10b-5(c). Scheme liability is alleged here.

[4] To the extent the Court takes judicial notice of certain SEC filings and press releases, they may be "considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021).

Contrary to these statements, however, Langan and Chhay used RCI's strip clubs as part of an illegal bribery scheme designed to evade sales taxes owed on Dance Dollars. Specifically, at the express direction of the Individual Defendants, RCI seduced New York tax auditor Alton Plunkett with free in-club entertainment, complimentary hotel accommodations, and restaurant outings in exchange for fraudulent audit resolutions. ¶58. Plunkett, also indicted as part of the scheme, held up his end of the bargain and allowed RCI's NYC Strip Clubs to evade more than $8 million in sales taxes through audit settlements that were substantially below the amounts actually owed. ¶56.

### A. Defendants' Internal Communications And Overt Acts Confirm Their Tax Fraud Scheme

The Complaint contains a substantial level of detail drawn from the Indictment, including Defendants' internal communications and acts, all of which confirm that RCI executives orchestrated the brazen criminal scheme.

The Indictment revealed the Individual Defendants' integral role in the bribery and fraud scheme. For example, before the Class Period on April 12, 2018, Langan expressed concern that RCI was going to be "hit by [$]3m in sales tax soon[.]" That same day, Defendant Langan reported to RCI's Director of Operations, Ahmed "Ed" Anakar, that "I think I got the sales taxes in New York to 350 plus interest possibly[,]" and that RCI Controller Timothy Winata "is discussing with the auditor tonight ;)[.]" ¶62. Later that night Langan approved bribes delivered to auditor Plunkett after being advised by an RCI-owned club employee, Kevlin, that "Tim['s] guest would like another $1500" and that it would be disguised as "a promo pay out in cage," responding simply: "***That's fine. Go ahead***." *Id*. Any question about Defendants' intent to conceal their conduct was answered in October 2018, when Winata informed Langan that Dance Dollar prices needed to be increased to account for sales tax obligations. ¶57. Rather than raising prices to address those

obligations, Langan proposed altering RCI's accounting treatment of the transactions, stating: "We can't Tim. ***We need to change the way we book this shit***. So[,] ***we only book the Net and not all of the dance dollars***." *Id*.

Importantly, Defendants' scheme ***continued*** during the Class Period. On June 13, 2023, Chhay emailed Anakar about bribing Plunkett to reduce an audit assessment from "200k" to "70k," explaining that the auditor historically lowered RCI's tax obligations to "1/3 of the initial he sends" and that Vivid Cabaret could be "out of the way for a while if we can get him to write us in the good guys bucket list." ¶65. That same day, Chhay instructed Winata to meet with the auditor and "[t]ry to get him under 70." ¶66. The effort succeeded. On September 1, 2023, Chhay texted Langan and Anakar that "Tim got the guy to $47k in [V]ivid New York," and that Winata "***owes him a couple trips***" because he "***has to keep his word***." ¶67. Defendants' scheme persisted through at least early 2024. In October 2023 and again in January 2024, Langan expressly authorized RCI to reimburse Winata for expenses incurred in connection with bribing Plunkett. ¶68. Both times, Langan approved the reimbursements with a one-word email: "Approved." *Id*.

Over the course of the scheme, Defendants secured at least four fraudulent audit settlements substantially below RCI's true sales tax liability. ¶70 (on July 12, 2012, Winata signed a Statement of Proposed Audit Change settling a Rick's Cabaret audit for $6,342.72); *Id*. (on December 4, 2018, Langan signed a Statement of Proposed Audit Change settling a Vivid Cabaret audit for $838,888.82); *Id*. (on January 18, 2022, Chhay signed a Statement of Proposed Audit Change settling a Hoops Cabaret audit for $200,773.91); *Id*. (on September 20, 2023, Chhay signed a Statement of Proposed Audit Change settling a Vivid Cabaret audit for $47,342.92).

**B. Plaintiffs' Investigation Confirms Defendants' Tax Fraud and Lack of Meaningful Compliance Efforts**

Former RCI employees and independent contractors confirm that RCI failed to collect and remit sales taxes on Dance Dollars in other RCI-owned clubs. For example, FE 1, a Hospitality Professional who worked as a traveling performer at many RCI clubs between 2021 and March 2026, reported that performers widely suspected RCI was not paying sales taxes on Dance Dollars because the income statements provided by RCI for tax purposes included "weird and random numbers," which were substantially lower than the amounts performers tracked themselves. ¶¶74-75. According to FE 1, "[w]e all suspected, including an agency the performers spoke to, that there is some tax fraud going on there with the Dance Dollars." ¶75. Likewise, FE 2, a Hospitality Manager in Texas from May 2025 to October 2025, explained that RCI charged a 20%-30% fee on Dance Dollars but "didn't charge any type of tax on Dance Dollars." ¶76.

FE 3[5] also confirmed that Langan's access to internal data gave him knowledge about RCI's fraudulent practices concerning Dance Dollars, explaining that operational reports were submitted through RCI's Club Tracks system directly to Langan and Anakar, which included information about the amount of Dance Dollars bought and spent. ¶78.

These FE accounts further establish that RCI executives knew RCI's compliance policies were ineffective. According to FE 3, numerous compliance violations were reported to Langan and Anakar, including violations of liquor laws, nudity restrictions, and prohibitions on sexual activity, but those reports "fell on deaf ears." *Id*. In fact, FE 3 noted that these violations would often occur when Langan would "bring in investors[,]" and that Langan and Anakar would visit all of the clubs every other month or every three months, with their visits often lasting a week. ¶¶78-79.

[5] FE 3 was an Assistant Manager at RCI-owned Rick's Cabaret located in Colorado from October 2021 until February 2024.

### C. Revelations of Defendants' Fraudulent Scheme

Defendants' scheme began to unravel on May 30, 2024, when *The Bear Cave* reported that it "believes Rick's New York City club was raided last night, as well as potentially other RCI Hospitality locations." ¶80. On this news, RCI stock fell 5.8% to close at $43.01 per share. ¶81. Then, on September 16, 2025, investors learned the full extent of the fraud when the NY AG unsealed the Indictment. ¶87. RCI executives were criminally charged for "brib[ing] an auditor with the New York Department of Taxation and Finance to avoid paying over $8 million in sales taxes," a scheme "authorized, directed, and overseen" by Langan and Chhay, among others. *Id.* Defendants were alleged to have falsified RCI's books and records to conceal their scheme by recording bribe payments as "'promotional' expenses." *Id*. RCI's stock price fell 16% that day and an additional 10% the following day, September 17, 2025. ¶¶88-90.

### D. Post-Class Period Events Confirm The Fraud

Events after the Class Period further revealed Defendants' misconduct and inadequate compliance and internal controls. ¶¶91-96. On November 28, 2025, shortly after the Indictment, RCI disclosed that Langan and Chhay were stepping down as CEO and CFO, respectively. ¶91. Critically, RCI later confirmed that its Board of Directors had approved a resolution for the Individual Defendants' resignations following the Indictment. ¶95.

In its March 19, 2026 Form 10-K, RCI ultimately admitted that it suffered from a material weakness in internal controls arising from the "ineffective design and operation of controls, which ***include management review controls***," relating to the accounting for "contingent liabilities." ¶93. The Company further implemented remediation efforts to "***improve the clarity and quality of documentation supporting review of legal contingencies***," including "***unasserted claims***." *Id.* RCI's independent auditor also issued an "adverse opinion on the effectiveness of the Company's

internal control over financial reporting because of the existence of material weaknesses" and warned that the financial impact of the Indictment was not estimable "***but could be material***." ¶94.

The financial consequences of Defendants' scheme soon became apparent. ¶96. When reporting fourth-quarter fiscal year 2025 results, RCI disclosed a net loss of $5.5 million, due in part to "higher non-cash legal accrual." *Id*. Langan also acknowledged on the related earnings call that the resulting "reserves have drastically affected the numbers for this quarter." *Id*.

## V. STANDARD OF REVIEW

"Motions to dismiss under Rule 12(b)(6) are viewed with disfavor" and "rarely granted." *Lormand*, 565 F.3d at 232. A complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a Rule 12(b)(6) motion, the Court does not resolve disputed fact issues. *See Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). Rather, the "complaint must be liberally construed in favor of the plaintiff, and all facts . . . must be taken as true." *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *2 (S.D. Tex. Jan. 19, 2016).

## VI. THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE EXCHANGE ACT

### A. The Complaint Is Replete With Detailed Allegations Of Defendants' Deceit

Defendants challenge the Complaint's detailed allegations as an "attempt to convert the unproven allegations in the New York criminal case into a claim for securities fraud," and argue that there are no actionable public statements during the Class Period. MTD at 7. That Defendants' scheme creates both criminal *and* civil liability, however, only strengthens the securities fraud claims. In choosing to both engage in criminal conduct and simultaneously lie about the strength of their compliance, internal controls, and sound financial reporting, Defendants are clearly culpable for misleading investors. Plaintiffs' allegations satisfy Rule 9(b), as they "specify the

statements contended to be fraudulent . . . the speaker . . . when and where the statements were made, and . . . why the statements were fraudulent." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 256 (5th Cir. 2005). The PSLRA, which further requires that falsity allegations based upon information and belief specify "all facts on which that belief is formed" (15 U.S.C. § 78u-4(b)(1)(B)), was not enacted to "raise the pleading burdens . . . to such a level that facially valid claims . . . must be routinely dismissed." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023).

**1. Defendants Misleadingly Warn Of The Risk Of Illegal Conduct While Simultaneously Bribing A Government Official[6]**

Throughout the Class Period, Defendants repeatedly touted their "comprehensive" compliance policies purportedly "***aimed at ensuring that the operation of each of our nightclubs is conducted in conformance with local, state and federal laws***." ¶101. Under these policies, Defendants claimed to "***continually monitor the actions of entertainers, waitresses and customers to ensure that proper behavior standards are met***." *Id*. Critically, Defendants assured investors that "management," including the Individual Defendants, believed that RCI's "policies are ***reasonably effective*** in achieving their purposes." *Id.*

False representations such as these, that a company is operating in conformity with applicable regulations, are actionable under the securities laws. For example, in *In re Equifax Inc. Sec. Litig.*, the court found actionable Equifax's misstatements that it "compl[ied] with applicable regulations" concerning data protection. 357 F. Supp. 3d 1189, 1227 (N.D. Ga. 2019). Similarly, in *Todd v. STAAR Surgical Co*., the court found actionable defendants' misstatement that the

[6] Defendants' failure to disclose their bribery and tax fraud violated Item 303 of Regulation S-K because such omission rendered their compliance statements materially false and misleading. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 266 (2024) ("claims based on Item 303 violations that create misleading half-truths" may be brought).

company was "substantially in compliance with the FDA's . . . regulations." 2016 WL 6699284, at **3, 11 (C.D. Cal. Apr. 12, 2016); *see also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (statements about compliance actionable where they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable" laws).

RCI's repeated claim that it "continually monitor[ed]" for misconduct at its strip clubs assured investors that the Company had a strict mechanism in place for preventing misconduct, when in reality Defendants themselves were at the heart of a bribery scheme that resulted in their indictment and an SEC investigation. *See, e.g., In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012) (Ellison, J.) (holding plaintiffs alleged "sufficient facts to call into question whether BP and its corporate officers and directors were in fact implementing the process safety reforms as they represented"); *JinkoSolar*, 761 F.3d at 251 (holding statements about continuous compliance monitoring were misleading because the monitoring system was failing to prevent substantial regulatory violations).

*First*, Defendants incorrectly argue that these statements are not actionable because they did not lead investors to believe that RCI was "fully compliant" with applicable regulations. MTD at 8. Plaintiffs' theory does not rest on whether the policies were infallible, but rather on whether Defendants were taking the steps that were assured to investors—*e.g.*, "continual[]" monitoring (¶101)—to comply with the law. Defendants were not. Instead, Langan and Chhay themselves directed RCI employees to carry out their illicit conduct. ¶¶62, 64-68. Moreover, Defendants' use of "hedging" language, *i.e.*, cautionary language—such as, "there can be no assurance that our policies will prevent deliberate acts by persons attempting to violate or circumvent them" (¶101)—does not insulate them from liability. *See In re Seagate Tech. Holdings PLC Sec. Litig.*, 2025 WL 1744505, at **7-8 (N.D. Cal. May 12, 2025) (risk disclosures concerning legal and regulatory

compliance were actionable despite warning that the compliance policies to prevent such risks provided "no assurance" that "employees, contractors, or agents will not violate" applicable laws); *see also Lormand*, 565 F.3d at 247 ("[T]hese warnings, while somewhat specific, do not provide sufficiently meaningful caution about clearly present danger that was materializing."). The inadequacy of RCI's hollow cautionary language is particularly evident because it was RCI's ***own executives*** who engaged in the illicit conduct.

Courts do not require the absolute compliance hurdle Defendants propose (MTD at 10-11). *See, e.g., In re BP,* 843 F. Supp. 2d at 759 (finding statements about safety procedures misleading where plaintiffs alleged facts demonstrating such procedures were not being implemented); *JinkoSolar*, 761 F.3d at 251 ("these descriptions did not guarantee 100% compliance 100% of the time. . . . However, investors would be misled . . . . if in fact the equipment and 24-hour team were then failing to prevent substantial violations").

*Second*, RCI's disclosures about the risk of illegal conduct are actionable because the warned-of conduct was known, actual, and ongoing. ¶¶61-69. RCI's purported risk disclosures were couched in contingent terms that warned of only theoretical risks, such as "[i]llegal activities or conduct at any of our nightclubs ***may*** result in negative publicity or litigation[.]" ¶99. Defendants knew when making these statements that they themselves were engaged in the very conduct that RCI supposedly warned may result in adverse consequences. ¶¶62, 64-68. Defendants continued to characterize these risks as merely hypothetical even *after* the NY AG executed search warrants on RCI in May 2024, and after RCI received a subpoena from the NY AG in June 2024 pertaining to the Company's New York tax filings and potential entertainment benefits provided to NY DTF personnel.[7] ¶¶83-84.

[7] Defendants suggest that the May 2024 search warrants and June 2024 subpoena cannot support Plaintiffs' allegations of falsity because neither establishes that wrongdoing occurred or that Defendants knowingly omitted material

Given that Defendants' brazen criminal conduct had already occurred before, and continued during, the Class Period, it was materially misleading to caution investors about the potential consequences of illegal conduct at RCI clubs without revealing that the precise risk identified in those warnings already existed and stemmed directly from Defendants' own acts.[8] *See Seagate*, 2025 WL 1744505 at **7-8 (holding statements about compliance risks actionable where the company already had "reasons for concern" that illegal conduct had occurred, despite providing no assurance that its compliance efforts would be successful).

The fact that no legal action had been initiated or expected when the statements preceding the May 2024 search warrant were made conflates the risk with its consequences. MTD at 9. This misunderstanding of Plaintiffs' allegations is underscored by Defendants' reliance on *In re AT&T Inc. Sec. Litig.*, 2025 WL 1685840 (N.D. Tex. June 16, 2025). In that case, AT&T disclosed that it was already subject to litigation and warned that an unfavorable litigation outcome could cause

---

information. MTD at 9-10. But courts commonly rely on such facts. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *22 (D.N.J. July 27, 2018) ("existence of a . . . criminal investigation" supported fraud claim); *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014) (collecting cases). Regardless, Plaintiffs' allegations are independently corroborated by Defendants' own internal communications, which provide direct evidence of their criminal misconduct. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 688 (S.D. Tex. 2002) (considering "facts unearthed" in government investigations in the scienter analysis).

[8] Defendants' contention that RCI's risk disclosures are not actionable as they did not lead a reasonable investor to believe that the Company was "fully compliant with all requirements or free of violations" (MTD at 8) again misconstrues Plaintiffs' falsity theory. Plaintiffs do not allege that the risk disclosures operated as a warranty of perfect regulatory compliance, but rather that Defendants mischaracterized a known, realized risk as contingent and hypothetical. Similarly, Defendants rely on *In re Plains All Am. Pipeline L.P. Sec. Litig.,* 307 F. Supp. 3d 583 (S.D. Tex. 2018), to suggest that Defendants' assurance that "management believes that our policies are reasonably effective" to ensure legal compliance is inactionable because the language provides "hedges and disclaimers." MTD at 10-11. Unlike in *Plains,* Defendants here directed and orchestrated the bribery scheme and could not have believed their policies were at all effective when they themselves were violating them. *See Plains,* 307 F. Supp. 3d at 635 (defendants' knowledge about notices of regulatory violations, which were "common" for a large pipeline company, was not sufficiently alleged). Defendants' stated belief that RCI's compliance policies were "reasonably effective" is an actionable opinion statements under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). Defendants' opinion was false and misleading because Defendants "did not hold the belief [they] professed," supplied "supporting fact[s] . . . [that] were untrue," and "omit[ted] material facts" about their "knowledge concerning" the statement of opinion that "conflict[ed] with what a reasonable investor would take from the statement itself." *Id.* at 185-86, 189; *see also Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *10 (S.D.N.Y. Mar. 28, 2017) (opinions about compliance with laws actionable when executives authorized payments of false invoices).

future harm. *See id*. at *12. The court held that the warned-of risk, "the outcome of litigation," had not yet materialized. *Id*. In contrast, in this action, the risk that investors were warned about was misconduct at RCI clubs, which had already materialized through Defendants' ongoing scheme (¶¶61-69), regardless of when legal consequences arose. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702-05 (9th Cir. 2021) (holding that risk disclosures were actionable even where the identified harm had not yet materialized at the time of the filing). Whether Defendants had knowledge of forthcoming legal action is irrelevant because, by portraying an already-existing risk as merely hypothetical, they "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023).

Accordingly, Defendants' argument that there is no need to disclose "unadjudicated wrongdoing" fails. MTD at 8-9. When Defendants chose to speak about the risk of illegal conduct at RCI strip clubs, they had a duty to disclose accurate information about the materialization of such risk. *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021) ("Whenever a defendant voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth."). Corporate actors must disclose "uncharged criminal conduct" when the failure to disclose would render other statements misleading. *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016); *see also In re El Paso Elec. Co. Sec. Litig.*, 2004 WL 377555, at *6 (W.D. Tex. Feb. 23, 2004) (company was "preclude[d] [] from remaining silent" because a reasonable investor "might refrain from investing their money in a company that is involved in [] potentially illegal" conduct).[9]

[9] For material omissions, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248; *see also McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 687 (E.D. Tex. 2001) (a "defendant may not deal in half-

Defendants' reliance on *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG* is misplaced. MTD at 8 n.4. In that case, the Second Circuit addressed a disclosure concerning an existing government investigation: UBS's offering materials "disclosed that the DOJ was investigating whether, from 2000–2007, UBS client advisors entered the United States to help U.S. clients evade their tax obligations, in violation of U.S. law." *See* 752 F.3d 173, 183-84 (2d Cir. 2014). The plaintiffs argued the disclosure was "materially incomplete" absent an admission that the scheme was ongoing, and the court concluded that, by "disclosing its involvement" in several investigations and legal proceedings, UBS "complied with its disclosure obligations." *Id*. at 184. Here, Plaintiffs do not challenge RCI's disclosures about the NY AG's investigation, but rather its warnings that illegal conduct at its clubs "may" expose the company to liability when the underlying illegal conduct had already occurred due to Defendants' own actions before and during the Class Period (¶¶60-72). *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Defendants' reliance on *In re Lumen Tech., Inc. Sec. Litig. II* is also misplaced, because the challenged disclosures there concerned only generalized risks arising from Lumen's legacy operations, and the court held that they did not obligate the company to disclose the speculative possibility of risks stemming from lead-sheathed cables, noting that "it is not clear that Lumen even was referring to lead-sheathed cables." *See* 2025 WL 978229, at *22 (W.D. La. Mar. 14, 2025). The court also found no allegations supporting a strong inference that the individual defendants knew Lumen's lead-sheathed cables created violations of environmental laws or exposed the company to material liability. *Id*. at *23. In contrast, Defendants cannot dispute that

truths"). Thus, "under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Six Flags*, 58 F.4th at 217.

their own criminal bribery and tax scheme fell squarely within the subject matter of RCI's challenged risk disclosures, rendering misleading any characterization of misconduct at RCI's clubs as merely hypothetical when the misconduct had already materialized due to their actions.

#### 2. Defendants Touted Adherence To A Code Of Ethics Prohibiting Unlawful Conduct While Bribing A Government Official

Defendants contend that RCI's Code of Ethics statements were "aspirational" and "incapable of objective verification," and thus not actionable. MTD at 11. Not so. RCI's code of ethics applied to the Individual Defendants and imposed verifiable obligations on them: to "***comply with applicable governmental laws, rules, and regulations***[,]" and to "***promptly*** report to the Chairman of the Audit Committee" "significant deficiencies in the design or operation of internal controls" and "***any fraud***" involving "***management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls***." ¶117.

Yet, the Individual Defendants knowingly ignored their obligations under the Code of Ethics by violating the law and failing to report to the audit committee their ***own*** fraudulent conduct—a criminal scheme resulting in the indictment of RCI and themselves (¶¶60-72). *See Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2019 WL 3336119, at *16 (D. Minn. July 25, 2019); *report and recommendation adopted, Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2019 WL 4277302 (D. Minn. Sept. 10, 2019) (holding actionable code of ethics that instituted specific guidelines); *see also In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 782 (D. Minn. 2019) (holding code of conduct that required executives to abide by it actionable). Tellingly, soon after the Indictment became public, RCI's Board of Directors approved a resolution for Langan and Chhay to resign. ¶95.

### 3. Defendants Admit That Their Statements About The Adequacy Of RCI's Internal Controls Were False

Throughout the Class Period, RCI identified only a specific, enumerated set of material weaknesses. ¶103. The Individual Defendants certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in design or operation of internal control over financial reporting." ¶¶115, 155. None of those disclosures, however, identified the weakness RCI has now admitted: the "ineffective design and operation of controls, which ***include management review controls***," over the accounting for contingent liabilities. ¶93. RCI's own remediation plan revealed the nature of the weakness. Following the Indictment, the Company committed to "***improve the clarity and quality of documentation supporting the review of legal contingencies***, including related legal fees and ***unasserted claims***." *Id.*

Langan and Chhay were principally responsible for ensuring that RCI maintained effective internal controls. Yet the subsequently disclosed material weakness arose because they failed to implement and maintain management review controls capable of identifying and evaluating loss contingencies associated with their own misconduct. *Id.* While only disclosing an unrelated, enumerated set of internal control weaknesses, Defendants concealed that RCI lacked adequate procedures to assess legal contingencies and "***unasserted claims***" arising from the scheme itself. ¶93. These inadequate procedures existed in every quarter in which the scheme was ongoing, demonstrating that the material weakness existed during the Class Period. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246-48 (S.D.N.Y. 2012) (determining that it was reasonable to infer that internal controls were inadequate throughout the class period, despite the weakness only being identified as of the last day of the relevant reporting period, where the underlying accounting error persisted for years). Consequently, RCI was unable to properly account for potential liabilities stemming from Defendants' wrongdoing. Following the Indictment

and the related internal review that required the Company to delay filing its financial reports, RCI had to record an approximately $9 million legal reserve, which Langan acknowledged "***drastically affected***" RCI's fourth quarter results. ¶¶20, 96.

Defendants' failure to disclose a known material weakness renders RCI's statements about its internal controls and the Individual Defendants' SOX certifications actionable (¶¶103, 105-07, 115, 119-21). *See Hoffman v. RCI Hosp. Holdings, Inc.*, 2021 WL 1232782, at *4 (S.D. Tex. Mar. 31, 2021) (holding omissions and misstatements actionable because "an accurate and complete story regarding internal control weaknesses" was not told).

**4. Defendants' False And Misleading Financial Reporting And GAAP Violations**

RCI's financial reporting was materially false and misleading and violated GAAP.[10] ¶¶109-14, 132-41. Due to Defendants' bribery and tax fraud scheme, RCI: (1) improperly recognized revenue by failing to remit sales taxes owed on Dance Dollars; (2) understated accrued sales tax liabilities because RCI's obligation to collect and remit sales tax arose by operation of law after each sale was made; and (3) recorded bribes as legitimate business expenses. ¶¶132-41.

*First*, RCI's financial misstatements were qualitatively material, regardless of the financial impact, because they ***all*** stem from Defendants' unlawful conduct and resulted in Defendants' indictment, management overhaul, and significant reputational harm. (¶¶87, 91, 95, 132-41). *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme that concerned a single contract "worth a fraction of" company's revenues was material given "possible exposure to significant civil and even criminal liability," financial impact, and loss of "market

[10] Defendants claim innocence because RCI's Independent Auditor had not "identified a material misstatement." MTD at 13. But RCI's auditor did not endorse the Company's financial reporting without reservation. It expressly warned that the financial impact of RCI's indictment "***could be material***," and stated that its opinion was "not modified with respect to this matter." ¶94.

opportunity”); *Villella*, 2017 WL 1169629, at *12 (failure to account for bribery payments representing “0.5%” of “average annual income,” but resulted in a decline in stock price, reputational harm, and management changes, was material to investors). Defendants rely on the SAB No. 99’s 5% quantitative benchmark for materiality (MTD at 15), but ignore that misstatements from ***unlawful conduct*** are qualitatively material. Moreover, their reliance on *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase & Co.* is misplaced because, in that case, there was “no allegation” that the loan misclassification “itself was illegal,” and thus qualitative materiality was not established.[11] *See* 553 F.3d 187, 204 (2d Cir. 2009).

*Second*, the Complaint alleges with sufficient particularity how RCI’s accounting was “improper in terms of reasonable accounting practices” and how the inaccuracies “were incorporated into [the] financial statements.” *Six Flags*, 58 F.4th at 221. Plaintiffs need not plead every misstated entry. In *Six Flags*, the Fifth Circuit held that improper revenue recognition was adequately alleged—even though plaintiff “could not have known the exact amounts”—because the improper accounting stemmed from conduct already pled with particularity and a specific example of a quarterly revision. *Id*. at 220-21.

Here, Plaintiffs allege ***specific*** corrupted tax audit settlements that occurred ***during*** the Class Period that rendered RCI’s reported revenues and sales tax liabilities false. Indeed, Chhay signed fraudulent audit settlements on January 18, 2022—in the second quarter of fiscal 2022—for $200,773.91 and on September 20, 2023 for $47,342—in the fourth quarter of fiscal 2023. ¶70. *See Six Flags*, 58 F.4th at 220-21 (where plaintiffs sufficiently alleged misstatements about facts the accounting depended on it was “not unreasonable . . . to infer that Defendants also may have

[11] Defendants cite this Court’s opinion, *In re Franklin Bank Corp. Sec. Litig.*, but the parties “agreed” upon the 5% benchmark to assess materiality in that case. *See* 782 F. Supp. 2d 364, 408 (S.D. Tex. 2011) (Ellison, J.). Plaintiffs do not agree that the 5% benchmark is dispositive for purposes of materiality here.

overstated [] revenue"). Because "the accounting questions in this case are disputed," dismissal of Plaintiffs' claims is "not appropriate." *Barrie*, 397 F.3d at 257.

The Complaint also specifically alleges that—at minimum—RCI's 2024 10-K and Q1 2024 10-Q improperly recorded bribes as promotional expense due to Langan's approval of reimbursing a co-conspirator's bribery costs on October 6, 2023 and January 10, 2024. ¶68. *See SEC Staff Accounting Bulletin No. 99*, 64 Fed. Reg. 45150, 45152 (1999) (a misstatement "concealing" an "unlawful transaction" is qualitatively material).

### B. "We Need To Change The Way We Book This Sh*t": Scienter Cannot Be Credibly Contested

Scienter is the "intent to deceive, manipulate or defraud" or "severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Edwards v. McDermott Int'l., Inc.*, 2021 WL 1421609, at *7 (S.D. Tex. Apr. 13, 2021). Scienter may be pled through "allegations of circumstantial evidence of conscious misbehavior or recklessness." *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) ("there will rarely be direct evidence of intent to defraud"); *see also Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 410 (5th Cir. 2001) (there is not "any question that under the PSLRA circumstantial evidence can support a strong inference of scienter"). Courts must analyze all of the Complaint's scienter allegations "holistically," and may not "scrutinize" individual allegations "in isolation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 310, 322-23, 326 (2007). The inference of scienter "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Lormand*, 565 F.3d at 251. Rather, it need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). A "tie favors the plaintiff." *Id.* at 686. Here, there is no tie. The requisite holistic review

of the facts alleged in the Complaint confirms that Plaintiffs' allegations raise a strong inference of scienter.

**1. Langan's And Chhay's Orchestration Of The Scheme Alone Raises A Strong Inference Of Scienter**

Defendants incorrectly assert that Plaintiffs rely on the Indictment's "mere existence" to plead scienter. MTD at 18-19. Instead, the Complaint alleges the Individual Defendants' ***own statements and acts***, which themselves give rise to a compelling inference of scienter.[12] *See Villella*, 2017 WL 1169629 at **10, 14 (a strong inference of scienter sufficiently alleged where executives themselves authorized payments of false invoices). Defendants fail to identify ***a single*** internal communication suggesting that their conduct was lawful. Conversely, the Complaint details the Individual Defendants' orchestration of the criminal scheme, including:

- After Langan had indicated the need to discuss "New York and dance dollars" with Anakar as the Company was going to be "hit by [$]3m in sales tax soon[,]" Langan texted Anakar on April 12, 2018, that "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight[.]" Also, on April 12, 2018, Kevlin communicated to Langan, in relevant part, "Tim['s] guest would like another $1500," and that they "would do a promo pay out in cage." In response, Langan texted Kevlin: "That's fine. Go ahead." After receiving approval from Langan, Anakar and Kevlin falsely recorded the $1,500 bribe to Plunkett as a promotional expense. ¶62.

- In October 2018, Winata raised with Langan the lawful solution to this exposure, which was "to increase the price of dance dollars to cover sales tax." Langan, however, rejected that approach and instead insisted that the Company alter the manner in which it recorded its Dance Dollars sales, stating, "We can't Tim. We need to change the way we book this shit. So[,] we only book the Net and not all of the dance dollars." ¶57.

- On September 1, 2023, Chhay sent an email to Langan and Anakar which stated, "Wow. Tim is clutch. But it did come with conditions." That same day, Chhay

[12] Defendants' citing of *Carlton v. Cannon* is misplaced. *See* 184 F. Supp. 3d 428, 480 (S.D. Tex. 2016) (the existence of government investigation, without more, did not raise an inference of scienter). Their reliance on *In re Inotiv Sec. Litig.* also fails. *See* 2024 WL 1344784, at *29 (N.D. Ind. Mar. 29, 2024) (holding it was "a bridge too far" to conclude that the "[d]efendants knew, or should have known prior to the unsealing of the federal indictment, that its principal NHP supplier was the target of the federal investigation"). Here, Plaintiffs rely on the Individual Defendants' ***own*** statements and actions.

texted Langan and Anakar that "Tim got the guy to $47k in [V]ivid New York" and that Winata "owes him a couple trips []." ¶67.

- On October 6, 2023, Langan emailed Winata a single word—"Approved"—authorizing RCI to reimburse Winata for the cost of bribing Plunkett during a Florida trip from September 26 through September 29, 2023. Similarly, on January 10, 2024, Langan again emailed Winata "Approved," authorizing the reimbursement of Winata's costs in connection with another Florida bribery trip from December 12-15, 2023. ¶68.

- Individual Defendants signed fraudulent settlements: ¶70 (on December 4, 2018, Langan signed a Statement of Proposed Audit Change settling a Vivid Cabaret audit for $838,888.82); *Id*. (on January 18, 2022, Chhay signed a Statement of Proposed Audit Change settling a Hoops Cabaret audit for $200,773.91); *Id*. (on September 20, 2023, Chhay signed a Statement of Proposed Audit Change settling a Vivid Cabaret audit for $47,342.92).

### 2. Plaintiffs' Additional Allegations Further Support A Compelling Inference Of Scienter

*First*, only about two months after the Indictment, RCI's Board of Directors abruptly adopted a resolution approving the Individual Defendants' resignations, strengthening an already compelling inference of scienter. ¶95. Taken together, Plaintiffs' particularized allegations of Langan's and Chhay's direct involvement in the scheme and their sudden resignations give rise to a strong inference of scienter. *See Hall v. Rent-A-Center, Inc.*, 2017 WL 6398742, at **33-34 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (forced resignations, among other allegations, supported scienter).

*Second*, former RCI managers and performers[13] confirmed that RCI failed to collect sales tax on Dance Dollars and that the Individual Defendants had contemporaneous access to data

[13] Despite Defendants' challenges to the sufficiency of the FE accounts, the FEs' roles as performers and club managers gave them direct knowledge about whether RCI collected sales tax on Dance Dollars at RCI clubs outside New York, as well as the adequacy and implementation of RCI's purported compliance policies. *See Six Flags*, 58 F.4th at 208 (crediting FE account because the FE's position was "relevant to the events at issue in [the] case"). Additionally, FE 3 explained that Langan received sales reports that included Dance Dollar transactions and reports of compliance violations. ¶78. *See In re Apache Corp.,* 2022 WL 4277350, at *7 (S.D. Tex. Sept. 15, 2022) (FE accounts confirming defendants received "regular reports" and "updates" supported an inference of scienter). Accordingly, the FE accounts bolster the Complaint's detailed allegations of Defendants' misconduct, which are independently supported by the Indictment.

reflecting the practice. For example, FE 2 confirmed that RCI "didn't charge any type of tax on Dance Dollars," while FE 1 stated that performers' personal records of Dance Dollars exceeded RCI's reported figures and added, "We all suspected, including an agency the performers spoke to, that there is some tax fraud going on there with the Dance Dollars." ¶¶75-76. FE 3 also explained she would input nightly sales reports in the RCI portal, Club Tracks, which included Dance Dollars bought and spent, with reports ***directly*** provided to Langan and Anakar. ¶78. Additionally, the FEs explained that Langan and high-level employees were regularly involved in RCI's day-to-day operations, supporting the inference that Defendants knew that RCI's compliance policies were not "reasonably effective." ¶¶77-79. Indeed, FE 3 explained that she witnessed numerous violations at her club that were reported to Anakar and Langan but went unaddressed, including liquor law violations, performers being fully nude, and illegal sexual activity. According to FE 3, such violations often occurred when Langan would "bring in investors." ¶78. FE 3 also confirmed that Anakar and Langan would visit all the clubs every other month or every three months. ¶79.

*Third*, the SEC initiated an investigation into the very conduct at issue in this case to determine whether RCI had violated federal securities laws. ¶86. *See Papa*, 2018 WL 3601229, at *21 ("While the existence of a criminal investigation is not sufficient to give rise to a strong inference of scienter, it can be considered as evidence of scienter.").

*Fourth*, Langan's and Chhay's SOX certifications support a strong inference of scienter because, when they certified RCI's financial reporting and internal controls, they knew or recklessly disregarded that the Company's ongoing scheme undermined both. *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724 (W.D. Tex. 2010) (holding SOX certifications contributed to a strong inference of scienter).

Viewed holistically, the scienter inference is not only cogent but far more compelling than Defendants' claim that their misconduct merely reflects "legitimate internal discussions" about accounting treatment and tax audits. MTD at 20. Defendants attempt to separate their bribery and tax fraud from any intent to mislead investors, but the two cannot be so neatly parsed. By concealing years of bribery and tax fraud, Defendants necessarily rendered RCI's financial statements and public disclosures materially misleading. The market's response confirms the significance of that misconduct: when the truth fully emerged, RCI's stock fell 24% over two trading days. ¶¶88-90.

### C. The Complaint Adequately Pleads Loss Causation

Loss causation is subject to the ordinary Rule 8 "plausibility" standard. *Lormand*, 565 F.3d at 256-58. Pleading loss causation is "not burdensome"; a complaint needs only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 256. A plaintiff may sufficiently plead loss causation by alleging that "when the relevant truth about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc*., 769 F.3d 313, 320 (5th Cir. 2014). The Complaint exceeds this standard.

Defendants' fraud on investors was revealed through two corrective disclosures. First, on May 30, 2024, *The Bear Cave* published an article reporting that it believed law enforcement had raided Rick's Cabaret in New York City the night before. The market immediately reacted: RCI shares fell 5.8%. ¶¶80-81. Then, on September 16, 2025, the truth fully emerged after the NY AG unsealed the Indictment. On this news, RCI shares sharply fell 16% within a thirty-minute window between the announcement of the Indictment and the market's closure. ¶¶87-89. As investors fully digested and reacted to the news, RCI shares fell another 10% the following day. ¶90.

Defendants first argue that the May 2024 *Bear Cave* Report cannot be corrective because it was speculative and did not "reveal the falsity" of any prior statement. MTD at 23. But a corrective disclosure need only "make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Amedisys*, 769 F.3d at 321; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("precisely mirror[ing]" a prior misstatement is not required). The truth may also be "gradually perceived in the marketplace through a series of partial disclosures," and partial disclosures may be considered "collectively." *Amedisys*, 769 F.3d at 322. Like the facts here, in *Amedisys*, the Fifth Circuit held that loss causation was adequately pled where partial corrective disclosures—consisting of media "speculation" about possible misconduct, two executive resignations, announcements of government investigations, and a disappointing earnings report—"collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation." *Id.* at 324; *see also Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 959 (S.D. Tex. 2016) (explaining that a *Seeking Alpha* blog post "speculat[ing]" about defendants' accounting misconduct can support loss causation as a partial disclosure).

Defendants also wrongly contend that the September 2025 stock decline cannot constitute a corrective disclosure because the Indictment was not "causally linked to any specific prior statement." MTD at 24. But the Indictment revealed far more than the existence of an investigation. It revealed Langan's and Chhay's ***own*** communications and orchestration of the bribery and tax fraud scheme, exposing the very misconduct concealed by Defendants and directly contradicting their statements made during the Class Period. ¶¶60-72. The Indictment's findings made "the

existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Amedisys*, 769 F.3d at 321.[14]

Finally, Defendants argue that the September 2025 decline in RCI shares "cannot be attributed solely to the revelation of the alleged fraud" because an indictment can cause "operational disruption and reputational harm independent of whether the underlying securities fraud claims have merit." MTD at 24. But sole causation is not the standard. Regardless, whether the connection between Defendants' misstatements and the corrective disclosures is ultimately found to be "too attenuated" to support loss causation at a later stage of the case, "is a highly fact intensive inquiry that need not be reached" at the pleading stage. *Amedisys*, 769 F.3d at 325.

### D. The Complaint Adequately Pleads Section 20(a) Claims

As set forth above in Sections VI. A. through C., the Complaint adequately alleges a primary violation. As Defendants recognize, Section 20(a) claims are "derivative" of primary claims under Section 10(b). MTD at 24. Because Defendants do not challenge Plaintiffs' allegations that Langan and Chhay were controlling persons of RCI, the Complaint's § 20(a) claims should be sustained.

## VII. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety. In the alternative, Plaintiffs request leave to amend.

---

[14] Defendants' reliance on *Greenberg v. Crossroads Sys. Inc.*, 364 F.3d 657 (5th Cir. 2004), is misplaced. MTD at 24. The *Crossroads* court considered the evidentiary record of a summary judgment motion, inappropriate to consider on a motion to dismiss, in holding a disclosure did not reference the speed of new routers that was the subject of the false statement. *Crossroads*, 364 F.3d at 667. Plaintiffs have adequately met the "facially plausible" connection between the Individual Defendants' misconduct alleged in the Indictment and Defendants' misrepresentations.

Dated: September 25, 2026

Respectfully submitted,

**AJAMIE LLP**

By: _/s/ Thomas R. Ajamie_
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 1600
Houston, TX 77002
Tel.: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
Nicholas Corso (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
ncorso@saxenawhite.com

Marco A. Dueñas (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 200-3263
Fax: (888) 631-3611
mduenas@saxenawhite.com

*Counsel for Lead Plaintiffs, and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie