**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ALEX HERNANDEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RCI HOSPITALITY HOLDINGS, INC., ERIC S. LANGAN, and BRADLEY CHHAY,<br><br>Defendants. | No. 4:25-cv-04477-KPE |

**APPENDIX OF EXHIBITS IN SUPPORT OF LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Pursuant to Section 6.B. of the Court Procedures of the Honorable Keith P. Ellison, Lead Plaintiffs Paul Stroub and William J. Neylan III, in his capacity as Co-Trustee and on behalf of WJ Neylan III, T A Neylan TTEE, William J Neylan III REV Living TR, U/A 12/5/12 Trust submit this appendix of exhibits in support of their Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint.

| Exhibit | Document |
|---|---|
| A | *People v. Eric Langan, et al.*, Indictment No. 73671/2025 (Sup. Ct. N.Y. Cnty.), Redacted |
| B | *People v. Eric Langan, et al.*, Indictment No. 73671/2025 (Sup. Ct. N.Y. Cnty.), Unredacted |
| C | *Edwards v. McDermott Int'l., Inc.*, 2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) |
| D | *Hall v. Rent-A-Center, Inc.*, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) |
| E | *Hall v. Rent-A-Center, Inc.*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) |
| F | *Hoffman v. RCI Hosp. Holdings, Inc.*, 2021 WL 1232782 (S.D. Tex. Mar. 31, 2021) |
| G | *In re Apache Corp.*, 2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) |
| H | *In re AT&T Inc. Sec. Litig.*, 2025 WL 1685840 (N.D. Tex. June 16, 2025) |
| I | *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016) |
| J | *In re El Paso Elec. Co. Sec. Litig.*, 2004 WL 377555 (W.D. Tex. Feb. 23, 2004) |
| K | *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716 (E.D. Tex. June 16, 2004) |
| L | *In re Inotiv, Inc. Sec. Sec. Litig.*, 2024 WL 1344784 (N.D. Ind. Mar. 29, 2024) |
| M | *In re Lumen Tech., Inc. Sec. Litig. II*, 2025 WL 978229 (W.D. La. Mar. 14, 2025) |
| N | *In re Seagate Tech. Holdings PLC Sec. Litig.*, 2025 WL 1744505 (N.D. Cal. May 12, 2025) |
| O | *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2019 WL 3336119 (D. Minn. July 25, 2019) |
| P | *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2019 WL 4277302 (D. Minn. Sept. 19, 2019) |
| Q | *Roofer's Pension Fund v. Papa*, 2018 WL 3601229 (D.N.J. July 27, 2018) |
| R | *Todd v. STAAR Surgical Co.*, 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) |
| S | *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) |

Dated: September 25, 2026

Respectfully submitted,

**AJAMIE LLP**

By: /s/ Thomas R. Ajamie
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 1600
Houston, TX 77002
Tel.: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
Nicholas Corso (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
ncorso@saxenawhite.com

Marco A. Dueñas (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 200-3263
Fax: (888) 631-3611
mduenas@saxenawhite.com

*Counsel for Lead Plaintiffs, and Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ERIC LANGAN,
TIMOTHY WINATA,
AHMED "ED" ANAKAR,
BRADLEY CHHAY,
SHAUN KEVLIN,
[redacted]
RCI HOSPITALITY HOLDINGS, INC.,
PEREGRINE ENTERPRISES, INC. (d/b/a "RICK'S CABARET"),
RCI DINING SERVICES (37TH STREET), INC. (d/b/a "VIVID CABARET"), and
RCI 33RD STREET VENTURES, INC. (d/b/a "HOOPS CABARET AND SPORTS BAR"),

Defendants.

**INDICTMENT**

73671/2025

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Shaun Kevlin, [redacted] RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law §105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 6, 2010, to on or about January 10, 2024, with intent that conduct constituting the crimes of Bribery in the Second Degree, in violation of Penal Law § 200.03, and Bribe Receiving in the Second Degree, in violation of Penal Law § 200.11, said crimes being C felonies, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

**<u>THE DEFENDANTS AND CONSPIRATORS</u>**

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI

owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and

operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Shaun Kevlin ("Kevlin") is and, since on or about October 5, 2023, has been the Assistant Director of Nightclub Operations for RCIMS. From at least the start of the conspiracy until on or about 2013, Kevlin served as a bartender, Manager, and Assistant General Manager for Rick's Cabaret. From on or about 2013 until on or about October 5, 2023, Kevlin was a Regional Manager and Vice President of Nightclub Operations for the Northeast for RCIMS with supervision over the daily operations of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, [redacted] ("[redacted] was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader, and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. [redacted] retired from DTF on or about April 30, 2024. During the period of the conspiracy, [redacted] conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006 through on or about February 1, 2011; (2) a sales tax audit of Rick's Cabaret that was conducted from on or about January 4, 2011, through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014, through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016, through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

## THE SCHEME

Beginning from at least on or about September 6, 2010, through on or about January 14, 2024, the defendants and others operated and devised a scheme in which RCI, RCIMS, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI Companies") and their officers, employees, and

agents conspired and schemed with [redacted] each other, and others to provide illegal bribes to [redacted] while [redacted] conducted and supervised tax audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs"). The object of the conspiracy was to induce [redacted] to aid the RCI Companies' prior and continuing commission of criminal tax fraud in which the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York the full amount of sales tax that should have been collected and paid on sales at strip clubs located in New York County.

At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to [redacted] and for [redacted] to receive such bribes. The object of the conspiracy was to induce [redacted] to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide [redacted] with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the RCI Companies and their officers, employees, and agents provided [redacted] with at least 13 different complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and [redacted] from New York to meet in Florida for such trips. During these trips, Winata accompanied [redacted] to RCI-owned strip clubs and provided [redacted] with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide [redacted] with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI

New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing [redacted] Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to [redacted] As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to [redacted] as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, [redacted] agreed to and did aid and further the ongoing commission of criminal tax fraud in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that [redacted] conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that [redacted] would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**<u>OVERT ACTS</u>**

In the course of and in furtherance of the conspiracy, the coconspirators committed and caused to be committed the following overt acts:

1) On September 6, 2010, [redacted] emailed Winata: "Let me know when your are coming up to New York to review the workpapers and to confirm the final amount. We will close the case in Miami."

2) On June 13, 2012, [redacted] texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

3) On August 4, 2014, Winata texted Anakar: "[redacted] is coming to club tonight. I will have to 'entertainment' him."

4) On November 27, 2015, [redacted] texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

5) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

6) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and [redacted] having fun at the club?"

7) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

8) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing [redacted] that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

9) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

10) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

11) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

12) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

13) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

14) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to [redacted] paid by an RCI-owned strip club as an expense for a club "promotion."

15) On June 13, 2018, [redacted] texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

16) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

17) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was

scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

18) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

19) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

20) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

21) On December 12, 2018, [redacted] texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

22) On January 29, 2019, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

23) On February 13, 2019, Winata texted Langan: "Eric, [redacted] (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

24) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

25) On February 16, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for February 26, 2019, to March 1, 2019.

26) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of [redacted]

27) On February 27, 2019, [redacted] texted Winata: "I am back from dancing . I need some more dancing dollars."

28) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

29) On May 18, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for May 28, 2019, through May 31, 2019.

30) On October 17, 2021, [redacted] texted Winata: "You will look very good in the end. We will celebrate big-time???"

31) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to [redacted] and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

32) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

33) On February 7, 2022, [redacted] signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

34) On February 17, 2022, [redacted] texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

35) On February 23, 2022, [redacted] texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

36) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

37) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

38) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

39) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

40) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

41) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

42) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

43) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

44) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

45) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

46) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from September 26, 2023, to September 29, 2023.

47) On October 13, 2023, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

48) On December 6, 2023, Winata texted Anakar: "Hi Ed. [redacted] called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

49) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

50) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from December 12, 2023 to December 15, 2023.

**<u>COUNT 2</u>**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law § 105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 1, 2011, to on or about June 21, 2024, with intent that conduct constituting the crime of Criminal Tax Fraud in the Second Degree, in violation of Tax Law § 1805, a C felony, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

**<u>THE DEFENDANTS AND CONSPIRATORS</u>**

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, [redacted] ("[redacted] was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. [redacted] retired from DTF on or about April 30, 2024. During the period of the conspiracy, [redacted] conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006, through on or about February 1, 2011; (2) a sales tax audit of Rick's

Cabaret that was conducted from on or about January 4, 2011 through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014, through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016, through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

## THE SCHEME

During the course of the conspiracy, the defendants and others agreed with each other and others to operate and devise a scheme in which Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs") willfully engaged in, and willfully caused others to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under article twenty-eight and pursuant to the authority of article twenty-nine of the Tax Law.

At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to [redacted] and for [redacted] to receive such bribes. The object of the conspiracy was to induce [redacted] to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide [redacted] with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the

RCI Companies and their officers, employees, and agents provided [redacted] with at least 13 different complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and [redacted] from New York to meet in Florida for such trips. During these trips, Winata accompanied [redacted] to RCI-owned strip clubs and provided [redacted] with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide [redacted] with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing [redacted] Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to [redacted] As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to [redacted] as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, [redacted] agreed to and did aid and further the object of the conspiracy in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that [redacted] conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that [redacted] would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**<u>OVERT ACTS</u>**

In the course of and in furtherance of the conspiracy, the coconspirators committed and caused to be committed the following overt acts:

1) On June 13, 2012, [redacted] texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter

that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

2) On or about July 12, 2012, Winata signed a Statement of Proposed Audit Change for Sales and Use Tax, settling an audit of Rick's Cabaret for $6,342.72.

3) On or about November 21, 2012, [redacted] signed a Field Audit Report, settling an audit of Rick's Cabaret for $6,342.72, in which [redacted] falsely certified: "I did not nor do I now have any interest, personal, financial or otherwise, in said taxpayer; and there is no relationship existing between the taxpayer and me which are inconsistent with my official duties."

4) On August 4, 2014, Winata texted Anakar: "[redacted] is coming to club tonight. I will have to 'entertainment' him."

5) On November 27, 2015, [redacted] texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

6) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

7) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and [redacted] having fun at the club?"

8) On or about March 1, 2017, to on or about March 21, 2018, Langan, Unindicted Co-Conspirator-1, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the First Degree, Tax Law § 1806, in that they willfully failed to collect and caused another to fail to collect $1,360,656.78 in sales tax for the period of March 1, 2017, to February 28, 2018.

9) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

10) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing [redacted] that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

11) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

12) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

13) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

14) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

15) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

16) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to [redacted] paid by an RCI-owned strip club as an expense for a club "promotion."

17) On June 13, 2018, [redacted] texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

18) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

19) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

20) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

21) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

22) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

23) On December 12, 2018, [redacted] texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

24) On January 29, 2019, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

25) On February 13, 2019, Winata texted Langan: "Eric, [redacted] (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

26) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

27) On February 16, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for February 26, 2019, to March 1, 2019.

28) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of [redacted]

29) On February 27, 2019, [redacted] texted Winata: "I am back from dancing . I need some more dancing dollars."

30) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

31) On May 18, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for May 28, 2019, through May 31, 2019.

32) On or about March 1, 2021 to on or about March 22, 2022, Langan, Chhay, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully failed to collect and caused another to fail to collect $190,259.22 in sales tax for the period of March 1, 2021 to February 28, 2022.

33) On October 17, 2021, [redacted] texted Winata: "You will look very good in the end. We will celebrate big-time???"

34) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to [redacted] and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

35) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

36) On February 7, 2022, [redacted] signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

37) On February 17, 2022, [redacted] texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

38) On February 23, 2022, [redacted] texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

39) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

40) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

41) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

42) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

43) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

44) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

45) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

46) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

47) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

48) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

49) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from September 26, 2023, to September 29, 2023.

50) On October 13, 2023, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

51) On December 6, 2023, Winata texted Anakar: "Hi Ed. [redacted] called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for

him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

52) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

53) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from December 12, 2023, to December 15, 2023.

54) On or about March 21, 2024, to on or about June 21, 2024, Langan, Chhay, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully failed to collect and caused another to fail to collect $79,918.60 in sales tax for the period of March 1, 2024, to May 31, 2024.

**COUNT 3**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law § 105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about December 21, 2011, to on or about June 21, 2024, with intent that conduct constituting the crime of Criminal Tax Fraud in the Second Degree, in violation of Tax Law § 1805, a C felony, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

**THE DEFENDANTS AND CONSPIRATORS**

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, [redacted] ("[redacted] was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader, and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. [redacted] retired from DTF on or about April 30, 2024. During the period of the conspiracy, [redacted] conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006 through on or about February 1, 2011; (2) a sales tax audit of Rick's

Cabaret that was conducted from on or about January 4, 2011 through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014 through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016 through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

**THE SCHEME**

During the course of the conspiracy, the defendants and others agreed with each other and others to operate and devise a scheme in which Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs") willfully engaged in, and willfully caused others to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax. At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to [redacted] and for [redacted] to receive such bribes. The object of the conspiracy was to induce [redacted] to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide [redacted] with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the RCI Companies and their officers, employees, and agents provided [redacted] with at least 13 different

complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and [redacted] from New York to meet in Florida for such trips. During these trips, Winata accompanied [redacted] to RCI-owned strip clubs and provided [redacted] with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide [redacted] with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing [redacted] Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to [redacted] As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to [redacted] as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, [redacted] agreed to and did aid and further the object of the conspiracy in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that [redacted] conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that [redacted] would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**<u>OVERT ACTS</u>**

In the course of and in furtherance of the conspiracy, the co-conspirators committed and caused to be committed the following overt acts:

1) On June 13, 2012, [redacted] texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter

that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

2) On or about July 12, 2012, Winata signed a Statement of Proposed Audit Change for Sales and Use Tax, settling an audit of Rick's Cabaret for $6,342.72.

3) On or about November 21, 2012, [redacted] signed a Field Audit Report, settling an audit of Rick's Cabaret for $6,342.72, in which [redacted] falsely certified: "I did not nor do I now have any interest, personal, financial or otherwise, in said taxpayer; and there is no relationship existing between the taxpayer and me which are inconsistent with my official duties."

4) On August 4, 2014, Winata texted Anakar: "[redacted] is coming to club tonight. I will have to 'entertainment' him."

5) On November 27, 2015, [redacted] texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

6) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

7) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and [redacted] having fun at the club?"

8) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

9) On or about June 21, 2017, to on or about March 21, 2018, Langan, Unindicted Co-Conspirator-1, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the First Degree, Tax Law § 1806, in that it willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $1,360,656.78 in sales tax for the period of March 1, 2017, to February 28, 2018.

10) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing [redacted] that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

11) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

12) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

13) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

14) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

15) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

16) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to [redacted] paid by an RCI-owned strip club as an expense for a club "promotion."

17) On June 13, 2018, [redacted] texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

18) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

19) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

20) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

21) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

22) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

23) On December 12, 2018, [redacted] texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

24) On January 29, 2019, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

25) On February 13, 2019, Winata texted Langan: "Eric, [redacted] (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

26) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

27) On February 16, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for February 26, 2019, to March 1, 2019.

28) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of [redacted]

29) On February 27, 2019, [redacted] texted Winata: "I am back from dancing . I need some more dancing dollars."

30) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

31) On May 18, 2019, Winata rented and paid for hotel rooms for himself and [redacted] in Hollywood, Florida for May 28, 2019, through May 31, 2019.

32) On or about June 22, 2021, to on or about March 22, 2022, Langan, Chhay, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $190,259.22 in sales tax for the period of March 1, 2021, to February 28, 2022.

33) On October 17, 2021, [redacted] texted Winata: "You will look very good in the end. We will celebrate big-time???"

34) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to [redacted] and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

35) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

36) On February 7, 2022, [redacted] signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

37) On February 17, 2022, [redacted] texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

38) On February 23, 2022, [redacted] texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

39) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

40) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

41) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

42) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

43) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

44) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

45) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

46) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

47) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

48) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

49) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from September 26, 2023, to September 29, 2023.

50) On October 13, 2023, [redacted] signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

51) On December 6, 2023, Winata texted Anakar: "Hi Ed. [redacted] called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for

him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

52) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

53) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe [redacted] during a trip to Florida from December 12, 2023, to December 15, 2023.

54) On or about June 21, 2024, Langan, Chhay, Anakar, Winata, [redacted] and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $79,918.60 in sales tax for the period of March 1, 2024, to May 31, 2024.

**COUNT 4**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Shaun Kevlin, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about May 31, 2017, through on or about January 29, 2019, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 5**

[redacted]

[redacted]

**COUNT 6**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Shaun Kevlin, RCI Hospitality Holdings, Inc., and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about February 5, 2019, through on or about February 17, 2022, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 7**

[redacted]

[redacted]

**COUNT 8**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about August 22, 2022, through on or about December 15, 2023, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 9**

[redacted]

[redacted]

**COUNT 10**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 11**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 12**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 13**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 14**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 15**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 16**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 17**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 18**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 19**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 20**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 21**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 22**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 23**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 24**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 25**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 26**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 27**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 28**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 29**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 30**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 31**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 32**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 33**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 34**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE,** in violation of Tax Law § 1804, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 35**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 36**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 37**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 38**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 39**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 40**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 41**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 42**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law and pursuant to the authority of article twenty-nine of the Tax Law.

**COUNT 43**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 44**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 45**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 46**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 47**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 48**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 49**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 50**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law and pursuant to the authority of article twenty-nine of the Tax Law.

**COUNT 51**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 52**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 53**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 54**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 55**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 56**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 57**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 58**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 59**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 60**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 61**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 62**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 63**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 64**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 65**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 66**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 67**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, [redacted] and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 68**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 69**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 70**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 71**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE,** in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 72**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 73**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 74**

[redacted]

[redacted]

**COUNT 75**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about December 4, 2018, to on or about December 12, 2018, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI Dining Services (37th Street), Inc. (case number X668171695), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

## COUNT 76

[redacted]

[redacted]

## COUNT 77

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Bradley Chhay, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about January 18, 2022, to on or about January 26, 2022, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI 33rd Street Ventures, Inc. (case number X187494318), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

**COUNT 78**

[redacted]

[redacted]

**COUNT 79**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Bradley Chhay, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 20, 2023, to on or about October 2, 2023, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI Dining Services (37th Street), Inc. (case number X190223394), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

Filed: AUG 1 3 2025 N/A

GRAND JURY 1

Grand Jury: 1
Case No.: 1962

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ERIC LANGAN, TIMOTHY WINATA, AHMED "ED" ANAKAR, BRADLEY CHHAY, SHAUN KEVLIN, [redacted] RCI HOSPITALITY HOLDINGS, INC., PEREGRINE ENTERPRISES, INC. (d/b/a "RICK'S CABARET"), RCI DINING SERVICES (37TH STREET), INC. (d/b/a "VIVID CABARET"), and RCI 33RD STREET VENTURES, INC. (d/b/a "HOOPS CABARET AND SPORTS BAR"),

Defendants.

**INDICTMENT**

CRIMINAL TAX FRAUD IN THE FIRST DEGREE, Tax Law § 1806 (4 counts: Langan, Winata, Anakar, [redacted] RCI)
BRIBERY IN THE SECOND DEGREE, P.L. § 200.03 (3 counts: Langan, Anakar, Winata, RCI; 2 Counts: Kevlin, Vivid Cabaret; 1 count: Chhay, Hoops Cabaret)
[redacted]
CRIMINAL TAX FRAUD IN THE SECOND DEGREE, Tax Law. § 1805 (12 counts: Rick's Cabaret; 10 counts: Langan, Winata, Anakar, [redacted] RCI, Vivid Cabaret; 8 counts: Chhay; 6 counts: Hoops Cabaret)
CRIMINAL TAX FRAUD IN THE THIRD DEGREE, Tax Law § 1804 (8 counts: Hoops Cabaret; 4 counts: Vivid Cabaret; 2 counts: Langan, Winata, Anakar, Chhay, [redacted] RCI)
CRIMINAL TAX FRAUD IN THE FOURTH DEGREE, Tax Law § 1803 (2 counts: Vivid Cabaret, Hoops Cabaret)
CONSPIRACY IN THE FOURTH DEGREE, P.L. § 105.10(1) (3 counts: Langan, Winata, Anakar, Chhay, [redacted] RCI, Rick's Cabaret, Vivid Cabret, Hoops Cabaret; 1 count: Kevlin)
[redacted]
OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE, P.L. § 175.35(1) (3 counts: Winata, RCI; 2 counts: Chhay, Vivid Cabaret; 1 count: Langan, Hoops Cabaret)

LETITIA JAMES
Attorney General of the State of New York

A True Bill

[redacted]

Foreperson

Matthew Luongo, [redacted]
Gregory Morril, [redacted]
Gary Fishman, [redacted]
*Assistant Attorneys General*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ERIC LANGAN,
TIMOTHY WINATA,
AHMED "ED" ANAKAR,
BRADLEY CHHAY,
SHAUN KEVLIN,
ALTON PLUNKETT,
RCI HOSPITALITY HOLDINGS, INC.,
PEREGRINE ENTERPRISES, INC. (d/b/a "RICK'S CABARET"),
RCI DINING SERVICES (37TH STREET), INC. (d/b/a "VIVID CABARET"), and
RCI 33RD STREET VENTURES, INC. (d/b/a "HOOPS CABARET AND SPORTS BAR"),

Defendants.

**INDICTMENT**

73671/2025

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Shaun Kevlin, Alton Plunkett, RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law §105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 6, 2010, to on or about January 10, 2024, with intent that conduct constituting the crimes of Bribery in the Second Degree, in violation of Penal Law § 200.03, and Bribe Receiving in the Second Degree, in violation of Penal Law § 200.11, said crimes being C felonies, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

## THE DEFENDANTS AND CONSPIRATORS

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI

owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and

operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Shaun Kevlin ("Kevlin") is and, since on or about October 5, 2023, has been the Assistant Director of Nightclub Operations for RCIMS. From at least the start of the conspiracy until on or about 2013, Kevlin served as a bartender, Manager, and Assistant General Manager for Rick's Cabaret. From on or about 2013 until on or about October 5, 2023, Kevlin was a Regional Manager and Vice President of Nightclub Operations for the Northeast for RCIMS with supervision over the daily operations of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, Alton Plunkett ("Plunkett") was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader, and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Plunkett retired from DTF on or about April 30, 2024. During the period of the conspiracy, Plunkett conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006 through on or about February 1, 2011; (2) a sales tax audit of Rick's Cabaret that was conducted from on or about January 4, 2011, through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014, through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016, through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

## THE SCHEME

Beginning from at least on or about September 6, 2010, through on or about January 14, 2024, the defendants and others operated and devised a scheme in which RCI, RCIMS, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI Companies") and their officers, employees, and

agents conspired and schemed with Plunkett, each other, and others to provide illegal bribes to Plunkett while Plunkett conducted and supervised tax audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs"). The object of the conspiracy was to induce Plunkett to aid the RCI Companies' prior and continuing commission of criminal tax fraud in which the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York the full amount of sales tax that should have been collected and paid on sales at strip clubs located in New York County.

At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to Plunkett and for Plunkett to receive such bribes. The object of the conspiracy was to induce Plunkett to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide Plunkett with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the RCI Companies and their officers, employees, and agents provided Plunkett with at least 13 different complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and Plunkett from New York to meet in Florida for such trips. During these trips, Winata accompanied Plunkett to RCI-owned strip clubs and provided Plunkett with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide Plunkett with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI

New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing Plunkett. Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to Plunkett. As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to Plunkett as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, Plunkett agreed to and did aid and further the ongoing commission of criminal tax fraud in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that Plunkett conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that Plunkett would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**OVERT ACTS**

In the course of and in furtherance of the conspiracy, the coconspirators committed and caused to be committed the following overt acts:

1) On September 6, 2010, Plunkett emailed Winata: "Let me know when your are coming up to New York to review the workpapers and to confirm the final amount. We will close the case in Miami."

2) On June 13, 2012, Plunket texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

3) On August 4, 2014, Winata texted Anakar: "Alton is coming to club tonight. I will have to 'entertainment' him."

4) On November 27, 2015, Plunkett texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

5) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

6) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and Alton having fun at the club?"

7) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

8) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing Alton that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

9) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

10) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

11) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

12) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

13) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

14) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to Plunkett paid by an RCI-owned strip club as an expense for a club "promotion."

15) On June 13, 2018, Plunkett texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

16) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

17) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was

scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

18) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

19) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

20) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

21) On December 12, 2018, Plunkett texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

22) On January 29, 2019, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

23) On February 13, 2019, Winata texted Langan: "Eric, Alton (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

24) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

25) On February 16, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for February 26, 2019, to March 1, 2019.

26) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of Alton?"

27) On February 27, 2019, Plunkett texted Winata: "I am back from dancing . I need some more dancing dollars."

28) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

29) On May 18, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for May 28, 2019, through May 31, 2019.

30) On October 17, 2021, Plunkett texted Winata: "You will look very good in the end. We will celebrate big-time???"

31) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to Plunkett, and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

32) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

33) On February 7, 2022, Plunkett signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

34) On February 17, 2022, Plunkett texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

35) On February 23, 2022, Plunkett texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

36) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

37) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

38) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

39) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

40) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

41) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

42) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

43) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

44) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

45) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

46) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from September 26, 2023, to September 29, 2023.

47) On October 13, 2023, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

48) On December 6, 2023, Winata texted Anakar: "Hi Ed. Alton called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

49) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

50) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from December 12, 2023 to December 15, 2023.

**COUNT 2**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law § 105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 1, 2011, to on or about June 21, 2024, with intent that conduct constituting the crime of Criminal Tax Fraud in the Second Degree, in violation of Tax Law § 1805, a C felony, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

**THE DEFENDANTS AND CONSPIRATORS**

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, Alton Plunkett ("Plunkett") was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Plunkett retired from DTF on or about April 30, 2024. During the period of the conspiracy, Plunkett conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006, through on or about February 1, 2011; (2) a sales tax audit of Rick's

Cabaret that was conducted from on or about January 4, 2011 through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014, through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016, through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

## THE SCHEME

During the course of the conspiracy, the defendants and others agreed with each other and others to operate and devise a scheme in which Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs") willfully engaged in, and willfully caused others to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under article twenty-eight and pursuant to the authority of article twenty-nine of the Tax Law.

At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to Plunkett and for Plunkett to receive such bribes. The object of the conspiracy was to induce Plunkett to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide Plunkett with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the

RCI Companies and their officers, employees, and agents provided Plunkett with at least 13 different complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and Plunkett from New York to meet in Florida for such trips. During these trips, Winata accompanied Plunkett to RCI-owned strip clubs and provided Plunkett with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide Plunkett with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing Plunkett. Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to Plunkett. As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to Plunkett as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, Plunkett agreed to and did aid and further the object of the conspiracy in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that Plunkett conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that Plunkett would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**<u>OVERT ACTS</u>**

In the course of and in furtherance of the conspiracy, the coconspirators committed and caused to be committed the following overt acts:

1) On June 13, 2012, Plunket texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter

that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

2) On or about July 12, 2012, Winata signed a Statement of Proposed Audit Change for Sales and Use Tax, settling an audit of Rick's Cabaret for $6,342.72.

3) On or about November 21, 2012, Plunkett signed a Field Audit Report, settling an audit of Rick's Cabaret for $6,342.72, in which Plunkett falsely certified: "I did not nor do I now have any interest, personal, financial or otherwise, in said taxpayer; and there is no relationship existing between the taxpayer and me which are inconsistent with my official duties."

4) On August 4, 2014, Winata texted Anakar: "Alton is coming to club tonight. I will have to 'entertainment' him."

5) On November 27, 2015, Plunkett texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

6) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

7) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and Alton having fun at the club?"

8) On or about March 1, 2017, to on or about March 21, 2018, Langan, Unindicted Co-Conspirator-1, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the First Degree, Tax Law § 1806, in that they willfully failed to collect and caused another to fail to collect $1,360,656.78 in sales tax for the period of March 1, 2017, to February 28, 2018.

9) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

10) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing Alton that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

11) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

12) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

13) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

14) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

15) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

16) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to Plunkett paid by an RCI-owned strip club as an expense for a club "promotion."

17) On June 13, 2018, Plunkett texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

18) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

19) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

20) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

21) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

22) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

23) On December 12, 2018, Plunkett texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

24) On January 29, 2019, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

25) On February 13, 2019, Winata texted Langan: "Eric, Alton (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

26) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

27) On February 16, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for February 26, 2019, to March 1, 2019.

28) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of Alton?"

29) On February 27, 2019, Plunkett texted Winata: "I am back from dancing . I need some more dancing dollars."

30) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

31) On May 18, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for May 28, 2019, through May 31, 2019.

32) On or about March 1, 2021 to on or about March 22, 2022, Langan, Chhay, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully failed to collect and caused another to fail to collect $190,259.22 in sales tax for the period of March 1, 2021 to February 28, 2022.

33) On October 17, 2021, Plunkett texted Winata: "You will look very good in the end. We will celebrate big-time???"

34) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to Plunkett, and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

35) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

36) On February 7, 2022, Plunkett signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

37) On February 17, 2022, Plunkett texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

38) On February 23, 2022, Plunkett texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

39) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

40) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

41) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

42) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

43) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

44) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

45) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

46) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

47) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

48) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

49) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from September 26, 2023, to September 29, 2023.

50) On October 13, 2023, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

51) On December 6, 2023, Winata texted Anakar: "Hi Ed. Alton called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for

him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

52) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

53) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from December 12, 2023, to December 15, 2023.

54) On or about March 21, 2024, to on or about June 21, 2024, Langan, Chhay, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully failed to collect and caused another to fail to collect $79,918.60 in sales tax for the period of March 1, 2024, to May 31, 2024.

**COUNT 3**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, RCI Hospitality Holdings, Inc., Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret"), and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CONSPIRACY IN THE FOURTH DEGREE**, in violation of Penal Law § 105.10(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about December 21, 2011, to on or about June 21, 2024, with intent that conduct constituting the crime of Criminal Tax Fraud in the Second Degree, in violation of Tax Law § 1805, a C felony, be performed, agreed with one and more persons to engage in and cause the performance of such conduct.

**THE DEFENDANTS AND CONSPIRATORS**

Defendant RCI Hospitality Holdings, Inc. ("RCI") is a publicly traded corporation, listed on the NASDAQ stock exchange under the ticker symbol "Rick," and incorporated in the State of Texas. Its principal place of business is 10737 Cutten Road, Houston, Texas. Until on or about August 6, 2014, RCI was known by the name "Rick's Cabaret International, Inc." Through its subsidiaries, RCI owns and operates more than 60 strip clubs and restaurants throughout the United States, including three located in New York County.

Defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") ("Rick's Cabaret") is and at all relevant times has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Rick's Cabaret maintains its principal place of business at 50 West 33rd Street in New York County.

Defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") ("Vivid Cabaret") is and, since on or about September 1, 2013, has been a wholly owned and operated subsidiary of RCI, incorporated in the State of New York. Vivid Cabaret maintains its principal place of business at 61 West 37th Street in New York County.

Defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") ("Hoops Cabaret") is, and since on or about March 1, 2016, has been a wholly owned subsidiary of RCI, incorporated in the State of New York. Hoops Cabaret maintains its principal place of business at 48 West 33rd Street in New York County.

Defendant Eric Langan ("Langan") is and at all relevant times has been the Chief Executive Officer, President, and Chairman of the Board of Directors of RCI. Langan also is and has been the president of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret since their formation and operation by RCI. At all relevant times, Langan supervised and controlled all of the business and affairs of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Bradley Chhay ("Chhay") is, and since on or about September 14, 2020, has been the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Chhay is and has been chiefly responsible for managing all financial functions and strategy, accounting systems, corporate development, mergers and acquisitions, and integration for RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. As such, he is a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Unindicted Co-Conspirator 1 served as the Chief Financial Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret from at least the start of the conspiracy through on or about September 14, 2020. As such, he was a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Ahmed "Ed" Anakar ("Anakar") is and at all relevant times has been the President and Director of Operations for RCI Management Services, Inc. ("RCIMS"), a wholly owned and operated subsidiary of RCI. Although not formally employed by RCI, Anakar has at all relevant times in practice and as a matter of fact acted as the Director of Operations and Chief Operating Officer of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret and is charged with supervision and management of their daily operations. As such, he served as a high managerial agent of RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

Defendant Timothy Winata ("Winata") is and at all relevant times has been a controller and accountant for RCIMS, RCI, Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret.

At all relevant times, Alton Plunkett ("Plunkett") was employed by the New York State Department of Taxation and Finance ("DTF") in Brooklyn, New York as an auditor, Team Leader, and supervisor of sales tax audits with responsibility for conducting and overseeing audits of Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret. Plunkett retired from DTF on or about April 30, 2024. During the period of the conspiracy, Plunkett conducted and supervised at least six tax audits of RCI-owned strip clubs in New York County: (1) a sales tax audit of Rick's Cabaret that was conducted from on or September 28, 2006 through on or about February 1, 2011; (2) a sales tax audit of Rick's

Cabaret that was conducted from on or about January 4, 2011 through on or about November 8, 2011; (3) a fixed assets and capital expenditures audit of Vivid Cabaret that was conducted from on or about June 20, 2014 through on or about June 13, 2017; (4) a sales tax audit of Vivid Cabaret that was conducted from on or about July 7, 2016 through on or about January 29, 2019; (5) a sales tax audit of Hoops Cabaret that was conducted from October 29, 2018, through February 8, 2022; and (6) a sales tax audit of Vivid Cabaret that was conducted from on or about March 4, 2022, through October 23, 2023.

## THE SCHEME

During the course of the conspiracy, the defendants and others agreed with each other and others to operate and devise a scheme in which Rick's Cabaret, Vivid Cabaret, and Hoops Cabaret (collectively the "RCI New York Strip Clubs") willfully engaged in, and willfully caused others to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax. At all relevant times, the RCI New York Strip Clubs sold "Dance Dollars" to their customers. Dance Dollars are and were redeemable at the RCI New York Strip Clubs for entertainment and amusement and for use of the facilities, including private dances. The RCI New York Strip Clubs also charged their customers a service charge of 20 to 25 percent in addition to the face value of the Dance Dollars. As such, both the sale of Dance Dollars and the service charge imposed by RCI qualified as an "admission charge" to a "place of amusement" and were subject to a combined sales tax rate of 8.875 percent for the City and State of New York and the Metropolitan Commuter Transportation District surcharge. The conspirators willfully failed to and caused the RCI New York Strip Clubs to fail to collect from their customers and pay to the State of New York sales tax on such sales despite being aware that the collection and payment of such taxes were legally required.

To conceal and perpetuate their ongoing sales tax fraud, the conspirators agreed with each other and with others to provide bribes to Plunkett and for Plunkett to receive such bribes. The object of the conspiracy was to induce Plunkett to not assess and penalize the RCI New York Strip Clubs for their failure to collect and pay sales tax during pending and future audits conducted by DTF. In furtherance of the conspiracy, the defendants agreed with each other and others to provide Plunkett with complimentary admission to and private dances at the RCI New York Strip Clubs and Tootsies Cabaret in Miami, Florida, which is also owned and operated by RCI. From 2012 through 2023, the RCI Companies and their officers, employees, and agents provided Plunkett with at least 13 different

complementary multi-day trips to its strip clubs in and around Miami, Florida, including Tootsie's Cabaret. Winata traveled from Texas and Plunkett from New York to meet in Florida for such trips. During these trips, Winata accompanied Plunkett to RCI-owned strip clubs and provided Plunkett with complimentary hotel stays, restaurant meals, and up to several thousand dollars' worth of private dances per day at RCI-owned strip clubs. Additionally, on at least 10 occasions from 2010 through 2021, Winata traveled to New York County from Houston, Texas to provide Plunkett with illegal bribes in the form of complimentary restaurant meals and admission to and private dances at the RCI New York Strip Clubs. Langan, Anakar, and Chhay authorized and directed Winata to travel to New York County and Florida for the purpose of bribing Plunkett. Anakar, Langan, and Kevlin provided and authorized and directed employees and managers of RCI-owned strip clubs in New York County and Florida to provide Winata with cash and Dance Dollars to give to Plunkett. As part of the conspiracy, the conspirators agreed with each other and others to falsify the business records of the RCI New York Strip Clubs and RCI-owned and operated strip clubs in Florida to record the bribe payments to Plunkett as "promo," "promotion," "promotional," "misc.," or "miscellaneous" expenses.

In exchange for the illegal benefits provided to him, Plunkett agreed to and did aid and further the object of the conspiracy in which the conspirators and the RCI New York Strip Clubs failed to collect from their customers and pay to the State of New York over $8 million in sales taxes that should have been collected and paid on the sales of Dance Dollars during the course of the conspiracy. As part of the conspiracy, the conspirators agreed with each other and others that during sales tax audits that Plunkett conducted and supervised for DTF of the RCI New York Strip Clubs, he would assess substantially less in unpaid sales taxes, interest, and penalties than were due. The conspirators also agreed with each other and others that Plunkett would improperly take official action to prevent and impede DTF from conducting additional routine sales tax audits of Rick's Cabaret, RCI's most profitable strip club in New York County.

**OVERT ACTS**

In the course of and in furtherance of the conspiracy, the co-conspirators committed and caused to be committed the following overt acts:

1) On June 13, 2012, Plunket texted Winata: "Do you want me to bring the official forms to close the case or let me know when you want to close the case. I will also give you and official letter

that I have recommended that there shoud be no follow audit because your company reporting correctly and kept good records and that it is not productive to do a follow up audit."

2) On or about July 12, 2012, Winata signed a Statement of Proposed Audit Change for Sales and Use Tax, settling an audit of Rick's Cabaret for $6,342.72.

3) On or about November 21, 2012, Plunkett signed a Field Audit Report, settling an audit of Rick's Cabaret for $6,342.72, in which Plunkett falsely certified: "I did not nor do I now have any interest, personal, financial or otherwise, in said taxpayer; and there is no relationship existing between the taxpayer and me which are inconsistent with my official duties."

4) On August 4, 2014, Winata texted Anakar: "Alton is coming to club tonight. I will have to 'entertainment' him."

5) On November 27, 2015, Plunkett texted Winata, in part: "I have been trying to get in touch with you to schedule an appointment to meet and finish up RCI Dining/Vivid. I know that you are a very busy person but this case is getting old auditor Olga said that she is not hearing from you."

6) On June 15, 2016, Winata texted Anakar: "Ed, can i have $300 payouts? I plan to take him out for dinner after this to minimize time in club."

7) On June 16, 2016, Unindicted Co-Conspirator 1 texted Winata: "Are you and Alton having fun at the club?"

8) On June 15, 2017, Winata texted Anakar: "Ed, we are at Rick's, just finished prelimimary discussions on audit scope and lunch. They said they would work with me, but at the same time, gave me copies of court rulings??? He has his staff with him. He had to play tough, I guess. He would stay after his staff left. We may need to pamper him more this time."

9) On or about June 21, 2017, to on or about March 21, 2018, Langan, Unindicted Co-Conspirator-1, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the First Degree, Tax Law § 1806, in that it willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $1,360,656.78 in sales tax for the period of March 1, 2017, to February 28, 2018.

10) On April 10, 2018, Winata texted Anakar: "Ed, good evening! I made a mistake informing Alton that I got here today so I am here at Rick's with him. Would you approve $1000 for tonight? I will try not to use it all. Whatever leftover, I will use it tomorrow."

11) On April 11, 2018, Kevlin provided Winata with $1,000 cash.

12) On April 12, 2018, Langan texted Anakar: "We need to talk about New York and dance dollars" and "We are going to be hit by 3m in sales taxes soon."

13) On April 12, 2018, Langan texted Anakar: "I think I got the sales taxes in New York to 350 plus interest possibly. Tim is discussing with the auditor tonight ;)"

14) On April 12, 2018, Kevlin texted Langan: "Hey buddy, reached out to Ed. Not sure how quickly he will get back. Tim guest would like another $1500. Would do a promo pay out in cage. We did $2k yesterday."

15) On April 12, 2018, Langan texted Kevlin: "That's fine. Go ahead."

16) On April 12, 2018, through April 13, 2018, Anakar and Kevlin created and caused to be created a false receipt and Sales Report that listed a $1,500 bribe to Plunkett paid by an RCI-owned strip club as an expense for a club "promotion."

17) On June 13, 2018, Plunkett texted Winata: "Where should I meet you. I have some Court Cases on night clubs for you."

18) On June 15, 2018, Kevlin texted Anakar: "Hopefully he really makes something happen" and "So many sketchy people in the public sector."

19) On October 4, 2018, Winata texted Anakar: "I told him that $1.1M is beyond me. The case will be transferref to Phil, Eric or Audit Commitee. We may even hire BDO to handle it. He was scared to lose this 'benefit'. So he told me that he would try to find another 20-30% discount for me. :)"

20) On October 5, 2018, Winata texted Langan: "We need to increase the price of dance dollars to cover sales tax."

21) On October 5, 2018, Langan texted Winata: "We can't Tim. We need to change the way we book this shit. So we only book the Net and not all of the dance dollars."

22) On December 4, 2018, Langan signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Vivid Cabaret for $838,888.82.

23) On December 12, 2018, Plunkett texted Winata: "Congratulations to you my friend, you have done a wonderful job. Thanks for your consent and today we received your down payment check. That's the way people do business in this country. Everyone is happy. You deserve a promotion .. keep the good work and we will Clebbrate in Florida early next year. Thanks for your cooperation."

24) On January 29, 2019, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $838,888.82.

25) On February 13, 2019, Winata texted Langan: "Eric, Alton (NY sales tax auditor) asked if we can go to FL at end of month. He reminded me that I have been too quiet after the settlement. I told him I have been busy with K and Q. Is it OK? Please inform."

26) On February 13, 2019, Langan texted Winata: "Whatever you think is fine."

27) On February 16, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for February 26, 2019, to March 1, 2019.

28) On February 26, 2019, Winata texted Anakar: "Hi, Ed. We are planning to go to club. Whom (which manager) should I ask to take care of Alton?"

29) On February 27, 2019, Plunkett texted Winata: "I am back from dancing . I need some more dancing dollars."

30) On February 27, 2019, Anakar texted Individual-1: "Give Tim $1,000 from the safe."

31) On May 18, 2019, Winata rented and paid for hotel rooms for himself and Plunkett in Hollywood, Florida for May 28, 2019, through May 31, 2019.

32) On or about June 22, 2021, to on or about March 22, 2022, Langan, Chhay, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $190,259.22 in sales tax for the period of March 1, 2021, to February 28, 2022.

33) On October 17, 2021, Plunkett texted Winata: "You will look very good in the end. We will celebrate big-time???"

34) On December 15, 2021, Anakar directed Individual-1 to give Winata $500, which was intended as a bribe to Plunkett, and to falsely record this money in the Daily Sales Report for Tootsie's Cabaret as a promotional expense.

35) On January 18, 2022, Chhay signed a DTF Statement of Proposed Audit Change for Sales and Use Tax, agreeing to settle an audit of Hoops Cabaret for $200,773.91.

36) On February 7, 2022, Plunkett signed a Field Audit Report, settling an audit of Hoops Cabaret for $200,773.91.

37) On February 17, 2022, Plunkett texted Winata: "Tim, I'm finished with the girl. I'm sitting down stairs."

38) On February 23, 2022, Plunkett texted Winata, in part: "This was the best trip I had in Florida. The girls were very beautiful and nice. On Thursday night there so many beautiful women. That's why I do many lap dances instead of going to the room. I hope we can have another trip before the Summer. Thanks again for making making the trip great and better before."

39) On November 16, 2022, Chhay texted Anakar: "You let Tim go tootsies unsupervised?"

40) On or about June 13, 2023, at 11:34 a.m., Chhay texted Langan and Anakar: "New York sales tax. Auditor asked to meet in FL next week to discuss audit result. What do you think?"

41) On or about June 13, 2023, at 11:44 a.m., Langan called Chhay.

42) On or about June 13, 2023, at 11:57 a.m., Chhay emailed Anakar with the subject line "Sales Tax Florida Guy" and wrote: "Let me know what you think. Its still in audit under that guys purview. Historicallly hes 1/3 of the initial he sends. So 200k - try to land at 70k. Once this is done 37th street should be out of the way for a while if we can get him to write us in the good guys bucket list."

43) On or about June 13, 2023, at 1:59 p.m., Anakar emailed Chhay: "No more than 70."

44) On or about June 13, 2023, at 2:39 p.m., Winata texted Chhay: "Should I meet with him next week?"

45) On or about June 13, 2023, at 2:39 p.m., Chhay texted Winata: "Yes" and "Try to get him under 70."

46) On or about September 1, 2023, at 6:44 p.m., Chhay emailed Langan and Anakar with the subject line "Fwd: NY Sales Tax Audit" and wrote: "Wow. Tim is clutch. But it did come with conditions. I'll tell you when I talk to you. Tim asked if this can be his last one. No more dealing with this type."

47) On or about September 1, 2023, at 6:44 p.m., Chhay texted Langan and Anakar: "Tim got the guy to $47k in vivid New York. But owes him a couple trips ed. And he said he has to keep his word. I'll update ya."

48) On September 20, 2023, Chhay signed a DTF Statement of Proposed Audit Change and Use Tax form, agreeing to settle an audit of Vivid Cabaret for $47,342.92.

49) On October 6, 2023, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from September 26, 2023, to September 29, 2023.

50) On October 13, 2023, Plunkett signed a Field Audit Report, settling an audit of Vivid Cabaret for $47,342.92.

51) On December 6, 2023, Winata texted Anakar: "Hi Ed. Alton called last night and asked whether I could take him to FL next week from Dec 12 to 15. Remember in the beginning the tax on Vivid audit was $190K plus interest. We wanted it to be $70K. While we were at Expo I told him that I would take him to FL once if he could get it down to that amount. He asked what it would take for

him to go twice. I told him that it cost us $13K - $14K each time we made the trip. So, if he could reduce it by $30K, I would split it. I would take him to FL once more. He managed to reduce it by $35K. We saved $35K in tax or $43K including interest. Are you going to be in Miami next week? Please inform."

52) On December 12, 2023, Anakar texted Winata: "I approved $5k so you have left over for tomorrow."

53) On January 10, 2024, Langan emailed Winata "Approved," approving the reimbursement of Winata by RCI for the cost of airline tickets, hotel rooms, restaurant meals, and a car rental used to bribe Plunkett during a trip to Florida from December 12, 2023, to December 15, 2023.

54) On or about June 21, 2024, Langan, Chhay, Anakar, Winata, Plunkett, and RCI committed the crime of Criminal Tax Fraud in the Second Degree, Tax Law § 1805, in that they willfully and with an intent to evade the payment of a tax failed to pay and caused another to fail to pay $79,918.60 in sales tax for the period of March 1, 2024, to May 31, 2024.

**COUNT 4**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Shaun Kevlin, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about May 31, 2017, through on or about January 29, 2019, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 5**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **BRIBE RECEIVING IN THE SECOND DEGREE**, in violation of Penal Law § 200.11, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about May 31, 2017, through on or about January 29, 2019, being a public servant, solicited, accepted and agreed to accept a benefit valued in excess of $5,000 from another person upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 6**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Shaun Kevlin, RCI Hospitality Holdings, Inc., and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about February 5, 2019, through on or about February 17, 2022, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 7**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **BRIBE RECEIVING IN THE SECOND DEGREE**, in violation of Penal Law § 200.11, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about February 5, 2019, through on or about February 17, 2022, being a public servant, solicited, accepted and agreed to accept a benefit valued in excess of $5,000 from another person upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 8**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") **BRIBERY IN THE SECOND DEGREE**, in violation of Penal Law § 200.03, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about August 22, 2022, through on or about December 15, 2023, conferred, and offered and agreed to confer, a benefit valued in excess of $5,000 upon a public servant upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 9**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **BRIBE RECEIVING IN THE SECOND DEGREE**, in violation of Penal Law § 200.11, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about August 22, 2022, through on or about December 15, 2023, being a public servant, solicited, accepted and agreed to accept a benefit valued in excess of $5,000 from another person upon an agreement and understanding that such public servant's vote, opinion, judgment, action, decision and exercise of discretion as a public servant would thereby be influenced.

**COUNT 10**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 11**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 12**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 13**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 14**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 15**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 16**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 17**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2017, through on or about March 21, 2018, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2017, through February 28, 2018.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 18**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 19**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE FIRST DEGREE**, in violation of Tax Law § 1806, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $1,000,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 20**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 21**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 22**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 23**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 24**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 25**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2018, through on or about March 21, 2019, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2018, through February 28, 2019.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 26**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 27**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 28**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 29**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 30**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 31**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 32**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 33**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2019, through on or about March 21, 2020, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2019, through February 29, 2020.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 34**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE,** in violation of Tax Law § 1804, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 35**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 36**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 37**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 38**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 39**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 40**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 41**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE FOURTH DEGREE**, in violation of Tax Law § 1803, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 23, 2020, through on or about March 23, 2021, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $3,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2020, through February 28, 2021.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 42**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law and pursuant to the authority of article twenty-nine of the Tax Law.

**COUNT 43**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 44**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret"), of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 45**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 46**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 47**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 48**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 49**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2021, through on or about March 22, 2022, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2021, through February 28, 2022.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 50**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law and pursuant to the authority of article twenty-nine of the Tax Law.

**COUNT 51**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 52**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 53**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 54**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 55**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 56**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 57**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 22, 2022, through on or about March 21, 2023, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2022, through February 28, 2023.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 58**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 59**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 60**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 61**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 62**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 63**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 64**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 65**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about June 21, 2023, through on or about March 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2023, through February 29, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 66**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendants failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 67**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, Ahmed "Ed" Anakar, Bradley Chhay, Alton Plunkett, and RCI Hospitality Holdings, Inc., of the crime of **CRIMINAL TAX FRAUD IN THE SECOND DEGREE**, in violation of Tax Law § 1805, committed as follows:

The defendants, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendants paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $50,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendants committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendants with intent to evade any tax failed to pay that tax.

**COUNT 68**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 69**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Peregrine Enterprises, Inc. (d/b/a "Rick's Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 70**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 71**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE,** in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 72**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, during the period from on or about March 1, 2024, through on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law § 1801(a)(6), in that the defendant failed to collect any tax required to be collected under Article 28 of the Tax Law and pursuant to the authority of Article 29 of the Tax Law.

**COUNT 73**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **CRIMINAL TAX FRAUD IN THE THIRD DEGREE**, in violation of Tax Law § 1804, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 21, 2024, committed a tax fraud act and acts and, with the intent to evade any tax due under the Tax Law, and to defraud the state and any political subdivision of the state, the defendant paid the state and a political subdivision of the state, by means of underpayment, in a period of not more than one year in excess of $10,000 less than the tax liability that was due, to wit, the tax liability due for the period of March 1, 2024, through May 31, 2024.

The defendant committed a tax fraud act and acts by willfully engaging in, and willfully causing another to engage in, the tax fraud act and acts set forth in Tax Law 1801(a)(7), in that the defendant with intent to evade any tax failed to pay that tax.

**COUNT 74**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law § 175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about January 29, 2019, with intent to defraud and intent to commit another crime and to aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, and omitted to make a true entry in the business records of an enterprise in violation of a duty to do so which he knew to be imposed upon him by law and by the nature of his position, to wit, an entry in a Field Audit Report for RCI Dining Services (37th Street), Inc. (case number X668171695), and kept and maintained by the New York State Department of Taxation and Finance.

**COUNT 75**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Eric Langan, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about December 4, 2018, to on or about December 12, 2018, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI Dining Services (37th Street), Inc. (case number X668171695), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

**COUNT 76**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law § 175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 7, 2022, with intent to defraud and intent to commit another crime and to aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, and omitted to make a true entry in the business records of an enterprise in violation of a duty to do so which he knew to be imposed upon him by law and by the nature of his position, to wit, an entry in a Field Audit Report for RCI 33rd Street Ventures, Inc. (case number X187494318), and kept and maintained by the New York State Department of Taxation and Finance.

**COUNT 77**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Bradley Chhay, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI 33rd Street Ventures, Inc. (d/b/a "Hoops Cabaret and Sports Bar") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about January 18, 2022, to on or about January 26, 2022, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI 33rd Street Ventures, Inc. (case number X187494318), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

**COUNT 78**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant Alton Plunkett of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law § 175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 13, 2023, with intent to defraud and intent to commit another crime and to aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, and omitted to make a true entry in the business records of an enterprise in violation of a duty to do so which he knew to be imposed upon him by law and by the nature of his position, to wit, an entry in a Field Audit Report for RCI Dining Services (37th Street), Inc. (case number X190223394), and kept and maintained by the New York State Department of Taxation and Finance.

**COUNT 79**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendants Bradley Chhay, Timothy Winata, RCI Hospitality Holdings, Inc., and RCI Dining Services (37th Street), Inc. (d/b/a "Vivid Cabaret") of the crime of **OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE**, in violation of Penal Law § 175.35(1), committed as follows:

The defendants, in the County of New York and elsewhere, during the period from on or about September 20, 2023, to on or about October 2, 2023, knowing that a written instrument, to wit, a Statement of Proposed Audit Change for Sales and Use Tax for RCI Dining Services (37th Street), Inc. (case number X190223394), contained a false statement and false information, and with intent to defraud the state and any political subdivision, public authority and public benefit corporation of the state, offered and presented it to a public office, public servant, public authority and public benefit corporation with the knowledge and belief that it would be filed with, registered and recorded in and otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

GRAND JURY 1

Filed: AUG 1 3 2025 N/A

Grand Jury: 1
Case No.: 1962

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ERIC LANGAN, TIMOTHY WINATA, AHMED "ED" ANAKAR, BRADLEY CHHAY, SHAUN KEVLIN, ALTON PLUNKETT, RCI HOSPITALITY HOLDINGS, INC., PEREGRINE ENTERPRISES, INC. (d/b/a "RICK'S CABARET"), RCI DINING SERVICES (37TH STREET), INC. (d/b/a "VIVID CABARET"), and RCI 33RD STREET VENTURES, INC. (d/b/a "HOOPS CABARET AND SPORTS BAR"),

Defendants.

# INDICTMENT

CRIMINAL TAX FRAUD IN THE FIRST DEGREE, Tax Law § 1806 (4 counts: Langan, Winata, Anakar, Plunkett, RCI)
BRIBERY IN THE SECOND DEGREE, P.L. § 200.03 (3 counts: Langan, Anakar, Winata, RCI; 2 Counts: Kevlin, Vivid Cabaret; 1 count: Chhay, Hoops Cabaret)
BRIBE RECEIVING IN THE SECOND DEGREE, P.L. § 200.11 (3 counts: Plunkett)
CRIMINAL TAX FRAUD IN THE SECOND DEGREE, Tax Law. § 1805 (12 counts: Rick's Cabaret; 10 counts: Langan, Winata, Anakar, Plunkett, RCI, Vivid Cabaret; 8 counts: Chhay; 6 counts: Hoops Cabaret)
CRIMINAL TAX FRAUD IN THE THIRD DEGREE, Tax Law § 1804 (8 counts: Hoops Cabaret; 4 counts: Vivid Cabaret; 2 counts: Langan, Winata, Anakar, Chhay, Plunkett, RCI)
CRIMINAL TAX FRAUD IN THE FOURTH DEGREE, Tax Law § 1803 (2 counts: Vivid Cabaret, Hoops Cabaret)
CONSPIRACY IN THE FOURTH DEGREE, P.L. § 105.10(1) (3 counts: Langan, Winata, Anakar, Chhay, Plunkett, RCI, Rick's Cabaret, Vivid Cabret, Hoops Cabaret; 1 count: Kevlin)
FALSIFYING BUSINESS RECORD IN THE FIRST DEGREE, P.L. 175.10 (3 counts: Plunkett)
OFFERING A FALSE INSTRUMENT FOR FILING IN THE FIRST DEGREE, P.L. § 175.35(1) (3 counts: Winata, RCI; 2 counts: Chhay, Vivid Cabaret; 1 count: Langan, Hoops Cabaret)

LETITIA JAMES
Attorney General of the State of New York

A True Bill

Foreperson

Matthew Luongo,
Gregory Morril,
Gary Fishman,
*Assistant Attorneys General*

# EXHIBIT C

2021 WL 1421609
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Miriam EDWARDS, et al, Plaintiffs,
v.
MCDERMOTT INTERNATIONAL, INC., et al, Defendants.

Civil Action No. 4:18-CV-4330
|
Signed 04/13/2021
|
Entered 04/14/2021

**Attorneys and Law Firms**

R. Dean Gresham, Gresham Law Group, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, Matthew Insley-Pruitt, Robert C. Finkel, Pro Hac Vice, Sean M. Zaroogian, Chet B. Waldman, Wolf Popper, LLP, James M. Fee, John J. Rizio-Hamilton, Lauren Ormsbee, Pro Hac Vice, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Jeffrey W. Chambers, Chambers Law Firm, Michael Kenan Oldham, Reynolds Frizzell LLP, Houston, TX, for Plaintiffs.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Elizabeth Pennington Furlow, Baker Botts LLP, Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE C. HANKS, JR., UNITED STATES DISTRICT JUDGE

***1** Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia") is the lead plaintiff in this securities class action brought on behalf of purchasers of the common stock of Defendant McDermott International, Inc. ("McDermott") between December 18, 2017 and September 17, 2019 (the "Class Period"). Nova Scotia has pled claims against McDermott and two of its executives, President and Chief Executive Officer David Dickson ("Dickson") and Executive Vice President and Chief Financial Officer Stuart Spence ("Spence"), under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Rule 10b–5 promulgated thereunder ("Rule 10b–5"). *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Nova Scotia has also pled claims of control person liability against Dickson and Spence under Section 20(a) of the Securities Exchange Act of 1934 ("Section 20(a)"). *See* 15 U.S.C. § 78t(a).

Nova Scotia alleges that the defendants misrepresented the financial health of Chicago Bridge & Iron Company, N.V. ("CB&I") to investors in order to facilitate a risky merger between McDermott and CB&I that guaranteed considerable financial benefits to Dickson and Spence but was disastrous for McDermott shareholders, bankrupting the company and leading to ongoing SEC and federal grand jury investigations. Before the Court is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by the defendants. The motion (Dkt. 125) is **DENIED**.

## BACKGROUND

The pertinent factual allegations, drawn from Nova Scotia's live complaint and taken as true for the purposes of this motion, are as follows. McDermott provides technology, engineering, and construction services to the energy industry. (Dkt. 105 at p. 24)

For much of its history, the company has "focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies." (Dkt. 105 at p. 25)

***The Merger and Its Aftermath***

In 2017, McDermott was "healthy" and "profitable[,]" with $178 million in net income from $3 billion in revenue, and it "had an established upstream offshore presence in South and Central America and the Middle East[.]" (Dkt. 105 at p. 25) But it was not well-diversified—nearly two-thirds of its 2017 revenue and nearly half of its 2017 contractual backlog came from a single client, Saudi Aramco—and it had "little presence in the stable market of the United States." (Dkt. 105 at p. 25) McDermott was also viewed as a "potential takeover target[.]" (Dkt. 105 at p. 25) Dickson and Spence "discuss[ed] what steps to take next" to alleviate "concern[s] about [McDermott's] lack of diversification" and its "sensitiv[ity] to the cyclical nature of [the oil and gas] industry and the changes in commodity prices." (Dkt. 105 at p. 25)

Dickson, Spence, and McDermott decided that the next step for McDermott was a merger with CB&I, an engineering and construction company that worked in the oil and gas industry and focused on downstream onshore operations, particularly the construction of petrochemical plants. (Dkt. 105 at p. 25) In December of 2017, McDermott entered into a business combination agreement with CB&I to effectuate a merger between the two companies. (Dkt. 105 at p. 30) Under the terms of the merger agreement, "CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." (Dkt. 105 at p. 30) The press release announcing the merger stated that the transaction would create a "premier fully vertically integrated onshore-offshore company, with a broad engineering, procurement, construction and installation service offering and market leading technologies portfolio." (Dkt. 105 at p. 30) The merger closed on May 10, 2018. (Dkt. 105 at p. 239)

***2** Commitment to the acquisition of CB&I led Defendants to reject at least one offer to purchase McDermott outright. In 2018, a competitor, Subsea 7, made an initial offer to buy McDermott for $7.00 a share, a premium of 16% over McDermott's then-share price of $6.05 a share. (Dkt. 105 at p. 247) Subsea 7 "said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management." (Dkt. 105 at p. 247) However, Dickson, Spence, and McDermott "never engaged Subsea 7 in any negotiations regarding a potential deal choosing, instead, to continue with the proposed Merger with CB&I." (Dkt. 105 at p. 248–49)

The moves took some by surprise. At the time of the merger, CB&I was "basically bankrupt" and "[d]esperate" and "looking to sell business units ... to raise badly needed capital." (Dkt. 105 at p. 29) The most coveted of those units was CB&I's technology business, Lummus ("the Technology Business"), which "held extremely valuable patents[;]" "had a very high profit margin[;]" and, according to the former Financial Operations Controller for CB&I's USA Oil and Gas Division, was the "gemstone in the rusty crown" that was CB&I. (Dkt. 105 at pp. 17, 29–30) Considering that McDermott could have purchased the Technology Business alone, CB&I employees found it "odd" that McDermott had purchased CB&I in its entirety "because a lot of CB&I seemed to be dead weight that should have been cut out from the deal." (Dkt. 105 at p. 30)

In the end, "dead weight" was an apt metaphor, as acquiring CB&I dragged McDermott's value down precipitously. McDermott's share price dropped 92.5% in less than two years after the merger and experienced multiple single-day double-digit percentage drops along the way as information about the merger's costs came to light. (Dkt. 105 at pp. 8–13) On November 4, 2019, McDermott filed a Form 10-Q with the Securities and Exchange Commission ("SEC") in which the company disclosed that the SEC had served subpoenas on the company on July 26, 2019 and was "conducting an investigation related to disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project." [1] *See* McDermott Form 10-Q dated November 4, 2019. [2] McDermott filed for Chapter 11 bankruptcy protection on January 21, 2020. *See* Southern District of Texas bankruptcy case number 20-30336. [3] On May 8, 2020, McDermott filed a Form 10-Q in which the company reiterated that the SEC is "conducting an investigation related to disclosures [the company] made concerning the reporting of projected losses associated with the Cameron LNG project" and further disclosed that "a Federal Grand Jury is conducting a

criminal investigation and [has] requested various documents, including cost forecasts and other financial-related information, related to the Cameron LNG project." *See* McDermott Form 10-Q dated May 8, 2020. The investigations are ongoing.

***Defendants' Financial Disclosures and Statements***

***3** When McDermott and CB&I merged, CB&I's contractual backlog included four large construction projects in the United States dubbed "the Focus Projects." (Dkt. 105 at p. 5) The Focus Projects consisted of two gas turbine projects, known as the Calpine Gas Turbine Power Project ("Calpine") and the IPL Project ("IPL"), and two liquefied natural gas export facility projects, known as the Freeport LNG Project ("Freeport") and the Cameron LNG Project ("Cameron"). (Dkt. 105 at p. 5) Nova Scotia alleges that, before the merger, "it was already internally apparent that the Four Focus Projects were gravely behind schedule and over budget and, as such, would vastly underperform their contracts." (Dkt. 105 at p. 8) The undisclosed risks and costs and improper accounting alleged in Nova Scotia's complaint largely revolve around the Focus Projects.

Defendants announced the proposed merger between CB&I and McDermott on December 18, 2017 (Dkt. 105 at p. 30) On that date, Dickson and Spence, along with CB&I's CEO, participated in a conference call. *See* McDermott Form 425 dated December 18, 2017. Dickson and Spence repeatedly told the analysts on the call that they had "dedicated a significant amount of time performing joint due diligence together with CB&I's team[,]" including "a great deal of due diligence" on the Focus Projects. (Dkt. 105 at p. 218) In response to a question about how McDermott had "priced in the potential risk" on the Focus Projects, Dickson said that the Focus Projects were "fairly well-progressed, so that takes out a lot of the risk that you would expect at the start-up." (Dkt. 105 at p. 62)

On February 20, 2018, CB&I disclosed $101 million in project charges for the Focus Projects for the fourth quarter of 2017. (Dkt. 105 at p. 73); *see also* CB&I Form 8-K dated February 20, 2018. Because of those project charges, CB&I's Engineering & Construction group posted a $41.2 million operating loss for the quarter. *See* CB&I Form 8-K dated February 20, 2018. CB&I reported a net loss of $1.5 billion for the full year 2017; CB&I had reported a net loss of $313.2 million in 2016. *See* CB&I Form 8-K dated February 20, 2018. Nevertheless, at a conference call the next day, Dickson said that Defendants were "even more confident" in the merger and that CB&I's financial disclosures were no cause for alarm. (Dkt. 105 at pp. 72–73); *see also* McDermott Form 425 dated February 21, 2018. With regard to the Focus Projects specifically, Dickson told the analysts on the call that "[t]he potential for incremental overruns on [the Focus] projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence." (Dkt. 105 at p. 73); *see also* McDermott Form 425 dated February 21, 2018. An analyst asked for clarification regarding whether CB&I's disclosure "impl[ied] that we're already starting off below where we wanted to or in line[.]" (Dkt. 105 at p. 73); *see also* McDermott Form 425 dated February 21, 2018. Dickson restated his prepared remarks, telling the analyst that:

> all of it is within our evaluation that we did during this due diligence period. Obviously, today, we're operating in separate companies, but credit to the CB&I management team they kept us posted as developments have occurred. So we're obviously monitoring the situation, but what I could say today is that it's in line with what we've been looking at and well within the work that we did during the due diligence. Dkt. 105 at pp. 73–74; *see also* McDermott Form 425 dated February 21, 2018.

McDermott and a subsidiary of CB&I filed proxy materials on January 24, March 2, March 23, March 27, and April 2, 2018. (Dkt. 105 at p. 83) The companies scheduled shareholder meetings on April 4, 2018 and May 2, 2018. (Dkt. 105 at p. 83) In its proxy solicitation materials, McDermott disclosed that one of its board members had voted against the merger with CB&I on the basis that the problems with the Focus Projects could "be difficult for McDermott's management to remedy (at least in the near term)[,]" rendering the transaction "too risky for McDermott[.]" (Dkt. 105 at p. 85); *see also* McDermott Form S-4/A dated March 27, 2018. In a warning that proved prescient, the dissenting director recounted his experience as president and CEO of a company that had gone bankrupt after suffering $2 billion in losses related to its acquisition of "a business with two

significant, fixed-price, lump-sum combined-cycle gas power plant projects[.]" (Dkt. 105 at p. 86); *see also* McDermott Form S-4/A dated March 27, 2018.

***4** In response to the dissenting director, the proxy materials stated that "McDermott's management team ... expressed the belief that, based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management." (Dkt. 105 at p. 86); *see also* McDermott Form S-4/A dated March 27, 2018. The proxy materials did not mention internal forecasts by CB&I personnel that are discussed in more detail below and that supported the dissenting director's position regarding the Focus Projects. (Dkt. 105 at pp. 86–88) The CB&I internal forecasts indicated that CB&I's financial statements were underreporting costs for the Focus Projects by $1 billion. (Dkt. 105 at p. 53)

The proxy materials also omitted consideration of the CB&I internal forecasts for the Focus Projects from their calculation of the fair value of assets. (Dkt. 105 at pp. 88– 89) The proxy materials instead "assumed" that, for assets other than intangible assets, "the fair value of all assets and liabilities equal[ed] their respective carrying values." (Dkt. 105 at p. 88–89); *see also* McDermott Form S-4/A dated March 27, 2018. Despite Defendants' repeated claims of extensive due diligence and cooperation with CB&I, the proxy materials stated that McDermott "w[ould] not have full access to all relevant information" until the merger was approved and that "the fair value of CB&I's contracts in process, net of advance billings on contracts[,]" could change after the merger. (Dkt. 105 at p. 88–89); *see also* McDermott Form S-4/A dated March 27, 2018.

Defendants appeared to be somewhat vindicated just before the scheduled merger vote, when CB&I reported that it "did not incur any material project changes to the Focus Projects in the first quarter 2018[.]" (Dkt. 105 at pp. 92–98) In a Form 8-K dated April 24, 2018, McDermott stated that it had identified $350 million in potential savings in operating costs that could result from the merger. (Dkt. 105 at pp. 96–97); *see also* McDermott Form 8-K dated April 24, 2018. In a conference call the same day, Dickson noted that McDermott had rejected the Subsea 7 offer and was moving ahead with the CB&I merger. (Dkt. 105 at p. 97); *see also* McDermott Form 425 dated April 24, 2018. Dickson stated that McDermott's management had "spent considerable time with CB&I reviewing the project portfolio" and felt "very comfortable with the progress" CB&I had made to "de-risk" the Focus Projects. (Dkt. 105 at p. 98); *see also* McDermott Form 425 dated April 24, 2018.

The merger with CB&I closed on May 10, 2018. (Dkt. 105 at p. 34) After the merger, McDermott essentially bled out financially. On July 31, 2018, McDermott reported a $221 million change in cost estimates for the Focus Projects. (Dkt. 105 at p. 101); *see also* McDermott Form 8-K dated July 31, 2018. Dickson said that McDermott was "clearly disappointed with the increased cost estimates" but continued to insist that "[t]he increases [we]re within the bounds of the scenarios [McDermott] contemplated during [its] due diligence[.]" (Dkt. 105 at p. 101); *see also* McDermott Form 8-K dated July 31, 2018.

The next quarter brought worse news. On October 30, 2018, McDermott disclosed that, "[f]or the third quarter of 2018, [it] recorded $744 million of changes in estimates" for the Focus Projects. (Dkt. 105 at p. 109); *see also* McDermott Form 8-K dated October 30, 2018. As a result, "goodwill [4] increased by approximately $782 million since the second quarter of 2018[,]" calculated as of the merger date—meaning that, five months after the merger, McDermott had determined that the price it had paid to purchase CB&I's assets exceeded the fair value of those assets by at least $782 million, a discrepancy almost entirely attributable to the cost of the Focus Projects. (Dkt. 105 at pp. 208–09); *see also* McDermott Form 10-Q dated October 30, 2018. Even so, Dickson said that McDermott "expect[ed] no further material changes in the cost estimates on [the Focus] projects" because McDermott's "first full quarter of ownership of CB&I" had given McDermott "the ability to fully grasp the magnitude of the challenges associated with our legacy Focus Projects[.]" (Dkt. 105 at p. 109–10); *see also* McDermott Form 8-K dated October 30, 2018.

***5** There were additional material changes to the cost estimates, as well as additional assurances that McDermott and the Focus Projects were turning a corner. On February 13, 2019, McDermott disclosed that, "[f]or the fourth quarter of 2018, [it] expect[ed] to report an adverse change in estimate of approximately $168 million" for the Cameron project. (Dkt. 105 at p. 212);

*see also* McDermott Form 8-K dated February 13, 2019. On a February 25, 2019 earnings call, Spence said that the second half of 2019 was "likely to be stronger than the first half" and that "[o]perating cash flow [wa]s similarly expected to be stronger in the second half, as [McDermott would] begin to see reduced outflows on the focus projects." (Dkt. 105 at p. 117)

On July 29, 2019, McDermott disclosed a net loss of $146 million and an operating loss of $61 million for the second quarter of 2019, along with a $205 million cash burn tied to the Cameron project. (Dkt. 105 at p. 213); *see also* McDermott Form 8-K dated July 29, 2019. Dickson acknowledged the "weaker than expected" second-quarter numbers but stated that McDermott "expect[ed] to see a sharp improvement in [its] operating income by the fourth quarter of this year, as [it] buil[t] momentum heading into 2020." (Dkt. 105 at p. 202); *see also* McDermott Form 8-K/A dated July 30, 2019.

But the Focus Projects ultimately sank McDermott before that "sharp improvement" could come. The SEC began its investigation on July 26, 2019 (though the investigation does not seem to be mentioned in McDermott's SEC filings until November 4, 2019), and McDermott filed for Chapter 11 bankruptcy protection on January 21, 2020. On its website, McDermott explained that it filed for bankruptcy protection because "the 'focus projects' (Freeport and Cameron LNG) have significantly strained McDermott's finances, and have made it difficult to maintain a timely balance between cash received from customers and cash spent on projects." [5]

***Nova Scotia's Allegations Regarding the Cost of the Focus Projects and the Companies' Internal Estimates***

According to several CB&I and McDermott project directors, cost managers, and executives discussed in Nova Scotia's complaint, "to accurately account for [the Focus Projects], McDermott needed to take $1 billion or more in charges at the Merger closing and to clearly state that the Four Focus Projects would create an ongoing cash burn in the hundreds of millions of dollars each quarter." (Dkt. 105 at p. 51) The Financial Operations Controller for CB&I's USA Oil and Gas Division said that the Cameron project—the subject of the ongoing SEC and federal grand jury investigations—alone was $1 billion over budget as of November of 2017 and was projected to have project end costs of at least $1 billion over project budget. (Dkt. 105 at pp. 52–53) The Controller further stated that CB&I's "management was ignoring [that] forecast and using a more optimistic forecast." (Dkt. 105 at p. 53)

The Controller's account was seconded by a project controls director who worked on both the Calpine and Cameron projects, who "said there was such rampant corporate override of the Cameron project's costs at the end of 2017 and throughout the first quarter of 2018, that it was just a deception to stakeholders of the company." (Dkt. 105 at p. 52) The project controls director left McDermott on June 12, 2018, just after the merger closed, and stated in an exit interview and a report that Cameron would "lose an additional 700MM to 1.2B before th[e] project [wa]s completed," that "$700 million to $1 billion more in cost should be reported on Cameron[,]" and that the "[p]roject cost forecast on the [Cameron] project [wa]s being overridden by corporate" in a way that was "deceptive to [the company's] stakeholders." (Dkt. 105 at p. 57)

***6** Nova Scotia alleges that documents showing the accurate forecasts were part of Defendants' pre-merger due diligence; "[i]nternal CB&I documents" titled Risk Registers, "which were part of the extensive pre-Merger due diligence that McDermott conducted, confirm [the project controls director's] account that charges between $700 million and $1 billion would be incurred at Cameron before completion." (Dkt. 105 at p. 53) The Risk Registers "confirm[ed] that risks at Cameron were escalating between the fourth quarter of 2017 and the first quarter of 2018, contrary to Defendants' repeated statements touting a de-escalation of risk at the Four Focus Projects." (Dkt. 105 at p. 54) The project controls director, who helped compile the Risk Registers, "stated that, by the end of 2017, forecasted costs on Cameron had escalated well beyond what CB&I was budgeting and forecasting publicly" and that "the inaccuracy of publicly reported forecasts got worse as the Cameron project went on." (Dkt. 105 at pp. 37, 53)

The project directors, cost managers, and executives cited in Nova Scotia's complaint also claimed that, instead of correcting CB&I's improper accounting and cost forecasting practices after the merger, Defendants continued those practices. For instance, the cost manager for Cameron "stated that the practice of upper management altering cost forecasts downward before publicly

reporting them continued unabated after McDermott closed the merger." (Dkt. 105 at p. 237) According to the Cameron cost manager, both CB&I and McDermott "changed the forecasts provided by [the cost manager's] team and the Project Controls group for the Freeport project, as was done on the Cameron project." (Dkt. 105 at p. 49) The Cameron cost manager further said that with both CB&I and McDermott, top executives, including the CEO and CFO, "received both the real forecasted numbers in initial reports and later revised forecasts with better numbers, which would be publicly published." (Dkt. 105 at p. 237) The Cameron cost manager stated that Defendants Dickson and Spence specifically "knew the numbers because they came on site to Cameron, and [the Cameron cost manager] went over the true cost estimates with Spence." (Dkt. 105 at p. 38) Defendants Dickson and Spence also received emails containing "the complete package of Project Control's unaltered forecasts, including low-level details and their basis." (Dkt. 105 at p. 38)

Nova Scotia further alleges that, in addition to improperly manipulating forecasts, both CB&I and McDermott delayed payment every quarter to vendors and suppliers on other, more successful projects in order to inflate cash reserves and fund the Focus Projects, particularly Cameron and Freeport. (Dkt. 105 at p. 46) A project procurement director for both CB&I and McDermott referred to the practice as "robbing Peter to pay Paul" and "cooking the books[.]" (Dkt. 105 at p. 46) After the merger, in line with this practice, payment decisions over $50 million required review and approval by Defendant Spence and sometimes Defendant Dickson. (Dkt. 105 at p. 238) The project procurement director said that the practice jeopardized McDermott's other projects; "this conduct caused vendors to shut down, refuse new purchase orders, and/or refuse to ship materials for money-making projects because they had not been paid on Cameron or Freeport." (Dkt. 105 at p. 46) On the Calpine and Freeport projects, McDermott also continued CB&I's practice of keeping "two schedules, one that was real and one that they showed to the client." (Dkt. 105 at pp. 48, 51, 238)

Nova Scotia alleges that McDermott's financial fortunes plummeted because "Defendants concealed the true risks of merging with CB&I rather than merely acquiring the Technology Business." (Dkt. 105 at p. 129) Dickson and Spence concealed the risks for financial reasons. The acquisition of CB&I elevated McDermott into a different Performance Peer Group of companies, "leading to Defendants Dickson and Spence receiving increases in their base and incentive compensation." (Dkt. 105 at p. 13) Dickson and Spence received "recognition bonuses"—$1,125,000 for Dickson; $637,500 for Spence—for their work on the merger. (Dkt. 105 at p. 238) For 2018, Dickson was paid total executive compensation of $11,294,007, and Spence was paid total executive compensation of $7,530,641, "primarily for [their] four plus months' work prior to the Merger[.]" (Dkt. 105 at p. 239) Dickson and Spence also engaged in "suspicious" stock, performance unit, and restricted stock unit transactions during the Class Period that "yielded [Dickson and Spence] a combined $9,984,700 ($8,015,187 for Dickson, $1,969,513 for Spence), along with 727,464 additional shares acquired at no expense (556,986 for Dickson, 170,478 for Spence) in net ill-gotten gains from prices inflated" while "the true facts regarding McDermott's business and operations ... remained hidden from investors[.]" (Dkt. 105 at p. 239–46)

## MOTIONS TO DISMISS AND THE PSLRA

***7** Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action. *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

Section 10(b) states that "[i]t shall be unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 then implements Section 10(b), disallowing the making of an "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal quotation marks and citations omitted). Omissions are material for purposes of the second element when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 747 (S.D. Tex. 2012) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The third element, scienter, requires "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC,* 401 F.3d at 643). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id*. (quotation marks omitted).

***8** The Private Securities Litigation Reform Act ("the PSLRA") and Federal Rule of Civil Procedure 9(b) impose a heightened pleading requirement for the misrepresentation and scienter elements of a Section 10(b) claim. *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). Rule 9(b), which applies where there are allegations of fraud, requires the pleading party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a strong inference of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254.

Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Furthermore, the PSLRA "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable

or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002).

## ANALYSIS

In their motion to dismiss, Defendants argue that Nova Scotia's Section 10(b) claims must be dismissed because: (1) all of the statements relied on by Nova Scotia are either puffery or non-actionable opinions; and (2) Nova Scotia's allegations do not give rise to the requisite strong inference of scienter. [6] The Court disagrees. Nova Scotia has sufficiently pled facts showing that Defendants made statements regarding the Focus Projects that, in context, were material, misleading, and made with at least severe recklessness.

"Under the judicially created puffery doctrine, general, forward-looking, optimistic corporate statements that are so vague and indefinite that they do not affect the price of a security because a reasonable investor would not rely on them in deciding whether to purchase or sell stock, are immaterial as a matter of law and should be dismissed." *Kurtzman v. Compaq Computer Corp.*, No. 4:99-CV-779, 2000 WL 34292632, at *37–38 (S.D. Tex. Dec. 12, 2000). The term "puffery" can also refer to "predictive or forward-looking statements" that "neither rise to the level of a guarantee nor include a specific statement of fact." *Id*.

The Fifth Circuit does not have a *per se* rule for dismissing puffery. *Id*. Rather, courts in this Circuit must "examine each corporate statement in the context in which it was made." *Id*. "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993).

Similarly, opinion statements can also be actionable, since "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. In order to make an opinion statement actionable, a plaintiff must "call into question the issuer's basis for offering the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 194 (2015). "The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*.

***9** Here, as set out above, Nova Scotia has pled sufficient facts to establish that Defendants' repeated assurances regarding the Focus Projects before and after the merger were material and misleading. Internal CB&I forecasts and risk registers compiled by project directors, cost managers, and executives showed that, at the time of the merger, McDermott was understating the costs associated with the Focus Projects by about $1 billion. A project controls director who worked on both the Calpine and Cameron projects at CB&I left McDermott shortly after the merger because the company, like CB&I before the merger, refused to report an additional $700 million to $1 billion in costs on Cameron and was engaging in "a deception to stakeholders of the company."

The forecasts that Defendants allegedly ignored or buried proved correct after the merger as the Focus Projects bled cash from McDermott. Even so, Defendants did not so much as mention those internal forecasts; rather, as the bad news regarding the Focus Projects mounted, Dickson and Spence repeatedly insisted that there would be "no further material changes in the cost estimates on [the Focus] projects" and that "a sharp improvement" was only one quarter away. Defendants' repeated assurances regarding the Focus Projects before and after the merger omitted material facts and are actionable. *See* *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation*, No. 4:20-CV-576, 2021 WL 182316, at *6 (S.D. Tex. Jan. 19, 2021) (J. Atlas) ("[B]y the time Defendants made 'forward-looking' statements during the Class Period regarding Shenandoah, Defendants already knew that the potential for Shenandoah was being exaggerated and needed 'a significant downward adjustment.' "). If nothing else, the existence of internal cost forecasts that were ignored even as they proved accurate tends to either belie Defendants'

claims that they conducted extensive due diligence jointly with CB&I or demonstrate that Defendants ignored the results of the very due diligence that they repeatedly touted to analysts and investors.

Nova Scotia has also alleged sufficient facts to establish that Dickson and Spence behaved in a manner that was, at a minimum, severely reckless. Among other things, Nova Scotia alleges that CB&I's practice of manipulating cost forecasts downward before publicly releasing them continued after the merger. Nova Scotia has further alleged that documents showing the accurate forecasts were part of Defendants' pre-merger due diligence and that, after the merger, top executives, including the CEO and CFO, received the accurate internal forecasts in initial reports. The Cameron cost manager said that he went over the true cost estimates for Cameron with Spence at a site visit at which Dickson was also present; the Cameron cost manager also said that Dickson and Spence received emails containing the complete package of Project Control's unaltered forecasts, including low-level details and their basis.

Nova Scotia has also alleged that Dickson and Spence stood to, and did, benefit greatly from staving off the takeover by Subsea 7 and closing the merger with CB&I. Because the acquisition of CB&I elevated McDermott into a different Performance Peer Group of companies, Dickson and Spence received bonuses and increases in their base pay. Nova Scotia also alleges that Dickson and Spence engaged in suspicious stock, performance unit, and restricted stock unit transactions during the Class Period, before the scope of the problems with the Focus Projects became clear to investors. Finally, judicially noticeable documents indicate that even though the SEC served subpoenas on McDermott and commenced an investigation into the Cameron project on July 26, 2019, the company did not disclose the investigation either in its July 29, 2019 SEC filings or at its earnings call for the second quarter of 2019, which took place on July 29, 2019. In fact, it does not appear that the company disclosed the existence of the investigation until over three months later, on November 4, 2019.

***10** Under the circumstances, Nova Scotia has established an entitlement to further discovery in this case.

## CONCLUSION

The defendants' motion to dismiss (Dkt. 125) is **DENIED**. Discovery in this case may proceed.

### All Citations

Not Reported in Fed. Supp., 2021 WL 1421609

## Footnotes

1 The Cameron LNG project was part of CB&I's contractual backlog at the time of the merger.

2 The Court takes judicial notice of the November 4, 2019 Form 10-Q filing, as well as the other SEC filings referenced in this opinion. *Izadjoo v. Helix Energy Solutions Group, Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017) (J. Rosenthal) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

3 The Court takes judicial notice that the bankruptcy petition was filed. "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

4 Goodwill is the amount a buyer pays beyond the book value of an acquired company's assets.

5 The Court takes judicial notice of this explanation on McDermott's website. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 746 n.3 (N.D. Tex. 2018),

*aff'd*, 935 F.3d 424 (5th Cir. 2019). The Court accessed the page at:

https://www.mcdermott.com/CMSPages/GetAzureFile.aspx?path=~%5Cmdrsite%5Cmedia%5C

pdf-docs%5Cfinal-public-faq-post-

filing.pdf&hash=29edc26c55102ea2dd4d2ab923bafb487b128b646c1d77385a70ed0726714ef8.

6 Defendants attack Nova Scotia's Section 20(a) claims solely on the basis that the Section 10(b) claims are inadequately pled.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2017 WL 6398742
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Alan HALL and James Depalma, individually and on behalf of all others similarly situated, Plaintiffs
v.
RENT-A-CENTER, INC., Robert D. Davis, and Guy J. Constant, Defendants

CIVIL ACTION NO. 4:16cv978
|
Signed 10/19/2017

**Attorneys and Law Firms**

Lionel Z. Glancy, Glancy Prongay & Murray LLP, Los Angeles, CA, Elton Joe Kendall, Jamie Jean McKey, Kendall Law Group, LLP, Willie Charles Briscoe, The Briscoe Law Firm, R. Dean Gresham, Steckler Gresham Cochran LLP, Dallas, TX, Jonathan Gardner, Marisa N. Demato, Labaton Sucharow LLP, New York, NY, Guillaume Orson Buell, Hicks Davis Wynn P.C., Houston, TX, for Plaintiffs.

David Dykeman Sterling, Baker Botts LLP, Houston, TX, Jessica B. Pulliam, Baker Botts LLP, Dallas, TX, Peter Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX, for Defendants.

## AMENDED REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE [1]

CAROLINE M. CRAVEN, UNITED STATES MAGISTRATE JUDGE

***1** The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motion is before the Court:

> **Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Docket Entry #44).**

The Court, having reviewed the relevant briefing, recommends the motion be **DENIED**.

## I. BACKGROUND

This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Rent-A-Center, Inc. ("RAC" or the "Company"); its former Chief Executive Officer ("CEO") Robert D. Davis ("Davis"); and its former Executive Vice President of Finance, Chief Financial Officer ("CFO"), and Treasurer Guy J. Constant ("Constant") (collectively "Defendants") [2] on behalf of all persons and entities that purchased or otherwise acquired RAC publicly traded common stock during the period from February 2, 2015 through October 11, 2016, inclusive (the "Class Period") and who were damaged thereby. The action involves Defendants' alleged collective failure to inform the market that the "pivotal initiative the Company undertook during the Class Period and had been promising Wall Street—the rollout of its proprietary point-of-sale ("POS")

management information system, which had been in development for more than five years and cost the Company at least $175 million—was an abject failure fraught with stability and functionality problems that directly affected the Company's ability to complete sales and collect rental income during the Class Period." Docket Entry # 45 at 1.

The facts are drawn from the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws and the documents it incorporates by reference such as filings with the Securities and Exchange Commission ("SEC") and other documents that provide the basis for Plaintiffs' claims. *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, No. CV H-15-2213, 2017 WL 590383, at *5 (S.D. Tex. Feb. 14, 2017) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

RAC is one of the largest rent-to-own operators in North America. Compl., ¶ 2. At RAC's stores, customers can rent-to-own electronics, appliances, furniture, and other durable items. During the Class Period, RAC generated revenue from four operating segments: (1) Core U.S., (2) Acceptance Now, (3) Mexico, and (4) Franchising. *Id.* at ¶ 3. Core U.S. was RAC's largest segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada, and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of the Core U.S. segment" and that any "significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies." *Id.*

***2** Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms. *Id.* at ¶ 4. Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. Because RAC's key customer demographic was "unbanked" and without credit, most of its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, the customer would be able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. *Id.*

The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts. RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. *Id.*

Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its proprietary point-of-sale management information system ("POS" or "SIMS"), which had been in development since at least 2009. *Id.* at ¶ 5. This new POS system was purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each store's sales and collection data. [3] Prior to the rollout of SIMS, each store was required to download and transmit to RAC headquarters all store data at least twice daily. *Id.*

At the beginning of the Class Period, on February 2, 2015, RAC announced the new POS system was "fully operational" at its first store "following the system-wide implementation of the back office solution." *Id.* at ¶ 6. Otherwise, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives. Specifically, Defendants knew, but failed to inform investors, the POS system had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of the system. *Id.*

Throughout 2015, the Company rolled out the POS system to an increasing number of stores, and by December 31, 2015, the system was deployed in 385 stores. *Id.* at ¶ 7. However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and other information that should have caused Defendants to either halt the Company-wide rollout of the system or at least undertake a system-wide revamp before proceeding with a full rollout, Defendants steadfastly refused to do either. *Id.* at ¶ 8. Defendants also failed to inform investors of the ongoing problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was "fully operational and ready to go." *Id.*

***3** "Defendants rushed out a full rollout of the POS system Company–wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016." *Id.* at ¶ 9. According to Plaintiffs, the truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016, when the Company announced its results for the year ended December 31, 2015 after the market closed that day. *Id.* at ¶ 10. The next day, during the Company's earnings call, Defendants acknowledged problems with implementation of the POS system and disclosed that for the first quarter of 2016 (ended March 31, 2016) RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact ... associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. *Id.*

According to Plaintiffs, Defendants falsely assured investors the "little bit of impact to revenue" would "go away then in the back half of the year." *Id.* Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores." Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. *Id.*

Additional information about problems with the POS system's implementation was revealed on April 27, 2016. *Id.* at ¶ 11. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so the Company could address a "greater-than-expected impact on sales." *Id.* However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [ ] operating this new POS system." *Id.* Defendants also assured investors the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations, RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. However, Plaintiffs allege the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues. *Id.*

The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016. *Id.* at ¶ 12. Despite revealing decreased sales because of the impacts and acceleration of the POS system rollout, Defendants represented "the distraction of a major system roll-out is now behind us." *Id.* As a result of these disclosures, on July 28, 2016, RAC's common stock price fell approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume. *Id.*

The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. *Id.* at ¶ 13. According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." *Id.* "In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, ***or over 28%*** on abnormally high trading volume." *Id.* (emphasis in original).

On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter. *Id.* at ¶ 14. On December 2, 2016, the Company announced the termination of Defendant Constant effective immediately. *Id.* at ¶ 15. On January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately. *Id.*

***4** According to Plaintiffs, the statements of former RAC employees ("confidential witnesses" or "CWs") "with personal knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues existed at the time RAC initially implemented the POS system in late 2014, and that these problems were not sufficiently remediated during the Company-wide rollout of the POS system when additional scalability and functionality problems surfaced." Docket Entry # 45 at 1. According to the Complaint, the statements of former RAC employees with knowledge of SIMS' development and implementation confirm that "internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system when it was initially rolled out in early 2015." Compl., ¶ 16. For example, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe) ("CW-1"), "stated Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout." *Id.* According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. "Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years." *Id.*

The Complaint also relies on "CW-2," who was employed by RAC for nineteen years from 1997 until June 2016. *Id.* at ¶ 17. "From March 2007 to June 2016, CW-2 held the title of Senior Director of Information Security and IT Service Management and reported directly to Chief Information Officer ... who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired." *Id.* "CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level." *Id.* CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout. CW-2 attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores, and CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

## II. PROCEDURAL BACKGROUND

On December 23, 2016, the original Class Action Complaint for Violations of the Federal Securities Laws was filed by Alan Hall, individually and on behalf of all others similarly situated. The case was assigned to District Judge Mazzant and referred to Magistrate Judge Johnson for pretrial purposes. On February 2, 2017, Magistrate Judge Johnson granted Defendants' Unopposed Motion for Consolidation of Related Cases, consolidating *James Depalma v. Rent-A-Center, Inc., et al.* (Cause No. 4:16cv981-ALM-KPJ) into the above first-filed case. Docket Entry # 9. All subsequent filings have been made in the above case.

On February 21, 2017, Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") filed a motion for the entry of an Order (1) appointing Oklahoma Firefighters as Lead Plaintiff for a Class of all persons who purchased the securities of Rent-A-Center, Inc., between July 27, 2015, and October 10, 2016, inclusive; and (2) approving Oklahoma Firefighters' selection of Labaton Sucharow LLP ("Labaton Sucharow") as Lead Counsel for the Class and Hicks Davis Wynn, PC as Liaison Counsel for the Class. Docket Entry # 10. The same day, Alan Hall and Larry Adams filed a motion for appointment as Lead Plaintiff and approval of Glancy Prongay & Murray LLP and Bragar Eagel & Squire, P.C. as Co-Lead Counsel for the class and Kendall Law Group, PLLC as Liaison Counsel. Docket Entry # 14. Three other movants filed motions to be appointed lead

counsel, but they later requested their motions be withdrawn. Docket Entry #s 13, 15, 16. Magistrate Judge Johnson granted the movants' requests.

Although Alan Hall and Larry Adams did not request the Court withdraw their motion, they notified the Court that it appeared they did not possess the "largest financial interest in the relief sought by the class" as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u(a)(3)(B). *See* Docket Entry # 25. Thus, Magistrate Judge Johnson only considered Oklahoma Firefighter's motion as to whether it met the requirements for designation as lead plaintiff. On March 16, 2017, Magistrate Judge Johnson granted Oklahoma Firefighters' motion and denied Alan Hall and Larry Adams' motion. Docket Entry # 34. Judge Johnson also approved Oklahoma Firefighters' selection of lead counsel.

***5** Court-appointed Lead Plaintiff Oklahoma Firefighters is a defined-benefit pension plan headquartered in Oklahoma City, Oklahoma. Oklahoma Firefighters, together with additional named plaintiff City of Hollywood Employees' Retirement Fund, filed the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws on May 5, 2017.

## III. DEFENDANTS' MOTION TO DISMISS

On June 5, 2017, Defendants filed their current Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Docket Entry # 44. The elements of a private securities fraud claim based on violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).

Defendants assert the Complaint fails to plead either (1) falsity or (2) the requisite strong inference of scienter with particularity as to any of the alleged misrepresentations. Specifically, Defendants assert the Complaint is devoid of any facts demonstrating how or why the Individual Defendants knew, or were consciously blind to, information showing that their regular (and increasingly negative) reports on the SIMS rollout throughout the Class Period were false at the time they were made.

In response, Plaintiffs point out Defendants contest only two elements of Plaintiffs' 10(b) claim—falsity and scienter—and assert Defendants thus concede "all other elements have been adequately pled: materiality, reliance, economic loss, and loss causation." Docket Entry # 45 at 3. Regarding falsity and scienter, Plaintiffs assert Defendants' arguments fail. According to Plaintiffs, allegations from senior-level CWs confirm that Defendants' statements and omissions were false and misleading when made. Plaintiffs assert Defendants, despite having test results and other information that clearly demonstrated the massive problems RAC was encountering with the SIMS rollout, failed to inform investors both of the existence of the ongoing problems and that the problems would likely materially affect the Company's revenues. "Instead, Defendants repeatedly assured the market that SIMS was fully operational and that any issues RAC faced were minor and had already been resolved," and when problems started to seriously impact RAC collection efforts, "Defendants falsely reassured investors that these were only temporary hiccups that had been fully addressed." *Id.* at 2.

In addition, Plaintiffs contend allegations from the CWs, the Core U.S. segment's importance to the Company and the POS to the future of RAC's business, "as well as Constant and Davis's terminations, taken together with allegations that Defendants were motivated to roll out the POS System rather than write down this $175 million asset, demonstrate a strong inference of scienter." *Id.* at 3.

## IV. LEGAL STANDARDS

**A. Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a case for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

***6** To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gonzalez*, 577 F.3d at 603 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.*

As explained below, a district court evaluating a motion under Rule 12(b)(6) must also consider the strict pleading requirements of Rule 9(b) and the PSLRA in a securities fraud case. *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. 03-md-1530, 2004 WL 5278716, at *5 (E.D. Tex. June 16, 2004); *see also* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

**B. Section 10(b) of the Securities Exchange Act and Rule 10b-5 pleading requirements**

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b); *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *9 (W.D. Tex. Jan. 26, 2017). Section 10(b) provides it is unlawful to "use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, nor misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).

Both FED. R. CIV. P. 9(b) and the PSLRA impose a heightened pleading requirement on § 10(b) claims. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b). To satisfy Rule 9(b)'s pleading requirements, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997); *see also* *Southland*, 365 F.3d at 362 ("The PSLRA reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading.")

***7** The PSLRA further enhances the "particularity" requirement for pleading securities fraud under Rule 9(b). Enacted in 1995 in response to frustration with Rule 9(b)'s inability "to prevent abusive, frivolous strike suits," the goal of the PSLRA is to "prevent the abuse of federal securities laws by private plaintiffs." *See* *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001) (citing H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740). The PSLRA provides in relevant part as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> * * *
>
> Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2)(A); *see also* *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642, 645 (5th Cir. 2005) (observing that only strong inferences of scienter, not based on conclusory allegations or unwarranted deductions, survive a motion to dismiss).

## V. WHETHER THE COMPLAINT PLEADS WITH PARTICULARITY ANY FALSE OR MISLEADING REPRESENTATION

### A. Plaintiffs' allegations

Plaintiffs allege RAC attempted to develop its own POS system, but the results were deeply flawed. According to Plaintiffs, the Individual Defendants knew the POS system implementation was experiencing "serious problems and that the roll-out threatened to affect both store operations and collections." Compl., ¶ 30. Plaintiffs allege the problems were not properly remediated before the system rolled out Company-wide, and the Individual Defendants disseminated materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the troubled implementation of the Company's new POS system, SIMS. *Id.* at ¶¶ 30, 34. This scheme allegedly: (i) deceived the investing public regarding RAC's operations and the true value of RAC's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase RAC common stock at artificially inflated prices, which fell as the truth concerning

the material and sustained effect that the implementation of the POS system had on Core revenues ultimately became known. *Id.* at ¶ 34.

Regarding the allegedly false and misleading statements and/or omissions, the Complaint alleges the following background. In 2008, RAC began developing a proprietary POS system with the goal of centralizing certain functions. *Id.* at ¶ 42. The system was designed to centralize and manage sales, inventory, payments, collections, and customer relationships, all in real-time, from one POS system. *Id.* at ¶¶ 5, 42. Centralizing these functions was critical to RAC's future success because its other strategic initiatives—including integrated inventory management, e-commerce, and variable pricing—required such centralized infrastructure.[4] *Id.* at ¶¶ 42, 72.

***8** CW-2 stated that between 2009—2010, RAC employed in-house and temporary engineers, as well as subcontractors, to develop the POS system that it ultimately named "SIMS." *Id.* at ¶¶ 5, 44. According to CW-1, the version of SIMS that was implemented during the Class Period was developed on an "outdated Oracle Linux-based operating system that was already considered to be at 'end of life' before SIMS was rolled out to the first store in Plano, Texas." *Id.* at ¶ 45. "Because of a series of executive changes in the CIO position at RAC between 2010 and 2013 (four CIOs in four years), CW-2 said that ownership of the POS/SIMS project was bounced around from executive to executive until December 2013 when RAC hired a new CIO (Herman Nell) and a new CTO (Christi Liebe)." *Id.* at ¶ 46.

According to CW-2, Nell reported directly to Davis while Liebe reported to Nell until Nell retired from RAC in April of 2016. *Id.* According to CW-2, when Nell retired Liebe reported directly to his successor Angela Yochem. "CW-2 said that Nell was tasked with getting the POS system ready to be commercially deployed (despite all its flaws) with Liebe and Gary Peek (former Vice President of IT Solutions) assisting with the development of the network servers, asset management, software licensing, database and network infrastructure, and "Dev/Ops" (cloud services)." *Id.*

Despite its efforts and capital investments of approximately $175 million during this period, SIMS, which the CWs have described as a patchwork of multiple older and outdated programs, suffered countless setbacks and was riddled with problems when RAC began pilot testing in one RAC store in December 2014. *Id.* at ¶¶ 47-52, 56. As explained by the CWs, the reason for its failure was that the POS was built on an outdated Oracle operating system that clashed with modern applications and was extremely difficult and costly to upgrade. *Id.* at ¶¶ 45, 64-65.

According to CW-1, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers that was responsible for implementing SIMS and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations, Nell and Liebe were given less than one year to work on the POS project before RAC decided to begin pilot testing in a store near headquarters in December 2014. *Id.* at ¶¶ 47, 50. CW-1 stated "the timing of the rollout decision was predominantly based on concerns that if the Company did not commercialize the POS system soon, significant amounts of the capitalized software development costs associated with the project would need to be written off." *Id.* at ¶ 47.

According to CW-1, at the end of 2014, SIMS was "still nowhere near ready for pilot testing" as "serious capacity and performance issues were being experienced." *Id.* at ¶¶ 48-49. According to CW-1, Liebe and Nell were aware of the serious problems surrounding the development and deployment of the system and "would have communicated any significant problems and delays to Davis and Constant through, for example, color-coded SIMS incident reports ... and at SIMS Executive Steering Committee meetings which were attended quarterly by Liebe, Nell, Department Heads, SVPs, and the Individual Defendants, and more frequently as the rollout of the POS system progressed." *Id.* at ¶¶ 50-51.

CW-2 confirmed that Davis and Constant were aware of issues relating to the POS system implementation. *Id.* at ¶ 52. CW-2 said Individual Defendants were on the SIMS Executive Steering Committee, and Davis held weekly meetings with his CIOs, including Nell during the Class Period, where SIMS issues were always discussed. *Id.*

The Complaint details the meetings attended by senior RAC executives, including the Individual Defendants, where the ongoing problems with the development and implementation of SIMS were discussed:

***9** • quarterly meetings of the SIMS Executive Steering Committee which included Davis and Constant during which SIMS' progress and issues were continually discussed (¶¶ 50-52);

• weekly SIMS project team meetings attended periodically by Davis and Constant (¶ 51); and

• weekly meetings Davis held with CIO Nell (then CIO Angela Yochem starting in May 2016) during the Class Period where SIMS was discussed.

*Id.* at ¶¶ 50-52, 74. CW-2 also indicated Davis and Constant were kept aware of issues the technology team was encountering with SIMS, and that as the SIMS rollout accelerated and more issues arose, Davis' involvement increased. *Id.* at ¶ 74. CW-2 further confirmed that Davis was directly involved in SIMS' development from the onset. *Id.*

The Complaint also details the reports provided to senior RAC executives in which the problems with the development and implementation of SIMS also were discussed, including:

• SIMS Incident Reports which employed a green/yellow/red color-coding system to rank the severity of SIMS' problems and were provided to Davis and Constant (¶¶ 51, 71); and

• "Root Cause Analysis Reports" which detailed the pervasive scope and specific issues the Company was having with SIMS and "show that RAC was experiencing outages in the weeks prior and subsequent to the start of the Class Period—the same time Defendants were reporting the successful implementation of SIMS in the first pilot store."

*Id.* at ¶ 68.

The Complaint alleges RAC rushed the pilot testing and rollout of the POS system despite known risks and flaws in order to avoid a massive write-down of the system. Specifically, the Complaint alleges as follows. RAC invested at least $175 million in the development of SIMS prior to the Class Period. *Id.* at ¶ 53. Pursuant to Generally Accepted Accounting Principles ("GAAP"), RAC was required to capitalize certain costs associated with SIMS' development. *Id.* at ¶¶ 53-56. The Company was not required to begin amortizing such costs until the software was placed into use. However, GAAP mandated that RAC write down its capitalized costs for software under development to the lower of (1) its carrying amount or (2) its fair value (if any) once its completion or use no longer appeared probable. *Id.* at ¶¶ 55-57, 169.

If it was no longer probable that the POS system would be completed or placed into service, the capitalized asset would need to be reported at the lower of the carrying amount or fair value, if any, less costs to sell. A rebuttable presumption existed in GAAP that uncompleted software has a fair value of zero. *Id.* at ¶ 57. The Complaint alleges the impact of such an accounting adjustment in late 2014 would have been highly material to the Company's annual financial statements. *Id.* at ¶¶ 58-60, 170-71. Indeed, the result of abandoning the still-not-functioning POS system and writing-off the approximately $175 million invested by the Company (and not pilot testing SIMS for later implementation even on a scaled back basis) would have converted RAC's net earnings for the year and the quarter ending December 31, 2014 of $96.4 million and $25.6 million, respectively, into net losses of approximately $0.6 million and $71.5 million. *Id.* at ¶ 171.

***10** "According to CW-1, it was very well known within the Company that the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its 5-year anniversary after having been started in 2009." *Id.* at ¶ 63. CW-1 explained that, by December 2014, RAC had to roll SIMS out into production in order to continue holding it as an asset on its balance sheet. *Id.* CW-1 further explained that if the Company failed to do so, it would be forced to take a substantial write off on SIMS, as its technology was already outdated by late 2014. CW-1 added that instead of taking the write off, the Company decided to rollout what they had and hoped to make it work as they went along. *Id.*

Turning to the alleged false and misleading statements and/or omissions, Plaintiffs contend RAC falsely touted SIMS as "fully operational" in 2015 while failing to acknowledge the serious issues plaguing the system. The Class Period begins on February 2, 2015. *Id.* at ¶ 80. According to the Complaint, in early 2015, Defendants announced that the "[n]ew POS system is fully operational in its first site...." *Id.* at ¶¶ 80, 81. Thereafter, the Company discussed its growth strategies, many of which relied on the successful implementation of SIMS. *Id.* at ¶ 82. However, the Company failed to mention "the pervasive issues the Company was having with the development and rollout of SIMS." *Id.*

Throughout 2015, Defendants touted the successful testing and implementation of the POS System in a growing number of stores, while failing to disclose the major issues the POS system was encountering:

• "hundreds of issues" were reported in Root Cause Analysis Reports from the first store in Plano, Texas; did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015; and generally failed in the stores it was rolled out to afterwards; (¶ 66)

• "major bugs were still being worked on through the end of [CW-1's] tenure in June 2016;" (¶ 67)

• the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (¶ 85(a))

• the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation; (¶ 85(b))

• the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; (¶ 85(c))

• the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores; (¶ 85(d))

• Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on were already considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with.

*Id.* at ¶ 86. Yet in an April 27, 2015 press release, the Company disclosed that the POS system was "fully operational" in 34 stores, and Davis stated, in part: "Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts." *Id.* at ¶ 87.

On April 28, 2015, before the market opened, the Company hosted a conference call to discuss its results for the first quarter ended March 31, 2015. During the call, with respect to the Company's implementation of SIMS, Davis stated, in part:

> ***11** Following the successful pilot tests of our new POS system last quarter, today I'm proud to say that 34 stores are running the new system exclusively as an expanded pilot. General deployment of our new POS system through the remainder of our Core US RTO stores will start midyear and continue throughout this year, giving us the tools to understand and serve customers like never before.

*Id.* at ¶ 88. Similar statements were made for second quarter fiscal 2015 results and third quarter fiscal 2015 results. *See id.* at ¶¶ 94-99, 101-04. For example, on November 9, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015 and stated, in part, as follows:

> We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. ***This system is operational in 8.5% of our Core U.S. stores at September 30, 2015, with general deployment starting in early 2016 to minimize impact on our fourth quarter holiday season.***

*Id.* at ¶ 104 (emphasis in original).

Both CWs confirmed that at all times from RAC's pilot program through June 2016, when they both left the Company, RAC continued to experience, document, and unsuccessfully mitigate hundreds of problems with SIMS, many relating to integral utilities such as general functionality and "scalability." *Id.* at ¶¶ 64, 67-68, 71, 73.

According to the Complaint, the details of the severity of the POS system implementation problems slowly began to emerge beginning with results for year ended December 31, 2015 (partial corrective disclosure). Compl. at pg. 42. However, Plaintiffs allege Defendants continued to mislead the market on the severity and impact of the POS system issues. *Id.* According to Plaintiffs, the truth about RAC's business was disclosed through a series of corrective disclosures of what Defendants "mischaracterized" as minor or "short-term" issues with the system beginning on February 2, 2016 with the release of the Company's fourth quarter 2014 results. Docket Entry # 45 at 8.

That day, the Company disclosed that its 2016 EPS would be down due to the "short-term impact" associated with putting the new POS system in stores. Compl., ¶¶ 109-11. Constant informed the market of the lower expected results during a February 2, 2016 RAC earnings call, stating: "What we've seen as we have tested the rollout ... is we see a pretty short-term impact, just given the activity associated with putting in new [POS] system in the stores. Very quickly the stores get up to speed and we end up with a better [POS] system that allows them to be more efficient to process transactions quicker and to deal with customers better." *Id.* at ¶ 110.

During the same call, Davis responded to a question concerning the rationale for the expected losses on the POS implementation. *Id.* at ¶ 111. Davis failed to acknowledge the persistent systemic issues with the POS system, blaming losses only on installation and training time. Davis also assured investors that all issues encountered during POS testing had been fixed, stating in part as follows:

> We've tested in 385 stores now, so ... we have a very good knowledge of what we see in terms of the impact on the stores. ***We've done numerous upgrades and additions to the system ... that's improved any of the areas where we were seeing challenges.***
>
> No, the commentary is more around just the change that occurs when you're asking people that are operating the point-of-sale system every day to change what they're doing..... And so that distraction that we see for a fairly short period of time is what we factored into the commentary around first-quarter revenue.

***12** *Id.* (emphasis in original).

The next partial corrective disclosure occurred on April 27, 2016 when, in connection with the announcement of the Company's first quarter 2016 results, Defendants revealed that SIMS had been rolled out to "fewer locations than expected in the quarter," stating this "allowed for implementation of identified system enhancements." *Id.* at ¶¶ 118. During the earnings call, Davis listed the POS implementation as one factor that caused a 7% decline in revenue. *Id.* at ¶¶ 119-20. Davis (1) reiterated that all necessary changes had been made, (2) said the POS system was "operating" in 33% of Core U.S. stores, and (3) projected Company-wide implementation by September 2016. *Id.*

Constant then suggested the POS issues stemmed from "potential transition period impact." *Id.* at ¶ 121. Constant further stated: "we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." *Id.*

Defendants made a third partial corrective disclosure on July 27, 2016 in connection with the announcement of second quarter 2016 results during which Defendants disclosed that Core U.S. revenue decreased by 10.6%, driven in part by "the impact and acceleration of the [POS] rollout" to all stores. *Id.* at ¶¶ 127-34, 137. During its earnings call the next day, Davis stated he was "extremely disappointed in our top-line performance and the short-term revised outlook" and explained that the rollout of the POS system to all 2,400 Core stores was accelerated because RAC's "other critical initiatives" depended on the full implementation of POS in all stores. *Id.* at ¶ 129. According to Plaintiffs, RAC continued to mislead investors about how the rollout to all stores would further exacerbate problems the Company was already struggling to mitigate. Specifically, Davis further stated as follows:

> Despite our team's efforts to mitigate the negative impact of accelerating the implementation of the new system, the decline in core top-line results was more significant than we expected, making up over half of the second-quarter decline in core same-store sales. ***Although the system performance and usability issues identified in the first quarter were fixed, the distraction of the new system*** impacted our core portfolio and took time away from collections efforts which resulted in a hit to revenues. Given the impact to the portfolio, we expect it to be a few quarters before we fully recover.
>
> That said, the distraction of a major system roll-out is now behind us, and we believe that longer-term benefits of our new system will outweigh the short-term costs. The new POS enables us to move forward with several growth opportunities to address the broader challenges in the core business.
>
> * * *
>
> The new POS system also enables us to be more prescriptive on pricing, so that we can customize pricing elements by region and by product category to ensure our value proposition continues to be relevant to our customers. Although we are not happy with the negative impact from ***the distraction related to the roll-out of new POS system, we are excited about the opportunities it will continue to bring well into the future***.

***13** *Id.* at ¶ 129 (emphasis in original).

Constant also made a number of other false and misleading statements, including calling the "primary driver" of the portfolio deterioration a "transition" problem and assuaging "now [ ] we're through that distraction." *Id.* at ¶ 132. Even when asked by an analyst regarding how the POS implementation could case such financial harm and why the Company elected to expedite the POS rollout if it had been projecting issues, including significant deterioration of earnings since at least the beginning of 2016, "neither Davis nor Constant explained the true loss "driver"-crippling POS system outages, coupled with an inexplicable failure to install redundancies, made it onerous if not impossible to collect payments from its high risk customers." Docket Entry # 45 at 10. Instead, Davis stated "there's a number of capabilities that we are unlocking by getting the POS system fully implemented and in place" and one part to the answer is "just getting it behind us and eliminating the distraction" and "get going sooner on these new capabilities." Compl., ¶ 133. Davis then "falsely reassured" the analyst the issues were corrected. *Id.* at ¶ 134.

According to Plaintiffs, the full truth about the troubled POS implementation and its negative effects on the Company's revenues was not revealed until October 11, 2016 when the Company issued a press release announcing results for the third quarter ended September 30, 2016. *Id.* at ¶ 141. Defendants disclosed that Core U.S. sales for the third quarter would be down by approximately 12% due to "***system performance issues and outages*** that resulted in larger than expected negative impact on Core sales." *Id.* Less than one month before this disclosure, Davis and Constant presented at the Raymond James North American Equities Conference, wherein Davis stated RAC had recently rolled out a new store information management system that was "having a short-term negative impact on sales" but that set RAC up very well in the future to continue to grow the business. *Id.* at ¶ 139.

On October 11, 2016, RAC's stock price per share fell from a close of $12.88 on October 10, 2016 to a close of $9.18 on October 11, 2016—a decline of approximately 28.7%—on unusually high trading volume. *Id.* at ¶ 142. Two weeks later on October 26, 2016, RAC confirmed that, for the quarter ended September 30, 2016, Core U.S. same store sales had decreased by 12% “driven by the impact of the store information management system implementation and system outages....” *Id.* at ¶ 146.

During a conference call the next day, the Company explained that it had to implement additional software releases and changes to “improve stability” and that “additional hardware capacity has been added to help mitigate the overutilization issues.” *Id.* at ¶ 148. Davis also explained how the peak time outages affected the Company's ability to collect revenues from RAC's customers. *Id.* Constant further revealed details concerning the Company's losses and how those losses impacted the Core U.S. segment going forward. *Id.* at ¶ 149. He stated about two-thirds of the “core same-sales decline” was related to the rollout of the new POS system; some was the “absorption factor ... as a result of co-workers getting used to the new system,” but the remainder was related to the outages. *Id.* at ¶ 150.

***14** Constant was terminated by Davis on December 2, 2016, less than sixty days after the Company announced the truth regarding the failed POS system implementation and its negative impact on the Company's long-term financial status. *Id.* at ¶ 154.

On January 9, 2017, the Board of Directors of RAC announced Davis' “resignation” as CEO and board member effective immediately. Board Chairman Mark E. Speese, the Company's founder and former CEO, was appointed interim CEO of RAC. *Id.* at ¶ 153.

**B. Defendants' assertions**

Defendants assert the Complaint fails to plead with particularity any false or misleading representation. According to Defendants, far from suggesting that the SIMS implementation was problem-free, RAC disclosed that SIMS was rolled out at a slow pace, starting with one store. Defendants further assert at the outset of the rollout, when SIMS was operational only in a small number of stores, the Company warned as follows:

- RAC's operations were dependent on effective management information systems and failure of the systems to perform as designed, loss of data, or any interruption of the management information systems for a significant period of time could disrupt RAC's business;

- If the management information systems were to sustain repeated failures, the Company might not be able to manage store operations, which could have a material adverse effect on its business, financial condition, and results of operations;

- Enhancements or replacement of store information management systems could have a significant impact on the ability to conduct core business operations and increase risk of loss resulting from disruptions of normal operating processes and procedure that may occur during the implementation of new technology; and

- RAC could make no assurances that SIMS would be implemented without material disruption, that it would be beneficial, or that it would not harm results of operations.

*See, e.g.*, Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 14.

According to Defendants, analysts following the Company repeated and explained these warnings in reports to investors. Compl., ¶ 84 (quoting April 20, 2015 analyst report stating “[a]ny disruption in the rollout of the company's new POS system could negatively impact sales and inventory”). On a quarterly basis throughout the Class Period, RAC informed investors about the number of stores operating SIMS and warned investors concerning the risks inherent in implementing the new system. *See, e.g.*, Compl., ¶¶ 80–83, 87–89, 91, 94–95, 98, 101, 104, 110–11, 114–15, 118–22, 125; *see also* Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 1 (warning that the Company's actual operating results might materially differ from projected results depending the Company's “ability to successfully implement [its] new store information management system”). According to Defendants,

RAC never suggested the pilot tests of SIMS were without setback, and the slow pace of the rollout demonstrated the Company was taking time to address issues along the way.

According to Defendants, over a year after SIMS rolled out to the first store, when RAC reported on its results for the year ended December 31, 2015, the Company reported it had tested SIMS in only 385 of 2,627 stores. Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68. Defendant Davis explained the Company had completed "numerous upgrades and additions to the system throughout the testing process" and had made "improvements" in areas where the Company was "seeing challenges." Compl., ¶ 111. By that time, RAC had been able to review the data related to the implementation of SIMS in the pilot stores.

***15** Even with only 385 stores in the pilot at that time, the Company projected that "activity associated with putting a new point-of-sales system in the stores" caused distraction that would negatively impact revenue. Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 13. As Davis explained, the Company planned to roll out SIMS to all stores by the end of the first quarter or beginning of the second quarter 2016 and was projecting that Core revenues in the first quarter would be down from $629.2 million the prior year to $575—$590 million.[5] Def. Ex. 6, Form 10-Q (filed May 1, 2015) at 11; Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 7.

Following the first quarter of 2016, the Company explained it paused the implementation of SIMS over the quarter because it had identified system enhancements that it needed to address and because there was a "greater-than-expected impact" on sales. Def. Ex. 17, First-Quarter 2016 Earnings Call (Apr. 28, 2016) at 3. At the time RAC reported on its results from the first quarter, SIMS was operating in one third of stores in the Core segment, and the Company expected to have the system fully implemented by the end of the third quarter. *Id.*

In the second quarter, the Company completed the implementation of SIMS earlier than expected, and SIMS rolled out to all stores in the Core segment by the end of the quarter. In reporting on the second-quarter results, RAC identified "system performance and usability issues" that had been fixed. Def. Ex. 20, Second-Quarter 2016 Earnings Call (Jul. 28, 2016) at 3. Davis explained that the implementation involved distraction that "negatively impacted Core revenue" and resulted in a decline in that segment's top-line results that was "more significant than ... expected." Def. Ex. 19, Form 8-K (filed July 27, 2016); Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3. Davis stated "we expect it to be a few quarters before we fully recover." Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3.

During the third quarter, after SIMS was operating in all stores, the system experienced "unexpected capacity-related system slowness and outages following the full implementation of our new store information management system within our Core U.S. stores." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3. When reporting on the third-quarter results, Davis explained that these issues and outages "resulted in a larger than expected negative impact on Core sales." Def. Ex. 23, Form 8-K (filed Oct. 11, 2016) at 2. Because the system was down during peak business hours, key business activities were severely limited and customers fell behind on their rental agreements. Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3. The Company reported it had implemented software releases to improve stability and that other steps were taken to mitigate overutilization issues. *Id.* at 4. As a result, the Company's collection metrics improved significantly during the weeks following the system outages. *Id.* at 3-4. The Company did not experience any capacity-related issues during the fourth quarter of 2016. Def. Ex. 25, Form 10-K (filed Mar. 1, 2017) at 13.

***16** According to Defendants, the majority of the challenged statements in the Complaint consist of RAC's reports concerning the number of stores that had transitioned to operating SIMS, but the Complaint does not plead any facts demonstrating RAC's reports about the number of stores operating SIMS during the rollout were inaccurate. Defendants contend the allegations appear to confuse the difference between the Company's reporting of historical information and reporting of information as of the date the Company was making statements to investors.

Defendants further assert the Complaint's only other basis for claiming falsity with respect to RAC's regular updates on the number of stores operating SIMS is a "litany of opinions from two unidentified low-level employees." Docket Entry # 44 at 20.

According to Defendants, the Complaint ignores that RAC never represented SIMS was problem-free and "instead coupled its reports of the slow rollout with warnings concerning the potential for unexpected results with the new system." *Id.* Defendants argue RAC's reporting of factual information about the number of stores in which SIMS was operating did not create any duty to disclose details or opinions about the issues it was addressing with SIMS during the course of its rollout. Even so, Defendants state RAC began reporting with more detail about SIMS—beyond merely stating the number of stores in which SIMS was operating—once the pilot had expanded around 385 of more than 2,400 stores.

According to Defendants, "[a]t that time, the Company did not pretend the rollout was without a hitch but instead explained, based on what it had learned so far in the pilot, that it expected a company-wide negative impact due to the distraction involved in implementing SIMS." *Id.* Defendants point out that in each quarter of the Class Period the Company "updated its outlook concerning the expected impact of implementing SIMS" and assert these "reports of negative information and opinions concerning a negative outlook did not create any duty to disclose the opinions of lower-level employees concerning SIMS." *Id.* at 20-21.

**C. Applicable law**

**1. Section 10(b) and Rule 10b-5**

Section 10(b) and Rule 10b–5 require that the defendant make a material misstatement or omission. A plaintiff pleading a false or misleading statement or omission as the basis for a § 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A):

(1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). This is the "who, what, when, where, and how" required under Rule 9(b) in Fifth Circuit securities fraud jurisprudence and under the PSLRA. *Id.* Additionally, under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, the plaintiff must "state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief." *Id.*

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity *sufficient* facts to support that belief. *Id.* at 353. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named. *Id.* at 352.

***17** In determining whether the plaintiff has plead with particularity sufficient facts to support the allegations of false or misleading statements made on information and belief, sources need not be named in the complaint so long as the other facts provide an adequate basis for believing the defendants' statements were false or misleading; if the other facts do not provide such an adequate basis, the complaint does not need to name the confidential sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made

on information and belief. *Id.* at 353. Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id.*

**2. PSLRA safe harbor**

With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." A statement is forward-looking if it is

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i) and (ii). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

Vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Fleming*, 2004 WL 5278716, at *9. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 888 (S.D. Tex. 2001) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

**D. Discussion**

**1. Safe harbor/ "puffery"**

Defendants contend the alleged misrepresentations are not actionable because they are protected by PSLRA's safe harbor or are inactionable "puffery." ***First***, Defendants argue ¶¶ 103, 109, 110, 111, 121, 127, 129-134 contain protected forward-looking statements. According to Defendants, each of these statements in RAC's quarterly filings, press releases, and conference calls were accompanied by meaningful cautionary language. Defendants assert statements projecting financial results and predicting the impact from the implementation of SIMS are not actionable, both because they were accompanied by meaningful cautionary

language and because the Complaint fails to plead any facts that either of the Individual Defendants had actual knowledge that the forward-looking statements were false at the time.

***18** As noted above, a forward-looking statement is a statement containing financial projections, a statement "of the plans and objectives of management for future operations," or a statement "of future economic performance." *In re BP p.l.c. Sec., Litig.*, 843 F. Supp. 2d 713, 747 (S.D. Tex. 2012); 15 U.S.C. § 78u-5(i)(1). The Fifth Circuit has described the test for applying the safe harbor provision of the PSLRA as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland*, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward-looking and accompanied by "meaningful cautionary statements" or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove the statement was made with "actual knowledge" that it was false or misleading. *Id.*; *see also* 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii), (B).

The Court first notes Plaintiffs have alleged Defendants had actual knowledge of the falsity of the statements when the statements were made. *See* Compl., ¶¶ 43-52, 62-74. Specifically, Plaintiffs have alleged facts based directly on the personal knowledge of two CWs, both of whom were senior managers, employed in the IT department at RAC where they worked on the technology at the center of the alleged fraud before and during the Class Period. The CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs assert the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since pilot testing began in December 2014. *Id.* at ¶¶ 17, 68, 71, 73. Moreover, the CWs stated they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his Chief Information Officer, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

Because Plaintiffs adequately allege Defendants "actually knew that their statements were misleading at the time they were made, [the second prong of] the safe harbor provision is inapplicable to all alleged misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) (citing 15 U.S.C. § 78u–5(c)(1)(A)–(B)). Even when the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward-looking and is accompanied by meaningful cautionary language. *Southland*, 365 F.3d at 371. Therefore, the Court considers the first prong of the safe harbor.

Regarding the first prong, Defendants do not assert, nor does the Court find, the statements are immaterial. Additionally, Plaintiffs assert the statements at issue are not forward-looking but false statements of existing fact. Plaintiffs rely on *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016),[6] wherein the court stated "[s]tatements describing past or present conditions are not forward-looking statements that trigger the PSLRA's safe harbor." The court in *Carlton* analyzed statements about how a plant operated and determined that statements regarding how "technology was operating and whether the problems *were* merely start-up glitches or more fundamental, structural issues implicating ... core proprietary technology" were not forward-looking, but "referred to then-present factual conditions." *Id.* (emphasis in original).

***19** Here, Defendants focus on ¶¶ 103, 109, 110, 111, 121, 127, 129-134 of the Complaint, representative samples of which are listed as follows: (1) "[The portfolio's] not in bad shape. But it's not quite as good as it was at the start of the quarter." (¶ 103); (2) "We expect the year-over-year declines in core revenues to the weakest in the first quarter, coming in at approximately $575 million to $590 million, ***as we absorb the short-term impact*** as seen in tests of the rollout of our new point-of-sale system to our core store network. This will result in a projected first quarter year-over-year earnings-per-share decrease of over 20% (¶ 109) (emphasis in original); (3) "Yes, that's correct, we expect the EPS to be down more than 20%. It's basically related to revenues in the core business that we think will come in between $575 million and $590 million. ***What we've seen as we have tested the rollout of our new point-of-sale system is we see a pretty short-term impact, just given the activity associated with***

***putting in new point-of-sale system in the stores***...." (¶ 110) (emphasis in original); (4) "We've tested in 385 locations now, so pretty substantial test and so we have a very good knowledge of what we see in terms of the impact on the stores. ***We've done numerous upgrades and additions to the system through the testing process that's improved many of the areas where we were seeing challenges***...." (¶ 111) (emphasis in original); (5) "[A]s we look at rolling out the POS system, we obviously want to a manage the impact we have on the stores and reduce the potential transition period impact over all to results.... Now that being said, we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." (¶ 121); (6) "The point of sale implementation negatively impacted Core revenue in the second quarter and reduced our portfolio making it necessary to revise our outlook for the year. ***However, the benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities.***" (¶ 127) (emphasis in original). *See also* ¶¶ 129-134.

While there are parts of these paragraphs that may contain future statements ("We expect...."), other parts of these paragraphs, and most significantly the parts emphasized in the Complaint, are past or present statements ("What we've seen ...;" "We've tested ...;" "We've done ..."). Even if certain of the statements at issue are "mixed present/future statement[s]," such statements are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014); 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).

Finally, Plaintiffs correctly assert none of the statements identified by Defendants as forward-looking were accompanied by meaningful cautionary language. A "meaningful" cautionary statement "calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. A "generic and formulaic" cautionary statement that is repeated "only with slight variations" and "used in conjunction with each alleged misrepresentation" is not meaningful. *Lormand*, 565 F.3d at 245. Thus, RAC's generic risk disclosures do not shield Defendants' false statements.

According to Plaintiffs, Defendants negated any cautionary statements "through their concomitant false and misleading reassurances that any SIMs distractions had been resolved and was limited to personnel concerns." Docket Entry # 47 at 4. For example, when the Company filed its annual Form 10-K on February 29, 2016, the Company qualified the potential in a risk disclosure concerning the POS implementation, stating the new POS system "may cause distraction of key personnel." Compl., ¶ 114. According to Plaintiffs, Davis and Constant both used the term "distraction" when discussing the Company's Q2 2016 results on July 28, 2016. *Id.* at ¶¶ 129-134. Davis used the term "distraction" no fewer than seven times during the Q2 2016 earnings call, twice claiming "the distraction ... is [ ] behind us." *Id.* at ¶¶ 129, 133-34. Constant used the term once during that call, but he did so by referring to "Robert [Davis'] point" about "now that we're through that distraction ... the resulting profitability of it will be much better." *Id.* at ¶ 132.

Drawing all inferences in favor of Plaintiffs, the Court finds any "cautionary language" relied upon by Defendants "do not provide sufficiently meaningful caution about clearly present danger that was materializing." *Lormand*, 565 F.3d at 247 (citing *Rubinstein v. Collins*, 20 F.3d 160, 167–68 (5th Cir. 1994)) (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive). Viewing all of the statements in context, the Court concludes Defendants' safe harbor argument is without merit.

***20** ***Second,*** Defendants argue many statements alleged to be false or misleading in the Complaint constitute non-actionable "puffery." *See* Compl., ¶¶ 80, 81, 87, 88, 89, 94, 96, 108, 127, 129.[7] The Fifth Circuit has repeatedly held that statements that constitute "optimistic generalizations" or "expressions of confidence in its management or business" are not actionable. *See, e.g.*, *Nathenson*, 267 F. 3d at 419 (statements that a drug was "fast acting" and an "improved formulation" were "optimistic generalizations" and thus non-actionable puffery). "Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because

no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Carlton*, 184 F. Supp. 3d at 455 (quoting *In re BP*, 843 F.Supp.2d at 748).

The statements identified by Defendants are not inactionable statements of puffery—"of the vague and optimistic type" that are not specific enough to perpetrate a fraud on the market. According to Plaintiffs, they detailed specific milestones RAC had purportedly reached in the development and implementation of SIMS while withholding "facts that would undermine the veracity of its statements at the time those statements were made." *Marcus v. J.C. Penney Co.*, No. 13-cv-736-MHS-KNM, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015). "Even if these statements were looked upon as mere 'puffery' ... that does not negate the duty to disclose other information necessary to make those statements not misleading." *Id.* (citing *Rubinstein*, 20 F.3d at 170). For these reasons, the Court finds Defendants' "puffery" arguments without merit.

**2. Falsity**

The Court now considers whether the Complaint alleges Defendants made materially false and misleading statements and/or omissions. A misleading statement or omission has been adequately pleaded when a plaintiff alleges the defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order the make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. § 78u-4(b)(1). Plaintiffs assert the Complaint clearly identifies each of the false and misleading statements and omissions, including the speaker and the date when and location where the statement was made; explains why each statement was false and misleading when made; identifies Defendants' purported risk disclosures; explains why each disclosure was insufficient; and contains substantial information from high-level CWs who were employed by RAC before and during the Class Period, based on their own personal knowledge of the facts alleged. Thus, according to Plaintiffs, they have adequately pleaded falsity under the PSLRA.

***21** According to Defendants, the Complaint suggests without support or particularization that Defendants were aware of ongoing material problems. Defendants assert "[a]t bottom, the Complaint contends that the Defendants committed securities fraud because they did not disclose opinions about SIMS espoused by low-level, unidentified employees who left the Company." Docket Entry # 46 at 3. Defendants assert they are not required to present an overly gloomy picture. but even so they reported negative information, did not tout the successful testing or implementation of SIMS, or convey SIMS was fully operational when it was not.

A corporation has "no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). "[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002). Instead, the plaintiffs must plead with particularity the reasons why the defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See* *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp.*, Inc., 537 F.3d 527, 541 (5th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Plaintiffs assert they have done just that and again rely on the *Carlton* case.

In its falsity discussion, the *Carlton* court found the plaintiffs had "plausibly alleged, with particularity, that the statements about the Columbus plant's operations materially misled investors to believe that KiOR was a viable business when it was not." 184 F. Supp. 3d at 472. According to the court, confidential witnesses, all former KiOR employees, "detailed issues at the Columbus plant throughout this period that were more severe than [CEO] Cannon and [CFO] Karnes represented." *Id.* And even though Cannon disclosed some of these issues in January 2014, the court noted "he also assured investors on the earnings call that the company would make improvements to the plant that would have it back up and running," but the plant was shut

down two months later. *Id.* Although Cannon and Karnes argued they had no obligation to characterize the operational issues at the Columbus plant as "severe design flaws" rather than as "start up issues," the court stated as follows:

> But by downplaying the extent and duration of the technological problems as normal start-up issues, while simultaneously assuring investors that the core technology was sound for commercial-scale production, these defendants represented that the ... plant was a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul.

*Id.* The court found the third amended complaint plausibly alleged "the misleading nature of these representations with facts that are sufficiently particularized to explain why and on what basis they were misleading." *Id.* at 472-73.

Notwithstanding the limited negative information Defendants may have disclosed, Plaintiffs assert Defendants, having chosen to speak about the POS system, had a duty to disclose the full truth about the problems plaguing the POS system and the Company-wide rollout of the system. In the Complaint, Plaintiffs allege Defendants' statements in each of the four partial disclosures (fourth quarter and full year 2014 results, first quarter fiscal 2015 results, second quarter fiscal 2015 results, and third quarter fiscal 2015 results) were false and misleading when made because Defendants knew but failed to disclose that:

> ***22** (a) the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;
>
> (b) the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;
>
> (c) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and
>
> (d) the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

Compl., ¶¶ 85, 92, 99, 105.

Further, for each of these partial disclosures, Plaintiffs allege the Company's disclosures about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS not performing as designed or sustaining "repeated failures." *Id.* at ¶¶ 86, 93, 100, 106. According to Plaintiffs, this was already happening during in-house testing and in the pilot stores where the system was implemented. Plaintiffs further allege Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with. *Id.* According to Plaintiffs, Defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See* *Shaw*, 537 F.3d at 541.

Defendants rely on *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14 CV 3876-LTS, 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016), wherein the defendants made public disclosures about RM's live check program that were generally positive but that downplayed increasing delinquency rates with the new program. "The thrust of all of Plaintiffs' allegations [was] that RM's positive statements regarding the live check program expansion, its loan loss reserve provisions, and its underwriting practices were materially misleading, or omitted information necessary to make the statements not misleading, because RM and the Individual Defendants knew, at the time of each such statement, that: (1) staffing problems had created, or were likely to lead

to, increased delinquencies; (2) that RM's underwriting practices were unsound and would lead to increased delinquencies as the live check program grew; and (3) that there were material undisclosed financial reporting and control problems." *Id.* at *5.

According to the court, the alleged misstatements as to RM's underwriting were statements in the nature of belief or opinion, and the plaintiffs did not allege facts demonstrating RM or the Officer Defendants did not believe the statements were true at the time they were made. *Id.* at *10. The court explained that "[a]lthough Plaintiffs have alleged that lower-level branch staff were skeptical of RM's live check underwriting and were experiencing difficulties in servicing live check loans, Plaintiffs have alleged no facts demonstrating that RM's management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type...." *Id.* The court concluded the plaintiffs' allegations did not identify misstatements or omissions of material facts, but rested solely on "non-actionable opinion statements by the Officer Defendants and RM...." *Id.* at *11.

***23** In *Waterford*, unlike in this case, the plaintiffs did not allege the defendants were aware of ongoing material problems that were already causing problems at the time the statements or omissions were made. There, the plaintiffs alleged no facts demonstrating RM's management believed the Company's underwriting practices were unsound or inappropriate for a program of that type. Instead, they alleged the defendants made poor business choices, including understaffing branches which "were likely to lead to" such problems. *Id.* at *5.

Here, Plaintiffs have alleged facts indicating Defendants knew of the problems with the POS development and implementation. What is more, the Court is not convinced the CWs relied upon in the Complaint were "low-level" employees whose corroborating allegations should be discounted like in the *Waterford* case, as maintained by Defendants in their reply brief. Confidential witness accounts are a permissible basis on which to allege falsity. As noted above, the witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." [8] *ABC Arbitrage*, 291 F.3d at 351-53. In lieu of names, plaintiffs must provide details such as "job descriptions, individual responsibilities, and specific employment dates for the witnesses." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 839 (S.D. Tex. 2016) (citation omitted).

In their Complaint, Plaintiffs provide each CW's job title and description, her reporting structure, dates of employment, office location, and basis of knowledge. Compl., ¶¶ 16-17. Defendants assert the CWs were no longer RAC employees during the third quarter of 2016, when SIMS experienced capacity-related outages, and therefore they have no personal knowledge of what led to the outages and are in no position to opine that the prior statements about SIMS were proven false by the subsequent outages. Even taken as true, Defendants assert none of the CW allegations are inconsistent with the Company's factual reports or the negative updates concerning SIMS in the latter half of the Class Period. According to Defendants, the opinions of two unidentified former employees who were no longer at RAC at the time of the third-quarter outages do nothing to demonstrate that, at the time of the prior statements, anyone predicted significant outages or problems with SIMS beyond those the Individual Defendants had already disclosed.

***24** In *Carlton*, Cannon and Karnes challenged the confidential witnesses' qualifications to offer opinions. 184 F.Supp.3d at 473. For example, they argued the confidential witnesses were "several levels removed from any operational authority" and could not distinguish between a design flaw and a start-up issue at the Columbus plant. *Id.* However, the court noted both confidential witnesses had worked at the Columbus plant from June 2012 to February 2013, and the complaint relied on their "firsthand observations from that work." *Id.* The court further noted both confidential witnesses had engineering and oil-refinery experience, and this experience was not insufficient or unreliable. *Id.* at 473-74.

The defendants also argued the allegations of the confidential witnesses' statements and reports were not sufficiently particular. *Id.* at 474. The defendants also criticized "the failure to directly quote the confidential witnesses and instead vaguely and conclusorily summarizing the information allegedly obtained from them." *Id.* The *Carlton* court pointed out that a complaint

relying in part on confidential witnesses must identify the witnesses' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. *Id.* According to the court, the third amended complaint provided this information. *Id.*

Similarly here, the Complaint identifies the CWs' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. The Court finds the two CWs have been described with sufficient particularity to establish their reliability and personal knowledge. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, both before and during the Class Period, where they gained personal knowledge of the central issue in this case—the Company's failed attempt at developing and implementing the POS technology platform. According to Plaintiffs, both before and during the Class Period, "the Company and the Individual Defendants relied on the CWs' experience and knowledge to help address the burgeoning problems with SIMs," and by reason of such first-hand knowledge and experience, "the testimony of these CWs reliably details the nature and extent of the issues with SIMs." Docket Entry # 47 at 1. The Court further notes the CWs independently corroborate one another's statements. *See* *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (CWs' statements sufficiently reliable to establish falsity where corroborated by other CWs). Considering Plaintiffs' allegations as a whole, including those provided by the Cws, the Court finds the Waterford case relied upon by Defendants is distinguishable.

Finally, the Court considers several other assertions made by Defendants, including that the Company reported it took one year to rollout the POS system to just 385 stores of the Company's 2,627 stores; the Company used the phrase "fully operational" in only three instances (when SIMs rolled out to 1, 10 and 34 stores); and the Company reported negative information in its disclosures, including that numerous upgrades had been required, the Company had been "seeing challenges," and implementation was going to negatively impact revenue. According to Defendants, the Complaint is entirely devoid of facts indicating that (1) the Individual Defendants' factual reports concerning the number of stores in which SIMS was operating were false or (2) the Individual Defendants did not believe the projections they gave concerning expected negative impacts from the SIMS implementation at the time of these reports or statements.

***25** Regarding the ***first issue***, Defendants argue the number of stores they reported to the market as "operating SIMS" each quarter was correct and thus cannot serve as the basis for liability. However, Plaintiffs are not challenging the number of stores where SIMS was installed, but that Defendants' repeated characterization of SIMS as "operational" in those stores was meant to and did convey to the market that SIMS was fully functional in those stores (which it was not). Plaintiffs have identified numerous instances over the Class Period where Defendants indicated SIMS was "functional in a growing number of locations." Docket Entry # 47 at 3. *See, e.g.*, Compl., ¶ 80 ("New POS system is fully operational in its first site"); ¶ 81 ("I am excited to say the new POS system is now fully operational in its first site"); ¶ 87 ("New POS system ... is fully operational in 34 stores"); ¶ 95 ("150 core US [are] running the new system exclusively); ¶ 104 ("[POS] is operational in 8.5% of our Core U.S. stores"); ¶ 115 ("We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015 and we expect to complete the roll out to the remaining stores in 2016."); ¶ 119 ("Today approximately one-third of our core stores are operating this new POS system."); ¶ 129 ("After out initial delay, in Q2 we completed the roll-out of our new POS system...."). According to Plaintiffs, the sparse "negative information" Defendants claims to have disclosed was inconsequential and "was offset by accompanying positive statements and baseless reassurances." Docket Entry # 47 at 3.

The Court agrees with Plaintiffs that whether the term "operational"/ "fully operational" was intended to and did convey to the market that SIMS was fully functional is best answered based on the evidence produced during a later stage of this litigation. *See* *Spitzberg*, 758 F.3d at 689 (stating whether Defendants–Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" can "only be answered based on the evidence produced during a later stage of this litigation"); *see also* *Lormand*, 565 F.3d at 249 ("defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized").

Regarding the ***second issue***, the CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs confirm the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since pilot testing began in December 2014. Compl., ¶¶ 17, 68, 71, 73. Moreover, the CWs confirmed that they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his CIO, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

In sum, the Court finds a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions as described above.

**3. Failure to disclose information required under Item 303 of SEC Regulations S-K**

Plaintiffs further allege Defendants violated Item 303 of Regulation S–K, 17 C.F.R. § 229.303, by failing to disclose trends or uncertainties that would have a material impact on RAC's sales, revenues, and income. "Item 303 of Regulation S–K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations." *In re Blockbuster Inc. Sec. Litig.*, No. 03-cv-0398-M, 2004 WL 884308, at *11 (N.D. Tex. Apr. 26, 2004).

According to Plaintiffs, Item 303 of Regulation S–K obligated Defendants to disclose, among other things, that: (i) the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (ii) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; (iii) the POS system lacked sufficient redundancies which would magnify any problems encountered during the implementation; (iv) by the first quarter of 2016, the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results; (v) RAC's projected growth strategy was unsustainable if the Company was unable to adequately collect overdue amounts in its rent-to-own portfolio; and (vi) the importance of the POS system to many of RAC's other strategic initiatives. Compl., ¶¶ 75-79. The Complaint also alleges the SOX certifications Davis and Constant signed during the Class Period were false. *Id.* at ¶ 79.

***26** The Fifth Circuit has not held that Item 303 creates a duty to disclose under the Exchange Act, and other circuits are divided on the question. *Compare* *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 creates an actionable duty to disclose), *with* *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (Item 303 does not create a duty to disclose under the Securities Act). Considering Defendants have not moved to dismiss on this issue, and further considering the Court's findings as to the issues on which Defendants moved to dismiss, the Court need no reach the question at this time of whether Item 303 creates a duty to disclose under the Securities Act.

The Court now considers whether the Complaint fails to establish a strong inference of scienter.

## VI. WHETHER THE COMPLAINT ESTABLISHES A STRONG INFERENCE OF SCIENTER

**A. Defendants' assertions**

Defendants assert the Complaint does not demonstrate any inference of scienter with respect to any statement by either of the Individual Defendants. Defendants assert the Complaint's CW allegations do not create any inference of scienter. According to Defendants, the Complaint contains none of the typical motive allegations, such as allegations that a corporate executive was motivated to issue false statements to capitalize on insider trades of the company's stock. Defendants argue the only supposed

"motive" is that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter. Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Finally, Defendants contend Davis and Constant's resignations do not support an inference of scienter.

**B. Applicable law**

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Stated differently, in the Fifth Circuit, "plaintiffs must plead facts giving rise to a 'strong inference' that defendants acted intentionally or severely recklessly to survive a motion to dismiss." *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d 544, 555 (E.D. Tex. 2004).

Severe recklessness is defined as follows:

> Severe recklessness, which, properly defined and adequately distinguished from mere negligence, resembles a slightly lesser species of intentional misconduct ... limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 555-56 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). A plaintiff can raise a strong inference of scienter by alleging either conscious disregard of the truth or "that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005).

The United States Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints for failing to establish a strong inference of scienter. "First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true." *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *10 (W.D. Tex. Jan. 26, 2017)(citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)). Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.*

***27** "The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences." *City of Pontiac*, 2017 WL 384072 (citing *Tellabs*, 551 U.S. at 324). To create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.' " *Local 731*, 810 F.3d at 957 (quoting *Tellabs*, 551 U.S. at 323). Plaintiffs may establish a strong inference of scienter by circumstantial evidence. *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d at 556.

The Fifth Circuit Court of Appeals has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court

looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine if a complaint sufficiently pleads scienter. *Id.*; *see also* *Trendsetter Inv'rs, LLC v. Hyperdynamics Corp.*, Civ. A. No. H-06-0746, 2007 WL 172627, at *13 (S.D. Tex. Jan. 18, 2007) ("The plaintiff must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant; so-called group pleadings are insufficient.").

Allegations of "motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). Without more, "an officer's position with a company does not suffice to create an inference of scienter." *Izadjoo*, 237 F.Supp.3d at 509. An officer's position with a company can support the scienter inference only when viewed with other "special circumstances." *Id.* (quoting *Local 371 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016)). These special circumstances include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements. *Id.*

Corporate statements that allegedly misrepresent facts or omit facts necessary to avoid misrepresentation can be connected to a particular officer if the plaintiff alleges the officer signed the document in which the statement appears or adequately alleges the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). Signed SOX certifications support scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)(internal quotation marks omitted). A defendant's signature on a SOX certification, without more, does not support a strong scienter inference. *Izadjoo*, 237 F. Supp. 3d at 509 (citations omitted).

**C. Discussion**

Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically," *Tellabs, Inc.*, 551 U.S. at 326, the Court has categorized the scienter allegations for convenience. The Court then assesses the allegations holistically. *See* *City of Pontiac*, 2017 WL 384072, at *10.

**1. CW allegations**

***28** Defendants first assert the Court should discount the confidential witness allegations. According to Defendants, "[a]llegations regarding scienter that are derived from confidential sources *detract* from their weight in the scienter analysis, and courts *must discount* allegations from confidential sources." (Docket Entry # 44 at 26)(emphasis in original) (quoting *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011), *aff'd sub nom.* *Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 Fed.Appx. 334 (5th Cir. 2012)). However, the Fifth Circuit Court of Appeals in *Spitzberg* recently reversed and remanded the dismissal of a securities fraud complaint and held that scienter was adequately alleged based, in large part, on statements from confidential witnesses.

In *Spitzberg*, the plaintiffs, investors in a Houston-based energy company, alleged the company's statement that it had "estimated recoverable reserves of 1 to 4 billion barrels" of oil was misleading. 758 F.3d at 680. The plaintiffs argued the statement "communicated to investors that certain geological testing had been completed based on the definition of 'reserves' used by the oil industry and by SEC regulations." *Id.* The defendants argued they had not "explicitly represent[ed] that any drilling had yet occurred," that their other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [oil industry]." *Id.* at 681.

The plaintiffs alleged other fraudulent statements were made after test drilling began. *Id.* Specifically, in a number of regulatory filings and press releases, the defendants repeatedly stated that a test well had produced "strong inflow[s]" and "significant shows" of both "gas and oil." *Id.* But according to the statements (cited extensively in the complaint) of confidential witnesses that were allegedly involved in the drilling operations, the test well produced no "inflow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. *Id.* at 682.

The Fifth Circuit assumed the truth of the confidential witness statements. *Id.* at 684. The court recognized that although additional evidence at later stages of the proceedings may confirm or undermine the factual proposition set forth by a particular confidential witness, the court noted that the plaintiffs' contention, at the motion to dismiss stage, was "at least as compelling as any opposing inference one could draw." *Id.* at 684-85. Therefore, according to the Fifth Circuit, the plaintiffs' complaint could not be dismissed based on the failure to plead severe recklessness. *Id.* at 685.

Even cases relied upon by Defendants (most older than *Spitzberg*) state confidential source statements are a permissible basis on which to make an inference of scienter. Confidential witness allegations may be credited if, as they are here, such sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Shaw*, 537 F.3d at 535 (ellipses omitted).

Here, the confidential witnesses are described with sufficient particularity to support the probability that a person in their position would possess the information pleaded. The CWs detail how Davis and Constant were made aware of information that demonstrated, contrary to their statements to the public, SIMS was initially not ready for pilot testing and then still not ready for general rollout due to persistent and pervasive problems which threatened to affect the Company's ability to record and track sales and payments. Compl., ¶¶ 16-17, 43, 47, 50-52, 65-68, 71-74.

***29** Defendants next assert the Complaint contains no facts to "support the probability that a person in the position occupied by [either of the confidential witnesses] would possess the information" ascribed to him. *Shaw Grp.*, 537 F.3d at 535, 539 (alteration in original). The Court disagrees. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, where they gained personal knowledge of the Company's attempt at developing and implementing SIMS. Defendants next contend Plaintiffs fail to allege particularized facts concerning the state of mind of either Davis or Constant regarding any alleged misrepresentation. [9] Defendants contend the Complaint vaguely references "Individual Defendants" or "the Company," as follows: (1) that company officials "would have communicated any significant problems and delays to Davis and Constant" via "color-coded SIMS incident reports ... and at SIMS Executive Steering Committee meetings," Compl. ¶ 51; (2) that "Davis held weekly meetings with his CIOs" during the Class Period in which "SIMS issues were always discussed," (*id.* ¶ 52); and (3) that "Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS." *Id.* at ¶ 74. According to Defendants, these vague and conclusory allegations add nothing to the scienter analysis, as they are drawn from two lower-level former employees, who—according to the Complaint—did not participate in any meeting with either Davis or Constant.

It is true an officer's mere presence at meetings, without specific allegations regarding discussions at the meetings, will not support an inference of scienter. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 632 & n.31 (S.D. Tex. 2013). However, this is not a case where Plaintiffs try to impute knowledge of problems with the POS system to Davis and Constant simply because of their mere presence at meetings. "Plaintiffs have pointed to specific meetings, reports, and practices whereby [Defendants] were made actually aware of the [POS'] status." *See In re EDS and "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004). Both CWs confirm *how* information about the POS' problems was communicated to Davis and Constant; *when* meetings occurred (¶¶ 32, 50-52, 74, 158), *who* was involved in communicating information (¶¶ 46, 50-52, 65, 71, 74), *what* reports were titled and *by whom* (¶¶ 16-17, 46-47, 68, 71, 74), facts regarding Davis and Constant's *motive* in acting severely recklessly (¶¶ 16, 53-63, 73-74, 159-73), and the contemporaneous problems the POS experienced during the Class Period, rendering Defendants' statements or omissions false and misleading. (¶¶ 45, 48-50, 64-73).

According to the CWs, Davis was involved in the POS project from the onset, and he held weekly meetings with RAC CIO Nell until April 2016 where SIMS was always discussed. Compl., ¶¶ 52, 74. Davis and Constant also were members of and participated in the "SIMS Executive Steering Committee," which was a "C-Level meeting" wherein the SIMS' progress and issues were discussed. *Id.* at ¶ 74. The Executive Steering Committee met quarterly at first, and then more frequently as the rollout progressed. *Id.* at ¶ 51. These Executive Steering Committee meetings were attended by Davis, Constant, CTO Liebe, CIO Nell, Department Heads, and SVPs. *Id.* Davis and Constant also periodically attended weekly SIMS project team meetings during which changes, challenges, and problems related to SIMS were discussed. *Id.* at ¶¶ 50-52, 74. As the SIMS rollout accelerated (and therefore into the Class Period), and more issues arose, Davis' involvement with the POS increased. *Id.* at ¶ 74. Both Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS. *Id.*

***30** What is more, both Davis and Constant admitted during the Class Period that management was deeply involved with the SIMS rollout: "the approach that we took to learn in the early stages had a lot more care and feeding [sic], if you will, and hand-holding and oversight from multi-levels of management" (¶ 134—Davis) and "as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores" (¶ 121—Constant).

With respect to the various reports the CWs describe, those are pled in sufficient detail, even under the case law relied on by Defendants. "[F]or allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients, and (2) the corporate reports be connected to the speaking executive in a persuasive way." *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (citations omitted). Both criteria are met here. Corroborating details, authors, recipients, and their connections to Davis and Constant are all adequately pled.

In addition to providing specific facts regarding how, when, and where information regarding the POS system was communicated to Defendants Davis and Constant, the former employees also provide the what—the scope of issues the POS system experienced prior to and during the Class Period:

• By the end of 2014, just prior to the start of the Class Period, the POS system experienced serious capacity and performance issues including but not limited to (1) network bandwidth issues; (2) scalability problems; (3) capacity problems including network capacity, database capacity, and old-technology capacity problems; (4) functionality problems with payment methods; and (5) hundreds of other varying issues. (¶ 48). Certain issues continued through at least June 2016. (¶ 73)

• RAC's systems ran on an older Oracle-based operating system that newer software was increasingly unable to interact with. (¶ 65)

• The POS System did not meet the Company's needs when it was first rolled out in Plano, Texas, resulting in hundreds of issue detailed in Root Cause Analysis Reports. Moreover, the overall functionality of the POS system never improved much, and did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015 (during the Class Period). POS system continued to generally fail as it was rolled out to additional stores. (¶ 66)

• The Company did not fix problems with the POS system before implementation in additional stores and major bugs were still being worked on as of June 2016. Necessary redundancies in the POS system were not in place by June 2016, which also magnified the risk of outages the Company was experiencing. (¶ 73).

Taken together, these facts—which the Court must accept as true—plead a strong inference that Davis and Constant were at least severely reckless during the Class period, "especially when they are juxtaposed with what they told the public:"

• On February 3, 2015, Davis stated "the new POS system is now fully operational in its first site." (¶ 81). Defendants did not disclose the system was unable to interact with the older system, or that it was experiencing "serious capacity and performance

issues"—instead, the Company's 10-K merely stated future issues hypothetically might impact the Company's performance (when present issues were already hampering performance at the pilot store). (¶ 83).

***31** • On April 27, 2015, the Company stated POS was "fully operational" in 34 stores. No warnings were provided to the market about what was internally known. (¶ 87).

• On February 2, 2016, Constant revealed that RAC saw a "short-term impact" due to a "distraction" in stores where the POS system was being rolled-out, and Davis stated that "numerous upgrades and additions to the [POS] system ... improved any of the areas where we were seeing challenges." (¶¶ 110-11). There was no disclosure of the host of ongoing capacity and functionality issues. (¶ 116).

• On July 28, 2016, Davis stated "we decided to accelerate the roll-out, which was completed in its entirety in Q2" and that "the system performance and usability issues identified in the first quarter were fixed," and "that distraction is behind us." (¶ 129). Again, there was no disclosure of the ongoing issues and outages being experienced.

Docket Entry # 45 at 24-25. [10]

**2. Motive**

Defendants spend a large part of their argument on motive, or the lack thereof. According to Defendants, Plaintiffs' only attempt to allege a "motive" is to assert that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter for the following reasons. ***First***, according to Defendants, this suggestion of a "write-down" motive is drawn entirely from the purported statements of a single confidential witness—who is not alleged to have been in a position to know anything about RAC's accounting policies or financial statements—and whose allegations "must [be] discounted." *See* *Shaw Grp.*, 537 F.3d at 535, 539. ***Second***, Defendants assert a motivation to take action that will maximize a company's financial results *i.e.*, placing SIMS into service to avoid writing off development costs, is not motive to commit securities fraud. According to Defendants, Plaintiffs' contention is nothing more than an allegation that the Individual Defendants were motivated to increase profits, which is insufficient to support a claim of scienter as a matter of law. ***Third***, Defendants assert the supposed "write-down" motivation is illogical and inconsistent with the other alleged facts—the scienter inference Plaintiffs propose is not compelling, much less *at least as compelling* as far more logical inferences that can be drawn from the alleged facts. [11] *See* *Tellabs*, 551 U.S. at 324 ("A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

***32** In *Spitzberg*, the Fifth Circuit noted the parties had mistakenly focused on the presence or absence of a pecuniary motive for the defendants to commit securities fraud, as the "absence of a motive allegation, though relevant, is not dispositive" under the PSLRA. 758 F.3d at 685 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1324 (2011)). Although motive allegations might "meaningfully enhance the strength of the inference of scienter," the Fifth Circuit found a strong inference of severe recklessness did not depend on such an enhancement in the *Spitzberg* case. *Spitzberg*, 758 F.3d at 685.

According to Plaintiffs, the CWs provide facts that raise compelling evidence of the Individual Defendants' motive. The Complaint alleges Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout, with severely limited functionality, but the Individual Defendants still directed the rollout late in 2014 in order to avoid having to write-down that asset. Compl., ¶¶ 16, 47, 63. According to the Complaint, that was the predominant reason the POS system was first rolled out in late 2014, despite all of its known flaws. *Id.* at ¶¶ 43, 63. Such a write-off—approximately $175 million—would have been substantial and material to the Company's 2014 financial results, and it would have turned its earnings upside down, from positive to negative earnings for the fourth quarter of 2014. *Id.* at ¶¶ 53-61, 169-73.

Although Defendants challenge CW-1's lack of knowledge of RAC's accounting policies and financial statements, Plaintiffs assert they are not relying upon CW-1 for facts regarding accounting irregularities or accounting policies. Rather, CW-1 provides contemporaneous facts regarding the Defendants' motivation to push out the POS system too early, when (contrary to their public statements) the POS system was not working and dragging down the Company's financial performance. These allegations enhance the strength of the inference of scienter.

**3. Core operations**

Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Plaintiffs do not rely on core operations as an independent basis to adequately alleged scienter but argue the "core operations" exception *contributes* to a strong inference of scienter.

The Fifth Circuit recognizes core operations as indicative of scienter in cases which exhibit some combination of the following four considerations that might tip the scales in favor of an inference of scienter: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality;" (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Nathenson*, 267 F.3d at 425.

According to Plaintiffs, both the Core U.S. segment and SIMS were critically important to RAC. Plaintiffs allege Defendants repeatedly acknowledged how important both the POS system and the Core U.S. segment were to the Company. Compl., ¶¶ 39, 81, 89, 94, 127, 161. The Core U.S. segment, which was negatively impacted by the POS system rollout during the Class Period, represented more than two-thirds of RAC's revenue throughout the Class Period. *Id.* at ¶¶ 159-63. Plaintiffs allege that "[g]iven the size of the Core Segment and its critical importance to [the Company's] overall business, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval." *Id.* at ¶ 163.

***33** The "core operations" doctrine is an extremely narrow exception to the rule that "scienter may not rest on the inference that defendants must have been aware of" the alleged misconduct "based on their positions within the company." *Abrams*, 292 F.3d at 432 (affirming trial court's dismissal of plaintiffs' securities fraud class action for failure to adequately plead scienter). Under the narrow exception, if a business unit or product is effectively the only product of a small-scale company, and certain other "special circumstances" apply, knowledge of that business unit or product might be sufficient to support an inference that executives must have known certain facts. *See* *Nathenson*, 267 F.3d at 422, 424–25 (plaintiffs "barely" pleaded scienter where a single-product company with less than 40 employees devoted "substantially all" of its resources to its patented product and had "ample opportunity to become familiar with" a patent it falsely represented as covering the product).

The Court is not convinced these "special circumstances" are present here. First, as noted by Defendants, the Company has approximately 21,600 employees and is much larger than the companies to which the exception has been applied. *See* *Carlton*, 184 F.Supp.3d at 479 ("These circumstances are not present here. KiOR has 183 employees, many more than the companies falling under the *Nathenson* exception."). Second, Defendants assert for the "core operations" exception to apply, Plaintiffs would have to plead particularized facts showing circumstances akin to those in *Nathenson*, in which the defendant company sold only a single patented product and planned to devote "[s]ubstantially all of [its] efforts and expenditures over the next few years" to that product. *Nathenson*, 267 F.3d at 422; *see also* *Carlton*, 184 F.Supp.3d at 479, 484 ("The plaintiffs have not pleaded a basis to infer that Karnes' culpable knowledge of the plant's day-to-day operations and the production issues can be presumed under the limited circumstances outlined in *Nathenson.*" However, the court allowed the "core-business exception" to apply to the CEO Cannon "by virtue of his position and in light of the surrounding circumstances.")

Here, the Company's size is substantially larger than the less than 40 employees in *Nathenson* and the 183 employees in *Carlton.* And despite Plaintiffs' allegations as to the importance of the POS system and the U.S. Core segment, the Court is not convinced

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

RAC is a "one-trick pony" without an "extensive operating [history]" whose success was "dependent" on the facts underlying the basis of the statements alleged to be false or misleading. *See* *Carlton*, 184 F.Supp.3d at 484 (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342-43 (5th Cir. 2008)). Plaintiffs recognize that "[d]uring [the] Class Period, [the Company] generated revenue from four operating segments: Core U.S., Acceptance Now, Mexico, and Franchising." Compl., ¶ 3. While "[t]he Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period," *id.*, nearly one third of the Company's consolidated net revenues came from other sources. For these reasons, this is not the "rare" case with such "special circumstances" where a strong inference of scienter may be drawn from Davis and Constant's positions in the Company. *See* *Diodes*, 810 F.3d at 959.

**4. Terminations/resignations of Davis and Constant**

Finally, Plaintiffs contend the Court should infer "compelling evidence of scienter" from the sudden terminations of Davis and Constant shortly after the truth was fully revealed. Compl., ¶¶ 153-55, 164-68. As urged by Defendants, "[t]he resignation of officials is, in and of itself, unavailing as proof of the commission of fraud" absent "specific evidence" indicating that the resigning officials knew of the alleged misconduct. *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. September 29, 2016) (noting "executive resignations did not have "any scienter implications" (citing *Southland*, 365 F.3d at 383 & *Abrams*, 292 F.3d at 434)). "Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724–25 (W.D. Tex. 2010).

***34** Even accepting as true Plaintiffs' allegation that Davis and Constant's departures were not voluntary but were terminations, Defendants assert the "more logical assumption is that" the allegedly forced resignations were due to "corporate mismanagement" rather than "the result of fraudulent acts." *In re Pilgrim's Pride Corp. Securities Litig.*, No. 2:08cv419-TJW, 2010 WL 3257369, at *13 (E.D. Tex. Aug. 17, 2010). However, Plaintiffs assert the sudden "terminations" of Davis and Constant, coupled with an acknowledgment by the Company after the Class Period that RAC's "operational challenges" were "exacerbated under the previous management regime" and that the departure of Davis and Constant was "a change aimed at improving shareholder value," contribute to the allegations of scienter. *Id.* at ¶ 168. The Court agrees.

Viewed in the context of all the factual allegations pleaded in the Complaint, the alleged terminations are circumstantial evidence that both Constant and Davis were let go because of the failed implementation of the POS system. *Id.* at ¶ 166. *See* *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 653 (W.D. Tex. 2006) (termination of CEO "for cause" because the company needed to "transition to a management led by an executive who was not involved in the subjects of the possible restatement of previous financial statements and the Audit Committee investigation" supported strong inference of scienter). Here, the Court finds this is another factor supporting a strong inference of scienter.

**5. Scienter allegations, viewed holistically**

Viewed holistically, Plaintiffs' allegations give rise to a strong inference of scienter and satisfy Plaintiffs' burden under the PSLRA. Even if Defendants' interpretation of the events does support a strong inference as to a lack of scienter, "15 U.S.C. § 78u–4(b)(2) is nonetheless satisfied in the present case because the competing inference of severe recklessness is at least as cogent and compelling." *Spitzberg*, 758 F.3d at 686. As recognized by the Fifth Circuit in *Lormand*, where there are competing inferences that establish or negate the scienter requirement, "a tie favors the plaintiff" on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2). 565 F.3d at 254. Taking them as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs' allegations present a strong inference of scienter against Defendants "at least as compelling as any opposing inference of nonfraudulent intent." *See* *Tellabs*, 551 U.S. at 314.

### VII. SECTION 20(a) CLAIMS

Section 20(a) claims for control person liability are derivative of primary claims under § 10(b), and when there is no viable § 10(b) claim, there can be no § 20(a) claim. *See, e.g.*, *Shaw Grp.*, 537 F.3d at 545 (reversing trial court's denial of defendants' motion to dismiss plaintiffs' § 20(a) claims where plaintiffs failed to adequately plead § 10(b) violations). Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Because those arguments fail, Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit.

### VIII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Docket Entry #44) be **DENIED**.

### OBJECTIONS

Within fourteen (14) days after receipt of this Amended Report and Recommendation, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

***35** Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6398742

### Footnotes

1 The Court issues this Amended Report and Recommendation to add on page 68 the inadvertently omitted phrase “Defendants' assertions regarding” in the last sentence of the Court's discussion of Plaintiffs' § 20(a) claims.

2 Davis and Constant are referred to herein as the “Individual Defendants.”

3 According to Defendants, SIMS was a “proprietary in-house developed system” designed to manage “key business processes in the store such as sales, customer account management, cash management and inventory management” and to “extend and improve capabilities for store sales and operations.” Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 13; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68; Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 4.

4 According to CW-2, prior to the Class Period RAC used an "off the shelf POS system designed for the rent-to-own market" and "sales and collection information" was stored and transmitted to RAC headquarters multiple times daily. Compl., ¶ 43. CW-2 stated the old program could not meet the technological goals of RAC, including a centralized reporting system and e-commerce functionality. *Id.*

5 The Complaint alleges RAC's stock price dropped "[i]n reaction to these disclosures" about the SIMS pilot in only 385 of 2,627 stores. Compl., ¶ 112; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68. According to Defendants, Plaintiffs ignore that the Company reported at the same time that it had written down goodwill as a result of impairment in its Core segment by $1.17 billion and reported a diluted loss of $17.20 per share, instead of what would have been earnings of $0.54 per share, as a result. Def. Ex. 13, Form 8-K (filed Feb. 1, 2016).

6 The court amended its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against the defendant company's CFO. Although the analysis changed, the outcome did not. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *1 (S.D. Tex. July 22, 2016).

7 *See, e.g.*, Compl., ¶ 80 ("[O]ur resolve is strengthened in the pursuit of that balance and the urgency remains high in delivering on the initiatives and results that we have promised."); ¶ 81 ("Our key initiatives have moved from the planning stage to the implementation stage and are set to provide meaningful results in 2015."); ¶ 87 ("Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts."); ¶ 88 (stating that fully deploying SIMS would "giv[e] us the tools to understand and serve customers like never before"); ¶ 89 ("[W]e are on the cusp of—the next couple of quarters—some of our strategic initiatives coming online and having a meaningful impact to the Business."); ¶ 94 ("We continue to see progress toward transforming our Core business."); ¶ 96 ("Again, we are very pleased with our second-quarter results and optimistic about our future, again, particularly given that two of our largest strategic initiatives are just now getting started in earnest."); ¶ 108 ("We're now two years into our multi-year transformation strategy, with the plan to deliver improved profitability in our core rent-to-own business."); ¶ 127 ("[T]he benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities."); ¶ 129 ("Although we are not happy with the negative impact from the distraction related to the rollout of new POS system, we are excited about the opportunities it will continue to bring well into the future.").

8 In *ABC Arbitrage*, the Fifth Circuit found that "allegations concerning a conversation between 'a high ranking [Company] official' who was 'a top executive of [the Company]' " and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standard for pleadings based on information and belief" in that "[t]his executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *In re Fleming*, 2004 WL 5278716, at *9 (quoting *ABC Arbitrage*, 291 F.3d at 357). The Fifth Circuit concluded that the plaintiffs' allegations relying on the Group Services Report, the *Stuttgarter Zeitung* article, the MMRs, and the "Kom–Aktuell" newsletter, "as well as the allegations based on a July 1998 conversation between a top Alcatel executive and Dunoge, survive dismissal under section 78u–4(b)(1) of the PSLRA." *ABC Arbitrage*, 291 F.3d at 358-59. However, as to those allegations that survived dismissal under the PSLRA's pleading requirements, the court found the plaintiffs failed to allege *materially* false or misleading statements or omissions sufficient to state a securities fraud claims under § 10(b) and Rule 10b-5 upon which relief could be granted. *Id.* at 362 (emphasis added).

9 On the one hand, Defendants assert the Complaint does not demonstrate how either CW had any first-hand information concerning either of the Individual Defendants' state of mind or knowledge of any specific event, conversation, or document. On the other hand, Plaintiffs assert such knowledge in not necessary, noting what Defendants "actually believed ... is irrelevant to whether Defendants ... were severely reckless." *Spitzberg*, 758 F.3d at 686. As pointed out

by Plaintiffs, in *Spitzberg* the Fifth Circuit relied in large part on allegations attributed to a single confidential witness that did not involve first-hand knowledge of the individual defendants' state of mind as sufficient to plead "circumstances constituting at least severe recklessness." *Id.* at 684-85. The court did not rely in its opinion on any allegations that the confidential witness interacted with the individual defendants; he only allegedly worked for another company that was the defendants' business partner. *Id.* at 681-85.

10 As urged by Plaintiffs, the allegations belie Defendants' argument that the Complaint engaged in "group pleading" only. These statements, and other alleged facts, are specifically attributed to each Individual Defendant.

11 The Complaint states "the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its [five]-year anniversary after having been started in 2009." Compl., ¶ 63. But according to Defendants, the Complaint does not explain the significance of the five-year anniversary for write-down purposes, nor does it explain why five years would have been any more significant than three, four, or six years. Defendants assert the notion that the Individual Defendants were motivated to misrepresent information about the SIMS rollout even while knowing SIMS was supposedly bound to fail due to "material flaws"—simply because the software-development project had reached its fifth anniversary—is illogical.

Defendants further argue Plaintiffs' proposed "motive" inference becomes more illogical when one considers the bigger picture, as the Complaint notes, for year-end 2015, the Company recorded and disclosed that it was taking a $1.17 billion dollar write-down to the goodwill asset on its balance sheet. Compl., ¶ 107. Defendants challenge Plaintiffs' over-inflated estimates, but even taking them as true, Defendants assert the value of a potential SIMS write-down was dwarfed by the company's $1.17 billion 2015 goodwill write-down. According to Defendants, Plaintiffs' allegations require the illogical assumption that, while the Individual Defendants disclosed over a billion dollars' worth of write-downs to investors, they also were willing to commit securities fraud to prevent a much smaller write-down of the cost of the SIMS program.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2017 WL 6379334
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Alan HALL and James Depalma, individually and on behalf of all others similarly situated, Plaintiffs
v.
RENT-A-CENTER, INC., Robert D. Davis, and Guy J. Constant, Defendants

CIVIL ACTION NO. 4:16cv978
|
Signed 12/14/2017

**Attorneys and Law Firms**

Lionel Z. Glancy, Glancy Prongay & Murray LLP, Los Angeles, CA, Elton Joe Kendall, Jamie Jean McKey, Kendall Law Group, LLP, Willie Charles Briscoe, The Briscoe Law Firm, R. Dean Gresham, Steckler Gresham Cochran LLP, Dallas, TX, Jonathan Gardner, Marisa N. Demato, Labaton Sucharow LLP, New York, NY, Guillaume Orson Buell, Hicks Davis Wynn P.C., Houston, TX, for Plaintiffs.

David Dykeman Sterling, Baker Botts LLP, Houston, TX, Jessica B. Pulliam, Baker Botts LLP, Dallas, TX, Peter Andrew Stokes, Norton Rose Fulbright US LLP, Austin, TX, for Defendants.

## MEMORANDUM ADOPTING AMENDED REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

***1** Came on for consideration the amended report of the United States Magistrate Judge in this action, this matter having been referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636. On October 19, 2017, the Magistrate Judge issued an Amended Report and Recommendation ("R&R"), [1] recommending Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. #44) be denied. Defendants filed objections to the R&R, Plaintiffs filed a response to the objections, and Defendants filed a reply. The Court conducts a *de novo* review of the Magistrate Judge's findings and conclusions.

## BACKGROUND

This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Rent-A-Center, Inc. ("RAC" or the "Company"); its former Chief Executive Officer ("CEO") Robert D. Davis ("Davis"); and its former Executive Vice President of Finance, Chief Financial Officer ("CFO"), and Treasurer Guy J. Constant ("Constant") (collectively "Defendants") [2] on behalf of all persons and entities that purchased or otherwise acquired RAC publicly traded common stock during the period from February 2, 2015 through October 11, 2016, inclusive (the "Class Period") and who were damaged thereby. The action involves Defendants' alleged collective failure to inform the market that the "pivotal initiative the Company undertook during the Class Period and had been promising Wall Street—the rollout of its proprietary point-of-sale ('POS') management information system, which had been in development for more than five years and cost the Company at least $175

million—was an abject failure fraught with stability and functionality problems that directly affected the Company's ability to complete sales and collect rental income during the Class Period." Dkt. #45 at 1.

The Court provides the following facts, as outlined in the Amended Report and Recommendation. RAC is one of the largest rent-to-own operators in North America. Compl., ¶ 2. At RAC's stores, customers can rent-to-own electronics, appliances, furniture, and other durable items. During the Class Period, RAC generated revenue from four operating segments: (1) Core U.S., (2) Acceptance Now, (3) Mexico, and (4) Franchising. *Id.* at ¶ 3. Core U.S. was RAC's largest segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada, and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of the Core U.S. segment" and that any "significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies." *Id.*

***2** Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms. *Id.* at ¶ 4. Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. Because RAC's key customer demographic was "unbanked" and without credit, most of its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, the customer would be able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. *Id.*

The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts. RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. *Id.*

Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its proprietary point-of-sale management information system ("POS" or "SIMS"), which had been in development since at least 2009. *Id.* at ¶ 5. This new POS system was purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each store's sales and collection data. [3] Prior to the rollout of the new POS system, each store was required to download and transmit to RAC headquarters all store data at least twice daily. *Id.*

At the beginning of the Class Period, on February 2, 2015, RAC announced the new POS system was "fully operational" at its first store "following the system-wide implementation of the back office solution." *Id.* at ¶ 6. Otherwise, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives. Specifically, Defendants knew, but failed to inform investors, the POS system had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of the system. *Id.*

Throughout 2015, the Company rolled out the POS system to an increasing number of stores, and by December 31, 2015, the system was deployed in 385 stores. *Id.* at ¶ 7. However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and other information that should have caused Defendants to either halt the Company-wide rollout of the system or at least undertake a system-wide revamp before proceeding with a full rollout, Defendants steadfastly refused to do either. *Id.* at ¶ 8. Defendants also failed to inform investors of the ongoing problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was "fully operational and ready to go." *Id.*

***3** "Defendants rushed out a full rollout of the POS system Company—wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016." *Id.* at ¶ 9. According to Plaintiffs, the truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016, when the Company announced its results for the year ended December 31, 2015 after the market closed that day. *Id.* at ¶ 10. The next day, during the Company's earnings call, Defendants acknowledged problems with implementation of the POS system and disclosed that for the first quarter of 2016 (ended March 31, 2016) RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact ... associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. *Id.*

According to Plaintiffs, Defendants falsely assured investors the "little bit of impact to revenue" would "go away then in the back half of the year." *Id.* Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores." Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. *Id.*

Additional information about problems with the POS system's implementation was revealed on April 27, 2016. *Id.* at ¶ 11. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so the Company could address a "greater-than-expected impact on sales." *Id.* However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [ ] operating this new POS system." *Id.* Defendants also assured investors the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations, RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. However, Plaintiffs allege the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues. *Id.*

The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016. *Id.* at ¶ 12. Despite revealing decreased sales because of the impacts and acceleration of the POS system rollout, Defendants represented "the distraction of a major system roll-out is now behind us." *Id.* As a result of these disclosures, on July 28, 2016, RAC's common stock price fell approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume. *Id.* The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. *Id.* at ¶ 13.

According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." *Id.* "In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, ***or over 28%*** on abnormally high trading volume." *Id.* (emphasis in original).

On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter. *Id.* at ¶ 14. On December 2, 2016, the Company announced the termination of Defendant Constant effective immediately. *Id.* at ¶ 15. On January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately. *Id.*

***4** According to Plaintiffs, the statements of former RAC employees ("confidential witnesses" or "CWs") "with personal knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues existed

at the time RAC initially implemented the POS system in late 2014, and that these problems were not sufficiently remediated during the Company-wide rollout of the POS system when additional scalability and functionality problems surfaced.” Dkt. #45 at 1. According to the Complaint, the statements of former RAC employees with knowledge of SIMS' development and implementation confirm that “internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system when it was initially rolled out in early 2015.” Compl., ¶ 16.

For example, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe) (“CW-1”), “stated Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout.” *Id.* According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. “Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years.” *Id.*

The Complaint also relies on “CW-2,” who was employed by RAC for nineteen years from 1997 until June 2016. *Id.* at ¶ 17. “From March 2007 to June 2016, CW-2 held the title of Senior Director of Information Security and IT Service Management and reported directly to Chief Information Officer ... who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired.” *Id.* “CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level.” *Id.* CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout. CW-2 attended a “Go No-Go” meeting each time RAC rolled SIMS out to additional stores, and CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

## AMENDED REPORT AND RECOMMENDATION

On June 5, 2017, Defendants filed their current Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Dkt. #44. Defendants assert the Complaint fails to plead either (1) falsity or (2) the requisite strong inference of scienter with particularity as to any of the alleged misrepresentations.

On October 19, 2017, the Magistrate Judge issued a sixty-nine page Amended Report and Recommendation (“R&R”), recommending Defendants' motion to dismiss be denied. In considering whether the complaint pleads with particularity any false or misleading representation, the Magistrate Judge first set forth approximately sixteen pages of allegations before determining Defendants' statements are not entitled to protection under the PSLRA’s Safe Harbor provision (R&R at 39) and the “statements identified by Defendants are not inactionable statements of puffery.” R&R at 40. Relying in part on the confidential witness allegations, the Magistrate Judge concluded a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions. R&R at 50.

***5** Regarding Defendants' arguments with regard to scienter, the Magistrate Judge first noted allegations of “motive and opportunity standing alone” are not enough to establish scienter but that such circumstantial evidence may “meaningfully enhance the strength of the inference of scienter.” R&R at 54 (citation omitted). The Magistrate Judge considered the following categories of scienter allegations (confidential witness allegations, motive, core operations, and terminations/resignations of Davis and Constant) and then viewed the scienter allegations holistically. According to the Magistrate Judge, viewed holistically, “Plaintiffs' allegations give rise to a strong inference of scienter and satisfy Plaintiffs' burden under the PSLRA.” R&R at 67. The Magistrate Judge stated even if “Defendants' interpretation of the event does support a strong inference as to a lack of scienter,

"15 U.S.C. § 78u-4(b)(2) is nonetheless satisfied in the present case because the competing inference of severe recklessness is at least as cogent and compelling." *Id.* (quoting *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014)).

Finally, the Magistrate Judge noted that Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Finding those arguments fail, the Magistrate Judge concluded Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit. R&R at 68.

## OBJECTIONS

Defendants filed objections to the Report and Recommendation. Defendants first assert the Magistrate Judge erred in stating and applying the law regarding allegations by confidential witnesses. According to Defendants, the R&R credits allegations by two departed employees who never had communications with the individual defendants. Defendants contend the R&R does not examine whether the "supposedly non-disclosed information would render misleading what a reasonable person would infer from the Company's statements" and does not rely on "any particularized facts possessed by either of the Individual Defendants demonstrating why either of them knew (or recklessly disregarded) that their statements were false or misleading." Dkt. #57 at 2. Defendants assert the allegations attributed to confidential witnesses must be discounted for scienter purposes.

Defendants next assert the R&R improperly credits allegations of motive in finding the scienter allegations sufficient. Finally, Defendants assert the R&R improperly finds two executive resignations add to the inference of scienter.

## *DE NOVO* REVIEW

***Whether Plaintiffs have adequately pleaded falsity***

The Magistrate Judge concluded that Plaintiffs adequately pleaded Defendants made false and misleading statements and omissions during the Class Period. R&R at 50. In reaching this determination, the Magistrate Judge considered all of Plaintiffs' allegations and found, at this stage, "a reasonable person may draw the plausible inferences from the allegations that Defendants made material representations or omissions...." R&R at 50.

Defendants have challenged the R&R on the element of falsity primarily with respect to the allegations regarding the two confidential witness described in the complaint (the "CWs"). Dkt. # 57 at 6-14. According to Defendants, the Magistrate Judge's failure to discount the CW allegations is contrary to *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527 (5th Cir. 2008). The *Shaw* case dealt with the issue of scienter, and the Court considers Defendants' arguments regarding the CW allegations in its discussion of scienter below.

A misleading statement or omission has been adequately pleaded when a plaintiff alleges the defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. § 78u-4(b)(1). The Magistrate Judge noted a corporation has "no duty to cast its business in a pejorative, rather than a positive, light." R&R at 41 (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003)). "[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002). According to the Magistrate Judge, the plaintiffs must plead with particularity the reasons why the defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." (R&R at 41-42)(quoting *Shaw*, 537 F.3d at 541); *see also* *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-249 (5th Cir. 2009) ("Once the defendants engaged in public discussions concerning the benefits ... they had a duty to disclose a mix of information that is not misleading.") (internal quotes omitted).

***6** Defendants argue the Magistrate Judge's conclusion that Plaintiffs adequately pleaded falsity (and scienter) "hinges upon the view that Rent-A-Center painted too rosy of a picture of the POS system and was instead required to disclose the opinions of two unidentified former employees who left the company long before the end of the class period." Dkt. #57 at 6. According to Plaintiffs, this mischaracterizes their allegations and attempts to downplay the strength of the facts as pleaded. The complaint does not allege Defendants were unduly optimistic about the success of the implementation of the POS system. Instead, as urged by Plaintiffs, the complaint alleges Defendants repeatedly misrepresented and omitted the severe problems the Company was encountering in the development and implementation of its POS system.

Defendants attempt to distinguish *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016), [4] a case relied upon by the Magistrate Judge. In *Carlton*, the defendants stated their core technology was "fundamentally sound, that [a production] plant operated successfully on a commercial scale, and that any problems were normal, start-up glitches rather than fundamental, structural defects." 184 F.Supp.3d at 472. The *Carlton* court held the complaint plausibly alleged those representations "painted a misleading picture of conditions at the ... plant." *Id.* In its falsity discussion, the *Carlton* court found the plaintiffs had "plausibly alleged, with particularity, that the statements about the Columbus plant's operations materially misled investors to believe that KiOR was a viable business when it was not." *Id.*

In *Carlton*, confidential witnesses provided enough particularity in their allegations to "explain why and on what basis [the defendants' statements] were misleading." *Id.* at 472–73. According to the court, confidential witnesses, all former KiOR employees, "detailed issues at the Columbus plant throughout this period that were more severe than [CEO] Cannon and [CFO] Karnes represented." *Id.* at 472. In particular, the witnesses detailed issues that "[s]tart-up costs and net-operating losses consistently increased" and "yields were lower, and costs higher, than represented." *Id.*

As noted by the Magistrate Judge in discussing *Carlton*, even though Cannon disclosed some of these issues in January 2014, the *Carlton* court noted "he also assured investors on the earnings call that the company would make improvements to the plant that would have it back up and running," but the plant was shut down two months later. *Id.* Although Cannon and Karnes argued they had no obligation to characterize the operational issues at the Columbus plant as "severe design flaws" rather than as "start up issues," the *Carlton* court stated as follows:

> But by downplaying the extent and duration of the technological problems as normal start-up issues, while simultaneously assuring investors that the core technology was sound for commercial-scale production, these defendants represented that the ... plant was a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul.

*Id.*

According to Defendants, the CW statements in *Carlton* were pleaded with much more particularity than those involved here. Defendants point out that one of the CWs in *Carlton* was "the senior scientist to develop the technology that the company tried to commercialize." But, according to Plaintiffs, those facts align with this case where both of the CWs were involved in the problem-plagued implementation of SIMS. [5] *See* Compl., ¶¶ 50-52, 68, 73-74. As in *Carlton*, the alleged false statements here concern how the POS system was operating during testing and implementation. Additionally, as in *Carlton*, Defendants here allegedly "downplay[ed] the extent and duration of the technological problems...." *Id.* at 472.

***7** According to the Magistrate Judge, "[n]otwithstanding the limited negative information Defendants may have disclosed, Plaintiffs assert Defendants, having chosen to speak about the POS system, had a duty to disclose the full truth about the

problems plaguing the POS system and the Company-wide rollout of the system." R&R at 42-43. The Magistrate Judge pointed out Plaintiffs allege Defendants' statements in each of the four partial disclosures (fourth quarter and full year 2014 results, first quarter fiscal 2015 results, second quarter fiscal 2015 results, and third quarter fiscal 2015 results) were false and misleading when made because Defendants knew but failed to disclose that:

(a) the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b) the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;

(c) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and

(d) the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

R&R at 43 (citing Compl., ¶¶ 85, 92, 99, 105).

According to the Magistrate Judge, for each of these partial disclosures, Plaintiffs allege the Company's disclosures about the risks of the implementation of the POS system were materially false and misleading when issued, as Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS system not performing as designed or sustaining "repeated failures." *Id.* (citing Compl., ¶¶ 86, 93, 100, 106). According to Plaintiffs, this was already happening during in-house testing and in the pilot stores where the system was implemented. Plaintiffs further allege Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life," and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with. *Id.* According to Plaintiffs, Defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See* *Shaw*, 537 F.3d at 541.

Defendants also object to the Magistrate Judge's falsity finding regarding Defendants' statements that the POS system was "fully operational" in the initial pilot stores. R&R at 48-49. The Magistrate Judge agreed with Plaintiffs that whether the term "operational"/ "fully operational" was intended to and did convey to the market that SIMS was fully functional is best answered based on the evidence produced during a later stage of this litigation. R&R at 49 (citing *Spitzberg,* 758 F.3d at 689) (stating whether Defendants—Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" can "only be answered based on the evidence produced during a later stage of this litigation"). In their objections, Defendants assert the complaint's allegations regarding issues and problems with the POS system or the Oracle operating system do not render false any statement about the number of stores where the system was operating. Dkt. #57 at 10. According to Defendants, nothing about the statements indicated the POS system was operating without problem or setback.

***8** As the R&R recognizes, Plaintiffs are not challenging the number of stores where SIMS was installed, but rather Defendants' repeated false statements that SIMS was "operational"—which was meant to and did convey to the market that SIMS was fully functional in those stores when it was not—being:

- ¶ 80 ("New POS system is *fully operational* in its first site");
- ¶ 81 ("new POS system is *now fully operational* in its first site");
- ¶ 87 (New POS system ... "*is fully operational in 34 stores*");

- ¶ 95 ("150 core US *[are] running the new system* exclusively");
- ¶ 104 ("*[POS] is operational* in 8.5% of our Core U.S. stores");
- ¶ 115 ("We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015....");
- ¶ 119 ("Today approximately one-third of our core stores *are operating this new POS system.*"); and
- ¶ 129 ("After our initial delay, in Q2 *we completed the roll-out* of our new POS system....").

R&R at 48-49 (quoting Consolidated Class Action Complaint). According to Plaintiffs, the "sparse negative information Defendants claim to have disclosed was inconsequential and was offset by accompanying positive statements and baseless reassurances." Dkt. #59 at 8.

Viewing the allegations as a whole, the Court agrees with the Magistrate Judge that a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions. R&R at 50. The complaint identifies each of the false and misleading statements and omissions, including the speaker, and the date when and location where, the statement was made; plausibly alleges the misleading nature of the representations with facts that are sufficiently particularized to explain why and on what basis they are misleading; and contains information from high-level CWs who were employed by RAC before and during the Class Period, based on their own personal knowledge of the facts alleged.

The Magistrate Judge recognized "[c]onfidential witness accounts are a permissible basis on which to allege falsity," so long as the complaint "provide[s] details such as job descriptions, individual responsibilities, and specific employment dates for the witnesses." R&R at 45-46 (citation omitted). Defendants have not challenged the Magistrate Judge's finding that the two CWs "have been described with sufficient particularity to establish their reliability and personal knowledge."[6] R&R at 47. The Court addresses below Defendants' specific objection as to the weight given to the CW allegations. Even giving less weight to the CW allegations, the Court agrees with the Magistrate Judge's finding that a reasonable person may draw the plausible inference from the allegations in the complaint that Defendants made material misrepresentations or omissions.

***Whether Plaintiffs have adequately pleaded a strong inference of scienter***

***9** Liability under Rule 10(b)(5) requires not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party has done so with "not merely simple or even inexcusable negligence" but rather with "scienter." Scienter requires an "intent to deceive, manipulate, or defraud" or "severe recklessness" in which the "danger of misleading buyers or sellers ... is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir. 1981) (en banc). For purposes of determining whether a statement made by a corporation was made by it with the requisite Rule 10(b) scienter, it is appropriate to look to the state of mind of the individual corporate official or officials who made or issued the statement (or approved it or its making or issuance, or who furnished information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

As noted above, confidential source statements are a permissible basis on which to make an inference of scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552 (5th Cir. 2007). The witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 353 (5th Cir. 2002). In lieu of names, the plaintiffs

must provide details, such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter." *Dawes v. Imperial Sugar Co.,* 975 F. Supp. 2d 666, 692 (S.D. Tex. 2013).

For CW1 and CW2, Plaintiffs provided the categories of the necessary information. The Magistrate Judge considered the CW allegations as one permissible basis on which to make an inference of scienter. According to the Magistrate Judge, the Fifth Circuit Court of Appeals in *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676 (5th Cir. 2014) recently reversed and remanded the dismissal of a securities fraud complaint and held that scienter was adequately alleged based, in large part, on statements from confidential witnesses. In *Spitzberg*, the plaintiffs, investors in a Houston-based energy company, alleged the company's statement that it had "estimated recoverable reserves of 1 to 4 billion barrels" of oil was misleading. *Id.* at 680.

The plaintiffs in *Spitzberg* argued the statement "communicated to investors that certain geological testing had been completed based on the definition of 'reserves' used by the oil industry and by SEC regulations." *Id.* The defendants argued they had not "explicitly represent[ed] that any drilling had yet occurred," that their other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [oil industry]." *Id.* at 681. The plaintiffs alleged other fraudulent statements were made after test drilling began. *Id.* Specifically, in a number of regulatory filings and press releases, the defendants repeatedly stated that a test well had produced "strong inflow[s]" and "significant shows" of both "gas and oil." *Id.* But according to the statements (cited extensively in the complaint) of confidential witnesses that were allegedly involved in the drilling operations, the test well produced no "in flow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. *Id.* at 682.

The Fifth Circuit assumed that the industry-specific term "reserves" would communicate to investors that certain production or geological testing had already been conducted, as alleged by the plaintiffs. *Id.* at 684. The Fifth Circuit further assumed the truth of one confidential witness statement that "neither oil nor flowable hydrocarbons were found in the ... well." *Id.* The court recognized that although additional evidence at later stages of the proceedings might confirm or undermine the factual proposition set forth by that particular confidential witness, the court noted that the plaintiffs' contention, at the motion to dismiss stage, was "at least as compelling as any opposing inference one could draw." *Id.* at 684-85. Therefore, according to the Fifth Circuit, the plaintiffs' complaint could not be dismissed based on the failure to plead severe recklessness.[7] *Id.* at 685.

***10** The Magistrate Judge similarly relied on the CW allegations in the complaint, finding this is not a case where Plaintiffs try to impute knowledge of problems with the POS system to Davis and Constant simply because of their mere presence at meetings. R&R at 58. According to the Magistrate Judge, "Plaintiffs have pointed to specific meetings, reports, and practices whereby [Defendants] were made actually aware of the [POS'] status." *Id.* (quoting *In re EDS and "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004)). The Magistrate Judge stated both CWs confirm *how* information about the POS' problems was communicated to Davis and Constant; *when* meetings occurred (¶¶ 32, 50-52, 74, 158), *who* was involved in communicating information (¶¶ 46, 50-52, 65, 71, 74), *what* reports were titled and *by whom* (¶¶ 16-17, 46-47, 68, 71, 74), facts regarding Davis and Constant's *motive* in acting severely recklessly (¶¶ 16, 53-63, 73-74, 159-73), and the contemporaneous problems the POS experienced during the Class Period, rendering Defendants' statements or omissions false and misleading. (¶¶ 45, 48-50, 64-73). R&R at 58.

In their objections, Defendants argue allegations from the confidential sources must be discounted as required by *Shaw*, 537 F.3d at 535 ("That these allegations derive from confidential sources further detracts from their weight in the scienter analysis. Following *Tellabs*, courts must discount allegations from confidential sources.... At the very least, such sources must be described" with sufficient particularity). According to Defendants, the Fifth Circuit's decision in *Spitzberg* left untouched the requirement that confidential witness statements, even when they are described with sufficient particularity, must be discounted. Dkt. #57 at 3. Although the Fifth Circuit in *Spitzberg* did not explicitly discount the confidential witness allegations, Defendants

assert the court focused on one confidential witness whose testimony the defendants conceded during oral argument was relevant. 758 F.3d at 682.

The Court is not convinced the Magistrate Judge failed to properly discount and gave too much weight to the CW allegations. However, in its *de novo* review, the Court will give the allegations from CW1 and CW2 less weight. Even still, the Court concludes the allegations, viewed together with the remaining allegations in the complaint, preclude granting a motion to dismiss for lack of a strong inference of scienter. *See Kohut v. KBR, Inc.*, No. CV H-14-1287, 2015 WL 11995250, at *12, *26 (S.D. Tex. Sept. 3, 2015).

Although not discussed in the R&R, the Court finds *Kohut* instructive. In *Kohut*, the plaintiffs alleged "the defendants artificially inflated KBR's stock price by misrepresenting the profits and losses from seven contracts to construct oil and gas facilities in Canada." 2015 WL 11995250, at *1. The plaintiffs' allegations were largely derived from confidential witnesses, who indicated the individual defendants were "integrally involved in the cost estimation process for the Canadian projects at issue." *Id.* at *2. The defendants moved to dismiss based on the absence of individual allegations supporting a strong inference of scienter. *Id.* at *6. The court found allegations based on the individual defendants' involvement in cost estimation precluded granting the motion to dismiss. *Id.* at *26.

According to the court, the amended complaint did not rest on "must have known" allegations like those in *Shaw* which were found to be insufficient to support a strong inference of scienter. Instead, the amended complaint contained allegations from confidential witnesses that there were monthly meeting where the defendants received detailed cost estimates for the projects. *Id.* at *25. Specifically, CW1, a former General Manager of KBR Industrial Services in Canada, described "senior management's role in estimating costs at the outset of projects." *Id.* at *26. According to the amended complaint, CW1 was responsible for preparing "white paper briefs" with detailed evaluations of potential projects. "Though CW1 was not involved in creating a white-paper brief for the seven Canadian contracts, he asserts that the papers would have been prepared and distributed to senior management." *Id.* The amended complaint alleged the "white papers contained detailed cost estimates, gave the bases for them, and provided risk evaluations, all giving the Individual Defendants information about the contract problems." *Id.* The amended complaint alleged Baldwin, Carter, Ferraioli, and Utt would have "reviewed and analyzed the cost estimates for the Canadian projects." *Id.* The amended complaint alleged KBR lacked design drawings for the seven Canadian contracts necessary to produce reliable cost estimates under percentage-of-completion accounting, and the individual defendants inaccurately described their profitability. *Id.*

***11** The amended complaint also alleged details from CW2 about the monthly Executive Leadership Team ("ELT") meetings in Houston. According to CW2, in advance of the meetings, the ELT members allegedly "received detailed monthly reports concerning the Company's important projects, including the Canadian projects at issue here." *Id.* CW2 prepared the KBR Monthly Business Unit Reviews for ELT members and stated these monthly meetings gave the defendants "critical information about the status of the Canadian projects." *Id.* These allegations from confidential witnesses precluded granting the motion to dismiss, especially when viewed in the aggregate with certain other scienter allegations. *Id.* at *26-*27.

Similarly here, the complaint specifically identifies the names of documents and meetings, the contents of such documents and meetings, the frequency and attendees of the meetings or the frequency and distribution of reports. The CWs link the reports and meetings to the Individual Defendants. R&R at 17-19. According to the CWs, Davis was involved in the POS project from the onset, and he held weekly meetings with RAC CIO Nell until April 2016 where SIMS was always discussed. Compl., ¶¶ 52, 74. Davis and Constant also were members of and participated in the "SIMS Executive Steering Committee," which was a "C-Level meeting" wherein the SIMS' progress and issues were discussed. *Id.* at ¶ 74. The Executive Steering Committee met quarterly at first, and then more frequently as the rollout progressed. *Id.* at ¶ 51. These Executive Steering Committee meetings were attended by Davis, Constant, CTO Liebe, CIO Nell, Department Heads, and SVPs. *Id.* Davis and Constant also periodically attended weekly SIMS project team meetings during which changes, challenges, and problems related to SIMS were discussed. *Id.* at ¶¶ 50-52, 74. As the SIMS rollout accelerated (and therefore into the Class Period), and more issues arose, Davis' involvement with the POS increased. *Id.* at ¶ 74. Both Davis and Constant were kept aware of any issues the technology

team was encountering with implementing SIMS. *Id.* These allegations from confidential witnesses, even given less weight, make a strong inference of scienter, especially when viewed in the aggregate with certain other scienter allegations.

According to Plaintiffs, both Davis and Constant admitted during the Class Period that management was deeply involved with the SIMS rollout: "the approach that we took to learn in the early stages had a lot more care and feeding [sic], if you will, and hand-holding and oversight from multi-levels of management" (¶ 134—Davis) and "as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores" (¶ 121—Constant).

As noted by the Magistrate Judge, in addition to providing specific facts regarding how, when, and where information regarding the POS system was communicated to Defendants Davis and Constant, the former employees also provide the what—the scope of issues the POS system experienced prior to and during the Class Period:

• By the end of 2014, just prior to the start of the Class Period, the POS system experienced serious capacity and performance issues including but not limited to (1) network bandwidth issues; (2) scalability problems; (3) capacity problems including network capacity, database capacity, and old-technology capacity problems; (4) functionality problems with payment methods; and (5) hundreds of other varying issues. (¶ 48). Certain issues continued through at least June 2016. (¶ 73)

• RAC's systems ran on an older Oracle-based operating system that newer software was increasingly unable to interact with. (¶ 65)

***12** • The POS System did not meet the Company's needs when it was first rolled out in Plano, Texas, resulting in hundreds of issue detailed in Root Cause Analysis Reports. Moreover, the overall functionality of the POS system never improved much, and did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015 (during the Class Period). POS system continued to generally fail as it was rolled out to additional stores. (¶ 66)

• The Company did not fix problems with the POS system before implementation in additional stores and major bugs were still being worked on as of June 2016. Necessary redundancies in the POS system were not in place by June 2016, which also magnified the risk of outages the Company was experiencing. (¶ 73).

Taken together, these allegations plead a strong inference that Davis and Constant were at least severely reckless during the Class period. [8]

## CONCLUSION

The Court has carefully reviewed the relevant briefing, the Amended Report and Recommendation, the objections, the response to the objections, and the reply, and is of the opinion the findings and conclusions of the Magistrate Judge are correct. The Court adopts the Magistrate Judge's report as the findings and conclusions of the Court. It is therefore

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. #44) is **DENIED**.

### All Citations

Not Reported in Fed. Supp., 2017 WL 6379334

### Footnotes

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

1 The original Report and Recommendation was amended to add on page 68 the inadvertently omitted phrase "Defendants' assertions regarding" in the last sentence of the Court's discussion of Plaintiffs' § 20(a) claims.

2 Davis and Constant are referred to herein as the "Individual Defendants."

3 According to Defendants, SIMS was a "proprietary in-house developed system" designed to manage "key business processes in the store such as sales, customer account management, cash management and inventory management" and to "extend and improve capabilities for store sales and operations." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 13; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68; Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 4.

4 The *Carlton* court amended its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against the defendant company's CFO. Although the analysis changed, the outcome did not. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *1 (S.D. Tex. July 22, 2016).

5 *See* FN 5, infra at p. 17.

6 CW-1 is a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers who were responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe). Compl., ¶ 16.

CW-2 was employed by RAC for nineteen years from 1997 until June 2016. From March 2007 to June 2016, he held the title of Senior Director of Information Security and IT Service Management and reported directly to the Chief Information Officer ("CIO"), who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired. CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level. CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout, and attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores. *Id.*, ¶ 17. CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

7 According to the Fifth Circuit, even if the district court's interpretation of the events did support a strong inference as to a lack of scienter, 15 U.S.C. § 78u–4(b)(2) was "nonetheless satisfied in the present case because the competing inference of severe recklessness [was] at least as cogent and compelling." *Spitzberg*, 758 F.3d at 686. "[W]here there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2)." *Id.* (quoting *Lormand*, 565 F.3d at 254).

8 In addition to the CW allegations and admissions by the Individual Defendants of their involvement in the POS rollout, Plaintiffs allege additional factors or motives in support of a strong inference of scienter (*i.e.* that Defendants were motivated to engage in the fraud in order to avoid a $175 million write-down which would have erased the Company's entire annual profit for 2014 and resulted in a loss ( ¶¶ 53-61, 169-173); that the terminations of Davis and Constant, within three months of the end of the Class Period, contribute to the inference of scienter). The Court agrees with the Magistrate Judge these allegations enhance the strength of the inference of scienter and overrules Defendants' objections regarding these findings.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2021 WL 1232782
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Ari HOFFMAN, et al., Plaintiffs,
v.
RCI HOSPITALITY HOLDINGS, INC., et al., Defendants.

CIVIL ACTION NO. 4:19-CV-1841
|
Signed 03/31/2021

**Attorneys and Law Firms**

Kara M. Wolke, Melissa C. Wright, Glancy Prongay et al., Los Angeles, CA, Joe Kendall, Kendall Law Group, PLLC, Dallas, TX, for Plaintiff Ari Hoffman.

Jeremy A. Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY, for Plaintiff David Grossman.

Laura Kirstine Rogers, Steckler Wayne Cochran Cherry, PLLC, Dallas, TX, for Plaintiff Ning Gu.

Jason S. Lewis, Marina Stefanova, DLA Piper LLP, Dallas, TX, David Allen Priebe, DLA Piper LLP, E. Palo Alto, CA, for Defendant RCI Hospitality Holdings, Inc.

Jason S. Lewis, Marina Stefanova, DLA Piper LLP, Dallas, TX, for Defendant Eric S. Langan.

Jason S. Lewis, DLA Piper, Dallas, TX, for Defendants Phillip Marshall, Nour-Dean Anakar, Steven L. Jenkins.

## ORDER

Alfred H. Bennett, United States District Judge

***1** Before the Court are Defendants' Motion to Dismiss Lead Plaintiffs' Amended Class Action Complaint (Doc. #37), Plaintiffs' Response (Doc. #38), and Defendants' Reply (Doc. #41). Having reviewed the parties' arguments and applicable legal authority, the Court denies the Motion.

### I. Background

This case involves a federal securities class action brought by lead plaintiffs [1] Roger DeMaggio, Patrick Prahl, Justin Kinslow, Joseph Milo, and Edgar Kee ("Plaintiffs") on behalf of all persons and entities who purchased or otherwise acquired RCI Hospitality Holdings, Inc. ("RCI") securities between December 13, 2016 and July 18, 2019 (the "Class Period"). Doc. #27 ¶ 1. RCI is a publicly traded holding company that operates live adult entertainment businesses ("Nightclubs") and bar-restaurant establishments ("Bombshells"). *Id.* ¶¶ 2, 37. Defendant RCI's officers and directors during the Class Period included outside directors Steven L. Jenkins ("Jenkins") and Nour-Dean Anakar, who both served as members of RCI's audit, compensation, and nominating committees, chief executive officer Eric Langan ("Langan"), and chief financial officer Phillip Marshall ("Marshall") (collectively, "Individual Defendants" and with RCI, "Defendants" unless otherwise specified). *Id.* ¶¶ 38, 41, 43, 44. As the CEO and CFO, Defendants Langan and Marshall signed all of Defendant RCI's Form 10-K annual reports and Form 10-Q quarterly reports filed with the Security Exchange Commission ("SEC"). *Id.* ¶¶ 39, 42. Defendant Langan also signed a Definitive Proxy Statement on Schedule 14A for the 2017 Annual Meeting of Stockholders ("2017 Proxy Statement"). *Id.*

¶¶ 39, 111. As members of the audit committee, Defendants Jenkins and Nour-Dean Anakar were charged with reviewing and approving all related party transactions ("RPTs"), reviewing and helping to ensure the integrity of RCI's financial statements, and reviewing the adequacy of its internal controls. *Id.* ¶¶ 43, 44. Defendant Jenkins also served as the designated financial expert for the audit committee. *Id.* ¶ 43.

On May 10, 2019, RCI announced that the SEC had initiated an informal inquiry into its financial statements after a "series of negative articles" alleged that the company had omitted certain RPTs. *Id.* ¶¶ 24, 94. In response to the inquiry, RCI's audit committee established a special committee to conduct an internal, independent review of the matters raised by the SEC. *Id.* ¶¶ 25, 96. On July 18, 2019, RCI filed a Form 8-K with the SEC announcing that its independent auditor, BDO USA, LLP ("BDO"), had resigned based on what BDO found to be an insufficient review process and failure to take appropriate remedial action. *Id.* RCI's stock fell by 12.95 percent the next day. *Id.* ¶ 97. Three days later, RCI filed a second Form 8-K stating that the special committee had concluded that the company's Fiscal Year ("FY") 2018 Form 10-K annual report needed be supplemented to include previously undisclosed information. *Id.* ¶¶ 98–101. Defendant Jenkins resigned from RCI's board of directors two weeks later, and RCI subsequently disclosed that the SEC's informal inquiry had transitioned into a formal investigation. *Id.* ¶¶ 103, 104. [2]

***2** This lawsuit was filed on May 21, 2019. Doc. #1. Plaintiffs then filed an amended class action complaint ("Amended Complaint") on February 24, 2020, asserting a claim against Defendants RCI, Langan, and Marshall for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder and a secondary claim against the Individual Defendants for violations of Section 20(a) of the Exchange Act. *Id.* ¶¶ 1, 188, 202. Plaintiffs' Section 10(b) claim is based on six allegedly misleading statements or omissions on RCI's Form 10-K annual reports for FY 2016, FY 2017, and FY 2018 that violate various provisions of SEC Regulation S-K, referred to as "Items."

Plaintiffs' first three allegations address failures to disclose RPTs in violation of Item 404: first, that Defendant Nour-Dean Anakar, a director who sits on RCI's audit committee and compensation committee, is the brother of RCI's "director of operations – club division," Ed Anakar, whose salary rose from $375,000 in 2016 to $471,154 in 2018, *id.* ¶¶ 7, 15, 18, 48, 76; second, Sherwood Forest and its predecessor Creative Steel Designs, two companies that RCI paid a total of $633,429 to between 2016 and 2018, are owned by Defendant Langan's brother and father, respectively, *id.* ¶¶ 7, 15, 18, 77; and third, that the company that built numerous Bombshell establishments and RCI's headquarters, Tannos Construction & Development, LLC ("Tannos Construction"), is closely affiliated with five Tannos Land Holdings, LLC entities that Defendant Langan and Ed Anakar are officers, managers and members of. [3] *Id.* ¶¶ 7, 15, 18, 40, 50, 61, 79. The Amended Complaint further alleges that the owner of Tannos Construction, Louis Tannos, is Defendant Langan's "friend and business associate" and that Defendant Langan downplayed his and RCI's relationship with Tannos Construction in a 2018 earnings call. *Id.* ¶¶ 21, 61, 117, 118.

Fourth, Plaintiffs allege that Defendants failed to disclose executive compensation to Defendant Langan and Travis Reese, RCI's executive vice president and board member, in the form of personal use of RCI-owned aircrafts for FY 2016 and FY 2017 and under-reported the same compensation for FY 2018, in violation of Item 402. *Id.* ¶¶ 7, 15, 18. Fifth, Plaintiffs allege that Defendants failed to disclose that Defendant Jenkins, the audit committee's designated financial expert, had filed two voluntary petitions for bankruptcy during his tenure on RCI's board of directors, in violation of Item 401. *Id.* ¶¶ 7, 15, 18, 67, 86. And finally, Plaintiffs allege that Defendants failed to disclose insufficient internal controls over financial reporting of RPTs, executive compensation, and required disclosures as one of RCI's material weaknesses as is required by the Sarbanes-Oxley Act. *Id.* ¶¶ 7, 15, 18, 129, 130, 138, 141.

Defendants filed a Motion to Dismiss ("Motion"), arguing that the Amended Complaint does not allege either falsity or scienter for the six alleged misrepresentations or omissions, as is required for a Section 10(b) violation, and therefore cannot allege a secondary Rule 20(a) violation as a matter of law. Doc. #37 at 16. Plaintiffs disagree. Doc. #38.

### II. Legal Standard

***3** To survive a motion to dismiss Section 10(b) claims, a complaint must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). Under this standard, plaintiffs alleging fraud must "describe, in short, the who, what, when, and where supporting their fraud allegations." *Molina-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784 (5th Cir. 2020) (quotation omitted). Additionally, under the PSLRA, a plaintiff must "allege with particularity why each one of defendant's representations or omissions was 'misleading' under 15 U.S.C. § 78u–4(b)(1) and, second, allege with particularity those facts giving rise to a 'strong inference' that the defendant acted with the required state of mind under 15 U.S.C. § 78u–4(b)(2)." *Spitzberg*, 758 F.3d at 683.

**III. Analysis**

To state a private claim under Section 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009). Defendants moves for dismissal based on failure to allege a strong inference of scienter and failure to allege a false statement. [4] Doc. #37 at 9, 11–15.

**a. Scienter**

Defendants argue that the Amended Complaint fails to plead a strong inference of scienter for the allegations regarding the Anakar brothers, the companies owned by Defendant Langan's brother and father, executive compensation, or Defendant Jenkins' bankruptcies. Doc. #37 at 11–13. "The required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness." *Spitzberg*, 758 F.3d at 684. "A complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "As a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of scienter," courts do "not need to consider additional allegations of scienter." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015).

As to the Anakar brothers and the companies owned by Defendant Langan's family, Defendants argue that they did not have the requisite scienter because they did not perceive these employment and vendor relationships as "transactions" that needed to be disclosed. *Id.* at 11. Item 404 requires that financial statements filed with the SEC describe "any transaction, since the beginning of the registrant's last fiscal year, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a). Item 404 defines "transaction" to include "any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships." *Id.* A related person includes "any director or executive officer," as well as a sibling of a director or executive officer. *Id.*

***4** RCI's 2017 Proxy Statement, 2017 Form 10-K, and 2018 Form 10-K all disclosed as an RPT that Defendant Langan was personally guaranteeing all of RCI's commercial bank indebtedness. Doc. #27 ¶¶ 111, 113, 115. None of these documents disclosed the relationship between the Anakar brothers or the relationship between Defendant Langan and the companies owned by his brother and father. Based on the disclosure that was made and the clear instructions for Item 404, Defendants' plea of ignorance is unpersuasive. The Court finds that the Amended Complaint contains sufficient specific factual allegations to infer that Defendants knew of the RPT requirements and acted with "an intent to deceive, manipulate, or defraud" when they signed the 2017 Proxy Statement, 2017 Form 10-K, and 2018 Form-10K, all of which stated that aside from Defendant Langan's

personal guarantee, the signatories "kn[e]w of no related transactions that have occurred." *Spitzberg*, 758 F.3d at 684. While the Court must credit allegations that weigh against scienter in Defendants' favor, the Court finds that Plaintiffs' allegations of scienter create an inference that is "at least as compelling as any opposing inference one could draw from the facts alleged." *See* *Tellabs*, 551 U.S. at 324.

The Court finds Defendants' disclosure of an encouraging RPT and simultaneous failure to disclose less flattering RPTs sufficient to create a strong inference of scienter. Therefore, it need not address the Amended Complaint's alleged failure to plead scienter regarding executive compensation and Defendant Jenkin's prior bankruptcies. *See* *Owens*, 789 F.3d at 537.

**b. False Statements**

Defendants also argue that the Amended Complaint fails to allege a material misrepresentation or omission regarding Tannos Construction or the public statements about RCI's internal controls. Doc. #37 at 11, 13. "[B]y signing documents filed with the [SEC], [signatories] implicitly indicate that they believe that the filing is accurate and complete." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 588 (S.D. Tex. 2003). As is true with all federal pleadings at the motion to dismiss stage, the Amended Complaint's factual "allegations must ... be taken as true." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). And unlike the PLSRA requirements for scienter, all reasonable inferences must be drawn in Plaintiffs' favor when determining whether the Amended Complaint alleges a material misrepresentation or omission. *Lormand*, 565 F.3d at 239.

As to Tannos Construction, Defendants argue that the Amended Complaint contains nothing more than a legal conclusion that Tannos Construction and Louis Tannos are related persons as defined under Item 404. Doc. #37 at 11. Defendants' arguments focus on the wrong actors and entities. Defendants do not dispute that Defendant Langan and Ed Anakar, two RCI officers, are related persons who serve as members, directors, and managers of five Tannos Land Holdings, LLC entities. *Id.*; Doc. #27 ¶ 50. The Amended Complaint alleges a specific development as an example for its belief that Tannos Construction develops real estate purchased by Tannos Land Holdings entities. *Id.* ¶ 50 n11. The Court finds these allegations sufficient to plausibly allege that RCI's transactions with Tannos Construction should have been disclosed because of Defendant Langan and Ed Anakar's indirect material interests in the transactions. *See* 17 C.F.R. § 229.404(a).

With regard to disclosures about RCI's internal controls, Plaintiffs allege that Defendants filed misleading statements with the SEC when they did not include insufficient internal controls for reporting of RPTs, executive compensation, and required disclosures as material weaknesses in their annual Form 10-Ks. Doc. #27 ¶¶ 55–60. Defendants argue that because each certification is signed by the CFO and CEO "based on [their] knowledge," statements in the SEC filings cannot be false unless the signatories knew of the falsity at the time of the signing. Doc. #37 at 14.

Even under Defendants' standard, the Amended Complaint alleges sufficient facts to plausibly allege that Defendants Langan and Marshall knew that the filings were false when they signed them. For example, Defendant Langan knew that he had used RCI's jet for personal use when he signed the 2017 Proxy Statement stating that "[t]he Company does not provide named executive officers with any significant perquisites or other personal benefits except for an automobile for each executive's business use." Doc. #27 ¶ 121. Additionally, Defendants do not dispute that Defendants Marshall and Langan knew of the undisclosed RPTs when they signed the Form 10-Ks stating that aside from Defendant Langan's personal guarantee, they "kn[e]w of no related transactions that have occurred since the beginning of the fiscal year." *Id.* ¶¶ 109, 113, 115. By extension, Defendants Marshall and Langan knew that the list of material weaknesses for internal controls should have included RPTs. That the Form 10-Ks disclosed weaknesses Defendants characterize as "more extensive and significant" does not negate the fact that the SEC filings signed by Defendants Langan and Marshall did not tell an "accurate and complete" story regarding internal

control weaknesses. *See* Doc. #41 at 5; *In re Enron*, 258 F. Supp. 2d at 588. Therefore, the Court finds that the Amended Complaint sufficiently alleges misleading statements or omissions regarding RCI's internal controls.

## IV. Conclusion

***5** In conclusion, the Court finds that the Amended Complaint sufficiently alleges that Defendants made material misrepresentations or omissions with the requisite level of scienter to state a Section 10(b) securities fraud claim. Defendants' argument that the Section 20(a) claim must fail based on the failure to allege a Section 10(b) claim is therefore unpersuasive. For the foregoing reasons, the Motion is hereby DENIED.

It is so ORDERED.

### All Citations

Not Reported in Fed. Supp., 2021 WL 1232782

## Footnotes

1 Ari Hoffman originally filed this collective action suit, but he is not included as a plaintiff in the Amended Complaint now before the Court. Doc. #1; *cf.* Doc. #27. Nevertheless, the caption for this case has not been updated.

2 Plaintiffs filed a request for the Court to take judicial notice of the two SEC administrative orders published in September 2020 as a result of the investigations into RCI and Jenkins. Doc. #42. Because the Court finds that the Amended Complaint is sufficient to survive the Motion to Dismiss, the request is denied without prejudice as moot.

3 The Amended Complaint alleges the following structure for five Tannos Land Holdings entities: 1) Holdings I has two directors: Langan and Louis Tannos ("LT"); 2) Holdings II has three members: Langan, LT, and Jonah Tannos; 3) Holdings III has three directors: LT, Langan, and Ed Anakar; 4) Holdings VI has one director, Langan, two managers, LT and Langan, and one member, Ed Anakar; and 5) Holdings V has one director, Langan, and two mangers, LT and Langan. Doc. #27 ¶ 50. The Amended Complaint further alleges "[o]n information and belief [that] Tannos Construction develops commercial and industrial real estate purchased and held by Tannos Land Holdings" entities and pleads a 2015 development in Friendswood, Texas as an example of Plaintiffs' basis for this belief. *Id.* ¶ 50, n11.

4 In the Motion, Defendants argue that because Plaintiff has failed to sufficiently plead that the transactions with Tannos Construction were RPTs, Plaintiff has failed to plead falsity and "as a result, [the Amended Complaint] also does not plead scienter or loss causation." Doc. #37 at 11, n1. In the Reply, Defendants argue that "falsity is not pled for ... the Item 404 claim based on Tannos Construction (which also lacks loss causation)." To the extent Defendants are attempting to raise an independent argument regarding loss causation in their Reply, "[a]rguments raised for the first time in reply briefs are forfeited." *Am. Guarantee & Liab. Ins. Co. v. United States Fire Ins. Co.*, 255 F. Supp. 3d 677, 691 (S.D. Tex. 2017), *aff'd*, 898 F.3d 574 (5th Cir. 2018).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

2022 WL 4277350
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

IN RE APACHE CORP. Securities Litigation

Civil Action No. 4:21-cv-00575
|
Signed September 15, 2022

**Attorneys and Law Firms**

David R Kaplan, Saxena White P.A., San Diego, CA, Naumon A Amjed, Daniel Rotko, Gregory M Castaldo, Pro Hac Vice, Johnston de Forest Whitman, Jr, Joshua Edward D'Ancona, Michelle M. Newcomer, Pro Hac Vice, Kessler Topaz Meltzer and Check LLP, Radnor, PA, John Saul Edwards, Jr, Thomas Robert Ajamie, Ajamie LLP, Houston, TX, Jeremy A Lieberman, Joseph Alexander Hood, II, Pomerantz LLP, New York, NY for Plaintiff.

David D. Sterling, Amy Pharr Hefley, Anthony Joseph Lucisano, Charles Frank Mace, Baker Botts LLP, Houston, TX, for Defendants.

## MEMORANDUM AND RECOMMENDATION

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

***1** Pending before me is Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("Motion to Dismiss"). *See* Dkt. 71. Having reviewed the motion, the response, the reply, the pleadings, and the applicable law, I recommend that the Motion to Dismiss be **DENIED**.

## BACKGROUND

This is a securities class action lawsuit brought by Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (collectively, "Lead Plaintiffs"), individually and on behalf of those purchasers of the common stock of Apache Corporation ("Apache") during the period from September 7, 2016 through March 13, 2020 (the "Class Period"). The defendants are Apache, an exploration and production company headquartered in the Houston area, and three of its top executives: (1) John J. Christmann IV ("Christmann"), Apache's President and Chief Executive Officer; (2) Timothy J. Sullivan ("Sullivan"), Apache's former Executive Vice President – Operations Support; and (3) Stephen J. Riney ("Riney"), Apache's Executive Vice President and Chief Financial Officer. I will refer to Christmann, Sullivan, and Riney, collectively, as the "Individual Defendants." Lead Plaintiffs bring claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission.

Lead Plaintiffs' live pleading is the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Class Action Complaint"). *See* Dkt. 65. In this 148-page pleading, Plaintiffs allege a massive fraud centering on an oil and gas field in the Texas panhandle. The origins of this fraud, according to Lead Plaintiffs, began in the early 2010s when Apache endured a prolonged financial slump. As its competitors in the exploration and production industry capitalized on advances in hydraulic fracturing, Apache allegedly did not make a single notable discovery during the fracking boom. As a direct result, the company's stock price languished. Plaintiffs cite a Houston Chronicle article, which observed that Apache

"found itself on the outside looking in," and management "knew Apache had to get back its swagger if it was to reverse its fortunes. It had to return to the business of risk, and it had to make a headline-grabbing find." *Id.* at 18.

In an effort to make such a headline-grabbing find, Apache focused on a remote area of West Texas in Reeves County, dubbed "Alpine High." On September 7, 2016, the first day of the Class Period, Apache announced Alpine High as a major oil discovery in Texas. As alleged by Plaintiffs,

> For three years, Defendants touted Alpine High as a "transformational discovery" and "world class resource play" with immense production capabilities, including "conservative" estimates of over three billion barrels of oil and significant amounts of "really rich gas." Defendants supported their claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations," which would "deliver incredible value to Apache and its shareholders for many, many years to come." Analysts and industry media lauded this "massive shale discovery," emphasizing that Alpine High's "compelling economics" represented Apache's "largest catalyst opportunity" for the coming years and put Apache "back in the game" after a "rough time keeping up with competitors." Fueled by Defendants' assurances, Apache's stock price soared, reaching a Class Period high of $69.00 on December 12, 2016. The Individual Defendants took full advantage, reaping more than $75 million in Alpine High-linked compensation during the Class Period.
>
> ***2** ... Unbeknownst to investors, Defendants' statements were false. In reality, Apache's own production data and analyses of the Alpine High play never supported Defendants' public representations. As Apache was ultimately forced to admit, Alpine High was virtually barren.
>
> Indeed, after three years of relentlessly touting Alpine High to investors, the "world class resource play" that was supposedly going to "transform" Apache produced less than 1% of the oil and gas that Defendants had represented to investors was recoverable. Alpine High was so devoid of oil and gas that Apache was forced to cease all drilling at the field in 2020, take a $3 billion write down, and slash its dividend by a staggering 90%. When the truth regarding Defendants' fraud emerged, analysts and the nation's leading financial publications excoriated Defendants, noting that the revelations "were in stark contrast to [Defendants'] past defense of Alpine High," and Apache's stock price was decimated, closing at a mere $4.46 on March 17, 2020—an astonishing decline of 93% from its high during the Class Period.

*Id.* at 8-9 (cleaned up).

This is not, Lead Plaintiffs insist, a situation in which a prospect turned out to be poor performing much to the surprise of those involved in the project. Instead, Lead Plaintiffs paint a sinister picture, claiming that Defendants touted the economic viability of Alpine High knowing full well that such statements were false. Based, in part, on statements from 24 confidential witnesses, the Consolidated Class Action Complaint asserts that Defendants lacked crucial data they needed to support impressive claims about Alpine High's production capabilities. Even worse, Lead Plaintiffs contend that the data behind the play actually indicated that Alpine High was not commercially viable. Lead Plaintiffs maintain that Defendants nonetheless went ahead and widely broadcast overwhelmingly positive statements about this high-profile project.

Defendants have moved to dismiss the Consolidated Class Action Complaint for failure to plead (i) an actionable false or misleading statement; or (ii) scienter with particularity as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Reform Litigation Act ("PSLRA").

## LEGAL FRAMEWORK

Rule 12(b)(6) authorizes dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At this initial pleading stage, I am required to accept as true all well-pleaded factual allegations in the Consolidated Class Action Complaint. *See* *Twombly*, 550 U.S. at 555–56.

Rule 9(b) requires parties claiming fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The allegations must include "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quotation omitted).

***3** Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R § 240.10b–5(b). "A § 10b–5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled 'with particularity' and ... the requirements of the [PSLRA]." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Enacted by Congress in 1995, the PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To accomplish this goal, the PSLRA contains "[e]xacting pleading requirements." *Id.* at 313. Under the PSLRA's heightened pleading requirements, a plaintiff seeking to state a § 10(b) and Rule 10b–5 claim must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quotation omitted).

The scienter, or state of mind element of a § 10(b) and Rule 10b–5 claim, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Scienter is satisfied by a showing of severe recklessness, *i.e.*, an extreme departure from the standards of ordinary care." *Sec. & Exch. Comm'n v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (quotation omitted). To allege scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Section 20(a) of the Exchange Act provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act. 15 U.S.C. § 78t(a). "To impute liability to [the Individual Defendants]—the alleged 'control persons' of [Apache] under § 20(a) of the Securities Exchange Act—the investors ha[ve] to show a 'primary violation' under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

## ANALYSIS

### A. Lead Plaintiffs Adequately Plead Actionable Misrepresentations

Defendants first argue that the Consolidated Class Action Complaint contains no well-pleaded allegations of an affirmative misrepresentation or omission. I disagree.

At the outset, I note that there is no dispute that Apache and the Individual Defendants made many optimistic statements during the Class Period about the commercial viability of Alpine Heights. [1] For illustrative purposes, I note that Defendants promoted Alpine High as "an immense resource and a transformational discovery for Apache" that would "drive incremental growth and returns for years to come." Dkt. 65 at 93; *see also id.* at 86 ("I've said it's world class. This would compare it versus three – what other people would view as world-class resources, the Woodford SCOOP, the Marcellus, and the Eagle Ford ... It stacks up as well as anything."); *id.* at 109 ("[W]e are building out a world-class resource play that will change the course of Apache."); *id.* at 115 ("There is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil."); *id.* at 118 ("Investors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High.").

***4** As Defendants correctly note, " 'the standard for misrepresentation in this [omission] context is whether the information disclosed, *understood as a whole*, would mislead a reasonable potential investor.' " Dkt. 71 at 27 (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 824 (S.D. Tex. 2017)). At this early pleading stage, it is my responsibility to determine whether the totality of allegations indicate that representations made by Defendants concerning the commercial viability of Alpine High were materially false or misleading when made. To help me make this determination, Lead Plaintiffs emphasize that the Consolidated Class Action Complaint does not make naked assertions of falsity. Instead, Lead Plaintiffs allege, in great detail, that Defendants were fully aware that there was no reliable data to support the wildly enthusiastic claims for Alpine High. By way of example, Lead Plaintiffs allege that Steven Keenan, the lead geologist Apache had tapped to discover the next big find, repeatedly told senior management in 2016 that the company did not have the data to announce the play, and would need at least nine more months of consistent production from numerous wells within the play to properly assess the commercial viability of Alpine High. Despite these warnings, Lead Plaintiffs contend, Apache made a grand announcement on September 7, 2016, hyping Alpine High's attributes, performance, and commercial viability. If the Consolidated Class Action Complaint is to be believed, Apache senior management had no reason to make such rosy statements to the market concerning this new shale play. Possibly even more alarming is the lawsuit's accusation that, in mid-2019, Apache commenced an independent internal technical review of Alpine High. That review, named "Project Neptune," reportedly concluded "that the vast majority of Apache's Alpine High wells had ***never*** performed or produced anything like the Company had represented to the market." Dkt. 65 at 46. "Instead, the current, recent, and historical production and performance were far worse than what Apache and Defendants had told investors." *Id.* Lead Plaintiffs also allege that Apache's top executive, Christmann, deliberately shielded critical Alpine High data from the rest of the company for years, thus precluding standard peer review practices from occurring.

Over my career, both as a lawyer and as a judge, I have had the opportunity to review a vast number of securities class action lawsuits. Despite their usual length, many of those filings are cut-and-paste jobs that unquestionably fail to properly allege a false or misleading statement. This is not one of those complaints. The Consolidated Class Action Complaint provides a detailed discussion of the alleged misrepresentations at issue and explains the reasons why Defendants allegedly knew at the time they spoke publicly that those statements were materially false. *See id.* at 85-130. For that reason, I conclude that Lead Plaintiffs have sufficiently alleged that Defendants made materially false or misleading statements, a necessary prerequisite to stating a § 10(b) and Rule 10b–5 claim. *See* *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021) (sustaining fraud claims at the motion to dismiss stage where plaintiffs relied "on the accounts of two production engineers, [to] allege that [defendants] clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates").

### B. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' Alleged Misstatements

Defendants contend that many of the alleged misstatements contained in the Consolidated Class Action Complaint constitute forward-looking statements protected by the PSLRA's safe harbor provision. The PSLRA's safe harbor provides, in relevant part, that a forward-looking statement is not actionable if (1) the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or

(2) if "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A–B).

Defendants assert that the "vast majority" of the Consolidated Class Action Complaint's alleged misstatements are forward-looking statements that fall within the PSLRA's safe harbor. Dkt. 71 at 29. In my view, Defendants are overreaching. Even a cursory review of the alleged misstatements (conveniently listed on the dueling Appendixes provided by the parties) indicates that many are statements of current or historical fact, which are not protected by the PSLRA's safe harbor. *See* *In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 799–800 (S.D. Tex. 2012) ("[T]he challenged statements are presented as a representation of [the defendant's] past achievements ... and are not forward-looking."); *In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009 WL 6325540, at *32 (S.D. Tex. July 9, 2009) ("[A] statement of historical fact cannot be protected by the safe harbor."). To the extent some of the alleged misstatements contain forward-looking elements, many of them incorporate factual assertions, rendering the safe harbor inapplicable. *See* *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (quotation omitted)); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) ("A forward-looking statement ... whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision.").

***5** Even if all the alleged misstatements can, nonetheless, be construed as forward-looking, I still do not believe the safe harbor provides a panacea for Defendants. Because the Consolidated Class Action Complaint alleges that the Defendants knew that their statements were misleading at the time they were made, the key question becomes whether those statements were accompanied by meaningful cautionary language. *See* *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016) ("Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement ... is identified as forward looking and is accompanied by meaningful cautionary language."). And what is meant by the phrase "meaningful cautionary language"? The Fifth Circuit has explained that "formulaic" and "generic" disclaimers cannot protect forward-looking statements because "Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–45 (5th Cir. 2009); *see also* *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (The safe harbor would not protect "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Here, the language Defendants primarily rely on for the safe harbor to apply provides that any company statements were subject to "a number of risks and uncertainties which could cause our actual results, performance, and financial condition to differ materially from our expectations." Dkt. 71 at 30. Defendants' generic use of terms such as "risks" and "uncertainties" fails to provide substantive, company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, as the Fifth Circuit requires. Indeed, the Fifth Circuit in *Lormand* expressly rejected similar cautionary-disclaimer language, refusing to apply the safe harbor when the company's disclaimer stated: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Lormand*, 565 F.3d at 245. As for the more specific warnings that Defendants point to, like warning of "the risk that Apache will not encounter commercially productive oil and gas reservoirs" (Dkt. 71 at 30), these warnings are insufficient because "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015). Accepting Lead Plaintiffs' allegations as true, at the start of the Class Period, Defendants had *years* of data indicating that Apache would not encounter commercially productive oil and gas reservoirs. Accordingly, far more specific warnings were

required to bring Apache's statements within the safe harbor. I thus conclude that Defendants' cautionary statements are not meaningful. The result is that the PSLRA's safe harbor provision does not apply.

**C. Lead Plaintiffs Adequately Plead Actionable Misleading Statements of Opinion**

Defendants next argue that the "vast majority" of alleged misstatements identified in the Consolidated Class Action Complaint qualify as non-actionable opinions. Dkt. 71 at 31. Because § 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A–B), Defendants note that statements of opinion are not actionable under federal securities laws simply because they allegedly "turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). That is true, but "certain opinion statements can be actionable as well, since 'the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.' " *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) (quoting *Lormand*, 565 F.3d at 248); *see also* *Omnicare*, 575 U.S. at 193 ("[T]he phrases 'we believe' or 'we think' ... can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors"). The Supreme Court's *Omnicare* opinion "clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion." *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. CV H-21-2045, ––– F. Supp. 3d ––––, 2022 WL 3227584, at *9 (S.D. Tex. Aug. 10, 2022). Under *Omnicare*, opinion statements are actionable if the speaker did not sincerely hold that opinion, or if the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.' " *In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting *Omnicare*, 575 U.S. at 189).

***6** As an initial matter, I am not convinced, as Defendants claim, that the "vast majority of the [alleged misstatements] qualify as opinions." Dkt. 71 at 31. But even if I assume that virtually all the alleged misstatements are opinions, those opinions are actionable under Supreme Court precedent. As Lead Plaintiffs point out, "Defendants repeatedly made highly specific and authoritative Alpine High estimates, including about its volumes of recoverable oil and gas, drilling locations, and commercial viability." Dkt. 74 at 54. Under *Omnicare*, each of these alleged misstatements is actionable because Defendants purportedly concealed material facts, including that (i) the Apache geologists responsible for exploring and developing Alpine High did not believe the data supported the company's grandiose predictions; (ii) top Apache management blocked Alpine High data from being vetted under the standard peer review processes that were otherwise utilized at Apache; and (iii) the underlying data never supported the sky-high estimates offered by Apache senior management. In short, Lead Plaintiffs have sufficiently alleged that Defendants omitted material factual information that would render their statements misleading to a reasonable investor under the *Omnicare* rubric. At this juncture, I conclude that Lead Plaintiffs' alleged misrepresentations, even those based on opinions, survive to see another day.

**D. Lead Plaintiffs Adequately Plead Scienter**

As a final matter, Defendants maintain that the Consolidated Class Action Complaint fails to establish a strong inference of scienter, as required by the PSLRA. To allege scienter under the PSLRA, the plaintiff must plead, with particularity, facts giving rise to a strong inference of either an "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12. Because "there will rarely be direct evidence of intent to defraud," *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. 503-MD-1530, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004), a plaintiff may allege scienter "by pleading facts giving rise to a strong inference of recklessness or conscious misconduct." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001). "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th

Cir. 2015) (quoting Tellabs, 551 U.S. at 326); *see also* Lormand, 565 F.3d at 251 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). A district court must also consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 323–24. "Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," but allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA. *Owens*, 789 F.3d at 540 (quotation omitted).

Turning to the inference of scienter in this case, I concede that this is a close call. A very close call. As I examined the scienter issue, I went back and forth as to whether Lead Plaintiffs' scienter allegations pass muster. In the end, I rely heavily on the Fifth Circuit's instruction that "where there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss." *Spitzberg*, 758 F.3d at 686 (quoting *Lormand*, 565 F.3d at 254).

Lead Plaintiffs claim that they have adequately alleged a strong inference of scienter through a detailed recitation of the purported fraud in the Consolidated Class Action Complaint. In a nutshell, Lead Plaintiffs contend that Defendants, desperate to reverse Apache's slumping performance and announce a major U.S. shale play, initially touted Alpine High as a huge prospect although such statements lacked any reasonable basis. According to Lead Plaintiffs, extensive geologic testing Apache conducted between 2012 and 2014 indicated that Alpine High was not a viable oil play. Then, near the start of the Class Period, a team of technical experts who had reevaluated the asset purportedly advised Apache senior management that the company lacked the technical data and analyses to make reasonable statements or projections about future production from Alpine High. Apache management disregarded these explicit warnings and moved forward with a major public announcement and glowing reports on how Alpine High would drive shareholder value for years to come. As alleged, the summer of 2019 witnessed growing friction among high-level Apache management as the company had still not escaped from the doldrums. The company launched an internal investigation of Alpine High, which concluded that: "(1) the vast majority of Alpine High wells never performed or produced anywhere close to the manner in which they were presented to investors; (ii) from the outset, Alpine High produced only limited quantities of poor quality of oil and gas; and (iii) any price pressure destroyed the economic viability of Alpine High." Dkt. 65 at 123. Nonetheless, Lead Plaintiffs assert, Defendants failed to come clean and acknowledge the project's severe limitations. Instead, Defendants stuck to their guns, defended the economic viability of Alpine High, and moved forward with the project on a wing and a prayer.

***7** For purposes of determining "whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter," the Fifth Circuit holds that it is "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement ... rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. In this case, Lead Plaintiffs' scienter allegations are based, in part, on statements from a bevy of confidential witnesses, many of whom confirm that the Individual Defendants received regular reports and updates on Alpine High, making the Individual Defendants fully aware of the play's limitations. In particular, the live pleading alleges that "Keenan was 'intimately aware' of production, drilling and completions at Alpine High through Daily Operations Meetings and Weekly Production Meetings," and he "routinely updated Defendants Christmann and Sullivan regarding Alpine High throughout the Class Period during both Quarterly Review Meetings in San Antonio as well as during Kennan's monthly trips to Apache's corporate headquarters in Houston." Dkt. 65 at 125. Riney also allegedly "closely tracked the status of each Alpine High well," *id.* at 125-16, and attended meetings at which Alpine High's production woes were openly discussed. *See id.* at 62. Despite this alleged knowledge, the Individual Defendants—through numerous investor presentations, press releases, earnings calls, and press interviews—made repeated statements promoting Alpine High's performance and profitability. These statements were, according to Lead Plaintiffs, materially misleading.

Defendants argue that Lead Plaintiffs' scienter theory—"that Defendants 'knew' Alpine High would never be an economic play and they 'lacked any scientific or factual basis' for their statements, concealed the truth from investors, and yet continued to 'pour[ ] money into the ground' to the tune of *more than $3 billion*"—is nonsensical. Dkt. 71 at 39 (quoting Dkt. 65 at 60, 120). It is, Defendants contend, wholly illogical and irrational for Apache and its senior management to promote a play they

knew, all along, would fail miserably. This argument goes a bit too far. While it certainly would not have been in the company's best interest to stick by a strategy doomed from the start, the Consolidated Class Action Complaint's allegations are not wholly illogical. With Apache stock languishing and senior management convinced that only a major announcement could put the company back on track, Defendants supposedly went "all in" on Alpine High, "gambling that they would figure something out, even though the Company's extensive explorations repeatedly failed to produce scientific support for their bold claims." Dkt. 74 at 73. To this end, after Apache announced the Alpine High play, the company "desperately drilled its way across Alpine High during the Class period," hoping to stumble across highly economic wells. Dkt. 65 at 54. The Consolidated Class Action Complaint quotes one confidential witness as stating that Apache geologists " 'willfully ignored' [data demonstrating that Alpine High lacked economically recoverable resources] because they were under 'a lot of pressure' to make an oil find and Alpine High was a 'Hail Mary pass to the end zone.' " *Id.* at 121. As Judge Richard Posner once explained:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). While the course of conduct allegedly pursued by Defendants might not have been a wise one, it was rational (though reckless).[2] Considering the totality of Lead Plaintiffs' allegations, the inference that Defendants acted recklessly is at least as compelling as any alternative inference.

To bolster their scienter allegations, Lead Plaintiffs advance a number of additional arguments. First, Lead Plaintiffs claim that the resignation in October 2018 of Keenan, Apache's lead technical advisor on the Alpine High play, favors an inference of scienter. Second, Lead Plaintiffs argue that a strong inference of scienter is supported by Apache's announcement in February 2020 that it took a massive $3 billion write-down and ceased all further exploration in Alpine High. Third, Lead Plaintiffs maintain that scienter is enhanced by the Individual Defendants' compensation structures, which strongly incentivized the executives to inflate Apache's stock price by hyping Alpine High. Even if I completely discount these additional scienter allegations, I still think Lead Plaintiffs have done enough at the pleading stage to establish a strong inference of scienter.

***8** Viewing Lead Plaintiffs' allegations as true and evaluating the facts as a whole, I conclude that Consolidated Class Action Complaint's allegations are sufficient to support a strong inference of scienter by Defendants. *See, e.g., In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) ("[I]f a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter."); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) (holding that defendants' access to contradictory information provided "more than mere conclusory allegations that Defendants ... must have had knowledge" of the information); *Singh v. 21Vianet Grp., Inc*, No. 2:14-cv-00894, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (a strong inference of scienter may arise when defendants knew facts or had access to information suggesting that their public statements were not accurate (quotation omitted); *Brody v. Zix Corp.*, No. 3:04-CV-1931, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (finding it reasonable to assume defendants had actual knowledge of material misstatements because they regularly received reports showing the statements were false). I thus recommend that the Motion to Dismiss be denied on the grounds that Lead Plaintiffs failed to adequately plead scienter.

## CONCLUSION

For the reasons explained above, I recommend that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. 71) be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4277350

## Footnotes

1 The Consolidated Class Action Complaint describes the alleged misstatements in great detail. For convenience, Defendants put together an Appendix identifying in one, easy-to-use chart, each alleged misrepresentation made by Defendants. *See* Dkt. 71-1. For completeness, Lead Plaintiffs have copied Defendants' Appendix A and added a column titled "Plaintiffs' Response" that contains Lead Plaintiffs' brief response to Defendants' arguments for why the alleged misstatements are not actionable. *See* Dkt. 74-2.

2 I must admit that I am puzzled by Lead Plaintiffs' assertion in their response that the Consolidated Class Action Complaint does **not** allege that "Defendants knew Alpine High was destined to fail." Dkt. 74 at 72. That is exactly what the lawsuit alleges. *See, e.g.*, Dkt. 65 at 111 ("As Defendants knew from the outset, ... Alpine High was never justified by the long-term scale and return potential even at lower gas prices." (cleaned up)).

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

2025 WL 1685840
United States District Court, N.D. Texas, Dallas Division.

IN RE AT&T INC. SECURITIES LITIGATION

Civil Action No. 3:24-CV-01196-N
|
Signed June 16, 2025

**MEMORANDUM OPINION AND ORDER**

David C. Godbey, Chief United States District Judge

***1** This Order addresses Defendants AT&T Inc., Randall Stephenson, John Stankey, Pascal Desroches, John Stephens, and Jeffrey McElfresh's (collectively, "Defendants") motion to dismiss [70]. Because the Court concludes that Lead Plaintiffs Teachers' Retirement System of the City of New York, New York City Employees Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Board of Education Retirement System of the City of New York (collectively, "Plaintiffs") have failed to state a claim under the rigorous requirements of the Public Securities Litigation Reform Act ("PSLRA"), the Court grants the motion and dismisses all claims without prejudice. The Court further grants Plaintiffs leave to amend their complaint within thirty days of this Order.

## I. ORIGINS OF THE DISPUTE

This is a putative class action under federal securities law on behalf of all persons and entities, other than Defendants, that purchased or otherwise acquired AT&T Inc. ("AT&T") securities between July 28, 2018, and July 26, 2023 (the "Class Period"). *See* Pls.' First Am. Compl. ¶ 1 [64] ("FAC").[1] On July 9, 2023, the Wall Street Journal ("WSJ") published an exposé titled "America Is Wrapped in Miles of Toxic Lead Cables" that stated "AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead .... As the lead degrades, it is ending up in places where Americans live, work and play." *Id.* ¶ 241. The story further reported that the telecom companies knew about the lead cables, their risks, and the potential for lead to leach into the environment but failed to act on these potential risks or take efforts to monitor the cables. *Id.*

Historically, the use of lead-lined transmission cables was an industry standard practice. *Id.* ¶ 115. By 1978, it was recognized that lead-lined cables were in wide use across the country, although they were no longer being used in new installations. *See id.* ¶ 118. As of July 2023, AT&T still owned approximately 200,000 miles of lead cables around the country, about one-third of which is located on aerial utility poles or underwater. *Id.* ¶ 125. The other two-thirds are either buried or located within conduit. *Id.* Frontline AT&T workers from various geographies report encountering lead cables that tend to be concentrated in older urban areas such as Dallas and Milwaukee. *See id.* ¶ 123. One worker estimates that roughly 80% of the cables in Dallas, including those used on aerial utility poles, are covered in lead. *Id.* In Chicago, most of the aerial cables are found in heavily populated neighborhoods. *Id.* WSJ investigators tested samples from various areas near lead lined cables, including 130 underwater cable sites, a playground, and in front of a school. FAC ¶ 241. All of these samples contained lead that seemingly leached from the cables. *Id.* The WSJ team found that aerial lead cables run alongside more than one hundred schools, while more than one thousand schools are within a one-half of a mile of an underwater lead cable. *Id.*

***2** AT&T stock fell 2.18% the day after the WSJ story first broke. *Id.* ¶ 399. After additional reporting raised alarm over AT&T's potential exposure for the lead cables, AT&T stock further declined to its lowest level since March 1993. *See id.* ¶¶ 406–07. Plaintiffs bring this lawsuit under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 against AT&T and several

of its executives. *Id.* ¶¶ 485–91. Plaintiffs allege that various statements about AT&T's efforts to retire its old telecom lines were materially false or misleading as to the risks AT&T faced from this widespread and deteriorating network of lead-lined cables. *See id.* ¶ 278. Plaintiffs also assert a claim under Section 20(a) of the Securities and Exchange Act against Stephenson, Stankey, Stephens, Desroches, and McElfresh (collectively, "Individual Defendants") as control persons of AT&T. *Id.* ¶¶ 492–97.

### *A. Statements on Cost Savings*

Over the course of the class period, Defendants made several statements about how retiring the old copper transmission lines would help reduce costs. *See, e.g., id.* ¶¶ 281, 290, 293, 295, 304–06, 317. Plaintiffs contend these statements are false or materially misleading in that they fail to apprise investors of the fact that AT&T's shutdown strategy, involving leaving lead-lined wires in place, was likely to expose AT&T to significant and costly scrutiny, liability, and reputational harm. *Id.* ¶ 280.

### *B. Statements on Environmental Stewardship*

Next, Defendants made several statements about AT&T's commitment to responsible waste management, and specifically the proper disposal of hazardous wastes. *See, e.g., id.* ¶¶ 331, 336, 343. Plaintiffs contend these statements are false or materially misleading because they fail to disclose the existence of the lead-lined cables, that they are being left in place, and that they are known to leach lead into the environment. *Id.* ¶ 332.

### *C. Statements on Employee Health and Safety*

Next, Defendants made statements about AT&T's commitment to complying with environmental, health, and safety ("EHS") laws, training employees on EHS, and continuously evaluating EHS compliance. *See, e.g., id.* ¶¶ 361–62, 368–70. Plaintiffs contend that these statements are materially false or misleading because they fail to reveal that many employees who worked on lead-lined cables did not receive appropriate lead safety trainings, AT&T did not implement controls to ensure proper EHS compliance, and the work performed on these cables released lead into the environment without proper abatement protocols. *Id.* ¶ 363.

### *D. Risk Statements*

Finally, Defendants made multiple statements about risks that could impact AT&T's business, including risks that "[n]etwork service enhancements ... may not occur as scheduled or at the cost expected" or that failure to manage and execute AT&T's "business transformation initiatives" could adversely affect AT&T's financial condition or competitive position. *See, e.g., id.* ¶¶ 384, 387. Plaintiffs contend these statements are false or misleading because they did not disclose the existence of, or risks associated with, the lead-lined cables and therefore that the risk of not completing network upgrades at the expected cost was more than hypothetical. *Id.* ¶ 386.

Defendants now move to dismiss all claims against them for failure to state a claim. Defs.' Mot. 1 [70].

## II. LEGAL STANDARDS

### *A. Rule 12(b)(6)*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

When deciding a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

***3** In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *See* *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, a court may also consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted ... to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Second, a "written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). Third, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.' " *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Finally, in "deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also, e.g.*, *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that the "district court took appropriate judicial notice of publicly-available documents and transcripts produced by the FDA, which were matters of public record directly relevant to the issue at hand").

### *B. Rule 9(b)*

Section 10(b) claims are subject to Rule 9(b), which requires that plaintiffs alleging fraud or mistake state their claims with particularity. *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015). Specifically, plaintiffs must set forth the "who, what, when, where, and how" of the events constituting fraud or mistake. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). Plaintiffs also must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (emphasis omitted). Allegations against defendants as a group, without more specific connections between an individual defendant and an allegedly fraudulent act, should be disregarded. *Owens*, 789 F.3d at 537–38. Other inference-based allegations, such as pleading based on a defendant's position or common knowledge alone are similarly too vague. *See* *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432–33 (5th Cir. 2002); *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 432 (S.D. Tex. 2020), *aff 'd*, 858 F. App'x 162 (5th Cir. 2021) (unpub.).

Conditions of a person's mind may be alleged generally, FED. R. CIV. P. 9(b), and the particularity standard may be relaxed where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). But courts pay careful attention to allegations made on

information and belief to ensure this exception is not misused as a "license to base claims of fraud on speculation and conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). The "complaint must set forth a factual basis for such belief." *Willard*, 336 F.3d at 385.

### *C. Section 10(b), Rule 10b-5, and the PSLRA*

Section 10(b) of the Securities and Exchange Act, codified at 15 U.S.C. § 78j(b), empowers the Securities and Exchange Commission to prescribe rules and regulations to protect the public from manipulative and deceptive securities practices. Rule 10b-5, implementing Section 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

***4** (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Violations require scienter, which is a "mental state embracing intent to deceive, manipulate, or defraud." *Mun. Emps.' Ret. Sys. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429–30 (5th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)). "Both intent and 'severe recklessness' are sufficient." *Id.* at 430 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). There is "considerable overlap among the subsections of the Rule," *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019), but subsection (b) focuses on false statements and omissions, whereas scheme liability under (a) and (c) concerns conduct. *See* *SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *18 (D.N.J. 2020). Thus, pleading each type of claim varies only slightly.

The elements of a private Rule 10b-5(b) claim are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss. *Owens*, 789 F.3d at 535 (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)). Similarly, Rule 10b-5(a) and (c) claims "require allegations 'that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries.' " *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 720 (N.D. Tex. 2018) (quoting *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 678 n.45 (S.D. Tex. 2006)).

The PSLRA further heightens the pleading requirements in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, plaintiffs must, "with respect to each act or omission ... , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). The latter "alters the usual contours of a Rule 12(b)(6) ruling" by requiring courts to "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Cotter v. Gwyn*, 2016 WL 4479510, at *6 (E.D. La. 2016) (quoting *Lormand*, 565

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

F.3d at 239). When viewing the allegations holistically, the inference must be "cogent and compelling, not merely reasonable or permissible, in light of other explanations." *Id.* (cleaned up).

### *D. Section 20(a)*

Section 20(a) of the Securities and Exchange Act "makes those who control others who violate section 10(b) jointly and severally liable 'unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.' " *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (quoting 15 U.S.C. § 78t(a)). Thus, adequately pleading a primary violation is a prerequisite to stating a control person claim. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023). Additionally, plaintiffs must allege "that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 791. But unlike Rule 10b-5 claims, section "20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b)." *Id.* Once plaintiffs have pled a primary violation with sufficient particularity, they "need only provide the defendant fair notice of the [control person] claim and the basis of the allegations." *Id.* (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993)).

## III. THE COURT GRANTS DEFENDANTS' MOTION TO DISMISS BECAUSE PLAINTIFFS' ALLEGATIONS FAIL TO CREATE A STRONG INFERENCE OF SCIENTER

***5** To state a valid claim under Rule 10b-5, Plaintiffs must allege facts giving rise to a strong inference that the Defendants acted with intent to deceive, manipulate, or defraud, or severe recklessness. *Pier 1*, 935 F.3d at 429–30. Here, Defendants argue that Plaintiffs have failed to meet this high bar for multiple reasons including the use of impermissible group pleading and offering weak, generalized allegations of motive. Defs.' Mot. 8. Reviewing the complaint, the Court agrees.

### *A. Plaintiffs Rely on Improper Group Pleading*

Plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (emphasis in original). Allegations against the Defendants as a group, without more specific connections between an Individual Defendant and an allegedly fraudulent statement, should be disregarded. *Owens*, 789 F.3d at 537–38. Scienter must be shown as to each Defendant, and group allegations "are not properly imputable as to any particular defendant." *Id.* at 537. Here, Plaintiffs rely on allegations that (1) are statements found in unsigned "Issue Briefs" attributed only to AT&T; and (2) attribute knowledge of various facts to a group or to nondefendant individuals. These allegations are insufficient to support an inference of scienter as to any defendant.

First, the challenged statements that come from AT&T's "Issue Briefs" fail to support scienter because they are not attributed or connected to any individual speaker. Across seventy-two paragraphs of the complaint, Plaintiffs challenge specific statements alleged to be materially false or misleading. Thirty-five of these challenged statements are found in Issue Briefs published on the AT&T website. *See* FAC ¶¶ 329–31, 335–37, 341–43, 345–47, 349–51, 357–59, 361–62, 364–66, 368–70, 372–74, 376–78, 380–82. In reciting each of these statements, the complaint does not attribute or connect any of them to an Individual Defendant — only to AT&T. *See id.* Accordingly, these statements are not actionable because they fail to draw the requisite connection needed to establish scienter. *See* *Southland*, 365 F.3d at 365 (requiring "specific factual allegations link[ing] the individual to the statement at issue").

Plaintiffs argue that these Issue Briefs are, in fact, attributed. Pls.' Resp. 25. However, the Court disagrees. Plaintiffs point to the fact that AT&T issues a yearly Corporate Sustainability Report ("CSR"), each of these CSRs contains an introductory letter from AT&T's CEO, and they also refer readers to the Issue Briefs. *See id.* However, the fact that the CSRs contain an introductory letter by the CEO (Stephenson or Stankey) may not even make the core statements within the CSRs attributable to the CEO, much less the statements within the obliquely referenced Issue Briefs. *See* *Southland*, 365 F.3d at 366 (stating corporate scienter as to a statement is shown by the state of mind of the individual making it, ordering or approving it, or furnishing information for inclusion). And even if the CSRs' statements can be attributed to the CEO, that does not necessarily mean the Issue Briefs are also attributed. Here, the connections between the CSRs and the Issue Briefs are attenuated at best. The CSRs discuss various subject matters, and often at the end of a section, include a note in the margin that states something like: "Read more in our Climate Change issue brief at [URL]." *See, e.g.*, Pls.' Appx. 154 [73-1].[2] This is a far cry from adopting or reasserting the statements in the Issue Briefs. And it is not enough for the Court to conclude that the introducing CEO ordered or approved everything in the Issue Briefs based on these minor references. Accordingly, the issue briefs are unattributed and are therefore not sufficient to support a strong inference of scienter for any Defendant.

***6** Second, many other allegations in the complaint attribute knowledge of facts to groups of people or lower-level employees — not Individual Defendants — and therefore do not raise an inference of scienter. The FAC frequently refers to groups like "leadership," the "EHS group," "AT&T" generically, and other nonspecific referents. *See, e.g.*, FAC ¶¶ 124, 143, 149, 197. These allegations, when taken as true, paint a picture of what happened "on the ground" at AT&T with regard to the lead-lined cables. But they fail to make any connection between those facts and any Individual Defendant's mental state, as required to state a claim for securities fraud. *See* *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 651 (S.D. Tex. 2021) ("The plaintiffs cannot simply point to the fact that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker."). Accordingly, without such a connection, these allegations do not support a strong inference of scienter here.

### *B. The Allegations of Motive are Insufficient to Establish Scienter*

Plaintiffs allege two general motives for suppressing information about lead-lined cables: (1) the need to reduce costs after AT&T "increased its net debt to over $180 billion to acquire two financially disastrous businesses," FAC ¶ 435, and (2) the desire for the executives to increase their incentive compensation, *Id.* ¶ 441. Neither of these alleged motives are sufficient to create or support an inference of scienter here.

First, the desire to reduce costs is a motivation held by all businesses and is so generic as to not be actionable. *See* *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 860 (rejecting the use of "universal corporate motives"). The Fifth Circuit has also doubted that even a motive tied to the ultimate survival of the business could establish scienter alone. *See* *Owens*, 789 F.3d at 539. Here, Plaintiffs allege that the cost reduction initiatives at AT&T were prompted by activist shareholders worried about "a deterioration in the performance of AT&T's stock" — not the ultimate survival of the business as a whole. *See* FAC ¶ 426. Accordingly, the cost reduction motive allegations are not enough to create a strong inference of intent to deceive, manipulate, or defraud in this case, even when viewed holistically with the other allegations.

Second, the Fifth Circuit has clearly stated that incentive compensation "can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Tuchman*, 14 F.3d at 1068; *see also* *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *6 (N.D. Tex. 2022) (Godbey, C.J.) (noting that "compensation structure arguments ... cannot create an inference of scienter alone"). And viewed in the context of the remaining factual allegations, the Court cannot conclude that a motive to increase incentive compensation in this case is strong enough to support or enhance any inference of scienter.

***C. The Allegations About Each Individual Defendant Fail to Establish Scienter***

Reviewing the remaining allegations as to each Individual Defendant, the Court concludes that the FAC fails to establish the requisite strong inference of scienter to support securities fraud claims. The alleged facts generally establish that the Individual Defendants knew that (1) AT&T was retiring copper wirelines in place, (2) some of these wires contained lead, and (3) lead is generally harmful. But the complaint fails to allege any facts showing the Individual Defendants were aware of any widespread environmental contamination risk or employee health issues that could reasonably result in material risk to the company. Without such belief of material risks (or severe recklessness as to those risks) no inference of scienter is supported.

***1. Defendant Stankey —*** The plurality of Plaintiffs' individualized allegations relate to John Stankey, AT&T's COO from October 2019 through June 2020 and CEO since July 1, 2020. *See* FAC ¶ 20. Plaintiffs allege he made multiple actionable statements about AT&T's transition from copper to fiber and the cost savings the transition was expected to create. Specifically, they challenge statements he made on analyst calls and at conferences as well as statements in 10-K forms he signed. For example, Plaintiffs challenge the following statement in AT&T's 10-K form for fiscal year 2020: "We continue to transform our operations to be more efficient and effective, reinvesting savings into growth areas of the business. We are restructuring businesses, sunsetting legacy networks, ... and reassessing overall benefit costs. We expect continued savings from these initiatives." FAC ¶ 285. To establish Stankey's state of mind, Plaintiffs allege that (1) Stankey admitted the use of lead cables was "well understood" and "has long been known" at AT&T; (2) he personally analyzed the legacy network to decide whether to "reclaim" old lines; (3) he knew lead was an environmental toxin; (4) Stankey led the team that decided to "reclaim" the copper wires and therefore must have known AT&T retired lead cables in place; (5) Stankey was told that the careless disposal of lead "can pose reputational and legal risks" to AT&T; and (6) he knew the risks were materializing because of a lawsuit over lead cables in Lake Tahoe. *See* Pls.' Resp. 21–25.

***7** Reviewing these contentions, the Court concludes they are insufficient to raise a strong inference that Stankey knew of or was severely reckless in failing to disclose material risks to AT&T stemming from these lead-lined cables. First, the Court cannot draw an inference of scienter from the allegations that Stankey led the team tasked with reclaiming copper wire. Generally, "it is well established that an officer's position on its own is insufficient to support an inference of scienter." *Yoshikawa*, 2022 WL 4677621, at *3 (citing *Abrams*, 292 F.3d at 433). And while it may seem that leading the team that reclaimed copper would necessarily impart operational knowledge of the reclamation details, the complaint only pleads that Stankey led an "enterprise-wide cost-reduction initiative" of which cutting costs in the wireline business was one element. *See* FAC ¶¶ 426–29. Similarly, the complaint does not plead that Stankey personally analyzed the legacy network — instead Plaintiffs allege he was "fully engaged [in] doing data analysis" across "all aspects of [AT&T's] operations." FAC ¶ 427. Leading a broad-brush cost-cutting endeavor is the kind of high-level activity executives regularly engage in, and thus does not itself raise a strong inference that Stankey personally knew the details of AT&T's wireline transition project and any material risks that could be associated with it.

And as to the allegation Stankey was told that careless disposal of lead "can pose reputational and legal risks" to AT&T, the complaint pleads this fact in the context of the disposal of lead-acid batteries in 2011. *See* FAC ¶¶ 168–73. This statement does not show that Stankey had any knowledge that the lead-lined cables at issue here were being disposed of carelessly in a way that would create obvious risks to AT&T. And similarly, knowledge of one lawsuit involving lead cables in Lake Tahoe does not establish knowledge of severe risks. Knowledge of one lawsuit in one area, with a disputed factual basis, does not impart knowledge that the entire lead cable network was subject to material risks.

Thus, regardless of whether Stankey knew in the abstract that lead was a hazard to the environment or to AT&T's employees, the complaint fails to allege Stankey was ever provided information or believed that these lead cables were emitting lead into the environment in any widespread way that could pose severe risks to the business. Reviewing the complaint holistically, the Court cannot say there is a strong inference of intent to defraud or severe recklessness as to Stankey — instead, the Court recognizes the at least slightly more persuasive inference that Stankey truthfully believed AT&T's wireline transformation would reduce costs and had no information that would give notice of severe risks in that effort.

***2. Defendant McElfresh —*** Plaintiffs also challenge a number of statements about the copper transition from Jeffrey McElfresh, AT&T's COO since April 2022 and the CEO of AT&T Communications before that. *See* FAC ¶ 22. Similar to Stankey, McElfresh made multiple statements about the expected cost savings coming from AT&T's efforts to retire its copper wireline network. For example, Plaintiffs challenge the following statement McElfresh made on March 11, 2022, at an AT&T Analyst & Investor Day:

> I've mentioned simplicity and focus. These are good ways to think about what we're doing to transform our legacy or copper network footprint and all the fixed and variable costs that go along with running and maintaining a very large copper network .... Reducing the legacy fixed cost and associated trailing expenses and migrating these customers to fiber and 5G solutions maintains our margins .... This program is in the early days of gaining scale, and we're getting to the point where the cost savings are materializing .... These actions not only drive cost efficiencies, but they're opening up more opportunity that is meaningful for our future.

FAC ¶ 304. And in support of scienter, Plaintiffs assert the same theories as for Stankey — that McElfresh knew about the retire-in-place strategy, knew that the cables had lead, and knew that lead was generally harmful. *See* Pls.' Resp. 21–24. However, for the same reasons as discussed for Stankey, the allegations here fail to create a strong inference of scienter. Taken together, the FAC's allegations do not show that McElfresh had any intent to defraud or deceive, or even severe recklessness. Instead, just as for Stankey, the Court finds it more persuasive that McElfresh truthfully believed the copper transition initiatives would lead to cost savings and had no reason to believe there was any severe risk to AT&T's business from that project.

***8** ***3. Defendants Desroches, Stephens, and Stephenson —*** Plaintiffs further challenge some statements by Defendants Pascal Desroches, John Stephens, and Randall Stephenson that relate to the copper transition or statements of risks. *See* FAC ¶¶ 287, 297, 308, 315 (Desroches); ¶¶ 285, 301 (Stephens); ¶ 384 (Stephenson and Stephens). Each of these statements has to do with the potential cost savings associated with transitioning away from copper cable products. *See id.* And Plaintiffs rest their theories of scienter for these defendants on even fewer allegations than those applicable to Stankey or McElfresh. *See, e.g.*, Pls.' Resp. 24 ("Desroches provided frequent and detailed disclosures about the cost benefits of removing copper, showing he had 'substantial familiarity' with the topic." (citation omitted)); FAC ¶ 426 (noting Stephenson stated he would personally oversee the "enterprise-wide cost-reduction initiative"). For the same reasons already discussed, the Court does not find a strong inference that these defendants had any intent to defraud, deceive, or manipulate or acted with severe recklessness as to any risks to AT&T's business. The complaint's allegations instead lead the Court to conclude that the competing inference is at least somewhat more plausible.

Then, because the Court concludes that the Complaint fails to plausibly allege scienter as to any Individual Defendant, the Court must also then conclude that scienter is lacking for the corporate defendant, AT&T. *See* *Southland*, 365 F.3d at 366 (stating courts should look at the "state of mind of the individual" who makes the statement in determining corporate scienter). The Court accordingly dismisses all claims against all defendants for failure to allege scienter. [3]

## IV. FALSITY AND MATERIALITY

Rule 10b-5 makes unlawful "any untrue statement of a material fact" or omission of a material fact when otherwise the statement is misleading. 17 C.F.R. § 240.10b-5. A fact is material if there is a substantial likelihood that a reasonable investor would have placed significance on the withheld or misrepresented information. *Southland*, 365 F.3d at 362 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). To satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standards, Plaintiffs must set forth why a statement is false or misleading. *See id.* While materiality "typically presents a mixed question

of fact and law," making it ultimately "a decision for the jury," *In re Venator Materials*, 547 F. Supp. 3d at 655, Plaintiffs cannot survive a motion to dismiss without setting forth facts that make materiality at least plausible. *Lormand*, 565 F.3d at 257 ("Asking for such plausible grounds to infer the element of a claim *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal that the elements of the claim existed." (emphasis in original) (quoting *Twombly*, 550 U.S. at 556) (cleaned up)). Defendants argue that Plaintiffs have not carried their burden to set forth facts demonstrating that some statements and omissions they challenge were both false and material. *See* Defs.' Mot. 19–20.

### *A. Statements on Cost Savings Are Actionable*

***9** Plaintiffs challenge numerous statements by the various defendants about expected cost savings from the transition away from copper, and the reclamation of that copper material. *See, e.g.*, FAC ¶ 295 (challenging statement by Stankey that AT&T is "taking cost out of the business based on fiber replacement to old infrastructure"); ¶ 293 (challenging McElfresh's statement that decommissioning copper network "takes cost out and helps grow margin"). Over the course of these statements, the Individual Defendants at AT&T repeatedly touted that their initiatives for retiring, replacing, or reclaiming copper wireline would help reduce AT&T's overall cost burden. Plaintiffs allege these statements are false and misleading because:

> these statements gave the false impression that AT&T's legacy infrastructure would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm, but failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company thereafter; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) it was reasonably likely that the Company would incur substantial costs in connection with legislative actions, regulatory enforcement, investigative efforts, removal, remediation, litigation, and/or related penalties.

FAC ¶ 280. Defendants argue that these, and other statements like it, cannot be false or materially misleading because they are statements of opinion, Plaintiffs fail to explain how certain facts being omitted made them misleading, and because they are protected by the PSLRA's safe harbor. Defs.' Mot. 21–25. However, viewing the complaint in the light most favorable to the Plaintiffs, the Court concludes that these statements are actionable.

First, Plaintiffs do plead with sufficient particularity how the challenged statements are false or misleading. As quoted above, Plaintiffs plead the complete chain of inferences necessary to connect the statements about cost savings to the alleged material liability from lead-lined cables. *See* FAC ¶ 280. This is sufficiently particular to survive this motion to dismiss.

Second, these statements about cost savings of the copper transition are mostly not opinions. "An opinion is a belief, a view, or a sentiment which the mind forms of persons or things," while a "fact is a thing done or existing or an actual happening." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (cleaned up). Many of the challenged statements about cost savings are not shrouded in language like "I believe" that could transform them into opinions. When discussing the state of AT&T's business, Defendant Stankey matter-of-factly stated "we are taking cost out of the business based on fiber replacement to old infrastructure." FAC ¶ 295. This is plainly not an opinion, but a statement about what is

actually happening in the business's books at that moment in time. Thus, this statement is an actionable statement of fact. Other statements like "[w]e are ... sunsetting legacy networks" are also phrased not as opinions but statements of current happenings. *See* FAC ¶ 285. And as recited above, Plaintiffs plead a sufficient inferential chain explaining why they believe this statement is misleading. Accordingly, many of the statements about the copper transition are actionable fact statements. [4] However, even when viewed in the light most favorable to Plaintiffs, some of the challenged statements fail to state any "thing done or existing or an actual happening" and therefore must be dismissed on this basis. [5] For example, Stankey's statement that "we believe we can further accelerate cost take-outs as we progress through the year ... [p]art of this entails transforming our network as we ultimately replace our copper services," FAC ¶ 323, is much closer to a statement of personal opinion, not a statement of fact and is therefore not actionable.

***10** Third, these statements about cost savings are not protected by the PSLRA safe harbor. The safe harbor provision protects some forward-looking statements, and it has two independent prongs. First, Defendants will not be held liable for immaterial statements or for forward-looking statements that are identified as such and are accompanied by cautionary language. 15 U.S.C. § 78u-5(c)(1)(A). Second, to evade the safe harbor, plaintiffs must properly plead that the forward-looking statement was made with actual knowledge that it was false and misleading. *Id.* § 78u-5(c)(1)(B). Unlike with the scienter requirement, severe recklessness does not suffice. The safe harbor provision is "disjunctive"; it may apply even when a plaintiff adequately alleges that the speaker had such knowledge if meaningful cautionary language was provided, and it also may apply even without that language if the plaintiff fails to allege facts sufficient to satisfy the second prong. *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016). To qualify for the safe harbor provision, forward-looking statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those described. 15 U.S.C. § 78u-5(c)(1)(A). Courts must determine how each statement is "specifically and meaningfully" protected. *Lormand*, 565 F.3d at 245. Boilerplate cautionary language does not suffice. *Id.* at 244–45.

Here, many of the challenged statements are not sufficiently forward looking to trigger the safe harbor. As pled by the Plaintiffs, many of the challenged statements on cost savings present the cost-savings idea as a present happening. *See, e.g.*, FAC ¶ 293 (stating "as of today, we're probably about 2,000 square miles of our copper network that's been decommissioned ... and that takes cost out that helps grow margin"). Statements like this are not forward looking, because they convey information about present circumstances of which the truth is discernible at the time the statement is made. *See* *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (Godbey, J.); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (noting that a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present").

Then, those statements that could be viewed as purely forward looking do not include sufficient cautionary language. The cautionary language proffered by defendants is entirely boilerplate. *See, e.g.*, Defs.' Mot. Ex. H, at Appx. 34 [70-1] ("First, just reminding everybody of the safe harbor. Some of the information we'll discuss is subject to risks and uncertainties and refer to our website for more information."). This is a far cry from the challenged statements being "specifically and meaningfully protected." *See* *Lormand*, 565 F.3d at 245. And even the more detailed cautionary language in the 10-K forms is still functionally a boilerplate "litany of generally applicable risk factors," as opposed to a "realistic description of the risks applicable to the particular circumstances." *See id.* (quoting *Southland*, 365 F.3d at 372). For example, the 2020 Form 10-K employs the following language when discussing potential risks from lawsuits:

> We have in the past been, and may in the future be, named as a defendant in lawsuits, claims and other legal proceedings that arise in the ordinary course of our business based on alleged acts of misconduct by employees. These actions seek, among other things, compensation for alleged personal injury (including claims for loss of life), workers' compensation, employment discrimination, sexual

harassment, workplace misconduct, wage and hour claims and other employment-related damages, compensation for breach of contract, statutory or regulatory claims, negligence or gross negligence, punitive damages, consequential damages, and civil penalties or other losses or injunctive or declaratory relief. The outcome of any allegations, lawsuits, claims or legal proceedings is inherently uncertain and could result in significant costs, damage to our brands or reputation and diversion of management's attention from our business.

Defs.' Mot. Ex. B, at Appx. 8. Defendants refer to this provision in arguing that cost-savings statements are protected. *See* Defs.' Mot. 23. This language, listing numerous categories of different possible lawsuit natures and legal claims, even simply stating "statutory or regulatory claims," is so broad as to be boilerplate. Because there is not adequate cautionary language from which the Court can say the challenged statements are specifically and meaningfully protected, the Court concludes the PSLRA safe harbor does not apply to the statements about cost savings from the copper transition.

### *B. Some Statements on Environmental Stewardship Are Actionable*

***11** Next, Defendants argue that the challenged statements about environmental stewardship are not actionable because they are either immaterial or they are not alleged to be false. The Court generally agrees.

First, many of the challenged statements in this category are simply generalized positive goals that are therefore immaterial. For example, Plaintiffs challenge the following statement found in an Issue Brief: "We are committed to reducing waste in our operations and responsibly handing the waste that we produce." FAC ¶ 329. This is a vague, optimistic statement that amounts to little more than puffery or corporate cheerleading and is therefore immaterial. *See In re BP p.l.c. Sec. Litig*, 852 F. Supp. 2d at 748. This, and each statement like it in the FAC, must therefore be dismissed for failing to plead materiality. [6]

Next, many of the statements refer to AT&T's general environmental initiatives, and as pled, do not purport to apply these general initiatives to every part, or any particular part, of AT&T's wireline network practices. For example, Plaintiffs challenge the statement that AT&T "manage[s] programs to reclaim and divert high-value network resources such as copper telecommunications wire." FAC ¶ 331. Plaintiffs argue that this statement is misleading because it fails to disclose the existence of the lead-lined cables along with the retire-in-place strategy and attendant environmental risks. *Id.* ¶ 332. However, despite these allegations, the statement that AT&T manages reclamation programs is not alleged to be literally false, nor does it purport to say AT&T reclaims *all* its copper wire. Accordingly, this statement, and others like it, fail to plead falsity. [7] *See* *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 620 (S.D. Tex. 2018) ("Allegations that Plains was ineffective in implementing its policies ... do not make the general statements describing Plains's policies and priorities actionably misleading.").

However, three of the challenged environmental statements are sufficient to survive this motion to dismiss. Specifically, Plaintiffs challenge the statement: "When AT&T vacates facilities and outside plant infrastructure, our teams remove all regulated materials and coordinate with vendors to recycle and dispose of the materials in an appropriate manner." FAC ¶¶ 350, 359. They further challenge the statement: "Hazardous waste is disposed in landfills, incinerated and recycled." FAC ¶ 337. These statements are plausibly alleged to be false, as Plaintiffs claim that AT&T would vacate wirelines (by ceasing to use them) but instead of removing lead (a regulated material), AT&T would simply leave the wires in place while knowing they were likely to leach lead into the environment. *See* FAC ¶ 332. At this stage, these allegations are sufficient to establish falsity for these statements.

### *C. Statements on Employee Health and Safety Are Not Actionable*

Next, Defendants argue that the challenged statements about employee health and safety are not actionable because they are neither false nor material. Defs.' Mot. 27–28. The Court agrees. First, like with the environmental allegations, many of the statements here are nothing more than generalized positive goals or corporate cheerleading. *See, e.g.*, FAC ¶ 361 (challenging statement that AT&T is "committed to complying with all applicable environment, health and safety laws and regulations and to maintaining and improving management systems throughout the company"). Statements like this are immaterial and therefore do not support a securities fraud claim. [8] Then, the remaining statements are nothing more than assertions that AT&T trains its employes on EHS topics and that AT&T monitors its EHS performance on a regular basis. *See, e.g.*, FAC ¶ 366 (stating "we evaluate our EHS performance through regular reviews and internal and external audits"). While Plaintiffs allege these statements are false based on the specific failures of EHS programs related to lead cables, Plaintiffs do not plead that AT&T had no EHS training or engaged in no EHS performance monitoring. Without such allegations, these statements fail to allege a false statement of material fact. [9] *See* *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d at 620.

### *D. Statements on Potential Risks Are Not Actionable*

***12** Finally, Defendants argue that the challenged statements about potential risks are not actionable because Defendants owed no duty to disclose potential investigations before they began. The Court agrees. Plaintiffs challenge various risk disclosure statements by Defendants. *See, e.g.*, FAC ¶ 393 ("Unfavorable litigation or governmental investigation results could require us to pay significant amounts or lead to onerous operating procedures. We are subject to a number of lawsuits both in the United States and foreign countries ...."). Plaintiffs argue these statements are false or misleading because "AT&T was already defending several lawsuits arising from its use and/or abandonment of lead-covered cables" and therefore the risks were more than hypothetical. *See* FAC ¶ 386. However, the Court concludes that these statements fail to support a securities fraud claim. To be actionable, forward-looking statements must be false when made. *See* *Southland*, 365 F.3d at 378. And statements can be misleading where they take presently materializing risks and pose them as a mere hypothetical future risk. *See Marcus v. J.C. Penney Co.*, 2015 WL 5766870, at *3 (E.D. Tex. 2015). But in the above statement, AT&T specifically disclosed that it was presently subject to lawsuits, but that the unknown future outcome may be onerous. Thus, the above statement and those like it were not false when made, because they were warning about future risks that had not yet materialized — the outcome of litigation. [10]

And similarly, the remaining statements, which generally warn that network enhancements may not occur with the expected level of cost, are not actionable either. As discussed in the sections about scienter, there is no sufficient allegation that would permit the inference that any Defendant knew of or believed in a material risk to AT&T's business from the lead-lined cables. And there is no plausible allegation that during the class period there were any significant, unexpected costs materializing from the wireline transition project. Accordingly, the asserted risk statements about future potential costs were not false when made and therefore not actionable. [11]

### V. THE COURT GRANTS THE MOTION TO DISMISS THE SCHEME-LIABILITY CLAIM

In addition to asserting a misstatement claim under Section 10(b) and Rule 10b-5, Plaintiffs also passingly reference a scheme-liability claim. *See* FAC ¶ 486. Defendants move to dismiss this claim, and Plaintiffs did not make any argument in response that is specific to a scheme-liability claim. *See* Defs.' Mot 30–31. Additionally, the Court notes that Rule 10(b) requires Plaintiffs to separately plead a scheme-liability claim if it is in any way distinct from their misstatement claim. *Linenweber v. Sw. Airlines*

*Co.*, 693 F. Supp. 3d 661, 687 (N.D. Tex. 2023). Because Plaintiffs have not provided any argument to the contrary, and the Court sees no distinct alleged facts supporting a scheme liability claim, the Court dismisses this claim without prejudice.

## VI. THE COURT GRANTS THE MOTION TO DISMISS THE CONTROL PERSON CLAIM

Plaintiffs finally assert a control person claim under Section 20(a) of the SEC act. *See* FAC ¶¶ 492–97. However, having dismissed all other substantive claims, the Court concludes that no sufficient primary violation is adequately pled for a Section 20(a) claim to remain. *See Linenweber*, 693 F. Supp. 3d at 688. Thus, the Court dismisses Plaintiff's control-person claim without prejudice.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion to dismiss and dismisses all Plaintiffs' claims without prejudice. The Court further grants Plaintiffs leave to amend their complaint within thirty (30) days of the date of this Order. If Plaintiffs do not amend their complaint within thirty days, the Court will dismiss all claims with prejudice without further notice.

**All Citations**

Slip Copy, 2025 WL 1685840, Fed. Sec. L. Rep. P 102,090

## Footnotes

1 For purposes of this motion, the Court assumes the truth of all well-pleaded facts in the FAC.

2 The Court may consider the contents of the CSRs at this stage because they are explicitly referenced in the complaint. *See* FAC ¶ 68 (describing statements in the 2018 CSR); ¶ 71 (stating the CSRs expressly refer investors to the Issue Briefs).

3 In addition to asserting lack of scienter, falsity, and materiality, Defendants argue that certain statements must be dismissed under the five-year statute of repose codified in 28 U.S.C. § 1658(b). *See* Defs.' Mot. 31. However, the Court declines to dismiss on this basis. For the 2017 form 10-K, Plaintiffs allege the misstatements were later incorporated by reference in future documents. *See* FAC ¶ 385. Having been reasserted within the repose period, the claims based on the substance of these statements are not blocked by the statute. And for the July 2018 EHS Issue Brief, there is a dispute of fact over the publication date that is not appropriate for decision on a motion to dismiss. *See* Pls.' Resp. 18 (noting the Issue Brief gives only an "updated" date, and that date is within the repose period). Defendants further challenge whether Plaintiffs have adequately pled loss causation for any bond transactions because "there is no allegation that the price of any of the bonds dropped." *See* Defs.' Mot. 32. However, Plaintiffs sufficiently allege that they "acquired AT&T securities at artificially inflated prices," these securities dropped in price in the fallout of the WSJ report, and that caused loss to Plaintiffs. *See* FAC ¶¶ 16, 468. The allegations do not limit the definition of "AT&T securities" to just common stock, and the use of the broad term is sufficient to put Defendants on notice that all AT&T securities are in play. Accordingly, the Court declines to dismiss on this basis.

4 *See* FAC ¶¶ 281, 283, 285, 287, 289, 290, 291, 293, 295, 297, 299, 301, 302, 304, 305, 308, 312, 315, 317, 318, 320, 321, 324, 326, 327.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

5 *See* FAC ¶¶ 279, 306, 310, 313, 323.

6 *See* FAC ¶¶ 329, 333, 335, 339, 341, 345, 349, 353, 357.

7 *See* FAC ¶¶ 330, 331, 336, 342, 343, 346, 347, 351, 354, 355, 358.

8 *See* FAC ¶¶ 361, 364, 368, 372, 376, 380.

9 *See* FAC ¶¶ 362, 365, 366, 369, 370, 373, 374, 377, 378, 381, 382.

10 *See* FAC ¶¶ 390, 391, 393, 394.

11 *See* FAC ¶¶ 384, 385, 387, 388.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

2016 WL 215476
United States District Court, S.D. Texas, Houston Division.

IN RE COBALT INTERNATIONAL ENERGY, INC. Securities Litigation.

CIVIL ACTION NO. H–14–3428
|
Signed 01/19/2016

**Attorneys and Law Firms**

David D. Sterling, Daniel David, Amy Pharr Hefley, Russell Carter Lewis, Baker Botts LLP, Houston, TX, for Cobalt International Energy, Inc. Securities Litigation.

**MEMORANDUM AND ORDER**

NANCY F. ATLAS, SENIOR UNITED STATES DISTRICT JUDGE

***1** This securities case is before the Court on the Motion to Dismiss [Doc. # 81] filed by Defendants Goldman, Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Tudor, Pickering, Holt & Co. Securities, Inc., Deutsche Bank Securities Inc., RBC Capital Markets, LLC, UBS Securities LLC, Howard Weil Incorporated, Stifel, Nicolaus & Company, Incorporated, Capital One Southcoast, Inc., and Lazard Capital Markets LLC (collectively, "Underwriter Defendants").[1] Also pending is the Motion to Dismiss [Doc. # 82] filed by Defendants Goldman Sachs Group, Inc., Riverstone Holdings LLC ("Riverstone"), First Reserve, and Kern Partners Ltd. ("Kern") (collectively together with The Carlyle Group, L.P., "Control Defendants"), in which Defendant The Carlyle Group, L.P. ("Carlyle") joined [Doc. # 84].[2] Cobalt International Energy, Inc. ("Cobalt"), Joseph H. Bryant, James W. Farnsworth, John P. Wilkirson, Peter R. Coneway, Henry Cornell, Jack E. Golden, N. John Lancaster, Jon A. Marshall, Kenneth W. Moore, J. Hardy Murchison, Michael G. France, Kenneth A. Pontarelli, Scott L. Lebovitz, Myles W. Scoggins, D. Jeff van Steenbergen, Martin H. Young, Jr., and William P. Utt (collectively, the "Cobalt Defendants") filed a separate Motion to Dismiss [Doc. # 83], to which Plaintiffs filed an Opposition [Doc. # 88], and the Cobalt Defendants filed a Reply [Doc. # 98].

The Court has reviewed the full record, including Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint") [Doc. # 72]. Based on this review, and the application of relevant legal authorities, the Court **grants in part and denies in part** the pending Motions to Dismiss.

## I. BACKGROUND

Cobalt is an exploration and production company that was formed in 2005 as a private company. Defendant Joseph H. Bryant, Goldman Sachs, and Riverstone founded the company, which was incorporated in the state of Delaware. Cobalt conducted an initial public offering ("IPO") of its shares in December 2009. At the time of the IPO, Bryant was Cobalt's Chief Executive Officer ("CEO") and Chairman of Cobalt's Board of Directors.

In 2007, Cobalt entered into an agreement with Sonangol E.P. ("Sonangol"), the Angolan national oil company, to acquire a 40% interest in oil exploration Blocks 9, 20, and 21 in offshore Angola. In 2009, the Angolan Parliament issued two decrees assigning an interest in the Blocks to Nazaki Oil & Gaz ("Nazaki"), Sonangol P&P, and Alper Oil, Limitada ("Alper"). In February 2010, Cobalt and these other companies signed Risk Services Agreements ("RSAs") with Sonangol.

***2** On January 4, 2011, Cobalt filed a Registration Statement and Prospectus ("January 2011 Registration Statement") with the Securities and Exchange Commission ("SEC"). Based on this 2011 Registration Statement, Cobalt conducted, *inter alia*, a stock offering in late February 2012 ("February 2012 Stock Offering") and a bond offering in December 2012 ("2012 Bond Offering").

On March 10, 2011, Cobalt learned that the SEC was conducting an informal inquiry into allegations that there existed a connection between Nazaki and senior government officials in Angola. The next day, Cobalt contacted the Department of Justice ("DOJ") regarding the same allegations. Both the SEC and the DOJ began formal investigations into whether Cobalt had violated the Foreign Corrupt Practices Act of 1977 ("FCPA"). The SEC investigation terminated in January 2015 with no recommendation for enforcement action against Cobalt. The DOJ investigation remains ongoing.

Meanwhile, Cobalt drilled two exploration wells in the offshore Angola drilling region: Lontra on Block 20 and Loengo on Block 9. Cobalt had no rights to gas discoveries and, instead, had rights only to any oil that was discovered in the Blocks. Ultimately, Lontra was found to contain a substantially higher percentage of gas than originally estimated, and drilling at Loengo failed to discover oil.

On November 30, 2014, Plaintiffs St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") and Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio"), who each purchased Cobalt securities, filed a Complaint [Doc. # 1] alleging violations of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"). On December 5, 2014, Steven Neuman, a purchaser of Cobalt securities, filed a Complaint [Doc. # 1 in Civil Action No. H–14–cv–3488], alleging violations of the Securities Act and the Exchange Act. By Order [Doc. # 67] entered March 3, 2015, the Court consolidated the two civil cases. By Order [Doc. # 68] entered the same day, the Court appointed GAMCO Global Gold, Natural Resources & Income Trust and GAMCO Natural Resources, Gold & Income Trust (collectively, "GAMCO") as lead Plaintiffs in the consolidated cases.

On May 1, 2015, Plaintiffs filed their Consolidated Amended Class Action Complaint ("Complaint") [Doc. # 72]. Plaintiffs allege in Count I of their Complaint that Cobalt and its executives violated Section 10(b) of the Exchange Act and Rule 10b–5. In Count II, Plaintiffs allege that Cobalt and its executives violated Section 20(a) of the Exchange Act. Plaintiffs assert in Count III a claim under Section 11 of the Securities Act against Cobalt, its directors, and the Underwriter Defendants. In Count IV, Plaintiffs assert a claim against the Control Defendants under Section 15 of the Securities Act. In Count V, Plaintiffs assert a claim against the Underwriter Defendants under Section 12(a)(2) of the Securities Act.

Defendants filed their Motions to Dismiss. All Defendants seek dismissal of all claims against them. The Motions to Dismiss have been fully briefed and are now ripe for decision.

## II. APPLICABLE LEGAL STANDARDS

### A. Pleading Standard for Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147. The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See* *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal–Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). When there are well–pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679.

***3** Except as explained below regarding the special pleading requirements for two elements of a § 10(b) claim, these pleading requirements apply to Plaintiffs' claims in this case. *See* *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004) ("Section 11 only requires notice pleading under FED. R. CIV. P. 8 rather than the detailed pleading mandated by FED. R. CIV. P. 9(b) or the Private Securities Litigation Reform Act"); *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658 (N.D. Tex. 2013).

**B. Special Pleading Requirements for § 10(b) Claims**

The basic elements of a § 10(b) claim involving publicly traded securities are: (1) a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, (3) scienter by the defendant, (4) justifiable reliance by the plaintiff, (5) damages; and (6) a causal connection between the material misrepresentation and the loss, referred to a "loss causation." *See* *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009). The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading requirement for two elements of a § 10(b) claim – the misrepresentation and scienter elements. *See* *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citing 15 U.S.C. § 78u–4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). Specifically, "the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so–called 'particularity' requirement." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u–4(b)(1)).

Additionally, the PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). To satisfy the pleading standard for the required "strong inference" of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 324). "[A] tie favors the plaintiff." *Id.* (quoting *Lormand*, 565 F.3d at 254).

**III. COBALT DEFENDANTS' MOTION TO DISMISS**

**A. "Foundational Infirmities"**

The Cobalt Defendants argue that the allegations in the Complaint should be "deeply discounted because of their dubious origins." *See* Cobalt Defendants' Motion, p. 20. Specifically, the Cobalt Defendants ask the Court to disregard allegations based on information from confidential witnesses and various published articles. The Cobalt Defendants argue also that Plaintiffs engaged in "selective editing" of the documents on which they base their claims.

Courts often discount allegations from confidential sources. *See, e.g.*, *Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). In this case, however, the confidential witnesses not identified by name are adequately identified in other ways and the basis for their knowledge is set forth in the Complaint. For example, two of the confidential witnesses are Cobalt's Chief Financial Officer ("CFO") and Executive Vice President from June 2009 to June 2010, and its Chief Information Officer ("CIO") from June 2012 to April 2014. Another was the executive administrative assistant for Cobalt's West Africa division from April 2010 to March 2015, who reported to Richard Smith (at the relevant time, Cobalt's Country Manager for Angola and Vice President, International Business Development, Commercial and Finance) for her first two years at Cobalt, and to Michael Drennon (Cobalt's Executive Vice President and General Manager Angola) throughout her tenure at Cobalt. These witnesses may be confidential to the extent that their names are not included in the Complaint, but they are neither anonymous nor secret. The allegations in the Complaint based on knowledge obtained from these witnesses will not be discounted, deeply or otherwise.

***4** Plaintiffs identify and cite to several articles which the Cobalt Defendants argue lack reliability. The cited articles relate primarily to the issue regarding Cobalt's alleged knowledge that Nazaki and Alper were owned by Angolan governmental officials, providing one source of evidentiary support for the allegations. Plaintiffs allege other bases, however, for their claim that the Cobalt Defendants made false or misleading statements. The content of the articles is properly alleged and the accuracy of the articles is not a proper subject for a motion to dismiss.

The Cobalt Defendants argue also that Plaintiffs selectively edited certain statements, and that the editing "casts even further doubt on Plaintiffs' claims." *See* Cobalt Defendants' Motion, p. 25. The pleading stage, however, is not the time to consider whether Plaintiffs' allegations should be doubted. The only issue is whether Plaintiffs' allegations in the Complaint satisfy the pleading requirements of the Federal Rules of Civil Procedure and the PSLRA.

**B. Allegations of False or Misleading Statements**

The Cobalt Defendants argue that Plaintiffs' § 10(b) and § 11 claims should be dismissed for failure to allege a false or misleading statement. As noted above, an essential element of a § 10(b) claim is that the defendant made a material statement that was false or misleading. *See* *Lormand*, 565 F.3d at 238. The only elements of a § 11 claim are: (1) an omission or misrepresentation of (2) a material fact required to be stated or necessary to make other statements not misleading. *See* *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993); *see also* *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 379 (S.D. Tex. 2011). A fact is "material" if "a reasonable investor would consider [it] significant in the decision whether to invest, such that it alters the total mix of information available about the proposed investment." *Krim*, 989 F.2d at 1445.

***Nazaki and Alper.***– Plaintiffs adequately allege with particularity that the Cobalt Defendants, through corporate filings and through statements during investor conference calls, misrepresented their knowledge that Angolan government officials owned Nazaki and Alper. Plaintiffs allege also that the Cobalt Defendants, in Cobalt's 2011 Form 10–K and otherwise, falsely represented that Nazaki was "a full paying member" of the partnership with Cobalt. [3]

Plaintiffs allege that an attorney in the United States conducted an investigation in 2008 and "was told that" Nazaki was controlled by Angolan government officials. Plaintiffs allege that it had been publicly reported as early as the first half of 2010 that Nazaki was controlled by an Angolan General. Plaintiffs allege that the *Global Witness* reported in May 2010 that "top Angolan officials" might be using Nazaki and Alper as fronts for the officials' own private benefit. Plaintiffs allege that, in response to the *Global Witness* report, the Cobalt Defendants denied the allegations and claimed they were unaware of any connection between Nazaki and any senior Angolan government officials. Plaintiffs allege that, even after the *Financial Times* reported in April 2012 that the three senior Angolan officials admitted their ownership of Nazaki, the Cobalt Defendants said they had refuted any allegations of wrongdoing and had conducted rigorous due diligence on the issue of Nazaki's ownership beginning in 2007.

***5** These and many other allegations in the Complaint satisfy the PSLRA requirements for pleading a false or misleading representation regarding a material matter – the ownership of Nazaki and Alper and whether Nazaki was a "full paying member" of the partnership.

***Longra and Loengo Wells.***– Plaintiffs adequately allege with particularity that the Cobalt Defendants through corporate filings and through statements during investor conference calls misrepresented their knowledge regarding the Longra and Loengo wells. Plaintiffs allege that the Cobalt Defendants described the two wells in the offering materials for the January 2013 and May 2013 stock offerings as "large [and] oil–focused." Plaintiffs allege that the Cobalt Defendants throughout 2013 described Lontra as a "super–size prospect" with oil potential greater than a billion barrels. Plaintiffs allege that Cobalt's Chief Exploration Officer, Defendant Farnsworth, falsely stated in October 2013 that Lontra was "not the big gas field" but was, instead, "an oil field" that was "a significant discovery." Plaintiffs allege that the Cobalt Defendants made these representations knowing that Lontra was primarily gas, to which Cobalt had no rights, and that there was "not even a remote chance" of success in the Loengo well.

***Forward–Looking Statements.***– The Cobalt Defendants argue also that certain statements regarding the Angolan wells are protected by the PSLRA's Safe Harbor clause as forward–looking. Under the Safe Harbor clause, a forward–looking statement is not actionable if: (1) it is identified as forward–looking and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the forward–looking statement was made with actual knowledge that it was false or misleading. *See* *Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u–5(c)(1)(A), (B); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004)). "Whether or not a statement is forward–looking is governed by the nature of the statement, not a litigant's allegations about the statement." *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 7760201, *10 (W.D. Tex. Dec. 1, 2015).

Many court have held that the Safe Harbor clause does not protect statements when the plaintiff adequately alleges that the defendant knew his statements were misleading when made. *See, e.g.,* *Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, *2 (E.D. Tex. Sept. 29, 2015). Plaintiffs in this case clearly allege that the Cobalt Defendants knew "fairly early on" that the Lontra well was producing primarily gas, to which Cobalt had no rights, and knew by the end of 2013 that there was "not even a remote chance" that the Loengo well would be successful. As a result, to the extent a plaintiff's allegation that the defendant knew that the statements were misleading precludes application of the Safe Harbor clause, the Motion to Dismiss based on that provision is denied.

***6** Moreover, the Safe Harbor clause applies only when the alleged misrepresentations are accompanied by "meaningful cautionary language." *See* *Lormand*, 565 F.3d at 244 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus*, 2015 WL 5766870 at *3. "When cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful." *Id.* (internal quotations and ellipsis omitted). In this case, the Cobalt Defendants note that the statements regarding the Lontra and Loengo wells related to their "potential" and "prospects." Plaintiffs allege, however, that by the time the Cobalt Defendants made the statements in 2012 and 2013 regarding the potential of the Lontra and Loengo wells, these Defendants already knew that the wells had limited potential, and that the risks that the Lontra well would be primarily gas and that the Loengo well would be a "dry" well had already begun to materialize. As a result, Plaintiffs have adequately alleged that the Safe Harbor provision does not apply to protect the "forward–looking" statements.

***Conclusion Regarding Material Misrepresentation Element.***– Plaintiffs have adequately alleged with particularity the factual basis for the material misrepresentation element of their § 10(b) and § 11 claims.

### C. Allegations of Scienter

Scienter is an element of Plaintiffs' § 10(b) claim. "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 326). Plaintiffs have alleged, primarily based on information received from the confidential witnesses who were Cobalt insiders, that the Cobalt Defendants knew that Nazaki was owned by Angolan officials. Plaintiffs have similarly alleged, based on information from Cobalt insiders, that the Cobalt Defendants knew "fairly early on" that Lontra was primarily gas, to which Cobalt had no rights, and that there was "not even a remote chance" that Loengo would be successful. Viewing all the factual allegations in the Complaint holistically and not in isolation, the Court finds that Plaintiffs have alleged with adequate particularity that the Cobalt Defendants acted with the requisite scienter.

### D. Allegations of Loss Causation

The loss causation element of a § 10(b) claim under the PSLRA requires the plaintiff to prove that the defendant's act or omission caused plaintiff's loss. *See* 15 U.S.C. § 78u–4(b)(4); *Pub. Emp. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). "For a complaint to adequately plead this requirement, it need only set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Amedisys, Inc.*, 769 F.3d at 320 (quoting *Dura Pharm., Inc., v. Broudo*, 544 U.S. 336, 341–42 (2005)). The plaintiff "must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Id.* (citing *Lormand*, 565 F.3d at 255 (citing *Dura*, 544 U.S. at 342)). "Loss causation in fraud–on–the–market cases can be demonstrated circumstantially by (1) identifying a corrective disclosure (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is *more probable* than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of price drop." *Id.* at 320–21 (internal quotations and citations omitted).

In this case, Plaintiffs have alleged that the Cobalt Defendants misrepresented their knowledge of the connection between Nazaki and senior government officials in Angola, and misrepresented their knowledge regarding the Lontra and Loengo wells. Plaintiffs have alleged that when Cobalt issued corrective disclosures on December 1, 2013, admitting that Lontra was primarily a gas–producing well, the stock price fell more than 21% over the next two days. Plaintiffs have alleged that when Cobalt issued corrective disclosures regarding the elevation of the SEC and DOJ investigations regarding Nazaki's ownership in August 2014, the stock price fell more than 11%. Similarly, Plaintiffs have alleged that when Cobalt disclosed in November 2014 that Loengo was a "dry well," the stock price immediately declined 11.5% on high volume trading. Based on Plaintiffs' allegations in the Complaint, the factfinder could reasonably infer that it is more probable than not that the corrective disclosures caused at least a substantial portion of these episodes of price decline.

**E. Allegations of Reliance**

***7** Reliance is an element of Plaintiffs' § 10(b) claim. To invoke the presumption of reliance based on a "fraud–on–the–market" theory, a plaintiff must allege, *inter alia*, that the security traded in an efficient market. *See* *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014). "Efficiency is a relative concept, a matter of degree." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 750 (S.D. Tex. 2006).

There is no challenge to Plaintiffs' allegation that the market for Cobalt common stock was an efficient one. The Cobalt Defendants argue that Plaintiffs failed to allege reliance as to the December 2012 and May 2014 bond offerings. Plaintiffs respond that the Cobalt bonds offered in December 2012 and May 2014 were convertible bonds and, therefore, their market price necessarily tracked that of the common stock. [4]

Because the bonds were convertible to common stock, and because Plaintiffs adequately alleged that there was an efficient market for the common stock, Plaintiffs have alleged sufficient facts on the reliance factor for their § 10(b) claim as to the bond offerings. *See* *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 675 (E.D. Pa. 2004); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 826 (N.D. Ill. 2000). The Cobalt Defendants' Motion to Dismiss on this basis is denied.

**F. Control Person Liability**

The Cobalt Defendants argue that the § 20 and § 15 control person liability claims must be dismissed because Plaintiffs have failed to allege a primary claim under § 10(b) and § 11. As explained above, however, Plaintiffs have adequately alleged their § 10(b) and § 11 claims. Therefore, the § 20 and § 15 claims are not subject to dismissal.

**G. Conclusions On Cobalt Defendants' Motion to Dismiss**

The only issue before the Court at this time is whether the securities claims in Plaintiffs' Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery. As discussed above, Plaintiffs have adequately alleged their Securities Act and Exchange Act claims against the Cobalt Defendants.

**IV. UNDERWRITER DEFENDANTS' MOTION TO DISMISS**

Plaintiffs allege that the Underwriter Defendants violated Section 11 of the Securities Act and Section 12(a)(2) of the Securities Act. Plaintiffs allege that each of the Underwriter Defendants except Lazard Capital Markets, LLC ("Lazard") served as an underwriter for Cobalt's February 2012 Stock Offering, that Goldman Sachs [5] and Morgan Stanley & Co. LLC ("Morgan Stanley") served as underwriters for the December 2012 Bond Offering, that Morgan Stanley and Citigroup Global Markets Inc. ("CGMI") served as underwriters for the January 2013 Stock offering, that CGMI served as an underwriter for the May 2013 Stock Offering, and that Goldman Sachs, Credit Suisse Securities (USA) LLC ("Credit Suisse"), CGMI, RBC Capital Markets, LLC ("RBC"), and Lazard served as underwriters for the May 2014 Bond Offering.

***8** The Underwriter Defendants have moved to dismiss, asserting (1) that the Securities Act claims based on the February 2012 Stock Offering are barred by the three–year statute of repose; (2) that claims based on the statements regarding Nazaki are barred by the one–year statute of limitations; (3) that Plaintiffs who purchased shares after April 30, 2013, have failed to allege reliance in support of their § 11 claim, and (4) that Plaintiffs fail to allege that any of the Underwriter Defendants is a "statutory seller" for purposes of the § 12 claim. [6]

**A. Statute of Repose**

Section 11 claims are subject to a three–year statute of repose which provides that "[i]n no event" shall an action be brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m. In this case, Cobalt stock was "bona fide offered to the public" on February 23, 2012. St. Lucie County Fire District Firefighters' Pension Trust Fund ("St. Lucie") and Fire and Police Retiree Health Care Fund, San Antonio ("San Antonio") filed an original class action complaint on November 30, 2014, prior to the expiration of the three–year statute of repose. The Underwriter Defendants argue that the November 2014 complaint does not prevent dismissal based on the statute of repose. Specifically, the Underwriter Defendants argue that neither of the two named Plaintiffs in the November 2014 complaint had standing to assert a Securities Act claim based on the February 2012 Stock Offering because neither Plaintiff purchased stock in that offering. As explained below, however, the allegations in the Complaint establish for present purposes that St. Lucie had standing on November 30, 2014, to assert the Securities Act claim based on the February 2012 Offering.

"Section 11 of the Securities Act, imposing civil liability for public offering of securities pursuant to a false registration statement, permits 'any person acquiring such security' to sue." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005) (citing 15 U.S.C. § 77k(a)). Section 11's "standing provisions limit putative plaintiffs to the narrow class of persons consisting of those who purchase securities that are the direct subject of the prospectus and registration statement." *Id.* (internal quotations and citation omitted). The plain language of the statute confers standing on any person who acquires a security issued under the registration statement that allegedly contained an untrue statement of material fact, "so long as the security was indeed issued under *that* registration statement and not another." *Id.* (emphasis in original); *see also Hopson v. Chase Home Fin. LLC*, 14 F. Supp. 3d 774, 783 (S.D. Miss. 2014) (citing *Krim*'s holding that § 11 provides a right of action to any person acquiring shares issued pursuant to an untrue registration statement); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010) (holding that if a registration statement contains an untrue statement of material fact, "then any person acquiring a security

pursuant to that registration statement has standing to sue a variety of participants in the security's issuance" and citing 15 U.S.C. § 77k(a)); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 892 (S.D. Tex. 2002) (holding that the term "any person acquiring such security" in § 77k(a) includes "purchasers of shares issued and sold pursuant to the challenged registration statement").

***9** In this case, Plaintiffs allege that the February 2012 Stock Offering that is the subject of the Underwriter Defendants' statute of repose challenge, and the December 2012 Bond Offering in which St. Lucie purchased Cobalt securities, were both conducted pursuant to the same January 2011 Registration Statement and Prospectus. *See* Complaint, ¶¶ 223, 233. "The point of Article III standing...is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases 'securities' as that term is defined in the Act issued pursuant to a particular registration statement." *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, *49 (E.D. Tex. June 16, 2004). Although reserving and not deciding the issue, the First Circuit in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, a case cited by the Underwriter Defendants, stated in *dicta* that a plaintiff could have standing "where the claims of the named plaintiffs necessarily give them – not just their lawyers – essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members." *Plumbers' Union*, 632 F.3d 762, 770 (2d Cir. 2011). In the November 2014 complaint, St. Lucie, as a purchaser in the December 2012 Bond Offering, challenged statements in the January 2011 Registration Statement on which both the December 2012 Bond Offering and the February 2012 Stock Offering were based. Therefore, St. Lucie had the same incentive to litigate its challenge to the subject Registration Statement as those purchasers of Cobalt stock in the February 2012 Stock Offering.

Here, St. Lucie purchased Cobalt securities in an offering pursuant to the same registration statement as any purchasers of Cobalt securities in the February 2012 Offering. [7] Because St. Lucie had standing to sue based on the January 2011 Registration Statement, it has standing to assert class–based claims for all purchasers of securities pursuant to that Registration Statement. St. Lucie's original complaint was filed on November 30, 2014, less than three years after the February 2012 Offering and within the statute of repose under the Securities Act. The policy concerns and the language of the applicable cases convince the Court that St. Lucie had standing on November 30, 2014. [8] The Underwriter Defendants' Motion to Dismiss claims based on the February 2012 Offering is, therefore, denied.

### B. Statute of Limitations

The Underwriter Defendants argue that the claims relating to statements about the Nazaki's ownership are barred by the applicable statute of limitations. Claims under the Securities Act must be filed "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m; *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 107 (2d Cir. 2013); *In re Magnum Hunter Resources Corp. Sec. Litig.*, 616 F. App'x 442, 446–47 (2d Cir. June 23, 2015). "The one–year limitations period applicable to discovery of the violation begins to run after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *In re Petrobras Sec. Litig.*, ___F. Supp. 3d ____, 2015 WL 4557364, *14 (S.D.N.Y. July 30, 2015) (quoting *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)). Determining when a plaintiff has sufficient information for the limitations period to begin is often fact specific and inappropriate for a motion to dismiss pursuant to Rule 12(b)(6). *LC Capital*, 318 F.3d at 156.

In this case, Plaintiffs allege that it was reported in an article in the *Financial Times* in April 2012 that senior Angolan officials admitted their ownership of Nazaki. Plaintiffs allege also, however, that Cobalt representatives immediately denied any alleged wrongdoing and stated that they had conducted rigorous due diligence regarding Nazaki's ownership. Plaintiffs allege that, days later, Morgan Stanley issued a report advising that it was reassured by Cobalt's statements in response to the *Financial Times* article. Therefore, the Court cannot conclude as a matter of law that the statute of limitations began to run in April 2012. It may have been, as Plaintiffs argue, that they did not have adequate information for the statute of limitations to begin until August 2014, when Cobalt announced that Angola had terminated Nazaki's participation in the partnership with Cobalt. Because it is

plausible that the allegations in the Complaint could support a finding that the statute of limitations did not begin to run until August 2014, the Court cannot conclude at this pleading stage that the claims relating to Nazaki's ownership are time–barred.

**C. Section 11 Claim – Reliance**

***10** A plaintiff asserting a § 11 claim must allege (and eventually prove) reliance on the misrepresentation in the registration statement if, and only if, the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). In this case, Cobalt issued earnings statements between February 2012 and April 2013.[9] The Underwriter Defendants argue that, as a result, Plaintiffs who purchased Cobalt securities after April 30, 2013, must allege reliance in support of their § 11 claim.

Plaintiffs argue first that Cobalt's earning statements were not "earning statements" for purposes of § 77k(a) because they continued to include the allegedly false statements. The Court find this argument unpersuasive. The clear language of the statute and the legislative history reflect that the term "earning statement" is unqualified and should be given its general meaning. *See* *Petrobras*, 2015 WL 4557364 at *15; H.R. CONF. REP. NO. 73–1838, 1934 WL 1291, *41 (1934) (explaining that the "basis of this provision is that in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated on that statement rather than upon the information disclosed upon registration.").

Plaintiffs argue also that they are entitled to rely on the "fraud–on–the–market" theory of reliance to support their § 11 claim. Plaintiffs in the Complaint, however, specifically allege that their reliance allegations, including those pertaining to the "fraud–on–the–market" theory, "pertain only to Plaintiffs' claim under the Exchange Act." *See* Complaint, ¶ 214.

Based on the current Complaint, Plaintiffs who purchased Cobalt securities after April 30, 2013, must plead reliance on the alleged misrepresentations in issue, in support of their § 11 claim. Having failed to do so, the § 11 claims of those Plaintiffs are dismissed. The Court will, however, permit Plaintiffs to file a Second Amended Consolidated Class Action Complaint by the deadline set forth below.

**D. Section 12 Claim – Underwriter Defendants as "Statutory Sellers"**

The Underwriter Defendants argue that Plaintiffs lack standing to assert their § 12 claim. Section 12(a)(2) imposes liability on anyone who "offers or sells a security... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact." 15 U.S.C. § 77*l*. Only persons who "directly purchase securities from the defendant in a public offering, rather than on the secondary market," have standing to assert a claim under § 12(a)(2). *See* *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 578 (1995).

In this case, Plaintiffs adequately allege that they purchased their shares from the Underwriter Defendants in the public offerings, rather than on a secondary market. *See* Complaint, ¶¶ 312–316. As a result, dismissal of Plaintiffs' § 12 claim against the Underwriter Defendants is not appropriate and is denied.

**E. Conclusion as to Underwriter Defendants' Motion to Dismiss**

Plaintiffs' Securities Act claims against the Underwriter Defendants are not subject to dismissal at this stage of the proceedings as barred by either the three–year statute of repose or the one–year statute of limitations. As to those Plaintiffs who purchased shares of Cobalt stock after April 30, 2013, they will be granted leave to amend to allege reliance, if such allegations comply with the requirements of Rule 11 of the Federal Rules of Civil Procedure. Plaintiffs have adequately alleged that they purchased their shares from the Underwriter Defendants in the public offerings and, therefore, dismissal based on the allegations in the

Complaint would be inappropriate. Consequently, the Underwriter Defendants' Motion to Dismiss is granted with leave to replead as to the § 11 claim by Plaintiffs who purchased their Cobalt securities after April 30, 2013, and is denied in all other respects.

## V. CONTROL DEFENDANTS' MOTION TO DISMISS

***11** Plaintiffs allege that Goldman Sachs, Riverstone, Carlyle, First Reserve, and Kern are liable as control persons under § 15 of the Securities Act for the violations of § 11 as alleged in the Complaint. Under § 15, any "person who, by or through stock ownership, agency, or otherwise,...controls any person liable under [§ 11 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 77*o*. To state a § 15 claim for control person liability, Plaintiffs must allege: (1) a primary violation of § 11 and/or § 12 of the Securities Act; and (2) that the defendant exercised "control" over the primary violator. *See* *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004); *see also* *In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011); *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

By regulation, the SEC has defined "control" as the "possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Control can also be established by "business relationships, interlocking directors, family relations, or the power to influence and control the activities of another." *In re Dynegy*, 339 F. Supp. 2d at 828. A "plaintiff needs to allege some facts beyond the defendant's position or title that show the defendant had actual power or control over the controlled person." *Id.* (citing *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509–10 (5th Cir. 1990)).

There are no United States Supreme Court or Fifth Circuit decisions establishing the pleading requirements for § 15. However, the Court finds persuasive the reasoning of district courts in the Fifth Circuit that "apply a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, *2 (E.D. Tex. November 23, 2015) (citing *Trendsetter Insurers, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, *15 (S.D. Tex. Jan. 18, 2007)). At the pleading stage, "a plaintiff need only allege that [the defendant] possessed the power to control the primary violator, not that control was exercised." *Id.* at *3 (citing *G.A. Thompson & Co. v. Partridge*, 737 F.2d 945, 957–58 (5th Cir. 1981)).

Whether a defendant is a control person is an intensely factual question, and Plaintiffs here allege that Goldman Sachs, Riverstone, Carlyle, First Reserve, and Kern together controlled Cobalt based, *inter alia*, on their significant stock ownership and ability to elect a majority of Cobalt's Board of Directors. Plaintiffs allege also that the Control Defendants possessed the ability to control or influence Cobalt's day–to–day operation because a Stockholder Agreement gave them the right to select a majority of the members of every Board Committee except the Audit Committee. Plaintiffs allege that the Control Defendants, except Carlyle, had one or two Managing Directors serving simultaneously as a member of Cobalt's Board. This gave the Control Defendants the power to influence those interlocking directors and, thereby, control or influence the Cobalt Board.

Plaintiffs also cite to statements by Cobalt in filings with the SEC. For example, in the Form 10–K for the fiscal year ending December 31, 2010, Cobalt stated that its "four largest stockholders collectively own approximately 72% of [Cobalt's] outstanding stock" and "have significant influence over all matters that require approval by [the] shareholders, including election of directors and approval of significant corporate transactions." In the same SEC filing, Cobalt identified itself as a "controlled company" in which "more than 50% of the voting power is held by another person or group of persons acting together." The Form 10–K identified First Reserve, Goldman Sachs, Riverstone, Carlyle, and Kern as the entities controlling a majority of voting power. The next Form 10–K, for fiscal year ending December 31, 2011, included similar statements.

***12** As noted above, the determination of whether a defendant is a control person is highly fact intensive. Plaintiffs and Control Defendants have cited a variety of district court cases that hold the plaintiffs there have or have not adequately alleged § 15 liability. Each one is similar to this case in certain respects and dissimilar in others. The issue is currently before this Court on Motions to Dismiss at the pleading stage. The Court is reviewing only Plaintiffs' allegations and expresses no opinion regarding what the evidence may ultimately show. The Court finds that although the allegations in the Complaint regarding control liability are limited, particularly as to Defendant Carlyle, the allegations are sufficient to satisfy the notice pleading requirements of Rule 8 and the PSLRA.

## VI. CONCLUSION AND ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Underwriter Defendants' Motion to Dismiss [Doc. # 81] is **GRANTED with leave to replead** as to claims by Plaintiffs who purchased Cobalt securities after April 30, 2013, and **DENIED** in all other respect. It is further

**ORDERED** that Plaintiffs shall file their Second Amended Class Action Complaint by **February 5, 2016**. It is further

**ORDERED** that the Control Defendants' Motion to Dismiss [Doc. # 82] is **DENIED**. It is further

**ORDERED** that the Cobalt Defendants' Motion to Dismiss [Doc. # 83] is **DENIED**. It is further

**ORDERED** that Carlyle's Motion to Dismiss [Doc. # 84] is **DENIED**.

SIGNED at Houston, Texas, this **19th** day of **January, 2016**.

### All Citations

Not Reported in Fed. Supp., 2016 WL 215476, Fed. Sec. L. Rep. P 99,001

### Footnotes

1 Plaintiffs GAMCO Global Gold, Natural Resources & Income Trust, GAMCO Natural Resources, Gold & Income Trust, St. Lucie County Fire District Firefighters' Pension Trust Fund, Fire and Police Retiree Health Care Fund, San Antonio, Sjunde AP–Fonden, and Universal Investment Gesellschaft m.b.H. filed an Opposition [Doc. # 89], and the Underwriter Defendants filed a Reply [Doc. # 97].

2 Plaintiffs filed an Opposition [Doc. # 90], and the Control Defendants filed a Reply [Doc. # 95], in which Defendant Carlyle joined [Doc. # 96].

3 The Cobalt Defendants argue that "full paying member" did not mean a member who had paid anything but, instead, described Nazaki's interests in the Angolan blocks as "non–carried." *See* Cobalt Defendants' Motion [Doc. # 83], p. 40. While this argument may be relevant to a motion for summary judgment, it does not indicate that Plaintiffs have failed to allege false and misleading statements to support their claims under the Securities Act and the Exchange Act.

4 In their Reply, the Cobalt Defendants argue that Plaintiffs do not allege that the bonds are convertible. In the Complaint, however, Plaintiffs clearly allege that the bonds offered in the December 2012 Bond Offering (¶ 232) and in the May 2014 Bond Offering (¶ 252) were convertible.

5 Goldman Sachs is also sued as a Control Person pursuant to § 20 of the Exchange Act. Its Motion to Dismiss the § 20 claims against it will be addressed below with the Control Defendants' Motions to Dismiss.

6 The Underwriter Defendants argue also that Plaintiffs' Securities Act claims should be dismissed for failure to allege adequately a material statement that was false or misleading. For the reasons discussed above in connection with the Cobalt Defendants' Motion to Dismiss, dismissal on this basis is denied.

7 Universal Investment Gesellschaft m.b.h., a named Plaintiff in the Complaint filed May 1, 2015, alleges that it purchased shares of Cobalt stock in the February 2012 Offering.

8 As noted above, the GAMCO Plaintiffs, not St. Lucie, have been appointed Lead Plaintiffs in this case.

9 Specifically, Cobalt issued a Q2 2012 Form 10–Q on July 31, 2012, a Q3 2012 Form 10–Q on October 30, 2012, a 2012 Form 10–K on February 26, 2013, and a Q1 2013 Form 10–Q on April 30, 2013. This "combination of reports" may be considered an "earning statement" for purposes of § 77k(a). *See* 17 C.F.R. § 230.158(a)(2)(i).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT J

2004 WL 377555
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, El Paso Division.

IN RE EL PASO ELECTRIC COMPANY SECURITIES LITIGATION

No. EP-03-CA-0004-DB.
|
Feb. 23, 2004.

**Attorneys and Law Firms**

Steven G. Schulman, Samuel H. Rudman, Milberg, Weiss, Bershad, et al, New York, NY, Daniel R. Malone, Malone Law Firm, El Paso, TX, Peter E. Seidman, Milberg Weiss Bershad, Hynes & Lerach LLP, New York, NY, for plaintiff.

Thomas E. Bilek, Hoeffner, Bilek & Eidman, L.L.P., Houston, TX, Jules Brody, Stull, Stull & Brody, New York, NY, for consolidated plaintiff.

David Chapman Duggins, Scott Olson, Clark, Thomas & Winters, Mark Strain, Austin, TX, Kenneth R. Heitz, Richard H. Zelichov, Irell & Manella LLP, Los Angeles, CA, for defendant.

*MEMORANDUM OPINION AND ORDER*

BRIONES, J.

***1** This Document Relates To: All Actions

On this day, the Court considered a "Motion By El Paso Electric Company, Terry D. Bassham, Julius F. Bates, James Haines, Jr., Gary R. Hedrick, and Eduardo A. Rodriguez to Dismiss" ("Motion to Dismiss"), filed in the above-captioned cause on August 20, 2003. Plaintiffs Jordan Roth, James Richards, and Kevmar Holdings Limited Partnership, ("Plaintiffs") filed a "Memorandum in Opposition To Motion To Dismiss" ("Response") on September 15, 2003. On October 2, 2003, Defendants filed a "Reply Memorandum In Support Of Motion To Dismiss" ("Reply"). Pursuant to the Order entered by the Court on November 26, 2003, it now enters this Memorandum Opinion and Order. After reviewing the factual recitations and the arguments in the Motion, Response, and Reply, the Court is of the opinion that the Motion to Dismiss should be denied in part and granted in part. The Motion to Dismiss is denied as pertaining to Defendants El Paso Electric Company, Terry D. Bassham, James Haines, Jr., and Gary R. Hedrick. However, the Motion to Dismiss is granted as pertaining to Defendants Julius F. Bates and Eduardo A. Rodriguez.

BACKGROUND

Defendant El Paso Electric Company ("EPE") is a public utility engaged in the generation, transmission and distribution of electricity throughout an area of approximately 10,000 square miles in western Texas and southern New Mexico. EPE is incorporated in Texas and its principle place of business is in El Paso, Texas.

In 1997, EPE entered into a Power Consulting Services Agreement (the "PCSA") with Enron Corporation ("Enron"). Pursuant to the agreement, EPE permitted Enron to staff its energy trading desk and control and direct EPE's transmission and generation assets 75% of the time. EPE also provided Enron with parking and lending services. [1] Under the PCSA, Enron staffed EPE's

real-time marketing desk for sixteen hours each regular business day and for twenty-four hours a day on weekends and holidays. In its function as a real-time marketer on behalf of EPE, Enron monitored EPE's electrical system on an hourly basis, arranged power purchase transactions necessary to balance the system, and identified opportunities to sell power at rates in excess of EPE's production costs.

In May 2002, the Federal Energy Regulatory Commission ("FERC") began an investigation into the manipulation of the power markets in the western United States. The FERC issued information requests to a number of energy trading companies, including EPE and Enron. On June 4, 2002, the FERC announced that EPE did not fully comply with its information requests and issued a "show cause" order to EPE that directed the Company to show why its market-based rate authority should not be revoked. On June 14, 2002, EPE responded that it sold over $200 million worth of Enron's electricity since early 2000. On August 13, 2002, the FERC announced that it was formally pursuing the matter against EPE in connection with its alleged manipulation of energy prices in California with Enron. During the FERC's investigation of EPE, EPE maintained that it had done nothing wrong, and that it was fully complying with the FERC's investigation.

***2** As the disclosures to the FERC were made, EPE's stock dropped. On June 5, 2002, EPE's stock price dropped 7.9%. From August 12, 2002 to August 14, 2002, EPE's stock price dropped 13% as the market digested FERC's report of EPE's connection to Enron's alleged manipulation of California's energy prices. On October 21, 2002, at the close of the period at issue (between February 14, 2000 and October 21, 2002), when EPE finally announced accurate and dismal financial results, the market responded negatively once more and EPE's stock price dropped by another 10%. As a result of the losses, this cause of action ensued.

On December 5, 2002, EPE announced that it had reached a settlement with the FERC. Under the terms of the settlement, EPE agreed to refund $14 million, and to refrain from making sales pursuant to its market-based rate authority between December 1, 2002 and December 31, 2004. As part of the settlement, EPE admitted, *inter alia,* the following: (a) during the course of the PCSA, EPE allowed Enron to dispose of the output of certain EPE generation assets while Enron operated EPE's real-time trading desk; (b) documents provided by Enron state that its "Fatboy"[2] trading strategy included parking energy on EPE's system; (c) Enron would sometimes purchase power from EPE while it was operating EPE's real-time desk; (d) Enron informed EPE that it kept track of its supplemental sales on "Fatboy" spreadsheets; and, (e) EPE identified thirty-six (36) transactions which may have been used by Enron as part of its "Richochet" strategy.[2]

Plaintiffs bring this class action lawsuit pursuant to Fed.R.Civ.P. 23(a) and (b)(3) on behalf of a potential class consisting of all persons who purchased or otherwise acquired the securities of EPE between February 14, 2000 and October 21, 2002, inclusive, and who were allegedly damaged thereby.[3]

Plaintiffs' amended class complaint is brought under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Securities & Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs allege that EPE's provision of these services violated the Federal Power Act, 16 U.S.C. § 824(a), as (i) EPE failed to file a tariff with the FERC to collect monies with respect to the parking and lending services that it provided to Enron; and (ii) EPE failed to provide these services on an open access and non-discriminatory basis.

The aforementioned scheme allegedly led to increased reported revenue and income for EPE, and this was reflected in an increase of EPE's stock price. EPE traded at $8.30 per share in February 2000; by the market's close on June 4, 2002, just before knowledge that an investigation by the FERC was looming, it was trading at $14.45 per share. According to Plaintiffs, these results were the product of a scheme to manipulate energy prices. The instant Motion to Dismiss followed. Defendants base their failure-to-state-a-claim-argument, pursuant to Fed.R.Civ.P. 12(b)(6), in part on the assertion that Plaintiffs did not adequately plead each element of Section 10(b) and Rule 10b-5, as required by the Private Securities Act of 1995 and Federal Rule of Civil Procedure 9(b).

STANDARDS

A. Federal Rule of Civil Procedure 12(b)(6)

***3** Rule 12(b)(6) allows a defendant to move for dismissal of a case because the plaintiff has failed to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Under Rule 12(b)(6), the Court must decide whether the facts alleged, if true, would entitle the plaintiff to some legal remedy. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Dismissal for failure to state a claim is highly disfavored and is not granted routinely because of the liberal "notice pleading" requirements of the Federal Rules. FED. R. CIV. P. 8(a); *Shipp v. McMahon,* 199 F.3d 256, 260 (5th Cir.2000). In short, a court should not dismiss a claim under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45-46, 78 S.Ct. at 102.

When considering a motion under Rule 12(b)(6), the court must limit its inquiry to facts stated in the plaintiff's complaint and the documents either attached to or incorporated therein. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). Further, the court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them, *Kaiser Aluminum & Chem. Sales, Inc., v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), and must review those facts in a light most favorable to the plaintiff. *Piotrowski v. City of Houston,* 51 F.3d 512, 514 (5th Cir.1995).

B. Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed.R.Civ.P. 9(b)

The PSLRA provides:

> In any private action arising under this chapter in which plaintiff alleges that the defendant-
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged that have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) (West 1997). "Pleading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation' and what [that person] obtained thereby." ' *ABC Arbitrage Plaintiffs Group; et. al. v. Tchuruk,* 291 F.3d 336, 349 (5th Cir.2002). Federal Rule of Civil Procedure Rule 9(b), which applies to securities fraud claims, states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The purpose of Rule 9(b) is to "provide [ ] defendants with fair notice of the plaintiffs' claims, protect [ ] defendants from harm to their reputation and goodwill, reduce [ ] the number of strike suits, and prevent [ ] plaintiffs from filing baseless claims and then attempting to discover unknown wrongs." *In Re BankAmerica Corp. Securities Litigation,* 78 F.Supp.2d 976, 986 (E.D.Mo., E.D.1999).

***4** The PSLRA "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must

be routinely dismissed on Rule 9(b) and 12(b)(6).” *ABC Arbitrage Plaintiffs Group,* 291 F.3d at 354. The plaintiffs need not allege “all” the facts that are related to their claim, because that requirement is not possible to determine at the pleading stage of the litigation in nearly every securities fraud case, only the defendants know “all” the facts. *Id.* The court in *ABC Arbitrage Plaintiffs Group,* opined that “even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act, we do not require the pleading of detailed evidentiary matter in securities litigation.” *Id.* at 356.

“Rule 9(b) [is] part of the entire set of [Civil Procedure] rules, including Rule 8(a)'s insistence upon simple, concise, and direct allegations. Relatedly, while 9(b) stands as an exception to an overarching policy of immediate access to discovery, it [does] not reflect a subscription to fact pleading.” *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 178 (5th Cir.1997). “The who, what, when, and where must be laid out *before* access to the discovery process is granted.” *Id.* (emphasis contained). “We must not dim the beacon of Rule 8(f) that ‘all pleadings shall be construed as to do substantial justice.” ’ *Id.*

DISCUSSION

Defendants' claim that Plaintiffs' reliance on rote allegations of fraud to explain why EPE's statements were allegedly misleading fails the PSLRA's and Rule 9(b)'s particularity requirements. In doing so, Defendants repeatedly refer to paragraph numbers in Plaintiffs' amended class complaint, but make an unconvincing attempt, by failing to pose plausible arguments to demonstrate to the Court how Plaintiffs have not satisfied the requirements of the PSLRA and Rule 9(b). Moreover, Defendants adamantly argue that Plaintiffs failed to adhere to the rudimentary requirements of answering the questions “who, what, when, and where” in their complaint.

The Court finds that Plaintiffs' recitation of the facts and allegations, taken to be true and reviewed in a light most favorable to Plaintiffs, do in fact state claims upon which relief may be granted. The Court is of the opinion that the Moving Defendants' Motion to Dismiss based on Rule 12(b)(6) should be denied in part and granted in part for the reasons stated below.

A. Section 10(b) and Rule 10b-5

“To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must allege (1) misstatement or omission (2) material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, and upon which (5) plaintiff justifiably relied, (6) proximately causing injury to the plaintiff.” *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 865 (5th Cir.2003). Since the parties do not dispute elements three, five, and six the Court construes the parties' silence as an implicit concession that these elements are adequately pled.

*i. Misstatement or Omission*

***5** Plaintiffs accuse Defendants of not making a proper disclosure to EPE's shareholders regarding the EPE/Enron relationship. In *Rubenstein v. Collins,* as in this case, the defendants were accused of “knowingly concealing adverse, material information,” that it did not disclose to shareholders. *Rubinstein v. Collins, et. al.,* 20 F.3d 160, 169-170 (5th Cir.1994). In that case, the court determined: “we have long held under Rule 10b-5, ‘a duty to speak the full truth arises when a defendant undertakes a duty to say anything’.... Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction [in a forecast statement], he must disclose material, firm-specific adverse facts that *affect the validity or plausibility* of that prediction.” *Id.* (emphasis added).

Defendants, for their part, argue that EPE did not have a duty under securities laws to publicly accuse itself of wrongdoing, especially when it was not aware of such wrongdoing. To buttress this position, they offer that EPE complied with all SEC regulations governing the disclosure of alleged uncharged and unlawful conduct. Defendants claim that “everybody knew about the ‘secret’ PCSA” because press releases were disseminated, articles were published, and annual reports included the agreement

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

between EPE/Enron. Moreover, Defendants contend that Plaintiffs failed to explain why the statements listed were misleading. In response, Plaintiffs specifically point to a press release that purportedly discloses EPE's arrangement with Enron. Plaintiffs claim, and the Court agrees, that the press release discloses very little about the relationship. Defendants' contention that the press release disclosed meaningful details is an ambitious leap. Since the Defendants “disclosed” the existence of the PCSA, they were required to make a full and truthful disclosure of all the aspects of that agreement and their actions in connection therewith. Defendants' earnest struggle to “split hairs” on this issue leads the Court to believe that Defendants do not have an adequate explanation for the subterfuge created to justify the EPE/Enron relationship.

The press release does not disclose the terms of the agreement. It does not even disclose the official name of the agreement. This press release in no way represents the “full truth” on the subject of the PCSA. Defendants also cite to EPE's 1996 annual report, which purportedly discloses the details of its relationship with Enron. Once again, the referenced document did not disclose any information of substance about the PCSA to the point of labeling its contents as the full truth about the EPE/Enron relationship. In fact, none of the exhibits that Defendants refer to shed proper light on the EPE/Enron relationship.

Finally, Plaintiffs identified with particularity that EPE failed to disclose its role in the Enron scheme because of the potential disgorgement of profits, substantial penalties, and suspension of EPE's market rate authority that would likely follow-all less than six months before EPE settled with the FERC and California parties for over $14 million and made certain admissions. In the final analysis, once EPE undertook the task of speaking about the PCSA in the aforementioned documents, it bore the onus of disclosing the full truth of the dealings between EPE and Enron. The Plaintiffs sufficiently plead the misstatement/omission element of the applicable Section 10(b) and Rule 10b-5 analysis.

*ii. Material Fact*

***6** A misstatement or omission is material if “there [is] substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.” *Id.* (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). “Materiality is not judged in the abstract, but in the light of the surrounding circumstances.” *Id.* at 866 (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1448 (5th Cir.1993)). The determination of materiality “requires delicate assessments of the inferences a ‘reasonable shareholder’ would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.” *SEC v. Fox,* 855 F.2d 247, 253 (5th Cir.1988) (quoting *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980).

Here, Defendants stretch to deflect charges that the information it failed to provide to investors was not material, by claiming that EPE did not violate any of the FERC's rules or regulations. That explanation misses the mark completely, irrespective of the FERC's rules or regulations because a reasonably prudent investor might refrain from investing their money in a company that is involved in a potentially illegal relationship. EPE was in such a situation because the PCSA gave Enron significant inroads to the daily control of EPE's operations; information that might be important to an investor.

The aforementioned conditions preclude Defendants from remaining silent while in possession of material information. Defendants had access to, and were responsible to keeping investors apprized of the details surrounding EPE's relationship with Enron, especially once it endeavored to disseminate press releases, annual reports, and made statements in articles surrounding the relationship. Here, the facts in the amended class complaint support a finding of materiality because the investors' decisions regarding EPE would be substantially impacted, if they were made privy to the close dealings between EPE and Enron. Thus, the Court is of the opinion that Plaintiffs adequately plead the materiality element of the applicable Section 10(b) and Rule 10b-5 analysis.

*iii. Scienter*

Under the PSLRA, the district court on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter. *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (3d Cir.2002) accord *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) (en banc), petition for cert. filed, 70 U.S.L.W. 3269 (Sept.27, 2001) (No.01-538).

"The plaintiff must also plead 'with particularity facts giving rise to a strong inference,' 15 U.S.C. § 78u-4(b)(2), that defendants acted with 'scienter', which is a 'mental state embracing intent to deceive, manipulate, or defraud." *Rosenzweig,* 332 F.3d at 866 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Circumstantial evidence may be strong enough to substantiate the requisite amount of scienter. *Id.* at 867.

***7** "Scienter also embraces 'reckless indifference,' which we have defined as: limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that presents a danger of misleading buyers or sellers which [are] either known to the defendant or is so obvious that the defendant must have been aware of it.... Insider trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter." *Rubinstein,* 20 F.3d at 169-170.

Here, Defendants postulate that Plaintiffs do not allege particularized facts that give rise to strong inference of scienter. To support this position, they declare ignorance about knowing that Enron was manipulating energy prices. Furthermore, they submit that Plaintiffs failed to allege Defendants had a bona fide motive to inflate stock prices. Defendants also assert that facts do not support the allegations that the stock sales were unusual or suspicious.

Plaintiffs retort that ignorance of Enron's activities is not a plausible shield coming from a major energy provider, which should not escape the probing discovery. Plaintiff adds that EPE was reckless, at the very least, because it failed to properly supervise Enron's use of EPE assets. As a result, the facts create a strong inference that EPE knew or recklessly disregarded the alleged fraud perpetuated at its trading desk, which in turn, allegedly resulted in misleading financial and other statements.

Moreover, Plaintiff alleges that EPE officials engaged in significant stock sales during the time in question. For example, Defendant Hopper sold more than 1.6 million shares of his EPE common stock for more than $21 million during the same time. Defendant Bassham sold approximately 51,000 shares for more that $700,000, and Defendant Haines sold more than 32,000 shares of his EPE common stock for nearly $950,000. The Court agrees with Plaintiffs when they claim that these allegations enhance the allegations of scienter against Defendants, especially when read in conjunction with other scienter allegations.

In the final analysis, EPE entered into an express agreement with Enron to provide exclusive and undisclosed parking and lending services, to allow Enron to operate its trading desk and control its assets 75% of the time, and to provide Enron with competitive market information. Plaintiffs contend, and the Court agrees, that these actions give rise to a strong inference of scienter because the actions are not possible without either actual knowledge or extremely reckless business dealings. Therefore, the Plaintiffs adequately plead the scienter element of the applicable Section 10(b) and Rule 10b-5 analysis.

B. Securities Exchange Act of 1934 Section 20(a)

Plaintiffs also allege defendants violated Section 20(a) of the Securities Exchange Act. Section 20(a) imposes joint and several liability upon persons who "control" defendants that violate the Exchange Act. *Rosenzweig,* 332 F.3d at 862. "Control person" liability is, however, derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws. *Rubinstein,* 20 F.3d at 166 (quoting Thomas Lee Hazen, *The Law of Securities Regulation § 13.15* (1990)). At this point in time of the litigation, the solitary issue presented is whether Plaintiffs have pleaded an independent violation under


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

10b-5. In order to state a claim under Section 20, a plaintiff must allege a predicate securities fraud offense under Section 10(b). *ABC Arbitrage Plaintiffs Group,* 291 F.3d at 361.

***8** Defendant's sole argument for dismissal is predicated on purported failure of the amended class complaint to "allege [the] predicate securities fraud offense under Section 10(b)" because Plaintiffs' Section 10(b) and Rule 10b-5 claims are allegedly not stated with particularity. Defendants do not otherwise challenge Plaintiffs' Section 20(a) claim, and collectively, the parties spend minimal time arguing their positions regarding this topic. Nevertheless, as discussed above, the Court is of the opinion that Plaintiffs have alleged a sufficient predicate securities fraud offense under Section 10(b) and, thus, the cause of action alleged under Section 20(a) will not be dismissed at this stage of the litigation.

C. Group Pleading Doctrine

Defendants also launch an assault against Plaintiffs' use of the "group pleading" doctrine. The group pleading doctrine allows Plaintiffs to attribute to officers and directors the actions of other officers in the group. *In Re BankAmerica Corp.,* 78 F.Supp.2d at 988. Defendants claim that Plaintiffs' attempt to rely on non-particularized group pleading to lump the Defendants together, violates the PSLRA's requirement that fraud be pled with particularity. Because the group pleading doctrine is a rebuttable presumption applicable only to a limited group of persons within a company, it is not inconsistent with the PSLRA. *Id.* Even if the group pleading doctrine would be inconsistent with the PSLRA, individual defendants may still be held liable where they participated in the preparation of false and misleading public statements. *See In re NetSolve, Inc. Sec. Litig.,* 185 F.Supp.2d 684, 699 (W.D.Tex.2001) (holding that although the group pleading doctrine does not survive passage of the PSLRA, "individual defendants will remain ... because the plaintiffs allege ... that [they] helped prepare, directly participated in, and/or were quoted in the allegedly misleading public statements and documents").

Here, Plaintiffs allege that Defendants Hedrick, Haines and Bassham signed or personally made false and misleading statements in the Forms 10K for 1999, 2000 and 2001, the Forms 10Q for all four quarters of fiscal years 2000 and 2001, as well as for the first quarter of fiscal 2002, which they showed to financial analysts and to reporters. Thus, the Court agrees with Plaintiffs that regardless of the status of the group pleading doctrine in the wake of the PSLRA, the amended class complaint explicitly alleges violations by Defendants Hedrick, Haines, and Bassham in order to reap corporeal economic gain from their actions.

However, with regards to Defendants Bates and Rodriguez, Plaintiffs fail to explicitly cite an instance where EPE's misstatements were attributable to them. Therefore, Defendants Motion to Dismiss is granted as to Bates and Rodriguez.

CONCLUSION

For the reasons stated in this opinion, the Court concludes that Plaintiffs have sufficiently pleaded their claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 with regards to Defendants Hedrick, Haines, and Bassham. However, the Court is further of the opinion that Plaintiffs have failed to specifically allege violations against Defendants Bates and Rodriguez. As a result, the Court is of the opinion that the Motion to Dismiss should be denied in part and granted in part. The Motion to Dismiss is denied as pertaining to Defendants El Paso Electric Company, Terry D. Bassham, James Haines, Jr., and Gary R. Hedrick. However, the Motion to Dismiss is granted as pertaining to Defendants Julius F. Bates and Eduardo A. Rodriguez.

***9** Accordingly, IT IS HEREBY ORDERED that the "Motion to Dismiss" is DENIED IN PART AND GRANTED IN PART as set forth herein.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 377555

## Footnotes

1 Black's Law Dictionary defines parking as the sale of securities subject to an agreement that the seller will buy them back at a later time for a similar price, and lending as allowing the temporary use of (something), sometimes in exchange for compensation, on condition that the thing or its equivalent be returned. Black's Law Dictionary 1139, 912-913 (7th ed.1999).

2 Both “Fatboy” and “Ricochet” are terms used to describe trading tactics.

3 A “Motion For Class Certification” is currently pending before the Court.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

2004 WL 5278716
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Texarkana Division.

In re: FLEMING COMPANIES INC. SECURITIES & DERIVATIVE LITIGATION

No. CIVA503MD1530TJW, MDL–1530.
|
June 16, 2004.

***MEMORANDUM OPINION AND ORDER***

WARD, J.

***1 THIS DOCUMENT RELATES TO ALL CASES**

**I. INTRODUCTION**

This private securities class action case relates to Fleming Companies, Inc. ("Fleming"). Fleming, at one time the second largest food distributor in the United States, first foreshadowed problems on July 30, 2002. The problems continued, culminating in a formal SEC investigation into Fleming's accounting practices. A series of class actions followed, which were consolidated. In April 2003, the company declared bankruptcy and announced its need to make a massive restatement of its earnings for 2001 and 2002. The company has yet to make any restatements of its earnings. An MDL proceeding ensued, and the cases were all transferred to this court for pre-trial handling. The court has appointed a lead plaintiff and set a briefing schedule. The plaintiffs filed their Third Amended Consolidated Class Action Complaint ("TAC"). The defendants have moved to dismiss the TAC on various grounds. The court held an oral hearing on the matter and, after considering the motions, responses, the arguments, and the applicable law, is of the opinion that the following order should issue.

**II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

The facts are stated in the light most favorable to the plaintiffs as alleged in the TAC. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). Fleming is a wholesale distributor of groceries. A wholesaler like Fleming purchases groceries from vendors and sells them to supermarkets and grocery stores. During the 1990s, Fleming struggled, due in part to its sharp business practices with its customers. Fleming's earnings steadily declined from 1995 through 1998, culminating in the termination of CEO Robert Smith in July, 1998.

In November 30, 1998, Fleming appointed Mark Hansen as CEO and Chairman of the Board. A week later, Fleming announced a "Strategic Plan to Improve Performance." One part of the plan was to improve the performance of Fleming's retail segment. Although Fleming had historically been a grocery wholesaler, the company identified a retail segment of price impact supermarkets as a potential growth opportunity. A price impact supermarket is a sort of "no frills" approach to selling groceries. Price impact supermarkets typically cost less to build and operate, lack amenities such as delis, and, ultimately, pass the savings along to customers in the form of lower prices. Hansen told shareholders at an annual meeting that Fleming would make a stronger and more focused push on retailing than ever before.

Throughout 1999, 2000, and 2001, Fleming made various statements concerning its strategic plan to analysts and investors. Fleming stated in a January 2000, press release that it attributed revenue growth to its emphasis on Food4Less price impact stores and expected future retail growth on a "same store" basis. To illustrate, Fleming expected that sales in retail stores 1, 2, and 3 would increase over the numbers realized by those stores in the preceding year. The court notes that same store

sales comparison is important because it allows analysts and investors to evaluate the actual internal growth of the company, unclouded by acquisitions or divestitures.

***2** Throughout 2000, Fleming indicated that its focus would be on price impact stores, at the expense of conventional stores. Fleming began to divest its conventional stores and, by May, 2001, represented that it had sold all of its conventional stores. During that same time period, Fleming reported earnings growth, attributed in part to the success of its retail strategy. Also during this time period, Fleming and certain officers made public statements touting the success of its retail strategy. One Fleming press release stated, for instance, that Fleming's reported 36% net earning increase for the fourth quarter of 2001 "validate[d] our strategic initiatives" relating to price impact supermarkets. (TAC, ¶ 82). Fleming's 10K for 2000 also promoted this retail strategy.

Throughout the first half of 2001, analysts reacted favorably to Fleming's strategy. Bear, Stearns & Co., Deutsche Banc Alex. Brown, and UBS Warburg all issued reports commenting favorably on Fleming's retail operations focus. (TAC, ¶¶ 86–88). Additional analysts responded favorably throughout the balance of 2001 and into the first half of 2002. (TAC, ¶¶ 89–92).

All was not well inside Fleming, however. The plaintiffs allege that Fleming used accounting manipulations to inflate its earnings numbers for 2001 and 2002. The details of this scheme are discussed in more detail below; however, for present purposes, it is sufficient to note that the plaintiffs allege first that Fleming executives instituted a practice wherein Fleming's retail and wholesale divisions would arbitrarily and improperly deduct amounts payable from vendors' invoices, without cause and with no expectation that the vendors would approve the deduction. At the same time, although Fleming would reserve for a portion of those deductions, the reserves were often woefully inadequate to cover the amount of deductions. This practice had the effect of inflating the quarterly and yearly earnings reported by the company in press releases, SEC quarterly and annual reports, and Registration Statements filed in March and June 2002, for public offerings of securities.

The second significant area of numbers manipulations that the plaintiffs attack is the company's reporting of same store sales growth. The plaintiffs allege that certain Fleming executives instituted a practice whereby the reported same store sales figures were inflated. These inflated numbers led the investing public to assume that Fleming's retail strategic plan was growing. The plaintiffs allege that the true same store sales figures, had they been revealed, would have shown that Fleming's retail segment was suffering and that its price impact format was not successful.

In July 2002, despite the company's statements concerning the success of its business strategy, Fleming began to foreshadow problems in its retail segment. On July 30, 2002, Fleming issued a press release which indicated it was evaluating strategic alternatives to its retail segment, and in particular, its price impact retail stores. The company stated that comparable store sales declined 4.7 percent. At the same time, according to the plaintiffs, Fleming overstated its wholesale earnings and masked the extent of retail losses to cushion any decline in stock value. Although Fleming reiterated its prior earnings forecasts, analysts began to doubt the validity of those numbers. J.P. Morgan analyst Stephen Chick, for instance, cut Fleming from "market perform" to "market underperform." An article in Supermarket News observed that Fleming's announcement concerning alternatives to its retail segment "appears to have caught most analysts by surprise." (TAC, ¶ 272).

***3** On September 4, 2002, the Dow Jones Newswire released an article on Fleming which disclosed customer dissatisfaction with certain of Fleming's price impact retail stores, inventory problems in those stores, and Fleming's practice of taking large vendor deductions to increase the company's cash flow. Although the article noted that the company was not alone in this practice, some of Fleming's unidentified customers said they had stopped shipping to Fleming because of the practice and one such customer, referring to Fleming, noted that "[w]hen it comes to deductions, they're off the scale compared to other customers." On September 5, 2002, the Wall Street Journal published the expose released by the Newswire the day before.

Fleming responded to the September 5, 2002 article by holding a conference call that day with analysts. The company's CFO, Neal Rider, stated on the conference call that Fleming's vendor deductions were "appropriately reserved for" and Fleming's CEO stated that "we have absolutely no issues with how we treated deductions, we reserve against deductions, and we certainly don't

assume 100% collection." (TAC, ¶ 282). In the same conference call, the officers stated that Fleming's financial condition was solid and that the deductions were an ordinary part of the business, and were an industry-accepted practice. Indeed, according to Rider, "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that's risen to the level that we are at an impasse today." (TAC, ¶ 289). The plaintiffs contend that these statements were false.

The stock market reacted adversely to the September 4 and 5 articles. On September 3, 2002, Fleming stock was trading at $9.31 per share. By September 5, the stock closed at $6.92 per share, a decline of 26%. According to the plaintiffs, even though the stock price declined significantly, the statements by Fleming's executives cushioned the fall of the stock because those statements represented that the deductions that might reach "impasse" were minimal and that the deductions in any event were an industry standard practice and were properly accounted for. (TAC, ¶¶ 295–296).

On September 24, 2002, Fleming announced the divestiture of its price impact stores. Thereafter, on October 23, 2002, Fleming announced its third quarter earnings, confirmed its decision to divest its price impact stores, and suggested that its relationship with its largest customer, Kmart, might be in jeopardy because of Kmart's bankruptcy proceedings and reorganization.

On November 13, 2002, Fleming announced that the SEC had commenced an informal investigation into Fleming's accounting practices. In particular, the SEC's investigation focused on Fleming's vendor trade practices and the company's calculation of comparable store sales in its discontinued retail operations. Following Fleming's January 23, 2003, announcement of a $190 million loss in retail operations for 2002, and its announcement of the loss of the Kmart contract in February 2003, Fleming's CFO insisted that the notion that Fleming would seek bankruptcy protection was "ludicrous." On February 25, 2003, the SEC reclassified its investigation as a formal one.

***4** In February and March, 2003, Fleming's credit ratings were downgraded. On March 3, 2003, Fleming announced the resignation of its CEO. Contrary to the previous representations of Fleming's CFO and unable to secure alternate sources of financing, Fleming announced on April 1, 2003, that it had filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

On April 17, 2003, Fleming announced that it would restate its 2001 annual and quarterly financial statements and 2002 quarterly financial statements previously filed with the Securities and Exchange Commission and that it would revise its previously announced 2002 fourth quarter and annual financial results. The Fleming press release stated in part that "the Company expects that the related restatements of the results for the full-year 2001 and the first three quarters of 2002 will reduce the pre-tax financial results from continuing operations for such periods by an aggregate amount of not more than $85 million." According to the press release, the restatements "mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts." (TAC, ¶ 322). Finally, the press release stated that Fleming's "fourth quarter 2002 pre-tax loss from continuing operations will be increased by expenses totaling not more than $80 million as a result of a number of factors, including increased vendor payback rates, the Kmart contract cancellation and corrections identified as a result of the Audit and Compliance Committee's independent investigation." (TAC, ¶ 322). Fleming subsequently announced it would restate its 2000 annual financial statements. To date, Fleming has not actually made its restatements.

These securities fraud cases raise the same issues involved in the SEC investigation and the announced restatements. The claims in this case may be divided into two categories: those brought under the 1934 Act and those brought under the 1933 Act. As will be seen, different standards apply to each.

In their 1934 Act claims, brought under section 10 and Rule 10b(5) promulgated thereunder, the plaintiffs complain of the conduct of five individual defendants. These defendants are referred to in this opinion either by individual name or collectively as the 1934 Act Individual Defendants. The 1934 Act Individual Defendants include the following past or present company officers: Mark Hansen, Fleming's Chief Executive Officer ("CEO"), Neal J. Rider, Fleming's Chief Financial Officer ("CFO"), Mark D. Shapiro, Fleming's Chief Accounting Officer ("CAO"), Thomas Dahlen, a Fleming Executive Vice–President and

head of Fleming's Retail Division, and E. Stephen Davis, a Fleming Executive Vice–President and head of Fleming's Wholesale Division. The plaintiffs have also asserted securities fraud claims under the 1934 Act against Deloitte and Touche ("D & T"), Fleming's outside auditor. The basis for the plaintiffs' fraud claims against D & T is that D & T conducted its audits while ignoring several "red flags" that D & T should have investigated and, by failing to do so, acted with severe recklessness sufficient to warrant liability under section 10.

***5** In their 1933 Act claims, brought under sections 11 and 12(a)(2) of that act, the plaintiffs complain of the conduct of several additional individuals, namely the outside directors and any other executive who signed the Company's Registration Statements filed with the SEC in March 2002 and June 2002. These individuals are referred to in this opinion as the 1933 Act Individual Defendants. The 1993 Act Individual Defendants include the following chief officers, directors and general counsel: Mark Hansen, Neal J. Rider, Mark D. Shapiro, Herbert M. Baum, Kenneth M. Duberstein, Archie R. Dukes, Carol B. Hallett, Robert S. Hamada, Alice M. Peterson, Edward C. Joulian, III, Guy A. Osborn and Carlos M. Hernandez. Also, the plaintiffs join as defendants to their 1933 Act claims the various underwriters involved in the June 2002 offering. These defendants are referred to herein as the Underwriter Defendants. D & T is also joined as a defendant to the 1933 Act claims. The court will sometimes refer to the defendants to the 1933 Act claims collectively as the 1933 Act Defendants. The court now turns to a discussion of the applicable legal standards, followed by a discussion of securities law, and, finally, to the analysis of the myriad issues raised by the motions to dismiss.

## III. STANDARDS FOR MOTIONS TO DISMISS IN SECURITIES LITIGATION

### *A. Rule 12(b)(6)*

The court begins with bedrock. Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A court may only dismiss a complaint under Rule 12(b)(6) when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Jones v. M.L. Greninger,* 188 F.3d 322, 324 (5 th Cir.1999). The court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 430 (5 th Cir.2002); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5 th Cir.1982). A plaintiff need only allege, not prove, sufficient facts to survive a motion to dismiss. *Koppel v. 4987 Corp.,* 167 F.3d 125, 133 (2d Cir.1999). Conclusory allegations, however, or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6). *S. Christian Leadership Conference v. Supreme Court of State of La.,* 252 F.3d 781, 786 (5 th Cir.2001). The court may consider the totality of the allegations in the complaint in their entirety. *Haack v. Max Internet Communications, Inc.,* 2002 WL 511514, at *5 (N.D.Tex. April 2, 2002).

Courts apply Rule 12(b)(6) principles to motions to dismiss in securities class action cases, but it must be remembered that a securities cause of action deals primarily with very fact-specific inquiries. *Id.* at *3 (citing *Basic Incorporated v. Levinson,* 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Notwithstanding that the cases are fact-specific, a district court evaluating a motion under Rule 12(b)(6) must consider the strict pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") in a securities fraud case.

### *B. Rule 9(b)*

***6** Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Rule 9(b) applies to private securities fraud claims under the PSLRA. *Abrams,* 292 F.3d at 430. The Fifth Circuit has held that the particularity requirement of Rule 9(b) sets "the same standard" required by the PSLRA. *ABC*

*Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 349 (5 th Cir.2002). It is settled in this circuit that Rule 9(b) requires the plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen,* 267 F.3d 400, 412 (5 th Cir.2001).

***C. PSLRA***

The express provisions of the PSLRA augment the Rule 9(b) requirements in several respects. The effect is to require plaintiffs to particularize the allegations of fraud so that individual defendants are given fair notice of the claims against them as well as their alleged roles in the fraudulent conduct. *ABC Arbitrage,* 291 F.3d at 349 n. 6. The PSLRA provides in relevant part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2).

The requirements of the statute are onerous. The statute was not, however, enacted to raise the pleading burdens under Rule 9(b) and § 78u–4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions. *ABC Arbitrage,* 291 F.3d at 348. A securities fraud plaintiff need not allege all facts that may be related to his claims-such a requirement is impossible at the pleading stage because usually only the defendants know all the facts related to the alleged fraud. *Id.* Therefore, the particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession. *Id.* Finally, the totality of the complaint determines whether a claim has been pled with particularity. *Goldstein v. MCI Worldcom,* 340 F.3d 238, 246–47 (5 th Cir.2003).

***D. Section 10(b) and Rule 10b–5***

***7** In the TAC, plaintiffs seek class certification for a class on behalf of all persons who purchased or acquired the publicly traded equity and debt securities of Fleming between May 9, 2001, and February 25, 2003, inclusive, including those who purchased or acquired such Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement or the June 17, 2002 Registration Statement. The private rights of action involved with respect to the securities fraud claims alleged in the TAC flow from alleged violations of sections 10(b) and 20(a) of the 34 Act and Rule 10b–5 of the SEC, promulgated pursuant to the 1934 Act. The court now examines those provisions.

Section 10(b) provides that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 states that it is unlawful for any person, directly or indirectly, "[t]o employ any device, scheme, or artifice to defraud; [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or [t]o engage in any act, practice, or course

of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The intersection of Rule 9(b), the PSLRA and the elements of a claim under section 10(b) and Rule 10b–5 yields a result which requires a plaintiff to allege, in connection with the purchase or sale of securities, the following:

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*ABC Arbitrage,* 291 F.3d at 350; *Nathenson,* 267 F.3d at 406–07. In addition, if an allegation is made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief. *ABC Arbitrage,* 291 F.3d at 350. This is the who, what, when, where, and how required under Rule 9(b) and the PSLRA. *Id.*

Section 10(b) and Rule 10b–5 require that the defendant make a material misstatement or omission. With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge ... that the statement was false and misleading." A statement is forward looking if it is

***8** (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer....

15 U.S.C. § 78u–5(i)(1)(A). The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(I) and (ii). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, which "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to 'bespeak caution' to investors that actual results may differ, thereby shielding the statements from section 10(b) and Rule 10b–5 liability ." *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 235 F.Supp.2d 549, 576 (S.D.Tex.2002)(quoting *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 176 n. 7 (11 th Cir.1999)). The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins,* 30 F.3d 160, 162 (5 th Cir.1994). Under Fifth Circuit precedent, "cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, ... materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id.* at 167–68 (citing *Krim v. BancTexas Group,* 989 F.2d 1435, 1448–49 (5 th Cir.1993)). "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis 'is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." ' *Id.* at 168 (citing *Krim,* 989 F.2d at 1445).

***9** In a similar vein, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Enron,* 235 F.Supp.2d at 576. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 888 (S.D.Tex.2001)(citing *Krim,* 989 F.2d at 1446).

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity sufficient facts to support that belief. *ABC Arbitrage,* 291 F.3d at 353. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named, provided they are described generally in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *Id.* In that situation, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. *Id.* Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id* .

In *ABC Arbitrage,* the Fifth Circuit found instances where the allegations as to confidential sources had been both adequately and inadequately pleaded. The court found that "allegations concerning a conversation between 'a high ranking [Company] official' who was 'a top executive of [the Company]" ' and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standard for pleadings based on information and belief" in that "[t]his executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *Id.* at 357.

On the other hand, with regard to allegations that the company had understated its losses, the court held insufficient certain allegations that the source of the information was consultations and interviews with "Swiss, Thai, and Indonesian business journalists, employees of Deutsche Telecom and other Alcatel customers throughout the world, trade union officials, and Telecom analysts" in the course of counsel's investigation. *Id.* at 358. These allegations, according to the court, had not been pleaded with sufficient particularity to withstand the requirements of the PSLRA.

***10** Securities fraud claims are, of course, *fraud* claims. The requirement is that a company officer or agent acted with a culpable mental state. To that end, "scienter" is a mental state embracing intent to deceive, manipulate, or defraud." *Ernst &*

*Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The PSLRA did not alter the substantive scienter requirement for claims brought under section 10(b) and Rule 10b–5. *Nathenson,* 267 F.3d at 408. The court must consider cumulatively any evidence of scienter pleaded by the plaintiffs. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068–69 (5 th Cir.1994). Therefore, the court must consider whether all facts and circumstances "taken together" are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.

Under the PSLRA, it is "not enough to particularize false statements or fraudulent omissions made by a corporate defendant ... [p]laintiffs must also particularize intent allegations raising a 'strong inference of scienter.'" *Goldstein,* 340 F.3d at 238. "For securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts that, assumed to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted" with the required mental state. *In re Electronic Data Systems Corp. Sec. & ERISA Litig.,* 2004 WL 52088, at *8 (E.D.Tex. Jan.13, 2004)(quoting *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 422 (N.D.Tex.2000)).

A plaintiff can demonstrate scienter with allegations of conscious misconduct or severe recklessness. *Abrams,* 292 F.3d at 439. Severe recklessness includes "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams,* 292 F.3d at 430; *Tuchman,* 14 F.3d at 1067. Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. *In re Triton Energy Ltd. Sec. Litig.,* 2001 WL 872019, at *10 (E.D.Tex. Mar.30, 2001); *see also* *Abrams,* 292 F.3d at 436 (stating an allegation of actual knowledge is not required to withstand a motion to dismiss).

Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" or have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *Abrams,* 292 F.3d at 432–33; *ABC Arbitrage,* 291 F.3d at 351–54; *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000). Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts relating to the corporation. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2 nd Cir.2001). In addition, courts have found sufficient allegations when plaintiffs have alleged "specific and detailed allegations about defendants' violation of GAAP, as well as other alleged misstatements regarding the company's earnings and technical problems [which] when viewed in their entirety—support[ed the claim]." *Haack,* 2002 WL 511514, at *7.

***11** Due to the fact that there will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter will suffice to withstand dismissal of the securities claims. *Goldstein,* 340 F.3d at 246; *Nathenson,* 267 F.3d at 424–25; *Novak,* 216 F.3d at 307. The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. *In re Triton,* 2001 WL 872019, at *11. But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. *Abrams,* 292 F.3d at 432. At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it. *Tuchman,* 14 F.3d at 1067. Thus, the requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud (2) engaged in deliberately illegal behavior (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Novaks,* 216 F.3d at 311.

A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10–K, regardless of whether he participated in the drafting of the document, "makes" a statement and may be liable as a primary violator under section 10(b) for making a false statement. *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 258 F.Supp.2d 576, 587 (S.D.Tex.2003). A misrepresentation alone is not enough, as the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. *Abrams,* 292 F.3d at 433. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. *Id.* When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter. *In re Triton,* 2001 WL 872019, at *11.

Rule 10b–5 does not impose on a corporation an affirmative duty to disclose all nonpublic material information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. *SEC v. Fox,* 855 F.2d 247, 252 (5 th Cir.1988). The duty to disclose only arises if the person is in a position of trust. *Id.* One instance where a duty to disclose is imposed by law on corporations, is when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that there is a duty to make it complete and accurate. *Rubinstein,* 30 F.3d at 170. The Fifth Circuit has held that "under Rule 10b–5, 'a duty to speak the full truth arises when a defendant undertakes a duty to say anything .'" *Id.* In addition, the defendants "have a duty under Rule 10b–5 to correct statements if those statements become materially misleading in light of subsequent events." *Id.* at 170 n. 41.

***12** While allegations of motive and opportunity alone are insufficient to satisfy the pleading requirements of the PSLRA, appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter. *Nathenson,* 267 F.3d at 412. Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations of motive and opportunity in and of themselves fail. *Abrams,* 292 F.3d at 434 (dismissing motive and opportunity allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices); *see also* *Tuchman,* 14 F.3d at 1068–69. Thus, some "motives," particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter.

Much of the parties' briefing is devoted to the issue of the group pleading or group publication doctrine. After the plaintiffs filed the TAC and after oral argument was held on the motions to dismiss, the Fifth Circuit held in *Southland Securities Corporation v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353 (5 th Cir.2004), that the group pleading doctrine did not apply in cases under the PSLRA. The effect of that case is to clarify the pleadings requirements in securities fraud cases which, as this one does, rely on press releases and SEC documents that are not attributable to any one person, but instead are published by the company itself. [1] The court will thus examine the ramifications of the Fifth Circuit's recent holding by providing an overview of the group publishing doctrine, followed by a discussion of *Southland.* The court will then apply *Southland* and the additional requirements discussed above to the allegations of the TAC.

The group pleading or "group publishing" doctrine was a creation of the courts. The doctrine permitted "plaintiffs to 'rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company." ' *Southland,* 365 F.3d at 363 (quoting *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999)(quoting in turn *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998))). "Instead of being required to plead that a particular defendant actually made, authored, or approved an offending statement in a corporate communication, the 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland,* 365 F.3d at 363. Under the doctrine as it existed before the

PSLRA, a plaintiff in a securities fraud case did not need to allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatements or omission where the defendants were "insiders or affiliates" of the company. *Id.*

***13** The TAC in this case relies heavily on press releases and filings with the SEC. The vast majority of the plaintiffs' complaint is devoted to establishing (1) that *Fleming* understated its earnings in 2001 and 2002(2) that *Fleming* disclosed those statements of its earnings in the company's press releases, 10Q Forms, 10K Forms, and Registration Statements. Under *Southland,* these are the types of documents one ordinarily would expect to see associated with group pleading because the information contained in the forms is generally the result of a collaborative effort on the part of the officers and agents of the company.

The plaintiffs have represented repeatedly that they do not rely on the group pleadings doctrine. This is a smart move because *Southland* has now explicitly held that they may not. But saying one is not relying on the group pleading doctrine only advances the issue part of the way. This case is about the overstatement of a company's earnings, and the representations concerning those overstatements are found largely in corporate documents that are the product of collaborative preparation efforts. *Southland* is clear that under the PSLRA:

> corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement.

*Southland,* 365 F.3d at 365.

Under this language, to the extent the plaintiffs are relying on representations of Fleming's earnings in press releases or SEC filings, it is not enough to plead that *Fleming* said or did something because the plaintiffs here do not sue Fleming. They sue individual defendants. As a result, the court must examine the TAC and determine whether the plaintiffs have alleged (1) that any or all of the 1934 Act Individual Defendants signed a corporate document containing a misrepresentation or (2) particular factual allegations explaining an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement. *Id.*

### *E. Section 20(a) controlling person liability*

The previous discussion addressed liability for primary violations of the 1934 Act. Section 20(a) provides a basis for additional liability and states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Since section 20(a) is a secondary liability provision, it is necessary that a primary violation be established before liability under section 20(a) arises. *ABC Arbitrage,* 291 F.3d at 348 n. 57. Controlling person liability under section 20(a) is not subject to the heightened pleading requirements of Rule 9(b), but is instead governed by Rule 8. *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 2003 WL 230688, at *12–13 (S.D.Tex.2003). Rule 8 is a "simplified notice pleading standard" that "applies to all civil actions, with

limited exceptions," and requires merely a statement that "gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N .A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

**IV. DISCUSSION**

***A. Analysis of the 1934 Act Issues***

***14** The court now addresses the various arguments made by the 1934 Act Defendants in the light of the standards set forth above. The 1934 Act Defendants filed a joint motion to dismiss, and each filed his own separate motion to dismiss to address issues peculiar to that defendant. The court will first detail the alleged fraud itself; then the court will address the 1934 Act Defendants' arguments as presented in their joint brief and will address the individual arguments, to the extent necessary, after considering those positions common to the group.

In the TAC, Lead Plaintiff Jackson Capital Management alleges a scheme by the 1934 Act Individual Defendants to inflate the price of Fleming securities and defraud the investing public. The TAC alleges that Fleming's external auditors, D & T, had knowledge of the fraud and/or was severely reckless with regard to the fraud and made materially false and misleading statements to the public. The TAC alleges that these 1934 Act Individual Defendants personally perpetrated the fraud.

Many of the plaintiffs' allegations come from information provided by four inside sources ("Sources") who allegedly observed much of the alleged accounting manipulations and the involvement of each of the 1934 Act Individual Defendants and D & T. According to the TAC, Sources 1 and 4 were financial analyst managers in Fleming's retail segment. Sources 2 and 3 were chief accountants for two of Fleming's principal wholesale divisions. Source 1 was employed at Fleming from the fall of 2001 to the summer of 2002. Source 4 was employed at Fleming from the summer of 2001 to early 2003. Source 2 was employed at Fleming from the 1980s to 2002 and served as a chief accountant for a wholesale division in 2001 and 2002. Source 3 was employed at Fleming as a chief accountant for a wholesale division from 2001 through 2002.

Because the TAC relies heavily on the Sources, it is important to understand the information alleged to be possessed by them. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen, Rider, Shapiro, Dahlen, and Davis. (TAC, ¶ 95). The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." (TAC, ¶ 96).

The TAC alleges that starting in July of 2001 through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "[h]ard copies of these reports were given directly to Defendants Hansen and Rider, and electronic copies were provided to Defendant Dahlen." (TAC, ¶ 122). The TAC alleges that from early 2001 through the class period, Sources 2 and 3 had access to company-wide financial information and frequently communicated with one another about accounting issues that affected the various divisions. (TAC, ¶ 144).

***15** The court now turns to the specific allegations of fraud. It is helpful to recall, as the court noted in the factual background section of this opinion, that Fleming's press releases, and SEC filings made various statements concerning the company's earnings and the success of Fleming's retail operations strategies. As is true in any fraud claim, the plaintiffs' complaint is that the defendants made certain statements with knowledge of information to the contrary. Bearing this in mind, the court now examines the allegations contained in the TAC.

The TAC alleges that Source 1 prepared earnings analyses prior to the closing of the books for the various reporting periods and that the CFO for the retail segment "directed that a new revenue or margin number, which they supplied, be substituted for the original number in the analysis, while providing no basis or back-up documentation for the change." (TAC, ¶ 98). Source

1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] [2] received." (TAC, ¶ 98).

The TAC further alleges that Source 1 was required by the retail CFO to reduce accounts payable by a specified amount in order to 'account' for 'deductions' that Fleming planned to claim from as-yet-unidentified vendors, for as-yet-unidentified products." (TAC, ¶ 99). The TAC alleges that the standard industry practice was to propose deductions to vendors for return of merchandise, adjustments for incorrect quantities invoiced, adjustments for incorrect pricing, and adjustments pursuant to written contractual arrangements, i.e., co-operative advertising agreements and volume discount agreements. (TAC, ¶ 99). The TAC alleges that according to Source 1, "Fleming did not follow standard industry practice" in that they "did not propose deductions." Fleming unilaterally took them without authorization from the vendors and that "there was no basis for concluding that the vendors would accept the improper and baseless deductions." (TAC, ¶ 100). The TAC alleges that the deductions "had already been accrued by Fleming's accounting department by the time Source 1 was told to change [the earnings analyses], even though the vendor, the product, and the basis for the deduction had not yet been identified." (TAC, ¶ 101).

The plaintiffs also allege that accrual of these unauthorized, improper, and unsustainable deductions was directed by Dahlen and the retail CFO; and that the retail CFO often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions. (TAC, ¶ 101). According to the TAC, Source 1 stated that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." (TAC, ¶ 102). Each financial analyst manager had a deduction worksheet, which was reviewed by higher-level executives. The TAC alleges that "[b]y June 2002, Source 1 was emailing Source 1's deduction worksheets to Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "[e]ven after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction." (TAC, ¶ 103). The TAC alleges that "Hansen and Dahlen directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." (TAC, ¶ 104). Further, the TAC alleges that "Fleming didn't correct its financial statements to reflect any such repayments [of the deductions], nor did the Company stop taking the improper deductions." (TAC, ¶ 105).

***16** The TAC alleges that the 1934 Act Individual Defendants and specifically Hansen attended Monday meetings where the handling of deductions and margins would be discussed. (TAC, ¶ 106). The executives allegedly reviewed documents showing that sales in Fleming's retail segment were flat or declining, and that there was a difference between publicly reported margins and internally calculated margins. (TAC, ¶ 106). Further Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by Dahlen. (TAC, ¶ 107). According to Sources 1 and 4 Hansen, Rider, Shapiro, and Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. (TAC, ¶ 108).

With regard to D & T, the TAC alleges that Source 1 provided back-up for these accrued deductions at D & T's request, but that D & T "never asked Source 1 any questions about the deductions that they were supposedly examining." (TAC, ¶ 109). The TAC alleges that the retail CFO hired D & T to validate deductions claimed by Fleming retail and that Source 1 provided information to D & T about the deductions. (TAC, ¶ 110). The TAC alleges that both Fleming wholesale and retail took deductions from vendors on the same product resulting in a double accrual of deductions on the books for a single product. (TAC, ¶ 112). In addition, the TAC alleges that when Fleming's wholesale group secured a contract with Kmart at thin margins, "the retail segment book[ed] more and more deductions in order to prop up company-wide margins" and "even accrued large disputed deductions on its purchases from Fleming's wholesale segment." (TAC, ¶ 114). The TAC alleges that there was a strong "push for unauthorized, improper, and unsustainable deductions in Fleming's retail segment reflect[ing] serious company-wide problems."

The TAC alleges that any reserves kept in the event that the deductions were reversed were inadequate and were eventually done away with in order to increase earnings. (TAC, ¶¶ 283–285). Specifically, according to Source 3 Fleming's policy was to

reserve against only 50% of claimed deductions, but that the wholesale management frequently reversed the reserves to increase earnings. (TAC, ¶ 283). Further, according to Source 3, the accounting managers were told by the wholesale managers at the direction of Fleming's corporate management to stop taking reserves in the second quarter of 2002. (TAC, ¶¶ 284–285).

The plaintiffs also contend that the 1934 Act Individual Defendants misrepresented the company's same store sales data. According to Sources 1 and 4, the TAC alleges that "Fleming manipulated its 'same store' sales data to show increases in same-store sales." (TAC, ¶ 115). Specifically, "Fleming's financial analyst managers tracked the real same store sales data" that consistently showed "large declines in same-store sales." (TAC, ¶ 117). However, the TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide the adverse sales trend" by rejecting the data from the financial analysts and "chang[ing] the composition of the population of stores which constituted the Company's 'same stores." ' (TAC, ¶ 118).

***17** Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year 'same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a 'same store' comparison as is commonly understood in the retail industry." (TAC, ¶ 118). The TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores ... were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." (TAC, ¶ 128). The TAC alleges that "[a]ccording to Source 1, in November 2001, Fleming's retail financial analyst managers expressed concern to [the retail CFO] that Fleming's retail segment was over-reporting the strength of its sales, especially its 'comparable store' sales," but that the retail CFO told them "not to raise concerns, or they would lose their jobs." (TAC, ¶ 119).

Further, the TAC alleges that "[a]ccording to Sources 1 and 4, beginning in 2001 and continuing into 2002, Fleming also inflated its same store and/or comparable store sales figures by including certain sales, referred to as 'red tag' sales."[3] (TAC, ¶ 120). The TAC alleges that "[e]ven though red tag sales were not made through any Fleming retail store, Fleming would falsely attribute the revenue from these sales to the retail stores included in its same store and/or comparable store analyses, thereby inflating the total amount of same store and/or comparable store sales." (TAC, ¶ 120). The TAC alleges that when Source 4 was first given "red tag" sales numbers by the retail CFO and asked what they were, the retail CFO answered: "You don't want to know." (TAC, ¶ 125).

In addition, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming—at the direction of Dahlen and the retail CFO—reduced the previously reported same store sales for the year 2000 fiscal year by subtracting $1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $4.7 million in red tag sales. (TAC, ¶ 120). The plaintiffs allege that same store sales information was also misstated by a process called diverting.[4] (TAC, ¶ 123). According to Source 4, Fleming included this revenue in "same store" sales figures despite its not being attributable to any of the retail stores. (TAC, ¶ 123). The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. The TAC alleges that the "total same store and/or comparable store figure for 2001 was falsely inflated, and the growth for the same store or comparable store figure was also falsely inflated [whereby] the market was misled about growth in same store sales." (TAC, ¶ 120).

***18** The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "[h]ard copies of these reports were given directly to defendants Hansen and Rider, and electronic copies were provided to defendant Dahlen." (TAC, ¶ 122). The TAC alleges that Hansen received special sales reports giving even more current information than Sources 1 and 4 received showing the declining sales trends. (TAC, ¶ 131). In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including defendants Hansen, Rider, and Dahlen—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." (TAC,

¶ 124). Source 4's reports in 2002 also listed same store sales separately in each of Fleming retail's seven regions showing that overall same store sales were declining in almost all of the company's regions, some at up to 20% over the course of a year. (TAC, ¶ 127). In addition, Hansen and Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. (TAC, ¶¶ 459, 462). Also, Hansen, Shapiro, Rider, and Davis received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. (TAC, ¶ 459).

The TAC alleges that the actual sales trends clearly showed that the price-impact format was not working according to Source 4. (TAC, ¶ 132). Specifically, between July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. (TAC, ¶ 133). Using data that had been available to Hansen, Rider, and Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. (TAC, ¶ 133). The TAC alleges that it was apparent in 2001 and 2002 from reports provided to defendant Hansen that newly-purchased stores were performing poorly and routinely were not meeting the revenue and earnings projections prepared by Source 4 with information provided to him that were used to justify the purchases. (TAC, ¶ 134). The TAC alleges that "with the knowledge and direction of the 1934 Act Individual Defendants, Fleming continued to purchase retail stores based on unrealistic projections in order to create the fiction of a new source of revenue to hide the decline in the Company's sales." (TAC, ¶¶ 134, 135).

***19** The plaintiffs allege that defendants Hansen and Dahlen received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, ¶ 455). In addition, Hansen, Rider, Shapiro, Dahlen, and Davis received weekly, monthly and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, ¶ 456). Also, the TAC specifically alleges that Hansen, Rider, Shapiro, Dahlen, and Davis attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. (TAC, ¶ 457). According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. (TAC, ¶ 460)

In addition to the vendor deductions and the same store sales issues, the TAC alleges that according to Sources 1 and 4 "Fleming often reported normal [, recurring] operating expenses as 'strategic plan charges' or other one time charges even when the expenses were not related to Fleming's strategic plan" despite the "financial analyst managers stat[ing] in meetings with management that the charges in question were recurring" thereby "increas[ing] its reported margins and falsely suggest[ing] to analysts and investors that the expenses would not recur in future reporting periods." (TAC, ¶ 136).

The above discussion has related generally to the company's retail operations. The TAC also alleges that Fleming "engaged in a series of manipulations during the Class Period [in its wholesale segment] involving improper inflation of revenues and earnings; the accrual of unauthorized, improper, and unsustainable vendor deductions; a scheme to obtain unearned promotional funds through the use of nonexistent stores; the improper failure to recognize inventory losses; and the improper classification of prior-year expenses." (TAC, ¶ 137).

According to Source 4, Fleming "inflated its earnings by booking losses to 'discontinued operations' when the losses were in fact attributable to continuing operations" thereby "overstat[ing] the earnings of its continuing operations and bury[ing] the losses in the presumably less important 'discontinued operations' category." (TAC, ¶¶ 138, 139). Specifically, following a September 24, 2002 press release announcing the divestment of its price-impact Food4Less and Rainbow Foods Stores these stores were "treated as discontinuing operations, while the limited-assortment Yes!Less stores were [still treated as] continuing operations." (TAC, ¶¶ 138, 139). According to Source 4, "Yes!Less would sell its excess inventory to the price-impact stores at full price" and the "price-impact stores would then resell the excess inventory to ... another retailer[ ] at a fifty percent

markdown.” (TAC, ¶ 139). “In this way, the ‘discontinued’ price-impact stores assumed the excess-inventory losses of the ‘continuing’ Yes!Less stores” thereby overstating the earnings for continuing operations. (TAC, ¶ 139).

***20** According to the plaintiffs, beginning at least as early as 2000 and continuing through the Class Period, Fleming manipulated its wholesale earnings through a scheme whereby the company's internal controls were weakened and the company's upper management, including defendants Hansen and Davis, put pressure on the divisional staff to meet budgeted targets by any means necessary. (TAC, ¶ 140). In early 2001, the company centralized its accounting operations and terminated divisional accounting managers and clerks. Essentially, the plaintiffs contend that management put pressure on its staff to meet targets even though those goals were unrealistic. (TAC, ¶ 146, 148).

According to Source 3, the accountants routinely discussed among themselves the Company's financial condition in both the wholesale and retail divisions based on their access to actual results showing large losses and “that Fleming's publicly disseminated rosy consolidated financial statements were completely contrary to reality.” (TAC, ¶ 151). These accountants even asked their directors where the publicly claimed profits were coming from, but received no valid or plausible response. (TAC, ¶ 151). The TAC alleges that after December 2001 these accountants “routinely discussed the fact that Fleming was a sinking ship that eventually would have to declare bankruptcy.” (TAC, ¶ 151).

The TAC alleges that “[o]ne of Fleming wholesale's most pervasive methods of inflating its earnings was to take unauthorized, improper, and unsustainable deductions from accounts payable to vendors.” (TAC, ¶ 156). “According to Sources 2 and 3, Fleming's division officers directed accounting managers to recognize unauthorized, improper, and unsustainable deductions from vendors' invoices in order to enable the divisions to meet their targets” that eventually “increased in a snowball effect from period to period.” (TAC, ¶ 157). The TAC further alleges that “[u]pon determining the amount of the division's shortfall to the forecast, the division staff would fax to the [accounting] managers sufficient unauthorized, improper, and unsustainable deductions, backdated to the financial period closing date, to make up the shortfall.” (TAC, ¶ 158).

According to Sources 2 and 3, Fleming maintained a “Vendor Compliance Manual” that was “an ‘open checkbook’ that authorized division accountants to impose deductions for any reason that” was used by the divisions, “especially those that struggled to meet their targets.” (TAC, ¶ 159). In one situation Fleming allegedly took an $800 deduction from a vendor because the truck was late making its delivery. The “deduction documents” sent to vendors “did not identify any specific vendor invoices that were the subject of the deduction” and one vendor said “ ‘it would take four months to figure out why Fleming took the deduction, and another four months to get it back.” ’ (TAC, ¶¶ 160, 161). The TAC alleges that once the “deduction documents” were prepared, the deduction would be accrued even though in most cases Fleming ended up reinstating all or almost all of the amount deducted from a vendor's invoice. (TAC, ¶¶ 161, 163).

***21** According to Source 3, at one point in July 2002, the disputed deductions totaled about $100 million at the corporate level in addition to $20 million at the divisional level in the wholesale segment. (TAC, ¶ 167). The TAC alleges that even though the deductions inevitably would have to be remitted to vendors and the accrual reversed, the deductions nevertheless were accrued because they created the illusion of present earnings. (TAC, ¶ 167). “According to Sources 2 and 3, in order to compensate for the adverse earnings consequences caused by writing checks to vendors to cover amounts improperly deducted, Fleming would initiate another round of unauthorized, improper, and unsustainable deductions” leading to “a vicious cycle which continually served to falsely inflate current earnings ... eventually result [ing] in a huge charge to earnings.” (TAC, ¶ 166).

The TAC includes excerpts from a September 5, 2002 *Wall Street Journal* article in its allegations detailing complaints from various vendors about the large deductions taken by Fleming being unjustified. (TAC, ¶¶ 171–174, 177–179). These articles include claims by former Fleming executives and employees that the disputed deductions amounted to $100 million during the middle of 2001, that the Fleming managers took the deductions at the direction of upper management, that Fleming took deductions for items it never actually put into distribution due to the cancellation of orders, and that executives resigned after disagreeing with Fleming about its practices. (TAC, ¶¶ 173, 177, 178).

The plaintiffs allege a variety of other accounting improprieties. According to Source 3, Fleming inflated earnings by booking sales and earnings to a fictitious store in order to earn promotional discounts from vendors and then failing to reverse the fictitious earnings. (TAC, ¶¶ 180–192). Also, Fleming, at the direction of defendant Shapiro, did not recognize a $1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. (TAC, ¶¶ 193–199). Fleming recognized an inventory surplus of $6 .2 million and booked it to income even though it was due to inventory that actually belonged to one of Fleming's customers and should have been offset by a liability. (TAC, ¶ 200).

Hansen, Shapiro, Rider, and Davis received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and were well aware of the magnitude and invalidity of massive deductions taken by Fleming. (TAC, ¶ 458). According to the plaintiffs, Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, defendants Hansen, Rider, Shapiro, and Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. (TAC, ¶ 461).

***22** As can be seen, the gist of the plaintiffs' complaint is that the 1934 Act Individual Defendants made false statements concerning Fleming's earnings with knowledge of contrary information and/or reckless disregard for the truth of those earnings statements. The TAC alleges that the 1934 Act Individual Defendants had the motive to make materially false and misleading statements. (TAC, ¶ 468). Specifically, the TAC alleges that the defendants made the materially false and misleading statements in order to facilitate Fleming's offering which netted $170 million in exchange for stock, $200 million in exchange for senior notes, and a $975 million in new credit facilities. (TAC, ¶ 468). In addition, the plaintiffs allege that the defendants had the motive to manipulate earnings since their bonuses were tied directly to reporting certain targeted earnings which were met in 2001 as a result of the manipulations. (TAC, ¶ 469).

### *1. Group Pleading*

The 1934 Act Individual Defendants contend that the TAC should be dismissed because the plaintiffs impermissibly rely on group pleading when they make allegations against the 1934 Act Individual Defendants as a whole and against Fleming. The plaintiffs respond that both parties have used the shorthand reference to the defendants in their pleadings and that allegations in the TAC against the 1934 Act Individual Defendants are as to each and everyone of them individually. The plaintiffs contend that the only paragraphs that arguably rely on group pleading concern the allegations that press releases were false and misleading and that the 1934 Act Individual Defendants knew of their falsity. The plaintiffs argue that there is a reasonable basis for believing that the individuals knew of their falsity based on the rest of the allegations in the TAC. Further, the plaintiffs contend that the viability of the group pleading doctrine after the enactment of the PSLRA is an open issue in this judicial district and the Fifth Circuit. Finally, the plaintiffs respond that the TAC makes adequate allegations against the individuals by name as well.

The Fifth Circuit's recent decision in *Southland,* discussed above, disposes of many of these issues. First, the court rejects the plaintiffs' argument to the extent it relies on the supposed potential “viability” of the doctrine in this circuit. The doctrine now has no viability at all. The court will not permit the use of such shorthand references to “defendants” to meet the particularity requirements of the PSLRA. This notwithstanding, the court observes that the plaintiffs do make substantial allegations that particular defendants were identified in press releases and conference calls with analysts. Likewise, the plaintiffs note, when appropriate, the signatories to the various SEC filings. No party has suggested that further repleading is necessary at this stage; accordingly, the court will consider the TAC as it stands under the decision in *Southland.*

### *2. Failure to Adequately Identify the Source of their “Information and Belief”*

***23** The 1934 Act Individual Defendants next contend that the TAC should be dismissed because the plaintiffs have not adequately identified the source of the allegations that are not based on the plaintiffs' personal knowledge. In addition, these defendants contend that no inference of fraud is raised without an adequate showing of the foundation of the Sources' information

and its reliability. The defendants argue that the TAC fails to describe the details concerning how, when, and where any of the Sources acquired their information.

The plaintiffs respond by stating that even though they did not disclose the names, they provided information about the Sources' job positions to support the probability that those persons would possess the information pleaded to support the allegations, as well as used information that predated their employment to know that the misrepresentations had been ongoing. The plaintiffs respond further by stating that these Sources have personal knowledge of the events, meetings, and internal reports that evidence the misrepresentations and personal knowledge that the defendants attended the meetings and reviewed the documents and reports.

Applying the standards announced in *ABC Arbitrage,* the court finds that the plaintiffs have sufficiently identified the Sources who provided the information for their allegations. Although the TAC does not name the Sources, it discloses specific information about the positions held by the Sources, the time period in which they worked for the Company, and their job responsibilities. The TAC also discusses how the Sources received the information underlying the allegations and to whom the information was forwarded. Based on the particularity with which the allegations discuss the Sources themselves and the specifics regarding how the Sources acquired the information and knowledge underlying the allegations, the court holds that the allegations in the TAC are adequately pleaded to support the probability that the Sources would possess the information pleaded that support the allegations of false or misleading statements by the defendants.

### *3. Failure to Plead Fraud with Particularity*

The 1934 Act Individual Defendants raise several issues with respect to whether the plaintiffs have sufficiently pleaded fraud with particularity. First, the defendants attack the pleading as it relates to financial reports, reports on retail stores, and Monday meetings. The defendants argue that the TAC does not allege specifically how the Sources know that the 1934 Act Individual Defendants knew about the improper earnings manipulations or knew what was being discussed at the Monday meetings. In addition, the defendants contend that there are no allegations that show that the 1934 Act Individual Defendants knew that the vendor deductions, same store sales analysis and improper classification of recurring expenses in the retail segment were improper.

The plaintiffs respond by arguing that the defendants are merely pointing to isolated paragraphs but that the totality of the complaint is what is determinative. With regard to the financial reports, reports on retail stores, and Monday meetings, the plaintiffs posit that the Sources prepared the financial reports with the manipulations as directed by defendants Dahlen and Hansen and known to the other 1934 Act Individual Defendants, prepared charts of retail store sales growth at the request of Hansen, and that the charts and manipulations were discussed at the Monday meetings.

***24** Although documentary evidence, such as internal reports, may be the basis underlying the allegations in the TAC of false and misleading statements, an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Abrams,* 292 F.3d at 432 (stating that plaintiffs did not point to any particular reports or information—available to the defendants before the announced financial restatements—that are contrary to the restatements and that it would be easier to infer that they had received such reports if information were given about who generated the reports, when they were reviewed, how defendants responded, etc.). Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients. *Id.* A plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. *ABC Arbitrage,* 291 F.3d at 356. However, the Fifth Circuit has expressly declined to adopt as a standard the threshold requirement in every case that the plaintiffs must provide report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information. *Id.* at 355.

A complaint can satisfy the PSLRA by providing documentary evidence and/*or* a sufficient general description of the personal sources of the plaintiffs' beliefs. *ABC Arbitrage,* 291 F.3d at 352. In this case, the plaintiffs have satisfied the pleading requirements by providing not only a sufficient factual basis for the internal reports, but also a sufficient factual basis for the information contained in the reports by virtue of the allegations concerning the Sources discussed above. The allegations contain numerous references to reports as outlined above, but in each instance the allegations contain sufficient factual information concerning the reports as required by *ABC Arbitrage* and/or are based upon information provided by the Sources. Therefore, the allegations in the complaint concerning internal reports are adequately pleaded.

Likewise, the allegations concerning the defendants and the Monday meetings are based on factual allegations provided by the Sources. The factual allegations in the TAC concerning the Sources support the belief that the Sources would possess the information about the Monday meetings. As discussed in *ABC Arbitrage,* as long as the factual basis concerning the Sources is adequate, the plaintiffs' allegations of false or misleading statements based on information provided by the Sources are adequate to satisfy the heightened pleading standards.

The court now considers whether the plaintiffs have sufficiently attributed any misrepresentation of fact to any particular 1934 Act Individual Defendant in light of the *Southland* decision. The court will address Fleming's statements concerning its earnings, followed by the same store sales reporting, and conclude with a discussion of the defendants' arguments concerning puffery, materiality and forward-looking statements. At the outset, the court agrees with the plaintiffs that Fleming's need to restate its earnings makes the plaintiffs' burden to demonstrate the falsity of particular earnings statements easier to discharge. The company made a public announcement that its earnings needed to be restated and that the restatement of its earnings for 2001 and 2002 would approximate $85 million, or 79% of Fleming's reported earnings for the time period at issue. At this point, the court is not addressing the scienter requirement; rather, the court is addressing whether the plaintiffs have sufficiently pleaded with particularity the falsity of the statements that any individual defendant made about Fleming's 2001 and 2002 earnings. The magnitude alone of the forecasted restatement is a testament to its materiality. And, although the court is not at this point addressing scienter, the size of the restatement shall figure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter.

***25** The earnings statements made in the May 29, 2001, August 24, 2001, and November 15, 2001 Form 10Qs filed with the SEC are pleaded with sufficient particularity as against defendant Neal Rider, who signed the Form 10Qs for 2001 Q1 and Q2. They are also sufficient as against defendant Mark Shapiro, who signed the Form 10Q for Q3 of 2001. The plaintiffs have not alleged how any person other than Rider or Shapiro contributed to any specific portions of the Form 10Qs. Therefore, the claims based on the Form 10Qs are limited to defendant Rider and Shapiro, as they signed the forms.

As to the March 6, 2002 Form 10K filed with the SEC reporting year end financial information, the statements of earnings contained therein are pleaded with sufficient particularity as to defendants Hansen, Rider and Shapiro. (TAC, ¶¶ 204, 210, 217, 229). The company's earnings as reported in the Registration Statement filed in anticipation of the March 2002 Note Offering, which incorporated the Form 10K from 2001 is also pleaded with particularity as to defendants Hansen, Rider and Shapiro.

With respect to the 2001 earnings reports set forth above, the plaintiffs have adequately alleged why the statements are false. The plaintiffs have alleged that Fleming itself has announced that its 2001 earnings information is false, and materially so. In the court's opinion, the announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false. There is no reasonable argument that could be made that the proposed restatement, even though it has not yet occurred, is anything other than a material one. Consequently, as to the 2001 earnings information, the court is persuaded that the plaintiffs have sufficiently alleged the who, what, why, where, when, and how required by Rule 9(b) as against the defendants included above.

The court now turns to the 2002 earnings information. First, the plaintiff has pleaded with sufficient particularity the statements contained in Fleming's Form 10Q filed with the SEC on May 17, 2002 (TAC, ¶ 245) and signed by defendant Shapiro. Second, defendant Rider's statements made in the conference call following the release of the 1Q 2002 results that "our EBITDA, for

continuing operations was $32.6 million for 4.87 percent of sales" is also sufficiently pleaded with particularity. (TAC, ¶ 244). Third, the earnings reported in the June 2002 Registration Statement which, in turn, incorporated the company's financial results included in the 2001 10K filed with the SEC and signed by defendants Hanson, Rider and Shapiro is sufficiently pleaded with particularity. Fourth, the earnings reported in the August 27, 2002 Form 10Q filed with the SEC and signed by defendant Shapiro are pleaded with sufficient particularity. Fifth, with respect to reserves, defendant Rider's statements on the September 5, 2002 conference call with analysts that "[e]verything would be appropriately reserved for, correct" and that "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that risen to the level that we are at an impasse today" are sufficiently pleaded with particularity. Sixth, the court finds that the earnings reported in the company's amended 10Qs and 10K filed with the SEC on October 16, 2002 for Q1 and Q2 of 2002 of FY 2001 and signed and/or certified by Shapiro, Hansen and Rider are pleaded with particularity. Seventh, the court holds that the representations of earnings contained in Fleming's 10Q for the third quarter of 2002 have been pleaded with particularity. That form was signed by Shapiro and certified by Hansen and Rider. Finally, the court holds that the statements made by Shapiro in the January 23, 2003 conference call are pleaded with sufficient particularity. (TAC, ¶ 311).

***26** As to defendant Stephen Davis, the plaintiffs do not allege that Davis personally made any particular oral false statements or signed any of the press releases or SEC forms which contained the alleged misstated earnings. [5] Consequently, the court examines whether there are any "particular factual allegations explaining an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement." The closest that the plaintiffs come is "[d]uring that same period, Fleming's wholesale president—defendant Stephen Davis—with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants, also utilized a variety of techniques, including the accrual of unauthorized, improper and unsustainable deductions from accounts payable due to vendors, to inflate earnings in violation of accepted accounting practices." (TAC, ¶ 14). But the plaintiffs' allegation that Davis performed accounting "manipulations" or violated accounting standards or that he did so with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants falls far short of alleging specific facts that Davis prepared any portion of a Fleming report or that, even if he did, that he did so with the knowledge or reckless disregard for the truth that the federal securities laws require to maintain a fraud claim. As such, the court dismisses the primary liability claims asserted against defendant Stephen Davis under section 10. The TAC is also silent as to specific allegations that Davis possessed the power or authority to control the operations of the company in general or had specific control over the activity upon which the primary violation is predicated. *McNamara v. Bre–X Minerals, Ltd.,* 46 F.Supp.2d 628, 638 (E.D.Tex.1999). The court therefore dismisses the controlling person claims against him as well.

The court now turns to a discussion of the statements claimed to be corporate puffing, nonmaterial, or forward-looking. The statements primarily under attack by the 1934 Act Defendants include: (1) statements regarding a "culture of thrift" or cost savings in light of the existence of the Fleming Air Force (2) statements regarding Fleming's overvalued retail stores (3) statements regarding Fleming not having a liquidity problem (4) Fleming's artificially inflated earnings in the October 23, 2002 press release and (5) Fleming's artificially inflated earnings in the January 23, 2003 press release. Because the motion to dismiss could be read, however, to challenge a broader range of statements (Joint Motion to Dismiss, p. 18 "[m]oreover, many of the alleged statements are either not material, or they are not false and misleading."), the court has endeavored to examine all of the alleged statements to assess their materiality and falsity.

The "culture of thrift" statement is not actionable. The plaintiffs argue that a statement that Fleming instituted "a culture of thrift" was misleading in light of their use of jets to fly home on the weekends and that one of the Sources knew that the executives had not instituted this culture. This statement is simply too general to constitute a material misstatement as required under Rule 10b–5. It is more in the nature of a corporate statement concerning a competitive strength of the company. As the defendants correctly observe, the courts have consistently held that analysts and investors rely on *facts* in making investment decisions, not vague expressions of corporate optimism or competitive strengths. *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869–70 (5th Cir.2003). "The generalized, positive statements about the company's competitive strengths, experienced management,

and future prospects are not actionable because they are immaterial." *Id.* at 869. The TAC does not contain any allegations as to why the statement is rendered false by the allegations concerning the Fleming Air Force. Therefore, the statement is not actionable.

***27** The next statement involves a January 14, 2003, press release where Fleming announced that it was marking down the "realizable value" of its retail stores by $116 million. The press release stated that "the company will record a non-cash charge of approximately $116 million to discontinued operations in the fourth quarter, to adjust the carrying value of the retail assets to their estimated net realizable value." The plaintiffs contend that this is a material misstatement in that this write-down did not result in the assets being adjusted "to their estimated net realizable value." The plaintiffs point to a subsequent press release from April 17, 2003, in which the Company announced "an additional impairment charge to discontinued operations of approximately $90 million related to retail store operations held for sale, due to a reduction in the net realizable value of such operations." Further, plaintiffs allege that the 1934 Act Individual Defendants, specifically Hansen, Rider, and Dahlen, received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores. In the second half of 2002, Source 4 prepared a report charting the trends in sales for newly-opened price-impact stores showing that the sales for a typical Fleming store declined consistently after opening, and never increased. The plaintiffs conclude that these allegations show that the net realizable value after the January 2003 write down was a material misrepresentation that the 1934 Act Defendants knew was false.

These allegations are not sufficient to make the statement actionable. The allegations do not provide enough information to show that the defendants knew even within a reasonable estimate the actual amount of the net realizable value. Measuring the net realizable value of a group of assets is not an exact science. The April, 2003, write-down easily could have been the result of the defendants being too optimistic in January of 2003 about how much a willing purchaser would pay for the assets or the result of subsequent events in the economy or operations. More to the point, the allegations revolve around the knowledge of the defendants in 2002, but does not address the knowledge of the defendants at the time of the first write-down. As such, the court holds that this statement is not actionable.

The third statement that the 1934 Act Defendants specifically contend is not adequately pleaded is a statement in a January 23, 2003 conference call in which an unidentified officer of the company stated in response to a question suggesting that the Company was having liquidity problems that "no [we are not dipping lower and lower versus the loan covenants,] ... [t]hree of the four covenants, we are consistently-have ample room underneath those covenants. The one covenant that we keep bumping up against, at least over the past few quarters, is debt-to-EBITDA." The question posed specifically addressed the loan covenants and Fleming's ability to meet the loan covenants. The plaintiffs do not provide any specific allegations, other than the Company's eventual bankruptcy on April 1, 2003, to show that the defendant knew the statement was false when it was made and that the Company did not have ample room underneath the three covenants. Therefore, the plaintiffs' allegations are not sufficient to make the statement actionable. [6]

***28** The next two statements concern the allegations that the defendants overstated Fleming's wholesale earnings in an October 23, 2002 press release and January 23, 2003 press release. (TAC, ¶ 312–313). The defendants contend that the allegations are conclusory and refer to the entire press release quoted in its entirety in a previous paragraph. The defendants are correct, in that plaintiffs cannot simply recite portions of publicly disclosed documents and summarily allege that they are false and misleading. *BMC Software,* 183 F.Supp.2d at 886. With respect to the October 23, 2002 press release, the plaintiffs do not allege who the earnings information is attributed to; therefore, they have not satisfied *Southland.* As to the January 2003, press release, the allegations specifically attribute the statements only to defendant Shapiro; accordingly the court holds that the statements are only pleaded with sufficient particularity as to that defendant.

The plaintiffs' allegations, moreover, specifically state that "[i]n the October 23, 2002, press release and in the conference call, the 1934 Act defendants overstated Fleming's wholesale earnings" and "[i]n the ... January 23, 2003 press release[ ] ..., the 1934 Act Individual defendants again knowingly or recklessly overstated Fleming's earnings by failing to account for the manipulations described in this Complaint." The bullet items listed below the allegations are the links to the previous allegations

supporting why the statements as to earnings were false. Looking at the totality of the TAC and its allegations concerning the ongoing use of various manipulations and overstatement of earnings throughout the Class Period up until the announced restatements in April of 2003, the court finds the allegations sufficient. Therefore, the court finds that the plaintiffs' allegations are sufficient to plead with particularity the material misstatements and why they are false and misleading with respect to the January 2003 press release.

***4. Failure to Adequately Plead Scienter***

The 1934 Act Individual Defendants and D & T also contend that plaintiffs failed to adequately plead allegations giving rise to a strong inference of scienter as to each defendant. The plaintiffs respond by stating that they have adequately pleaded scienter against each of the 1934 Act Individual Defendants by alleging not only motive and opportunity, the close involvement of the individual defendants with the operations of Fleming, the violation of GAAP, and the magnitude of the fraud; but also the plaintiffs allege direct evidence of scienter by pointing to individual defendants and alleging that they directed manipulations resulting in misrepresentations on numerous occasions and knew about discrepancies in financial information and either made misstatements or omissions about the information or failed to correct previous misrepresentations or omissions.

The plaintiffs contend that they have adequately pleaded scienter against D & T by alleging red flags, numerous violations of the accounting and auditing standards, GAAP and GAAS, the simplicity of the accounting principles violated, the relative ease with which the fraud could have been detected, the magnitude of the restatement, and motive and opportunity. With the above standards as to pleading allegations of a strong inference of scienter in mind, the court now turns to the allegations as to each defendant.

***29** Mark Hansen was Chief Executive Officer of Fleming from November 1998 until March 3, 2003. Hansen contends that the allegations of scienter against him are insufficient. Hansen contends that Fleming's deduction practices have not been shown with particularity to be fraudulent and thus the allegations are not sufficient to show scienter. Also, Hansen contends that the TAC does not state with particularity that he had the information or knew of the information with regard to allegedly fraudulent deductions and accounting practices, only that he must have known about them. In addition, Hansen contends that the TAC does not specifically state what was in the reports and comparisons available to him. Finally, Hansen states that the TAC includes impermissible general allegations against the defendants as a whole that is foreclosed due to the fact that the group pleading doctrine is no longer followed after the enactment of the PSLRA.

The plaintiffs urge that Hansen himself publicly touted Fleming's strategic plan, portrayed himself as knowledgeable concerning Fleming's earnings, sales, and operations, and represented to the market that earnings and sales were growing. The plaintiffs further contend that the deduction practices were fraudulent in that they went beyond industry practices, were done without vendor permission, and were improper and baseless. Specifically, the plaintiffs point to statements by Source 1 that deductions were taken and accrued to increase earnings before Fleming had even identified the vendor, the product, and the basis for the deduction. The plaintiffs argue that these allegations give rise to a strong inference that the deductions were not a legitimate cost reduction, but were instead accounting manipulations.

Additionally, plaintiffs point out that Source 1 personally participated in the delivery of reports showing revenue, cost, and margins in both the wholesale and retail segments to Hansen that showed the true financial picture for Fleming. The plaintiffs contend that the Sources give direct evidence that defendant Hansen was provided information showing that Fleming's internally-reported earnings were substantially different from Fleming's publicly-reported earnings. Also, the plaintiffs contend that Hansen's presence at Monday meetings where there were reports showing the discrepancies and discussions about the deduction practices supports a strong inference of scienter.

The plaintiffs thus attempt to allege a strong inference of scienter with regard to Hansen with numerous allegations that he knew of accounting manipulations, received reports showing the actual numbers, and made statements or signed filings containing representations that conflicted with the information that he knew about or recklessly disregarded. With regard to receiving reports of financial information and attending meetings where the manipulations and financial information were discussed the

TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile [d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen. According to Source 1, Hansen received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. Also, the TAC alleges that the general ledger was published during the Class Period to Hansen.

***30** Source 4 also contributed to the allegations related to Hansen. Starting in July of 2001 and continuing through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "[h]ard copies of these reports were given directly to Hansen. At the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Hansen—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining.

According to Sources 1 and 4, Hansen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Further, Hansen received special daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he made public statements claiming that Fleming's retail segment was growing. In July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. Using data that had been available to Hansen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. In addition, Hansen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

With regard to Hansen's personal participation in the manipulations, the TAC alleges that "Hansen ... directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors" resulting in only $78,000 of the deductions being accepted. Thus, under the plaintiffs' theory and allegations, Hansen personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth.

Hansen cites two Fifth Circuit cases that he contends support his motion to dismiss: *Goldstein v. MCI Worldcom* and *Abrams v. Baker Hughes Inc.* In *Goldstein,* the court held that the plaintiffs' circumstantial evidence relating to the timing of accounts receivable write-offs, the magnitude of the write-offs, the defendants' close involvement in the day-to-day operation and management of the company, and the defendants' positions in the company and alleged decision-making roles in writing off uncollectible accounts failed to sufficiently connect the defendants to support a strong inference of scienter. 340 F.3d at 248–54. In *Abrams,* the court held that the plaintiffs' circumstantial evidence relating to the defendants' receipt of financial reports that apprised them of the company's true financial status, the company's violations of GAAP, the defendants' desire to raise money and protect their incentive compensation, and the timing of the resignation of certain accounting department employees was insufficient to demonstrate a strong inference of scienter. 292 F.3d at 431–35.

***31** These decisions notwithstanding, the allegations against Hansen taken as a whole sufficiently allege a strong inference of scienter. The allegations in the TAC include not only circumstantial evidence similar to that discussed in the cases above, but also direct evidence of Hansen's knowledge of and involvement in the scheme. In addition, the weakness of the allegations as to internal reports discussed by the Fifth Circuit in the two cases discussed above is not present in this case.

In *Abrams,* the Fifth Circuit held that "an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." 292 F.3d at 432 (quoted in *Goldstein,* 340 F.3d at 253–54). The court went on to state that "[s]uch allegations must have corroborating details regarding the contents of allegedly contrary reports of their authors and recipients." *Id.* Here, the allegations are supported by Sources who worked in the Company's accounting department and not only prepared some of the reports discussed at the request of the defendants, but also delivered them to the defendants. Other allegations state that the Sources saw reports that were prepared by other accounting managers, knew the contents of the reports, and knew that the reports were forwarded to the defendants.

In *ABC Arbitrage* the Fifth Circuit held that plaintiffs could satisfy the reports "standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them." 291 F.3d at 356 (quoting *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72, 73 (2d Cir.2001)). Further, the court held that the allegations as to Monthly Management Reports in the case met the standard because they identified the reports as "being prepared monthly by each subsidiary's controller's office and transmitted to the defendants at the beginning of each month to convey information about the Telecom sector at each subsidiary by comparing actual results to budgeted numbers." *Id.* at 357. The allegations in this case are sufficiently similar and satisfy the standard as well.

In addition, these Sources had knowledge of the manipulations that resulted in the actual numbers in the reports being different from those reported to the public. The defendants contend that allegations where the Sources themselves were not actually involved in the events, but claim to have knowledge of the events are insufficient. The court in *ABC Arbitrage* noted that if the documentary evidence does not provide an adequate basis for believing that the defendants' statements or omissions are false, then the plaintiffs can satisfy their pleading burden with allegations from confidential sources as long as the sources described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. 291 F.3d at 353. Here, the allegations as to the documentary evidence and the Sources are sufficient to give rise to a strong inference of at least severe recklessness as to Hansen.

***32** Neal Rider was the Chief Financial Officer of Fleming from January 2000 to February 2003. Rider contends that the allegations in the TAC against him are insufficient to give rise to a strong inference of scienter because they do not show what specific information was allegedly provided to him, why that information was false and misleading, or how he knew the information was false or that he acted with severe recklessness.

The plaintiffs respond by stating that Rider had access to all of the same information and reports alleged by the Sources. In addition, Source 4 specifically states that Rider personally approved the manipulation of same-store sales data, such that the data did not even compare sales for the same stores. The TAC also alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Rider. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment."

Rider also allegedly received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. The TAC alleges that starting in July of 2001 and continuing through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "[h]ard copies of these reports were given directly to ... Defendant Rider." In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Defendant Rider—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by defendant Dahlen whereby "new stores ... were being

compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence."

Further, the TAC alleges that Rider received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores yet, he made public statements claiming that Fleming's retail segment was growing. According to Sources 1 and 4, Rider received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Using data that had been available to Rider prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format.

***33** Finally, the TAC specifically alleges that Rider attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC specifically alleges that Rider received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. The TAC alleges that Rider participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Rider either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

Rider cites *In re Capstead Mortgage Corp. Sec. Litig.* to support his contention that the allegations are insufficient to support a strong inference of scienter. 258 F.Supp.2d 533 (N.D.Tex.2003). In that case the plaintiffs attempted to show knowing misconduct by alleging that senior officers and directors had access to and control over internal corporate data and other non-public information (specifically monthly reports on the company's intranet and monthly management reports) which contradicted their positive representations about the company's mortgage servicing operation. *Id.* at 564–65. The plaintiffs did not specifically identify any particular internal documents containing the alleged adverse information, the contents of such adverse or negative information, when the internal document containing the negative or adverse information was prepared, by whom it was prepared, or to whom it was directed. *Id.* at 565. The court stated that plaintiffs must allege facts which demonstrate that at the time defendants made representations regarding projected earnings and dividends, defendants knew or were severely reckless in not knowing information that adversely impacted the earnings. *Id.* The court specifically held that allegations the defendants were aware of the adverse information were insufficient due to the fact that the plaintiffs had not cited any documentary evidence or personal sources to establish the basis for this belief. *Id.* In this case, by contrast, the plaintiffs have not only cited documentary evidence and reports with particular facts as to their contents, who prepared them, and who received them, but the plaintiffs have also cited the Sources to support the allegations as to the reports and their contents and defendants and their knowledge. The court holds that the TAC pleads specific facts to support a strong inference of at least severe recklessness as against Rider.

Mark Shapiro was Senior Vice President of Finance and Control and Chief Accounting Officer from at least 2001 to February 2003, at which time he was appointed Chief Financial Officer and served until late April 2003. Shapiro contends that the allegations are insufficient to allege a strong inference of scienter. Shapiro contends that a majority of the allegations are not specific to him but to the management in general and that when Shapiro is specifically mentioned the TAC does not provide facts from which one could conclude that Shapiro knew any particular statement to be inaccurate when made. Further, Shapiro contends that the allegations that he had reports that showed variances and discrepancies are not specific enough and that allegations concerning the Monday meetings do not state when he was there or what was discussed at them.

***34** The plaintiffs argue that Shapiro received the reports and information showing discrepancies between internal financial information and publicly-reported numbers and the deduction practices and participated in Monday meetings where flat or declining retail sales, variances between public and internal finances, and deduction practices were discussed. Further, the plaintiffs allege that Shapiro had a central role in the intentional weakening of Fleming's accounting practices, the linchpin of the

manipulation scheme, when all divisional accounting operations were centralized in Oklahoma City and managed by unqualified division reports. This, the plaintiffs contend, allowed the company to put tight reigns on the manipulations and oversee them.

In addition, plaintiffs contend that Sources 2 and 3 have knowledge of Shapiro's knowledge of and participation in a scheme to defraud vendors to obtain unearned promotional funds to inflate its earnings. The plaintiffs allege that Shapiro directly participated in inventory manipulations to inflate earnings and shift losses from continuing operations to discontinued operations.

The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Shapiro. According to Sources 1 and 4, Shapiro received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. The TAC also alleges that Shapiro participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Shapiro either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. The TAC specifically alleges that Shapiro attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

Under the allegations of the TAC, Shapiro received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. Also, the TAC alleges that Fleming, at the direction of Shapiro, did not recognize a $1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. The TAC further alleges that "Source 1 saw reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." The TAC alleges that Shapiro received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. On balance, and reading the complaint as a whole, the court is persuaded that the allegations raise a strong inference of at least severe recklessness against Shapiro.

***35** Thomas Dahlen was Executive Vice President and President, Retail and Marketing for Fleming in April 2001, and resigned effective December 31, 2002. Dahlen contends that the allegations are insufficient to support a strong inference of scienter. The court disagrees. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and 'product category managers" ' along with other financial analysts and "compile[d] Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Dahlen. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and ... reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment."

In addition, Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] received." The TAC further alleges that "accrual of these unauthorized, improper, and unsustainable deductions was directed by Defendant Dahlen [and the retail CFO; and that the retail CFO] often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions." In the TAC Source 1 alleges that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." The TAC alleges that "[b]y June 2002, Source 1 was emailing Source 1's deduction worksheets to Defendant Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "[e]ven after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction."

The TAC alleges that "Defendant Dahlen directed Source 1 to deduct from vendors' invoices a 'two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." Further, Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by defendant Dahlen. According to Sources 1 and 4, Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002.

The TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide adverse sales trend" by rejecting the data from the financial analysts and 'chang[ing] the composition of the population of stores which constituted the Company's 'same stores." ' Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year 'same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a 'same store' comparison as is commonly understood in the retail industry." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores ... were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." Further, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming—at the direction of Dahlen and [the retail CFO]—reduced the previously reported same store sales for the year 2000 fiscal year by subtracting $1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $4.7 million in red tag sales." The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category ... demonstrat[ing] to recipients of the report—including Defendant Dahlen—that Fleming was including in its 'same store sales' data that were not attributable to any stores and that same store sales were declining." The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "electronic copies were provided to defendant Dahlen." Using data that had been available to Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. The TAC specifically alleges that Dahlen received weekly, monthly, and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, as well as, received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he either made or failed to correct misrepresentations claiming that Fleming's retail segment was growing.

***36** Also, the TAC specifically alleges that Dahlen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC alleges that defendants Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

The TAC includes allegations that Dahlen made false and misleading public statements about Fleming's financial results, the health of the company, its prospects for growth, and the true nature and extent of the fraud, as well as, disclose false financial information and made public statements that were false, misleading, and in conflict with the information that the Sources had personally communicated to him. According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. The court finds that the allegations are sufficient to support a strong inference of scienter as to Dahlen. The allegations are specific as to the information that Dahlen possessed and his participation in the accounting manipulations.

D & T was the outside auditor for Fleming beginning in at least 1994 and throughout the Class Period. Defendant D & T contends that the plaintiffs failed to adequately allege scienter with respect to claims under section 10(b) of material misrepresentations involving D & T's issuance of its allegedly false and misleading 2001 audit opinion and quarterly Review Reports. D & T contends that the TAC is not sufficiently detailed and argues that the plaintiffs' alternative pleading that D & T either “knew” or “should have known” is not sufficient to show recklessness. Specifically, D & T states that the plaintiffs do not allege that the specific vendor deductions actually tested were fraudulent. Further, D & T points to the TAC's allegations that the fraud was concealed by Fleming and its employees from D & T and states that these allegations undercut the plaintiffs' scienter allegations as to D & T. Also, D & T contends that motive and opportunity alone do not suffice for an inference of scienter. Finally, D & T argues that it is not liable as an aider and abetter under *Central Bank.*

The plaintiffs respond by stating that the following facts establish a strong inference of scienter: (1) numerous red flags existed that should have alerted D & T of Fleming's fraud, (2) the magnitude of the restatement was significant, (3) violations of Generally Accepted Accounting Principles (“GAAP”) were repetitive and over several fiscal years, (4) the accounting principles violated were relatively simple, (5) D & T failed to obtain sufficient evidentiary support for account balances in violation of Generally Accepted Auditing Standards (“GAAS”), (6) D & T failed to follow-up on known accounting errors in violation of GAAS, (7) the fraudulent vendor deduction scheme could have been identified with relative ease, and (8) D & T had a financial motive to engage in fraudulent or reckless conduct. The plaintiffs contend that the totality of these allegations in the TAC in light of the restatement give rise to a strong inference of scienter.

***37** More specifically, the plaintiffs contend that the following sixteen red flags existed during the Class Period that should have alerted D & T that Fleming was artificially inflating its financial results: (1) a decline in net income for the years 1995–2000 that gave Fleming an incentive to manipulate its financial results, (2) self-imposed pressure by Fleming by setting aggressive earnings targets and unrealistic forecasts, (3) the gutting of Fleming's accounting staff and weakening of internal controls and centralization of accounting at the company's headquarters, (4) making non-accountant division presidents responsible for the financial reporting functions, (5) shortening of the monthly closing period and increased time pressure, (6) entering into large long-term contract with tight profit margins, (7) improper lengthening of the amortization period for long-term assets to reduce expense and increase income, (8) overstatement of inventory at one of the divisions by $1 million, (9) the remitting of payments by Fleming during the time of the 2001 audit field work to vendors who refused to accept deductions, (10) increase in the vendor deduction account to $120 million, (11) the elimination of the reserve against vendor deductions (12) the tying of executive bonuses to targeted earnings and the achievement of those earnings and payment of bonuses equaling 200% of the base salaries in 2001, (13) the findings of Ernst & Young of Fleming's excess price charges to its customers and demand by the auditor to be transferred away from Fleming when Fleming would not correct the overcharges, (14) the pending of lawsuits for overcharging customers, (15) Fleming's debit memos for vendor deductions did not identify the vendor invoices from which the deductions were taken, (16) the reporting by both the wholesale and retail segments of vendor deductions from the same product resulting in double accruals.

The plaintiffs state that with regard to testing, the allegations need only state that the auditor failed to test the items altogether, or inadequately tested items by selecting an insufficient sample size, or adequately tested items but turned a blind eye to errors that were discovered. The plaintiffs contend that “should have known” allegations are sufficient and that even though Fleming provided allegedly false information there was no basis or backup documentation supporting the information and that if D & T had sought backup in accordance with auditing procedures it would have learned of the falsity. The plaintiffs further contend that motive and opportunity can add weight to the scienter calculus and that D & T's consulting work and corresponding fees amounting to two times the audit fees is sufficient motive. Finally, the plaintiffs state that D & T is not alleged to be an aider and abetter, but instead is liable as a primary violator upon the false statements contained in the audit opinion and review reports. [7]

With regard to sufficiently alleging scienter against auditors, courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an auditor performed a reckless or fraudulent audit: 1) red flags regarding accounting matters, 2) restated financial statements, 3) an auditor's failure to obtain sufficient support for account balances, and 4) an auditor's failure to follow-up on known accounting errors. *In re Enron,* 235 F.Supp.2d at 677–79, 706–

07. The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct. *Id.* Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circumstances surrounding the restatement. *In re Triton,* 2001 WL 872019, at *11. A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the accounting principles that were violated. *Id.*

***38** Likewise, mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in a section 10(b) action against an accounting firm. *Abrams,* 292 F.3d at 430. *See also* *Melder v. Morris,* 27 F.3d 1097, 1103 (5 th Cir.1994)("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud"); *Umsted v. Andersen LLP,* 2003 WL 222621, at *3 (N.D.Tex. Jan.28, 2003)(noting that there is a judicial consensus that mere general allegations of violations of GAAP and/or GAAS are insufficient to state a claim for securities fraud). The plaintiffs must link such allegations of violations of GAAP and/or GAAS with fraudulent intent by showing that the firm deliberately misrepresented material fact or acted with reckless disregard about accuracy of its audits or reports. *Abrams,* 292 F.3d at 430; *Novak,* 216 F.3d at 308.

Recent cases provide insight about circumstances under which allegations of financial restatements and/or GAAP or GAAS violations, under the totality of circumstances, may constitute important factors in evaluating whether scienter has been adequately pleaded. Some of the factors recent courts have frequently addressed include: (a) the nature, size, and scope of GAAP violations; (b) the magnitude and frequency of restatements; and (c) whether the allegations of GAAP violations and/or restatements are accompanied by allegations of insider trading. Securities Litigation Update, SJ014 ALI–ABA 505, 516 (2003). In addition, in cases where the auditor is the defendant, courts look for "red flags" that should have put the auditor on notice of the company's financial improprieties. *Id.; see also, e.g., Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194 (11th Cir.2001).

When the defendant is an auditor, allegations that the audit was conducted negligently and allegations that the defendant lacked adequate internal controls are also routinely found insufficient. On the other hand, courts appear willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing. Securities Litigation Update, SJ014 ALI–ABA 505, 516 (2003).

For example, in *In re Ikon Office Solutions, Inc. Securities Litigation,* the court found the plaintiff properly pleaded scienter by alleging defendant (1) violated auditing principles and (2) had notes in its accounting file regarding an audit committee meeting which specifically referred to one employee "cooking the books." 66 F.Supp.2d 622, 629–34 (E.D.Pa.1999). In *In re Health Management, Inc. Sec. Litig.,* the court denied an auditor's motion to dismiss where plaintiff pleaded violations of GAAP/GAAS coupled with red flags of suspicious inventory shipments, and an analyst's letter alerting the auditor to inflated accounts receivables. 970 F.Supp. 192, 202–03 (E.D.N.Y.1997). In *Carley Capital Group v. Deloitte & Touche, L.L.P.,* the court denied an auditor's motion to dismiss, finding plaintiffs adequately pleaded scienter by alleging violations of GAAS coupled with the auditor's unrestricted access to financially records, heavy involvement in management and highly suspicious revenue manipulations that would have "put prudent auditors on notice." 27 F.Supp.2d 1324, 1339–40 (N.D.Ga.1998). The court concluded that alleged violations of accounting principles "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter ... [and] the totality and magnitude of the ... accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Id.*

***39** Recently, in *In re Worldcom, Inc. Sec. Litig.* the court held the pleadings of scienter sufficient as to an outside auditing firm and denied its motion to dismiss. 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003). The court noted that the auditor

had unlimited access to the company's books and records and an obligation to review and evaluate those records in order to form an opinion regarding the company's financial statements. The court discussed the obligations of an outside auditor as follows:

> Independent auditors [have unlimited access to the client's books and records and] are charged with obtaining and evaluating evidence concerning the assertions made in their client's financial statements. Auditors are not entitled to allow representations from a company's management to substitute for the auditing procedures that are necessary to provide a reasonable basis for forming an opinion regarding the financial statements that are the subject of the audit. In auditing the financial statements, an auditor may consider as evidence all books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations and reconciliations. The underlying accounting data should be considered when forming an opinion as to the financial statements. Professional auditors are required to act diligently and in good faith, and to apply a professional skepticism to their evaluation of evidence. An auditor should conduct the audit objectively, thoroughly and carefully. Before certifying financial statements, an auditor should have an understanding of the factors that may have a significant effect on the financial statements.

*Id.* at *3–4. The court further noted that the defendant's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs. The court noted that had the auditor reviewed the company's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. Additionally, the court pointed to the fact that the complaint identified the steps the auditor should have taken and failed to take, and the fraud it would have discovered if it had taken those steps. In that case, the defendants pointed to the subsequent indictments and guilty pleas of former company executives showing that the company's senior management had lied to and concealed the falsification of the books from the auditors as evidence that the defendants lacked scienter. The court rejected the argument noting that the auditor would have uncovered the fraud perpetrated by the company if it had conducted the review it was required to do before issuing its audit opinions and that the auditor's audit opinions included in the company's year-end financial statements materially misrepresented the company's financial state.

***40** In this case, the court finds that the TAC in its totality sufficiently alleges scienter as to D & T. To begin with, the TAC includes allegations substantial allegations of motive and opportunity. Specifically, the TAC alleges that D & T served continuously as the company's auditor from at least 1994 through the class period. During that time D & T personnel were present at the company's headquarters frequently throughout the year and had continual access to and knowledge of Fleming's private and confidential corporate, financial, and business information giving D & T thorough knowledge of all aspects of Fleming's financial history, accounting practices, internal controls, and business operations.

Additionally, the TAC's allegations that D & T had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that of its auditing fees are sufficient to support an inference of scienter as well. *Nathenson,* 267 F.3d at 412 (holding that motive and opportunity to commit fraud may be facts that add to the scienter calculus); *see also* *In re Global Crossing, Ltd. Sec. Litig.,* 2004 WL 763890, at *20–21 (S.D.N.Y. Mar.23, 2004)(finding motive allegations sufficient where the auditor generated consulting fees of six times its auditing fees and noting that an auditor may take on “a vested interested in the performance and profitability” of its client, and consequently “weaken[ ] its ability to rely on its reputation in countering as ‘irrational’ allegations that it participated in a client's fraud”)(quoting *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 655 (E.D.Va.2000)). Courts have been especially ready to find motive pleading adequate to survive dismissal in cases where the auditing company plays a dual rule [8] with respect to the client. *Id.* at 20 (collecting cases).

The allegations surrounding D & T's failure to uncover the lack of internal controls and accounting manipulations are also pleaded sufficiently to give rise to a strong inference of scienter. Specifically, as to the lack of internal controls, the TAC alleges that during the latter part of 2001 the company terminated the controllers, the accounts receivable and accounts payable managers, and clerks from each division and centralized its accounting operations at the company's headquarters. Further, the TAC alleges that the company terminated its divisional internal audit staff and outsourced the function to Ernst & Young. Subsequently, the lone E & Y internal auditor allegedly demanded a transfer to another client after learning of the company's widespread improprieties. The TAC alleges that these conditions—inadequate staffing of accounting personnel, the absence of documentation supporting transactions, journal entries, and lack of any internal auditing of operations—required D & T to expand the extent of procedures applied as required by GAAS (AU § 312). [9]

With regard to the accounting manipulations, the TAC alleges that the Company accrued large amounts of unauthorized vendor deductions that D & T failed to discover during its audit and review procedures. The TAC alleges that the company violated GAAP by reducing both its accounts payable and cost of goods sold by the amount of the vendor deductions even before the vendor had received the debit memorandum and approved the deduction in contravention of FASB Statement No. 5. [10] The accrual of these vendor deductions resulted in earnings being overstated by up to $120 million at any one time during 2001 and 2002 amounting to more than 10% of the accounts payable during the class period and resulting in a material reduction of accounts payable that obligated D & T to audit their validity.

***41** The TAC alleges that, according to Source 3, D & T received copies of the debit memorandums in its audit packages, but never requested the invoices for which the debit memorandums were issued and never asked any questions, requested supporting documents, or sought verification of any documents or entry in contravention of GAAS (AU §§ 326 and 330). [11] The TAC alleges that if D & T during its interim reviews starting in mid–2001 had compared the magnitude of the dollar amount of vendor deductions issued during the fiscal quarter with the magnitude of the dollar amount of vendor deductions issued during the comparable prior period's quarter and during the immediate proceeding quarter in accordance with GAAS (AU § 722), [12] then D & T would have learned of the huge dollar amount of unauthorized, improper, and unsustainable deductions.

The TAC alleges that although the Company created debit memorandums supporting the deduction amounts, the debit memorandums did not include vendor invoice numbers that would allow the tracking of the deductions to the relevant invoice in an attempt to determine its validity. The TAC posits that had D & T adequately tested the debit memorandums in accordance with GAAS (AU § 150) [13] to determine their validity by inspecting vendor correspondence, examining signed vendor contracts, and inspecting the vendor statements, D & T would have learned that the claimed deductions were after-the-fact and after-delivery de facto unsubstantiated deductions disputed by the vendors. Additionally, the TAC alleges that letters from irate vendors disputing large deductions such as Agrilink Foods Inc., Kellogg Co., Unilever PLC, Oil–Dri, Solo Cup Co. were readily available for review by D & T in the vendor correspondence files. Further, the TAC alleges that the Company's reserve against doubtful deductions to accounts payable was at all times either insufficient to cover the extent of the disputed deductions or reversed to eliminate any reserve for the deductions.

With the amount of the deductions allegedly increasing to, at one point, upwards of $120 million, D & T's failure to test the legitimacy of the vendor deductions and the reserve account exceed an inference of negligence. Finally, the company's announcement in April of 2003 of a restatement of earnings of $85 million due to accounting irregularities accounting for 79% of the company's reported earnings for the time period at issue adds to and supports the allegations of a material misrepresentation in the company's financial statements and an inference of scienter. *In re MicroStrategy,* 115 F.Supp.2d at 652 (holding that the magnitude of the restatement and the simplicity of the GAAP principles violated in the case and the ease with which the violations could be detected suggest a deliberate ignorance on the auditor's part and support an inference of scienter). Therefore, the court finds that the totality of the allegations of scienter in the TAC sufficiently support a strong inference of scienter as to D & T. As a result, D & T's motion to dismiss the 1934 Act claims is denied.

***5. Failure to Adequately Plead Loss Causation***

***42** The 1934 Act Defendants contend that the plaintiffs have failed to adequately plead loss causation. The defendants do not dispute that the plaintiffs have adequately pleaded transaction causation through the allegations of price inflation, but the defendants contend that the plaintiffs have failed to allege that the fraudulent conduct was in some reasonably direct way responsible for the loss caused by the decline in the price of their securities. The "loss causation" provision in the PSLRA provides that

> In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u–4(b)(4). At trial, the plaintiffs will be required to show that the untruth was in some reasonably direct, or proximate, way responsible for their loss. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981). The necessary element of causation includes both "loss causation" and "transaction causation." *Coates,* 26 F.Supp.2d at 922. Transaction causation, similar to "but for" causation, is another way of describing reliance and is satisfied by allegations that the "misrepresentations or omissions induced [the plaintiff] to make the investment." *Id.* On the other hand, loss causation is satisfied by allegations that the plaintiff "would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss." *Id.*

At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation, not whether they can prove it. *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 626 (N.D.Tex.1998). The PSLRA does not affect causation pleadings, thus the allegations must only meet the traditional "fair notice" standards. *Id.* To adequately plead loss causation and survive a motion to dismiss, "[p]laintiffs need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *Id.*

In this case, the plaintiffs' allegations outline the alleged misrepresentations and omissions leading up to the stock decline that caused the stock to be artificially inflated. Next, the allegations discuss in detail the sequence of events starting with Fleming's first press release on July 30, 2002, that caused the stock price to fall from $16.18 to 10.81, and the subsequent stair step decline in the price of the stock following the release of negative information from the company and articles in the financial news culminating with the SEC's upgrading of its investigation to formal on February 25, 2003, after which the price fell from $2.97 to $1.85, and the filing of bankruptcy in April of 2003. (TAC, ¶¶ 6–12). As in *Coates,* the plaintiffs allege tremendous drops in stock price in the days after the "truth" was revealed. 26 F.Supp.2d at 922. The court in *Coates* noted that even if the plaintiffs may not ultimately be able to prove that the decline resulted from the announcements, the foregoing allegations are adequate to demonstrate loss causation. *Id.*

***6. Failure to State a Claim for Controlling Person Liability***

***43** The defendants contend that the TAC does not state a claim for liability under section 20(a) of the 1934 Exchange Act. Specifically, defendants contend that plaintiffs have not alleged that any of the 1934 Act Individual Defendants, in their positions as officers of the Company, controlled any of the other 1934 Act Defendants such that liability under section 20(a) could exist for other individuals' primary violations. In addition, the defendants contend that plaintiffs have failed to adequately plead the necessary control to establish section 20(a) liability for the actions of Fleming. Finally, the defendants contend that the failure to allege the existence of underlying violations of section 10(b) and Rule 10b–5 by either Fleming or any of the 1934 Act Defendants negates any claim for controlling person liability.

Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. 78t(a). Since section 20(a) is a secondary liability provision, it is necessary that a primary violation be established before liability under section 20 arises. *ABC Arbitrage,* 291 F.3d at 348 n. 57. In considering whether the plaintiff has stated a claim under section 20, the court must determine whether the plaintiff has pled facts sufficient to establish that a defendant was in control of the primary violators. Control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12(b)–2(f); *see* *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957 (5 th Cir.1981).

Under the control person doctrine, officers and directors may be found liable even if they did not make a representation themselves or play a significant role in the preparation of a misrepresentation. *In re Enron,* 235 F.Supp.2d at 594–96; *G.A. Thompson & Co.,* 636 F.2d at 958 (holding that a plaintiff need not demonstrate "actual participation" in the underlying fraudulent transaction). However, controlling person liability requires more than merely identifying a defendant's place in the hierarchy of the company or his job title and cannot hinge solely upon a defendant's position or title. *Id.* at 621; *Dennis v. General Imaging Inc.,* 918 F.2d 496, 509–510 (5 th Cir.1990). " '[A] person should be presumed to be a controlling person ... if they occupy a status or position that ordinarily bestows authority to control the primary violator generally, or specifically with respect to the matter or affairs that produced the Securities Act violation." ' *In re Enron,* 2003 WL 230688, at *18 (quoting Loftus C. Carson, II, *The Liability of Controlling Persons Under the Federal Securities Acts,* 72 Notre Dame L.Rev. 263, 281–83(1997)). In various cases the Fifth Circuit has provided the possible alternative or overlapping bases: day-to-day control of the corporation operations; knowledge of the underlying primary violation by the controlled person; or facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies. *Id.; see* *G.A. Thompson & Co.,* 636 F.2d at 958 (holding that in determining whether a plaintiff has made a *prima facie* showing of "control," a plaintiff must plead facts indicating that the defendant "had the requisite power to directly or indirectly control or influence corporate policy"); *McNamara,* 46 F.Supp.2d at 638 (stating that although it has not been explicitly addressed by the Fifth Circuit, it does not appear that a plaintiff must establish that the defendant "actually participated in the general, day-to-day control [of the general affairs of the company]").

***44** Federal Rule of Civil Procedure 9(b) and 15 U.S.C. § 78u–4(b)(2) do not apply to control person claims. *In re Enron,* 2003 WL 230688, at *42–45. The plaintiffs are not required to plead facts supporting every element of a prima facie case, but must only provide the defendants fair notice of the plaintiffs' claims and the grounds upon which they rest. *Id.* Controlling persons of a controlled entity are subject to liability as a controlling person even where the controlled entity is not joined as long as there are sufficient allegations of primary violations of the securities laws by the controlled person as an element of the action. *SEC v. Savoy,* 587 F.2d 1149, 1170 n. 47 (D.C.Cir.1978). At this stage, the court has concluded that the plaintiffs have pleaded sufficient facts under the PSLRA to survive the motions to dismiss as to certain primary violations alleged against the defendants Hansen, Rider, Shapiro and Dahlen. The court will, at this stage, deny the motions to dismiss on the grounds that the plaintiffs have sufficiently pleaded controlling person liability as against these named defendants. This concludes the court's discussion of the issues related to the 1934 Act claims.

***B. Analysis of the 1933 Act Issues***

The court now turns to the 1933 Act claims. These claims arise from offerings of Fleming securities to the public by means of two allegedly material false and misleading Registration Statements in March and June of 2002. The first, a March 2002, exchange offering involved the issuance of $400 million of 10 5/8% Series D Senior Subordinated Notes in exchange for all outstanding Series B and Series C notes. The second, a June 2002, offering involved the sale of 8 million shares of common stock at $19.40 per share and $200 million of 9 1/4% Senior Notes from a previous shelf offering that allowed for the delayed or continuous sale of up to $600 million of debt or common stock or some combination thereof over a two-year period. The plaintiffs allege that the FY01 financial statements used in both offerings were materially false and misleading and that Fleming acknowledged later the FY01 financial statements were false and need to be restated. In addition, the plaintiffs allege that the registration statements contained materially false and misleading statements regarding Flemings' current and historical business and operating conditions and that D & T falsely represented that its audit had been conducted in conformity with GAAS and that the statements fairly presented Fleming's financial condition. The plaintiffs [14] brought actions against the 1933 Act Individual Defendants, the Underwriters, and D & T.

The 1933 Act claims do not require a plaintiff to plead or prove fraudulent conduct and the plaintiffs expressly disavow all allegations of fraud or scheme. Therefore, the heightened pleading standards of Federal Rule of Civil Procedure 9(b) do not apply. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.,* 238 F.3d 363 (5 th Cir.2001). Notice pleading under Rule 8 is all that is required to properly state 1933 Act claims. *In re Enron,* 235 F.Supp.2d at 596. That said, the court now turns to a discussion of liability under the 1933 Act. Specifically, these plaintiffs assert claims under sections 11 and 12(a)(2) of that act.

***45** Section 11 imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading and grants standing to sue to any person acquiring such security. 15 U.S .C. § 77k(a). Section 11 imposes a stringent standard of liability on the parties who play a direct role in a registered offering. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). A plaintiff who purchased a security issued pursuant to a registration statements need only show a material misstatement or omission to establish his *prima facie* case. *Id.* at 382. The plaintiffs do not have to allege knowingly or intentionally false statements in registration statement because section 11 claims do not sound in fraud. *Schlotzsky's,* 238 F.3d at 369. Section 11 does not require a plaintiff to plead or prove scienter. *Id.* Congressional policy underlying section 11 was to create liability regardless of fault. *Id.* If there is a material misstatement or omission in the registration statement, the buyer may sue the issuer, underwriter, or signor of the registration statement.

The Fifth Circuit interprets the operative language of section 11 to allow suits to be brought by direct buyers on the day an offering closes, as well as subsequent purchasers who can trace their securities to the challenged registration statement. *Rosenzweig,* 332 F.3d at 872–73. To establish standing, the plaintiffs must allege facts to show that all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement. *Krim v. pcOrder.com, Inc.,* 210 F.R.D. 581 (W.D.Tex.2002). Where there have been multiple offerings of the same type of securities, plaintiffs do not satisfy their tracing burden by showing they probably bought stock issued pursuant to the allegedly false registration statement. *Id.* at 586.

Under section 11 an expert has an affirmative defense if it shall sustain the burden of proof that after reasonable investigation it had reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statement therein not misleading. 15 U.S.C. § 77k(b). A defendant may be shielded from section 11 liability if the

defendant reasonably, and without actual knowledge of any inaccuracies, relies on parts of a registration statement "purporting to be made on the authority of an expert." 15 U.S.C. § 77k(b)(3)(C). Expertised portions of a registration statement and prospectus include those, such as financial statements, that have been examined, reported upon and audited by independent auditors. *In re Enron,* 235 F.Supp.2d at 598. An underwriter may rely on expertised portions of a registration statement or prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. *Id.* at 613. The fact-specific determination of the reasonableness of a defendant's investigation or of his reliance on the opinion of an expert is not a question properly resolved on a motion to dismiss unless the affirmative defense clearly appears on the face of the complaint. *In re Enron,* 258 F.Supp.2d at 639.

***46** Section 12(a)(2) imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact. *Lewis v. Fresne,* 252 F.3d 352, 357 (5 th Cir.2001). A seller is one who either passes title of the securities to the buyer or one who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). To count as solicitation, the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig,* 332 F.3d at 871. An issuer may be liable only if the plaintiff can allege and prove that an issuer's role was not the usual one, that it went farther and became the vendor's agent. *Id.* Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. *Lone Star Ladies,* 238 F.3d at 370. Section 12(a) does not require a plaintiff to prove scienter either and the pleadings need only satisfy the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. *In re Enron,* 235 F.Supp.2d at 596.

As several of the 1933 Act Defendants raise limitations arguments, the court addresses in general the applicable limitations period. The 1933 Act requires plaintiffs to bring claims under section 11 or 12(a)(2) "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The Sarbanes–Oxley Act does not extend the limitations period for the 1933 Act claims to two years. The plain language of the Sarbanes–Oxley Act states that the extended limitations period applies "to a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance ... as defined in section 3(a)(47) of the Securities Exchange Act of 1934." The courts have rejected the argument that the Sarbanes–Oxley limitations period applies to 1933 Act claims. *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 265 (S.D.N.Y.2003); *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 974–75 (W.D.Wis.2003). Instead, the applicable limitations period to these claims is one year after the plaintiffs were put on inquiry notice of their claims as required by Section 77m of the 1933 Act.

It is well-settled the inquiry notice may be determined as a matter of law. *Jensen v. Snellings,* 841 F.2d 600, 607 (5 th Cir.1988) (affirming a dismissal where record revealed that the plaintiffs had notice of claims); *Rahr v. Grant Thornton LLP,* 142 F.Supp.2d 793, 796 (N.D.Tex.2000). In this regard, one court has observed that "[w]here ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint, resolution of the issue on a motion to dismiss is appropriate...." *LC Capital Partners, LP v. Frontier Ins. Group,* 318 F.3d 148, 156 (2d Cir.2003).

***47** In this case, the plaintiffs plead that Fleming issued a press release on July 30, 2002, announcing that its retail segment was suffering from declining prices (TAC, ¶ 264). The plaintiffs also allege that on July 31, 2002, analysts downgraded Fleming's investment rating and questioned its reported per-share earnings (TAC, ¶ 270–71). Finally, most importantly, the plaintiffs allege that the Wall Street Journal published an article on September 5, 2002, that revealed Fleming's practice of taking unauthorized, improper, and unsustainable deductions from vendor's invoices. (TAC, ¶ 281). As a matter of law, the plaintiffs' own allegations

reveal that, at the latest, the plaintiffs' were on inquiry notice of their claims by September 5, 2002, the date of the Wall Street Journal article exposing the practice of vendor deductions. Thus, limitations expired on the 1933 Act claims September 5, 2003, one year later. Against this backdrop, the court examines the various limitations arguments.

The 1933 Act Individual Defendants and D & T assert that the plaintiffs' claim against them relating to the March 2002 offering of 10.625% Notes is time-barred. In their response, the plaintiffs appear to concede that Terry Slater is the only plaintiff with standing to assert a section 11 claim relating to the March 2002 Registration Statement because he is the only named plaintiff to have obtained notes in an offer made pursuant to that statement. The plaintiffs argue that Terry Slater filed a lawsuit in Oklahoma state court on November 14, 2002, within the limitations period. But, what the plaintiffs fail to appreciate is that Slater did not sue the *1933 Act Individual Defendants or D & T* in that case. Slater's case joined only the Fleming Companies, Hansen, Rider, and Dahlen. Slater failed to join the 1933 Act Individual Defendants and D & T until September 12, 2003, more than one year after limitations commenced. Therefore, the claims against the 1933 Act Individual Defendants and D & T are time-barred unless saved by an exception, which, as the court will explain, they are not.

Rule 15(c)(3), governing the relation back of pleadings, does not apply. The explicit language of the rule states that an amendment adding a new defendant relates back only if, among other things, the new defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." The rule does not protect plaintiffs who "knew of the late-named party at all times but failed to include that party in the original filing." *In re Xchange Inc. Sec. Litig.,* 2002 WL 1969661, at *4 (D.Mass. Aug.26, 2002). In this case, the identities of the 1933 Act Individual Defendants and D & T were readily ascertainable. All of the Individual Defendants (save and except Hernandez) actually signed the March 2002 Registration statement, and D & T's role as the auditor was plain from the face of the statement. (*See, e.g.,* March Registration Statement, p. 106, identifying independent auditor as D & T). And, even with respect to Hernandez, the plaintiffs here make no argument that they were mistaken as to his identity or that it was not readily ascertainable. The court grants the 1933 Act Individual Defendants' and D & T's motions to dismiss the plaintiffs' claims under the 1933 Act relating to the March 2002 offering because they are barred by the applicable one-year statute of limitations. Resolution of the limitations question makes it unnecessary to consider the 1933 Act Individual Defendants' and D & T's alternative argument that the March 2002 exchange offer is exempt from the provisions of section 11.

***48** The 1933 Act Individual Defendants, Defendant D & T, and the Underwriter Defendants (collectively, "1933 Act Defendants") also contend that the section 11 claim should be dismissed because the claims based on the June 2002 offering are time barred. The 1933 Act Defendants urge, with respect to the June 2002 offering, that the plaintiffs' claims relating to the purchase of 9.25% Notes are barred because one of the original plaintiffs, MSCPF, did not purchase notes in the offering and plaintiff Alaska Fund, which did purchase notes in that offering, was not joined as a party-plaintiff until September 12, 2003, after limitations had expired. The court disagrees.

The linchpin of the 1933 Act Defendants' argument is that MSCPF lacked standing to pursue claims on behalf of the note purchasers when it filed its February 20, 2003, complaint because it only purchased stock. It is not disputed that MSCPF filed suit within the limitations period and its pleading, on behalf of a class, alleging violations of federal law in connection with the sale of "Fleming Securities" issued in or traceable to the June 2002 Offering, placed the defendants named therein plainly on notice of these claims. There is authority that suggests that a *class representative* who purchased stocks can represent purchasers of debt instruments in the same lawsuit. *In re Enron Corp. Sec. Litig. .,* 206 F.R.D. 427, 445 (S.D.Tex.2002)(noting "there is no requirement that the claims of all plaintiffs and class members must be identical"); *Endo v. Albertine,* 147 F.R.D. 164, 167 (N.D.Ill.1993)("[A] class of plaintiffs who purchased different types of securities may properly be certified with a representative party who only purchased one type of security."); *In re Saxon Sec. Litig.,* 1984 WL 2399, at *7 (S.D.N.Y. Feb.23, 1984)(holding that "[d]ebenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct").

The 1933 Act Defendants contend these cases are distinguishable, and these parties say that the cases concerned the propriety of class representation under Rule 23, not jurisdictional standing. The 1933 Act Defendants point to the holding in *In re Paracelsus Corp.,* 6 F.Supp.2d 626 (S.D.Tex.1998), where the court held that purchasers of stock issued pursuant to one registration statement did not have standing to sue on behalf of purchasers of notes issued out of a companion statement. It is true that *Paracelsus* addressed the concept of standing and dismissed, on standing grounds, the claims of plaintiffs who had not purchased bonds issued pursuant to the registration statement at issue. In that case, however, the two types of securities were issued pursuant to separate registration statements. The claims of the note purchasers had to be linked under section 11 to the registration statement pursuant to which the company issued the notes. Otherwise, the statutory requirements of section 11 failed.

***49** The point of Article III standing and the more specific statutory standing concept addressed in *Paracelsus* is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases "securities" as that term is defined by the Act issued pursuant to a particular registration statement. In this case, it is not disputed that the stocks and the notes were issued pursuant to a single registration statement, nor is it disputed that MSCPF bought securities issued pursuant to the registration statement. MSCPF had in February 2003, and continues to have a personal stake in the outcome of the case sufficient to warrant Article III standing on the section 11 claims.

Contrary to the 1933 Act Defendants' argument, the case law holds that purchasers of one type of security have *standing* to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement. The court in *In re Worldcom, Inc. Sec. Litig.,* 2004 WL 555697, at *6–7 (S.D.N.Y. March 19, 2004), recently rejected a similar argument when it held that purchasers of one type of debt security (domestic) had standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant to the same registration statement). Similarly, the court in *In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 911 (D.N.J.1998) was faced with an argument that stock purchasers lacked standing to represent the interests of note purchasers and held that the plaintiffs had "sufficiently alleged individual cognizable injuries pursuant to section 11 and section 12(a)(2)" to confer standing. The court therefore rejects the argument that section 11 claims related to notes issued pursuant to the June 2002 Registration Statement are barred by the statute of limitations. Resolution of this question in this manner renders it unnecessary to consider the plaintiffs' alternative arguments that *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) applies to this case to toll limitations until the addition of Alaska Fund to this case in the September, 2003 or that Rule 15 permits the relation back of Alaska Fund's claims to the date of MSCPF's February 2003 complaint.

The 1933 Act Defendants also argue that aftermarket purchasers of Fleming's common stock cannot "trace" their purchases to the June 2002 Registration Statement, and therefore, section 11 claims asserted on their behalf should be dismissed. In the Fifth Circuit, aftermarket purchasers who can trace their purchase to the challenged registration statement have standing to bring a section 11 claim. *Rosenzweig,* 332 F.3d at 873. Bearing in mind that the case is still in the pleading stage, the court rejects the 1933 Act Defendants' argument. Here, the TAC specifically alleges that "Plaintiffs and the other members of the Subclasses purchased the Fleming Securities that were issued pursuant and traceable to the March and June 2002 Registration Statements." (TAC, ¶ 509). The plaintiffs have sufficiently pleaded section 11 standing with their allegation that the members of the class purchased the securities that were "issued pursuant and traceable to" the pertinent registration statements. Whether and to what extent the plaintiffs will be able to *prove* tracing is a different question and is one which, in any event, is not susceptible to decision in the current posture of this case.

***50** The 1933 Act Individual Defendants and D & T also contend that the plaintiffs' section 12(a)(2) claims should be dismissed because they are not "sellers" of securities. Section 12(a)(2) provides that a person who "offers or sells" a security by means of a prospectus or oral communication that contains a materially false statement or that omits to state certain material facts shall be liable to any person purchasing such security from him. 15 U.S.C. § 771(a). A section 12(a)(2) "seller" is either

(1) the person who actually passes title to the buyer, or (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter,* 486 U.S. at 647.

The March and June 2002 offerings were firm commitment underwritings. As such, investors purchased securities not from Fleming, but from the underwriters or broker-dealers who purchased from the underwriters. Consequently, as a matter of law, the 1933 Act Individual Defendants and D & T cannot be sellers under the title-passing definition adopted by the Supreme Court.

As to the second definition, the plaintiffs allege in conclusory fashion that each defendant named in Count V "solicited and/or was a substantial factor in the purchase by plaintiffs of securities in the offerings." (TAC, ¶ 517). What is required under *Pinter* is that the named defendant "successfully solicit" the purchase. To that end, the court agrees with the defendants that solicitation is a legal term of art and that conclusory allegations in a pleading or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5 th Cir.1993).

The Fifth Circuit has narrowly circumscribed the scope of section 12(a)(2) liability under the second *Pinter* definition. The court has held that to count as "solicitation," the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig,* 332 F.3d at 871. An issuer, like Fleming (and, by extension, its directors and its auditor), is liable under section 12(a)(2) only if the plaintiff can allege and prove "that an issuer's role was not the usual one; that it went farther and became a vendor's agent." *Id.* (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.,* 238 F.2d 363, 370 (5 th Cir.2001)). This is because virtually all issuers promote their securities in some fashion, either by preparing prospectuses or conducting road shows. *Lone Star Ladies,* 238 F.3d at 370. The TAC is bereft of allegations that the 1933 Act Individual Defendants or D & T directly communicated with the purchasers of the securities or assumed the unusual role of the vendors' agents. The plaintiffs have failed to allege sufficient facts to prevent dismissal of the section 12(a)(2) claims against the 1933 Act Individual Defendants and D & T, and the court grants the motion to dismiss those claims.

***51** The Underwriter Defendants are named as defendants under sections 11 and 12(a)(2) of the 1933 Act with respect to their role in the June 2002 Offering. Most of their arguments have been addressed previously; however, they make a separate, distinct argument which they assert entitles them to a dismissal of all of the 1933 Act claims against them. According to the Underwriter Defendants, they were entitled to rely on the accuracy of Fleming's financial statements because those statements were "expertised."

As noted above, section 11 of the 1933 Act contains a safe harbor from liability for underwriters who reasonably rely upon "expertised" portions of a registration statement. 15 U.S.C. § 77k(b)(3)(C). Likewise, underwriters are shielded from liability for a claim under section 12(a)(2) if they rely on the "expertised" portions of an offering prospectus. *In re Worlds of Wonder Sec. Litig.,* 814 F.Supp. 850, 867–68 (N.D.Cal.1993), *aff'd in relevant part,* 35 F.3d 1407 (9 th Cir.1994). Unfortunately for the Underwriter Defendants, this question is generally not proper for resolution by a motion to dismiss, because the underwriter bears the burden of proof to show that it had no reason to believe and did not believe that the expertised portions of the registration statement were untrue. *In re Enron Corp. Sec. Derivative & ERISA Litig.,* 258 F.Supp.2d 576 (S.D.Tex.2003); *Griffin v. PaineWebber, Inc.,* 84 F.Supp.2d 508, 512–13 (S.D.N.Y.2000); *In re Chambers Development Sec. Litig.,* 848 F.Supp. 602, 624 (W.D.Pa.1994). The court rejects the Underwriter Defendants' argument that their entitlement to this affirmative defense is apparent from the face of the TAC and therefore denies the Underwriter Defendants' motion to dismiss the 1933 Act claims leveled against them.

Finally, the Underwriter Defendants assert that the plaintiffs have not sufficiently alleged standing to pursue their section 12(a)(2) claim against them. As noted, section 12(a)(2) liability is narrow. Standing exists under section 12(a)(2) and *Pinter* when a plaintiff can plead and prove that a seller actually passed title to a buyer. The Underwriter Defendants argue that the TAC fails to allege that the plaintiffs acquired title in their securities from the Underwriter Defendants, such that the first definition of "seller" under *Pinter* is satisfied.

The TAC alleges that "[t]he Underwriter Defendants offered for sale and sold the securities purchased by plaintiffs and the members of the Subclass...." (TAC, ¶ 516). This allegation is susceptible to two constructions: the first is that the Underwriter Defendants offered for sale and sold the securities *directly to* the plaintiffs; the second is that the Underwriter Defendants offered for sale and sold the securities *first to another* who *then* sold to the plaintiffs. As section 12(a)(2) only permits a purchaser to recover against his direct seller, the court agrees with the Underwriter Defendants that the plaintiffs have not sufficiently alleged section 12(a)(2) standing with this allegation. Nor have the plaintiffs sufficiently articulated how or if they had direct communication with the Underwriter Defendants such that they satisfy the second *Pinter* definition. It may be, however, that the plaintiffs are able to satisfy these requirements. They are granted leave to do so within ten (10) days after the date of the entry of this opinion if they can. The court has canvassed the remaining arguments in support of the various motions to dismiss and, to the extent they have not been specifically addressed in this opinion, they are now rejected.

## V. CONCLUSION

***52** In accordance with the above opinion and for the reasons more fully expressed herein the court **ORDERS** that the following motions be disposed of as indicated below:

- Defendant Mark D. Shapiro's Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 15) **GRANTED IN PART AND DENIED IN PART**
- Defendant E. Stephen Davis' Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof (Docket # 16) **GRANTED**
- 1934 Act Defendants' Joint Motion to Dismiss Pursuant to Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 and Memorandum of Law in Support (Docket # 17) **GRANTED IN PART AND DENIED IN PART**
- Defendant Neal Rider's Supplemental Motion to Dismiss Pursuant to Rules 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 and Memorandum of Law in Support (Docket # 18) **GRANTED IN PART AND DENIED IN PART**
- Defendant Thomas Dahlen's Individual Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 19) **GRANTED IN PART AND DENIED IN PART**
- Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof of Defendant Mark Hansen (Docket # 20) **GRANTED IN PART AND DENIED IN PART**
- Motion to Dismiss of Defendants Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities, Inc., and Morgan Stanley & Co. Incorporated (Docket # 21) **GRANTED IN PART AND DENIED IN PART**
- Defendant Deloitte & Touche LLP's Motion to Dismiss and Supporting Brief (Docket # 22) **DENIED**
- 1933 Act Individual Defendants' Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Supporting Brief (Docket # 25) **GRANTED IN PART AND DENIED IN PART**

So **ORDERED** and **SIGNED** this *10th* day of June, 2004.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 5278716

## Footnotes

1 The Ninth and Tenth Circuits have continued to apply the group pleading doctrine following the passage of the PSLRA. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065–66 (9th Cir.2000); *Schwarz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 154 (10th Cir.1997). The First Circuit has yet to decide the issue. *In re Cabletron Systems, Inc.,* 311 F.3d 11, 40 (1st Cir.2002).

2 The position of retail CFO during the class period was filled initially by John Simrell and later Tim Otte. Since the two men are not being sued individually the use of their individual names is unnecessary.

3 "Red tag" sales are one-time transactions in which Fleming purchased and immediately sold large lots of a commodity which had been located for Fleming by a broker.

4 "Diverting" is a practice where the retail operations purchase product and resell it at a higher price to another company but where the retail operations do not take possession of the product or sell it through a particular store.

5 The TAC alleges that "... Hansen, Rider, Shapiro, Dahlen, and Davis made public statements claiming that Fleming's retail segment was growing." (TAC, ¶ 456). The plaintiffs, however, point to no particular statement made by Davis, making it impossible to gauge whether the remaining requirements of the PSLRA have been satisfied. This allegation is, therefore, equivalent to no allegation at all.

6 As noted above, the court has carefully examined the totality of the allegations in the TAC to assess whether the claimed statements are actionable misrepresentations. The court will detail some of these statements below, but the parties should assume that if the court has not specifically held a statement to be (a) a material misrepresentation that is (b) pleaded with sufficient particularity, then the court has concluded that the statement is not actionable under Rule 10b–5.

The following statements are either too vague to be actionable or are forward-looking statements protected by the safe-harbor provision of the PSLRA: the statement attributed to defendant Hansen in the October 24, 2001 press release that "[o]ur price impact formats, with their high volumes and low operating costs, are a great fit with our distribution strategy" (TAC, ¶ 215); the statements in the November 5, 2001 DSN Retailing Today article attributed to Hansen that the value retailing market represents an opportunity for expansion with "significant growth potential," and that the "formats have received overwhelming customer response" (TAC, ¶¶ 219–20); the statements in the Form 10K attributed to the signatories of the 10K that "[o]ur price impact supermarkets offer name-brand food and consumable goods at significantly lower prices than conventional format retail store operators because of the many low-cost features of our stores" and "we expect to be able to grow our price impact supermarket operations while incurring lower capital expenditures" (TAC, ¶ 229); the statements attributed to defendant Dahlen in the April 16, 2002 press release concerning Fleming's "excitement" about the acquisition of seven new retail stores in the Dallas market (TAC, ¶ 236–37); the statements in the May 7, 2002 press release attributed to defendant Hansen concerning Fleming's "outstanding start to 2002" and the company's "keenly focused" strategies (TAC ¶ 239); the statements attributed to Hansen in the conference call following the release of the first quarter 2002 results that "[w]e are very pleased about that and feel good about the customer acceptance" and that he was "almost giddy [about] the progress we are making

in this area" (TAC, ¶ 244); the statements quoted from the June 2002 Registration Statement concerning the successful price impact retail format (TAC, ¶ 250); the company's ability to secure favorable terms and volume discounts on its purchases (TAC, ¶¶ 254–56); and the statement attributed to Rider in the second conference call concerning "closing of the gap" (TAC, ¶ 266). Although these statements may have evidentiary significance in the trial of this case, they are not actionable misrepresentations in the context of a Rule 10b–5 claim.

7 D & T also attacks the standing of one of the lead plaintiffs with respect to plaintiffs' section 10(b) claims. D & T contends that the Lead Plaintiff, Jackson Capital, does not have standing to assert section 10(b) claims on behalf of a putative class including purchasers of Fleming bonds because Jackson Capital pleads that it purchased only Fleming common stock. The plaintiffs respond by stating that a stockholder plaintiff may press bondholder claims so long as both arose out of the same scheme to defraud. The court finds D & T's argument unpersuasive and rejects it. At the pleading stage, Lead Plaintiff Jackson Capital has standing to assert a section 10(b) claim on behalf of purchasers of all securities against a defendant who makes "any untrue statement of material fact in connection with the purchase or sale of *any security"* because the various purchasers' claims arise out of the same material misstatements. 17 C.F.R. § 240.10b–5 (emphasis added). As discussed *infra* at pages 83–85, under section 11 of the 1933 Act, standing is limited to those purchasers who purchase securities pursuant to a specific registration statement containing a material misstatement because the claim arises out of that particular registration statement and the misrepresentations made within it. *See In re Paracelsus Corp.,* 6 F.Supp.2d 626 (S.D.Tex.1998).

8 In 2001 Fleming paid D & T $1,800,000 in consulting fees; $400,000 in attestation services and $1,000,000 in auditing fees.

9 In planning an audit, an auditor must assess the audit risk by looking at the various risks at issue in each audit, such as inherent risk and control risk, to assess the extent and scope of the audit.

10 In accounting for contingencies, contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.

11 Evidential matter from independent sources outside an entity provides greater assurance of reliability than that secured solely within the entity. The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly. In the examination of accounts payable, for example, alternative procedures [to sending written confirmation requests] may include examination of subsequent cash disbursements, correspondence from third parties, or other records to provide evidence for the completeness assertion.

12 During a review of interim financial information an auditor should compare interim financial information with comparable information for the immediately preceding interim period and for corresponding previous periods.

13 Standard of Field Work No. 3 requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations.

14 The "1933 Act Plaintiffs" include: Massachusetts State Carpenters Pension Fund ("MSCPF"), Massachusetts State Guaranteed Annuity Fund ("MSGAF"), Alaska Electrical Pension Fund ("Alaska Fund"), Anthony Colarich, David Dickey, Joel Feliciano, Raheela Zaman and Terry Slater.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

2024 WL 1344784
United States District Court, N.D. Indiana, Hammond Division.

IN RE INOTIV, INC. SECURITIES LITIGATION

Cause No. 4:22-CV-045-PPS-JEM
|
Signed March 29, 2024

**OPINION AND ORDER**

PHILIP P. SIMON, JUDGE

***1** This is a putative class action involving allegations of securities fraud by Defendant Inotiv, Inc. and some of its key officers. The lead plaintiff is the Oklahoma Police Pension and Retirement System, [1] which owned shares of Inotiv during the operative time. Inotiv is a publically traded company in the medical field. Part of its business involves the use of live animals to test the safety and efficacy of products. In November 2021, as part of a strategic acquisition plan, Inotiv closed a stock and cash acquisition of a company called Envigo. In January 2022, Inotiv acquired another firm called Orient Bio Resource Center (OBRC). Envigo and OBRC specialized in breeding, importing, and selling research models, including “large” animals like beagles and non-human primates (“NHPs” or “primates” for short). These acquisitions were supposed to enable Inotiv to expand into a new and potentially lucrative business segment. Inotiv viewed these acquisitions as “transformational” to its business.

In the months that followed the acquisitions, they indeed proved to be transformational—but for all the wrong reasons. In May 2022, the Department of Justice obtained a temporary restraining order against Envigo based on what can only be described as appalling violations of the Animal Welfare Act dating back at least July 2021, when USDA conducted an inspection at a dog-breeding facility in Cumberland, Virginia. After the government brought the hammer down, Inotiv opted to close the Cumberland facility in June 2022. Then, in November 2022, a federal indictment was unsealed, charging six executives from Inotiv's primary NHP supplier on felony charges in connection with an international smuggling ring. This separate case implicated Envigo and OBRC, as well: an OBRC executive pleaded guilty to making false statements to federal investigators, Envigo and OBRC received grand jury subpoenas in the course of the government's investigation, and OBRC was ultimately identified as an unindicted co-conspirator in the smuggling ring.

To say the least, the acquisitions were nothing short of a public relations nightmare. Despite ongoing government investigations into Envigo and OBRC's sketchy operations, Plaintiff claims that none of these dirty details were shared with Inotiv's investors in public disclosures despite clear signals that the government investigations were likely to result in serious sanctions against Envigo, OBRC, and/or Inotiv's principal supplier of NHPs, which completely undermined the rosy financial projections Inotiv projected for the merged company. While the company's executives conducted due diligence and worked toward closing the acquisitions, Defendants allegedly concealed information that had a strong material impact on Inotiv's business. And after the information came to light in the market through a series of corrective disclosures, Inotiv's stock price fell dramatically—from $55.55 per share to just $6.82, between September 2021 and November 2022.

***2** The sharp decline in Inotiv's stock price prompted some investors to cry foul. This putative class action was filed by one such investor, Sergio Grobler, who claimed that Inotiv and its executives made various false or misleading statements or omissions concerning its business, operations, and prospects in connection with acquiring Envigo and OBRC. [DE 1.] Following publication of the early notice required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(a)(3)(A)(i), several other Inotiv investors appeared in the case and sought appointment as Lead Plaintiff. As noted above, I

appointed the Oklahoma Police Pension and Retirement System as Lead Plaintiff for the putative investor class. [DE 37; *see* DE 18-2.]

In an unwieldy and sprawling complaint spanning 141 pages and 326 numbered paragraphs [DE 53 (FAC)], Plaintiff asserts violations of § 10(b), § 14(a), and § 20(a) of the Securities Exchange Act of 1934 against Inotiv and its executives and seeks to proceed on these claims on behalf of a class of investors that acquired Inotiv common stock from September 21, 2021 through November 16, 2022. Defendants have moved to dismiss the complaint [DE 67], asserting the amended complaint's factual allegations fall short of the standard required to plead plausible claims under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b).

For the reasons explained below, I find that Plaintiff has plausibly alleged violations of § 10(b), § 14(a), and by extension § 20(a). Therefore, Defendants' motion [DE 67] will be denied.

## Background

I will start by distilling the well pled factual allegations of the complaint, which I accept as true at this stage of the case. [DE 53 (FAC).[2]] As prefaced, this is not an insignificant task. Plaintiff provides a great deal of factual detail about the period leading up to Inotiv's acquisition of Envigo and OBRC [FAC at 16–26, 40]; the underlying investigations into the companies' operations [*id.* at 26–54]; Defendants' allegedly false and misleading public statements and omissions regarding material risks of the acquisitions between September 2021 and August 2022 [*id.* at 73–101]; events following the revelation of the disturbing conditions at the Cumberland facility [*id.* at 102–05]; Defendants' intent to mislead them and violations of SEC rules regarding disclosures in public filings [*id.* at 105–09]; and the financial harm they've experienced as a result [*id.* at 111–16]. Plaintiff also asserts various facts based on its ongoing investigation into Envigo's operations, including statements from Confidential Witnesses that worked at Envigo. *Id.* at 59–72.

### I. Background on Inotiv

Inotiv is a contract research organization based in West Lafayette that provides services in the drug and medical device industry. In particular, it specializes in the commercial production and sale of laboratory "research models," like purpose-bred mice and "large research models" (*e.g.*, dogs, primates, rabbits). It's a public company listed and traded on the NASDAQ under the ticker symbol "NOTV." The Federal Drug Administration, a key regulator in the industry, requires companies to conduct a phased approach to drug and device development, including discovery and development and preclinical research stages. Those stages involve mandatory laboratory and live animal testing prior to human clinical trials. That's where Inotiv, and its supply of research animals, comes in.

***3** In 2016, Inotiv was facing financial and strategic issues, including declining revenues, as big pharmaceutical companies moved their business to larger, multi-service contract research organizations ("CROs," for short). [FAC, ¶¶ 5-6.] In response, the company hired a new financial consultant, Robert Leasure; and in 2017, the company " 'reinvented' itself under Leasure's guidance to become a 'fully integrated solutions-oriented CRO.'" *Id.* That strategy involved expanding Inotiv's business through "strategic acquisitions." *Id.* By one measure, this effort was a success—Plaintiff tells me that from 2016 to 2022, Inotiv grew its annual revenue from $20 million to a projected $460 million while completing more than a dozen acquisitions. *Id.*

Several executives at the company allegedly played roles in Inotiv's strategic acquisitions, hammering out the financial particulars and conducting due diligence on the targets' operations. They include Leasure (who was installed as its CEO in 2019), CFO Beth Taylor, Chief Strategy Officer John Sagartz, and VP of North American Operations Carmen Wilbourn, all of whom have been named as defendants in this case. Plaintiff refers to Leasure and Taylor collectively as the "Control Defendants," based on their positions at the highest levels of Inotiv's corporate management, participation in the due diligence process leading up to

the strategic acquisitions, and their direct involvement in preparation and disclosure of allegedly false or misleading statements to investors concerning the acquisitions.

**II. Envigo and the Cumberland Facility**

As early as November 2019, Inotiv had some interest in acquiring a company called Envigo, a provider of research models and services. [FAC, ¶ 41.] Starting in April 2021, Inotiv began to discuss ways the companies could potentially "work together," and on May 21, 2021, they entered a mutual non-disclosure agreement to explore whether they could strike a deal. *Id.* A presentation entitled "Envigo Corporate Overview" was provided to Leasure by Inotiv's former CEO shortly thereafter, which included "details about the Envigo business." This primer was followed by "consistent calls every week" from June to September 2021, in which Envigo representatives "followed up regarding business matters, due diligence, agreements, closing issues and post-closing issues." *Id.*, ¶ 43. Leasure and Sagartz twice met with Envigo representatives in June 2021 to discuss Envigo's business and "additional due diligence related follow-up questions." *Id.*, ¶ 44.

While the companies figured out the financial particulars, Leasure, Sagartz, and Wilbourn conducted a due diligence "tour," visiting 17 of 22 Envigo facilities between July 20, 2021 and August 20, 2021. *Id.*, ¶ 45. Along the way, they visited Envigo's dog-breeding facility in Cumberland, Virginia and a primate facility in Alice, Texas. According to statements Plaintiff obtained from confidential witnesses with knowledge of the site visits, these visits would entail half a day to a full day at each Envigo facility, during which time Inotiv personnel would be toured around the facility and engage in "information gathering discussions" with Envigo's on-site staff. One witness (CW2) alleges that Leasure asked questions of Envigo personnel and was directly involved in gathering information about the sites, while other Inotiv personnel and advisors also visited facilities to compile information for summaries provided to Leasure, Taylor, and Sagartz. After Inotiv concluded its due diligence, the company negotiated a reduced purchase price for Envigo, down to $485 million from $500 million asking. *Id.*, ¶ 46. Plaintiff claims that the basis for this $15 million reduction was not explained beyond "a reference to the elimination of certain representations and warranties," without reference to specific operational issues. *Id.*

***4** A proposed merger of the firms was announced September 21, 2021, with a sticker price of $485 million, comprised of $200 million in cash and 9,365,173 Inotiv common shares valued at $285 million. [FAC, ¶ 47.] On September 24, Inotiv filed a Preliminary Proxy Statement containing matters to be approved by Inotiv's shareholders to consummate the transaction. [DE 69-5.] A Definitive Policy Statement was filed October 5, advising shareholders they had until November 4 to vote or designate proxies on these matters. [DE 69-6.] Numerous documents were incorporated by reference into the Proxy Statements, as delineated at paragraph 48 of the Amended Complaint. [FAC, ¶¶ 47–48.] On October 21, Inotiv issued an update on its Form 8-K containing supplemental disclosures. *Id.*, ¶ 50.[3] The resolutions needed to consummate the merger were approved by shareholders, with some 95–99% of shareholders voting in favor. *Id.*, ¶¶ 49, 51. On November 5, 2021, the deal closed and the transaction was announced by press release and via Form 8-K filed with the SEC. *Id.*, ¶ 52.

When the deal closed, Inotiv acquired a Research Models and Services ("RMS") business segment, making it a one-stop shop for the entirety of discovery and nonclinical development. Defendants called the deal "transformational to [Inotiv's] underlying business" because it resulted in the creation of its new RMS business segment, which accounts for nearly three quarters of Inotiv's revenue and involves the "breeding, importing, and selling of live animals for research purposes, as well as the manufacture and distribution of various products and services associated with the use of animals in research." *Id.*, ¶¶ 1, 7, 9, 35–40. In addition, the acquisition helped the company's existing business segment by providing an in-house source of research animals. *Id.*, ¶ 7.

In the process, Inotiv became the owner of a purpose-bred canine facility in Cumberland, Virginia. "Purpose-bred canine facility" is a fancy phrase for what most folks would simply call an industrial puppy mill. Prior to its acquisition, Envigo had a significant share of the market for beagles used in drug testing (some 25%). Beagles are used in drug trials because, as most dog owners know, they typically have a docile demeanor, and researchers prefer to work with research models that have good health and temperament. There was strong demand for the dogs—Envigo used to sell them for upwards of $1,000 a pop (or pup, as it were).

But even dogs bred and raised for purely instrumental purposes are afforded minimal standards of welfare. The law provides protections reflecting that they are still living, breathing creatures worthy of basic dignity. Indeed, pursuant to the Animal Welfare Act, breeders and dealers of regulated animals must be licensed with the United States Department of Agriculture. The USDA, in turn, sets standards for the humane care of animals and monitors compliance through inspections (both routine inspections and "focused," or unannounced inspections). [FAC, ¶¶ 53–59.]

In 2019, Envigo obtained a "Class A" license under the Animal Welfare Act to breed and sell dogs at the Cumberland facility. *Id.*, ¶ 60. The USDA performed five inspections of the Cumberland facility between July 2021 and May 2022, and issued public findings, which are available to view on its website, about "noncompliant items" found at the facility. In July, USDA found 18 noncompliant items at the facility; in October 2021, it found 13 noncompliant items; in November 2021, the number rose to 26 noncompliant items. The following year, in March 2022 and May 2022, noncompliant items were still found at the facility, including several repeat violations. [*Id.*, ¶¶ 61, 70, 77, 87, 91; *see id.* ¶¶ 196, 210; DE 53-1 at 3.]

Plaintiff rehashes the so-called "non-compliant items" in detail, and to say the least, they are appalling. Just to list a few, in the July 2021 inspection, which took place during Inotiv's due diligence process, investigators reported findings including "a listless puppy covered in dried excreta that had been trapped in a pan underneath the cage in which its mother and litter mates were living"; nursing beagles that were "deliberately denied food for 42 hours" with food "just out of reach outside of their cages where the dogs could see and smell it"; housing areas with temperatures exceeding 90 degrees; a feed silo "contaminated with a variety of live insects"; and insufficient staffing to determine if dogs required veterinary care (*i.e.*, *one* attending veterinarian overseeing care for more than 5,000 dogs). [FAC, ¶ 66.] "Critical" findings included inadequate documentation of veterinary care—records indicated over 300 puppy deaths attributed to "unknown causes"—a persistent failure to separate fighting or incompatible dogs, resulting in fight wounds and deaths; and failures to meet minimum enclosure requirements to prevent injuries. *Id.*, ¶ 67. Sadly, this listing is not exhaustive—reprinting all of the violations identified by inspectors would literally take pages to unpack.

***5** USDA inspectors granted Envigo an opportunity to address the problems and set deadlines for compliance. *Id.*, ¶¶ 68–69. Inspectors returned for additional investigations in October and November 2021—right around the same time Inotiv was closing a deal to buy Envigo. *Id.*, ¶¶ 70–86. They found that Envigo had failed to correct many of the significant violations initially identified. In October, after finding repeat violations, USDA inspectors set a deadline for Envigo to address the issues by November 5–8, 2021. *Id.*, ¶ 74. They also held an "exit briefing" with Envigo personnel, including Defendant Wilbourn (then Envigo's VP for North American Operations) and an unnamed "Chief Operating Officer." *Id.*, ¶ 75.

Inspectors came back to the facility in November and found several "Direct Repeat" violations. To name a few: they included staff members authorized to perform euthanasia without following approved procedures (*i.e.*, euthanizing dogs without the use of anaesthesia); dogs suffering from dental disease identified as early as August 2021 without any care to address the issues; improper handing and housing of animals (*e.g.*, "21 puppies were found to be handled in a manner that they were damp, shivering, and cold"; 25 puppies found dead due to cold exposure over the prior eight weeks); persistent "dog fights" resulting in "serious" injuries to dogs; inadequate staffing; and dirty food containers, including containers with a "large number of live maggots." *Id.*, ¶ 79. Inspectors also found additional violations that cast a pall on Envigo's remediation efforts. *Id.*, ¶¶ 80–83.

Following the November inspection, inspectors gave Envigo another opportunity to address certain issues, reminded it of its obligations under the Animal Welfare Act, and on December 17, 2021, another "exit briefing" was held with company personnel, including Wilbourn and a "Manager of Operations." [FAC, ¶¶ 84–85.] But even after Inotiv closed the Envigo acquisition, the issues persisted—in March and May 2022, following focused inspections, USDA inspectors again found repeated AWA violations at the facility. *Id.*, ¶¶ 87–93. After the May inspection, Wilbourn, a Manager of Operations, and a "Chief Operating Officer" attended another exit meeting with investigators. *Id.*, ¶ 93.

Plaintiff claims that because of the due diligence efforts Defendants undertook from May to September 2021, they had knowledge about the terrible conditions at the Cumberland facility. These conditions were obvious to anyone on a tour of the

facility, including Leasure, Sagartz, and Wilbourn, who personally visited the site. [*See* FAC, ¶ 95.] That's because the violations found at the Cumberland facility were blatant—they included conditions such as overpowering odors from visibly accumulated animal waste and other unclean conditions, dogs visibly injured due to fighting, dogs kept in overcrowded enclosures, facilities that were in obvious states of disrepair, and a facility that was understaffed and unable to provide adequate care for the thousands of dogs living under their care. Sadly, this information is consistent with findings of violations at the facility going back to *2017* (when it was under the management of another company Envigo acquired in 2019), suggesting that it would have been a point of focus for anybody conducting a due diligence "tour" through the facility. *See id.*

Approximately ten months after the Cumberland facility was cited for over 60 AWA violations, the government decided enough was enough. At that point, a civil enforcement action was added to the picture. On May 18, 2022, federal law enforcement officials executed a search warrant and raided the facility. [FAC, ¶¶ 96.] The government then obtained a temporary restraining order based on the finding that Envigo was engaged in serious and ongoing violations of the AWA. *Id.*, ¶¶ 98–99. *See generally United States v. Envigo RMS, LLC*, Cause No. 6-22-CV-028-NKM (W.D. Va.). The court in that case noted there were several violations found in May 2022 that had been first observed back in July 2021 and issued a TRO mandating Envigo's compliance with numerous AWA requirements the company had consistently failed to meet. [FAC, ¶¶ 99–100.]

***6** The following month, the court held a hearing on the government's request for a preliminary injunction. A memorandum opinion was issued June 17, 2022 granting an injunction, in which the court observed that the motion "was all but uncontested." *See id.*, ¶¶ 107–08. *United States v. Envigo RMS, LLC*, 2022 WL 2195030, at *1 (W.D. Va. June 17, 2022). In opposing the motion, Envigo (of course, under Inotiv's management) took the position that it would close the Cumberland facility. The company was willing to submit to a court order designed to ensure its AWA compliance in the interim. The court accepted this stipulation and concluded that it was unnecessary to enjoin Envigo from fulfilling its existing contractual obligations (*i.e.*, it could keep selling puppies) while winding down its Cumberland operations. In deciding there was "good reason" to allow Envigo to fulfill its existing contracts, the court specifically noted "expert" testimony submitted in support of Envigo's opposition brief stating that dogs produced at that particular facility were "exceedingly important to domestic pharmaceutical discovery and development," and the facility "has historically produced up to 25 percent of the domestic supply of beagles for research." That information reinforced the strategic importance of the facility to clinical research and Envigo's business in an environment where "the existing supply of research animals is insufficient to meet the current needs of research institutions." 2022 WL 2195030, at *3. [*See also* FAC, ¶ 108.] The court also specifically cited testimony from Sagartz that he could not "argue with a USDA inspection report that identifies areas that are identified to be out of compliance." *Id.* at *2. [*See also* FAC, ¶ 108.] Notably, those reports had been in Envigo's records dating all the way back to July 2021.

That night, Inotiv issued a press release announcing the closure of the Cumberland facility. [FAC, ¶ 109.] The asserted basis for this move was that it was cheaper to shut down the facility than to make "required investments" to improve its operations. *Id.* Plaintiff asserts that Envigo's (and by extension Defendants') position in the injunction proceeding was a "dramatic reversal," because up to that point the company had "sought to downplay or deny the seriousness of the AWA violations" and "publicly maintained that [it] intended to bring the Cumberland Facility into compliance." *Id.*, ¶ 107. On June 24, 2022, Inotiv announced that James Harkness, the former COO of Inotiv's RMS business segment, would be retiring effective September 30, 2022. [FAC, ¶ 237; *see id.*, ¶ 204.]

### III. OBRC and the International Primate Smuggling Ring

Plaintiff provides less detail about Inotiv's acquisition of a second company called Orient Bio Research Center in January 2022 and the due diligence efforts the company undertook prior to this separate acquisition. It's not specifically stated in the complaint, but it appears that prior to the merger agreement, Envigo and OBRC may have been related in some way. Both of the companies had primate facilities in the city of Alice, Texas. As noted above, part of Inotiv's due diligence "tour" through Envigo's operations included a site visit at a primate facility in Alice, Texas. The amended complaint does not specifically allege that Inotiv personnel separately visited an OBRC facility in Alice. That said, it's entirely possible Envigo and OBRC had no corporate relationship prior to the Inotiv-Envigo merger and simply owned separate facilities in the same location. Plaintiff appears to treat them as separate companies, both prior to and after the acquisitions, and I will assume that to be the case for

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

present purposes. OBRC was not part of the initial merger agreement that closed in November 2021. Instead, Inotiv closed the acquisition of OBRC on January 27, 2022. [FAC, ¶ 128 n.10.] As part of that separate deal, OBRC transferred three percent of the purchase price to an executive at the company named Gary Tucker. *Id.* More on Mr. Tucker in a moment.

OBRC imports non-human primates. This activity is regulated internationally pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES" for short), to which the U.S. is a party, and domestically pursuant to the Endangered Species Act (ESA), the Lacey Act, and regulations promulgated by the United States Department of the Interior and the U.S. Fish and Wildlife Service. [FAC, ¶ 110.] While acknowledging the regulated nature of the business, Inotiv touted the acquisition of OBRC because it provided the company a key competitive advantage: "increased access to critical research models" in a supply-constrained environment. *Id.*, ¶¶ 1, 8, 38, 118, 201, 204, 224. But the risks quickly subsumed the rewards, as it came to light that Tucker, OBRC, and Envigo were all the subject of a criminal investigation into the illegal importation of primates.

***7** On June 22, 2021, a criminal case against Gary Tucker was unsealed in the U.S. District Court for the Southern District of Florida. *Id.*, ¶ 113. *See United States v. Tucker*, Cause No. 1:21-CR-20263-WPD (S.D. Fla.). Also in June 2021, Envigo and OBRC received grand jury subpoenas in connection with Justice Department's investigation into the importation of NHPs from certain countries in Southeast Asia. *Id.*, ¶ 116. The subpoenas issued in 2021 related to a previous round of subpoenas issued in 2019 to OBRC and Covance Research Products, a company Envigo had later acquired prior to its merger with Inotiv, seeking production of documents and information related to DOJ's investigation into NHP smuggling. *Id.*, ¶¶ 119, 235. While the charges against Tucker were unsealed, at that point, the fact that OBRC and Envigo had received grand jury subpoenas as part of the larger criminal investigation still remained out of public view.

On August 4, 2021, Tucker pleaded guilty to a charge of making false statements to agents of the U.S. Fish and Wildlife Service and a joint factual statement was filed in the case. [FAC, ¶ 114.] The statement reflects that in 2019, Tucker was interviewed by investigators in Washington, D.C., and that he lied in response to questions about his involvement in the procurement of long-tailed macaques (a small primate regularly used in drug trials) as an executive at OBRC. *Id.* The government issued a press release concerning Tucker's plea the same day, stating that the case related to an ongoing criminal investigation into "international trafficking of primates into the United States." *Id.* In an October 2021 press release about his sentencing, the government stated that Tucker had lied in response to questions "about potential illegal trafficking of wildlife," involving the "procurement and importation to the U.S. of long-tailed macaques" for use in scientific research. *Id.*, ¶ 115. (He ultimately received a sentence of home confinement and a $5,000 fine. *Id.*)

On November 16, 2022, the other shoe dropped in the Justice Department's investigation. A second and more wide-ranging criminal case was unsealed in the Southern District of Florida charging eight members of an international primate smuggling ring. *Id.*, ¶ 117. *See United States v. Keo*, Cause No. 1:21-CR-20340-KMW (S.D. Fla.). The indictment named a company based in Alice, Texas as an unidentified coconspirator in the smuggling ring. The description suggests that this company is OBRC. [FAC, ¶ 118.] On November 17, 2022, in a Form 8-K issued before markets opened, Inotiv informed investors that key employees of its supplier of NHPs had been indicted on multiple felony counts in connection with the international primate smuggling ring. *Id.*, ¶¶ 117, 241. The disclosure indicated that the day prior, Inotiv had been informed that its supplier's employees had been criminally charged, along with Cambodian government officials, with conspiring to illegally import NHPs from December 2017 through January 2022 and in connection with seven specific incidents between July 2018 and December 2021. *Id.* This announcement came on the heels of the unsealing of documents in the federal case against the officials, including the indictment that referred to "Unindicted Co-Conspirator 2," which appears to implicate OBRC. *Id.*

While charges were never filed against OBRC or Envigo, Plaintiff claims that through the course of their due diligence, Defendants were aware of the pending criminal investigation, the subpoenas issued to the companies, and their resulting productions of documents to DOJ. *Id.*, ¶ 119. Plaintiff specifically alleges that while the sprawling criminal case remained under seal, Defendants became aware of the fact that a company called "Vanny," along with OBRC and Envigo, were the focus of the government's investigation. That was a serious cause for concern, because Vanny was Inotiv's "principal supplier" of NHPs, and

access to a stable supply of NHPs was a “key justification” for acquiring Envigo and OBRC. *Id.* By the company's own account, it was aware of the subpoenas (it must have been in the course of its due diligence) and cooperated with the government and both Envigo and OBRC produced documents related to the importation of NHPs dating back to 2014. *See id.*, ¶¶ 116, 219. However, none of this information was shared with investors until February 2022 and May 2022, respectively. *Id.*, ¶¶ 120, 219, 229, 235.

**IV. Statements from Confidential Witnesses**

***8** Plaintiff asserts additional facts based on statements obtained from four confidential witnesses. All four worked for Envigo in various capacities and provide additional details based on their personal knowledge of the company's operations leading up to Inotiv's acquisitions.

CW1 was an employee at Envigo from 2019 until April 2022 and supported both the Cumberland, Virginia and Alice, Texas facilities. CW1 personally visited the Cumberland facility and stated that the conditions uncovered by USDA inspectors “were impossible to miss” and the facility only had one attending veterinarian, who had worked remotely during the pandemic. [FAC, ¶¶ 121–22.] CW1 further states that prior to Inotiv's acquisition, audits and inspections conducted by non-profit organizations and Envigo clients found deficiencies with the Cumberland facility, most notably a “lack of human contact with the dogs,” which had “led to complaints that the ... dogs were difficult to work with.” *Id.*, ¶ 123.

In addition, CW1 provides information about the company's alleged knowledge of the criminal matter involving OBRC executive Tucker, including discussion among management-level employees at Envigo ahead of Inotiv's acquisition of OBRC. *Id.*, ¶¶ 127–28. Leasure and Tucker were both allegedly present at a meeting of executives held shortly before the announcement of Inotiv's acquisition of OBRC, at which CW1 states there was “general knowledge among the attendees” of Tucker's prior guilty plea and sentencing in connection with his criminal case. *Id.*, ¶ 128. CW1 understood that Tucker would not be continuing in his role with OBRC following the acquisition, in part due to the criminal investigation—rather, he got a buyout from OBRC as part of the deal. *See id.* & n.10.

CW2 worked at Envigo as a manger of operations in St. Louis from December 2020 to March 2022 and recalls participating in the due diligence process. [FAC, ¶ 129.] CW2 recalls Defendants Leasure and Wilbourn visiting the St. Louis facility in July or August 2021 for around four hours. During this time Inotiv personnel asked questions about the facility's operations and took a facility tour. Leasure specifically asked CW2 about financial matters and whether CW2 reviewed those matters on a monthly basis, while others on Inotiv's executive team asked Envigo personnel about scientific and IP-related questions. *Id.*, ¶¶ 130–31. CW2 learned about conditions uncovered at the Cumberland facility from Envigo management shortly after the initial inspection in July 2021. *Id.*, ¶ 132. While Envigo stated a “town hall” meeting would be held to discuss employee concerns, the focus of the internal communication was “about certain animal rights organizations taking action against Envigo,” and the town hall did not take place before CW2 left the company in March 2022. *Id.*

CW3 worked for Envigo in Indianapolis as a scientist and researcher from 2015 to December 2021. [FAC, ¶ 133.] In 2021, CW3 worked with a startup customer conducting a study requiring the use of dogs, which required CW3 to visit the Cumberland facility for four days in March 2021, prior to USDA's initial findings of noncompliance in July 2021. *Id.* CW3 observed many issues later documented by USDA in its reports, including empty dog feeders, openings in kennel floor grates that puppies could slip through, and dogs with feet covered in feces “so thick that it became stuck to the walls of the containers” used to transport them. *Id.*, ¶¶ 134–36. In addition, CW3 noted the older dogs “were not socialized,” and would be frightened when CW3 performed veterinary checks, as well as other dogs in the study that were aggressive. *Id.*, ¶ 137. Although the customer for the study wanted to adopt the dogs after the study had completed, “only one dog in the study was able to be adopted” because the dogs “had teeth that were in such bad condition that they could not be adopted.” *Id.* Moreover, CW3 was aware that many of the dogs at the Cumberland facility had a genetic condition called “wet paw,” which would cause excessive sweat and irritation on the animals’ paws. Some customers would not purchase dogs from the facility because these issues went unaddressed. *See id.*, ¶ 138. Based on discussion with colleagues with knowledge of the USDA's findings, CW3 states that the reports would have accurately reflected the conditions at the Cumberland facility. *Id.*, ¶ 139.

***9** CW3 also provides information about "serious problems" with the "practices and behavior" of Dr. Dawn Gau, the attending veterinarian at the Cumberland facility. [FAC, ¶ 140.] CW3 specifically states that during one study, Gau did not use proper anaesthesia during biopsies performed on the dogs, and they woke up during surgery. *Id.* "[N]umerous complaints" were made about Gau's practices but nothing was done to address the concerns because it would've been too hard for the company to find a replacement. *Id.* CW3 further states that there were no written Standard Operating Procedures at place in the Cumberland facility for certain "sensitive and high-risk procedures being performed on dogs," which contrasted with the practice at other Envigo facilities and "likely contributed to poor conditions at the site." *Id.*, ¶ 141. Finally, the Cumberland site director allegedly told CW3 that "investors" visited the facility "during the summer of 2021." CW3 believes those investors were Inotiv executives and they would have observed the same issues as CW3 upon touring the site. *Id.*, ¶ 142.

CW4 also worked for Envigo in Indianapolis and served as a talent acquisition specialist. [FAC, ¶ 143.] One of CW4's duties was hiring dog handlers and other operational staff positions for Cumberland facility. According to CW4, the facility was a "revolving door," and the site took up "20% to 30% of CW4's time." *Id.*, ¶ 144. The low pay and poor work conditions at the site made it hard to keep employees, and many would remain there for under a year before finding a new job. *Id.* CW4 believes that the high employee turnover "contributed to the problems" identified by inspectors. *Id.* Finally, while CW4 concedes that they did not "have any prior indication of the problems" at the Cumberland facility, shortly before the conditions at the site became public knowledge, they were asked by managers to gather personnel information about employees at the facility and instructed to conduct "social media investigations" pertaining to whether the employees had ties to animal rights groups. *See id.*, ¶ 145.

**V. Defendants' Partial Corrective Disclosures and Plaintiff's Injuries**

Plaintiff's theory of harm in this case is that Defendants deceived the market and their conduct artificially inflated the price of Inotiv's stock. After the truth about Defendants' false statements or omissions came to light, the hot air flew out of Inotiv's stock price and it came hurtling down to earth. As it fell, Plaintiff and other similarly situated owners of Inotiv stock lost money, independent of any losses traceable to changed market conditions or Inotiv-specific facts in the market unrelated to Defendants' allegedly fraudulent conduct. [FAC, ¶¶ 256–59.]

In support of this theory, Plaintiff points to a "series of partial corrective disclosures" Defendants made after November 15, 2021. They peg their financial losses to these partial corrective disclosures. On November 15, USDA posted its July 2021 inspection reports on its website and PETA issued a press release including links to copies of two of the reports. In response to this news, Inotiv's stock price fell by $2.80 per share, a decline of around 5%, to close at $52.75. *Id.*, ¶ 260.

On February 16, 2022, Inotiv filed its Q1 2022 Form 10-Q. [DE 69-10.] Plaintiff tells me this form contained two key disclosures. First, Inotiv disclosed for the first time that during the period July through December 2021, USDA had inspected "one of Envigo's U.S. facilities" multiple times and "issued inspection reports with findings of non-compliance." *Id.*, ¶ 261. The company had appealed certain findings in the inspection reports but noted that "USDA has indicated ... it intends to conduct a formal investigation" that "could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation." *Id.* The Q1 2022 Form 10-Q also disclosed for the first time that some eight months earlier, Envigo had received a grand jury subpoena issued by DOJ "requiring the production of documents related to the importation into the United States of live non-human primates" from Asian countries and that the company was "cooperating with the Department of Justice" in connection with its ongoing investigation. *Id.*

***10** When this news was revealed to the market, the price of Inotiv stock fell $4.73 per share, a decline of approximately 17%, to close at $23.59 per share. *Id.* The news continued to spread in the market and Inotiv's stock continued to get pummeled, falling another $3.30 per share, nearly 14%, to close at $20.29 per share on February 17, 2022. *Id.* An article published in Bloomberg News attributed the precipitous decline, in part, to Inotiv's "disclos[ure] that [a] recently bought unit received a grand jury subpoena from Miami prosecutors investigating imports of primates from Asia," and another report published by an analyst at Lake Street Capital Markets attributed the declining stock price to factors including "new risks added to the 10-Q related to one of Envigo's research model facilities [in Cumberland, Virginia] being non-compliant" and "a DOJ investigation of NHP suppliers." *Id.* The Lake Street report continued: "In speaking with management, the center at risk is a small, non-core

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

center producing minimal revenue (single digit millions) and is not profitable. [Lake Street] expect[s] the needed changes have been made (or are in process) and the facility will regain compliance in the near-term.” *Id.* As to the information about the grand jury subpoena, Lake Street's report added that it might be part of a broader inquiry, but it “hesitate[d] to draw any conclusions” while acknowledging that the news could “carry negative repercussions” for the company. *Id.*

Then, on May 20, 2022, Inotiv made an announcement following the close of markets that (1) on May 19, 2022, law enforcement agencies had executed a search warrant at the Cumberland facility, and (2) the same day, DOJ had filed a civil enforcement action against Envigo in connection with AWA violations at the facility. [FAC, ¶ 262.] In response, on May 23 (the next trading day), Inotiv's stock price fell by $5.19 per share, dropping approximately 28%, to close at $13.14 per share on high trading volume. *Id.*

On June 13, 2022, after the close of markets, Inotiv issued a press release announcing the closure of two Envigo facilities, including the Cumberland puppy mill. *Id.*, ¶ 263. Leasure acknowledged there had been problems at the facility and Inotiv decided to close it rather than make “required investments to improve the facility.” *Id.* Lake Street issued a report prior to the markets opening on June 14 suggesting that Inotiv's decision “should be well-received by investors” in part due to “recently increased” costs of investments needed to bring the Cumberland facility into AWA compliance but downgraded the target stock price from $75 to $50 per share. *Id.* When markets opened, Inotiv's stock price fell yet again, declining by $0.25 per share (approximately 1.92%) to close at $12.78 per share. *Id.*

The beat rolled on in November 2022. Inotiv filed a Form 8-K stating that on November 16, 2022, the company “became aware” that the Justice Department had criminally charged employees of its main primate supplier, along with two Cambodian officials, for conspiring to import primates and pointed to seven specific imports between July 2018 and December 2021. [FAC, ¶ 264.] The Form 8-K noted the subpoenas issued to Envigo and OBRC, which the company had previously disclosed in its Q1 2022 Form 10-Q, and claimed that Inotiv “has been fully cooperating, and will continue to cooperate” with the Justice Department. *Id.* After this disclosure was made, on November 17, 2022, the price of Inotiv's stock fell by nearly 57%, down to $6.82 per share from the prior day's closing price of $14.85 per share. *Id.*

Lake Street subsequently downgraded Inotiv from a “buy” to a “hold” stock and lowered its price target by a mile: from $60 per share to a mere $7 per share. *Id.* The revelations risked a “worst case scenario” in the mind of Lake Street's analyst Frank Takkinen, in which primate supplies were cut off entirely and Inotiv's ability to service its existing debts could come into question. *Id.* Adding to this, a Bloomberg report published November 18 noted that Inotiv's stock price was continuing to fall after the November 17 spiral and observed that an analyst at Jefferies had cut the price target for the company's stock from $27 to $10 per share because “NHPs are a significant driver of growth in [Inotiv's] business, an area of high demand and constrained supply.” *Id.* On November 18, 2022, Inotiv's stock price fell another 15.7%, to close at $5.75 per share.

***11** All told, the company's public valuation went from $1.45 billion in November 2021 to $303.45 million in May 2022, with more than 25.59 million shares outstanding. [FAC, ¶ 265(e).]

### VI. Defendants’ False and Misleading Statements or Omissions

The crux of this case is whether Defendants defrauded Inotiv's investors. So let's take a step back and distill the statements and omissions they made that allegedly pumped hot air into Inotiv's stock price. Plaintiff outlines a lengthy series of public statements and omissions (some of which are detailed above) Defendants made in connection with the Envigo and OBRC acquisitions and its primate business over an eleven-month span that Plaintiff claims are materially false and misleading. [FAC, ¶¶ 161–236.]

These alleged lies fall into two main buckets—first, statements or omissions about the ongoing AWA violations at the Cumberland facility, prior to Inotiv's decision to close the facility in response to the government enforcement action (*id.*, ¶¶ 161–69, 173–76, 181, 184, 193, 197, 200–01, 207–10, 217–18, 224–25, 232, 235); and second, statements or omissions concerning the fact that Inotiv's principal supplier of primates was in the crosshair of a criminal investigation implicating the company's supply chain and that Envigo and OBRC had received grand jury subpoenas in the course of the same investigation (*id.*, ¶¶ 169, 187–89, 200–01, 204, 219, 224, 229, 235). With respect to its claim under § 14(a) of the Securities Exchange Act, Plaintiff

specifically alleges material misrepresentations and omissions in Inotiv's proxy and documents incorporated therein. *Id.*, ¶¶ 47–48, 161, 165–69, 172–76. I'll examine each of these “buckets” of alleged lies in turn.

**A. Defendants’ Materially False and Misleading Statements or Omissions Pertaining to Envigo's Cumberland Facility**

The statements pertaining to the Cumberland facility date back to Inotiv's initial deal announcement on September 21, 2021. Specifically, Plaintiff takes issue with the following statements made in a conference call, investor presentation, and an associated merger agreement provided to investors on September 21:

- *First*, a statement Leasure made describing Envigo as “a best-in-class provider of high quality research models” with a “dedication to quality” that would benefit Inotiv, and agreed with the characterization of Envigo as a company providing “high-quality research-grade laboratory animals.” [FAC, ¶¶ 161–64.]

- *Second*, statements in investor presentation slides referring to Envigo as a “leading provider of high-quality research models and services,” and showing the Cumberland facility among the critical facilities to be acquired that made Envigo “a leader in research models services in key research locations,” and noting Envigo's ability to “suppl[y] customers with genetically consistent research models time after time.” *Id.*, ¶¶ 165–68.

- *Third*, assertions in a proposed merger agreement filed as an attachment to an Inotiv 8-K that Envigo was in full legal compliance and not under investigation, including that Envigo “is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement” or “guidance standards and policies” of any governmental authority, and that Envigo had not received any “inspection reports with findings of material deficiencies.” *Id.*, ¶¶ 161, 169.

***12** Plaintiff claims these three statements were misleading because they omitted material information about the low quality of the research models produced at the Cumberland facility and the appalling violations of the AWA first documented months earlier by federal government investigators. [FAC, ¶ 171.] Absent that important context, the market responded to the deal announcement positively.

For example, analysts from the firm Craig-Hallum Capital Group LLC published a report on the heels of the deal announcement reiterating a “BUY Rating” for Inotiv stock and suggesting a healthy target price of $57. *Id.*, ¶ 170. Craig-Hallum based this recommendation, at least in part, on the belief that acquiring Envigo would provide Inotiv with “better access to animals,” noting that this supply chain issue was a “key concern for customers” in the “pharma/biotech” industry. *Id.* The firm specifically reproduced pages from the investor presentation showing that large animal models, like primates and dogs, would constitute some 32% of revenues for the combined company, and noted that Inotiv was locking down supply “across many species, thereby eliminating risk.” *Id.* The only risks identified in connection with the deal were risks that Inotiv would be acquired, struggle with financing, or face risks due to its own use of “live animals to test the safety and effectiveness of experimental drugs”—the same risks Craig-Hallum had identified in earlier reports—and not new risks related to Envigo's operations at the Cumberland facility or involvement in the importation of NHPs. *Id.*

Plaintiff further alleges that Defendants made similarly false or misleading statements in an October 5, 2021 Definitive Proxy Statement on Schedule 14A filed with the SEC (the “October 2021 Proxy”), and its November 5, 2021 closing press release. These allegedly false and misleading statements referred to Envigo's “research-quality animals,” “high-quality small and large research models for basic research and drug discovery and development,” and “high degree of focus on animal welfare,” all of which Plaintiff claims omitted material information about the low quality of the research models produced at the Cumberland facility and the government's findings of widespread and ongoing AWA violations at the facility. [FAC, ¶¶ 172–82.] More specifically, the October 2021 Proxy referenced various factors that Inotiv's board considered in determining whether to approve the proposed merger agreement, including “*taking into account the results of Inotiv's due diligence review of Envigo*,” and acknowledged under the heading “Legal and Regulatory Risk Factors” that Envigo “expends significant resources on compliance efforts.” *Id.*, ¶¶ 174–75 (emphasis added). Pointing to the fact that Defendants Leasure, Sagartz, and Wilbourn

personally visited the site in the summer of 2021, and CW1 observed the same conditions and believed they were "impossible to miss," Plaintiff claims the positive statements in the October 2021 Proxy regarding Envigo's product quality and legal compliance were false and misleading to investors. *Id.*, ¶¶ 178, 182.

Between November 11, 2021 and February 2022, Defendants allegedly made three additional sets of misrepresentations and omissions in the course of responding to criticism of the conditions at the Cumberland facility. Specifically, these include:

- *First*, a statement on November 11 that Envigo had "participated in" USDA inspections in which inspectors provided "feedback" that the company was incorporating, and reiterating that "[t]he highest quality animal welfare is a core value of our company and is central to our business," and that Envigo "remain[ed] steadfast in [its] commitment" to animal welfare. [FAC, ¶¶ 191–94.]

***13** • *Second*, a statement on November 16 (the same day USDA started its November 2021 inspection at the Cumberland facility) responding to animal rights' activists release of reports from the July 2021 inspection, which denied or downplayed inspectors' findings and claimed that Envigo was "tak[ing] the necessary corrective actions for all issues outlined in the reports" and "making an ongoing effort" to address "feedback" from inspectors, while reiterating its commitment to "[t]he highest quality of animal welfare [that] is a core value of our company and is central to our business." *Id.*, ¶¶ 196–98.

- *Third*, Wilbourn's February 3, 2022 testimony at a Virginia Senate Hearing stating that Envigo was "working hard to fix the current issues and [has] already taken many steps towards doing so" and was "doing everything we can" to ensure the compliant operation of the Cumberland facility; that the ongoing AWA violations were mere "temporary lapses" due to the pandemic that Envigo had acted "immediately" and "swiftly" to address; and that Envigo was focused on the "highest animal welfare standards" and was "working hard to fix" issues identified by USDA. *Id.*, ¶¶ 206–12.

Finally, Plaintiff alleges two additional sets of false and misleading statements and material omissions made in a quarterly SEC filing on February 16, 2022, and during a quarterly earnings call on May 13, 2022. [FAC, ¶¶ 216–27.] In both instances, Plaintiff claims Inotiv made false statements about the fact that animals bred and sold by its RMS business segment (which, as noted above, included the Cumberland facility acquired from Envigo) were of "research quality" and did not mention AWA violations identified in the two inspections performed by USDA in 2022.

### B. Defendants' Materially False and Misleading Statements or Omissions Concerning Inotiv's NHP Business

The other bucket of alleged false statements and omissions Defendants' made pertain to its primate-related business in the course of acquiring Envigo and OBRC. Plaintiff reiterates that access to a stable supply of primates from a "limited international source of supply" was important to Inotiv's business. This fact allegedly formed a material consideration supporting its acquisition of Envigo—and Plaintiff claims it was essentially the sole justification for Inotiv's purchase of OBRC. *Id.*, ¶¶ 8–9, 14–15, 38–40, 110–11, 119, 170, 201.

Plaintiff points to numerous specific statements Defendants made about their primate related business and assert they were materially false and misleading or omitted material information. Here's a distillation of the specific material misstatements or omissions at issue:

- Statements in the September 21, 2021 investor call, presentation, and merger agreement concerning Inotiv's legal compliance that failed to disclose the June 2021 grand jury subpoena issued to Envigo (and after January 2022, the subpoena issued to OBRC) and the fact that Inotiv's principal supplier of primates was the target of a criminal investigation. [FAC, ¶¶ 116, 127–28, 169, 171(c).]

- Various statements in "Primate Fact Sheets" maintained on an Envigo-branded public website following the closing of the Envigo acquisition on November 5, 2021, stating that it was "the world's largest and most trusted source" of "high-quality" primate research models procured from "high-quality breeding farm partners." *Id.*, ¶¶ 186–89.

- Statements Mr. Leasure made at a November 16, 2021 virtual conference that the Envigo acquisition addressed "some of the risk [Inotiv] had to [its] business model" with respect to "supply chain in [its] access to research models, which is becoming more and more of a problem and is like a limiting resource," noting that primates were a concern addressed through the acquisition and it was now in a unique position of being "the only CRO that has access to all the research models"—a "real competitive advantage right now with the supply and demand chain where it is today." *Id.*, ¶¶ 199–201.

***14** • Additional statements Leasure made at the November 16, 2021 conference that Inotiv had "an extensive supply of rhesus and cynomolgus [*i.e.*, macaque] models," "routinely conducts extensive audits of each farm to ensure supplier facilities are well maintained, the animals are well-cared for and healthy, and the export facilities are of high quality," that Inotiv is "very selective in our breeding farm partners," carries out an extensive audit program" of supplier facilities, and can provide its clients with the ability to "procure ... [primates] when and where [clients] need them," and that Inotiv acquired Envigo to address "a concern that [Inotiv] did not have a significant source of [primates] that we could rely upon," giving the company a "competitive advantage" in that it was "the only CRO that has access to all the research models." *Id.*, ¶¶ 187–89, 201.

- Statements in the Inotiv press release announcing the OBRC acquisition on January 27, 2022 that the company was "a leader in primate welfare and supply" and that the acquisition would "accelerate growth, provide scale, and ensure that client needs are met with the highest level of animal welfare." *Id.*, ¶ 204.

- A statement from Leasure in announcing the OBRC acquisition on January 27, 2022 that OBRC would "provide increased access to critical research models" and "the highest level of service, animal welfare, and enhanced supply chain logistics." *Id.*

- A statement from Leasure on May 13, 2022 assuring investors that purchasing OBRC protected Inotiv from industry-wide primate supply constraints as it "provides an opportunity to further expand [Inotiv's] services and address client needs at a time when the industry demand is outstripping supply." *Id.*, ¶ 224. Similar statements (and omissions) regarding the grand jury subpoenas and focus of the criminal investigation into the smuggling ring were allegedly made on February 16, 2022, May 16, 2022, and August 12, 2022, in Inotiv's Q1–Q3 2022 Form 10-Qs signed by Leasure and Taylor. *Id.*, ¶¶ 216–19, 222, 228–30, 234–36.

- A statement from Leasure on an August 10, 2022 earnings call in response to a question from a financial analyst about "the supply side of [Inotiv's primate] business," that "[i]t's been a market where the ... demand has been outstripping our supply" and Leasure did not "see the supply increasing any at this time," citing "what's taking place in Asia, China, Cambodia" and difficulty "get[ting] that information directly over the phone." *Id.*, ¶¶ 231–32.

**Discussion**

Based on the above set of facts, Lead Plaintiff Oklahoma Police Pension and Retirement System asserts claims on behalf of a putative class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The asserted class consists of all persons and entities who (1) purchased or otherwise acquired Inotiv stock during the Class Period (September 21, 2021 through November 16, 2022) and were damaged thereby or (2) held Inotiv shares as of October 4, 2021 and were entitled to vote on the acquisition of Envigo at the November 4, 2021 meeting of shareholders. [FAC, ¶ 273; *see id.* at 7 (defining Class Period).] Prior to the start of the Class Period, on June 30, 2021, Inotiv had over 15.91 million shares of common stock outstanding, and as of April 26, 2022, it had more than 25.51 million shares outstanding, suggesting that the members of the putative class likely total in the thousands. *Id.*, ¶ 274.

On behalf of this putative class, Plaintiff brings four legal claims. *First*, Plaintiff asserts violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 based on Defendants' allegedly materially false and misleading statements and omissions that deceived the investing public, artificially inflated and maintained Inotiv's stock price, and caused Plaintiff to purchase Inotiv stock at higher prices than it would have absent the artificial inflation. *Id.*, ¶¶ 293–301 (Count I). *Second*, Plaintiff asserts violations of § 20(a) of the Exchange Act against Leasure and Taylor as "controlling persons." *Id.*, ¶¶ 302–06 (Count II).

***15** *Third* and *fourth,* Plaintiff brings separate proxy solicitation claims under §§ 14(a) and 20(a) of the Exchange Act, which it styles as its "Proxy Claims." *Id.*, ¶¶ 307–26 (Counts III, IV). These claims are "based solely on negligence" (*i.e.*, not Defendants' knowledge or recklessness) and are asserted only on behalf of investors who held Inotiv stock on the record date of November 4, 2021 (*i.e.*, those who were entitled to vote on matters necessary for Inotiv to acquire Envigo). *Id.*, ¶ 307. The theory for these claims is substantially similar to the § 10(b) claims: that Defendants made statements to solicit shareholder approval of the Envigo acquisition including the September 21 investor presentation deck (*see id.*, ¶¶ 156–63); the proposed merger agreement (*id.*, ¶ 164); and the October 2021 Proxy (*id.*, ¶¶ 167–74). In particular, Count III asserts "proxy claims" for violation of § 14(a) and Rule 14a-9 against Inotiv, Leasure, and Taylor, while Count IV is against Leasure and Taylor as "controlling persons" within the company under § 20(a) of the Exchange Act. *Id.*, ¶¶ 314–26.

Defendants seek dismissal of all counts. Before getting into the thrust of the arguments, let's first set out the controlling standards governing my decision making. Rule 8(a)(2) requires the complaint to state a "short and plain statement" of the claim showing that the plaintiff is entitled to relief. Rule 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As for the fraud-related claims, Rule 9(b) requires pleading "with particularity." Fed. R. Civ. P. 9(b). This means the plaintiff must describe in his complaint who made the false statement, when and where it was made, the content of the misrepresentation and the method it was communicated. *Cornielsen v. Infinium Cap. Holdings, LLC*, 168 F. Supp. 3d 1033, 1040 (N.D. Ill. 2016) (citing *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)).

In addition, the Private Securities Litigation Reform Act (PSLRA) imposes heightened pleading requirements on securities plaintiffs. 15 U.S.C. §§ 78u–4(b); *Trahan v. Interactive Intelligence Group, Inc.*, 308 F. Supp. 3d 977, 986 (S.D. Ind. 2018) (citing *Beck v. Dobrowski*, 559 F.3d 680, 681–82 (7th Cir. 2009)). Plaintiffs alleging a proxy statement is misleading due to an omission must identify each statement alleged to have been misleading, the reason why each statement is misleading, and the relevant facts supporting that conclusion, as well as that the statement caused some type of economic loss. *Id.*; *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1003 (S.D. Ind. 2019), *aff'd*, 13 F.4th 631 (7th Cir. 2021) (citing § 78u–4(b)(4); *Grace v. Rosenstock*, 228 F.3d 40, 46–47 (2d Cir. 2000)). *See also* *AnchorBank*, 649 F.3d at 617. I may not consider "catch-all" or "blanket" assertions—what matter under the PSLRA is "particularly pled allegations." *Id.* (citing *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019)).

**I. Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person" to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b-5, which makes it unlawful:

***16** (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To state a securities fraud claim under § 10(b) of the Exchange Act a plaintiff must typically allege "(1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." *AnchorBank*, 649 F.3d at 617 (citing *Schleicher v. Wendt*, 618 F.3d 679, 681–82 (7th Cir. 2010)). *See also* *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (listing elements plaintiff must prove to prevail on implied right of action for § 10(b) violation).

### A. Defendants' Material Misrepresentations or Omissions

Defendants challenge Plaintiff's fraud claims on the basis that the amended complaint fails to allege any actionable fraudulent statements on their part. This argument is really two-fold. First, Defendants assert that they were under no duty to disclose imposed by affirmative law and thus there can be no liability. Second, even if a duty to disclose could be inferred, there was nothing "material" to disclose at any point prior to the end of the class period.

#### 1. Was There a Duty to Disclose?

It's well established that the Exchange Act does not codify "a system of continuous disclosure," and companies "are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001) (collecting cases). A firm "does not commit fraud by standing on its rights under a periodic-disclosure system." *Id.* at 810–11. Absent a duty to disclose imposed by positive law, disclosure is required when necessary to make statements made, in light of the circumstances in which they were made, not misleading. *Anderson v. Abbott Laby's*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001). Defendants tell me: (1) they disclosed all the information required by Item Nos. 303, 103, and 105 of the SEC's Regulation S-K; (2) they had no duty to disclose the allegedly omitted information under Regulation S-K or any other source of positive law; and (3) they did, in fact, disclose the allegedly omitted information when they were obligated to do so. [DE 68 at 20–23.]

Plaintiff, in response, argues that the complaint plausibly alleges that Defendants violated affirmative disclosure duties imposed by Regulation S-K. As a general matter, Regulation S-K outlines how registrants should disclose material qualitative descriptors of their business on registration statements, periodic reports, and any other filings with the SEC (*i.e.*, within the confines of the Exchange Act's "periodic-disclosure system" explained in *Gallagher*). "Item 303(a)(3)(ii) of Regulation S–K ... provides that registration statements and annual 10–K reports must reveal 'any known trends or uncertainties that have had or that the registrant *reasonably expects* will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.' " *Gallagher*, 269 F.3d at 810; *see* 17 C.F.R. § 229.303(b)(2)(ii). Item 105 similarly requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §

229.105(a). Finally, Item 103 requires companies to describe any material legal proceedings, including the principal parties, facts giving rise to the proceeding, and the relief sought. *See* 17 C.F.R. § 229.103.

***17** It does not appear that the Seventh Circuit has ever held that Regulation S-K imposes a duty to disclose that gives rise to a fraud claim under the Exchange Act. Plaintiff does not meaningfully address this point in opposing Defendants' motion. Other circuits have taken the issue up and have reached different conclusions. *See* *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *8 (N.D. Ill. Feb. 10, 2023) (collecting cases); *Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020) (same) (finding persuasive Second Circuit authority holding that "Item 303 does impose a duty to disclose for the purposes of securities fraud claims, because silence as to Item 303 conditions in an SEC filing has the potential to mislead investors"). Even in jurisdictions which recognize that Regulation S-K imposes a duty to disclose, it's not like any information conceivably covered by Regulation S-K forms a basis for a fraud claim. To prevail on such a claim, "an actionable securities violation also requires the plaintiff to meet the materiality standard[.]" *Akorn, Inc.*, 2020 WL 564222, at *7. The fact remains that the circuit has not held that the disclosure obligations imposed by Regulation S-K cannot form a basis for a § 10(b) claim. I will therefore assume for present purposes that a failure to disclose information required under Regulation S-K can form a basis for a fraud claim under the Exchange Act. [4]

Plaintiff doesn't really spell out how the allegedly omitted information fell within the requirements of Regulation S-K. Its opposition brief simply provides a citation to the relevant items in the regulation and a listing of the omitted material information they claim was required to be disclosed. As outlined in detail above, that information is that: (1) in June 2021, Envigo and OBRC received grand jury subpoenas in DOJ's criminal investigation; (2) as a result of the criminal investigation and its focus on Inotiv's principal primate supplier, Inotiv was exposed to risk that federal law enforcement would take actions resulting in significant costs and expenses or harm to Inotiv, including potential penalties or reputational damage, including cessation of primate imports; (3) USDA inspectors found serious and ongoing AWA violations at the Cumberland facility that had not been remediated over many months; (4) as a result of USDA's findings and the ongoing nature of the violations and the company's inadequate response, Inotiv was exposed to a present risk that the inspection process would result in civil or criminal actions and consequently impose significant costs, expenses, and reputational damage on the company; and (5) the criminal investigation and AWA violations could adversely affect Inotiv's bottom line. [DE 73 at 25.]

Defendants argue that the rules only require issuers to disclose known and material proceedings and risks under Items 103 and 105, and a violation of Item 303 requires "proof" of actual knowledge. In their view, none of the facts allegedly omitted from their proxy and Forms 10-Q and 10-K fit the bill. [DE 74 at 4.] The "reasonably expects" language in Item 303 of Regulation S-K has not been defined by the Seventh Circuit, but district courts in other circuits and the SEC have stated it requires more than a remote possibility but something less than more-likely-than not. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp.3d 821, 837–38 (N.D. Ind. 2018) (collecting authorities). If a company expresses risks only in vague terms or as a hypothetical when those risks are coming down the pike or have already come to fruition, doing so can form a basis for liability under the securities laws. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172 (9th Cir. 2009), *aff'd sub nom.* *Matrixx Initiatives v. Siracusano*, 563 U.S. 27 (2011); *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013).

Defendants have failed to identify any controlling authority rejecting a duty to disclose in light of the detailed facts alleged indicating that the civil and criminal investigations into Envigo's and OBRC's sketchy operations were real and pressing concerns likely to result in significant financial and reputational harm to the company. I cannot say, as a matter of law, that Plaintiff's allegations fail to make out colorable violations of the relevant items in Regulation S-K. It would be improper to do so based solely on lower court authorities rejecting duties to disclose information about government investigations in distinct contexts, as Defendants invite me to do. That approach would essentially ignore the wealth of factual allegations presented indicating that Defendants knew full well that the investigations were serious concerns and not routine compliance proceedings. *See Oak*

*Street Health, Inc.*, 2023 WL 198119, at *6 (noting that while there is no duty to "confess to uncharged, unadjudicated claims of wrongdoing," such an argument "misses the point" where plaintiffs plausibly allege defendants' statements "omitted the fact that [they] engaged in the ... specific practices alleged to be illegal.") (citing *Heavy & Gen. Laborers' Loc. 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022); *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018)). *See also* *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2016).

***18** Moreover, Plaintiff makes a related argument that, even if Defendants were under no obligation to "speak" under Regulation S-K, Defendants *did* make public statements that were rendered false and misleading in context by the failure to disclose additional information. [DE 73 at 24.] In other words, even if Defendants did not have a duty to disclose imposed by Regulation S-K, they assumed one by providing some information about the Envigo and OBRC acquisitions, its new RMS business segment, the Cumberland facility, and its primate business, but intentionally omitting others. *See, e.g.*, *Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d at 839 ("[W]hile *Gallagher* rightly stands for the proposition that there is no general duty to disclose bad news, plaintiffs allege that ZBH made statements while in possession of information that it knew would make them misleading, which is distinct from what occurred in *Gallagher*.").

In *Gallagher*, the Seventh Circuit held that Item 303's disclosure requirements did not impose a duty to disclose a letter the defendant received from the FDA because the allegedly misleading statement occurred days prior to the issuance of the letter. *Gallagher*, 269 F.3d at 810 ("The 10-K report was filed on March 9, 1999, and the FDA's letter is dated March 17, eight days later. Unless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written."). The court concluded that the defendants did not make any false or misleading statements about what the FDA was doing. Because the statements in the defendants' Form 10-K were not false at the time they were made and there was no duty to update, there could be no liability. *Id.* at 808.

But Plaintiff's case, as alleged, is broader. It is not strictly tied to the timing of the government's raid of the Cumberland facility or the unsealing of the criminal case against the primate smuggling ring, as Defendants suggest. Based on pervasive compliance issues over a span of many months at the Cumberland facility, which coincided with Inotiv's due diligence efforts and facility tours of Envigo facilities by Inotiv executives, Plaintiff alleges that it was entirely predictable to the powers that be that the company would not be able to bring the facility into compliance (and perhaps avoid an enforcement action) while meeting the financial goals the company was projecting. And in light of information Envigo and OBRC received in the course of the sealed criminal investigation, Plaintiff alleges that it was predictable that Inotiv's major supply of primates was in jeopardy of disappearing at a moment's notice, undermining its financial goals in this lucrative market.

In sum, Plaintiff has alleged that Defendants were in possession of information about serious AWA violations that existed at the Cumberland facility dating to at least July 2021, the issuance of grand jury subpoenas to Envigo and OBRC in June 2021, and the fact that the focus of the Justice Department's investigation was Inotiv's principal supplier of primates. And that's all information the Defendants knew would make their public statements misleading. As such, even if Defendants did not violate Regulation S-K *per se*, they were obligated "to tell the truth about material facts once they commence[d] speaking." *Ackerman v. Schwartz*, 947 F.2d 841, 846, 848 (7th Cir. 1991) ("Under Rule 10b–5, moreover, the lack of an independent duty does not excuse a material lie. A subject of a tender offer or merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues."); *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) (same); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) (same); *see also* *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).

***19** Defendants make a final argument that they did eventually disclose the allegedly omitted information and therefore didn't hide anything. [DE 68 at 21–23.] Before the Envigo acquisition, they told investors, in broad strokes, that Envigo is subject

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to governmental regulations and expends significant resources on compliance efforts, the company's facilities are subject to routine formal inspections by regulatory agencies, and failure to comply with applicable governmental regulations could harm its business. The USDA reports were made public after they were finalized (the complaint notes the first reports were posted on USDA's website on November 15, 2021, *see* FAC, ¶ 196). And after the search warrant was executed and the civil case was filed, Inotiv promptly disclosed that information to investors. Inotiv also disclosed that, as a general matter, Envigo depends on a limited source of supply for primates, a disruption of supply could harm its business, and it had experienced disruptions of its supply. Plaintiff asserts that the criminal investigation itself (in contrast to specific aspects of the investigation implicating OBRC as an unindicted co-conspirator of the smuggling ring and jeopardizing Inotiv's principal supply of NHPs) was "a matter of public record since as early as June 22, 2021," prior to either acquisition. *Id.*, ¶¶ 113–14. Finally, Inotiv disclosed the existence of the grand jury subpoenas issued to Envigo and OBRC in February and May 2022, only after it was publicly revealed that employees of its primate supplier had been indicted.

Notwithstanding these arguments, if Defendants wanted to provide investors with material information, they weren't permitted to tell half a story. In my view, based on what Defendants' said pertaining to the Envigo acquisition, it's hard to see how a buyer could beware (let alone be aware of) the risks posed by the acquisition. The disclosures Defendants point me to are essentially boilerplate. They simply noted opaque things like Envigo was subject to governmental regulations (who isn't?!) and failure to comply with them could harm the company's business, and that there were supply issues in the market for NHP research models.[5] Only later, after the investigations came to a head and the details of the government's investigations were thrown into public light, did Defendants offer more specific disclosures about risks to its business that, by all accounts, Plaintiff alleges were or should have been crystal clear to Defendants many months earlier. As exhaustively detailed above, Defendants' initial disclosures left out a significant amount of information about the appalling conditions at the Cumberland facility. And they omitted details about the serious risk that Inotiv would lose access to its main supply of primates in the course of wide-ranging governmental investigations—both of a civil and criminal nature—into the smuggling of these misfortunate creatures.

In sum, Plaintiff has plausibly alleged that Defendants chose to comment on matters germane to issues in public filings but in doing so omitted critical information about the context of the government investigations and significant risks facing the company, leading a reasonable investor to falsely believe the Envigo and OBRC acquisitions were going to be a positive development. Defendants surely have a factual rejoinder to much of this, but that is for another day. For now, based on the allegations in the amended complaint, the case is not subject to dismissal on this basis.

### 2. Does the Complaint Sufficiently Allege Materiality?

***20** To have a securities fraud claim, plaintiff must plead with particularity the falsity of a statement of fact or omission and its materiality. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). *See also* *Makor Issues & Rts., Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 596 (7th Cir. 2006), *as modified on denial of reh'g* (July 10, 2006), *vacated and remanded*, 551 U.S. 308 (2007) ("*Tellabs I*") (reiterating that "[t]he crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company").

An analog to the materiality standard is that if a "statement amounts to vague aspirations or unspecific puffery, it is not material." *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.

1995)). Because puffery is "devoid of any substantive information," it "contains no useful information upon which a reasonable investor would base a decision." *Searls*, 64 F.3d at 1066. It is thus immaterial for purposes of the securities laws. *Id.*

Similarly, expressions of opinion or belief are typically not actionable, unless a plaintiff makes a showing that "the speaker did not hold the belief she professed," the opinion statement contained supporting facts that are objectively untrue, or the opinion statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when "those facts conflict with what a reasonable investor would take from the statement itself[.]" *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *9, *14 (N.D. Ill. Apr. 18, 2022) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86, 189 (2015)). Even statements that are "literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor." *Id.* at *11. I must make these evaluations in the "context of the 'total mix' of information" a reasonable investor would consider. *Hospira, Inc.*, 2013 WL 566805, at *23–*25. *See also* *Omnicare, Inc.*, 575 U.S. at 190 ("[W]hether an omission makes an expression of opinion misleading always depends on context.").

For purposes of a motion to dismiss, the question is whether "the complaint includes factual allegations that state a plausible claim for relief"—not whether "*parts* of claims" fail to pass muster in isolation. *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *10 (N.D. Ill. Apr. 26, 2021) (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015)). Given the standard elucidated by the Supreme Court in *Basic, Inc.*, it should come as no surprise that the materiality of a statement is quite fact intensive and as such the "materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997). "[T]hese assessments are peculiarly ones for the trier of fact." *Id. See also* *Stransky*, 51 F.3d at 1333 ("[M]ateriality is typically an issue to be resolved by the finder of fact.").

So too here. Defendants make an array of arguments for why various of the alleged statements or omissions outlined in the complaint are immaterial – including that they are "textbook puffery," the Cumberland facility was financially immaterial to Inotiv's business, and certain of the statements are protected by the PSLRA's safe harbor provision. [*See* DE 68 at 31–37.] I find that none of these arguments form a basis for dismissal of Plaintiff's § 10(b) claim for failure to plead the materiality of Defendants' alleged statements or omissions.

***21** Initially, Defendants repeatedly characterize the alleged statements or omissions about the Cumberland facility as an attempt at "fraud by hindsight," arguing that Plaintiff simply relies on later-issued USDA reports to prove the falsity of statements Defendants had previously made. [*See, e.g.*, DE 68 at 28–29.] But that ignores Plaintiff's allegations that inspectors first identified the violations (which continued on and on for months leading up to the Envigo acquisition and then festered for months thereafter under Inotiv's management) in *July 2021*, prior to the start of the Class Period and nearly a year prior to the filing of the civil action. And it ignores Plaintiff's allegations that with each set of findings, the company was cited for violations and its top executives were told in no uncertain terms what it would take to fix the violations (*i.e.*, things they determined were financially unpalatable, in closing the facility). It would be inappropriate to find that the pervasive compliance issues identified at the Cumberland facility that became the subject of the USDA's inspections from July 2021 to May 2022, leading to the raid, TRO, and subsequent closure of the facility were not material to Inotiv's business. Likewise, it would border on the absurd to hold that OBRC's involvement (while short of indictment) in a criminal smuggling ring, including the indictment of one of its top executives for lying to investigators and the issuance of subpoenas to OBRC and Envigo, was not material to Inotiv's significant investments in its primate business.

As outlined in detail above, the complaint sets forth facts sufficient to support a strong inference that Defendants disregarded evidence that their public statements contained material misrepresentations and omissions about the risks the company faced in acquiring Envigo and OBRC. Defendants assert that they acknowledged all outstanding issues of material concern to Envigo's

business and no reasonable investor would have believed that Inotiv was "downplaying or denying anything." [DE 74 at 7–8.] But as explained above, their statements about the quality of research models produced at the Cumberland facility, remedial actions to address compliance issues at the facility, and Envigo's commitment to animal welfare are plausibly alleged to have minimized the repeated and continuing nature of the AWA violations USDA initially identified in July 2021.

In context, Plaintiff sets forth facts supporting the reasonable inference that no speaker professing the view that Envigo was a "best-in-class provider of high-quality research models and services," or that public allegations of AWA violations at the Cumberland facility were "misleading or lacking important context" could have believed these things to be true, or that these so-called opinions were based on objective facts. Plaintiff has alleged facts permitting the reasonable inference that research models produced at the facility fell far short of that standard, and that this issue was readily ascertainable to the folks in charge as Inotiv conducted its due diligence. Plaintiff avers that the models fell short of "research quality"—an important standard for animals supplied for clinical research purposes—precisely due to the shocking welfare violations persisting at the facility for months before and after Inotiv closed the deal. The same goes for statements to the effect that the company was "working hard to fix the current issues" identified by inspectors prior to their public statements, "acted swiftly" to address them, and "showed improvement," given the same issues prevailed at the facility for months after the government's initial report documenting the AWA violations, mounting into a federal lawsuit against the company.

In seeking the dismissal of various statements or factual omissions as immaterial or mere puffery or opinion statements, Defendants seem to take the position that the government's enforcement action in May 2022 came as a broadside. The complaint paints a far different tale. Crediting the truth of Plaintiff's allegations, as I must at this stage, in the context of a longstanding government investigation involving routine "exit" discussions with executives at the company, the government's civil action strikes me as closer to inevitable than surprising. It is a perfectly predictable consequence of persistent failures to comply with basic animal welfare standards. And that drumbeat of violations didn't happen just anywhere – they were taking place while Inotiv conducted due diligence and eventually acquired Envigo's Cumberland facility, which historically produced some 25% of the beagles supplied as research models in the domestic market.

***22** In that vein, Plaintiff specifically alleges that Leasure, Sagartz, and Wilbourn personally toured the Cumberland facility *at the very time* the repeated violations took place, and that based on experience of former Envigo personnel who visited the facility around the same time period, the conditions for which the company was cited were open and notorious. None of the pervasive AWA issues were mentioned whatsoever as Defendants touted the upside of the deal based, in part, on the quality of the research models Envigo produced and its commitment to animal welfare and legal compliance. Plaintiff also specifically alleges information about the serious staffing shortages at the facility, which—if not on a personal tour through the facility in the summer of 2021—was information Inotiv knew or certainly should have known in the course of its due diligence, and which substantially undermines their public statements about Envigo's commitment to producing high-quality research models, animal welfare standards, and the condition of Envigo's research models.

Defendants also argue that the Cumberland facility was "just one facility of 22 in the RMS segment," comprised less than one percent of Inotiv's total revenue, and was not profitable – suggesting that information about the facility was not financially or otherwise material. [DE 68 at 35–36.] But there are numerous facts in the complaint, which if credited, belie the notion that the issues at the Cumberland facility were immaterial to investors. [*See, e.g.*, FAC, ¶ 156 (Leasure personally participated in lobbying efforts and retention of Virginia lobbyists to respond to negative publicity surrounding the release of the July 2021 inspection report), ¶ 210 (Wilbourn asserted that Inotiv was engaged in an "all hands on deck exercise"); *see also id.*, ¶¶ 39, 171, 207, 245, 311.] While opposing DOJ's motion for a preliminary injunction in June 2022, Inotiv itself tendered an expert witness who testified that the purpose-bred beagles produced at the Cumberland facility were essential to biomedical research and that 25% of the domestic supply of beagles for clinical research had historically been supplied from that facility. [FAC, ¶¶ 108, 245.]

The materiality standard is not so rigid, at the pleading stage, as to require Plaintiff to allege that the whole collapse of Inotiv's stock price was due to Defendants' alleged misstatements or omissions. Given the large dip in Inotiv's stock once the details underlying the government's longstanding investigation and Inotiv's decision to close the facility (rather than invest in its

remediation) hit the market, I would find it hard to buy that this information is immaterial *as a matter of law. See* *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 912–13 (N.D. Ill. 2002) (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.... If a company's disclosure of information has no effect on stock prices, it follows that the information disclosed ... was immaterial as a matter of law.' ")).

In sum, frankly, much of Defendants' argument on materiality strikes me as post hoc rationalization, asserting that their statements at the time were sufficient because the risks were not apparent—until they exploded disastrously into public view. To which I ask: doesn't that prove the point? Even accepting that the Cumberland facility was a small percentage of Envigo's overall operation (a position that cuts against the position Inotiv took in the civil enforcement action), the optics of what was happening at that location were horrifying; how could that information *not* be material to the stock price? At least in the short run, collective emotions are what often fuel stock market rallies and collapses. And there's not a lot more evocative than the photos in Plaintiff's amended complaint of the hapless beagles at the Cumberland facility. [*See, e.g.*, FAC, ¶¶ 103, 105–06.] In all events, I view Defendants' materiality arguments as better tailored to summary judgment, when the issue can be evaluated with the benefit of additional facts elicited in discovery.

### B. Application of the Safe Harbor Provision

***23** A related argument Defendants raise is that some of the allegedly material statements are not actionable because they fall within the so-called "safe harbor" provision of the PSLRA. Safe harbor protects statements from liability under the securities laws, so long as certain conditions are met. The safe harbor applies to written or oral forward-looking statements if: (1) "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the statement is immaterial; or (2) if the plaintiffs fail to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(c)(1)(A)–(B); *see* *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *21 (N.D. Ill. Oct. 15, 2020).

Defendants assert that both subsections of the statutory safe harbor apply to two sets of alleged statements (1) in Inotiv's November 5, 2021 and January 27, 2022 8-Ks and during the Q2 2022 earnings call concerning the future benefits of the Envigo and OBRC acquisitions, and (2) that Leasure made at a conference regarding the company's intent to "eventually" rebrand the companies' merged operations under the Inotiv name. [DE 68 at 36–37 & n.29; DE 74 at 13–14; *see* FAC, ¶¶ 181, 201, 204, 224.] The cited statements all include forward-looking language:

- A statement in Inotiv's November 5, 2021 press release stating that the company "will receive access to a wide range of high-quality small and large research models for basic research and drug discovery and development." *Id.*, ¶ 181.
- Leasure's statement at a November 16, 2021 conference that the company would "eventually brand everything under the Inotiv name." *Id.*, ¶ 201.
- A statement in Inotiv's January 27, 2022 press release from Inotiv's then-COO for the RMS business, John Harkness, that the acquisition of OBRC "will accelerate growth" and "will provide increased access to critical research models and expanded facilities." *Id.*, ¶ 204.
- A statement Leasure made on the May 13, 2022 Q2 2022 earnings call that Inotiv "anticipate[s] supporting growth in services and consolidating 2 existing RMS locations," including "facility improvements ... to enhance animal welfare." *Id.*, ¶ 224.

Inotiv's Form 8-K, filed with the SEC on January 31, 2022, noted that "[s]uch statements involve risks," including "the possibility that expected benefits may not materialize as expected ... and other risks that are described in [Inotiv's] latest [ ] Form 10-K and its other filings with the SEC." [DE 69-9 at 7.] Inotiv's proxy filed September 24, 2021 [DE 69-5] listed "legal and regulatory risk factors" in connection with the Envigo deal, and generally stated that it was subject to governmental regulations, expends significant resources on compliance efforts, was subject to routine inspections by regulatory and supervisory authorities, and failure to comply with government regulations "could harm [its] business." *Id.* at 8.

There was far more detail in Inotiv's Form 10-K for the fiscal year ending September 30, 2021, which was filed on December 21, 2021. Inotiv disclosed that "*if* those authorities determine that [Envigo's] facilities or procedures do not meet applicable requirements," the company could be subject to an enforcement action. [DE 69-8 at 8 (emphasis added).] It further stated that from July through December 2021, one of Envigo's facilities "was inspected on several occasions by the USDA," after which USDA had issued "inspection reports with findings of non-compliance with certain USDA laws and regulations," and USDA "indicated it intends to conduct a formal investigation." *Id.* Then, as previously noted, Inotiv's Form 10-Q, filed February 16, 2022, included a whole subheading entitled "government investigations," which reiterated the above facts about the Envigo investigation and added that some eight months earlier, Envigo had received a grand jury subpoena issued by DOJ "requiring the production of documents related to the importation into the United States of live non-human primates" from Asian countries and that the company was "cooperating with the Department of Justice" in connection with its ongoing investigation. [DE 69-10 at 5.] In sum, while the September proxy simply noted generalized risk factors related to government investigations, Inotiv's filings in December 2021 and February 2022 included more specific details about the government's investigations into Envigo and OBRC, prior to the government's raid of the Cumberland facility in May 2022.

***24** Plaintiff does not meaningfully contest that the statements made were forward-looking in nature. Rather, Plaintiff argues that even if the cited statements were forward-looking, Defendants failed to provide "meaningful" cautionary language accompanying the statements. Defendants allegedly omitted information from their initial public disclosures necessary to render them not false or misleading, Plaintiff argues, and it follows that for the same reason they did not provide sufficiently cautionary language to invoke safe harbor. [*See* DE 73 at 31.] Plaintiff's arguments in response are frankly underdeveloped and do not lend much clarity on the relevant timeline for purposes of applying the safe harbor provision.

"The Seventh Circuit has explained that, to be meaningful, a firm's warnings must amount to something more than 'caveat emptor.' " *Gogo, Inc.*, 2021 WL 1608342, at *11 (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004)). While a company is not obligated to "list all factors that might affect results," language is meaningful and cautionary if it puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Thus, the warnings accompanying a forward-looking statement "must be more than boilerplate." It's not enough that "a statement warn of general risks applicable to any business (e.g. the state of the economy); rather, the risks should be specifically tailored to the company's business." *Id.* at 843–44. *See also* *Asher*, 377 F.3d at 733 (merely "highlight[ing] some parts of the business that might cause problems" is not enough to "avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight"); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

As to the latter two statements allegedly made in 2022 [FAC, ¶¶ 204, 224], Plaintiff does not really have a leg to stand on. The cautionary statements included in the Form 10-K and Form 10-Q, which were in turn incorporated into the January 27, 2022 press release and May 13, 2022 Q2 2022 earnings call, were more than boilerplate. Although they maintained that USDA had not "initiated" a formal investigation, these disclosures clearly stated that Envigo had findings of noncompliance stemming from inspections in the second half of 2021, and that there were specific legal compliance risks (including an enforcement action and forfeiture of Envigo's AWA license) associated with the inspections that had taken place. [DE 69-8 at 8; DE 69-10

at 5.] Plaintiff does not contend whatsoever with the specific language in Defendants' disclosures filed in December 2021 and February 2022, respectively, which both express caution as to risks of enforcement actions in connection with USDA's findings of noncompliance dating back to the July 2021 inspection.

Cautionary statements may be incorporated by reference, and the PSLRA "does not require the most helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *9–10 (N.D. Ill. Feb. 28, 2011) (citing *Asher*, 377 F.3d at 734; *Desai v. Gen. Growth Props., Inc.*, 654 F.Supp.2d 836, 844 (N.D. Ill. 2009)). Defendants have shown that they provided as much in connection with the two cited statements in Harkness's January press release and Inotiv's May 2022 earnings call.

***25** As to the former two statements [FAC, ¶¶ 181, 201], however, Plaintiff gets the better of the argument—at least at this stage. The September 2021 proxy, incorporated by reference into the November 5, 2021 press release and Leasure's November 16, 2021 remarks, referenced in broad strokes potential legal and regulatory risks, including enforcement of AWA regulations by the USDA, but in the same breath emphasized that Envigo "expends significant resources on compliance." [DE 69-5 at 8.] Again, that was many months after the initial inspection and findings specifically referenced in Inotiv's later filings with the SEC in December 2021 and February 2022. With respect to these two statements, the amended complaint alleges specific information, known to Defendants, which made their disclosures about the risks of the Envigo acquisition false or misleading. Whether or not the general language in the September 2021 proxy was sufficiently cautionary strikes me as yet another issue ill-suited to resolution on the face of Plaintiff's complaint. *See, e.g.*, *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015) (declining to dismiss claim under safe harbor provision where there was "a question of fact concerning whether Defendants knew the 'potential' risks identified had already occurred"); *In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964, 972 n.12 (N.D. Cal. 2009) ("find[ing] that the application of the PSLRA safe harbor to any purely forward-looking statements involves a factual dispute that is not appropriately resolved at the pleading stage").

In sum, Plaintiff may not proceed on its § 10(b) claim as to the alleged statements contained in paragraphs 204 and 224 of the amended complaint, as they fall within the safe harbor provision; but Plaintiff has sufficiently alleged that the statements contained in paragraphs 181 and 201 fall outside its scope and are actionable. In any event, as explained above, Plaintiff has sufficiently alleged other material misstatements or omissions pertaining to the Envigo and OBRC acquisitions sufficient to maintain a § 10(b) claim, so the claim will be allowed to proceed even though two of the alleged statements are not actionable because of the PSLRA's safe harbor provision.

### C. Plaintiff's Allegations of Scienter

The next pleading hurdle imposed by the PSLRA is the requirement that Plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). While the scienter standard is a bit murky, the Seventh Circuit has described it as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. *See also* *S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) (scienter may be established by showing defendant acted with "a reckless disregard of the truth").

The Supreme Court addressed the issue of scienter back in 2007 and stated that it is established when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("*Tellabs II*"). The inference that a defendant acted with scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.' " *Id.* at 326. *See also* *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

Therefore, to determine whether scienter has been adequately alleged, my job is to conduct a balancing of the allegations and weigh inferences in Plaintiff's favor against any possible inferences of "plausible non-culpable explanations for the defendants' conduct." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*"). In making this determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. "While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference ... the absence of a motive allegation is not fatal." *Id.* at 325. *See also* *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) ("Each individual fact about scienter may only provide a brushstroke, but the resulting portrait [may satisfy] the requirement for a strong inference of scienter under the PSLRA.").

***26** Additionally, in the context of omissions, reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 855 (N.D. Ill. 2017) (finding statement made with reckless disregard of truth, but not intent to deceive, manipulate, or defraud, plausibly alleged scienter and would be "allowed to proceed" as pled) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). The relevant inquiry "is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing.' " *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (quoting *Sundstrand*, 553 F.2d at 1045).

Defendants tell me that there are no "classic indicator[s]" of scienter in connection with the Envigo acquisition and issues identified at the Cumberland facility, such as "contemporaneous internal reports or communications suggesting a plot to defraud investors; no witnesses who claim to have firsthand knowledge of wrongdoing; and no suspiciously timed insider stock sales." [DE 68 at 11; *see id.* at 38–42.] They reiterate their arguments that there are no allegations supporting the reasonable inference that Inotiv knew the subpoenas issued to Envigo and OBRC as part of the primate-smuggling investigation would lead to the indictment of employees of its principal primate supplier and that nobody from Inotiv or its subsidiaries (aside from Gary Tucker, of course) was charged with any wrongdoing. *Id.* Plaintiff responds that these arguments are not enough to create reasonable inferences in Defendants' favor that "defeat the whole factual picture of Defendants' scienter painted by the FAC." [DE 73 at 33; *see id.* at 33–42.]

One way plaintiffs can more specifically state scienter allegations is by relying on statements from confidential witnesses or the defendants themselves. As outlined above, here Plaintiff relies on statements from various individuals who worked for Envigo during the time in question. The parties dispute whether these statements have a meaningful bearing on Defendants' scienter. In *Tellabs III*, the Seventh Circuit specifically disclaimed a presumption to disregard confidential witness allegations. 513 F.3d at 712. District courts, including courts in this district, have followed this guidance where a complaint sets forth in sufficient detail the basis for a confidential witness's knowledge. *See, e.g.*, *Hospira, Inc.*, 2013 WL 566805, at *17 (allegations from confidential witnesses are more believable when the complaint provides their "job title, duration of employment ..., and a description of employee responsibilities"); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *9 (N.D. Ind. May 23, 2018) ("The Seventh Circuit has approved of confidential sources as providing an inference of scienter and has identified several factors which strengthen the inference, including a large number of confidential witnesses, descriptions of their jobs that indicate they had first-hand knowledge of the facts to which they are testifying, corroboration by other sources, and the inclusion of their real names.").

While the amended complaint sets forth details providing a basis for each confidential witnesses' knowledge, it's clear that these statements fall far short of creating a 'smoking gun' supporting a strong inference of scienter. CW2 is alleged to have personally attended meetings with Leasure and Wilbourn during a site visit conducted as part of their due diligence tour. [FAC, ¶¶ 130–31.] While the visit was not conducted at the Cumberland facility, CW2 provides insight into the nature of the site

visit and states that the Inotiv team was given a tour of the office space, laboratories, and animal housing areas over a span of approximately four hours. *Id.*, ¶ 131. Aside from that, CW1 recalled Leasure and Sagartz participated in visits to an Envigo primate facility in Texas, during which time "Inotiv personnel spent the entire day at the location and toured the facility." *Id.*, ¶ 126. This information requires a logical leap to infer that the site visit in Cumberland was similarly involved, but that inference strikes me as entirely reasonable in the context of an orderly due diligence review of Envigo's operations.

***27** The balance of information Plaintiff draws from its confidential witness statements is flimsier and essentially anecdotal. CW1 personally visited the Cumberland facility on four occasions (it's not clear when), and in CW1's view, the "conditions at the Cumberland facility were impossible to miss" and there is "no way that Inotiv personnel who visited the Cumberland facility during the 2021 due diligence process would not have seen the poor condition of the dogs and the facilities at that time." *See id.*, ¶¶ 121–27. These statements relay CW1's "second-hand belief" that Defendants actually possessed knowledge of the conditions. *See, e.g.*, *Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *4 (N.D. Ill. July 12, 2006) (framing "must have known" allegations as "an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly").

Similarly, CW1's statements that the ongoing NHP investigation was "general knowledge" and a topic of "water cooler" discussion among management-level employees at Envigo's primate facility in Alice, Texas amount to little more than CW1's second-hand belief about what executives at the company knew about the NHP-smuggling investigation. [FAC, ¶ 127.] These statements do not purport to provide insight on what anybody outside of Envigo's primate facility in Alice, Texas knew about DOJ's investigation. More fundamentally, these generalized statements do not permit a reasonable inference that Defendants knew or recklessly disregarded the key facts that DOJ's investigation targeted Vanny (Inotiv's primary supplier of NHPs) or that Envigo and OBRC had responded to subpoenas or were otherwise caught in the government's crosshair. The same goes for CW1's statement that Leasure was present at a leadership meeting and dinner along with Gary Tucker shortly before the OBRC acquisition and that it was a matter of "general knowledge" that Tucker had previously pled guilty to lying to federal investigators and "would not be continuing in his position with OBRC after the Inotiv acquisition, at least in part due to" his plea in that case." *Id.*, ¶ 128. CW1 may honestly believe that it was a matter of "general knowledge" that Leasure and other Inotiv executives knew of Tucker's guilty plea, OBRC's involvement in the smuggling ring, and that the government was circling in on Inotiv's principal supplier of NHPs – but that does not speak to the *fact* that Leasure or other executives actually knew that sealed criminal charges were coming down against Inotiv's principal supplier of NHPs.

That said, the confidential witness statements are but one piece of Plaintiff's complaint. With respect to Plaintiff's claim based on the Envigo acquisition and issues identified at the Cumberland facility, I credit the amended complaint's well pled allegations regarding the participation of Leasure and Sagartz in overseeing an extensive due diligence process, which specifically included a tour of the Cumberland facility at the same period of time USDA inspectors uncovered open and notorious AWA violations scattered across the facility. [FAC, ¶¶ 11–14, 43–46, 243.] As noted above, the statements from CW2 and CW1 regarding the nature of the site visits during the due diligence tour, albeit in connection with other facilities, form a basis for a legitimate inference that Inotiv's visit to the Cumberland facility was of similar scope. According to Inotiv's proxy statement, between July 20, 2021 and August 20, 2021, Leasure and Sagartz visited Envigo locations, including a facility in Virginia, as part of their due diligence tour. *Id.*, ¶ 243. Plaintiff then explains how the conditions at the facility, as substantiated by declarations submitted by USDA inspectors, included overpowering odors from visibly accumulated animal waste and other unclean conditions, dogs fighting and injured due to fighting, dogs kept in overcrowded enclosures, facilities that were obviously in disrepair (such as the persistent flooring and flooding issues inspectors repeatedly documented), and a galling lack of staffing to care for the thousands of dogs living at the Cumberland facility. *Id.*, ¶¶ 95, 243. Moreover, these conditions did not arise overnight – they went back to at least August 2017, when USDA issued similar findings of animal neglect at the facility prior to Envigo assuming ownership. *Id.*, ¶ 95. In other words, they were things to be on alert for at a site visit in Cumberland during a due diligence "tour."

***28** As the investigation continued, key leaders attended several "exit meetings" with inspectors conveying the seriousness of the claims and the real costs of remediation; these meetings, which involved Wilbourn and (in some cases) Sagartz, dated all the way back to at least the October 2021 inspection. *Id.*, ¶¶ 75, 85, 93. Moreover, while Harkness (COO of the RMS segment)

allegedly played an essential role in the due diligence process, in June 2022 he was removed from his role. *Id.*, ¶¶ 237, 247. While his ouster was characterized as a "retirement," courts have recognized that the departure of a key executive involved in matters that form the basis of alleged fraud supports a strong inference of scienter. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (timing of departure to company's disclosure of misconduct "adds one more pieces to the scienter puzzle"). That's not to say that, in isolation, Harkness's departure is somehow a smoking gun; it's just one piece in a necessarily complex inquiry into what was going on in the minds of Inotiv's executives when they made the allegedly fraudulent statements and omissions. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (departures, while "not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

Drawing all reasonable inferences in Plaintiff's favor, with respect to Defendants' statements concerning Envigo and the issues identified at its Cumberland facility, the complaint essentially alleges that: (1) conditions at the facility were egregious for a long period of time, including between July and August 2021 when Leasure and Sagartz personally toured the facility; (2) Defendants knew of or consciously and recklessly disregarded the conditions and the USDA's repeated findings of noncompliance because they conducted due diligence while the investigation was heating up over the latter half of 2021 and after Inotiv assumed ownership of the facility in November 2021; and (3) Defendants intentionally misrepresented the integrity of their statements about the quality of research models Envigo produced and the company's commitment to legal compliance, notwithstanding partial corrective disclosures issued in Inotiv's December 2021 Form 10-K and February 22 Form 10-Q. The foregoing facts reinforce the significant magnitude of the problems persisting at the Cumberland facility, and paint a plausible picture that Defendants made statements and omitted details about Envigo's operations with reckless disregard for the truth.

These allegations and the voluminous facts underpinning them may be difficult to prove, but that is not the question when considering a motion to dismiss. *See* *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996). Plaintiff has alleged specific facts giving rise to a strong inference that Defendants recklessly ignored key warning signs at the Cumberland facility in a manner that plausibly rendered their filings and other public statements fraudulent. In other words, the allegations before me are akin to a bevy of cases in which defendants "[d]eliberately ignoring 'red flags' such as those alleged here can constitute the sort of recklessness necessary to support § 10(b) liability." *Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 928–29 (N.D. Ill. 1998) (collecting cases).

Defendants push back on this view, arguing that "multiple facts" undermine an inference of scienter in connection with the Envigo acquisition and conditions identified at the Cumberland facility, including that three of the four individual defendants purchased Inotiv stock during the class period and none sold any stock; Inotiv made timely disclosures about the relevant risks and sent internal communications to employees about the Cumberland facility; and Defendants had no incentive to conceal the conditions at the facility given it was small potatoes financially. [DE 68 at 38, 40–42.] The inference of scienter raised in the complaint remains strong in light of these competing, plausible explanations offered by Defendants. I find it persuasive that none of the individual defendants sold their stock; Plaintiff does not suggest that Inotiv and its executives had financial motivation to lie about the conditions at the Cumberland facility. However, the law does not require plaintiffs to plead allegations of motive in order to sufficiently allege a strong inference of scienter. *Tellabs II*, 551 U.S. at 325, 127 S.Ct. 2499 ("absence of a motive allegation" is "not fatal"); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014) ("Although motive allegations might meaningfully enhance the strength of the inference of scienter, a strong inference of scienter does not necessarily depend on such an enhancement.").

***29** If Defendants are correct, they may turn out carrying the day on the merits. But I do not agree that these arguments so overwhelm Plaintiff's allegations of scienter as to warrant dismissal on the pleadings. *AnchorBank*, 649 F.3d at 617 (noting that "while the competing explanations regarding scienter and reliance could be useful to the trier of fact, they are insufficient ... to justify dismissal for failure to state a claim on which relief can be granted"). *See, e.g.*, *Shah*, 348 F. Supp. 3d at 845

("[A] tie goes to the plaintiff at this stage in the litigation.") (*citing* *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008)).

The other half of the scienter story, involving the OBRC acquisition and DOJ's primate-smuggling investigation, is a closer question. As repeatedly outlined above, Plaintiff bases its claims on two sets of alleged misstatements or omissions—the preceding allegations about the Envigo acquisition and longstanding compliance issues at the Cumberland facility; and a separate set of allegations pertaining to the OBRC acquisition and information Defendants' allegedly concealed about the government's criminal investigation. Scienter is where the latter set of allegations fail to hold together to form a securities claim.

With respect to Defendants' scienter, Plaintiff has essentially alleged that: (1) Leasure attended a leadership conference where CW2 claims, without any specific knowledge, he learned or would have learned of OBRC being embroiled in a criminal investigation that was specifically focused on its principal supplier of NHPs; and (2) Envigo and OBRC received and responded to subpoenas during DOJ's criminal investigation. [FAC, ¶¶ 116–20, 128, 243.] Otherwise, Plaintiff asset that Inotiv's executives obtained personal knowledge sealed from public view—*i.e.*, that Vanny was the target of DOJ's investigation—by osmosis in the due diligence process undertaken in late 2021 and early 2022. The charges against Vanny, which included OBRC as an unnamed co-conspirator, were not unsealed until November 16, 2022. The fact that Envigo and OBRC received subpoenas in the course of the investigation and Tucker pled guilty to lying to investigators suggests that there was something amiss. But Plaintiff's argument that I can "infer Defendants' scienter" because receipt of the subpoenas and Defendants' "understanding the nature of the Criminal Investigation" somehow "transformed any hypothetical risks as to NHPs into realized risks" requiring public disclosure is not well taken in light of the PSLRA's heightened pleading requirements. [*See* DE 73 at 35.]

An inference that Defendants knew, or should have known prior to the unsealing of the federal indictment, that its principal NHP supplier was the target of the federal investigation, and thus its precious supply of NHPs was in jeopardy of being cut off entirely, is a bridge too far from the facts alleged in the complaint. USDA's investigation into the Cumberland facility yielded specific findings of violations over the span of many months that were discussed directly with the company's leadership and mirrored the claims ultimately filed against Envigo in the government's civil enforcement action.

By contrast, there is no suggestion that Inotiv's executives recklessly disregarded information about the target of DOJ's investigation and the risks it posed to its business. The fact that Envigo and OBRC received subpoenas is just that – they received subpoenas. They cooperated with the government and were not indicted. While it is a close question, in my view, the amended complaint provides no particularized facts supporting an inference that Inotiv and its executives knew or recklessly disregarded the fact that the target of a sealed criminal investigation was its "principal supplier" of NHPs. *See* *Rubinstein*, 241 F. Supp. 3d at 855 (reckless disregard entails "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care"). As soon as those charges were unsealed, Inotiv promptly disclosed the information to investors. Considering the allegations pertaining to OBRC and the NHP-smuggling investigation holistically, Plaintiff has failed to allege facts supporting a strong inference of scienter. That is not to suggest Plaintiff cannot plead more particularized facts that would establish a strong inference of scienter as to this set of alleged misrepresentations or omissions; but as it stands, the allegations before me do not satisfy the PSLRA's heightened pleading requirements.

***30** In sum, Plaintiff has met its burden to allege facts supporting a strong inference of scienter with respect to Defendants' alleged statements and omissions concerning the Envigo acquisition and conditions identified at the Cumberland facility contemporaneous with its due diligence on the company. But Plaintiff's allegations fall short of demonstrating that Defendants at least acted with reckless disregard for the truth in connection with their alleged statements and omissions regarding the OBRC acquisition and the government's NHP-smuggling investigation. Because Plaintiff's § 10(b) claim is predicated on both sets of alleged misstatements and omissions, the failure to adequately allege scienter as to the latter set of allegations does not mandate dismissal and Plaintiff may proceed on its claim as to the alleged statements and omissions concerning the Envigo acquisition and conditions identified at the Cumberland facility.

**D. Loss Causation**

The final argument Defendants present for dismissal of Plaintiff's securities fraud claim is failure to adequately plead loss causation. *See* *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Loss causation is an element under the PSLRA but it's not subject to the heightened pleading standard. *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *32 (N.D. Ill. Apr. 18, 2022). "To plead loss causation in the Seventh Circuit, '[t]he plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries.' " *Id.* (quoting *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 749 (N.D. Ill. 2006)). *See also* *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997). Because loss causation is not subject to the heightened pleading requirements of Rule 9(b), it suffices to provide a "short and plain statement" that provides "a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* (quoting *Ong*, 459 F. Supp. 2d at 742). *See also* *Dura*, 544 U.S. at 338, 347.

Proving this element of the claim is "often a complex and fact-intensive exercise that typically requires expert testimony." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022) (citing *Glickenhaus & Co. v. Household Intern.*, 787 F.3d 408, 421 (7th Cir. 2015)). But "*pleading* loss causation requires no proof, just plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." *Id.* In assessing Plaintiff's allegations, I am guided by the notion that loss causation "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets*, 482 F.3d 991, 995 (7th Cir. 2007).

Courts have further explained that where a plaintiff alleges a "fraud on the market," as Plaintiff does in this case [*see* FAC, ¶¶ 265, 267, 280], loss causation is often demonstrated circumstantially, by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*Meyer v. Greene*, 710 F.3d 1189, 1196–97 (11th Cir. 2013) (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011)). A corrective disclosure "need not ... be a 'mirror image' of previous misstatements." *In re Boeing*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022) (quoting *In Re Motorola Sec. Litig.*, 505 F. Supp. 2d. 501, 543 (N.D. Ill. 2007) ("holding that a damaging disclosure that appears 'on its face unrelated to any fraudulent scheme' can be a basis for showing loss causation.")). "[A] disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions." *Id.* *See also* *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006)

***31** Plaintiff tells me that they "easily met the pleading standard." Defendants provide an additional four pages of arguments for why the allegations don't satisfy this standard. [DE 73 at 42; *see* DE 68 at 43–46.] Having determined that Plaintiff's allegations concerning the OBRC acquisition and threats to Inotiv's NHP business do not form a basis for its fraud claim due to inadequate allegations of scienter, I will set them aside for purposes of evaluating this element of the claim.

As summarized above, Plaintiff points me to a trio of "partial corrective disclosures" Defendants made after November 15, 2021 that relate back to their misstatements and omissions about Envigo and the issues at the Cumberland facility:

- *First*, Plaintiff alleges that on November 15, USDA posted its July 2021 inspection reports on its website and PETA issued a press release including links to copies of two of the reports. In response to this news, Inotiv's stock price fell by $2.80 per share, a decline of around 5%, to close at $52.75. [FAC. ¶ 260.]

- *Second*, on February 16, 2022, Inotiv filed its Q1 2022 Form 10-Q. [*See* DE 69-10.] Plaintiff tells me this is when Inotiv disclosed for the first time that during the period July through December 2021, USDA had inspected "one of Envigo's U.S. facilities" multiple times and "issued inspection reports with findings of non-compliance." [FAC, ¶ 261.] The company had appealed certain findings in the inspection reports but noted that "USDA has indicated ... it intends to conduct a formal investigation" that "could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation." *Id.* The same disclosure contained information pertaining to Envigo's receipt of a grand jury subpoena pertaining to its NHP-smuggling investigation. *Id.* When this news was revealed to the market, the price of Inotiv stock fell $4.73 per share, a decline of approximately 17%, to close at $23.59 per share. *Id.* The news allegedly continued to spread in the market and Inotiv's stock continued to get pummeled, falling another $3.30 per share, nearly 14%, to close at $20.29 per share on February 17, 2022. [6] *Id.*

- *Third*, on May 20, 2022, Inotiv made an announcement following the close of markets that (1) on May 19, 2022, law enforcement agencies had executed a search warrant on the Cumberland facility, and (2) the same day, DOJ had filed a civil enforcement action against Envigo in connection with AWA violations at the facility. [FAC, ¶ 262.] On May 23 (the next trading day), Inotiv's stock price fell by $5.19 per share, dropping approximately 28%, to close at $13.14 per share on high trading volume.

***32** Initially, Defendants make a fact-bound argument in connection with the November 2021 disclosure, asserting that it cannot support a theory of loss causation because Inotiv's "stock price quickly rebounded after an initial loss." [DE 68 at 43.] Whether or not the stock rebounded so as to undermine Plaintiff's theory of causation in this case strikes me as a premature fact dispute. *See, e.g.*, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d at 829 (noting Supreme Court's guidance in *Dura* that "pleading rules are not meant to impose a great burden upon a plaintiff" and finding loss causation allegations sufficient where they provided Defendants "with some indication of the loss and the causal connection that [they have] in mind"). Crediting the amended complaint's allegations as true, the market did respond to the publication of the USDA findings and PETA's press release, reflected in a 5% decline in the company's stock price day-over-day. Plaintiff plausibly ties the information back to Defendants' alleged misstatements and omissions about the conditions at the Cumberland facility that had resulted in repeated findings of noncompliance between July and November 2021 and that the company had been given opportunities to cure the conditions first documented in July 2021, but failed to do so.

Defendants get the better of their second argument, which is that the February 2022 disclosure came on the heels of its December 2021 Form 10-K, which as previously noted included a nearly identical risk disclosure regarding the USDA inspections. [*See* DE 68 at 44. *Compare* DE 69-8 at 8 (December 2021 Form 10-K), *with* DE 69-10 at 5 (February 2022 Form 10-Q).] This disclosure therefore did not "present facts to the market that are new, that is, publicly revealed for the first time." *Meyer*, 710 F.3d at 1197–98.

Finally, Defendants argue that Plaintiff cannot connect the stock drop following the May 2022 corrective disclosure revealing DOJ's execution of a search warrant at the Cumberland facility and filing of a civil complaint against Envigo to their fraud, as opposed to the market's reaction to those shocking facts. [DE 68 at 45.] This argument speaks past Plaintiff's allegations that this disclosure revealed the truth of Defendants' misrepresentations and omissions regarding the serious, repeated nature of the findings of noncompliance at the facility. [FAC, ¶¶ 161–85, 191–202, 206–30, 262.] It strikes me as another attempt to inject premature fact disputes into the analysis. Defendants also point out that the amended complaint alleges the DOJ action reported

conditions that were consistent with prior USDA inspection reports. *See id.*, ¶ 101. Viewing this allegation in isolation does not undermine the inference that, notwithstanding the consistency between the DOJ's allegations in the civil case and past violations identified and reported at the facility, the stock dropped partly due to the revelation that Defendants had been understating the seriousness of the government's reported findings and potential for fixing the issues in the absence of an enforcement action. That's information Plaintiff plausibly claims Defendants kept hidden from investors until it sprung into the public light in May 2022. In sum, for pleadings purposes Plaintiff has done enough: the amended complaint sufficiently alleges that the market responded to the May 2022 Form 8-K because it revealed the truth of Defendants' misstatements and omissions regarding the longstanding AWA violations identified at the Cumberland facility and the serious risk of an enforcement action, particularly in light of repeated failures to remediate the facility over the better part of a year in which the facility remained in flagrant noncompliance with the AWA.

I previously determined that Defendants' statements pertaining to its supply of NHPs and the subpoenas issued to Envigo and OBRC are not actionable for failure to plausibly allege Defendants' scienter. Some of those statements post-date the May 2022 Form 8-K. [FAC, ¶¶ 231–36.] Defendants point out that Plaintiff last purchased Inotiv stock on May 26, 2022. [DE 53-1 at 3.] Plaintiff argues that this does not affect the scope of its claim on behalf of the putative class given that the FAC alleges that the truth as to those matters was not fully revealed until November 2022. [DE 73 at 23 n.17.] But, as presently pled, the cited statements are not actionable, because Plaintiff does not provide a particularized set of facts supporting a strong inference of Defendants' scienter. The fact remains that Plaintiff did not buy any Inotiv securities after May 2022; it follows that Plaintiff cannot plausibly allege losses based on statements made after May 2022.

***33** The circuit has explained that it is "proper" to dismiss claims for "failure to allege loss causation" where a claim is predicated on statements or omissions made after a plaintiff's purchase of securities. *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992) ("Roots alleges that defendants made several statements following Roots' July 25th purchase that violate Rule 10b–5. Such post-purchase statements cannot form the basis of Rule 10b–5 liability, because the statements could not have affected the price at which plaintiff actually purchased.") (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755 (1975) (Rule 10b–5 proscribes only fraud in connection with the purchase or sale of securities)). *See also* *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 705 (N.D. Ill. 2005) (rejecting plaintiff's claim that "as long as he has standing based on some claim, he can state claims for which he does not have standing on behalf of putative class members," noting that "[m]any courts in this circuit have dismissed securities fraud claims in accord with th[e] principle" that "post-purchase statements cannot form the basis of Rule 10b–5 liability"). Therefore, Plaintiff's fraud claim is limited to losses allegedly tied to statements made prior to its purchase of securities—namely, in November 2021 and May 2022.

### II. Section 14(a) of the Exchange Act and Rule 14a-9

Section 14(a) of the Exchange Act prohibits soliciting proxies in violation of SEC rules and regulations. 15 U.S.C. § 78n(a)(1). The SEC's Rule 14a-9, in turn, prohibits proxy solicitation "by means of any proxy statement .... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). In the context of a proxy statement, a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991); *TSC Indus., Inc.*, 426 U.S. at 448–49. The elements of a claim under Section 14(a) are: "(i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970)).

The proxy solicitation claim has been brought against Inotiv, Leasure, and Taylor. In seeking its dismissal, Defendants reiterate their arguments for dismissal of the § 10(b) claim. Defendants' arguments as to materiality fail for substantially the same reasons discussed above. Plaintiff has sufficiently alleged that the alleged omissions rendered false or misleading information Defendants provided in their proxy in violation of Rule 14a-9.

Defendants further argue that the claim must go by the wayside because a § 14(a) plaintiff must plead both economic loss and proximate causation. [DE 68 at 47–48.] *Kuebler*, 13 F.4th at 645. They tell me that Plaintiff's allegation that it and members of the putative class suffered losses measured by "the difference between the value Inotiv shareholders received and Envigo's true value at the time of the acquisition"—in essence, that shareholders approved Envigo's acquisition for more than its true value—is insufficient under this standard. [FAC, ¶¶ 318–19.] Defendants point me to no fewer than six cases, including a case in this district, analyzing similar allegations and concluding that it does not suffice to allege loss causation for a proxy solicitation claim based on claims that a company's stock was undervalued at the time of a merger or that losses are equal to "the difference between the price [ ] stockholders received and the 'true value' of their shares." *See, e.g.*, *Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977, 1000 (S.D. Ind. 2018); *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *4 (D. Del. Feb. 1, 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022); *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, *11 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 603 (9th Cir. 2020). In *Trahan*, for example, the plaintiffs alleged that shareholders were induced to approve a merger by actionable misrepresentation and their damages were measurable by "the difference between the price [the acquired company's] shareholders received and the [acquired company]'s true value at the time of [the merger]." 308 F. Supp.3d at 1000.

***34** Plaintiff argues that these authorities are a little out of place, insofar as they involve claims by shareholders of *targets* of acquisitions who were deemed to have insufficiently alleged that they were given lesser consideration in mergers (*i.e.*, less value in the acquiring company's stock) than would have been the case in the absence of the defendants' alleged misstatements or omissions in proxy solicitations. [DE 73 at 48 n.44.] Defendants do not respond to this argument, while claiming that Plaintiff has "abandon[ed]" an "insufficient claim that shareholders approved the Envigo acquisition for more than its true value." [DE 74 at 21.]

Whatever value the foregoing cases have in this distinct context, Defendants are speaking past the relevant allegations. The amended complaint specifies when and by how much Inotiv's stock dropped following the alleged misstatements or omissions contained in Inotiv's proxy after information about Envigo and the issues at the Cumberland facility burst into public view and Defendants made partial corrective disclosures in November 2021 and May 2022. [*See* FAC, ¶¶ 256–60, 262, 309–13.] As for the § 10(b) claim, that suffices to plausibly allege loss causation supporting Plaintiff's proxy solicitation claim under § 14(a), so the proxy claim can proceed as pled.

### III. Control Person Liability Under § 20(a) of the Exchange Act

The final issue to address concerns Plaintiff's claims that Leasure and Taylor are liable as "control persons" under the Exchange Act. "Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and Section 15 of the 1933 Act, 15 U.S.C. § 77***o***, both set out 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). There are three elements to such a claim: (1) a primary violation of the securities laws; (2) the exercising of general control over the operations of the company; and (3) possession of "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Control person liability does not require any heightened pleading standard or scienter. *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 843 (N.D. Ill. 2000). Finally, any doubts as to whether or not dismissal is warranted is resolved in plaintiffs' favor because "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact

that cannot be determined at the pleading stage." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (internal citation omitted).

Defendants' sole argument for dismissal of the § 20(a) claims (Counts II, IV) is based on the failure to plead a primary violation of the securities laws. [DE 68 at 48.] Because I have concluded that Plaintiff adequately pleads primary violations of § 10(b) and § 14(a), Plaintiff may proceed with the § 20(a) claims against Leasure and Taylor, as well.

**ACCORDINGLY:**

For the reasons explained in this Opinion and Order, Defendants' motion to dismiss [DE 67] is **DENIED**.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1344784, Fed. Sec. L. Rep. P 101,837

**Footnotes**

1 Acknowledging that the putative class has not been certified, I will refer to Oklahoma Police Pension and Retirement System throughout this Opinion and Order as "Plaintiff."

2 It is unclear to me why there are two amended complaints, one at DE 52 and another, filed nine days later, at DE 53. Everyone seems to agree that the amended complaint docketed at DE 53 is the operative complaint, so that's the one I have analyzed and will cite to. I refer throughout this Opinion and Order to the amended complaint docketed at DE 53, the First Amended Complaint, as "FAC," for short.

3 A Form 8-K is filed by a publicly traded company after an unscheduled material event occurs; a Form 10-K, by contrast, is an annual report that is required to be filed by publicly traded companies each year.

4 Defendants seem to anticipate this possibility, in light of the unsettled law in this circuit, arguing in the alternative that Plaintiff fails to sufficiently plead a violation of Items 303, 103 and 105 in the first place. [*See* DE 68 at 21; DE 74 at 4.]

5 District courts have parsed similar allegations about "general disclosures that did not alert investors to [a] very particular, concrete, and grave risk[ ]" about the defendant's facilities and associated risks. *See, e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017) (risk disclosures that did not address facts plaintiffs alleged defendant knew of, including that certain facilities "*may not* comply with our standards," were materially false and misleading for pleadings purposes (emphasis added)); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583-84 (S.D.N.Y. 2016) (disclosures that the company was subject to scrutiny that "has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas" were insufficient as they "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation").

6 Bloomberg News attributed the precipitous decline, in part, to Inotiv's "disclos[ure] that [a] recently bought unit received a grand jury subpoena from Miami prosecutors investigating imports of primates from Asia," and another report published by an analyst at Lake Street Capital Markets attributed the declining stock price to factors including "new risks


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

added to the 10-Q related to one of Envigo's research model facilities [in Cumberland, Virginia] being non-compliant" and "a DOJ investigation of NHP suppliers." [FAC, ¶ 261.] The Lake Street report reflected that the Cumberland facility was not a big issue in the eyes of management, but that the issuance of the subpoena could be part of a bigger inquiry and the news could "carry negative repercussions" for the company. *Id.* That said, the FAC does allege that the stock price decline in February 2022 was caused, in part, by further disclosures regarding the Cumberland facility, including the disclosure of, as one analyst put it, "new risks added to the 10-Q related to [the Cumberland facility] being non-compliant." *Id.*

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT M

2025 WL 978229
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Monroe Division.

IN RE: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION II

CIV. ACTION NO. 3:23-1290
|
Signed March 14, 2025

## REPORT AND RECOMMENDATION

Kayla Dye McClusky, United States Magistrate Judge

***1** Before the undersigned Magistrate Judge, on reference from the District Court, are two motions filed by Defendants, a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) [doc. # 36] and a motion to take judicial notice of various materials for purpose of the motion to dismiss [doc. # 38], and a related motion to strike [doc. # 46] filed by Plaintiffs. The motions are opposed. For reasons detailed below, IT IS ORDERED that the motion to strike [doc. # 46] is denied and the motion to take judicial notice [doc. # 38] is GRANTED IN PART and DENIED IN PART. Furthermore, IT IS RECOMMENDED that the motion to dismiss be GRANTED.

## Background

From a relative high of $41.25 per share on September 8, 2014, the ten-year trajectory of Lumen Technologies, Inc., f/k/a CenturyLink ("Lumen" or the "Company")'s stock price has been markedly downward. [1] For example, on November 8, 2018, July 7, 2023, and October 2, 2023, Lumen's stock price closed at $14.89, $2.19, and $1.39, respectively, before finally bottoming out at $.98 per share on November 1, 2023. [2] In the latter half of 2024, Lumen's stock accorded beleaguered shareholders a modicum of relief when it briefly rebounded as high as ten-fold off its lows, before settling back down into the five-dollar range where it remains today. *Id.* By then, however, long-suffering Lumen shareholders had initiated not one, but two putative class action securities fraud cases against Lumen and its senior executives.

On March 3, 2023, affected shareholders filed suit to certify a putative class on behalf of all persons and entities who had purchased or acquired Lumen stock between **September 14, 2020,** and **February 7, 2023**. *See In Re: Lumen Technologies, Inc. Securities Litigation*, Civ. Action No. 23-0286 (W.D. La.) ("*Lumen I*"). The suit sought to recover damages stemming from alleged misleading statements made by Lumen and its senior management related to the rollout and implementation of Lumen's Quantum Fiber brand. *Id.* Following delays for briefing and to tend to the demands of other cases on its docket, the Court eventually granted defendants' Rule 12(b)(6) motion and dismissed the suit on October 30, 2024. *Id.*

Meanwhile, on September 15, 2023, a little over six months after *Lumen I*, an affected shareholder(s) commenced this latest putative federal securities class action to recover damages on behalf of all persons and entities ("Plaintiffs") that purchased or otherwise acquired Lumen securities between **November 8, 2018**, and **October 31, 2023** (the "Class Period"). Named Defendants include Lumen; Kate Johnson, Lumen's President and Chief Executive Officer ("CEO") since November 7, 2022 ("Johnson"); Chris Stansbury, Lumen's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 4, 2022 ("Stansbury"); Jeff K. Storey, Lumen's former President and CEO from May 23, 2018, until November 7, 2022 ("Storey");

and Indraneel Dev, Lumen's former EVP and CFO from before the start of the class period until April 1, 2022 (collectively, "Defendants") ("Dev"). (First Amended Class Action Complaint [doc. # 35] ("FAC"), Preamble, ¶¶ 1, 18-23, 42).

***2** Plaintiffs contend that Defendants are liable under federal securities laws because, during the Class Period, Defendants made various statements that were misleading when they failed to disclose that Lumen faced potentially significant civil and regulatory liability from pre-1960 lead-sheathed copper telephone cables that its predecessor-in-interest, AT&T, placed in the ground, underwater, or suspended overhead, for which Lumen assumed responsibility via its acquisition of a former AT&T sub-entity.

On July 9, 2023, following an 18-months-long investigation, the *Wall Street Journal* ("*WSJ*") shined a national spotlight on the issue when it published the first in a series of articles documenting the dangers posed by legacy AT&T lead-sheathed copper telephone cables. The next day, Lumen's stock fell by almost six percent. Over the next week, the *WSJ* issued at least five more articles on the topic that caused further erosion of Lumen's stock price.

On August 1, 2023, Chris Stansbury, Lumen's EVP and CFO, admitted that "[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but "less than 5% of our approximately 700,000-mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure." (FAC, ¶ 234). The next day, Lumen's stock price declined by almost 12 percent. *Id.*, ¶ 366.

Stansbury's estimate that *less than* 5% of Lumen's 700,000-mile copper network contains lead is the equivalent of *up to* 34,999 miles of lead-sheathed cable. Borrowing an estimate of $33.43 per foot to remove buried cables tendered by a remediation expert in a 2016 class action lawsuit filed by Texas landowners against AT&T, *see Cook v. AT&T Corp.*, Civ. Action No. 16-0542 (S.D. Tex) and discussion, *infra*, Plaintiffs extrapolate that Lumen is facing a contingent liability of $6.2 billion to remove and remediate the up to 34,999 miles of lead cable that it currently owns. (FAC, ¶¶ 5, 194-195, 384). [3] Plaintiffs further speculate that the cost of removal could reach as high as $23.3 billion if, instead, one were to use a $126.6 per foot estimate to remove the lead cable. *Id.*, ¶ 385. [4] In other words, Lumen's potential liability to remove the lead-sheathed cables is daunting.

In the wake of the *WSJ* articles, shareholders of AT&T and Verizon filed federal securities class action lawsuits against their respective companies on July 28 and August 18, 2023. [5] Sensing an opportunity, Plaintiff John McLemore filed the instant suit against Lumen and the individual Defendants on September 15, 2023. (Compl. [doc. # 1]). As stated above, Plaintiffs seek to maintain this suit as a class action to recover compensatory damages against Defendants on their own behalf and on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240. (FAC [doc. # 35], ¶¶ 1, Prayer). The suit also seeks an award of reasonable costs and attorney's fees incurred in the action. *Id.*

***3** On November 14, 2023, Chris Goodwin [doc. # 11], Daniel Safer [doc. # 12], and Michael Glauber [doc. # 13] filed competing motions for appointment as lead plaintiff and approval of selection of counsel. On December 8, 2023, the Court granted Michael Glauber's motion and appointed him as lead plaintiff in this matter and approved his selection of Pomerantz, L.L.P., as Lead Counsel, together with the O'Bell Law Firm, L.L.C., as Liaison Counsel, for the Class. (Mem. Order [doc. # 26]). The competing motions were withdrawn or denied.

On December 28, 2023, the Court entered the parties' proposed scheduling order, which included a February 26, 2024 deadline to file an amended complaint, together with extended briefing deadlines for the anticipated motion to dismiss. (Order [doc. # 34]).

On February 26, 2024, Lead Plaintiff Michael Glauber and additional Plaintiff John McLemore (collectively, "Plaintiffs") duly filed the FAC. [doc. # 35].

On April 26, 2024, Defendants filed the instant motion to dismiss for failure to state a claim upon which relief can be granted. [doc. # 36]. They contemporaneously filed a motion to take judicial notice of various documents for the purpose of the motion to dismiss. [doc. # 38]. Unfortunately, however, the latter motion was filed nineteen minutes past midnight, and, thus, was docketed as filed on April 27, 2024. *Id.*

On June 25, 2024, Plaintiffs filed the instant motion to strike Defendants' motion to take judicial notice on the grounds that it was untimely, seeks to introduce exhibits that are not appropriate for judicial notice, and because it seeks to circumvent page limitations by presenting additional argument in support of the motion to dismiss. [doc. # 46].

On June 26, 2024, Plaintiffs filed their opposition to Defendants' motion to take judicial notice of certain documents. [doc. # 50].

On June 27, 2024, Plaintiffs filed their opposition to Defendants' motion to dismiss. [doc. # 52].

On July 17, 2024, Defendants filed their opposition to Plaintiffs' motion to strike. [doc. # 53].

Plaintiffs filed their reply in support of their motion to strike on July 24, 2024. [doc.# 54].

Finally, Defendants filed their reply memoranda in support of their motions to take judicial notice and to dismiss on August 9 and August 12, 2024, respectively. [doc. #s 55 & 58]. Accordingly, briefing on the pending motions is complete; the matter is ripe. [6]

**Plaintiffs' Allegations**

The facts, at the pleading stage, are drawn from the operative pleading, which, in this case, is the First Amended Class Action Complaint ("FAC"). [7] The FAC consists of 165 pages of allegations and pertinent background information, including disclosures from confidential witnesses. The Court will recite or paraphrase provisions of the FAC, generally following the outline employed by Plaintiffs. For brevity's sake, the Court will omit unsupported, conclusory, irrelevant, redundant, or cumulative allegations. Nonetheless, the Court has familiarized itself with the entire pleading and Plaintiffs' thorough and exhaustive contentions.

**A. Overview**

***4** Previously known as CenturyLink, Lumen is a large telecommunications company based in Monroe, Louisiana. (FAC, ¶ 32). Unlike its peers, AT&T and Verizon, Lumen primarily has focused on wireline services, i.e., services based on physical cable plant, as opposed to mobile or wireless technology. *Id.* Since its formation in 1968, Lumen grew to become the third largest wireline telecommunications company in the United States by acquiring other major wireline providers or their cable assets, including Pacific Telecom, Embarq, Verizon, Qwest, and Level 3. *Id.*, ¶¶ 32-41.

By the start of the Class Period in 2018, Lumen owned an extensive network of "legacy" copper telephone cables, as well as a separate network of newer, high-speed fiber optic cable. *Id.*, ¶¶ 46-47. Lumen was required by law to maintain its copper wire assets in certain locations. To introduce competition to the telecommunications market following the breakup of the Bell System in 1994, Congress passed the Telecommunications Act of 1996 ("the Telecommunications Act"), which substantially amended the Communications Act of 1934, the primary federal law governing telecommunications in the United States. Among other things, the Telecommunications Act required incumbent wireline companies, each referred to as an incumbent local exchange carrier ("ILEC"), to not only maintain their copper wireline network, but also open it to any other companies wishing to use it. *Id.*, ¶ 48.

In October 2022, Lumen divested almost 400,000 miles of its "legacy" assets in 20 states, including Louisiana, via sale to the private equity firm, Apollo Global Management, Inc. ("Apollo"), under the brand name, Brightspeed. (FAC, ¶ 5, 49-50). Even so, Lumen still retained approximately 700,000 miles of copper cable. *Id.*, ¶ 111.

Since before the start of the Class Period, Lumen has proclaimed that being a good "corporate citizen" is one of its top priorities and, to that end, has maintained an Environment, Health & Safety and Sustainability framework as part of its Environmental, Social, and Government ("ESG") program. (FAC, ¶ 52). This framework focuses on six key areas, including, among others, "environmental compliance and management," "occupational health and safety," and "waste." *Id.*

Lumen's Environmental, Health & Safety Department ("EHS") is the business unit charged with responsibility for carrying out each of the elements of the Company's Environmental Health & Safety and Sustainability framework. (FAC, ¶ 53). Since 2015, Lumen has published an annual ESG report highlighting its ESG efforts for its stakeholders and the communities in which it operates. Before 2019, the report was known as the Corporate Social Responsibility ("CSR") report. *Id.*, ¶ 54.

**B. Lead Is a Well-Known Toxin Extremely Harmful to Human Health**

Lead is a brittle heavy metal that can release unnoticeable particles on contact. (FAC, ¶¶ 56, 59). In this form, lead is a potent neurotoxin that can cause major damage to nearly every major body system in humans. *Id.*, ¶ 60. Exposure of this type can produce a range of severe health conditions, including impaired cognition, organ failure, coma, birth defects, and, in extreme cases, death. *Id.*, ¶ 62. Children are acutely vulnerable. *Id.*, ¶ 63.

Due to its unique physical properties, lead was used ubiquitously as a common industrial material until its dangers became better understood in the mid-twentieth century. *Id.*, ¶¶ 58, 66.

Since the 1970s, the U.S. government has taken a series of well-known steps to protect the public from lead and to eradicate its continued use. Among other things, it banned the use of lead in residential paint, gasoline, and pipes used in public water systems. *Id.*, ¶¶ 67-68, 72, 75. Through these measures, the dangers of lead have become widespread public knowledge and there is almost universal public consensus that lead is extremely harmful to human health. *Id.*, ¶ 76.

***5** Nevertheless, lead still remains in certain industries. *Id.*, ¶ 77. As such, the Occupational Safety and Health Administration, better known as "OSHA," has promulgated stringent occupational safety standards for workers who handle lead. *Id.*, ¶¶ 78-82. These standards set rules on exposure limits, monitoring, employee training, compliance controls, and personal protective equipment ("PPE"). *Id.* It is recognized that occupational exposure is one of the leading causes of lead poisoning. *Id.*, ¶ 77.

Lead is also harmful to plants and wildlife and poses a threat to surrounding communities when released into the environment. *Id.*, ¶¶ 86-87. As such, there are several laws that govern the handling or disposal of lead, including the Resource Conservation and Recovery Act of 1976 ("RCRA"). *Id.*, ¶ 88. Lead is classified as a "hazardous waste" under the RCRA, along with arsenic and mercury. *Id.*, ¶ 89. The Environmental Protection Agency ("EPA") has broad power under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), also known as the "Superfund" law, to investigate and order the cleanup of any toxic waste that is released into the environment, including lead. *Id.*, ¶ 91.

In short, lead has been recognized as a harmful environmental contaminant for decades. *Id.*, ¶ 93.

**C. The Lead in Lumen's Copper Network**

Until it was phased out in the 1950s, lead was the industry standard protective covering, or "sheathing," for telephone cables and used pervasively by the companies that built out the nation's telephone network, including, most notably, those in the Bell System. (FAC, ¶¶ 95-96, 99-102). In fact, by the 1950s, approximately 90% of all telecommunications wire was sheathed in lead and, thus, foundational to the prolific growth of the telecommunications industry and its wireline network. *Id.*, ¶ 96. Lumen added lead-covered cables to its network by acquiring wireline assets from the so-called, "Baby Bells," created by the federal government's breakup of the Bell System in 1984 or otherwise owning companies that operated prior to the phase out of lead. *Id.*, ¶¶ 98, 105. Specifically, Lumen acquired (i) Pacific Telecom in 1997, including the telephone lines that it recently had

purchased from US WEST; (ii) regional copper wire access lines from Verizon in 2002; and (iii) Qwest in 2011, including all of the copper wireline assets that it inherited from US WEST. *Id.*

Even after the Brightspeed transaction, Lumen retained up to 34,999 miles of lead-covered cable spread across its nationwide network of copper telephone cables. *Id.*, ¶ 111. Frontline workers tasked with maintaining this network frequently encountered lead cables across the geographies where Lumen operates, especially in the oldest parts of its network that envelop densely populated metropolitan areas, including Denver, Las Vegas, Minneapolis, Portland, Salt Lake City, Seattle, and elsewhere. *Id.*, ¶¶ 107-09. This ancient hardware sits in piles in underground vaults, hangs on utility poles overhead, and runs directly into residential buildings. *Id.*

**D. Lumen's Practices Were Inconsistent with its ESG Goals**

Before the start of the Class Period, the majority of Lumen's revenues derived from products and services that relied on its copper telephone lines, like local and long-distance calling and DSL internet access. (FAC, ¶¶ 40, 45). However, its revenues were progressively declining as demand for these legacy services subsided with the proliferation of higher-speed alternatives like wireless and highspeed internet. *Id.*, ¶ 40. On November 1, 2017, Lumen completed a $34 billion transaction to acquire Level 3 Communications, Inc., a leading provider of fiber optic services to business, or "enterprise," clients. *Id.*, ¶ 41.

***6** On November 8, 2018, Storey announced a new strategic direction for Lumen which involved winding down its copper-based services and becoming a leading provider of fiber optic technology as part of an ongoing "digital transformation." *Id.*, ¶ 115. One key "pillar" of this vision was taking costs out of the legacy business and managing it for cash. *Id.*, ¶¶ 382, 408. This decision was based on Storey taking a "hard look" on whether Lumen should be in the "consumer fiber business" and the "consumer copper business." *Id.*, ¶ 408. Storey decided that they should manage copper for cash in markets where that made sense and invest in fiber where that made sense. *Id.*

Consistent with the goal of establishing itself as a next generation leader, in mid-2019, CenturyLink enhanced its sustainability reports to provide more robust disclosures around its corporate citizenship and ESG initiatives. *Id.*, ¶ 54. Then, in 2020, CenturyLink officially rebranded as "Lumen" as part of its ongoing plan to transform into a leader for the "4th Industrial Revolution." *Id.*, ¶ 43.

During the Class Period, Defendants regularly spoke about Lumen's "digital transformation" program and touted its ESG efforts. Call after call, they told investors that they were "replacing" legacy infrastructure with fiber and that doing so would yield substantial cost savings. *Id.*, ¶¶ 260-83. Meanwhile, in its ESG disclosures, Lumen represented that it was "actively making choices to lessen [its] environmental impact" and had programs in place to "ensure the appropriate disposition of hazardous waste." *Id.*, ¶¶ 305-35. It even specified that it "recycles telecommunications equipment," such as "copper wire." *Id.*

However, multiple confidential witnesses, who were frontline workers for Lumen/CenturyLink testified that Lumen was not "recycling" or "replacing" the lead cables in its copper network once retired; rather, it was retiring or abandoning the cables in place. *Id.*, ¶¶ 383, 117-123. According to the anonymous frontline workers, the decision to abandon the cables in place was not about safety, but always motivated by financial considerations. *Id.*, ¶¶ 118, 123.

The Company also repeatedly touted its commitment to providing a workplace "free" from hazards. *Id.*, ¶¶ 284-304. As part of this commitment, Lumen said that it regularly reviews "safety performance" to identify gaps that need improvement. *Id.*

Again, however, multiple confidential witnesses, who were frontline workers for Lumen/CenturyLink, stated that Lumen had no control measures in place to ensure adherence to lead safety protocols and no efforts to enforce safety guidelines. *Id.*, ¶¶ 113-14. Consequently, there was rampant noncompliance with the OSHA lead standard, exposing Lumen's workforce to lead poisoning. *Id.*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**E. Indications that Lumen Was Aware of the Dangers Posed by Lead-Sheathed Cables**

Since 2010, Lumen has reported its retirement of copper wireline to the Federal Communications Commission ("FCC"). *Id.* ¶¶ 182-88. "Retirement" under the FCC regulations, includes "removing or disabling." *Id.* [8]

At a 2010 symposium held by the Environmental, Health & Safety Communications Panel ("EHSCP"), [9] a senior manager of EHS at AT&T gave a presentation titled, "Lead Exposure in Outside Plant Operations," in which he discussed EHS concerns raised by continued use and/or abandonment of such cables. *Id.*, ¶¶ 125-137. One of the slides from the conference cautioned that "[s]ome older metropolitan areas may still have over 50% lead cable." *Id.* The presentation explained that a variety of lead-based compounds can "leach" to the surface of the sheathing over time and become "airborne," posing a risk to employees working on the cable and the surrounding environment. *Id.* Another slide emphasized that "soils retained between 83 and 98 percent of the released lead **within 2 inches**" from such cables. *Id.* Over the years, various Lumen EHS managers have attended EHSCP events and/or participated on EHSCP committees. *Id.*

***7** In late 2012, a CenturyLink technician in Minnesota began feeling physical discomfort following work in a manhole that contained a lead-filled telecommunications cable. (FAC, ¶145-163). Blood samples from the worker and his children showed elevated levels of lead in their blood. *Id.* A confidential witness confirmed that CenturyLink did not perform air monitoring as required by the OSHA lead standard. *Id.* When the matter was brought to the attention of a CenturyLink EHS senior manager, the manager took the position that the lead might have come from a non-work source(s). *Id.* Accordingly, the worker filed a complaint with the Minnesota Occupational Safety and Health Administration ("MNOSHA"). *Id.*

On July 9, 2013, following an investigation, MNOSHA cited CenturyLink for ten violations of the lead standard, which it classified as "serious." *Id.* MNOSHA required CenturyLink to abate the conditions and pay a $21,600 penalty. *Id.* On September 10, 2013, CenturyLink and its union agreed to a settlement proposed by MNOSHA that required CenturyLink to administer a lead abatement program to bring it into compliance with the OSHA lead standard. *Id.* By November 2013, CenturyLink and its union agreed to a nationwide expansion of the lead abatement program established by the MNOSHA Settlement Agreement. *Id.*

Defendants, Storey, Dev, Johnson, and Stansbury were aware of dangers posed by lead because, over the years, they were required to acknowledge receipt of EPA-approved pamphlets detailing the dangers of lead paint associated with the sale/purchase of older residences. *Id.*, ¶¶ 374-81.

From 2010 through at least 2020, Lumen filed reports with the EPA disclosing that a total of three, out of its 250 *facilities* that handled hazardous waste, contained lead. *Id.*, ¶¶ 174-81.

**F. Two Cases Filed Against AT&T Show that Lumen was Aware of Liability Stemming from Abandoned Lead-Covered Cables**

On March 1, 2016, six Texas landowners filed a putative class action against AT&T, seeking "damages for pollution of their land," among other things. (FAC, ¶¶ 193-196); *Cook v. AT&T Corp.*, Civ. Action No. 16-00542 (S.D. Tex.) (the "Texas Action"). According to the Texas Action, in the 1950s, the plaintiffs and other landowners granted AT&T's predecessor an easement to lay its lead cables along their properties. *Id.* Thereafter, AT&T's predecessor "buried a six-inch cable within the easement." *Id.*

The Texas Action alleged that the lead cables were still on the plaintiffs' land, but were in disrepair and had been cut in multiple places. *Id.* The suit further claimed that,

> [t]he buried cable "contains lead ... Corrosion of the lead sheath on this type of cable is a mechanism that can result in lead being released to the environment. Such corrosion is a common occurrence with older cables, especially when the cable is cut or damaged. Cables of the type used on [p]laintiffs' property require routine inspection and maintenance. If the cover surrounding the lead is damaged, the lead will contaminate the immediate area. The Environmental Protection Agency has stringent rules for the storage and disposal of lead.

The plaintiffs added that the lead cable coverings were "badly damaged" and that the lead was "directly contacting the soil" on their land. *Id.* Moreover, the lead cable was continuing to deteriorate and "contaminate the subsurface of the [p]laintiffs' real property." *Id.*

Although plaintiffs in the Texas Action survived summary judgment, they later voluntarily dismissed their claims in February 2020. *Id.*

On January 14, 2021, an environmental group called California Sportfishing Protection Alliance filed suit against Pacific Bell Telephone Company ("Pac Bell"), an AT&T subsidiary in the United States District Court for the Eastern District of California. *See Cal. Sportfishing Protection Alliance v. Pac. Bell Tel. Co.*, Civ. Action No. 21-0073 (E.D. Cal.) (the "Lake Tahoe Action") (FAC, ¶¶ 197-201). The lawsuit asserted claims under the RCRA and the California State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65"). *Id.* According to the complaint, there were/are approximately 41,600 feet (approximately 7.9 miles) of lead cables owned by Pac Bell located at the bottom of Lake Tahoe: "The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick.... Each foot in length of the cables contains approximately 3.3 pounds of lead." *Id.*

***8** The Lake Tahoe Action alleged that these lead-sheathed cables have been abandoned and left to decay away in the water of Lake Tahoe. *Id.* A portion of the lead cables were removed and tested to determine if the cables were likely to leach lead into the Lake Tahoe water. *Id.* Based on testing results, "[a] *reasonable inference* ... can be drawn ... that lead in the [c]ables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead." *Id.* (emphasis added).

In September 2021, the parties in the Lake Tahoe Action agreed on a proposed consent decree that required Pac Bell to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million." *Id.*

By the time of the *WSJ* exposé in July 2023, however, Pac Bell still had not removed the underwater cables. Once the story was released, AT&T informed the court that it no longer wished to abide by the consent decree. *Id.* AT&T explained that "in 2021, [it had] agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense of litigation." *Id.* Instead, it now proposed that, "the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than sensationalized media coverage." *Id.*

**G. The Wall Street Journal Articles and Subsequent Disclosures**

On July 9, 2023, the *Wall Street Journal* ("*WSJ*" or "Journal") published an article titled, "America is Wrapped in Miles of Toxic Lead Cables." (FAC, ¶ 218). The article reported, in pertinent part, that,

> AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.
>
> * * *
>
> Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency.
>
> * * *
>
> For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially

> leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.
>
> * * *
>
> In response to the Journal's reporting, AT&T, Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.
>
> * * *
>
> American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.
>
> When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.
>
> ***9** With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.
>
> * * *
>
> The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, **and dropped within a few feet—a sign the lead was coming from the cable, experts said**.
>
> **The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.**
>
> * * *
>
> Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." **Other experts said covering the cables and the area around them could reduce the risk**.

(FAC, ¶ 218) (emphasis added). The next day, Lumen's stock closed down almost six percent. *Id.*, ¶ 353.

By the evening of July 9, 2023, the United States Telecom Association ("USTelecom"), an industry trade association for telecommunications-related businesses, had created a website to dispute the environmental and public health impacts of lead cables, titled, "Telecom Cable Facts." (FAC, ¶ 223). Among other things, the site declared in bold letters, **"[w]e have not seen, nor have U.S. regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue**." *Id.* It added that, "[t]he presen[ce] of lead in soil, sediment, or water is not sufficient to conclude that the source of lead is telecom cables." *Id.* Furthermore, "[r]isks associated with legacy lead-sheathed telecom cables are mitigated by the nature of the material, their location, coatings on them, conduits surrounding them, and other factors" and most "are generally in locations that minimize the potential for public contact." *Id.* Finally, the site asserted that, "in some situations, telecom cables are appropriately left in place when no longer in current use and may stand by to be used if and when needed," as "with many other types of infrastructure, such as rail lines or pipelines." *Id.*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

The *WSJ's* story took many—including those intimately familiar with the telecommunications industry—by surprise. (FAC, ¶ 219). *Fierce Telecom*, a publication dedicated to the telecommunications industry, ran a story on July 10, 2023, about the *WSJ*'s report, stating that "**the lead-covered telco cables seem to have flown under the radar, until now**." *Id.* Analyst Craig Moffett of SVB MoffettNathanson, who covered the industry for more than 20 years said, "we had never previously encountered the topic of lead in telecom networks." *Id.* Four former FCC Chairs told the Journal that they were unaware of lead in legacy copper wire networks. *Id.*

On July 11, 2023, USTelecom provided a statement to the *WSJ*, declaring that, "[w]e have not seen, nor have regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue." (FAC, ¶ 224).

After the close of trading on July 11, 2023, the *WSJ* published another story in its series on lead cables titled, "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After WSJ Investigation." *Id.*, ¶ 354. That article revealed that a number of Congressmen were demanding that the owners of the lead telecom cables take immediate action to protect Americans and revealed that regulators were evaluating enforcement options. *Id.* The article stated, in part,

> ***10** [t]he Federal Communications Commission, which regulates telecom companies, said it has reached out to the EPA and the White House Council on Environmental Quality about the issues raised by the Journal's report and stands "ready to assist addressing these public health concerns."
>
> "We take seriously the concerns raised about potential lead exposure from communications lines—including the infrastructure that first connected so many remote and rural parts of the country," an FCC spokesperson said. "We are currently looking into what authorities may exist under the Communications Act to address this issue."

*Id.* On this news, Lumen's stock fell one and one-half percent from $2.07 on July 11, 2023 to close at $2.04 on July 12, 2023. *Id.*, ¶ 356.

On July 14, 2023, the business section of the *WSJ*, published a report entitled, "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables," which estimated that it could cost the industry as much as $59 billion to clean up the lead cables and specifically identified Lumen as one of the most exposed, behind only AT&T and Verizon. *Id.*, ¶ 357. On this news, Lumen's stock price declined 10.2 percent to close at $1.85 on July 14, 2023. *Id.*

On the morning of July 17, 2023, the *WSJ* released yet another article entitled, "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." *Id.* ¶ 359. The article stated, in pertinent part,

> [t]hree environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies. In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

*Id.* On this news, Lumen's stock price declined a little over eight percent to close at $1.70 for the day. *Id.*, ¶ 360.

On the morning of July 18, 2023, the *WSJ* reported that "[s]maller carriers" including "Lumen have seen their shares plunge 34% and 22%, respectively, on worries about their larger reliance on wireline services" since the Journal's report first ran on July 9, 2023. *Id.*

Also on July 18, 2023, *Fierce Telecom* ran a story that contained a quote from a Lumen spokesperson which confirmed for the first time that the Company was "working with outside experts to prioritize and sequence our investigative efforts, including site testing and implementation of science-based steps where advisable." *Id.*, ¶ 361. Lumen's stock closed at $1.62, a drop of 4.71 percent. *Id.*, ¶ 362.

After the close of trading on July 26, 2023, the *WSJ* released another article in its lead cable series titled, "Justice Department and EPA Probe Telecom Companies Over Lead Cables," stating, in pertinent part,

> [t]he Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead-sheathed telecom cables across the U.S.
>
> * * *
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

***11** *Id.*, ¶ 363.

On August 1, 2023, at its first earnings call since the exposé, Stansbury, Lumen's EVP and CFO, stated that "[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but "less than 5% of our approximately 700,000-mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure." (FAC, ¶ 234).

That same day, Lumen released its quarterly report on Form 10-Q with the SEC for the second quarter of 2023, which revealed that its lead-clad cables posed a previously undisclosed risk of loss to investors: "[i]n the past we acquired companies that installed lead-sheathed cables several decades ago, or operated certain manufacturing companies in the first part of the 1900s. Under applicable environmental laws, we could be responsible for environmental liabilities arising from the historical operations of our predecessors." *Id.*, ¶ 366. The next day, Lumen's stock price declined by almost 12 percent. *Id.*

On October 31, 2023, Lumen released its quarterly report on Form 10-Q with the SEC for the third quarter of 2023, stating that,

> [o]ur network includes some residual lead-sheathed copper cables installed years ago. These lead-sheathed cables constitute a small portion of our network. **Due to recent media coverage of potential health and environmental risks associated with these cables**, we anticipate incurring certain investigative costs. We also may include other costs from related proceedings, including litigation, regulatory initiatives, and remediation.

*Id.* ¶ 368 (emphasis added). The next day, Lumen's stock price dropped 32.8 percent to close at its Class Period and all-time low. *Id.*

**Motion to Dismiss Standard and Extrinsic Documents**

Defendants seek dismissal of Plaintiffs' claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. However, "[a] dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to

state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997) (citation omitted). Furthermore, in a securities case, a Rule 12(b)(6) motion must consider not only the strict pleading requirements of Rule 9(b), but also that of the Private Securities Litigation Reform Act. *Hall v. Rent-A-Ctr., Inc.*, Civ. Action No. 16-0978, 2017 WL 6398742, at *6 (E.D. Tex. Oct. 19, 2017), *R&R adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (citations omitted). Accordingly, the Court will begin with a recitation of the usual Rule 12(b)(6) standard and then address the ancillary motions.

**A. Rule 12(b)(6) Standard of Review**

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A pleading states a claim for relief, *inter alia*, when it contains a "short and plain statement ... showing that the pleader is entitled to relief ..." FED. R. CIV. P. 8(a)(2). Of course, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," that is, a plaintiff must "specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (quoting FED. R. CIV. P. 9(b)) and *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citations omitted).

***12** To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between. *See* *Iqbal*, 556 U.S. at 678. Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *See* *Twombly*, 550 U.S. at 556. Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Twombly*, 550 U.S. at 555. A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id.* "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010) (citation omitted).

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly*, 550 U.S. at 556. Nevertheless, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319 (1989).

**B. Motion to Strike**

By this motion, Plaintiffs seek a court order striking: (1) Defendants' Motion to Take Judicial Notice; (2) the exhibits that are the subject of the foregoing motion; and (3) the appendices attached to Defendants' motion to dismiss. Plaintiffs urge the Court to strike items (1)-(2) because Defendants filed their motion nineteen minutes past midnight of the purported April 26, 2024 deadline and because a significant swathe of the documents that form the basis for the motion to take judicial notice should not be considered by the Court. Plaintiffs contend that the item (3) documents should be stricken because they represent an impermissible backdoor attempt to exceed the page limits for Defendants' motion to dismiss.

While the importance of Court-imposed deadlines and page limits is self-evident, here, Plaintiffs have suffered no more than negligible prejudice. Although other courts may permit such gamesmanship, this Court is not. The undersigned is not inclined

to grant a pedantic request for relief to redress *de minimis* transgressions premised upon a 19-minute delay or for purportedly exceeding page limitations via additional appendices when the Court concomitantly had expressed its willingness to permit *both* sides to exceed ordinary page limits. *See* doc. #s 39 & 51 and FED. R. CIV. P. 1 (federal rules should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding). It is always the goal of the undersigned magistrate judge to treat counsel and litigants fairly and equally.

Furthermore, Plaintiffs ask the Court to strike the exhibits that form the basis for Defendants' motion to take judicial notice for the same reasons that they opposed Defendants' motion on the merits. In other words, Plaintiffs' argument in support of their request to strike those exhibits is redundant. [10]

***13** For the foregoing reasons, IT IS ORDERED that Plaintiffs' motion to strike [doc. # 46] is DENIED. [11]

**C. Motion to Take Judicial Notice**

In assessing whether plaintiffs' claims survive a Rule 12(b)(6) motion to dismiss, "the factual information to which the court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (citations omitted). The Court also may consider documents that a defendant attaches to its motion, so long as the documents are referred to in the complaint and are central to the plaintiff's claims. *Id.* (citing, *inter alia, Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must consider the complaint, plus documents incorporated into the complaint by reference, and matters of which a court may take judicial notice). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). When taking judicial notice, however, the courts generally are limited to recognizing the existence of a document, rather than taking as true potentially disputed factual statements or findings contained within that document, unless the facts themselves satisfy the Rule 201(c) criteria. *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998).

In their motion to take judicial notice, Defendants ask the Court to consider 37 exhibits. Plaintiffs do not object to fifteen of the exhibits, Exh. #s 3-8, 23, 25-31, & 37, for the limited purpose of identifying what was said to the public, but not for the truth of the matters stated therein. (Pl. Opp. Brief, pg. 1 [doc. # 50]).

Ultimately, the motion is moot because the Court has not relied on any of the documents submitted by Defendants. *See* discussion, *infra.* Nonetheless, the Court will grant the motion as to those documents that are unopposed for the limited purpose of identifying what was said to the public, but otherwise deny the remainder of the motion as moot. Accordingly,

IT IS ORDERED that Defendants' motion to take judicial notice [doc. # 38] is GRANTED IN PART, as to the unopposed Exhibit #s 3-8, 23, 25-31, & 37. The motion otherwise is DENIED IN PART, as moot. [12]

**§ 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**

**A. Overview**

***14** Plaintiffs' first count against Defendants is for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), together with Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (FAC, ¶¶ 433-441).

Section 10(b) of the Securities Exchange Act provides that,

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to its rule-making authority, the SEC made it unlawful for anyone:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)).

Although, by its terms, the Securities Exchange Act does not authorize a private cause of action for § 10(b) violations, the Supreme Court has recognized an implied right of action in the words of the statute and its implementing regulation. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n.9 (1971)). "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citation omitted); *see also* *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

In an effort to curb the perceived abuse of federal securities laws by private plaintiffs, [13] Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). The PSLRA enhanced the particularity requirements for pleading fraud in two ways. "First, plaintiffs must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...' Second, for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *In re: Shaw*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u-4(b)(1)(B)& (2)). Only the latter requirement alters the usual contours of a Rule 12(b)(6) ruling. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). In other words, under Rule 12(b)(6), courts must draw all reasonable inferences in the plaintiff's favor. *Id.*

***15** However, "for scienter only, as required by the PSLRA, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* (citations and internal quotation marks omitted). Thus, to adequately plead scienter in a § 10(b) action, plaintiffs must set forth facts that render "an inference of scienter **at least as likely as any plausible opposing inference**." *Lormand*, 565 F.3d at 250 (citing *Tellabs, Inc.*, 551 U.S. at 324) (emphasis added). Ultimately, the inference of scienter must be "cogent and compelling," not merely "reasonable" or "permissible." *Lormand*, 565 F.3d at 239

(citations omitted). "[W]here there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2)." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

**B. The Challenged Elements of Plaintiffs' Claim under Section 10(b) of the Exchange Act and SEC Rule 10b5**

Defendants contend that Plaintiffs fail to adequately plead: (a) the required strong inference that any Defendant acted with scienter (i.e., fraudulent intent or severe recklessness); (b) the existence of any actionable misstatements or omissions; or (c) loss causation.

First, they argue that Plaintiffs do not satisfy the PSLRA's heightened standard for pleading scienter (i.e., fraudulent intent), which requires Plaintiffs to establish a "cogent and compelling" inference that each Defendant knew, or was severely reckless in not knowing, that the Company should have disclosed a significant financial exposure caused by health or environmental risks relating to lead-sheathed cables

Second, Defendants assert that the alleged misstatements in the FAC are non-actionable because none of them address the topic of lead-sheathed cables, and, therefore, the supposed omission of information about those cables did not render the statements misleading. Defendants further maintain that all of the statements are either immaterial puffery, accurate statements of historical fact, forward-looking statements protected by the PSLRA's safe harbor, or nonactionable opinion statements.

Finally, Defendants argue that Plaintiffs fail to adequately plead the existence of "corrective disclosures" that revealed the supposed fraud and caused them losses. The *WSJ* articles did not contain any revelations about Lumen's lead-sheathed cables. Moreover, Lumen's subsequent disclosures that the negative attention from the articles might generate legal actions are statements about future risks related to lead-sheathed cables and did not inform investors that the Company's prior assessments about the risks it faced were incorrect.

The Court will set forth generally applicable law regarding actionable misstatements or omissions, scienter, and loss causation, before proceeding to analyze the sufficiency of Plaintiffs' allegations.

i) Material Misrepresentations or Omissions

"Commission Rule 10b–5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.' " *Lormand*, 565 F.3d at 238 (citing 17 C.F.R. § 240.10b–5). "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.' " *Matrixx Initiatives, Inc.*, 563 U.S. at 38 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand*, 565 F.3d at 248 (citations omitted). Under Rule 10b-5, a defendant has a duty to speak the full truth when that defendant elects to speak on a matter. *Id.* at 249 (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)). In other words, "[o]nce the defendants engaged in public discussions ... they had a duty to disclose a 'mix of information' that is not misleading." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("*In re: Six Flags*") (citing *Lormand*, at 248-49).

***16** Although the duty to disclose does not extend to every fact or assumption underlying a prediction, the defendant must disclose "material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249. Therefore, "[t]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only

possible for the unfavorable events to happen when they have already occurred is deceit." *Lormand*, 565 F.3d at 249 (quoted sources and internal quotation marks omitted).

Nonetheless, a "claim of incomplete disclosure is actionable only if what [defendants] said is misleading. [I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re: Shaw*, 537 F.3d at 541 (citations and internal quotation marks omitted). Furthermore, some statements constitute "non-actionable puffery," if they are "of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (citation omitted).

Defendants also contend that, "[a] claim of securities fraud may not be based on accurate statements of historical facts." (Defs. M/Dismiss, Memo., pgs. 30-31) (quoting *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778, 784 (S.D. Miss. 2002)). However, when, as here, the claim is based on alleged material omissions, the statements must be analyzed in context. *See* discussion, *infra.*

The PSLRA also contains a safe harbor provision that precludes liability for written or oral forward-looking statements, which are defined as,

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

15 U.S.C. §§ 78u-5(c), 78u-5(i)(1)(A)-(C). [14]

Under the PSLRA's safe harbor provision, a defendant is not liable if "(1) the statement is identified as forward-looking and 'is accompanied by meaningful cautionary statements'; or (2) the statement is 'immaterial'; or (3) the plaintiff fails to plead that the statement 'was made with actual knowledge ... that [it] was false or misleading.' " *In re: Six Flags*, 58 F.4th at 210 (citing, *inter alia*, § 78u–5(c)(1)(A)–(B)). In other words,

> [t]he safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. Under the first prong, there is no liability if, and to the extent that, the forward-looking statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (ii) "immaterial." Under the second prong, there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading.

***17** *Southland Sec. Corp.*, 365 F.3d at 371–72 (internal citations omitted). [15]

"The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Id.* at 372 (citation omitted). A "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg*, 758 F.3d at 691 (citations omitted). "Each statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245 (citations omitted).

Even if forward-looking statements are not protected by meaningful cautionary language, they "may still qualify for safe harbor protection if Plaintiff fails to plead facts demonstrating the statements were made with 'actual knowledge' that they were misleading." *In re: Six Flags*, 58 F.4th at 212 (citations omitted). The Fifth Circuit has yet to determine whether the safe harbor's scienter standard of "actual knowledge" for forward-looking statements encompasses severe recklessness. *Id.*, at 214. However, "liability for a forward-looking statement must satisfy a more demanding standard than for current statements." *Id.* Therefore, "[l]iability arises only upon proof of *knowing falsity* because the provision explicitly specifies that a defendant must have made the statement with 'actual knowledge' of its falsity." *Id.* (emphasis added).

ii) Scienter

Scienter is defined as an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoted source omitted). Severe recklessness "comprises solely those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (citation omitted). [16] "[P]leading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *In re: Shaw*, 537 F.3d at 535 (citation omitted). Likewise, " 'general allegations and conclusory statements, such as stating [defendants] knew ... adverse material' do not contribute to a strong inference of scienter." *Id.* (quoted source omitted). [17] Attempts to allege scienter based upon defendants' experience in the industry is analogous to alleging scienter premised upon a defendant's position in the company -- which does not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). [18]

***18** "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 326). Moreover, the Fifth Circuit has rejected the "group pleading approach to scienter." *Id.* Instead, courts must look to

> the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

*Id.* That being said, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. Likewise, "[i]n determining whether [plaintiff] has alleged facts sufficient to give rise to a strong inference of scienter, [the courts] consider the factual allegations contained in the complaint *in toto*." *R2 Investments LDC*, 401 F.3d at 643 (citation omitted).

Finally, "[f]ollowing *Tellabs*, courts must discount allegations from confidential sources," because "[s]uch sources afford no basis for drawing the plausible competing inferences required by *Tellabs*." *In re: Shaw*, 537 F.3d at 535 (internal citations omitted). "At the very least, such sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source ... would possess the information pleaded.' " *Id.*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

iii) Loss Causation

Defendants' motion focuses upon whether Plaintiffs properly alleged facts to satisfy the material misrepresentation or omission and scienter elements of their claims. However, Defendants also contend that certain misrepresentations or omissions were not related to any "corrective disclosure," as required to support loss causation. Pursuant to Rule 8(a)(2), plaintiffs are required to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiffs' economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiffs' economic loss. *Lormand*, 565 F.3d at 258 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). Thus, "[l]oss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed." *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, Civ. Action No. 12-1609, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013) ("LHC Grp., Inc.") (citation omitted). "[U]ndisclosed information cannot drive down the market price of a stock. Only information known to the market can cause a loss." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). "Absent the requirement of causation, Rule 10b-5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *as corrected on denial of reh'g* (July 13, 1981), *aff'd in part, rev'd in part*, 459 U.S. 375 (1983) (citations omitted).

***19** "[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). In turn, the "test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (citations omitted).

**C. Plaintiffs' Allegations of Material Misrepresentations and Omissions Analyzed**

Plaintiffs contend that Defendants made false and misleading statements that caused Lumen's shares to trade at artificially inflated prices during the Class Period. (FAC, ¶ 415). In their FAC, they identified dozens of alleged misstatements, which they grouped into five categories: (1) EHS contingencies; (2) the cost benefits of transitioning away from copper cable services; (3) employee health and safety; (4) environmental stewardship; and (5) GAAP (Generally Accepted Accounting Principles) compliance. (FAC, ¶¶ 253-350).

Defendants argue that the *WSJ* articles barely mention Lumen, much less show that the Company was concealing a significant liability for health and environmental issues. Further, less than five percent of its legacy copper network contains lead, with most of it secured within buried conduit. According to Defendants, the only thing the articles actually show is that (a) the public (including Lumen's shareholders) have known for many years that the Company has owned historic lead-sheathed cables; (b) those cables may pose health or environmental risks under certain circumstances; and (c) the extent of those risks, if any, is still unknown and subject to debate. In other words, the factual allegations in the Complaint affirmatively disprove the existence of fraud because Lumen could not have "hidden" what the FAC concedes investors already knew about lead-sheathed cables.

Plaintiffs argue that the fact that the information was publicly available may affect the reliance element of their claim, i.e., it presents a "truth on the market" defense, but does not excuse Defendants' scienter. (Pl. Opp. Brief, pg. 26). Plaintiffs maintain that even if investors knew that Lumen owned lead cables in the past, they did not know "(1) that Lumen continued to own them during the Class Period; (2) the extent of Lumen's lead-clad infrastructure remaining in Lumen's network; [and] (3) that Lumen decided to abandon those cables across the country as it transitioned to fiber." *Id.*

Defendants reply that Plaintiffs misunderstand their argument. Instead, their point is that "Plaintiffs do not adequately allege that Defendants had any additional or contrary information apart from what was already known by the public, the sum total of which was patently insufficient for anyone to 'know' the alleged financial exposure that Plaintiffs now assert based on unfounded conjecture." (Defs. Reply Brief, pg. 9).

To a certain extent, the parties are talking past one other. Therefore, before proceeding to analyze each statement that Plaintiffs allege to be materially false and misleading, the Court will pause to try and sort out, according to the FAC, who knew what and when. The confusion undoubtedly stems from the fact that there are several aspects to the information disclosed by the *WSJ* articles.

***20** First, the articles discussed the toxic nature of lead. However, the toxicity of lead should not come as news to anyone, let alone a reasonable investor. By 2018, there was an all but "universal public consensus" that, at least at a certain level, physical exposure to lead may be harmful. *See* FAC, ¶ 76.

Second, the articles disclosed that telecommunications companies historically used lead-sheathed cables. While this information may not have been widely known, and, consequently, came as a surprise to "many," including industry insiders, *see* FAC, ¶ 219, it certainly was not a secret. The information was available in the public domain for anyone who cared to look. *See, e.g.*, the Texas and Lake Tahoe Actions, FAC, ¶¶ 193-201.

Third, the articles explained that telecommunications companies were abandoning disused lead-sheathed cables in place. Again, however, this disclosure, like the last, while not widely disseminated, was available in the public domain. *See* the Texas and Lake Tahoe Actions, FAC, ¶¶ 193-201. Furthermore, Plaintiffs cannot argue, in good faith, that investors did not know that Lumen owned legacy AT&T lead-sheathed cables, because, after the initial story broke, Lumen's stock fell – even though the article made no mention of Lumen. *See* FAC, ¶ 352.

Finally, and most importantly, the articles discussed findings indicating that lead from these cables, whether buried, submerged, or suspended overhead, was leaching or migrating from its immediate location and potentially contaminating nearby areas, thereby harming individuals and the environment. This last disclosure represented the real revelation that, not only contradicted the industry's conventional thinking, but also accorded significance and consequences to the two preceding disclosures. Stated differently, if, as the *WSJ* investigation suggested, the lead from the cables migrated significantly, then this had the effect of undermining the industry's practice of retiring or abandoning the lead-sheathed cables in place. After all, if the lead remained in place, then exposure could be controlled and limited.

Plaintiffs contend that financial considerations were the motivating force behind Lumen's decision to abandon the lead-sheathed cables in place. Given Plaintiffs' estimates of the incredible costs associated with the removal of lead-sheathed cables from Lumen's network, *see* FAC, ¶¶ 384-385, one would have to be naïve not to suspect that cost played a role in Lumen's, and the entire industry's decisions to leave the cables in place. In fact, as a prudent steward of its increasingly stressed financial resources, Lumen would have been remiss and derelict in its duty to its shareholders had the cost of removal *not* been a factor in its decision-making process.

However, at least part of the reason it was so costly to remove the cables is precisely because of the need to properly protect workers from exposure, together with the obligation to properly transport and dispose of the highly toxic lead. *See* FAC, ¶ 218 ("former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process"). [19] In short, safety concerns are inextricably intertwined with the cost of removal.

***21** When the *WSJ* published the results of its investigation, it had the effect of unbalancing the industry's extant equation regarding its approach to lead-sheathed cables. Until then, there was every good reason for Lumen and other industry actors to believe that the lead would remain contained in conduits or otherwise within a few inches of the cables. *See* FAC, ¶ 218. As such, the decision to leave the cables in place arguably was a sound one that had the effect of not only preserving Company,

and, by extension, shareholder, resources in the short term, but also limited the further spread of toxic lead to workers and the environment at large, were it to be removed. In fact, the jury is still out as to what the best course of action is, i.e., removal and remediation or retire the cables in place. Indeed, Plaintiffs do not allege that the EPA has taken a definitive stance on the matter.

Plaintiffs contend that the two lead-sheathed cable lawsuits filed against AT&T and an AT&T subsidiary, i.e., the *Texas* and *Lake Tahoe Actions*, provided notice to "Lumen Management" that there was a risk Lumen could be liable to property owners or otherwise be made to remediate and remove its lead cable infrastructure. (FAC, ¶¶ 193-201). However, Plaintiffs do not allege any facts to show that any individual Defendant was aware of these cases. Even if they were, the two cases do not confirm a significant threat of liability to Lumen.

For instance, the *Lake Tahoe Action* focused upon an underwater cable. However, Plaintiffs do not allege any facts to show that Lumen has a significant amount of underwater lead-sheathed cables, if any. Moreover, even though the defendant AT&T subsidiary agreed to a consent judgment in the Tahoe Action, it expressly disputed plaintiff's allegations, which it maintained lacked merit. *Lake Tahoe Action*, Civ. Action No. 21-0073 (E.D. Cal. Nov. 5, 2021) (Amend. Consent Decree [doc. # 21]).[20]

As for the *Texas Action*, Plaintiffs tout the fact that the court denied summary judgment, and that the case had been set for trial before plaintiffs abruptly dismissed the suit. *See* FAC, ¶ 196. What Plaintiffs do not disclose, however, is that, per the summary judgment motion, the reported concentration of lead in the field samples was orders of magnitude below the Protective Concentration Levels ("PCL") (19.4 mg/kg out of a PCL of 500 mg/kg), which meant that it posed no risk to human health or the environment. *Texas Action*, Civ. Action No. 16-0542 (S.D. Tex.) (AT&T MSJ [doc. # 76]). This circumstance, together with the district court's perfunctory, three-sentence denial of the MSJ, might help to explain why plaintiffs otherwise inexplicably dismissed their suit, despite having survived the MSJ. *Id.*, doc. # 95.

Subject to the foregoing, the Court will consider the alleged misstatements and omissions identified by Plaintiffs. At the same time, the Court will address whether Plaintiffs allege facts to show scienter.

i) Statements About EHS Contingencies and Risks

**FAC, ¶ 253**

On November 9, 2018, the day after the start of the Class Period, Lumen filed a quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q 2018 Form 10-Q"), which expressly incorporated by reference "the risk factors discussed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017." That filing, in turn, stated as follows in Part I, Item 1A:

> **Risks posed by other regulations**. All of our operations are also subject to a variety of environmental, safety, health and other governmental regulations. ***In connection with our current operations, we use, handle and dispose of various hazardous and non-hazardous substances and wastes.*** In prior decades, certain of our current or former subsidiaries owned or operated, or are alleged to have owned or operated, *manufacturing businesses*, for which we have been notified of certain potential environmental liabilities regarding those past operations. ***We monitor our compliance with applicable regulations or commitments governing these current and past activities***. Although we believe that we are in compliance with these regulations in all material respects, ***our use, handling and disposal of environmentally sensitive materials, or the prior operations of our predecessors, could expose us to claims or actions that could potentially have a material adverse effect on our business, financial condition and operating results.***

***22** The same or substantially similar statements appear on other quarterly or annual reports in 2019-2020. (FAC, ¶ 254).

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because Lumen failed to disclose that:

> (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement equipment; and, thus, (v) the risk that the company failed to comply with applicable environmental, safety, health and other governmental regulations and commitments was not merely hypothetical. This statement is also false and misleading when made because, far from monitoring its compliance with applicable regulations or commitments, Lumen had no system in place prior to, or during, the Class Period to monitor worker compliance with the OSHA Lead Standard, the MNOSHA Settlement, or its internal guidelines addressing those matters.

(FAC, ¶ 255).

The Court reiterates that, a "claim of incomplete disclosure is actionable only if what [defendants] said is misleading. [I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re: Shaw*, 537 F.3d at 541. The crux of Lumen's statement is that it could be exposed "***to claims or actions that could potentially have a material adverse effect on our business, financial condition and operating results.***" That statement, however, did not create an impression that differed materially from the one that actually existed. First, from the statement itself, it is not clear that Lumen even was referring to lead-sheathed cables. Rather, the statement references "manufacturing businesses," which one does not readily associate with a dormant cable. Second, insofar as the statement was broad enough to encompass lead-sheathed cables, it candidly disclosed that there could be claims or actions that *could materially* affect Lumen's business, financial condition and operating results. That is true. Even after the publication of the *WSJ* articles, Lumen continues to face no more than the specter of unrealized claims or actions that materially could affect its affairs. In short, the statement was not false or misleading. [21]

Instead, Plaintiffs seem to fault Lumen for speaking of the risk posed by its legacy operations in general terms, but then failing to disclose specific details and the scale of the potential risk that the firm faced from lead-sheathed cables. However, the Court is not persuaded that, by speaking of general risks from its legacy operations, Lumen opened the door to require disclosure about lead-sheathed cables, in particular. *See* *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (no duty to disclose because defendants' failures to speak did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

***23** Furthermore, "companies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *Veal v. LendingClub Corp.*, 423 F.Supp.3d 785, 806 (N.D. Cal. 2019) (citation omitted). "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("*UBS*") (citations and internal quotation marks omitted). [22]

Accordingly, the Court finds that Plaintiffs' proffered reasons for why Lumen's statements were false and misleading do not withstand scrutiny. While the *WSJ* investigation showed some evidence of dispersed lead from lead-sheathed cables, there has been no definitive agency or court determination that the present risk of migration is extensive enough to warrant the expense, the worker exposure, and the risk of further spread/contamination inherent with any removal/remediation of the cables. Therefore, the risk that the Company failed to comply with applicable environmental, safety, health, and other governmental regulations remains, at present, speculative.

Plaintiffs further fault Lumen for falsely representing that they were monitoring compliance with applicable regulations or commitments when it had no system in place to monitor the OSHA Lead Standard, the MNOSHA Settlement, or its internal guidelines. Again, however, it is not evident that Lumen's statement even contemplated lead-sheathed cables.

Finally, there are no plausible facts alleged to suggest that any individual defendant knew, or otherwise was severely reckless in failing to know, that Lumen had thousands of miles of improperly contained lead-sheathed cable, exposing its workers, the public, and the environment to dangerous levels of lead in violation of applicable regulations and laws. Even if Plaintiffs *had* alleged facts to show that Defendants knew that Lumen had thousands of miles of legacy lead-sheathed cables that had been abandoned in place, they have not alleged facts to support the cogent and compelling inference that Defendants knew that the lead, where it lay, posed a risk to others and the environment. At minimum, a more plausible inference is that they believed the lead was safe or comparatively stable where it was. *See* *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 432 (5th Cir. 2019) (even if plaintiffs adequately alleged that defendants knew about the company's high inventory, they still had to allege facts demonstrating an "intent to deceive" or at least "severe recklessness" as to their failure to disclose a markdown risk).

***24** To be sure, Plaintiffs tout warnings by confidential witnesses ("CWs") that were made known to various Lumen ESH managers, but there are no facts alleged to show that any individual Defendant was aware of same. The Court reiterates that scienter cannot be based on the collective knowledge of the corporation's officers and employees acquired in the course of their employment. *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d at 208. It also bears repeating that, "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *In re: Shaw*, 537 F.3d at 535 (citation omitted). [23] Consequently, Plaintiffs' various "must have known" or "should have known" allegations [24] prove unavailing and do not materially move the needle in favor of their attempt to establish scienter.

Finally, Plaintiffs do not attribute the allegedly false and misleading statement to any individual Defendant. As discussed above, the Fifth Circuit has "rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) ...' " *In re: Shaw*, 537 F. 3d at 533. Furthermore, the Fifth Circuit has not endorsed the concept of corporate scienter that is recognized by some other circuits. *Neukranz v. Conestoga Settlement, LLC*, Civ. Action No. 19-1681 2023 WL 2555551, at *6, n.6 (N.D. Tex. Mar. 16, 2023) (citations omitted). In any event, the corporate scienter exception is extremely narrow and was created "for situations in which an announcement is issued that is so 'dramatic' that it 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.' " *Id.* (citations omitted). Plaintiffs have not established those circumstances here.

**FAC, ¶ 256**

On March 11, 2019, Lumen filed its 2018 Form 10-K, which was signed by Defendants Storey and Dev. The 2018 Form 10-K stated as follows:

> [f]rom time to time ***we may incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment***. Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, ***we do not currently believe that future environmental compliance and remediation expenditures will have a material adverse effect on our financial condition or results of operations. For additional information, see "Risk Factors—Risks Relating to Legal and Regulatory Matters—Risks posed by other regulation" in Item 1A of Part I of this report and Note 17—Commitments, Contingencies and Other Items included in Item 8 of Part II of this report.***

***25** The same or substantially similar statement appears on Lumen's 2019 Form 10-K. (FAC, ¶ 258).

Plaintiffs contend that the statements in bold and italicized were false and misleading because (i) the "Risks posed by other regulation" disclosure set forth in Item 1A of Part I of that filing was itself false and misleading for all the reasons set forth in ¶ 255; and (ii) Note 17—Commitments, Contingencies and Other Items to the consolidated financial statements failed to disclose that the lead cables owned by the Company gave rise to a loss contingency as set forth in ¶ 348. (FAC, ¶¶ 257, 259).

The Court finds that these statements were not false and misleading by omission for many of the same reasons set forth in the discussion of the ¶¶ 253-254 statements. *See* discussion, *supra.* Furthermore, the statements plainly addressed prior industrial sites, vehicle fleets, and power supplies -- not lead-sheathed cables. This same dichotomy applies to Plaintiffs' loss contingency argument.

In addition, there are no facts to raise a strong inference that Defendants, Storey or Dev, knew, or were severely reckless in failing to know, about a material risk of environmental compliance and remediation expenses associated with lead-sheathed cables.

ii) Statements About Converting Legacy Copper Cables to Fiber and the Associated Cost Savings

**FAC, ¶ 260**

On November 8, 2018, Lumen held a conference call with analysts to discuss its financial results for the quarter ended September 30, 2018. During his prepared remarks, before opening the floor to questions from analysts, Defendant, Dev, stated:

> [f]rom the third quarter 2018, capital expenditures were $665 million.... In addition, ***we put in place a capital governance process comprised of senior leaders of the company to ensure all investments are in line with business and financial objectives.*** The financial rigor and discipline led to several decisions to redirect investments. ***One example is our decision to minimize investment in our copper-based plant for the consumer business***. However, we are ramping up investments in our fiber footprint for consumer to complement our micro-targeting strategy.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke about the benefits of shifting investment from copper to fiber cables from the perspective of the Company's "financial objectives," but failed to disclose that: (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment

over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) it was reasonably likely that the Company would incur substantial costs in connection with legislative actions, regulatory enforcement, investigative efforts, removal, remediation, litigation, and/or related penalties. In addition, Lumen has admitted that (i) the lead cables it has owned since the outset of the Class Period gives rise to a loss contingency under ASC 450 that needs to be disclosed in its SEC filings as described more fully in ¶ 235; (ii) it has been "engaged" with the EPA in what the Company refers to as the "early stages" of the investigation initiated by the Agency using its Superfund authority into the environmental risks posed by lead cables as described more fully in ¶ 237; and (iii) it anticipates incurring investigative costs due to the discovery of these lead cables as described more fully in ¶ 238. (FAC, ¶ 261).

***26** The Court finds that the foregoing statement does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading. It is difficult to discern how an innocuous statement on ensuring that investments are in line with business and financial objectives, together with a stated intent to minimize investment in the "copper-based plant," somehow gives rise to a duty to discuss an unrealized risk from lead-sheathed cables that the Company had every reason to believe, *at that time*, were comparatively safe where they lay. In other words, there is little-to-no connection between the statement and the alleged omission. Moreover, it certainly was not reasonably foreseeable, at the time, that the Company would incur substantial costs associated with removal, remediation, litigation, and/or penalties, because there was a reasonable basis to believe that the cables were safe, in place. Once the *WSJ* investigation revealed studies indicating that lead migrated from the cables, *then* it became more likely that Lumen ran a risk of removal, remediation, litigation, and/or penalties, which undoubtedly is why Lumen included this information in its post-*WSJ* articles disclosures.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Dev knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation expenses associated with lead-sheathed cables, to the extent that he even knew about them at all.

**FAC ¶ 262**

On February 13, 2019, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2018. On this call, Defendant, Storey, described the cost savings associated with moving away from copper cable-based services:

> [f]or the Wholesale business, we expect to see much of what we've seen over the past few years, generally declining but predictable revenue ... Although there are a lot of things we can do to manage the Consumer business for cash, we are always open to evaluating other ways to maximize shareholder return from these assets. ***A big part of our story for 2019 is our focus on transformation. Our operational model is based on decades-old legacy systems and processes, which deliver a lower customer experience and a higher cost to serve than we want. We believe we can transform the experience and simultaneously greatly improve the cost structure***. But whether you're talking about investing for growth or investing to transform our company, as I've said many times before, our focus is always on generating significant free cash flow per share. We will carry that focus into 2019 and beyond. We have a lot of work ahead, but we believe our asset base, our focus and our financial strength give us good reasons to be excited about the future.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as

they speak about how moving away from "legacy systems," which includes Lumen's copper-based infrastructure, and that it will "greatly improve the cost structure." (FAC, ¶ 263).

As the Court appreciates the matter, however, Plaintiffs' argument overlooks the distinction between fixed or sunk costs and variable costs. The lead-sheathed cables represent fixed costs that were present whether or not Lumen continued to utilize the copper cables. Consequently, discussions regarding operational cost savings from transitioning away from copper lines have no bearing on the sunk cost for that small portion of Lumen's copper lines that are sheathed in lead. In any event, as Defendants point out in their brief, Lumen's copper network is not coextensive with lead-sheathed cables because less than five percent of Lumen's copper network contains lead. *See* FAC, ¶ 234.

Consequently, the Court finds that the statement in FAC, ¶ 262 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all. *See* discussion, *supra.*

**FAC, ¶ 264**

***27** On February 25, 2019, Defendant, Storey, attended the Morgan Stanley Technology, Media & Telecom Conference hosted by Morgan Stanley analyst, Simon William Flannery. Asked about "the interplay between the legacy product sets and the strategic product sets" in terms of "transition," Storey replied,

> [t]hat's going to occur for a while. But it's also something, as an industry, that we're very good at. If you look at our company, CenturyLink, we have had a number of legacy products that have traded over time ... ***And, so, we are very good at cannibalizing our products and services and augment them—augmenting them and replacing them with others—meanwhile taking cost out faster than revenues decline. And, so, we'll continue to do that with legacy services***. It's early still to before I can tell you where that bottoms out and where it starts to climb, but we've been pretty good as an industry and very good as a company.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs." (FAC, ¶ 265). Plaintiffs further argue that the statements were false and misleading when made because Lumen's lead-encased cables were not being "traded" or "replaced," but, rather, abandoned in place to decay away over time. *Id.* Plaintiffs conclude that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm. *Id.*

The Court disagrees. The statement does not necessarily mean that Lumen was *physically* trading or replacing copper with fiber. No reasonable investor would have been misled by that statement. Copper and, more specifically, lead-sheathed copper, is not mentioned at all. As far as taking cost out faster than revenues decline, the statement clearly refers to variable or operating cost savings because the fixed cost of any lead-sheathed copper remains present, regardless of a shift to fiber.

Accordingly, the Court finds that the statement in FAC, ¶ 264 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all. *See* discussion, *supra.*

**FAC, ¶ 266**

On February 12, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year that ended December 31, 2019, during which Storey stated:

> ***[w]e've prioritized fiber deployment for consumers over previous investments in copper-based technologies like bonding and vectoring***. We now have enabled more than 2 million fiber households, a number we expect to continue to grow. And we're making it easier for our consumer customers to access these networks by standardizing our product set and enabling a digital environment. That digital environment allows customers to immediately initiate service using automated and seamless provisioning processes. ***In turn, this lowers our cost to operate and improves our customer experience. This type of transformation creates a virtuous cycle. We optimize our capabilities to reduce costs***, which drives a better customer experience; and happy customers buy more and churn less.

***28** Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "copper-based technologies," in terms of reducing "costs." (FAC, ¶ 267). Plaintiffs contend that these statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm. *Id.*

The Court disagrees. Plaintiffs continue to conflate variable or operating costs with fixed or sunk costs and attempt to equate copper lines with lead-sheathed copper lines, when the latter represents less than five percent of the former.

For these reasons, and as further detailed above, the Court finds that the statement in FAC, ¶ 266 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all. *See* discussion, *supra.*

**FAC, ¶ 268**

On February 25, 2021, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2020 (the "2020 Form 10-K"), which was signed by Defendants, Storey and Dev. The 2020 Form 10-K included the following statement about the Company's rebranding and new segments,

> [a]s part of the recent Lumen rebranding, we refined our marketing approach to better align with our customer base. Lumen is the name of our company and our flagship brand for serving the enterprise and wholesale markets. We also launched our Quantum Fiber brand and reconfirmed the importance of our expansive CenturyLink platform name. Quantum Fiber is our brand for providing fiber-based services to small business and residential customers. ***Our CenturyLink brand covers our mass-marketed legacy copper-based services, managed for optimal cost and efficiency.***

The same statement appears in Lumen's annual report on Form 10-K for the full year ended December 31, 2021 (the "2021 Form 10-K"). (FAC, ¶ 269).

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about Lumen's "copper-based services" being managed to optimize "cost." (FAC, ¶ 270). Plaintiffs add that the statements gave the false impression that Lumen's copper-based services would not be managed in a fashion that would create costly scrutiny, liability, and reputational harm. *Id.*

The Court disagrees. Plaintiffs continue to confuse variable or operating costs with fixed or sunk costs and attempt to equate copper cables with lead-sheathed copper cables, when the latter represents less than five percent of the former. There is no reason to discuss speculative fixed costs when the Company is discussing variable costs. Furthermore, Lumen had every reason to believe that the lead-sheathed cables were safe where they lay.

For these reasons, and as further detailed above, the Court finds that the statements in FAC, ¶¶ 268-269 do not represent untrue statements of a material fact or constitute an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to support the strong inference that Storey or Dev knew, or were severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables, to the extent they even knew of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 271**

***29** On August 5, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2020. Asked about "the pace at which certain legacy services roll off" and "your ability to take legacy costs out" as the digital transformation accelerates, Defendant Storey, responded as follows:

> [s]o, a big part of the digital transformation is new opportunities for us as our customers are adapting to virtual reality and augmented reality and really the fourth industrial revolution. And, so, that's good opportunity for us. There are certainly products that are declining, and we see that, and we'll continue to see that. But I don't think that—and there are aspects of our—helping our customers evolve in digital transformation that could affect those products. But my goal is not only to help CenturyLink—existing CenturyLink customers go out and transform digitally, but it's my goal to go out and get other companies' customers to digitally transform. And that brings new business to us. It brings the profitable, high-margin business that we're focused on to the company. And, so, yes, is there some aspect of it that can harm our legacy? ***Yes, but there's far more opportunity for us than downside.***

**FAC, ¶ 272**

Defendant Dev added immediately thereafter:

> I think just to add to Jeff's is—***and yes, we can take cost out faster on the legacy platforms***—it helps with our network simplification, it helps in terms of how we rightsize our real estate portfolio. So yes, we can do that to offset any impact from higher erosion on legacy products. But the key point, like Jeff mentioned, is we've never seen it be like-for-like.

Plaintiffs allege that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak

about the benefits of moving away from legacy services as part of the digital transformation in terms of reducing "costs." (FAC, ¶ 273). Plaintiffs add that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm. *Id.*

The Court disagrees for reasons explained previously. *See* discussion, *supra.* The statements in FAC, ¶¶ 271-272 do not represent untrue statements of a material fact or constitute an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to support the strong inference that Storey or Dev knew, or were severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables, to the extent they even knew of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 274**

On September 15, 2020, Defendant, Storey, participated in the Goldman Sachs Communacopia Conference hosted by equity analyst Brett Joseph Feldman, who noted that ILECs appear to grapple with "cost associated with maintaining legacy services, which are typically in some state of decline" and asked whether the COVID-19 pandemic "accelerate[s] your ability to start addressing some of those structural legacy costs and take them out more quickly." Storey responded,

> ***30** ***Yes. We see that on both sides of the equation, on the revenue side and on the cost side.*** My expectation of our team is that we go out and that we help accelerate the transition, the digital transformation that our customers are going through. We bring them to new technologies. But we also go out and accelerate the digital transformation of people that are not our customers today. And, so, we will continue to bring new products and services, new platforms online to bring those customers to us, and ***we'll continue to focus on taking out costs for the businesses that are declining. We've proven we're very good at really both sides of that and want to continue to drive both sides of that.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs." (FAC, ¶ 275). Plaintiffs assert that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm. *Id.*

The Court disagrees for the same reasons set forth in response to ¶ 268. *See* discussion, *supra.*

**FAC, ¶ 276**

On May 19, 2021, Lumen hosted a virtual webcast of its annual stockholders meeting, during which senior management responded to questions submitted by investors in advance. In response to a question about "current revenue trajectory," Defendant Storey stated:

> [a]ll revenues are not the same, and we are seeing a natural evolution that plays out time and time again in our industry. Our legacy revenues are declining, but that is as expected ***for new technologies will be again replacing legacy solutions***. On the other hand, we're generally growing where we make new fiber investments. Not the right, [sic] I believe we need to, but fiber investments are growing. That's why we've put our investments in those solutions that we feel offer the greatest opportunity for sustainable

> growth, such as edge computing and adaptive networking to replace the churn we are seeing in our legacy products.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph above was false and misleading when made, or omitted material facts necessary to make it not misleading, because Lumen's lead-encased cables were not being "replaced" with "new technologies," but, rather, abandoned in place to decay away over time. (FAC, ¶ 277). The statement purportedly gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id.*

The Court disagrees. The statement does not necessarily mean that Lumen was *physically* trading or replacing copper with fiber. Moreover, the statement does not reference copper, let alone the less than five percent of Lumen's copper cables that were lead-sheathed. In short, no reasonable investor would have been misled by that statement.

In addition, Plaintiffs do not allege any facts to support the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables -- to the extent he even knew of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 278**

***31** On February 9, 2022, Lumen hosted a conference call with analysts to discuss its financial results for the quarter and year ended December 31, 2021. While fielding a question from an analyst about the Company's leverage, Defendant, Dev, stated:

> [o]n the leverage, Nick, if you look at 2020, we were at about roughly around 3.6x. 2021, we exited about 3.6x, and we paid down about $6 billion of debt since we announced our deleveraging plans, $7 billion since the close of the Level 3 transaction. The key point is I think we've been pretty good about calibrating our leverage to the business profile. So even though we're divesting a fair amount of legacy revenues, we haven't really levered up. If you think about Quantum Fiber, that's going to be a high-growth business and infrastructure business. So you always have to think about de-averaging our leverage and think about whether that's appropriate going forward. Our view right now is the 3.6x is probably a good assumption. Now we have said that it will be roughly in that zip code. So any quarter-over-quarter, you might see some fluctuations. But until the business profile changes significantly, we don't see the need to change that at this point. ***And like Jeff has mentioned several times, we're going through an investment cycle***. And it truly is a discrete project. ***It is upgrading our copper network to fiber and it's a long-lived asset***. And, so, as we do that, we're okay with the leverage fluctuating a little bit as we fund that build.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen's lead-encased cables were not being "upgrad[ed]" with "fiber," but, rather, bypassed by fiber and abandoned in place to decay away over time. (FAC, ¶ 279). Furthermore, the statement(s) gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id.*

The Court disagrees. Lumen's copper *network* was being upgraded to fiber. As the Court appreciates it, fiber was/is an upgrade i.e., an improvement, from copper for both the customer and the Company. Dev did not purport to discuss what happened with old lead-sheathed copper cables, nor was he obligated to do so for reasons already discussed ad nauseum. *See* discussion, *supra.*

In addition, Plaintiffs do not allege any facts to support the strong inference that Dev knew, or was severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables -- to the extent he even knew of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 280**

On February 7, 2023, Lumen hosted a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2022. In response to a question about the ability to begin removing "legacy fixed costs" in rural areas, Stansbury stated,

> when you look at our existing footprint, we've obviously still got a lot of areas that are rural. And as we've said, our plans for Quantum are dense urban areas and major metros, and that remains. We're not going to be looking to run fiber to lower density areas because the numbers just don't make sense. As it relates to those areas, though, they—their overall performance has been more stable than the 20 states that we've sold. So the performance there has been good. ***We will manage that very closely for things like*** rates and ***costs as time goes on. But at this point, those are assets that are attractive to us, and we'll continue to manage them closely***.

***32** Plaintiffs contend that the statement(s) identified in bold and italicized text in the paragraph above was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about managing Lumen's "legacy" assets to control "costs." (FAC, ¶ 281). Instead, Plaintiffs maintain that the statements gave the false impression that Lumen's legacy assets, including its copper-based network infrastructure, would not be managed in a fashion that would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id.*

While Stansbury purportedly was asked about "legacy fixed costs" in rural areas, he responded by stating that, because of costs, Lumen did not plan to run fiber to the rural areas. Instead, Lumen would manage them for rates and costs, which, at that time, were attractive. In other words, he seems to be saying that Lumen still was making money on the legacy copper lines. Therefore, while he was asked about fixed costs, Stansbury provided a non-responsive answer that discussed the operating profitability of the legacy copper lines. No reasonable investor would have been misled by Stansbury's pivot to explain why the legacy business continued to make sense. The fixed costs associated with the copper network were sunk costs, no matter whether Lumen continued to utilize the network to make money, or not.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Stansbury knew, or was severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables – insofar as he even knew of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 282**

On February 23, 2023, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2022 (the "2022 Form 10-K"), which was signed by Defendants, Johnson and Stansbury. The 2022 Form 10-K offered the following description of Lumen's business segments:

[w]e conduct our operations under the following three brands:

• "Lumen," which is our flagship brand for serving the enterprise and wholesale markets

• "Quantum Fiber," which is our brand for providing fiber-based services to residential and small business customers

- ***"CenturyLink," which is*** our long-standing brand for providing mass-marketed legacy copper-based services, ***managed for optimal cost and efficiency.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about Lumen's "copper-based services" being managed to optimize "cost." (FAC, ¶ 283). To the contrary, these statements purportedly gave the false impression that Lumen's copper-based services would not be managed in a fashion which would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id.*

The Court disagrees. Plaintiffs continue to conflate fixed with variable costs. They also mistakenly equate copper cables with lead-sheathed copper cables, when the latter represents less than five percent of the former. Even if Johnson and Stansbury were talking about lead-sheathed cables, they were managing them for optimal cost and efficiency by leaving them where they lay, when, at that time, there was every reason to believe that was a safe course of action.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Johnson or Stansbury knew, or were severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables – insofar as they even knew of lead-sheathed cables at all. *See* discussion, *supra.*

iii) Statements About Employee Health and Safety

**FAC, ¶ 284**

***33** Scheduled to coincide with Earth Day, on April 22, 2019, Lumen released its CSR Report for 2018 (the "2018 ESG Report"), stating that,

> CenturyLink recognizes the importance of providing employees with a safe and healthful workplace. ***We are committed to preventing occupational injuries and illnesses through our robust safety management systems***.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph above was false and misleading when made or omitted material facts necessary to make them not misleading. (FAC, ¶ 285). They contend that Lumen was not committed to "preventing occupational injuries and illness" for employees who worked with lead and did not maintain "robust safety management systems" for such workers because, as detailed more fully above, during the Class Period: (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead; (ii) this form of sheathing was known to release lead particles into the air when disturbed through physical contact; (iii) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions or protective equipment; (iv) many workers were not given any advance notice that the job they were sent out to perform would involve a lead cable; and (v) Lumen neither implemented any controls to reasonably assure that employees who worked with lead complied with its policies and procedures for doing so nor had any system in place to monitor worker compliance with the OSHA Lead Standard, the MNOSHA Settlement and related side agreements, or its internal guidelines on such topics. *Id.*

The Court disagrees. Insofar as Plaintiffs contends that the statement is inconsistent with the 2013 MNOSHA Settlement, the challenged statement (made in 2018), says that "[w]e *are* committed ..." (emphasis added) -- not that we *were* or *always have been* committed to worker safety. Therefore, the statement was not false or misleading because it does not purport to address past practices.

Insofar as Plaintiffs rely on statements from CWs for its claims that Lumen was not taking proper precautions for its workers in the years following the 2013 MNOSHA Settlement, *e.g.*, in the 2019 time period, *see* FAC, ¶¶ 113-114, they have not alleged facts to plausibly allege that there was a public disclosure regarding these alleged practices from that period. Of course, until the fraud is disclosed, defendants cannot be held liable for a decline in the stock price. *See* *LHC Grp., Inc.*, 2013 WL 1100819, at *5; *Alaska Elec. Pension Fund*, 572 F.3d at 230 (only information known to the market can cause a recoverable loss).

Furthermore, Plaintiffs do not allege facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen purportedly was exposing its workers to unreasonable levels of lead without proper safety equipment and monitoring procedures. [25]

**FAC, ¶ 286**

***34** On approximately April 22, 2020, Lumen released its ESG Report for 2019 (the "2019 ESG Report"), stating as follows,

> ***CenturyLink is committed to providing a healthy and safe workplace for our employees and others who visit our facilities. CenturyLink's safety management system is designed to drive continuous improvement in safety performance by incorporating "risk-based thinking" into our prioritization of health and safety objectives and organizational safety goals.***

**FAC, ¶ 287**

The same section of the 2019 ESG Report included the following representation: ***[t]he CenturyLink EHS, Risk Management and Operations teams continuously monitor safety performance to evaluate opportunities to eliminate or reduce the risks of workplace hazards.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen purportedly was *not* committed to "providing a healthy and safe workplace" for employees who worked on lead cables and did not have systems in place to "drive continuous improvement" in safety for those workers or "continuously monitor safety performance" for those workers for the reasons set forth in ¶ 285. (FAC, ¶ 288).

The Court disagrees with Plaintiffs' arguments for the same reasons specified for ¶ 284. *See* discussion, *supra.* Furthermore, the statement that CenturyLink was committed to a healthy and safe workplace represents immaterial, non-actionable corporate cheerleading, puffery, or vague statement of optimism. *See* *In re SolarWinds Corp. Sec. Litig.*, 595 F.Supp.3d 573, 587 (W.D. Tex. 2022), *opinion clarified*, 2022 WL 3699429 (W.D. Tex. Aug. 19, 2022); *Bhangal v. Hawaiian Elec. Indus., Inc.*, Civ. Action. No. 23-4332, 2024 WL 4505465, at *12 (N.D. Cal. Oct. 15, 2024) (statements such as, "[s]afety is our number one priority ...," and the like, are not actionable) (citations omitted). Also, the statement that "safety performance" included "risk-based thinking" is not false or misleading because it was consistent with certain allegations in the FAC that there was a reasonable basis for the Company to believe that leaving the cables in place would reduce further exposure to workers. *See, e.g.*, FAC, ¶ 234.

**FAC, ¶ 289**

On May 6, 2020, Lumen hosted a conference call with analysts to discuss its financial results for the quarter ended March 31, 2020, during which Storey stated, "I'm very proud of our employees and ***we will continue to keep their health and safety as our top priority***."

Plaintiffs contend that the statement identified in bold and italicized text in the foregoing paragraph was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 285. (FAC, ¶ 290).

The Court disagrees for the same reasons specified for ¶ 284. *See* discussion, *supra.* Furthermore, the statement constitutes immaterial, non-actionable corporate cheerleading, puffery, or a vague statement of optimism. *See* discussion, *supra.*

**FAC, ¶ 291**

In September 2020, Lumen revamped its website in connection with its name change and new image. By no later than September 27, 2020, Lumen published an "Environment" page in the "Corporate Responsibility" section of its official website, representing that, **Occupational Health and Safety**

> ***35** ***We are committed to providing a healthy and safe workplace for our employees and others who visit our facilities. Our safety management system is designed to drive continuous improvement in safety performance by incorporating "risk-based thinking" into our prioritization of health and safety objectives and organizational safety goals.***

Plaintiffs assert that the statements identified in bold and italicized text above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was *not* committed to "providing a healthy and safe workplace" for employees who worked on lead cables and did not have any systems in place to "drive continuous improvement" in safety for those workers for all the reasons set forth in ¶ 285. (FAC, ¶ 292).

In addition to rejecting Plaintiffs' argument for the same reasons specified for ¶ 284, the Court finds that the statements plainly represent non-actionable corporate cheerleading, puffery, or vague statements of optimism. *See* discussion, *supra.*

**FAC, ¶ 293**

On February 25, 2021, Lumen filed its 2020 Form 10-K, which contained a new disclosure on its stakeholder value creation strategies:

> Health & Wellness
>
> We believe a healthy, engaged and high performing workforce is part of our competitive advantage. We want all of our employees to thrive, and we ***regularly re-evaluate how to best support our employees' wellness, health and safety through benefits and resources***. Our current benefit and wellness programs drive engagement that positively impacts our culture, job satisfaction, recruiting and retention programs. In response to the COVID-19 pandemic, we expanded our physical, mental, and family health programs and informational outreach.

**FAC, ¶ 294**

The same statements as those quoted in the preceding paragraph were made in Lumen's 2021 Form 10-K.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen purportedly did *not* "regularly

re-evaluate" how best to support the "health and safety" of employees who worked on lead cables for all the reasons set forth in ¶ 285. (FAC, ¶ 295)

The Court rejects Plaintiffs' arguments because the statements provide that Lumen reevaluates its employees' wellness, health, and safety *through benefits and resources.* Plaintiffs do not allege any facts in the FAC to suggest that Lumen did not revaluate benefits and resources available to workers. The Court also fails to see how Lumen's reevaluation of worker health and safety *through benefits and resources* somehow opened the door to require Lumen to talk about physical safety protections, or the alleged lack thereof, for workers. Moreover, there was no disclosure as required to support loss causation.

Finally, Plaintiffs do not allege facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen purportedly was exposing its workers to unreasonable levels of lead without proper safety equipment and monitoring procedures. *See* discussion, *supra.*

**FAC, ¶ 296**

***36** On April 22, 2021, Lumen released its ESG Report for 2020 (the "2020 ESG Report"), which stated, in pertinent part,

> ***[t]he health and safety of our employees and business partners is a top priority for Lumen. We are committed to providing a workplace free of recognized hazards. Our environment, health and safety (EHS) team oversees our OHS program, focusing on continuous improvement by incorporating "risk-based thinking" into our organizational safety goals, prioritization of health and safety objectives, and safety management systems.***

**FAC, ¶ 297**

The same section of the 2020 ESG Report included the following representation:

> [w]e have implemented occupational health and safety management systems for employees in ... North America ... ***Our environment, health and safety team and relevant business units implement these systems and perform periodic reviews to identify and achieve improvements in overall safety performance***.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was, in fact, *not* committed to "providing a workplace free of recognized hazards" for employees who worked on lead cables and did *not*, in fact, have systems in place to drive "continuous improvement" in safety for those workers or "perform periodic reviews" to identify further safety improvements for those workers for all the reasons set forth in ¶ 285. (FAC, ¶ 298).

The Court rejects Plaintiffs' arguments for the same reasons set forth relative to ¶¶ 284 and 287. *See* discussion, *supra.*

**FAC, ¶ 299**

On November 4, 2022, Lumen released its ESG Report for 2021 (the "2021 ESG Report"), which stated, in pertinent part,

> ***[p]roviding a safe and healthy working environment for our people, partners and visitors is of paramount importance. We are committed to workplaces that are free of recognized hazards ... We design our safety management systems to drive continuous improvement by incorporating "risk-based thinking" into our organizational objectives and goals.***

**FAC, ¶ 300**
The same section of the 2021 ESG Report included the following representations:

> ***[o]ur environment, health and safety (EHS), risk management and operations teams continuously monitor safety performance to evaluate opportunities to eliminate or reduce the risk of workplace hazards***. We have implemented Occupational health and safety (OHS) management systems in ... North America ***... We carry out periodic reviews to identify and achieve improvements in overall safety performance.***

Plaintiffs argue that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was, in fact, *not* committed to "providing a workplace free of recognized hazards" for employees who worked on lead cables and did not, in fact, have systems in place to drive "continuous improvement" in safety for those workers or "continuously monitor safety performance" to identify further safety improvements for those workers for all the reasons set forth in ¶ 285. (FAC, ¶ 301).

***37** The Court rejects Plaintiffs' arguments for the reasons set forth relative to ¶¶ 284 and 287. *See* discussion, *supra.*

**FAC, ¶ 302**
On February 23, 2023, Lumen filed its 2022 Form 10-K, stating, in pertinent part, that,

> Health & Wellness
>
> ***[w]e are committed to promoting the health, safety and well-being of our employees, business partners and global communities***. We want all of our employees to thrive, and ***we regularly re-evaluate how to best support our employees' well-being through benefits and resources***. We design our current benefit and wellness programs to drive engagement that positively impacts our culture, job satisfaction, recruiting and retention programs.

**FAC, ¶ 303**
In addition, the 2022 Form 10-K stated, in relevant part:

> Occupational Health and Safety: The EHS team conducts risk assessments, reviews safety incident data and monitors health and safety legislation to develop policies and procedures designed to minimize safety hazards and support compliance with applicable laws and regulations. ***We carry out periodic reviews to identify steps designed to improve overall safety performance***.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was, in fact, *not* committed to promoting the "health, safety and well-being" of employees who worked on lead cables for all the reasons set forth in ¶ 285. (FAC, ¶ 304).

These statements, and Plaintiffs' associated argument(s), simply represent more of the same. Therefore, the Court rejects Plaintiffs' arguments for the reasons set forth relative to ¶¶ 284 and 287. *See* discussion, *supra.*

iv) Statements About Environmental Stewardship

**FAC, ¶ 305**

By no later than the start of the Class Period, CenturyLink maintained a "CenturyLink and the Environment" page in the "Community" section of its official website, which represented, in pertinent part,

> ***CenturyLink is actively making choices to lessen our impact on the environment***, while offering our customers solutions that enable them to do the same. Our goal is to help ensure the long-term health of our environment, joining with consumers and businesses who are focusing on ways to promote and practice the intelligent use of resources.

Plaintiffs contend that the statements identified in bold and italicized text in the foregoing paragraph were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because Lumen failed to disclose that: (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions. (FAC, ¶ 306). Plaintiffs add that, far from "actively making choices to lessen our impact on the environment," the Company made a series of decisions that disregarded its impact on the environment. *Id.*

***38** The Court disagrees with Plaintiffs for reasons stated previously. At the time that Lumen made the statement, it had reasonable grounds to believe (and still does) that leaving the lead-sheathed cables where they lay has less of an impact on the environment than disturbing and removing the lead, which could spread contamination throughout the environment. Consequently, the statement was not misleading and Lumen had no obligation to discuss lead-sheathed cables at all. Furthermore, the statement plainly represents non-actionable corporate cheerleading, puffery, or vague statements of optimism. *See* discussion, *supra* and *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F.Supp.3d 300, 315–16 (S.D.N.Y. 2024) (non-actionable puffery: "across the company, across the globe, all of our employees are embracing ESG ... one of the key aspects of ESG is managing risks ...").

Finally, Plaintiffs do not allege facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen purportedly was exposing its workers to unreasonable levels of lead without proper safety equipment and monitoring procedures. *See* discussion, *supra.*

**FAC, ¶ 307**

Lumen released its 2018 ESG Report on April 22, 2019, stating that,


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

> [t]he CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year. ***CenturyLink recycles telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. CenturyLink Recycled more than 3,450 metrics tons of these materials in 2018.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph above was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because it gave the false impression that Lumen properly disposed of its copper wire cables upon retirement. (FAC, ¶ 308).

The Court disagrees. According to the FAC, more than 95 percent of Lumen's legacy copper wire was not lead-sheathed, and there is no indication, and certainly no public disclosure, that Lumen was not recycling non-lead-sheathed copper. Therefore, Plaintiffs do not plausibly allege loss causation. *See* discussion, *supra.* Furthermore, Lumen did not purport to say that it recycled *all* of its copper wire. In short, no reasonable investor would have been misled by the statement or omission.

Finally, Plaintiffs do not allege facts to raise the strong inference that any individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen failed to recycle its lead-sheathed copper cables or that it was unreasonable (from an environmental or social perspective) to leave those cables where they lay in conduits, on water bottoms, or suspended overhead. *See* discussion, *supra.*

**FAC, ¶ 309**

On April 8, 2020, Lumen filed a definitive proxy statement for 2020 on Form DEF14A (the "2020 Proxy Statement"), stating that, ***"[r]esponsible corporate citizenship has long been a part of our governance and business strategy and continues to be a key priority for our Board and management team."***

**FAC, ¶ 310**

The same statement from the preceding paragraph was made in Lumen's proxy statement for 2021 filed on Form DEF14A on April 7, 2021 (the "2021 Proxy Statement").

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false impression that Lumen would not make business decisions that disregarded the environment and the communities in which it operates. (FAC, ¶ 311).

***39** The Court disagrees. The statements represent non-actionable corporate cheerleading, puffery, or vague statements of optimism. *See* discussion, *supra.* Furthermore, at the time the statements were issued, Lumen had reasonable grounds to believe that the safest approach was to leave the lead-sheathed cables where they lay. Accordingly, the statements were not false or misleading.

In any event, Plaintiffs allege no facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, that Lumen's treatment of retired lead-sheathed cables was not a responsible course of action – to the extent any individual Defendant was aware of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 312**
Lumen's 2019 ESG Report was released on April 22, 2022, and included a note from Defendant, Storey, stating that,

> [i]n addition to the fundamental positive contributions our services make for people around the world, ***we have very intentionally committed to growing our business in an ethical and sustainable manner***. Through our actions, our goal is to make our employees, business partners and communities proud of our innovative and quality services, the unwavering integrity of our business ethic, our deep commitment to being a good employer, ***our respect for the environment, and our ongoing support of the communities where we live and work.... Being a good corporate citizen is a priority for CenturyLink.*** Thank you for your interest in learning how we ethically support sustainability and social responsibility in our communities.

**FAC, ¶ 313**
The 2019 ESG Report continued to represent that CenturyLink was a responsible corporate citizen: ***"[r]esponsible corporate citizenship has long been a part of our governance and business strategy and continues to be a key priority for our Board and management team."***

Plaintiffs assert that the statements identified in bold and italicized text in the foregoing paragraphs were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false impression that Lumen would not make business decisions that disregarded the environment and the communities in which it operates. (FAC, ¶ 314).

The Court disagrees. The statements represent non-actionable corporate cheerleading, puffery, or vague statements of optimism. *See* discussion, *supra.* Furthermore, at the time the statements were issued, Lumen had reasonable grounds to believe that the safest approach was to leave the lead-sheathed cables where they lay, which is consistent with its professed ethical duty to the environment. Accordingly, the statement were not false or misleading.

In any event, Plaintiffs allege no facts to support the strong inference that Storey or any other individual Defendant knew, or was severely reckless in failing to know, that Lumen's treatment of retired lead-sheathed cables was not a responsible course of action – to the extent any individual Defendant was aware of lead-sheathed cables at all. *See* discussion, *supra.*

**FAC, ¶ 315**
The 2019 ESG Report stated, in pertinent part,

> CenturyLink is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, reuse, and recycling. ***These programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes***. The EHS team assists in determining waste management methods, submitting annual reports to regulatory agencies regarding disposal, and auditing disposal facilities for environmental compliance.
>
> ***40**
>
> * * *
>
> The CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year. ***CenturyLink recycles telecommunications equipment and many other items such as***

batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. Recycling data is captured in the "Targets and metrics" table below.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement when it did not. (FAC, ¶ 316).

The Court disagrees for the same reasons set forth in response to ¶ 307. *See* discussion, *supra.*

**FAC, ¶ 317**

By no later than September 27, 2020, Lumen published an "Environment" page in the "Corporate Responsibility" section of its official website, representing that,

> **Environmental Compliance and Management**
>
> We are focused on complying with applicable environmental regulatory requirements. ***Our environmental management systems (EMS) help us identify and mitigate the environmental impacts of our operations***, drive continuous improvement and facilitate regulatory compliance.
>
> * * *
>
> **Waste Management**
>
> Lumen is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, re-use, and recycling. ***Our waste management programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes and to reduce waste through managing product-end-of-life, which includes recycling and reuse of electronic and communications equipment.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because the statements gave the false impression that Lumen properly disposed of its copper wire cables upon retirement when it did not. (FAC, ¶ 318).

The Court disagrees with Plaintiffs for the same reasons that the alleged misstatement in ¶ 307 is not actionable. *See* discussion, *supra.*

**FAC, ¶ 319**

On April 22, 2021, Lumen released its 2020 ESG Report, stating that,

> ***[r]esponsible corporate citizenship has long been a part of the way we do business***, and our Lumen brand launch created the perfect platform for enhancing our sustainability program.
>
> * * *
>
> ***Responsible corporate citizenship is a key priority for our Board and management team.***

Plaintiffs assert that the statements identified in bold and italicized text in the above-paragraphs were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because they

gave the false impression that Lumen would not make business decisions that disregarded the environment and the communities in which it operates. (FAC, ¶ 320).

***41** The Court disagrees with Plaintiffs for the same reasons it found that the alleged misstatements contained in ¶¶ 309-310 are not actionable. *See* discussion, *supra.*

**FAC, ¶ 321**
The 2020 ESG Report stated that,

> [e]nvironmental stewardship is inherent in our Lumen purpose. ***We actively review the impact of our operations to make choices to reduce our environmental footprint***. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors. Our EHS team oversees and executes the company's EHS and environmental sustainability visions, which are available to all employees on the Lumen intranet.

**FAC, ¶ 322**
The 2020 ESG Report further stated,

> [w]e are reducing waste through minimization, re-use, and recycling. ***Our internal waste management programs and initiatives also focus on the appropriate disposition of hazardous wastes***. Our EHS team implements waste management methods, submits annual reports to regulatory agencies regarding disposal and audits disposal facilities for environmental compliance.
>
> * * *
>
> We divert millions of pounds of electronic and communications equipment from landfills each year. ***We recycle telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. Lumen recycled more than 3,509 metric tons of these materials in 2020.

Plaintiffs contend that the foregoing statements identified in bold and italicized text were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement when it did not. (FAC, ¶ 323).

The Court disagrees with Plaintiffs for the same reasons it determined that the alleged misstatement in ¶ 307 was not actionable. *See* discussion, *supra.*

**FAC, ¶ 324**
On April 8, 2022, Lumen filed its definitive proxy statement for 2022 on Form DEF14A (the "2022 Proxy Statement"), stating that,

> [e]nvironmental stewardship is inherent in our Lumen purpose. ***We actively review the impact of our operations and make choices to reduce our environmental footprint***. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we

provide and value creation for our employees, communities, customers and investors. Our EHS team oversees and executes the company's EHS and environmental sustainability visions, which are available to all employees on the Lumen intranet.

Plaintiffs maintain that the statement identified in bold and italicized text in the foregoing paragraph was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because, far from "actively making choices to lessen our impact on the environment," the Company made a series of decisions that disregarded its impact on the environment. (FAC, ¶ 325).

The Court disagrees with Plaintiffs for the same reasons it determined that the alleged misstatements in ¶¶ 309-310 are not actionable. *See* discussion, *supra.*

**FAC, ¶ 326**

***42** On November 4, 2022, Lumen released its 2021 ESG Report, stating that,

***Responsible corporate citizenship is the foundation of our business.***

* * *

***Responsible corporate citizenship has long been a part of the way we do business.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because the statements gave the false impression that Lumen would not make business decisions that disregarded the environment and the communities in which it operates. (FAC, ¶ 327).

The Court rejects Plaintiffs' arguments for the same reasons identified in response to the alleged misstatements in ¶¶ 309-310. *See* discussion, *supra.*

**FAC, ¶ 328**

Lumen stated in its 2021 ESG Report that,

[g]ood corporate environmental stewardship is important to Lumen. ***As well as reducing our own environment footprint***, we are working to build an efficient global network to help reduce the emissions of our customers.

**FAC, ¶ 329**

The 2021 ESG Report further stated,

[t]o reduce our environmental impact, we establish and maintain effective waste management programs and initiatives that focus on reducing waste through minimization, re-use, and recycling. ***Our approach is also designed to ensure that hazardous waste is appropriately disposed***. Our EHS collaborates with various business units to implement and optimize waste management methods, policies and procedures.

* * *

> Each year, we divert millions of pounds of electronic and communications equipment away from landfills. ***We recycle telecommunications equipment and items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement. (FAC, ¶ 330).

The Court rejects Plaintiffs' arguments for the same reasons detailed in response to the misstatement alleged in ¶ 307. *See* discussion, *supra.*

**FAC, ¶ 331**

On February 23, 2023, Lumen filed its 2022 Form 10-K, signed by Johnson, which read, in pertinent part,

> our Environment, Health and Safety ("EHS") team is responsible for overseeing and implementing our EHS and environmental sustainability initiatives.

The EHS program framework focuses on seven key areas:

> • Waste: ***We are committed to*** reusing and recycling products, minimizing material use and carefully managing our waste. Each year, we divert millions of pounds of electronic and communications equipment from landfills. ***We recycle telecommunications equipment***, and our modem/router takeback program allows customers to return their equipment, which are then either reused or sent to an R2-certified recycler.

Plaintiffs contend that the statement identified in bold and italicized text in the foregoing paragraph above was false and misleading when made, or omitted material facts necessary to make it not misleading, for all the reasons set forth in ¶ 306, and because it gave the false impression that Lumen properly disposed of its copper wire cables upon retirement. (FAC, ¶ 332).

***43** The Court disagrees with Plaintiffs' arguments for the same reasons detailed in response to the alleged misstatement set forth in ¶ 307. *See* discussion, *supra.*

**FAC, ¶ 333**

On April 5, 2023, Lumen filed a definitive proxy statement for 2022 on Form DEF14A (the "2022 Proxy Statement"), stating, in pertinent part, that,

> [w]e have implemented occupational health and safety management systems for employees in our North America and Europe, Middle East and Africa (EMEA) regions. ***Our environment, health and safety***


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

> ***team and relevant business units implement these systems and perform periodic reviews designed to identify and achieve improvements in overall safety and performance.***

**FAC, ¶ 334**
The 2022 Proxy Statement further stated, that,

> ***[w]e are committed to environmental stewardship***, knowing that sustainability promotes the health of both our planet and our business and creates value for our customers, employees, suppliers, communities and investors. ***In addition to reducing our own environment footprint***, we are working to build an efficient global network to help reduce the emissions of our customers.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because far from "actively making choices to lessen our impact on the environment," the Company made a series of decisions that disregarded its impact on the environment. (FAC, ¶ 335).

The Court rejects Plaintiffs' arguments for the same reasons detailed in response to the alleged misstatements in ¶¶ 312-313. *See* discussion, *supra.*

v) Statements About GAAP Compliance

**FAC, ¶ 347**
In the 2018 and 2019 Form 10-Ks, plus each of the 10-Q Forms for 2019 through the third quarter of 2020, Defendants Lumen, Storey, and Dev stated, "***[o]ur consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles***."

**FAC, ¶ 349**
In the 2020 and 2021 Form 10-Ks, Defendants Lumen, Storey, and Dev, stated, "***[o]ur consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles***." Similarly, in the 2022 Form 10-K, Defendants Lumen, Johnson, and Stansbury stated, "***[o]ur consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles***." Lumen also made a similar statement in its quarterly reports on Form 10-Q for the first quarter of 2021 through the first quarter of 2023, to wit: "***our unaudited interim consolidated financial statements provided herein have been prepared in accordance with the instructions for Form 10-Q***."

Plaintiffs assert that the statements identified in bold and italicized text in the preceding paragraphs were materially false or misleading each time they were made, or otherwise omitted to state material facts necessary to make them not misleading, because Defendants failed to disclose Lumen's risk of loss related to its lead-sheathed copper cable network which was reasonably possible to occur based on the foregoing facts, including: (i) the scope of Lumen's lead-sheathed cable network which spanned over 37 states for tens of thousands of miles; (ii) the acute public health concerns associated with lead contamination; (iii) the extensive federal and state regulation holding private actors liable for lead contamination and remediation; (iv) the known contamination caused by lead-sheathed cables as acknowledged by industry officials; (v) Lumen's neglect of its lead-sheathed cable network; (vi) the systemic exposure of Lumen employees to lead; and, (vii) Lumen's widespread failures to

protect its employees from dangers of lead exposures. (FAC, ¶ 348). Plaintiffs also cite to Lumen's supposed knowledge of the *Lake Tahoe Action*, as of January 2021. *Id.*, ¶ 350.

***44** The Court notes that all financial statements filed with the SEC, including those appearing on the quarterly Form 10-Q reports, must be prepared in accordance with GAAP. (FAC, ¶ 247) (citing 17 C.F.R. § 210.4-01(a)(1)). Any financial statement filed with the SEC that is not presented in accordance with GAAP is presumed to be misleading, despite any footnotes or other disclosures to the contrary. *Id.* (citing 17 C.F.R. § 210.4-01(a)(1)).

GAAP refer to those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time promulgated by the Financial Accounting Standards Board ("FASB"). (FAC, ¶ 248). The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"). *Id.*

"ASC 450 addresses loss contingencies." *In re Perrigo Co. PLC Sec. Litig.*, 435 F.Supp.3d 571, 582 (S.D.N.Y. 2020). A loss contingency is defined as an "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." *Id.* (quoting ASC 450-20-20). "Loss contingencies can include actual or possible claims, as well as pending or threatened litigation." *Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F.Supp.3d 1, 19 (D.D.C. 2017) ("*RPM*").

"The applicable accounting standards set out different rules for claims that *have been asserted* and those that *have yet to be asserted.*" *Id.* (emphasis added). For a claim that has been asserted, the loss contingency must be disclosed if there is "at least a reasonable possibility" that a loss may be incurred, even if the amount cannot be reasonably estimated. *Id.* (citing ASC 450–20–50–2, 3, & 5). A loss contingency is reasonably possible, in turn, if the likelihood that it will occur "is more than remote but less than likely." *Id.* (citing ASC 450–20–20).

On the other hand, disclosure is not required for unasserted claims "if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment" unless: (1) "[i]t is considered probable that a claim will be asserted," *and* (2) "[t]here is a reasonable possibility that the outcome will be unfavorable." *Id.* (quoting ASC 450–20–50–6); *see also Steinberg v. Schmitt Indus., Inc.*, Civ. Action No. 22-1533, 2024 WL 1007879, at *6 n.2 (D. Or. Feb. 2, 2024), *R&R adopted*, 2024 WL 1912537 (D. Or. Apr. 27, 2024) (citations omitted).

Plaintiffs assert that Lumen's exposure during the Class Period was massive and included regulatory risk/scrutiny, litigation risks, operational risks, remediation risks, and the risk of severe reputational harm. (FAC, ¶ 337, 339-344). They assert that because Lumen faced at least a "reasonable possibility" of loss related to potential removal and litigation costs associated with its lead cable network, it was required under ASC 450 to disclose the potential loss and to provide an estimate of the loss or otherwise state that it was not estimable. *Id.*, ¶¶ 338, 344.

In their brief, Plaintiffs contend that ASC-450-20-50-6 is inapplicable because the losses alleged in the FAC arise from contingencies other than legal claims, such as environmental remediation. (Pl. Opp. Memo., pg. 17, n.3). The Court disagrees. Whether the risks associated with Lumen's lead-sheathed cables are characterized as regulatory, operational, remedial, reputational, or the costs of litigation, it was not unreasonable for Lumen to take the position that they arise from claims or regulatory assessments, which means that the risk had to be disclosed only if it was probable that a claim would be asserted *and* there was a reasonable possibility that the outcome would be unfavorable. *See* ASC-450-20-50-6. However, neither of those circumstances were present here.

***45** Plaintiffs argue that Lumen has recognized that it should have disclosed these potential losses earlier because it added a new disclosure to its quarterly report filed on August 1, 2023. (FAC, ¶¶ 235, 345). However, the August 1, 2023 quarterly report was the first report after the *WSJ*'s articles were published in July 2023, which was the first time that potential claimants were made aware of possible claims or an assessment, thereby triggering the disclosure obligation. Rather than supporting earlier

disclosure of the loss contingency, Lumen's recognition of the loss contingency after the stories broke is consistent with its prior accounting practices.

Plaintiffs also point to class actions filed by Verizon utility workers for exposure to lead-sheathed aerial cables as further evidence that Lumen needed to disclose the risk of loss related to public health and operational risks. *See* FAC, ¶ 341. Again, however, these suits were not filed until mid-August and September 2023, *after* publication of the *WSJ* articles and the resulting outcry. By then, of course, Lumen already had disclosed the loss contingency in its August 1, 2023 10-Q.

Plaintiffs again trumpet the *Texas* and *Tahoe Actions* as evidence of litigation risks that Lumen should have appreciated. (FAC, ¶ 342). As discussed previously, however, those cases did not demonstrate a serious potential liability from lead-sheathed cables. *See* discussion, *supra.* In any event, prior to the *WSJ* articles there was no manifestation by a potential claimant of an awareness of a possible claim or assessment against *Lumen. See* ASC-450-20-50-6. As discussed previously, prior to the investigation conducted by the *WSJ*, as revealed in the July 2023 articles, there was no indication that the lead-sheathed cables posed a hazard to the public or the environment where they lay. To be sure, in 2013-2014, there was evidence that workers might be exposed to unsafe levels of lead, but, following the MNOSHA Settlement, Lumen reasonably believed that proper precautions were in place. [26]

Finally, Plaintiffs allege no facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, that Lumen was required by GAAP to show a contingent loss stemming from its practice of retiring its legacy lead-sheathed cables in place. *See In re Diebold Nixdorf, Inc., Sec. Litig.*, Civ. Action No. 19-6180, 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021) ("no allegations that there were any internal reports"--or any other documents, analyses, or data for that matter--"that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it ... rose to the level of fraud.") (citation omitted). In fact, allegations of GAAP violations or accounting irregularities, without evidence of "corresponding fraudulent intent," are insufficient to state a securities fraud claim. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citations omitted).

vi) Summation

The Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 253-350. Considering the absence of any material misrepresentations or omissions, there also are no facts to support a "cogent and compelling" inference of scienter, either individually or holistically.

**D. Additional Evidence of Scienter**

***46** Having determined that Plaintiffs do not allege facts to show plausibly that any Defendant made a statement that was misleading as to a material fact, the Court need not reach Plaintiffs' additional evidence of scienter. However, having proceeded this far, the Court briefly will address these additional arguments. [27]

i) Core Operations Theory

Plaintiffs contend that the individual Defendants' knowledge of the practices at issue in this case may be inferred from the fact that Lumen's copper wire infrastructure was a key piece of its business. *See* FAC, ¶¶ 405-408. The Fifth Circuit has recognized that, although an officer's position with a company does not suffice to infer scienter, "special circumstances," combined with the officer's position, may result in a strong inference of scienter. *In re: Six Flags*, 58 F.4th at 219 (citing *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958-959 (5th Cir. 2016)). Pertinent factors that "might tip the scales" include "(1) the company's size; (2) whether the transaction at issue was critical to the company's continued vitality; (3) whether the misrepresented information would have been readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent with one another." *Id.* (citation and internal quotation marks omitted).

Applying the foregoing factors to the case at hand, Plaintiffs concede that Lumen is a large company. (Pl. Opp. Brief, pgs. 27-28). Furthermore, while Plaintiffs again try to equate Lumen's entire copper line network with its lead-sheathed copper lines, they gloss over the fact that lead-sheathed copper represent less than five percent of Lumen's copper lines. *See* discussion, *supra.* Moreover, Plaintiffs continue to mix the cost of removing the lead-sheathed cables with the cost of operating them, when it has yet to be determined that the lead even needs to be removed, and, even if were so, it represents a fixed cost.

The Court also has not recognized any information that was misrepresented or omitted or any statements made by a Defendant that were internally inconsistent. Therefore, the Court finds that Plaintiffs' core operations theory does not provide support for a strong inference of scienter.

ii) Powerful Economic Incentives

Plaintiffs argue that, given the estimated cost to remove the lead-sheathed cables, Defendants had a powerful economic incentive, a/k/a motive, to suppress information concerning its lead-covered cables. *See* FAC, ¶¶ 382-387. Motive is a critical, but non-essential component of a successful claim for securities fraud. *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) ("Pier 1 Imports") (citation omitted). "A failure to show motive means that 'the strength of the circumstantial evidence of scienter must be correspondingly greater.' " *Id.* (citations omitted). "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.* (citations and internal quotation marks omitted).

However, allegations of motives that are universal to corporations and their officers, *e.g.*, personal economic benefit, do not suffice to establish an inference of fraud under Rule 9(b). *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d at 213 (collecting cases) (desire to complete a financially successful tender offer does not suffice). Similarly, the desire to maintain a high credit rating is universally held among corporations and their executives and, thus, does not contribute significantly to an inference of scienter. *In re: Shaw*, 537 F.3d at 544 (citation omitted). While the Fifth Circuit has recognized that the need to complete a "crucial" $129 billion merger will provide a company with a motive to inflate its financial results, [28] those circumstances are not present here where there was no crucial merger or any facts to suggest that any individual Defendant was aware of a potential need to remove lead-sheathed cables and the scope of the issue. *See* discussion, *supra.* Accordingly, the Court rejects Plaintiffs' economic incentives argument as a basis for supporting an inference of scienter.

iii) Certifications Pursuant to the Sarbanes-Oxley Act of 2002

***47** Plaintiffs contend that scienter may be inferred from the fact that the individual Defendants certified pursuant to the Sarbanes-Oxley Act of 2002 that they were "responsible for establishing and maintaining disclosure controls and procedures," which ensures that material information relating to the registrant is made known to them. (FAC, ¶¶ 409-412).

"Under the Sarbanes–Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports." *In re: Shaw*, 537 F.3d at 544–45 (citing 15 U.S.C. § 7241(a)). However, "a Sarbanes–Oxley certification, standing alone, is not indicative of scienter." *Id.* (citation omitted). Instead, there must be "facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." *Id.* (citation and internal quotation marks omitted). Plaintiffs have not made the requisite showing here.

**E. Loss Causation**

The Court's having determined that the FAC does not plausibly allege a material misrepresentation or a cogent and compelling inference of scienter, the Court need not reach remaining issues of loss causation raised by Defendants. *Crutchfield v. Match Grp., Inc.*, 529 F.Supp.3d 570, 603–04 (N.D. Tex. 2021) (citing *Owens v. Jastrow*, 789 F.3d 529, 546 (5th Cir. 2015)).

**Section 20(a) of the Securities Exchange Act of 1934**

In Count II of the FAC, Plaintiffs allege violations of Section 20(a) of the Exchange Act against the individual Defendants. (FAC, ¶¶ 442-450). Section 20(a) of the Securities Exchange Act of 1934, [29] extends liability to any person who "controls" a person who is subject to primary liability under the respective statutory scheme. Under the act, "controlling person" liability requires, "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant." *See* *Trendsetter Investors, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *14-15 (S.D. Tex. Jan. 18, 2007) (discussing liability under § 20(a)) (citation omitted). Status or position alone does not automatically confer controlling person liability. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). Rather, the controlling person must have at least exercised some influence over the direction of the firm. *Id.*

However, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp.*, 365 F.3d at 383 (citation omitted). Because the FAC fails to state a claim for primary liability under the 1934 Act, *see* discussion, *supra*, there can be no controlling party liability under § 20(a), and dismissal of the § 20(a) claim is required. *In re: Shaw*, 537 F.3d at 545.

**Conclusion**

***48** Following an 18-months-long investigation, the *Wall Street Journal* published a series of sensationalist articles regarding studies which had shown that lead was migrating from lead-sheathed cables, installed as part of the nation's telephone network through the first half of the last century. The revelation took many—including those intimately familiar with the telecommunications industry—by surprise. (FAC, ¶ 219). Realizing an opportunity to potentially recoup some losses in the wake of Lumen's years long stock price decline, Plaintiffs, via counsel, seized upon several shoots of circumstantial evidence to expertly craft the latest securities actions against Lumen and its officers. However, Plaintiffs' effort, like the last, falls short.

As the FAC effectively concedes, until the *Wall Street Journal* published the findings of its investigation, the telecom industry had every good reason to believe that the best practice was to leave the lead in place, undisturbed. Obviously, the *WSJ* exposé and the ensuing public and regulatory outcry materially changed the industry's prior calculus. Try as they might, however, Plaintiffs do not allege facts to show plausibly that Defendants made any material misrepresentations or omissions.

At the end of the day, the Court is left with the inexorable conviction that Plaintiffs are attempting to assert a non-cognizable "fraud by hindsight" securities claim. *See* *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (allegations of "fraud by hindsight" are not cognizable). However, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Ultimately, the Court is unable to infer any ill motive or intent stemming from alleged failures to disclose a risk that Defendants did not recognize the Company faced while discussing no more than tangentially related issues, or as part of a broader, all-encompassing category, and/or in general, aspirational tones.

Accordingly, the undersigned finds that Plaintiffs do not state a plausible claim for relief against Defendants. Stated differently, there is no reasonable expectation that discovery will reveal evidence to support the myriad missing elements of their claims. *See* *Twombly*, 550 U.S. at 556. [30]

For the reasons stated,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

IT IS ORDERED that Plaintiffs' motion to strike [doc. # 46] is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to take judicial notice [doc. # 38] is GRANTED IN PART and DENIED IN PART, as detailed in the body of this decision. Furthermore,

IT IS RECOMMENDED that Defendants' motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 36] be GRANTED and that Plaintiffs' claims against all Defendants be DISMISSED WITH PREJUDICE, in their entirety. FED. R. CIV. P. 12(b)(6).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

***49 A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 14th day of March, 2025.

**All Citations**

Not Reported in Fed. Supp., 2025 WL 978229

## Footnotes

1 *See* https://finance.yahoo.com/quote/LUMN/ (last visited on March 5, 2025). The Court may take judicial notice of stock prices. *Linenweber v. Sw. Airlines Co.*, 693 F.Supp.3d 661, 674 (N.D. Tex. 2023) (citing *Catogas v. Cyberonics*, 292 F. App'x 311, 316 (5th Cir. 2008)).

2 https://finance.yahoo.com/quote/LUMN/history/?period1=322151400&period2=1741132800 (last visited on March 5, 2025).

3 This figure does not contemplate 371,000 miles of copper wireline infrastructure that Lumen divested via its 2022 sale of certain legacy assets to Apollo Global Management, Inc., under the brand name, Brightspeed. (FAC, ¶ 5, 48-50).

4 Plaintiffs derived this cost per foot estimate from a 2010 projection that "Northeast Utilities Service Company" provided to the EPA to remove 1,200 miles of paper insulated lead cable from its underground electric distribution system. *Id.*

5 *See In Re: AT&T Securities Litigation*, Civ. Action No. 24-1196 (N.D. Tex.) and *General Retirement System of the City of Detroit v. Verizon Communications, Inc., et al.*, Civ. Action No. 23-5218 (D. N.J.). There are pending motions to dismiss in both cases.

6 On January 31, 2025, Plaintiffs' counsel filed a suggestion of death for Lead Plaintiff Michael Glauber. [doc. # 61]. On February 10, 2025, Defendants filed a response to the suggestion of death, stating that a new qualified lead plaintiff should be appointed in place of the deceased Mr. Glauber, who apparently passed away in November 2024. [doc. # 62]. In light of the undersigned's recommended disposition of the pending motion to dismiss, *see* discussion, *infra*, Plaintiffs may file an appropriate motion to substitute or appoint a new lead plaintiff, as needed.

7 An "amended complaint supersedes the original complaint and renders it of no legal effect, unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). Here, there is no indication that the amended complaint adopted or referenced the earlier pleading. Furthermore, the parties agreed that any motion to dismiss would be directed toward the FAC. *See* Dec. 28, 2023 Order [doc. # 34].

8 In all likelihood, however, the focus of the rule is to monitor the effect that the retirement of copper transmission lines has on the ability of ILECs to provide telecom services. *See* ¶¶ 182-188, 48.

9 EHSCP is a consortium of communications environmental, health, and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry. (FAC, ¶ 125). As of **2011**, its "member companies" included Alcatel-Lucent, AT&T, CenturyLink, Ericsson, Cincinnati Bell, NextG Networks, Sprint Nextel, T-Mobile, Verizon, Verizon Wireless, and Windstream Communications. *Id.*

10 Plaintiffs contend that striking the exhibits will promote a clear record of the materials that the Court is considering in support of the motion to dismiss. Plaintiffs may rest assured, however, that the undersigned will specify if exhibits are considered. In this case, they were not. In any event, striking a document does not contribute to a clearer record because, even if stricken, the documents are not erased or scrubbed from the docket.

11 As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court. Any objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal Rules of Civil Procedure.

12 As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court. Any objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal Rules of Civil Procedure.

13 *E.g.*, "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers ..." *Tellabs, Inc.*, 551 U.S. at 320 (citation omitted).

14 "[F]orward-looking statements that are included in a financial statement prepared in accordance with GAAP are excluded from the safe-harbor provision." *Padilla v. Cmty. Health Sys., Inc.*, Civ. Action No. 19-0461, 2022 WL 3452318, at *37 (M.D. Tenn. Aug. 17, 2022) (citing, *inter alia*, 15 U.S.C. § 78u5(b)(2)(A)).

15 Oral statements can qualify for the safe harbor:

(A) if the oral forward-looking statement is accompanied by a cautionary statement-

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

(B) if--

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(2).

16 Although the Fifth Circuit has held that the PSLRA did not eliminate "severe recklessness" as a basis for scienter generally under § 10(b)/Rule 10b-5, the Court did suggest that for forward-looking statements, Congress modified the scienter definition by requiring plaintiffs to demonstrate that defendants' had "actual" knowledge. *Nathenson*, 267 F.3d at 409; *cf. Southland Securities Corp*, (court analyzed defendants' forward-looking statements, and found that plaintiffs failed to allege facts demonstrating actual knowledge or severe recklessness).

17 In fact, the Fifth Circuit has more than once remarked that "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996) (citation omitted).

18 A "bare allegation about industry custom is precisely the type of conclusory allegation that motivated the heightened pleading standards of Rule 9(b) in the first place." *Lovelace*, 78 F.3d at 1020.

19 In a 1996 article adduced by Plaintiffs, the authors discussed the dangers experienced by recyclers from stripping the lead from copper telecom cable. *American Journal of Industrial Medicine*, "Lead Poisoning in Telephone Cable Strippers: A New Setting for an Old Problem;" Pl. Opp. Memo., Exh. A [doc. # 45-3]. The authors concluded that "[o]ther aspects of cable processing, including cable pulling, transport and disposal, as well as environmental/household contamination, may put significant numbers of workers and others at risk of lead poisoning ..." *Id.*

20 A court may take judicial notice of court pleadings in other cases because they constitute public records. *See Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 Fed. App'x. 617, 618 n.1 (5th Cir. 2015) (citations omitted).

21 Plaintiffs do not allege any facts to show that, at the time the statements were issued, any "untoward" or "unfavorable" event had occurred. *See* *Lormand*, 565 F.3d at 249.

22 In *UBS*, the company disclosed in an offering that it was involved in multiple legal proceedings and government investigations that could expose the company "to substantial monetary damages and legal defense costs," etcetera. *UBS*, 752 F.3d at 184. Nonetheless, the court held, under § 11 of the Securities Act, that the company was not required to admit that it was engaged in an ongoing tax evasion scheme, i.e., the specific details of its alleged wrongdoing. *Id.* Further, although the court was addressing liability under § 11 of the Securities Act, it applied the same definition of "materiality" as under § 10(b) of the Exchange Act. *UBS*, 752 F.3d at 188.

23 The fact that Plaintiffs resort to alleging that Defendant, Kate Johnson, once toured a telecommunications museum that housed a display containing a timeline with historic telecom cables, only serves to underscore Plaintiffs' lack of facts regarding scienter. *See* FAC, ¶ 97.

24 *E.g.*, Lumen's obligation to protect workers (FAC, ¶ 373), Defendants' presumed knowledge of dangers posed by lead paint (FAC, ¶¶ 374-381), Defendants' alleged ability to access an engineering database that could disclose whether cables were lead-sheathed (FAC, ¶¶ 388-393), regular Company reviews of data on cable retirement (FAC, ¶¶ 394-396), Defendants, Storey and Johnson's platitudes on ESG awareness (FAC, ¶¶ 400-402), and Stansbury's month-long review of legacy revenue (FAC, ¶¶ 403-404).

25 Plaintiffs allege that the information was made known to Lumen's EHS leaders. *See* FAC, ¶¶ 172-173. However, none of the EHS leaders is an individual Defendant.

26 The CWs allege that Lumen was not adhering to safe or best practices during the Class Period. However, there is no indication that this issue was brought to the attention of any individual Defendant. Moreover, Plaintiffs do not refer to any claims filed with regulatory agencies or civil complaints filed by Lumen workers against their employer.

27 The Court already has acknowledged and rejected Plaintiffs other claimed evidence of scienter. *See* discussion, *supra.*

28 *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003).

29 Section 20(a) states that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

30 To the extent that the undersigned has expanded upon the grounds for dismissal urged by Defendants, the instant report and recommendation provides adequate notice to the parties. *Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998); *Alexander v. Trump*, 753 Fed. App'x. 201, 208 (5th Cir. 2018) (the R&R provided both notice and an opportunity to respond).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT N

2025 WL 1744505
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE SEAGATE TECHNOLOGY HOLDINGS PLC SECURITIES LITIGATION

Case No. 23-cv-03431-RFL
|
Signed May 12, 2025

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 106

RITA F. LIN, United States District Judge

***1** In this putative class action alleging securities fraud, Plaintiffs contend that Seagate Technology Holdings plc ("Seagate") and two of its executive officers, William D. Mosley and Gianluca Romano, violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs' claims are based on Defendants' statements regarding Seagate's sales of hard disk drive ("HDD") technology to the Chinese company Huawei Technologies Co., Ltd. ("Huawei").

In August 2020, the Department of Commerce, through its Bureau of Industry and Security ("BIS"), issued the Foreign Direct Product Rule ("FDPR"), which prohibited exports of certain designated U.S. technologies to Huawei, based on national security and foreign policy concerns. In 2020 and 2021, Seagate continued to sell HDDs to Huawei, even after its competitors ceased shipments, and allegedly sold over $1 billion in HDDs to Huawei after the FDPR went into effect. In April 2023, Seagate admitted that those sales were illegal under the FDPR, and paid a historically large $300 million civil penalty in a settlement with BIS. This securities lawsuit alleges that, in 2020 and 2021, Seagate falsely represented to investors that its sales were in fact in compliance with the FDPR based on its continual monitoring of the regulations.

Seagate's motion to dismiss the Complaint was previously granted with leave to amend because, among other things, Plaintiffs had not adequately alleged that Seagate *knew* its sales to Huawei were illegal at the time those statements were made. Plaintiffs have now added allegations that the BIS guidance interpreting the FDPR required that, in any situation where there was "reasonable suspicion that a transaction will violate" the Export Administration Regulations ("EAR"), Seagate had an obligation to (1) engage in further inquiry, and (2) to refrain from the transaction or seek guidance from BIS if the company continued to have "reasons for concern" after its inquiry. (Dkt. No. 100 ("Compl.") ¶ 43 (quoting BIS guidance).) Seagate neither refrained from further sales to Huawei nor sought guidance from BIS. Accordingly, by stating its compliance with the FDPR and touting its familiarity with the regulations, Seagate was allegedly also representing to investors that it did not have "reasons for concern" that its sales to Huawei were illegal.

Plaintiffs have sufficiently alleged that Seagate's actions support a strong inference that, by October 2020, the company was well aware that there were "reasons for concern" about the legality of its continued sales to Huawei under the FDPR. Although Seagate had openly discussed Huawei's role as a customer in September 2020, the company allegedly shifted its policy to stop discussing its sales to customers by October 2020. Indeed, on December 7, 2020, Seagate allegedly signed a strategic cooperation agreement with Huawei where it became Huawei's priority supplier, and in January 2021, Huawei allegedly placed a "massive" order for 2 million HDDs and received a $280 million line of credit from Seagate. Yet, despite Seagate's allegedly typical practice of announcing similar partnerships, Seagate remained silent rather than touting those developments, supporting an

inference that it was aware of reasons for concern about its ongoing sales to Huawei. From May 2021 through September 2021, Seagate also allegedly refused to answer questions from Congress about its sales to Huawei, further suggesting the company had reasons for concern about those sales. And, ultimately, an October 2021 minority report from the Senate Commerce Committee concluded that Seagate had "knowingly violated the Foreign Direct Product Rule for more than one year." (*Id.* ¶ 102 (quoting the report).) Those allegations support a strong inference that Seagate was, at the very least, aware of reasons for concern about the legality of its sales to Huawei.

***2** For the reasons stated below, the Court **GRANTS IN PART WITHOUT LEAVE TO AMEND AND DENIES IN PART** Defendants' motion to dismiss the Amended Consolidated Class Action Complaint ("Complaint") for failure to state a claim. As to most of Seagate's statements regarding compliance with the FDPR, the drivers of its revenue, and its reliance on sales to Huawei to meet its revenue projections, Plaintiffs have sufficiently pled their claims.

## I. BACKGROUND

### A. The Foreign Direct Product Rule

On August 20, 2020, BIS issued the FDPR. In relevant part, footnote 1 of the FDPR— titled "Foreign-produced direct product items involving footnote 1 designated entities"—provides:

> You may not reexport, export from abroad, or transfer (in-country) without a license or license exception any foreign-produced item specified in paragraph (a) or (b) of this footnote when there is "knowledge" that:
>
> (1) The foreign-produced item will be incorporated into, or will be used in the "production" or "development" of any "part," "component," or "equipment" produced, purchased, or ordered by any entity with a footnote 1 designation in the license requirement column of this supplement; or
>
> (2) Any entity with a footnote 1 designation in the license requirement column of this supplement is a party to any transaction involving the foreign-produced item, *e.g.*, as a "purchaser," "intermediate consignee," "ultimate consignee," or "end-user."

Paragraph (b) of the footnote, titled "Direct product of a plant or major component of a plant," states: "The foreign-produced item is produced by any plant or major component of a plant that is located outside the United States, when the plant or major component of a plant, whether made in the U.S. or a foreign country, itself is a direct product of U.S.-origin 'technology' or 'software' subject to the EAR that is specified in" particular Export Control Classification Numbers of the Commerce Control List. And, according to the notes to paragraph (b), "[a] major component of a plant located outside the United States means equipment that is essential to the 'production' of an item, including testing equipment."

The term "direct product" is defined elsewhere in the Export Administration Regulations as "[t]he *immediate product* (included processes and services) produced directly by the use of technology or software." 15 C.F.R. § 772.1 (emphasis added). Based on that definition, Seagate contended that the rule could be read as prohibiting only the export of the immediate product of equipment using the prohibited technology. Specifically, Seagate argued that it interpreted the FDPR "to require evaluation of only the last stage of its HDD manufacturing process rather than the entire process." (Dkt. No. 72-19 ("BIS Order") at 5.) [1]

However, footnote 1 expressly contemplates that foreign-produced items may be direct products when produced by plants or major components of plants that are themselves direct products of the prohibited technology. Moreover, a "major component" of a plant is defined to include "equipment that is essential to the 'production' of an item"—meaning that a "major component" appears to include essential equipment from any phase of production of the product. Based on footnote 1 of the FDPR, the rule is fairly read to prohibit the export of items "produced by" any essential equipment, where such *equipment* was the direct product of the prohibited technology. So long as the *equipment* was the direct product, all items produced by that equipment would similarly be barred from export throughout the entire manufacturing chain.

***3** The latter interpretation appears more faithful to the plain text of the FDPR. Otherwise, the rule's knowledge requirement —which prohibits the item's "incorporate[ion]" or "use[ ]" in the "production" or "development" of any part or equipment used by the entity when there is knowledge—would be rendered pointless, if the rule were read to only apply to the last stage of production. BIS guidance confirms this point. In response to a public comment requesting a definition for the term "essential," BIS stated that "[b]ecause the definition of production applies to 'all production stages, such as: Product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance', any equipment subject to the Export Control Classification Numbers specified in footnote 1 of supplement no. 4 to part 744 of the EAR that is involved in any of the production stages is considered *essential*." Addition of Huawei Non-U.S. Affiliates to the Entity List, the Removal of Temporary General License, and Amendments to General Prohibition Three (Foreign-Produced Direct Product Rule), 85 Fed. Reg. 51,596 (Aug. 20, 2020) (to be codified at 15 C.F.R. pts. 736, 744, 762) (emphasis in original). It would not make sense for the agency to define essential equipment to include the entire chain of production if the final stage of manufacturing was the only stage that mattered.

Seagate's strained interpretation also defies the purpose of the export restrictions—which is to avoid allowing Huawei to access products that could allow them to reverse-engineer prohibited technology. Although Seagate could conceivably have been unaware that its interpretation was wrong, the BIS guidance specified that once Seagate was put on notice that its conduct might conceivably violate the FDPR, Seagate was not entitled to bury its head in the sand, but instead was under an affirmative obligation to engage in further inquiry. According to the guidance, when a company becomes aware that its customer is on the U.S. restricted party list—as Huawei is—that "should cause reasonable suspicion that a transaction will violate the EAR," and the company has "a duty to check out the suspicious circumstances." "The purpose of this inquiry is ... to determine whether the 'red flags' can be explained or justified." But if a company "continue[s] to have reasons for concern" after their initial inquiry, the guidance explains that it "should either refrain from the transaction or submit all the relevant information to BIS in the form of an application for a license or in such other form as BIS may specify." [2]

### B. The Court's Prior Motion to Dismiss Order

In its prior order on the motion to dismiss, the Court found that there were insufficient allegations contained in the complaint from which to infer that "Seagate or the other defendants knew that Seagate's interpretation of the FDPR was incorrect at the time they claimed to be in compliance with the rule, or that Defendants made those statements with the required deceptive intent." (Dkt. No. 96 ("MTD Order") at 2.) That version of the complaint did not contain any allegations about the BIS guidance —which describes the affirmative duties that are triggered once a company has reasons for concern. As explained above, that BIS guidance required Seagate to either refrain from the transaction or seek guidance from BIS in the face of uncertainty, which it did not.

### C. Timeline of Events

The FDPR was promulgated on August 20, 2020. Immediately following the promulgation of the FDPR, Seagate's competitors announced that they would stop shipping HDDs to Huawei. Seagate did not follow suit. Instead, as will be discussed in greater detail below, at a Deutsche Bank Technology Conference on September 14, 2020, Romano assured investors that although Seagate was "still going through the final assessment," based on what the company had "seen until now," it did not "see any particular restriction for [Seagate] in term[s] of being able to continue to ship to Huawei or any other customers in China." (Dkt. No. 101 at 1.) Additionally, Romano stated that Seagate "[did not] think [it] need[ed] to have a specific license." (*Id.*)

***4** However, by the time that an investor call took place on October 22, 2020, Seagate's approach to discussing its sales to Huawei had changed. Despite Seagate's willingness to openly discuss sales to Huawei during the previous month, when asked explicitly about whether Seagate was continuing to ship to Huawei, Mosley did not respond to the question directly, stating only that Seagate "continually monitor[s] and remain[s] in compliance with all the rules and regulations around." (*Id.* at 15.) And by January 21, 2021, when asked about Huawei on an earnings call, Romano stated that Seagate does not "comment on any specific customers." (*Id.* at 37.)

On December 7, 2020, Seagate signed a three-year strategic cooperation agreement with Huawei, which provided Seagate with priority over other Huawei suppliers. Though most companies would presumably be eager to tout a large and highly profitable deal to investors, Seagate allegedly did not publicize this agreement with Huawei at all. That approach contrasted with Seagate's approach to similar agreements in the past—such as on February 12, 2025, when Seagate publicly announced a strategic alliance with Micron Technology, and on September 18, 2017, when Seagate publicly announced a strategic cooperation agreement with Baidu. (Compl. ¶ 84 n.7.)

Through 2021, Seagate continued to receive notice that it may be in violation of the FDPR, yet continued to publicly claim compliance. On January 27, 2021, one of Seagate's third-party suppliers sent Seagate an "FDP rule notification" letter, notifying it that the supplier's own technology was restricted under the FDPR. And on May 10, 2021, Senator Wicker—the Ranking Member of the Senate Commerce Committee—sent a letter to Seagate (in addition to Western Digital and Toshiba), "seeking to determine whether industry-leading hard disk drive suppliers are complying" with the FDPR. (Compl. ¶ 96 (quoting letter).) The letter asked the companies to provide their interpretation of the FDPR, including their opinion on whether a license was required to continue selling HDDs to Huawei. Although its competitors responded to the request, Seagate "declined to provide its interpretation of the rule, detail its transactional relationship with Huawei, or disclose whether the company had obtained a license to continue shipment of hard disk drives to Huawei." (Dkt. No. 104-10 ("Committee Investigation Report") at 6.) In August 2021, the Minority Staff of the Commerce Committee contacted Seagate again, "seeking to determine its interpretation" of the rule. (*Id.* at 7.) Seagate refused to respond.

It was not until after the Commerce Committee received nonpublic information from BIS—including information regarding any license applications submitted by suppliers—that Seagate representatives agreed to interview with Minority Staff. In the interview, Seagate representatives "disclosed that Seagate ha[d] not applied for any licenses to export hard disk drives to Huawei or its affiliates that are currently on the Entity List" and "that the company ha[d] stopped shipping hard disk drives to Huawei," though it "declined to provide the date that shipments ended." (*Id.*) It was later revealed that Seagate ceased HDD shipments to Huawei on or around September 29, 2021. On October 26, 2021, the Commerce Committee Minority Staff published its report, in which it stated that based on the "evidence available to Minority Staff, it appears that Seagate Technology knowingly violated the Foreign Direct Product Rule for more than one year" and that "Seagate likely made the strategic calculation to continue violating national security regulations based on the prospect of earning significantly greater profits through market monopolization than the potential cost of regulatory penalties." (*Id.* at 8.)

***5** On August 29, 2022, Seagate received a proposed charging letter from BIS, alleging that it had violated the FDPR. In April 2023, Seagate paid a $300 million civil penalty in connection with a settlement with BIS, admitting that it had violated the FDPR. Although Seagate never admitted that it knew its interpretation of the FDPR was incorrect, BIS's penalty guidance states: "Many apparent violations are isolated occurrences, the result of a good-faith misinterpretation, or involve no more than simple negligence or carelessness. In such instances, absent the presence of aggravating factors, the matter frequently may be addressed with a no action determination letter or, if deemed necessary, a warning letter." (Compl. ¶ 65 (quoting BIS penalty guidance).) Taking the penalty guidance into account, the $300 million penalty assessed against Seagate suggests that BIS concluded that, at the very least, the company's conduct was not the result of negligence or carelessness.

## II. DISCUSSION

### A. Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance in contravention" of the Securities and Exchange Commission's rules. 15 U.S.C. § 78j(b). The SEC's implementing regulation, Rule 10b-5, makes it unlawful for any person "[t]o make any untrue statement or a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Plaintiffs must prove each of the following elements to recover under Rule 10b-5(b): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

To survive a motion to dismiss, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a plausible claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For private securities fraud actions, a complaint must satisfy the additional pleadings requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the heightened pleading standard of Rule 9(b). Under the PSLRA, where a plaintiff alleges that the defendant "made an untrue statement of a material fact," they must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Similarly, "with respect to each act," a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). Under Rule 9(b), a plaintiff is required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

The challenged statements can be grouped into three categories: (1) affirmations of compliance with the FDPR and other applicable export restrictions; (2) statements about Seagate's reliance on sales to Huawei; and (3) statements about the drivers of Seagate's revenue. Each category is addressed in turn.

### 1. Statements of compliance

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (cleaned up). Moreover, "[a] complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (citation and internal quotation marks omitted). "[D]eliberate recklessness is more than *mere* recklessness or a motive to commit fraud." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citation omitted) (emphasis in original). "It is instead an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted) (emphasis in original).

***6** Plaintiffs adequately pled with particularity both falsity and scienter as to all of Seagate's statements of compliance, except for those made on September 14, 2020. As previously described, at a Deutsche Bank Technology Conference on September 14, 2020, Romano stated that although Seagate was "still going through the final assessment," based on what the company had "seen until now," it did not "see any particular restriction for [Seagate] in term[s] of being able to continue to ship to Huawei or any other customers in China." (Dkt. No. 101 at 1.) Additionally, Romano assured investors that Seagate "[did not] think [it] need[ed] to have a specific license." (*Id.*) On that same call, Romano responded to another question about whether Seagate was impacted by several Chinese companies being put on the Entity List by stating: "I would say the majority of our customers are in China. We have a very high market share in China in general .... We don't have any limitation right now in term[s] of what we can ship to those customers." (*Id.* at 8.)

The Complaint's factual allegations do not support an inference that Defendants knew, by September 14, 2020, that their interpretation of the FDPR was erroneous, or that they were required to obtain a license in order to continue shipments to Huawei. Though Seagate's competitors had previously ceased shipments, Seagate explained that it was still going through its

final assessment of the rule. These statements imply that, at that point in time, Seagate was still forming its opinion on the potential consequences of the rule. Because Plaintiffs have not alleged that Seagate's assessment of the rule was complete by the time at which Romano made this statement, or that Seagate had reason to know that it was not in compliance with the rule prior to concluding its assessment, Seagate's statements on September 14, 2020 do not provide a basis from which scienter or falsity can be plausibly inferred.

However, by October 22, 2020, Seagate's behavior changed. Notwithstanding Romano's willingness to specifically discuss Huawei during the call that took place just the month prior, when asked explicitly on an investor call about whether Seagate was continuing to ship to Huawei, Mosley responded only with the following statement: that Seagate "continually monitor[s] and remain[s] in compliance with all the rules and regulations around." (*Id.* at 15.) And by January 21, 2021, when asked again asked about Huawei, Romano stated that Seagate does not "comment on any specific customers." (*Id.* at 37.) Seagate's shift to refusing to discuss Huawei supports an inference that Seagate was, at the very least, aware that there were reasons for concern that its activities were not in compliance with the FDPR.

As Seagate confirmed at oral argument, its assertion that it remained in compliance with "all the rules and regulations" was a representation that Seagate remained in compliance with the BIS guidance. In turn, that guidance required Seagate to either refrain from the transaction or seek guidance if it had "reasons for concern" about the legality of its sales to Huawei. Because Seagate neither stopped its sales nor sought guidance, Seagate's statement of compliance was a representation that it had no reasons for concern. Accordingly, Seagate's alleged awareness of reasons for concern about its Huawei sales provides a basis for both falsity and scienter. If Seagate truly believed its interpretation of the FDPR was reasonable, and thus, that it had no reasons for concern that it was non-compliant with the rule, why not continue to openly tout its business with Huawei?

Seagate's refusal to directly answer questions about Huawei on investor calls is not the only evidence that Seagate was aware that there were reasons for concern. As previously described, Seagate's choice to not publicize its strategic cooperation agreement with Huawei, despite the large size of the agreement and despite allegedly doing so when entering into similar agreements with other companies in the past, provides an additional basis to infer that Seagate was aware that its activities might not comply with the requirements of the FDPR. Likewise, Seagate's choice to stonewall the congressional investigation, including by refusing to provide the Commerce Committee with its own interpretation of the FDPR, further supports an inference that the company believed it had reasons for concern that its interpretation was incorrect. This conduct supports an inference of scienter, especially when analyzed in light of the other indications that Seagate's interpretation was incorrect—such as that Seagate knew its interpretation was different from others', that it received notice from a third-party supplier that the supplier's technology was restricted under the rule, and that the Commerce Committee was investigating the issue.

***7** Seagate suggests that to infer scienter based on "reasons for concern" rather than known illegal conduct would lower the pleading requirement of deliberate recklessness to the standard for negligence. But Seagate allegedly represented to investors, effectively, that it had no "reasons for concern" about the legality of its HDD sales. Because that is the representation Seagate made, the inquiry focuses on whether Seagate's representation was in fact false and whether Seagate knew it was false. That does not change the legal requirements for scienter.

Interpreted against this backdrop, Seagate's repeated affirmations of compliance—that is, that there were no "reasons for concern"—are sufficiently alleged to be false, and known to be false to Seagate at the time. For example, Seagate made the following statement of compliance on June 8, 2021:

> We always answer to this specific question the same way because that is the truth is we comply with all the rules and regulations. And based on that, we ship for all our customers following those rules and regulations .... We don't comment on specific customers as we don't comment on specific suppliers or

> investors. But in general, it's part of our job to ensure that we understand and then we follow all the rules and regulations of trade.

(*Id.* at 44.) On October 26, 2021, Seagate also made the following statement:

> Seagate "complies with all laws applicable to its business and operations, including export control regulations."

(*Id.* at 58.) And on October 26, 2022, Seagate made the following statements:

> Seagate "did not engage in prohibited conduct," "complied with all relevant export control laws and regulations," and that "Seagate has committed to compliance through its global team of international trade compliance and legal professionals and by maintaining robust trade controls compliance policies and procedures."

> "We have responded to the letter and believe that we've complied with all relevant export control laws and regulations."

(*Id.* at 66, 73.)

Finally, Defendants' risk factor statements in their annual and quarterly financial reporting, and associated SOX certifications, are also adequately alleged to be false and to support a strong inference of scienter. A representative example of a risk factor statement contained in Seagate's Form 10-Q is the following:

> There have been no material changes to the description of the risk factors associated with our business previously disclosed in "Risk Factors" in Part I, Item 1A. in our Annual Report on Form 10-K for the fiscal year ended July 3, 2020.

> Our business is subject to regulation under a wide variety of U.S. federal and state and non-U.S. laws, regulations and policies. There can be no assurance that laws, regulations and policies will not be changed in ways that will require us to modify our business model and objectives or affect our returns on investments by restricting existing activities and products, subjecting them to escalating costs or prohibiting them outright .... Although we have implemented policies and procedures designed to ensure compliance, there can be no assurance that our employees, contractors or agents will not violate these or other applicable laws, rules and regulations to which we are and may be subject.

(*Id.* at 21-22) (emphasis added).) This statement was included in Seagate's filings from October 29, 2020, January 28, 2021, April 29, 2021, October 28, 2021, January 27, 2022, and April 28, 2022. In the SEC-mandated SOX certifications associated with those filings, Romano and Mosley represented that, based on their knowledge, "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and moreover, that the filing disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." (Dkt. No. 101 at 29-30.)

***8** Once a risk is known to the company, a statement that no material changes have occurred is misleading. *In re Alphabet, Inc. Secs. Litig.*, 1 F.4th 687 (9th Cir. 2021), is instructive. There, in the aftermath of the discovery of a bug, Google's legal and policy team created a memo describing the bug, as well as the ongoing security vulnerabilities that risked additional data exposures. As such, the Ninth Circuit concluded that "[g]iven that the April 10-Q filing was made after the detection of Google's cybersecurity issues [and] after internal deliberation based on the Privacy Bug Memo ... the complaint plausibly alleges that omission of any mention of the Three-Year Bug or the other security vulnerabilities made the statements in each Form 10-Q materially misleading to a reasonable investor and significantly altered the total mix of information available to investors." *Id.* at 702. Similar logic applies here. The allegations here support a strong inference that, by October 2020, Seagate was aware that there were reasons for concern that its sales were illegal, and thus, that it was required to either refrain from those

sales or seek further guidance from BIS, but did not do so. As such, Seagate's continued statements that there were "no material changes" to its risk were misleading, precisely because Seagate had allegedly already become aware that there were reasons for concern—and thus, that it was out of compliance with the FDPR's requirement to refrain from sales or seek guidance—and failed to disclose that noncompliance to investors.

In conclusion, Plaintiffs have sufficiently pled scienter and falsity as to all of Seagate's statements of compliance, except for those made by Seagate on September 14, 2020. Accordingly, referencing Plaintiffs' chart of challenged representations (Dkt. No. 101), the motion to dismiss is denied with respect to Statements 3 through 12 (dated October 22, 2020 through January 25, 2023), and granted as to Statements 1 and 2 (dated September 14, 2020). [3]

**2. Statements of revenue drivers**

As to the second category of statements, Plaintiffs have pled with particularity both scienter and falsity as to all statements, except for the January 26, 2022 statement made during the 2022 Q2 earnings call (Statement 28). Specifically, Plaintiffs allege that in making statements about the drivers of Seagate's revenue during Q1 2021 through Q2 2023, it was misleading for Seagate not to disclose that its revenue "was driven in material part by illegal sales to a single customer, Huawei." (Compl. ¶ 227.) The following are representative examples of the types of statements Seagate made:

> Seagate's revenue results were driven by "solid double-digit revenue growth for our consumer drives, reflecting both the return to seasonal patterns and strength of the Seagate's brand among prosumers and gamers." (Statement 16, October 22, 2020, Q1 Earnings Call).
>
> Seagate's revenue "performance reflected strong recovery in the video and image application, or VIA, market." (Statement 16, October 22, 2020, Q1 Earnings Call).
>
> Seagate's positive revenue results were driven by (1) the fact that "the enterprise markets began to recover for the first time since the onset of the pandemic," particularly improving demand "amongst large enterprise OEM customers, which led to strong sequential revenue growth for both nearline and mission critical drives"; (2) "stronger-than expected growth in video and image applications or VIA markets, due in part to pent-up demand"; and (3) "strong seasonal demand for our desktop PC and consumer drives." (Statement 18, January 21, 2021, Q2 Earnings Call).
>
> "Seagate delivered another quarter of strong financial performance driven by ongoing operational execution and record sales of our high capacity nearline drives. We grew revenue, expanded profitability and achieved non-GAAP EPS above our guided range. Our March quarter results underscore the strength of our HDD product portfolio and increasing demand for mass capacity storage." (Statement 23, April 22, 2021, Press Release/8-K).

(Dkt. No. 101 at 112, 126, 161, 205.)

These statements are misleading because they imply that the driving causes of Seagate's strong financial performance were lawful rather than attributable, in significant part, to its allegedly illegal HDD sales to Huawei. To the contrary, Plaintiffs allege that, "[a]bsent illegal sales, Seagate would have come in below the midpoint of its revenue guidance" for Q1 of 2021, Q2 of 2021, and Q4 of 2021, and would have "missed its revenue guidance range entirely" for Q3 of 2021 and Q1 of 2022. (Compl. ¶ 107.) Furthermore, in the Amended Complaint, Plaintiffs added allegations explaining that the midpoint of revenue guidance is a metric that is "highly material to investors in evaluating an issuer's financial performance." (*Id.*) To support this proposition, Plaintiffs explain in a footnote that, "[a]s numerous studies have explained, securities analysts focus on the midpoint of issuer revenue guidance in evaluating an issuer's financial performance," and cite to one such study that makes this argument as an example. (*Id.* ¶ 107 n.9.) Thus, as to all these statements (excluding Statement 28), Defendants' failure to mention that sales to Huawei was among the factors materially driving Seagate's positive revenue performance was misleading because it created the false impression that sales to Huawei were not necessary for Seagate to reach the midpoint of its revenue guidance for these

quarters. *See* *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("Disclosure is required ... when necessary to make statements made, in light of the circumstances under which they were made, not misleading" (cleaned up)).

***9** The prior dismissal order regarding these statements observed that a "different situation" might be presented "if Seagate allegedly knew its Huawei sales were illegal and privately credited those sales with Seagate's ability to meet the earnings targets." (MTD Order at 7 n.2.) Plaintiffs have now sufficiently pled that Seagate *did* likely know that it was in violation of the FDPR's requirements that it cease sales or seek guidance if it had reasons for concern about the legality of those sales, as discussed above. Moreover, with that knowledge, beginning in October 2020, Seagate allegedly pointed investors to other drivers of its revenue, while also refusing to speak about revenues from Huawei, even as its Huawei sales skyrocketed through a major strategic partnership. Those actions support a strong inference of scienter: that, allegedly, the company privately understood the significance of its sales to Huawei and sought to downplay them in light of its realization that there were reasons for concern about their legality. *See, e.g.*, *In re Syncor Int'l Corp. Secs. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (finding "defendants' statements attributing overseas growth solely to legitimate business practices [ ] at least incomplete" where they "omitt[ed] any mention of illegal payments," and stating that "[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists" (internal quotation omitted)).

However, the Court's prior conclusion as to the January 26, 2022 statement (Statement 28) during the Q2 2022 earnings call still stands. Q2 2022 ended on December 31, 2021. Prior to that quarter, "Seagate had already stopped shipping to Huawei, so sales to Huawei could not have been a driver of revenue for that quarter." (MTD Order at 6.) No new allegations address this deficiency. Thus, this statement was not materially misleading.

After that January 26, 2022 statement, Seagate then allegedly embarked on another series of representations. Specifically, Seagate's HDD revenues allegedly declined in subsequent quarters after sales to Huawei were halted on September 29, 2021, but Seagate represented that these declines were driven by a variety of other non-Huawei factors. For example:

> Seagate's negative revenue results were driven by: (1) "industry-wide supply challenges"; (2) "impacts from the ongoing conflict in Ukraine"; and (3) "COVID restrictions" that were all "constraining growth over the near term." (Statement 29, April 27, 2022, Q2 Earnings Call).
>
> Seagate's revenue decline attributable to legitimate business factors, including: "[g]lobal economic uncertainties and broad-based customer inventory corrections" and "current macro uncertainties." (Statement 34, October 26, 2022, Press Release/8-K).

(Dkt. No. 101 at 205, 243.) These statements are misleading because they suggest that the cause for Seagate's declining revenue was unrelated to its loss of sales to Huawei, but instead, was attributable to supply challenges, global conflict, COVID restrictions, and other factors. Thus, for the same reasons outlined above, falsity and scienter are sufficiently alleged as to these statements.

In conclusion, Plaintiffs have sufficiently pled falsity and scienter. Accordingly, the motion to dismiss is denied with respect to Statements 16 through 36 (dated October 22, 2020 through January 25, 2023), except as to Statement 28 (dated January 26, 2022).

### 3. Statements of reliance on sales to Huawei

For the same reasons, Plaintiffs have adequately alleged falsity and scienter as to Mosley's statement to investors on October 22, 2020, that Huawei's revenue contribution to Seagate was not "material" to Seagate's December quarter guidance for Q2 2021. Although Huawei's revenue contribution for that quarter accounted for 5.61% of Seagate's HDD revenue, Plaintiffs have alleged

that Seagate would have missed the midpoint of its revenue guidance for that quarter without those sales and that Seagate sought to downplay those sales in light of the reasons for concern about the legality of sales to Huawei.

However, Plaintiffs have failed to adequately plead falsity as to the remainder of Seagate's statements about its reliance on sales to Huawei. On September 14, 2020, in response to a question about the Huawei's revenue contribution to Seagate, Romano stated: "[W]e don't disclose the level of revenue of specific customers. But as you know, we should report if the customer is above 10%. So, you can assume that [it] is not [at that] level." (*Id.* at 89.) During Q1 of 2021, Seagate's sales to Huawei were 3.06% of HDD revenue—which is under 10%. Although Plaintiffs allege that Defendants "downplay[ed] [Seagate's] reliance on, and exposure to, Huawei sales," Romano's statement on that date accurately conveyed that Huawei was not above the 10% level. (Compl. ¶ 104.) Nor does that statement promise to immediately report Huawei's sales the moment those sales increase beyond 10%. Instead, that statement appears to reference GAAP requirements for annual disclosures of certain major customers, as discussed below. There is no allegation Seagate failed to comply with such required annual reporting. Thus, there is no basis to infer that Seagate's statement was false or misleading.

***10** Plaintiffs also challenge Defendants' statement in Seagate's April 29, 2021 Form 10-Q, which represents that the document was "prepared in accordance with U.S. generally accepted accounting principles [("GAAP")]." (Dkt. No. 101 at 102.) This statement is allegedly false because GAAP requires disclosure where transactions with a single customer amount to 10% or more of a public entity's revenues. Seagate made no such disclosure, despite Seagate's sales to Huawei amounting to 13.42% for Q3 of 2021. In its prior order, the Court dismissed the claim with respect to this statement because Plaintiffs did "not allege which GAAP rule requires such disclosures to be made for interim reporting periods, as opposed to on an annual basis." (MTD Order at 5.) Now, Plaintiffs point to ASC-280-10-50-19, which states that issuers "are encouraged to report information about segments that do not meet the quantitative thresholds if management believes that it is material." (Compl. ¶ 54 n.6.) Although this "encouragement" applies "for each period for which an income statement is presented," per ASC-280-10-50-20, it is just that: an encouragement, not a requirement. (*Id.*) And as ASC-280-10-50-39 indicates, entity-wide disclosure requirements only apply to annual reports. Accordingly, failure to comply with the ASC-280-10-50-19 encouragement does not render Seagate's GAAP compliance representation false.

Accordingly, Plaintiffs have failed to adequately plead falsity as to Statements 13 and 15, but not as to 14. Accordingly, the motion to dismiss is granted with respect to Statement 13 (dated September 14, 2020) and Statement 15 (dated April 29, 2021), and denied as to Statement 14 (dated October 22, 2020).

### 4. Scheme liability theory

Additionally, Plaintiffs allege that Seagate engaged in a fraudulent scheme to defraud investors, based on Seagate's alleged orchestration of "a secret 'priority' business relationship with Huawei to hide the extent of Seagate's reliance upon illegal sales to Huawei and Seagate's repeated violations of the FDPR." (*Id.* ¶ 283.) To state a claim under this theory, each defendant must have "committed a deceptive or manipulative act in furtherance of the alleged scheme," in addition to the other elements described above. *York Cnty. on Behalf of Cnty. Of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024). Plaintiffs have plausibly stated a claim, as Plaintiffs have sufficiently alleged that each Defendant acted in a deceptive and manipulative manner in making false statements that downplayed or obscured Seagate's sales to Huawei, as described above. At this stage, this is sufficient to state a claim.

### 5. Loss causation

To plead loss causation, Plaintiffs must allege "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). At the pleadings stage, alleging loss causation is a "low bar." *In*

*re WageWorks, Inc., Secs. Litig.*, No. 18-cv-01523, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Defendants argue that Plaintiffs failed to plead loss causation with respect to Seagate's March 8, 2022 disclosure—where Seagate lowered its earnings guidance for the upcoming quarter—and its July 21, 2022 disclosure—where Seagate reported depressed financial results for the fourth quarter of 2022. However, Plaintiffs have adequately pled a causal connection between the statements and the loss, as a corrective disclosure need only "relate back to the misrepresentation" to survive a motion to dismiss. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Plaintiffs allege that "Seagate's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions that created false impressions concerning Seagate's regulatory and legal compliance with U.S. export restrictions and its reliance on HDD sales to Huawei. As a result of Defendants' materially false and misleading statements and omissions, the market price of Seagate's common stock was inflated." (Compl. ¶ 260.) Moreover, Plaintiffs allege that "Seagate's declining financial performance, which was driven by declining HDD sales in Asia due to the loss of the Company's Huawei sales, further revealed the truth concealed by Defendants' misstatements, as Seagate's financial performance continued to assimilate and reflect the loss of the Company's illegal monopoly. Again, analysts connected Seagate's poor financial performance to declining demand in Asia .... These analysts explained that the disappointed revenue results were 'driven by HDD inventory adjustments across most segments' and specifically highlighted flagging demand in China." (*Id.* ¶ 118.) That is sufficient at this stage.

**B. Section 20(a) Claim**

***11** Section 20(a) of the Exchange Act contemplates liability for certain "controlling" individuals for violations of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78t(a). Thus, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.' " *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (quoting *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp. ("America West")*, 320 F. 3d 920, 945 (9th Cir. 2003)). Defendants' only argument as to the Section 20(a) claim is that it "fails for failure to plead a primary violation of securities law." (Dkt. No. 104 at 31 n.28.) Because Plaintiffs have adequately pled a primary violation of securities law, this claim survives as well. Accordingly, the motion to dismiss with respect to this claim is denied.

**III. CONCLUSION**

For the reasons stated above, the motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims is denied with respect to Statements 3 through 12, Statement 14, Statements 16 through 27, and Statement 29 through 36. The motion to dismiss is similarly denied with respect to Plaintiffs' Section 20(a) claim. The motion to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims is granted without leave to amend with respect to Statements 1 and 2, Statement 13, Statement 15, and Statement 28.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 1744505

**Footnotes**

1 Citations to page numbers refer to the ECF pagination.

2 In the final rule promulgating the FDPR, BIS referred companies to this guidance in response to a public commenter's question about how deeply companies must dive into the supply chains and design chains of their customers.

3 For ease, the Court will follow the same numerical identification that Plaintiffs assigned to each challenged statement for purposes of its amended complaint. (Dkt. No. 101 (chart identifying the statement number, the false and misleading statement, reasons the statements was false, misleading, or deceptive when made, and facts giving rise to a strong inference of scienter).)

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT O

2019 WL 3336119
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

PLYMOUTH COUNTY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, Plaintiff,
v.
PATTERSON COMPANIES, INC., Scott P. Anderson, Ann B. Gugino, R. Stephen Armstrong, and James W. Wiltz, Defendants.

Case No. 18-cv-871 (MJD/SER)
|
Signed 07/25/2019

**Attorneys and Law Firms**

Lucas F. Olts and Alexi Pfeffer-Gillett, Robbins Geller Rudman & Dowd LLP, Anne M. Lockner, Robins Kaplan LLP, and Lester R. Hooker, Saxena White P.A. (for Plaintiff), and

Patrick S. Williams, Aaron G. Thomas, and Jordan Weber, Briggs & Morgan, PA (for Defendants).

## REPORT AND RECOMMENDATION

Steven E. Rau, United States Magistrate Judge

***1** This matter is before the Court on Defendants' Motion to Dismiss the Amended Class Action Complaint. (ECF No. 89). This motion was referred to the undersigned for a report and recommendation under 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. (ECF No. 95). This Court recommends the motion be granted in part and denied in part.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, led by Plymouth County Retirement System and other institutional investors, seek remedies under the Securities Exchange Act against Defendant Patterson Companies, Inc., and various executives of Patterson. Plaintiffs assert Patterson conspired with its principal competitors, Henry Schein, Inc., and Benco Dental Supply Company to boycott Group Purchasing Options ("GPOs") and fix dental supply prices.

GPOs are membership organizations that aggregate the buying power of solo dentists and small group dental practices. (Compl. ¶¶ 3, 42, 44). In aggregating their purchasing power, GPOs provide dentists power to negotiate lower prices on dental supplies. (Compl. ¶ 3). GPOs further save costs by using online sales rather than the door-to-door sales force relied upon by Patterson, Schein, and Benco. (Compl. ¶ 3). These discounts cut into the traditionally "significantly marked-up prices" that Patterson, Schein, and Benco charge independent dentists. (Compl. ¶¶ 3, 41–43). GPOs also introduced competition to Patterson, Schein, and Benco by providing sales opportunities to smaller distributors. (Compl. ¶ 44).

Patterson, a Minnesota company, is "the second largest distributor of dental supplies in the United States." (Am. Class Action Compl. ¶¶ 1, 19, 25) (hereinafter "Compl.").[1] Patterson supplies consumable products and basic and advanced dental equipment to dentists, dental laboratories, and other healthcare professionals. (Compl. ¶ 39). Patterson and its competitors, Schein and Benco, are full-service distributors for the dental supply market. (*See* Compl. ¶ 3). Combined, Patterson, Schein, and Benco control about 85% of the dental supply market. (Compl. ¶¶ 1, 40).

### A. Procedural Posture

Plaintiffs initially brought suit on March 28, 2018 against Patterson, Scott Anderson,[2] and Ann Gugino.[3] (ECF No. 1). Afterwards the parties, including various competing plaintiffs, stipulated to the appointment of lead plaintiffs and lead counsel. (ECF Nos. 58, 63, 64). Plaintiffs then filed the operative complaint against Patterson, Anderson, Gugino, Stephen Armstrong,[4] and James Wiltz.[5] (Compl., ECF No. 74). Count One asserts a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). (Compl. ¶¶ 261–70). Count Two asserts a violation of Section 20(a) of the Exchange Act. (Compl. ¶¶ 271–77). Plaintiffs propose a class of those who purchased or acquired Patterson stock from June 26, 2013 through February 28, 2018. (Compl. ¶ 255).

***2** Defendants moved to dismiss the complaint. (ECF No. 89). The parties fully briefed the motion. (ECF Nos. 91, 100, 101). The motion was referred to the undersigned, (ECF No. 95), and argued at a motion hearing held May 13, 2019, (ECF No. 103; *see* ECF No. 107). Plaintiffs submitted supplemental authority on June 14, 2019, (ECF No. 110), and Defendants responded, (ECF No. 111). The motion to dismiss is now ripe for determination.

### B. Factual Background[6]

Sometime around February 2013, a newly formed GPO in New Mexico announced it had partnered with Patterson "to provide the individual office the same opportunities as the larger corporations." (Compl. ¶ 54). On February 8, 2013, Benco's managing director, Chuck Cohen, forwarded the New Mexico GPO's email announcement to Patterson's president, Paul Guggenheim,[7] stating: "Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups (though we do work with corporate accounts) and our team understands that policy." (Compl. ¶¶ 5, 55). Guggenheim forwarded this email to Patterson's head of sales, David Misiak,[8] and Patterson's head of marketing, Tim Rogan.[9] (Compl. ¶¶ 5, 56). Guggenheim then responded to Cohen: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these." (Compl. ¶¶ 5, 56). Cohen then sent a text message to a Benco regional manager: "I just sent Paul [Guggenheim] a note about it. Don't want to call because it might be construed as price fixing." (Compl. ¶¶ 5, 57). Three days later, Patterson informed the New Mexico GPO it would not be partnering with it. (Compl. ¶ 58).

On February 27, 2013, Misiak emailed Anthony Fruehauf, Patterson's mid-Atlantic regional manager, instructing him to reject Atlantic Dental Care, a suspected GPO, even though Fruehauf believed Patterson would "los[e] a big chunk of business." (Compl. ¶ 59). Misiak instructed Fruehauf to inform his sales staff that it was in "their best interest long term ... not to take our business in that direction." (Compl. ¶ 59). Misiak further stated: "Confidential and not for discussion ... our 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me." (Compl. ¶¶ 6, 59).

***3** After Benco did business with Atlantic Dental Care, Guggenheim emailed Cohen on June 6, 2013 using the same email thread from February 2013. (Compl. ¶ 60). Guggenheim stated:

> Reflecting back on our conversation earlier this year, could you shed some light on your business agreement with Atlantic Dental Care? ... I'm wondering if your position on buying groups is still as you articulated back in February? ... Sometimes these things grow legs without our awareness!

(Compl. ¶¶ 8, 60). Cohen responded on June 10, 2013: "As we've discussed, we don't recognize buying groups." (Compl. ¶¶ 8, 61). Cohen explained how Atlantic Dental Care was not a GPO, even noting that Benco had asked to see various business

documents for confirmation. (Compl. ¶ 61). Guggenheim responded: "Sounds good Chuck [Cohen], Just wanted to clarify where you guys stand." (Compl. ¶¶ 8, 62). Guggenheim then forwarded the email conversation to Anderson, Patterson's CEO, with an accompanying message of "FYI." (Compl. ¶¶ 8, 62).

On June 26, 2013, Patterson filed its 2013 Form 10-K with the SEC, for fiscal year ending April 27, 2013. (Compl. ¶¶ 63, 141). The 2013 Form 10-K contained certifications from Defendants Anderson and Armstrong. (Compl. ¶ 141). The 2013 Form 10-K included statements that Patterson was a "market leader with a strong competitive position," that the United States dental products distribution industry was "highly competitive," and Patterson used "competitive pricing" to differentiate itself from competitors. (Compl. ¶ 142). Patterson described the dental supply market as "highly fragmented and competitive," noting that industry consolidation among suppliers, price competition, and new competitors could increase competition. (Compl. ¶ 143). Patterson attributed its success to "value-added, full-service capabilities, using technology to enhance customer service, continuing to improve [their] operating efficiencies, and growing through internal expansion and acquisitions." (Compl. ¶ 144). Patterson indicated the healthcare industry was "experiencing substantial changes which are causing uncertainty in the market and may adversely affect" the dental supply business. (Compl. ¶ 146). The healthcare industry "has undergone significant change driven by various efforts to reduce costs," including "collective purchasing arrangements and consolidation among office-based healthcare practitioners that may enable purchasing at more favorable prices ...." (Compl. ¶ 146). Patterson warned that its profit margins, as well as those of its competitors, "may be adversely affected by industry changes." (Compl. ¶ 146).

In August 2013, Neal McFadden, [10] Patterson's division head for special markets, contacted Misiak and Rogan regarding whether to consider doing business with GPOs, asking: "Is it worth it to explore GPO?" (Compl. ¶¶ 7, 64). Rogan responded: "We don't need GPOs in the dental business. Schein, Benco and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry." (Compl. ¶¶ 7, 46, 64).

***4** Patterson issued its fiscal year 2014 first quarter earnings on August 22, 2013 and held an earnings call. (Compl. ¶ 148). Anderson indicated that Patterson's consumable dental supplies sales had experienced "six months of solid growth" attributable to "stability in the dental market." (Compl. ¶ 148).

Misiak emailed Anderson and Guggenheim on September 3, 2013, forwarding an article entitled "GPOs Expand Their Reach" (Compl. ¶ 66). The article described the relationship between a GPO and Burkart—Patterson's competitor and the dental supply market's fourth largest distributor. (Compl. ¶¶ 8, 66). Misiak stated:

> I would not currently classify [GPOs] as a big threat to the business but the GPO noise has been pretty loud from the field. We have said no at every turn, including to Delta Dental. Benco has also crept into a few of these. My guidance has been to politely say no and weather the storm with these. Incredible to me that Burkhart has bit this apple and they are broadcasting it.

(Compl. ¶¶67, 8). Anderson responded that "We need to watch this" and the article "shows how weak Burkhart is." (Compl. ¶¶ 67, 8). The next day, Misiak and McFadden distributed a memo to all of Patterson's regional and branch managers stating that the special markets division would not work with GPOs as a "guiding principle." (Compl. ¶¶ 7, 65).

The Texas Dental Association formed TDA Perks Supplies in October 2013. (Compl. ¶ 78). TDA Perks Supplies, a state-run GPO, planned to sell discounted dental supplies to member dentists via an online sales platform, in collaboration with SourceOne. (Compl. ¶ 78). Sometime thereafter, Benco's regional manager for Texas, Ron Fernandez, called John Hyden, Patterson's regional manager for San Antonio, to discuss whether their companies would attend the Texas Dental Association's annual trade convention in light of its partnership with SourceOne. (Compl. ¶ 81). Hyden discussed the conversation with Clint Edens, his supervisor and Patterson's south central regional manager. (Compl. ¶ 81). Edens emailed Misiak and Rogan, stating that TDA had "flooded the market with advertisements offering 35% savings" and that he was "committed to pulling from the

TDA if they do not discontinue competing with us via TDA Perks." (Compl. ¶ 82). Rogan responded: "This one has royally pissed me off." (Compl. ¶ 82). Rogan instructed Edens to generate a presentation for TDA of "[a]ll things Patterson does in state" and to "spin it to our mantra about helping our customers grow and not trying to decrease their supply bill." (Compl. ¶ 82).

On November 20, 2013, Misiak told Andy Goldsmith, a representative from Smile Source, a GPO, that Patterson was "currently not interested but will keep the strategy and Smile Source on the 'idea board' and get back to you should things change." (Compl. ¶ 70). Benco and Schein had similarly rejected doing business with Smile Source in October 2013. (Compl. ¶ 69). That same day, a Patterson sales representative emailed Rogan to inquire how to respond to a GPO that had reached out to her. (Compl. ¶ 71). Rogan responded: "We don't sell to buying groups" and "Let's talk live." (Compl. ¶ 71).

Patterson issued its fiscal year 2014 second quarter earnings on November 21, 2013 and held an earnings call. (Compl. ¶¶ 151–52). Anderson attributed Patterson's performance to "industry-leading technology wrapped by a suite of value-added services." (Compl. ¶¶ 151–52).

***5** On December 13, 2013, Patterson announced it would not attend the Texas Dental Association's 2014 convention. (Compl. ¶¶ 84, 78). On January 6, 2014, Misiak called Dave Steck, Schein's head of sales, to discuss whether Schein was also boycotting the 2014 TDA convention. (Compl. ¶ 85). Less than a week later, Steck emailed Misiak: "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days." (Compl. ¶ 86). The email subject line was "Texas." (Compl. ¶ 86). Misiak forwarded the email to Rogan, adding: "He already told me they were out. Full blown!" (Compl. ¶ 86). Rogan replied to Misiak: "That sucks. You should call him. 'Thought I could trust you' type of conversation." (Compl. ¶ 86).

About five weeks after their previous communications, on December 30, 2013, Smile Source again reached out to Misiak and McFadden indicating it was "odd" that he "never heard back" because Smile Source "purchase[s] over $14MM annually in supplies, and that number continues to double every year. Dr. Goldsmith advised me that you are not interested in working with us." (Compl. ¶ 70).

Per the Complaint, McFadden was omnipresent when it related to Patterson's relationship with GPOs. McFadden informed another GPO, Lighthouse Dental Buying Group, LLC, on February 10, 2014 that "[a]t the advice of our legal department and our executive leadership team I am respectfully declining your offer to participate further in your RFP. Patterson has historically never done business with GPOs and culturally we do not feel it is a long term strategy for our company." (Compl. ¶ 72). On April 23, 2014, McFadden informed Guggenheim that he instructed Patterson sales staff "should pass on [GPOs]" given they are a "slippery slope" and "tout a 20% saving to the dentists on supplies." (Compl. ¶ 72).

Patterson issued its fiscal year 2014 third quarter earnings on February 20, 2014 and held an earnings call. (Compl. ¶ 154). Anderson stated Patterson's "strong growth" was attributed to its "dental team execut[ing] well with equipment and software sales increasing 5.6% from the year earlier level and all major categories posting gains." (Compl. ¶ 154).

Sometime in March 2014, Patterson met with the Texas Dental Association to demand that it end its contractual relationship with SourceOne. (Compl. ¶ 88). Patterson asserted that if the relationship continued, Patterson would no longer attend the Texas Dental Association's convention or advertise in its publications. (Compl. ¶ 88). On April 16, 2014, Cohen forwarded an article from the Texas Dental Association entitled "Texas Private Practices Gain the Volume Purchasing Power of Corporate Practices" to Guggenheim and Tim Sullivan, Schein's president. (Compl. ¶ 91). The article noted that large distributors "rarely provide the best deal" and TDA Perks could save an average of 35% on dental supplies. (Compl. ¶ 91). Cohen commented in the forwarded email: "Thought you'd be interested in this 'essay' from our friends at the TDA. Not only are they our new competitor, but they basically tell their members that dental distributors rip off their dentists. Nice!" (Compl. ¶ 91).

A Patterson sales representative in Atlanta informed McFadden that Smile Source was "really growing." (Compl. ¶ 72). McFadden responded on May 8, 2014, calling Smile Source "very sleazy ... Basically giving small dentists better buying power.

Most dealers are not working with them except small desperate ones. I'm sorry you're experiencing this.” (Compl. ¶ 72). About a week later, on May 19, McFadden told another sales representative who inquired about GPOs: “I am electing not to participate with these groups—we have said no already.” (Compl. ¶ 72). On June 12, 2014, McFadden asked a former colleague, who now worked with a GPO, via text message: “Is Choice One a GPO or are you all actually acquiring practices? The reason I'm asking is we've signed an agreement that we won't work with GPOs.” (Compl. ¶¶ 72, 7).

***6** On June 25, 2014, Patterson filed its 2014 Form 10-K with the SEC, for fiscal year ending April 26, 2014. (Compl. ¶ 156). The 2014 Form 10-K contained certifications from Anderson and Armstrong. (Compl. ¶ 156). The 2014 Form 10-K included statements similar to the 2013 Form 10-K. (Compl. ¶ 156).

On July 18, 2014, the Texas Attorney General sent a civil investigation demand to Patterson regarding Patterson, Schein, and Benco's collective boycott of the Texas Dental Association's GPO and annual convention. (Compl. ¶ 9).

Like in Texas, the Arizona Dental Association (“AZDA”) created a GPO in partnership with SourceOne. (Compl. ¶ 92). On July 21, 2014, Mike Wade, Benco's regional manager for Arizona, emailed Chad Bushman, Patterson's regional manager for Arizona. (Compl. ¶ 94). Wade stated:

> I wanted to catch up and get your take on our friends at the AZDA becoming our competitors? I am sure you are hearing plenty from your reps about the AZDA partnership with SourceOne selling supplies. Needless to say we are not real happy and we are looking at pulling our sponsorship including the AZDA meeting. I know that Patterson, Schein and Benco boycotted the [TDA] meeting this year after the TDA did the same thing and wanted to see if we could create the same message here in AZ.

(Compl. ¶ 94). Bushman, copying his supervisor Dan Reinhardt, responded: “Mike, thank you for reaching out. If the AZDA has in fact signed with SourceOne (which it looks like they have) we will be pulling our sponsorship and attendance of the state meeting as they will have positioned themselves as a competitor.” (Compl. ¶ 95). Wade replied: “Thanks for the quick reply. We are of the same mindset. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea to become a distribution competitor.” (Compl. ¶ 95).

Later that day, Reinhardt then emailed Edens and Misiak regarding Patterson's boycott of the TDA convention. (Compl. ¶ 96). Misiak responded promptly: “Please discuss live and no more emails on this topic.” (Compl. ¶¶ 9, 96). Reinhardt then passed this message along to Bushman regarding the AZDA meeting: “Please discuss live and no further emails.” (Compl. ¶ 96). In September 2014, Patterson, Schein, and Benco announced they would not attend AZDA's annual trade show. (Compl. ¶ 98).

On August 21, 2014, Patterson issued its fiscal year 2015 first quarter earnings and held an earnings call. (Compl. ¶ 158). Anderson stated Patterson saw “positive trends” in sales of dental consumables, making Patterson a “proven leader in the dental equipment market” due to “best-in-class technology and basic equipment that is wrapped with Patterson's industry leading after-sales support platform.” (Compl. ¶ 158).

On October 11, 2014, a Patterson sales representative received an email from a dentist indicating he was switching from Patterson to the Kois Buying Group. (Compl. ¶ 72). The sales representative forwarded this message to another Patterson customer, adding: “Patterson corporate has concluded ‘we will NOT be entertaining participating in any buying group of this nature.’ ” (Compl. ¶ 72). On October 23, 2014, a Patterson branch manager informed McFadden that a customer indicated they were “trimming back on their orders with Patterson” pending information concerning a new pricing structure from Kois Buying Group. (Compl. ¶ 72). McFadden responded: “As a rule we are trying our best to steer clear of all buying groups. As far as ‘Kois Group through Patterson’—that's news to me. Special Markets has had no communications with [Kois].” (Compl. ¶ 72).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***7** In October 2014, the Arizona Attorney General began its own investigation of Patterson and coordinated with the Texas Attorney General. (Compl. ¶ 98).

Patterson issued its fiscal year 2015 second quarter earnings on November 20, 2014 and held an earnings call. (Compl. ¶ 160). Anderson attributed Patterson's success to an "unparalleled suite of value-added services" and "solid execution by [its] industry-leading sales force." (Compl. ¶¶ 160–61). In response to an analyst's question regarding Schein's apparent market share growth, Anderson reported Patterson was "growing faster than the market and taking share" and were "compet[ing] head-to-head with multiple people. We are more than holding our own and gaining share." (Compl. ¶ 162).

Patterson's southeast regional manager emailed McFadden on January 14, 2015 asking about a GPO formed in Florida. (Compl. ¶ 72). McFadden responded: "If he calls I will ask him for financials. – does [the dentist] own all these offices – if not he is a GPO – we don't deal with GPOs." (Compl. ¶ 72). On March 26, 2015, McFadden told a sales representative: "[W]e have said no to Smile Source. It is a direct competitor to ours sales reps. They are a buying club and have agreements with study clubs, state institutions, and everybody they can connect with." (Compl. ¶ 72). On July 29, 2015, McFadden was informed by Bill Neal, Patterson special markets executive, that he met with a GPO named Dentistry Unchained and told them "that we [Patterson] have not elected to participate in these types of programs in the past." (Compl. ¶ 72).

Patterson issued its fiscal year 2015 third quarter earnings on February 19, 2015 and held an earnings call. (Compl. ¶ 164). Anderson attributed growth to "strong core and technology offerings, industry leading service and support, and the trend toward digitization of the dental office," as well as the ability of its "industry-leading sales force to meet the needs of [its] dental customers." (Compl. ¶¶ 164–65).

Patterson, as well as Schein and Benco, continued boycotting state dental associations' conventions and meetings where those state dental associations partnered with SourceOne or other entities to establish GPOs. (Compl. ¶¶ 100–104). In April 2015, Patterson informed the Louisiana Dental Association it would boycott its annual convention unless it abandoned its relationship with SourceOne, which had begun in January 2015. (Compl. ¶ 101). Patterson also did not attend trade meetings of the Colorado Dental Association and Maryland State Dental Association. (Compl. ¶¶ 102, 104).

Patterson issued its fiscal year 2015 fourth quarter earnings on May 21, 2015 and held an earnings call. (Compl. ¶¶ 167–68). Anderson attributed growth and share gains to "technology-oriented sales driven by Patterson's industry-leading sales, technical service and after-sales support." (Compl. ¶ 167). Anderson also attributed the results to "just very strong [and consistent] execution at Patterson and high demand for the portfolio of products [it] sell[s]." (Compl. ¶ 168). Around the same time, Patterson filed its 2015 Form 10-K with the SEC. (Compl. ¶ 170). The 2015 Form 10-K included statements similar to the 2013 Form 10-K and 2014 Form 10-K. (Compl. ¶ 170).

***8** On August 7, 2015, Patterson received a letter from the Texas AG informing it that the Federal Trade Commission began an investigation of the alleged price-fixing scheme between Patterson, Schein, and Benco and that the Texas AG planned to share its own investigative materials with the FTC. (Compl. ¶¶ 72, 110).

Patterson issued its fiscal year 2016 first quarter earnings on August 27, 2015 and held an earnings call. (Compl. ¶¶ 171–72). Anderson attributed "sustained growth in the consumables category" to "stable-to-steadily improving dynamics in the dental market." (Compl. ¶ 171). Anderson discussed that the "continued healthy conditions of the dental market position [Patterson] well for continued growth and market share gains," and noted that the "North American Markets are very stable," including consumables. (Compl. ¶ 172).

On September 1, 2015, SourceOne commenced suit in the United States District Court for the Eastern District of New York against Patterson, Schein, and Benco alleging a violation of the Sherman Act were they "conspired to exclude it from the market and took overt acts in furtherance of that conspiracy by boycotting the Texas and Arizona Dental Associations' annual

meetings and by pressuring manufacturers and individual dentists not to do business with SourceOne." *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 310 F. Supp. 3d 346, 352–53 (E.D.N.Y. 2018); (*see* Compl., at 2).

In September 2015, the Georgia Dental Association ("GDA") contacted Patterson about an RFP for its newly formed buying group. (Compl. ¶ 103). Peter Cousins, Patterson sales manager, responded: "After careful consideration Patterson Dental has made the decision not to respond to the RFP at this time." (Compl. ¶ 103). Frank Capaldo, executive director of the GDA, replied: "I am confused as your immediate prior email indicated you were setting up dates to sit down and talk with us and include your president!" (Compl. ¶ 103). Cousins forwarded Capaldo's email to Fruehauf and McFadden: "The sooner the better on some sort of positioning statement that I can give to the sales team ... my phone is ringing today b/c Frank took my email reply and relayed it to the board last night." (Compl. ¶ 103). Cousins also told Fruehauf: "I think we just say the company has chosen not to participate in GPOs at this time." (Compl. ¶ 103).

On November 10, 2015, Guggenheim texted Cohen, requesting that the two meet at an upcoming trade convention in New York. (Compl. ¶¶ 9, 72). After receiving no response, Guggenheim texted again two days later. (Compl. ¶ 72). Cohen responded: "Paul, sorry for the delayed response. Spoke with our attorney this week and I think we should pass on any conversations until current antitrust issues are resolved." (Compl. ¶¶ 9, 72).

Patterson issued its fiscal year 2016 second quarter earnings on November 24, 2015 and held an earnings call. (Compl. ¶¶ 174–75). Anderson attributed dental sales growth to "stable-to-steadily improving dynamics in the North American dental market." (Compl. ¶ 174). On the earnings call, Gugino reported "organic sales [in the dental segment] improved 3.1% on a constant currency basis" and "consumables grew 3.3% reflecting continued stability in this end market." (Compl. ¶ 175).

On February 11, 2016, a group of dental practices and dentists sued Patterson, Benco, and Schein in the Eastern District of New York under Section 1 of the Sherman Act alleging they "engaged in conduct that has led to higher prices for dental supplies, eliminating competition between themselves, and thereby keeping their profit margins artificially high." *In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *1 (E.D.N.Y. Sept. 28, 2016); (*see* Compl., at 2).

***9** Patterson issued its fiscal year 2016 third quarter earnings on February 25, 2016 and held an earnings call. (Compl. ¶¶ 177–78). Anderson highlighted "solid growth in the consumables category" due to "stable to steadily improving dynamics in the North American dental market" and that Patterson was "increasingly well-positioned to capitalize on this trend" due to technology leadership and support infrastructure. (Compl. ¶ 177). In response to an analyst's question, Anderson also attributed growth to the "strong execution" of its sales force and that Patterson felt it was "growing faster than the market." (Compl. ¶ 179).

Patterson issued its fiscal year 2016 fourth quarter earnings on May 26, 2016 and held an earnings call. (Compl. ¶¶ 181–83; Aff. of Aaron G. Thomas, Ex. C, ECF No. 92). Sales for Patterson's dental unit, representing approximately 46% of total company sales, were $662.1 million and a 3.3% increase in consumable dental supplies. (Compl. ¶ 181). Anderson stated Patterson was taking market share from its competitors and growth was due to "an era of stability" in the dental market. (Compl. ¶ 183). Anderson further stated, in response to an analyst's question, that growth in consumables was attributable to "really stable, consistent growth throughout our customer base both in our largest customers as well as our midsized and smaller customers." (Compl. ¶ 183).

On June 29, 2016, Patterson filed its 2016 Form 10-K with the SEC. (Compl. ¶ 185). The 2016 Form 10-K contained certifications from Anderson and Gugino. (Compl. ¶ 185). The 2016 Form 10-K discussed Patterson's competition in the dental supply market, noting the "industry is highly competitive" and explained Patterson's strategy of differentiating itself from competition through

> premium customer service with multiple value-added components, a highly qualified and motivated sales force, highly-trained and experienced service technicians, an extensive breadth and mix of products and

> services, technology solutions allowing customers to easily access our inventory, accurate and timely delivery of product, strategic location of sales offices and fulfillment centers, and competitive pricing.

(Compl. ¶ 185). Patterson touted "competitive strengths" that included broad product offerings at competitive prices, proprietary branded products, and a "[f]ocus on customer relationships and exceptional customer service," including "personal visits by field sales representatives." (Compl. ¶¶ 186–87). Patterson noted it competed with Benco and Schein. (Compl. ¶ 188). Patterson warned that GPOs "may place [it] at a competitive disadvantage." (Compl. ¶ 190). Patterson noted the formation of GPOs "may shift purchasing decisions to entities or persons with whom we do not have a historical relationship" which may threaten its ability to compete effectively. (Compl. ¶ 190). Patterson noted it was "seeking to obtain access to lower prices demanded by GPO contracts or other contracts, and develop relationships with provider networks and new GPOs" but it "cannot assure that such terms will be obtained or contracts will be executed." (Compl. ¶ 190).

Patterson issued its fiscal year 2017 first quarter earnings on August 25, 2016 and held an earnings call. (Compl. ¶¶ 192–95). Sales for Patterson's dental unit, representing approximately 43% of total company sales were $555 million, a 3.5% decrease. (Compl. ¶ 192). Gugino attributed Patterson's sales decline to strategic "sales force realignment." (Compl. ¶ 194). Anderson responded to an analyst's question, indicating that the sales force realignment was not a reaction to changes in the competitive landscape, but rather about finding effective ways to serve its customers and lead the market. (Compl. ¶ 195).

***10** Patterson issued its fiscal year 2017 second quarter earnings on November 22, 2016 and held an earnings call. (Compl. ¶¶ 197–99). Sales for Patterson's dental unit, representing approximately 43% of total company sales were $601.6 million, flat with the previous year and a 2.5% decrease in consumable dental supplies. (Compl. ¶ 197). Gugino again attributed the decline to the sales force realignment. (Compl. ¶ 199). Patterson's stock dropped $7.95 per share, a 16.7% decline. (Compl. ¶¶ 201, 242–43).

Patterson issued its fiscal year 2017 third quarter earnings on February 23, 2017 and held an earnings call. (Compl. ¶¶ 202–06). Sales for Patterson's dental unit, representing approximately 45% of total company sales were $626.3 million, a 1.8% decrease from the previous year and a 2.8% decrease in consumable dental supplies. (Compl. ¶ 202). Anderson and Gugino attributed the decline to "disruption from [Patterson's] sales force realignment initiative." (Compl. ¶ 204). Anderson touted the "very strong long-term fundamentals" and stability of the consumables market. (Compl. ¶¶ 205–06).

In March 2017, Travis Almquist, Patterson's team lead for products and pricing, emailed his supervisor, Joseph Lepley, Patterson's director of strategic pricing and forwarded a contract from Schein that appeared to show it was instituting a discount program for GPOs. (Compl. ¶ 107). Almquist's email said: "Normally I would send this back to the GM (or have the pricing desk send something) stating that we do not participate in buying groups for multiple reasons, but I wanted your feedback on it since so many things are changing in that MidMarket space." (Compl. ¶ 107). Lepley forwarded the email to Rogan, adding: "Attached is some competitive intel from Schein on a program on Buying Groups ... Given our recent discussions with Smile Source are we looking at talking with Buying Groups now?" (Compl. ¶ 107).

Patterson issued its fiscal year 2017 fourth quarter earnings on May 25, 2017 and held an earnings call. (Compl. ¶¶ 208–11). Sales for Patterson's dental unit, representing approximately 42% of total company sales were $607.3 million, an 8.3% decrease from the previous year and a 4.3% decrease in consumable dental supplies. (Compl. ¶ 208). Patterson and Anderson attributed the decline to the sales force realignment. (Compl. ¶¶ 210–11). Anderson believed Patterson's sales force would "continue to be a key competitive differentiator." (Compl. ¶ 211).

On June 1, 2017, Anderson "abruptly resigned" as CEO and Chairman of the Board. (Compl. ¶ 236). There was no reason proffered and it was not noted in the earnings call that took place less than one week prior. (Compl. ¶ 236).

On June 28, 2017, Patterson filed its 2017 Form 10-K with the SEC. (Compl. ¶ 213). The 2017 Form 10-K contained certifications from Gugino, Anderson, and James Wiltz, Patterson's interim CEO. (Compl. ¶ 213). The 2017 Form 10-K included statements similar to the 2016 Form 10-K. (Compl. ¶ 214).

On August 17, 2017, IQ Dental Supply, Inc., sued Patterson, Benco, and Schein in the Eastern District of New York under the Sherman Act, state antitrust laws, and common law. *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019); (*see* Compl., at 2). IQ alleged Patterson, Benco, and Schein "engaged in [a] campaign to force SourceOne out of business by conspiring to organize a boycott" and a price-fixing conspiracy. *IQ Dental Supply, Inc.*, 924 F.3d at 61.

Patterson issued its fiscal year 2018 first quarter earnings on August 24, 2017 and held an earnings call. (Compl. ¶¶ 215–17). Sales for Patterson's dental unit, representing approximately 40% of total company sales were $518.8 million, an 6.5% decrease from the previous year and a 3.6% decrease in consumable dental supplies. (Compl. ¶ 215). Wiltz, in response to an analyst's question, stated that Patterson had not yet seen competition from the online marketplace, specifically referencing Amazon. (Compl. ¶ 217).

***11** Patterson issued its fiscal year 2018 second quarter earnings on November 21, 2017 and held an earnings call. (Compl. ¶¶ 219–22). Sales for Patterson's dental unit, representing approximately 40% of total company sales were $553.6 million, an 8% decrease from the previous year and a 4.4% decrease in consumable dental supplies. (Compl. ¶ 219). In response to analysts questioning Patterson's "leaking market share," Gugino asserted it was due to "a variety of competitors" and could "win[ ] it back" with competitive prices but also a "value-added business model approach." (Compl. ¶¶ 221-22).

Following its three-year investigation, the FTC filed a formal complaint against Patterson, Benco, and Schein on February 12, 2018, alleging they "entered into an agreement refusing to provide discounts to or compete for the business of buying groups," constituting a *per se* violation of Section 5 of the Federal Trade Commission Act. (Compl. ¶¶ 2, 12, 117).

Once the FTC complaint was filed, several financial investment reports issued drawing attention to the magnitude of the FTC's action. (Compl. ¶ 119–20). A February 13, 2018 report from Jeffries commented that "the FTC move should be taken seriously & could have negative [long term] implications for margin." (Compl. ¶ 120). The report continued, noting that the "core tenets of the FTC's case" were "levied in other lawsuits" against Patterson, "[b]ut the FTC's move here is very serious & much more severe, in our view." (Compl. ¶ 120). Patterson's stock price fell, in one day, from $39.92 per share to $31.21 per share, on a trading volume of 5.5 million shares; a market cap loss of $160 million. (Compl. ¶¶ 12, 121, 246).

On March 1, 2018, Patterson announced their third quarter results from fiscal year 2018, disclosing a 26% drop in earnings. (Compl. ¶¶ 12, 123; Thomas Aff., Ex. B). Patterson announced dental sales had declined 7.7%. (Compl. ¶ 123). Gugino, Patterson's CFO, resigned. (Compl. ¶¶ 12, 123). Reports from financial investment research firms were bleak. (Compl. ¶¶ 125–26). Patterson's stock dropped 24% on March 1, from $31.58 per share to $24.11 on a trading volume of 15 million shares; a market cap loss of approximately $700 million. (Compl. ¶¶ 14, 127, 247–48).

The Texas AG filed a formal complaint against Patterson on April 19, 2018—it had already brought complaints against Benco in 2015 and Schein in 2017. (Compl. ¶ 131). The Texas AG alleged Patterson "participated in a group boycott by dental supply distributors to suppress the entry of a new market participant in the dental supply distribution market" in violation of Texas antitrust laws. (Compl. ¶¶ 15, 131). Benco, Schein, and Patterson all settled with the Texas AG the day the respective complaints were filed against them. (Compl. ¶¶ 15,131). Patterson agreed to cease its anticompetitive conduct, pay $200,000, and provide the Texas AG an ongoing log of all oral and written communications between its senior executives and other dental supply distributors for one year. (Compl. ¶¶ 15,131).

On May 3, 2018, Misiak resigned. (Compl. ¶ 132).

On August 30, 2018, Patterson reported that its earnings missed expectations. (Compl. ¶¶ 15, 133). Mark Walchirk, Patterson's new CEO, explained that Patterson fell short of earnings expectations because of “competitive pricing pressures at the point of sale.” (Compl. ¶ 133). In respond to an analyst's question, Walchirk stated that the source of the competitive pricing pressure was a changing customer base that “purchases a larger volume of products, and obviously, commands an improve price position.” (Compl. ¶ 134). Patterson's stock fell 5%. (Compl. ¶¶ 15, 134).

***12** On September 7, 2018, Patterson, Benco, and Schein reached an agreement to pay $80 million to settle the consumer antitrust class action pending in the Eastern District of New York entitled *In re Dental Supplies Antitrust Litig.* (Compl. ¶ 135). Patterson expected to contribute $28.5 million towards the settlement. (Compl. ¶ 135).

Throughout the relevant time period, Patterson maintained on its website its “Principles of Business Conduct and Code of Ethics.” (Compl. ¶ 224). Patterson expressly incorporated it by reference into its Form 10-K filings. (Compl. ¶ 224). One section is entitled “Competing Ethically,” and it states: “Patterson fully complies with the antitrust laws and fair trade practices of the United States and all other applicable jurisdictions.” (Compl. ¶ 224). Patterson claimed it instituted “specific guidelines that should be observed by all employees,” including:

> (1) “[n]ever discuss pricing policy with competitors”; (2) “[n]ever engage in a joint selling activity with a competitor”; (3) “[n]ever ask a vendor to cease doing business with a competitor”; and (4) “[a]void even the appearance of improper or collusive conduct when meeting with competitors or vendors at trade shows or trade association meetings.”

(Compl. ¶ 225).

## II. ANALYSIS

### A. Legal Standard

“To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.” *Sletten & Brettin Orthodontics v. Cont'l Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Facial plausibility of a claim exists “when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Although a sufficient complaint need not be detailed, it must contain “[f]actual allegations ... enough to raise a right to relief above the speculative level.” *Twombly*, 550 U.S. at 555 (citation omitted); *see id.* (“The pleading must contain something more ... than ... a statement of facts that merely creates a suspicion of a legally cognizable right of action.”) (quotations and citation omitted). Additionally, complaints are insufficient if they contain “naked assertions devoid of further factual enhancement.” *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act makes it unlawful “[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.” 15 U.S.C. § 78j(b). “SEC Rule 10b–5 implements [§ 10(b)] by making it unlawful to, among other things, ‘make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.’ ” *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Section 10(b) and Rule 10b–5 claims require the claimant to show:

> ***13** (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss.

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 760 (8th Cir. 2009) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002). Section 20(a) imposes secondary liability on every person "who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder ...." 15 U.S.C. § 78t(a).

"The [Private Securities Litigation Reform Act ("PSLRA")] imposes heightened pleading requirements on private securities actions 'to curb perceived abuses' of such actions, including 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.' " *Horizon Asset Mgmt. Inc.*, 508 F.3d at 761 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007)). The PSLRA requires a securities plaintiff to satisfy two heightened pleading standards. 15 U.S.C. § 78u-4(b)(3); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005).

> First, the plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading. 15 U.S.C. § 78u–4(b)(1). If falsity is alleged based upon information and belief, the complaint must state with particularity all facts on which the belief is formed. *Id.* In addition, the plaintiff must plead scienter by "stat[ing] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

*In re Cerner Corp. Sec. Litig.*, 425 F.3d at 1083; *Little Gem Life Sci., LLC v. Orphan Med., Inc.*, 537 F.3d 913, 916–17 (8th Cir. 2008) (quoting *In re NVE Corp. Sec. Litig.*, 527 F.3d 749, 751 (8th Cir. 2008)).

"On a motion to dismiss an action covered by the Reform Act, the Court views factual allegations in the light most favorable to the plaintiff ... and assumes the truth of particularly pleaded allegations." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1022 (D. Minn. 2009) (internal citations omitted), *aff'd sub nom Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *Little Gem Life Sci., LLC*, 537 F.3d at 917. "The complaint is construed liberally, all factual allegations taken as true, but 'conclusory or catch-all assertions of law and unwarranted inferences' are rejected." *Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016) (quoting *In re K-tel Int'l*, 300 F.3d at 889). The court may consider the pleadings, materials embraced by the pleadings, and public records. *Rand-Heart of New York, Inc.*, 812 F.3d at 1176.

### B. Misrepresentations of Material Fact

To allege a securities-fraud claim, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). "A misrepresentation or omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.' " *Parnes*

*v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *Detroit Gen. Ret. Sys.*, 621 F.3d at 805. "The trier of fact is uniquely competent to determine materiality, as that inquiry requires 'delicate assessments of inferences a [reasonable investor] would draw from a given set of facts.' " *In re Control Data Corp. Sec. Litig.*, 933 F.2d 616, 621 (8th Cir. 1991) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). But "[w]here a reasonable investor could not have been swayed by an alleged misrepresentation, however, a court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546.

***14** Here, Plaintiffs allege Defendants proffered various misrepresentations or omissions of material fact. For ease of analysis, these alleged misrepresentations can be grouped into categories: (1) 2013–15 Form 10-K filings; (2) Patterson's code of ethics incorporated into its Form 10-K filings; (3) quarterly earnings reports and accompanying earnings calls; and (4) 2016–17 Form 10-K filings.

### 1. 2013, 2014, and 2015 Form 10-K Filings

Plaintiffs assert the 2013, 2014, and 2015 Form 10-K filings are all similar. Patterson touted itself as a market leader with a strong *competitive* position, that the dental supply industry was *highly competitive* and *fragmented*, that Patterson used *competitive* pricing to beat out its *competitors*, and new *competitors* increased *competition*, but that Patterson's value-added services, technology, and operational efficiencies placed it in a strong market position. Plaintiffs assert Defendants violated Section 10(b) and Rule 10b-5 by not disclosing their alleged anti-competitive behavior and the ongoing government investigations into that behavior.

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Sofamor Danke Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)); *Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). Under Regulation 2-K Item 103, a company must "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant" is subjected, as well as "any such proceedings known to be contemplated by governmental authorities." 17 C.F.R. § 229.103. "An investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges." *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) (quoting *ABA Disclosure Obligations under the Federal Securities Laws in Government Investigations—Part II.C.*) (holding that a Wells Notice issued by the SEC falls "well short of litigation" and thus is not required to be disclosed under Item 103); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) (SEC investigation not a "pending legal proceeding" or a "proceeding known to be contemplated by governmental authorities" until the agency brings charges). Courts have likewise held that state investigations are not "pending legal proceedings" subject to Item 103 disclosure. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 718 (S.D.N.Y. 2013) (Item 103 did not render a duty to disclose more than thirty state investigations into MetLife's compliance with unclaimed property laws).

The Texas AG initiated its investigation in July 2014. The Arizona AG initiated its investigation in October 2014. The FTC started investigating Patterson sometime before August 2015. These investigations dragged on for several years, not materializing into complaints until the FTC brought suit on February 12, 2018. The Texas AG followed by filing suit on April 19, 2018, which was instantly settled by Patterson. There is no indication that the Arizona AG ever commenced suit or an enforcement action. Thus, the only reporting requirement under Item 103 during the class period—June 26, 2013 to February 28, 2018—would be the FTC's complaint. But Patterson had no public statements between February 12, 2018 and February 28,

2018, let alone any to which this duty to disclose attached. Accordingly, something beyond the mere existence of governmental investigations must trigger a disclosure obligation to beget liability for non-disclosure.

***15** Plaintiffs argue that where Defendants touted their success in the "highly competitive" dental supply market, they were required to disclose their anticompetitive scheme to render those statements not misleading. As the Eighth Circuit has noted, "even absent a duty to speak, a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *Kushner*, 317 F.3d at 831 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 541, 561 (6th Cir. 2001) (en banc)). Thus, "[e]ven where a party does not otherwise have an affirmative duty to disclose certain information, once a material topic has been broached, the party has an affirmative duty to disclose sufficient additional information to prevent the original disclosure from being misleading." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1057 (D. Minn. 2003). This is because "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc.*, 563 U.S. at 45.

This Court is not convinced that merely speaking about competitiveness renders a duty to report all anti-competitive behavior. There is no "duty to disclose 'soft information,' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions." *Kushner*, 317 F.3d at 831. The "federal securities laws do not require a company to accuse itself of wrongdoing." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotations, alterations, and citations omitted). "Rule 10b–5 was not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement," thus illegal conduct does not establish a Rule 10b–5 violation unless made in conjunction with a misleading statement. *Galati v. Commerce Bancorp, Inc.*, 2005 WL 3797764, at *8 (D.N.J. Nov. 7, 2005), *aff'd* 220 F. App'x 97 (3d Cir. 2007). Thus, there was no automatic duty for Defendants to disclose their alleged anticompetitive behavior in the 2013, 2014, and 2015 Form 10-K filings. *But see* *Utesch v. Lannett Co., Inc.*, 2019 WL 2136467, at *6–*8 (E.D. Pa. May 15, 2019) (finding plaintiff appropriately pled a misleading statement where generic drug manufacturer stated it "face[d] strong competition" but allegations showed the market was not competitive as it would have misled a reasonable investor).

### 2. Code of Ethics

Plaintiffs assert Patterson's code of ethics, incorporated into all of its Form 10-K filings, was a misstatement because it averred compliance with antitrust laws while Defendants conspired with their competitors to violate those same laws. Defendants point this Court to various cases that hold particular companies' ethics codes constituted puffery sufficient to render them immaterial. For example, in *Singh v. Cigna Corp.*, Cigna "published a pamphlet titled 'Code of Ethics and Principles of Conduct' " that included "statements from senior Cigna executives affirming the importance of compliance and integrity." 918 F.3d 57, 61 (2d Cir. 2019). The pamphlet stated " 'it's so important for every employee ... to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations,' and that 'we have a responsibility to act with integrity in all we do, including any and all dealings with government officials.' " *Id.* (alterations in original). The Second Circuit concluded that a reasonable stockholder would not consider these statements as important in deciding whether to buy or sell shares of stock because they amounted to "general declarations about the importance of acting lawfully and with integrity." *Id.* at 63.

***16** Unlike *Singh*, however, Patterson's code of ethics went further than simply touting compliance with "all laws and regulations." *See* *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 2428529, at *8 (S.D.N.Y. June 11, 2019) ("Cigna's code of conduct statements were not actionable, because they were exceptionally vague and aspirational."). Indeed, it went even

further than touting compliance with antitrust laws. Patterson's code of ethics instituted specific guidelines for compliance with antitrust laws: no discussions of policy with competitors, no joint selling with competitors, no asking vendors to boycott a competitor, and avoiding appearances of improper or collusive conduct when meeting with competitors at trade shows. This Court finds the distinction important; this is not a code of ethics that merely aspires to be "open, honest, and direct in all our dealings," or something similarly fuzzy. *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1135–1140 (N.D. Cal. 2013) (declining to find such language in a code of ethics to constitute a material statement because doing so would "render every code of ethics materially misleading whenever an executive commits an ethical violation following a scandal"). Rather, this is a code of ethics that outlines specific guidance for compliance with a specific subset of laws.

"Absent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose." *Kushner*, 317 F.3d at 831. Here, there are allegations that various Patterson employees knew their collusive scheme with Benco and Schein was illegal. After letting Reinhardt know of the fallout from the Texas Dental Association boycott—an antitrust investigation by the Texas AG—Misiak informed him to discuss the matter "live" and send no more emails about the proposed Arizona Dental Association boycott. Misiak, alongside McFadden, is a key player in Patterson's misconduct. Misiak reported directly to Anderson and there are allegations showing a line of communication between Misiak, Anderson, and Guggenheim. For example, Misiak emailed Anderson and Guggenheim on September 3, 2013, noting he has told his staff to reject GPOs. Anderson did not refute that plan of action but instead suggested further monitoring. The next day, Misiak and McFadden distributed a memo telling their sales managers not to work with GPOs. Anderson was informed in June 2013 of Guggenheim's conversations with Benco's Cohen concerning an agreement to reject GPOs. While Anderson received only a "FYI" email, there is no indication he repudiated Guggenheim's conduct. Like Misiak, Guggenheim directly reported to Anderson. Thus, starting with the June 2013 discussion forwarded to Anderson, Plaintiffs have sufficiently alleged Anderson knew the incorporated code of ethics statements to be false.

Compared to Anderson, there is no clear allegation that other certifiers of the Form 10-K filings—Armstrong, Gugino, and Wiltz—knew the incorporated code of ethics statements to be false. Rather, their inclusion is based on their certifications as high-ranking members of Patterson. Indeed, these three named defendants only appear in the complaint with respect to quarterly reports, earnings calls, and Form 10-K filings; there are no particular allegations lodged against them with respect to the underlying anticompetitive conduct. As such, this Court concludes the incorporation of the code of ethics into the Form 10-K filings are not attributable to Armstrong, Gugino, and Wiltz as misstatements.

### 3. Quarterly Earnings and Earnings Calls

In Patterson's various earnings reports and follow-up earnings calls conducted by Anderson and Gugino, Patterson's performance was attributed to various factors, including: the stability or growth of the dental market (FY2014 Q1, FY2015 Q4, FY2016 Q1, FY2016 Q2, FY2016 Q3, FY2016 Q4); industry-leading technology wrapped by a suite of value-added services (FY2014 Q2, FY2015 Q1, FY2015 Q2, FY2015 Q3, FY2015 Q4, FY2016 Q3); a strong sales force (FY2014 3Q, FY2015 Q2, FY2015 Q3, FY2015 Q4, FY2016 Q3); and the digitalization of dental offices (FY2015 Q3). When Patterson's performance faltered in FY2017, Anderson and Gugino, attributed it to a sales force realignment. Anderson emphasized that the sales force alignment was not due to competitive changes to the market, but about effective customer service. Starting in FY2018, with Wiltz at the helm, the decline in Patterson's performance was no longer attributed to sales force realignment, but due to various competitors, but not yet competition from online marketplaces (FY2018 Q1, FY2018 Q2).

***17** "A statement is not material and is mere puffery if it is 'so vague and such obvious hyperbole that no reasonable investor would rely upon them.' " *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (quoting *Parnes*, 122 F.3d at 547). "No reasonable investor would rely on 'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrases used to champion the company but devoid of any substantive information.' " *In re Stratasys Ltd. S'holder*

*Sec. Litig.*, 864 F.3d at 882 (quoting *Parnes*, 122 F.3d at 547). “Optimistic statements are not actionable if they cannot be supported by objective data or otherwise subject to verification by proof.” *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d at 882 (quotation omitted).

Defendants’ statements during these quarterly earnings reports and earnings calls are vague and unverifiable. None of these statements relate to GPOs and, despite the Plaintiffs’ desire to read in things left unsaid, they do not relate to Patterson's compliance with antitrust law. These corporate statements amount to little more than corporate gobbledygook self-justifying Patterson's existence and place in the dental supply economy—“industry-leading technology” and “value-added services.” These constitute “optimistic rhetoric” and “promotional phrases used to champion the company,” but they are “devoid of any substantive information” and constitute puffery.

Certainly, Plaintiffs would have this Court read in added language to some of these earnings statements: the dental market was stable or grew *due to an anticompetitive agreement to keep out GPO competition*; a strong sales force *due to an anticompetitive agreement that kept out GPO competition*; the sales force realignment *was required due to an unraveling anticompetitive agreement*. But this reading would stretch these statements too far, as there is no clear link between the illegal conduct and these statements. *See* *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2015) (“Courts that have determined that corporations had a duty to disclose uncharged illegal conduct in order to prevent other statements from misleading the public have required a connection between the illegal conduct and the statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line.”) (collecting cases). The connection is too attenuated here. *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006) (“The connection between the alleged inaccurate statement and the underlying conduct may not be too attenuated, and, again, must be pled with sufficient specificity.”). The statements here are generic descriptions of the state of the market and a recitation of Patterson's supposedly unique operations. *See* *Menkes*, 2005 WL 3050970, at *8.

**4. 2016 and 2017 Form 10-K Filings**

The 2016 Form 10-K indicated that Patterson competed with Benco and Schein and that GPOs may place it at a competitive disadvantage. Patterson noted it was seeking to obtain access to lower prices demanded by GPO contracts and develop relationships with GPOs. Although the language is not provided in the complaint, Plaintiffs allege the 2017 Form 10-K contains similar representations. The allegations show Patterson was actually doing the opposite; Patterson was not competing with Benco and Schein, at least with respect to GPOs, and Patterson was not seeking to develop relationships with GPOs, but was seeking to choke off GPOs from the market. The parties appear to agree Patterson made no misrepresentation when it stated that GPOs could put it at a competitive disadvantage.

***18** Defendants argue that there are no misrepresentations in these Form 10-K filings. This Court disagrees. While Patterson added the caveat that it could not guarantee obtaining access to lower prices demanded by GPO contracts or that any such contracts would be executed, it clearly stated it was already in the process of seeking out such contracts. “Seeking to obtain access” does not equal “will seek to obtain access.” It indicates present, current action and Defendants cannot paint this as a purely forward-looking statement. By June 2016, Patterson was waist-deep in its alleged anticompetitive agreement; indeed, it was under investigation by the FTC, Texas, and Arizona by that time.

As noted with the code of ethics, there is no clear allegation that the certifiers other than Anderson—Gugino and Wiltz—knew these statements to be false. Rather, their inclusion is based on their certifications as high-ranking members of Patterson. Thus, this Court concludes the 2016 Form 10-K and 2017 Form 10-K are not attributable to Gugino and Wiltz as misstatements.

**C. Scienter**

" 'Rote allegations that the defendants knowingly made false statements of material fact' fail to satisfy the heightened pleading standard of the Reform Act." *Kushner*, 317 F.3d at 827–28 (quoting *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 745 (8th Cir. 2002)). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2). "The required state of mind for private securities fraud actions is 'scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud,' or the defendant's 'severe recklessness.' " *Horizon Asset Mgmt. Inc.*, 580 F.3d at 761 (quoting *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008)).

Scienter can be established "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Detroit Gen. Ret. Sys.*, 621 F.3d at 808; *In re K-tel Int'l*, 300 F.3d at 893. This involves a holistic inquiry looking for "badges of fraud." *In re Navarre Corp. Sec. Litig.*, 299 F.3d at 745. Inferences of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*; *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1029 (8th Cir. 2011) (quoting *Tellabs, Inc.*, 551 U.S. at 323–24).

**1. Gugino, Armstrong, and Wiltz**

As noted above, Defendants Gugino, Armstrong, and Wiltz are only included in the complaint with respect to their certification of the Form 10-K filings and quarterly earnings reports and calls. Armstrong's sole involvement is his certification of the 2013 and 2014 Form 10-K filings. Wiltz certified the 2017 Form 10-K filing and participated on the FY2018 Q1 earnings call, noting that Patterson had not yet seen competition from the online marketplace such as Amazon. Gugino had the largest role, but she mostly recounted financial information during various earnings calls—unsurprising given her role as Patterson's CFO. On the FY2017 Q1, Q2, and Q3 earnings calls, she attributed poor financial performance to a sales force realignment, but Anderson was the Patterson representative who expanded upon the purpose of the sales force realignment. During the FY2018 Q2 earnings call, Gugino attributed Patterson's "leaking market share" to a "variety of competitors" but that Patterson could rebound with competitive prices and value-added business practices.

***19** Plaintiffs cannot solely rely on Gugino, Armstrong, and Wiltz's positions as officers at Patterson to support an inference of scienter. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 382 (citing *In re Health Mgmt., Inc., Sec. Litig.*, 970 F. Supp. 192, 204 (E.D.N.Y. 1997)); *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *17 (E.D. Mich. Jan. 30, 2007) (holding that, without more, certifications of the accuracy of quarterly and annual reports do not permit a strong inference of scienter as it is required of all corporate officers and directors and says nothing about the defendants' intent). "[C]orporate officials are not required to be clairvoyant and are responsible only for revealing the material facts reasonably available to them." *In re Patterson Cos., Inc. Sec., Derivative & ERISA Litig.*, 479 F. Supp. 2d 1014, 1032 (D. Minn. 2007) (citing *In re Navarre Corp. Sec. Litig.*, 299 F.3d at 743); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (it is insufficient to "simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud"). Absent any direct connection to the underlying anticompetitive actions of Anderson's subordinates, Plaintiffs have not pointed to any "badges of fraud" showing that Gugino, Armstrong, and Wiltz knowingly made false statements of material fact or that they intended to deceive, manipulate, or defraud. [11]

After the poor fiscal performances in FY2017 and the first three quarters of FY2018, Gugino resigned. Plaintiffs argue scienter can be inferred from Gugino's resignation. Absent any other allegation tying Gugino to the underlying anticompetitive actions,

her departure does not establish scienter. *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (holding that "notable departures are not in and of themselves evidence of scienter" because "[m]ost major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions").

### 2. Anderson

As compared to Gugino, Armstrong, and Wiltz, the complaint does contain "badges of fraud" detailing Anderson's knowledge of the alleged anticompetitive behavior: Plaintiffs assert that Anderson was aware of the collusive agreement as early as June 2013, that he communicated with the principle enforcers of the collusive agreement, and that he directly supervised those actors.

Looking at all the facts alleged, Anderson's connection to the anticompetitive conduct perpetrated by his underlings gives rise to a strong inference of scienter. The complaint alleges, at the least, that Anderson knew of an anticompetitive agreement between Patterson, Benco, and Schein, that he allowed that agreement to persist, and that he did nothing to prevent his direct reports from furthering and enforcing that agreement. Specifically, Anderson was apprised early on by Guggenheim that he had been in contact with Benco's Cohen regarding GPOs. Anderson took no action to curtail these missives. Several months later, Guggeheim affirmed to Anderson that Patterson was rejecting GPOs and monitoring how its competitors interacted with GPOs. Rather that reject Guggenheim's handling of GPOs, Anderson doubled down by pointing out the weakness of those entities doing business with GPOs and requested continued monitoring. Buttressing this, Anderson directly supervised Misiak and received reports of how he communicated the anti-GPO position to subordinate sales staff. Moreover, Anderson made statements as to the competitiveness of the market [12] and Patterson while the company was under investigation, suggesting his statements "were made with the requisite scienter." *Utesch*, 2019 WL 2136467, at *8. Thus, it is reasonable to infer Anderson's scienter; Plaintiffs have pleaded Anderson's repeated statements concerning the competitive nature of the dental supply market, the competitiveness of Patterson, Patterson's competition with Benco and Schein, and that Patterson was seeking business opportunities with GPOs were made with the requisite state of mind.

***20** Unlike Gugino, Anderson's resignation is accompanied by allegations tying him to the underlying anticompetitive actions. Anderson's resignation was abrupt and not discussed on the earnings call held one week prior. Based on the allegations of the complaint, it is difficult to tie Anderson's resignation to any specific precipitating factor. *See* *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."). Thus, while not much standing alone, Anderson's resignation buttresses the inference of scienter under the holistic approach. *Id.* ("Even though it is also possible to infer, for example, that Defendants left of their own volition or that they were removed for mismanagement unrelated to wrongdoing, the Court finds that the proximity of Defendants' departures to the financial restatements and investigations adds one more piece to the scienter puzzle.") (quotation omitted).

### 3. Patterson

The "Eighth Circuit has not directly addressed the issue of 'collective scienter,' " but "has done so implicitly." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1035; *Horizon Asset Mgmt. Inc.*, 508 F.3d at 767 ("The appropriate standard for considering the pleading of corporate scienter under the PSLRA appears to be an open question in this circuit."). Accordingly, courts in this District have not applied the "collective scienter" doctrine but instead require plaintiffs "establish corporate scienter by adequately alleging the scienter of individual corporate officers." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1035. "The knowledge and scienter of a corporate officer such as its CEO or CFO may of course be imputed to the corporate entity." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 896 (D. Minn. 2011); *Beaver Cty. Employees' Ret. Fund v. Tile*

*Ship Holdings, Inc.*, 94 F. Supp. 3d 1035, 1054 (D. Minn. 2015). As concluded above, Plaintiffs have adequately pled scienter as to Anderson, Patterson's CEO. This also imputes sufficient scienter to Patterson.

Even if this Court were to consider the "collective scienter" reasoning, the collective action of Patterson's employees satisfies the standard. As discussed, Misiak had a line of communication with Anderson. Misiak and McFadden repeatedly distributed marching orders to their sales managers who then passed on that information to their middle-management and ground-level sales representatives. Sales representatives' requests for guidance on how to proceed with GPOs, even with substantial business opportunities on the line, were repeatedly met with the same answer: "No business with GPOs—just like Benco and Schein." Indeed, there were frequent check-ins with counterparts at Benco and Schein when Patterson employees suspected their competitors of reneging on their plan towards GPOs. Where the "wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business," corporate scienter is sufficiently pled. *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007).

**D. Loss Causation**

"Loss causation in a securities fraud case is analogous to the common law's requirement of proximate causation. The plaintiff must show 'that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk.' " *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (citing and quoting *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)). The securities statutes make fraud actions available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm.*, 544 U.S. at 345; *see also* 15 U.S.C. § 78u–4(b)(4) (requiring plaintiffs to prove the defendant "caused the loss"). "A complaint must 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.' " *McAdams v. McCord*, 584 F.3d at 1114 (quoting *Dura Pharm*, 544 U.S. at 347).

***21** Defendants point out that the alleged antitrust misconduct was already known to the market prior to the FTC's complaint by reason of the various private lawsuits against Patterson and its collusive competitors. Private lawsuits were filed against Patterson on September 21, 2015, February 11, 2016, and August 17, 2017, well before the February 12, 2018 FTC complaint was filed and made public. Defendants also assert that Patterson's stock "quickly rebounded" following the FTC action's commencement.

This Court is unpersuaded by Defendants' argument that the alleged antitrust misconduct was already known to the market prior to the FTC's complaint. Defendants essentially ask this Court to weigh their truth-on-the-market defense. This a defense that seeks to "rebut the fraud-on-the-market presumption of reliance by proving that 'the market makers were privy to the truth.' " *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004) (quoting *Basic Inc.*, 485 U.S. at 248). This is an intensely fact-specific defense that is rarely appropriate to determine at the motion to dismiss stage. *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d at 985–86 (citing *Ganino v. Citizens Utils. Co.*, 228 F. 3d 154, 167 (2d Cir. 2000)). As Plaintiffs point out, the FTC complaint provided new information to the market unrevealed by the previous private lawsuits, mainly internal communications, and a financial analyst described the FTC complaint "as very serious [and] much more severe" than the allegations of the private lawsuits.

This Court is more sympathetic to Defendants' arguments concerning the causal connection between the FTC complaint and the stock losses, particularly where Defendants point to data that shows Patterson's stock price was ultimately unaffected in the weeks following the FTC complaint until the March 1, 2018 earnings report was released. (*See* Thomas Aff., Ex. A). As detailed in the various earnings reports above, Patterson's earnings had been dropping for some time before the FTC complaint was revealed. Plaintiffs have not clearly explained how the FTC complaint was the precipitating cause of the stock price fall in March 2018 as compared to the accumulated effects of Patterson's near-continuous declining earnings. To counteract Defendants' argument, Plaintiffs assert that the declining earnings were the result of Patterson's unraveling anticompetitive

conduct; essentially, Patterson's previously-inflated financial performance had to normalize to the reality that Patterson was not actually as competitive in the dental supply marketplace as it had continuously touted. Thus, Plaintiffs assert, the stock price drop in March 2018 was due to the materialization of the concealed anticompetitive conduct.

These entangled facts are difficult to resolve in the absence of discovery and would be better suited for resolution on summary judgment where experts can weigh in with their analysis. *See* *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003) (declining "to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context"). Nonetheless, Defendants' argument may be more relevant to the economic harm analysis than that of loss causation. At this stage in the proceeding, this Court cannot draw appropriate boundaries for stock value consideration and what impact the FTC complaint's revelation of the extent of Patterson's anticompetitive behavior had on Patterson's stock prices as compared to its declining earnings. As the Eighth Circuit has noted, the "causation requirement for damages is not very stringent." *Id.* at 831. Plaintiffs have pleaded a revelation—the February 2018 FTC complaint—followed by the March 2018 earnings call and contemporaneous drop in stock value. At this point in the litigation, this Court concludes Plaintiffs have sufficiently provided Defendants "some indication of the loss" and the causal connection to survive the motion to dismiss.

### E. Summary

***22** Plaintiffs have alleged a long-running scheme at Patterson, concocted in the upper echelons of corporate management, to collude with its direct competitors to stifle new entrants to the market to protect its artificially inflated prices charged by reason of unorganized buyers with little power. Because of an FTC complaint, Plaintiffs have provided allegations with a degree of clarity ordinarily unavailable. But those allegations are insufficient to assert securities violations against all Defendants. This Court concludes Plaintiffs have properly pled securities violations against Anderson and Patterson. As to the other named Defendants—Gugino, Armstrong, and Wiltz—Plaintiffs have failed to sufficiently plead their involvement with the underlying misconduct and this Court concludes they should be dismissed as defendants.

Because this Court concludes Plaintiffs have adequately pled a Section 10(b) claim against Anderson, their Section 20(a) claim survives against him and Patterson. *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d at 911. As noted above, Plaintiffs have sufficiently alleged that Anderson supervised the principle actors in the misconduct and was apprised of their actions. *Lustgraf v. Behrens*, 619 F.3d 867, 873–74 (8th Cir. 2010); *Beaver Cty. Employees' Ret. Fund*, 94 F. Supp. 3d at 1054–55.

## III. RECOMMENDATION

Based on the foregoing, and all the files, record, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion to Dismiss the Amended Class Action Complaint, (ECF No. 89), be **GRANTED IN PART and DENIED IN PART** as set forth herein.

## NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3336119

## Footnotes

1 Patterson distributes its products through three subsidiaries, Patterson Dental, Patterson Animal Health, and Patterson Medical. (Compl. ¶¶ 25, 39). Patterson Dental makes up approximately 60% of Patterson's business, generating sales in excess of $2billion. (Compl. ¶ 39). Unless specifically noted, references to "Patterson" herein are to Patterson and Patterson Dental.

2 Anderson served as Patterson's CEO and president from April 25, 2010 through June 1, 2017. (Compl. ¶ 26). Prior to that, Anderson served as president of Patterson Dental from June 2006 through April 2010. (Compl. ¶ 26).

3 Gugino served as Patterson's CFO from November 2014 through her resignation on March 1, 2018. (Compl. ¶¶ 12, 30, 123). Before that, she served as Patterson's vice president of finance and operations and vice president of strategy and planning. (Compl. ¶ 30).

4 Armstrong served as Patterson's executive vice president, CFO, and treasurer from July 1999 through October 2014. (Compl. ¶ 28).

5 Wiltz served as Patterson's interim CEO from June through November 2017. (Compl. ¶¶ 32, 213).

6 Because this matter is before the Court on Defendants' Rule 12(b)(6) motion, "the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true." *City of Lake Elmo v. 3M Co.*, 237 F. Supp. 3d 877, 885 (D. Minn. 2017) (citing *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir. 1994)). Thus, these facts are derived solely from the complaint or materials embraced by the complaint. *See* *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (noting that, on a motion to dismiss, courts may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record).

7 Guggenheim served as president of Patterson Dental from April 2010 through June 15, 2016, at which point he was appointed chief innovation officer of Patterson, where he served until June 1, 2017. (Compl. ¶ 35). Guggenheim reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

8 Misiak served as Patterson's head of sales from 2010 to until November 1, 2016, when he became president of Patterson Dental. (Compl. ¶ 36). Misiak served as president of Patterson Dental through May 3, 2018. (Compl. ¶¶ 36, 132). Misiak reported directly to Anderson, Patterson's CEO. (Compl. ¶¶ 132, 229).

9 Rogan served as Patterson Dental's head of marketing from 2010 through 2017, when he was appointed as vice president and general manager of North America. (Compl. ¶ 37). Rogan reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

10 McFadden served as president of Patterson Dental's special markets division beginning June 2013, when that division was formed. (Compl. ¶¶ 38, 64). McFadden reported directly to Anderson, Patterson's CEO. (Compl. ¶ 229).

11 This Court will not use the "core operations" theory as urged by Plaintiffs where the Eighth Circuit has not addressed it and noted that it has been rejected by other circuit courts. *Elam v. Niedorff*, 544 F.3d 921, 929 (8th Cir. 2008).

12 Ignoring statements certified by Anderson in Patterson's Form 10-K filings, Anderson repeatedly cited the dental supplies market's stability, (Compl. ¶¶ 148, 172, 174, 177, 183), and Patterson's competitiveness, (Compl. ¶¶ 158, 160–62, 164–65, 179), in earnings calls.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT P

2019 WL 4277302
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
PATTERSON COMPANIES, INC., et al., Defendants.

Civil File No. 18-871 (MJD/SER)
|
Signed 09/10/2019

**Attorneys and Law Firms**

Lucas F. Olts, Alexi Pfeffer-Gillett, and Heather G. Schlesier, Robbins Geller Rudman & Dowd LLP; Anne M. Lockner, Robins Kaplan LLP; Steven B. Singer, Kyla Grant, Maya Saxena, Joseph E. White, III, Lester R. Hooker, Dianne Anderson, Saxena White P.A.; and Robert D. Klausner, Klausner, Kaufman, Jensen & Levinson, Counsel for Plaintiff.

Patrick S. Williams, Aaron G. Thomas, and Jordan Weber, Briggs & Morgan, PA, Counsel for Defendants.

**ORDER**

Michael J. Davis, United States District Court

***1** The above-entitled matter comes before the Court upon the Report and Recommendation of United States Magistrate Judge Steven E. Rau dated July 25, 2019. Defendants filed objections to the Report and Recommendation.

Pursuant to statute, the Court has conducted a de novo review upon the record of those portions of the Report and Recommendation to which objections were made. 28 U.S.C. § 636(b)(1); Local Rule 72.2(b). Based upon that review, the Court **adopts** the Report and Recommendation of United States Magistrate Judge Rau dated July 25, 2019, with the modification that, on page 23 of the Report and Recommendation, the amount "$39.92" is amended to read "$32.92."

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. The Court **ADOPTS** the Report and Recommendation of United States Magistrate Judge Steven E. Rau dated July 25, 2019 [Docket No. 112] with the modification set forth in this Order.

2. Defendants' Motion to Dismiss the Amended Class Action Complaint [Docket No. 89] is **GRANTED IN PART** and **DENIED IN PART** as set forth in the Report and Recommendation.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4277302

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT Q

2018 WL 3601229
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

ROOFER'S PENSION FUND, Plaintiff,
v.
PAPA, et al., Defendant.

Civil Action No. 16-2805
|
Filed 07/27/2018

**Attorneys and Law Firms**

Daniel S. Sommers, Cohen, Milstein, Sellers & Toll, PLLC, Washington, DC, Michael B. Himmel, Michael Thomas Gray Long, Lowenstein Sandler, PC, Roseland, NJ, for Plaintiff.

Goutam Umesh Jois, Gibson Dunn & Crutcher, LLP, Brian Thomas Frawley, Sulivan & Cromwell, Ryan M. Chabot, Steven William Shuldman, Wilmer Cutler Pickering Hale and Dorr, LLP, New York, NY, Alan S. Naar, Greenbaum, Rowe, Smith & Davis, LLP, Iselin, NJ, Jane J. Felton, Jonathan W. Wolfe, Skoloff & Wolfe, PC, Livingston, NJ, for Defendant.

## OPINION

Madeline Cox Arleo, United States District Judge

***1 THIS MATTER** is before the Court by way of Defendants Perrigo Company PLC ("Perrigo"), Joseph Papa, Judy Brown, Laurie Brlas, Gary M. Cohen, Jacqualyn A. Fouse, Ellen R. Hoffing, Michael Jandernoa, Gerland K. Kunkle, Jr., Herman Morris, Jr., and Donal O'Connor's Motion to Dismiss, ECF. No. 114, and Defendant Mark Coucke's Motion to Dismiss, ECF No. 119, the First Amended Complaint ("FAC"), ECF No. 89. Lead Plaintiff Perrigo Institutional Investor Group ("Plaintiff") opposes the motion, ECF No. 126. Plaintiffs argue that Defendants made material misrepresentations about four areas to prevent the Perrigo shareholders from accepting a bid from Mylan, which had made a final tender offer. For the reasons set forth herein, Defendants' Motions are **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

This is a federal securities class action brought on behalf of purchasers of the common stock of Perrigo between April 21, 2015, and May 3, 2017, both dates inclusive (the "Class Period"), and owners of common stock as of November 13, 2016, seeking to recover damages caused by Defendants' alleged violations of securities laws. Am. Compl. ¶ 1. More specifically, this action arises from alleged misrepresentations that Defendants made to investors while fighting a hostile takeover bid by Mylan, a pharmaceutical conglomerate, and throughout the Class Period. Id. ¶ 1. Generally, Plaintiffs contend that Perrigo intentionally violated accounting rules in its treatment of a royalty stream it acquired prior to the Class Period and misrepresented the stream's value, misrepresented the pricing policy and competitiveness of the company's generic division in order to hide a price fixing scheme that garnered them hundreds of millions of dollars in collusive revenue, inflated organic growth rates despite knowing that organic growth had slowed substantially in the quarters preceding the Class Period, and misrepresented the success of Perrigo's integration of Omega Pharma N.V. ("Omega"), the company's largest acquisition to date. As a result of their knowing misrepresentations and omissions, Plaintiffs contend that Defendants fended off the Mylan bid and reaped personal profits.

**A. The Parties**

Lead Plaintiff Perrigo Institutional Investor Group is comprised of Migdal Insurance Company Ltd. ("Migdal Insurance"), Migdal Mafeket Pension and Provident Funds Ltd. ("Migdal Mafeket" and, with Migdal Insurance, "Migdal"), Clal Insurance Company Ltd. ("Clal Insurance"), Clal Pension and Provident Ltd. ("Clal Pension"), Atudot Pension Fund for Employees and Independent Workers Ltd. ("Atudot" and, with Clal Insurance and Clal Pension, "Canaf-Clal"), and Meitav DS Provident Funds and Pension Ltd ("Meitav"). FAC ¶ 26. Migdal is one of the largest insurance and pension managers in Israel, and each of the Migdal entities purchased Perrigo stock during the Class Period and purchased Perrigo securities on the Tel Aviv Stock Exchange during the Class Period. FAC ¶ 27. Canaf-Clal is made up of Israeli investment entities, each of which purchased Perrigo shares during the Class period and purchased Perrigo securities on the Tel Aviv Stock Exchange during the Class Period. FAC ¶ 28. Meitav, an affiliate of a leading investment management firm in Israel, purchased Perrigo shares during the Class Period and purchased Perrigo securities on the Tel Aviv Stock Exchange during the Class Period. Id. ¶ 29.

***2** Defendant Perrigo is the world's largest manufacturer of over-the-counter ("OTC") healthcare products and is a significant supplier of generic pharmaceuticals, infant nutrition products, branded pharmaceuticals in Europe, and animal health products. Id. ¶ 30. A predecessor to Perrigo operated as a U.S. company until 2013, when it combined with an Irish entity, Elan, and became Perrigo Company PLC. Id. Perrigo's common stock is dual listed on the New York Stock Exchange ("NYSE") and Tel Aviv Stock Exchange ("TASE"). Id. ¶ 31.

Defendant Joseph Papa ("Papa") joined Perrigo as its President and Chief Executive Officer ("CEO") and served in that capacity until April 25, 2016. Id. ¶ 32. Papa was also a director of Perrigo between November 2006 and April 2016. Id. Defendant Laurie Brlas ("Brlas") joined Perrigo's board of directors in August 2003 and served as director at all time relevant to this action. Id. ¶ 33. In April 2016, Brlas became Chair of Perrigo's Board of Directors. Id. Defendant Judy Brown ("Brown") served as Perrigo's Chief Financial Officer ("CFO") from July 2006 until her resignation on February 27, 2017. Id. ¶ 34. Defendant Gary M. Cohen ("Cohen") joined Perrigo's board of directors in January 2003 and served as a director at all times relevant hereto. Id. ¶ 35. Defendant Marc Coucke ("Coucke") was the co-founder, Chairman and CEO of Omega and served as the Executive Vice President and General Manager of Perrigo's Branded Healthcare ("BCH") division and as the representative of Mylecke Management, Art & Invest NV ("Mylecke"), one of the entities involved in the sale of Omega to Perrigo, from the closing of the Omega acquisition to April 2016. Id. ¶ 36. Coucke also served as a director of Perrigo between November 2015 and April 2016. Id. Defendant Jacqualyn A. Fouse, Ph.D. ("Fouse") joined Perrigo's board of directors in November 2012 and served as a director until April 2016. Id. ¶ 37. Defendant Ellen R. Hoffing ("Hoffing") joined Perrigo's board of directors in July 2008 and served as a director of Perrigo until her resignation on May 2, 2017. Id. ¶ 38. Defendant Michael R. Jandernoa ("Jandernoa") joined Perrigo's board of directors in January 1981 and served a director until his resignation in February 2017. Id. ¶ 39. Jandernoa formerly served as Perrigo's Chief Executive Officer between 1988 and 2000, and its Chairman of the Board from 1991 to 2003. Id. Defendant Gerald K. Kunkle, Jr. ("Kunkle") joined Perrigo's board of directors in October 2002 and served as a director of Perrigo until his resignation in February 2017. Id. ¶ 40. Kunkle served as the Lead Independent Director on Perrigo's board of directors from August 2009 through April 2016. Id. Defendant Herman Morris, Jr. ("Morris") joined Perrigo's board of directors in November 2014 and served as a director at all times relevant hereto. Id. ¶ 41. Defendant Donal O'Connor ("O'Connor") joined Perrigo's board of directors in November 2014 and served as a director at all times relevant hereto. Id. ¶ 42. O'Connor was previously a director of Elan Corporation, PLC ("Elan") from May 2008 until Perrigo's acquisition of Elan in December 2013. Id. Defendants Papa, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, and O'Connor were the directors of Perrigo during the Mylan offer and are collectively referenced herein as "Director Defendants." Id. ¶ 43. Together with Brown and Coucke, the Director Defendants comprise the "Individual Defendants."

**B. Defendants' Alleged Misrepresentations and Omissions to Defeat Mylan Bid**

***3** On April 8, 2015, Mylan announced an unsolicited bid to purchase Defendant Perrigo for cash and stock worth $205 per share. Id. After twice increasing its bid, Mylan proceeded with a formal tender offer, which was announced on September 14, 2015. Id. To discourage Perrigo shareholders from accepting this tender offer, Defendants allegedly made material misrepresentations and omissions to overvalue the company in four key areas: (1) the deteriorating value of Perrigo's largest

financial asset, a royalty stream for the drug Tysabri; (2) Perrigo's organic growth; (3) collusive pricing in Perrigo's most profitable division, generic drugs; and (4) the integration of Perrigo's largest acquisition, Omega Pharma. Id. at 1.

**1. Tysabri Royalty Stream**

Following Perrigo's combination with Elan, Perrigo acquired Elan's major asset–a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis manufactured and sold by Biogen Inc. Id. ¶ 48. Perrigo accounted for the royalty interest as an intangible asset. Id. at 122. Plaintiffs allege that this accounting treatment violated Generally Accepted Accounting Principles ("GAAP"), which required Perrigo to account for the acquired royalty stream as a financial asset. Id. ¶ 49. By improperly accounting for the Tysabri royalty stream as an operating asset and consequently failing to make disclosures required for intangible assets, Plaintiffs allege that Defendants concealed the deterioration in the value of the Tysabri royalty stream. Id. Following from this argument, Plaintiffs claim that Defendants' statements of GAAP compliance were materially misleading. Plaintiffs also allege that Defendants affirmatively misrepresented the fair value of the royalty stream by claiming that its "fair value exceeded the carrying value," when, in reality, the fair value had fallen substantially below the carrying value. Id. ¶ 219.

**2. Anti-Competitive Pricing Practices in Generic Rx Divisions**

While Perrigo was principally known as a manufacturer of store brand OTC products, the operating segment with the greatest impact on earnings was not its consumer healthcare (CHC) division, but Generics Rx. Id. ¶ 66. For the six quarters prior to the Class Period, the Generic Rx division contributed more to Perrigo's adjusted net operating earnings than any other segment. Id. Plaintiffs allege that Generic Rx division's contributions are attributable to collusion with other manufacturers of generic drugs or to pre-existing price fixing conspiracies. Id. ¶ 69. According to Plaintiffs, "[i]nstead of engaging in price competition that usually drives generic drug prices relentlessly downward toward the cost of production, Perrigo and other generics manufacturers colluded to raise contemporaneously prices for many generic products by 300%-500% or more." Id. ¶ 6.

An economic expert retained by Plaintiffs determined that there was strong indicia of collusion, including dramatic price hikes contemporaneous with competitors following industry conferences and "startling absence of price variance following these hikes," in many of Perrigo's most important generic drugs: desonide cream and ointment, econazole cream, permethrin cream, tretinoin cream, clobetasol gel and foam, and halobetasol cream and ointment. Id. ¶ 70-91. Plaintiffs' allege that Defendants repeatedly omitted the price collusion scheme and anticompetitive practices in describing Perrigo's generic drug pricing strategy, claiming instead that that the company's policy was to keep pricing "flat to up slightly." Id. ¶¶ 176-204. Additionally, Plaintiffs claim that Defendants affirmatively misrepresented the competitiveness of the market for generic drugs and omitted their participation in the anticompetitive pricing scheme in order to continue reaping financial benefit. Id.

**3. Perrigo's Organic Growth Rate**

***4** Throughout Defendant Papa's term as CEO, Perrigo claimed an ability to grow organically, as well as through acquisitions. [1] Id. ¶ 63. For example, in early 2014, Papa explained that organic growth had accounted for half (8%) of Perrigo's 15-16% revenue growth over the past four years, and that the company targeted organic revenue growth of 5-10% during any rolling three year period. Id. Plaintiffs allege that, by blending older, higher growth periods with newer low-growth periods, Perrigo was able to create the impression of organic growth levels it had not consistently achieved for many quarters. Id.

Plaintiffs' forensic accounting expert determined that Perrigo's actual organic growth rates during the six quarters preceding the Class Period averaged just over 1% and were even negative for two quarters. Id. ¶ 64. [2] Plaintiffs further allege that Perrigo's financial reporting obscured the deterioration in organic growth and prevented investors from making true organic growth calculations on their own. Id. ¶ 65. In sum, Plaintiffs allege Defendants were aware that Perrigo's organic growth rate had deteriorated substantially in the six quarters preceding the Class Period, that Defendants nevertheless claimed confidence in the company's ability to meet an organic growth rate of 5-10% going forward, and that Defendants knowingly relied on false

information regarding the successful integration of Omega–discussed below–and the competitive market for Perrigo's products in making these misrepresentations. See id. ¶¶ 151-175.

**4. Perrigo's Integration of Omega**

On November 6, 2014, Perrigo announced it would acquire Omega for $4.5 billion. Id. ¶ 53. The acquisition closed on March 30, 2015, just before the beginning of the Class Period in this action. Id. Omega was one of the largest OTC healthcare companies in Europe and had a commercial presence in 35 countries. Id. Plaintiffs allege that Defendants misrepresented the success of integrating Omega and inflated Omega growth prospects despite numerous, known impediments.

To substantiate their allegations, Plaintiffs rely heavily on information given by Christine Kincaid ("Kincaid"), who was Perrigo's Global Cyber Security Manager from June 2015 to December 2015. She indicated that IT integration between Perrigo and Omega had stalled by mid-2015. Id. ¶ 57. Ms. Kincaid also indicated that EU regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain and that Omega's most senior executives unsuccessfully attempted to communicate such and other concerns to Defendants Papa and Brown. Id. ¶ 59. Furthermore, Ms. Kincaid noted that Defendant Papa appointed Mary Donovan, an Irish executive, to bridge communication gaps between Perrigo's U.S. operations and Omega. Id. ¶ 60. Additionally, Ms. Kincaid recounted that her superior, Tom Farringon, directed her to identify and hire a forensic analytics firm to go to Belgium, where it would analyze senior Omega executives' e-mail traffic to ascertain whether any of the executives had revealed material confidential business information to Mylan to aid Mylan's takeover. Id. ¶ 61. The FAC also cites to various Perrigo supervisors and employees recounting operational impediments including poor organizational structure, IT integration problems, management resistance, and underperformance in key Omega markets. Id. ¶ 62.

***5** Plaintiffs allege that Defendants repeatedly misrepresented the success of the Omega integration and its effect on Perrigo's organic growth, while omitting these known impediments to integration. Id. ¶¶ 132-150. The FAC points to various alleged misrepresentations, including Defendants Brown's statement in June 2015 that Perrigo was "in line" with its planned Omega integration process, id. ¶¶ 139-140, and Defendant Papa's statement in August 2015 that Perrigo had "delivered on [its] Omega integration plans", id. ¶¶ 141-142. According to Plaintiffs, the problems with Omega integration that Defendants "concealed" were "so profound that the Company ultimately had to take impairment charges totaling more than $2 billion, or nearly half of the total purchase price for Omega." Id. ¶ 5.

**C. Aftermath of the Takeover Bid**

On November 13, 2015, Mylan's tender offer expired pursuant to its terms after less than 50% of shares were tendered. Id. ¶¶ 107, 111. Plaintiffs allege that Defendants Papa and Brown were awarded millions of dollars in special bonuses following the defeat of the Mylan bid and that they engaged in unusual stock sale at prices artificially inflated by Defendants' fraud, totaling approximately $7 million. Id. ¶¶ 23, 113, 272.

On February 18, 2016, Perrigo reported fourth quarter 2015 revenues, profits, and margins below the projections touted during the Mylan takeover bid. Id. ¶¶ 225-226. Perrigo also revealed that certain Omega assets would need to be restructured and took a $185 million impairment charge while also reducing the Perrigo's 2016 guidance range–its estimate of future earnings–from $10.010 to $9.80. Id. ¶¶ 9, 225-226. On April 22, 2016, reports surfaced that Defendant Papa would leave Perrigo for Valeant Pharmaceuticals International, Inc., and he left the following business day. Id. ¶¶ 10-11, 227-229. Perrigo's shares dropped severely on both dates. Id. Perrigo also lowered its 2016 earning guidance to $8.20-$8.60 per share, a full $1.40 less than claimed three months earlier, and reported that first quarter 2016 earnings would disappoint due to more competitive generic drug pricing. Id. ¶¶ 11, 229. Moreover, Perrigo stated it was considering additional impairment charges for Omega. Id.

On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure. Id. ¶ 234. Following this announcement, Perrigo shares fell $3.71, or 4%, to close at $89.04. Id. ¶ 236. On August 10, 2016, Perrigo announced that it was cutting guidance again as a result of having to implement "transformational organizational changes" at Omega and additional pricing pressure in the Generic Rx division. Id. ¶¶ 14, 237-238. Perrigo projected that

impairment charges, which were excluded from this guidance, would nearly double from $1.74 per share to $3.29 per share. Id. ¶ 14. Consequently, Perrigo shares fell approximately 10% to close at $86.00. Id. On December 8, 2016, after Perrigo announced that it needed to restructure the entire branded division, shares declined further, from $83.94 to $81.94. Id. ¶¶ 17, 238.

On February 27, 2017, Perrigo announced that it would sell the Tysabri royalty stream for $2.2 billion cash (plus additional contingent payments of up to $0.65 billion), billions of dollars less than the value allegedly claimed by Perrigo throughout the Class Period. Id. ¶¶ 18, 240. That same day, Perrigo disclosed that it could not timely file its Annual Report on Form 10-K for 2010 because it needed to review historical revenue recognition practices for the royalty stream and other potential issues, and disclosed that Defendant Brown was resigning. Id. Following these disclosures, Perrigo shares dropped another 12%, or $9.91 per share, to close at $74.77.

On March 3, 2017, Bloomberg reported that Perrigo's generic drug pricing was under investigation by the DOJ, causing shares to drop 3.71%. Id. ¶¶ 19, 242. On May 3, 2017, Perrigo's offices were raided by the DOJ, causing its stock to drop over 5%, or $3.88 per share, to close at $72.35. Id. ¶¶ 20, 243. Shortly after the Class Period, Perrigo issued one of the largest restatements by any public company in decades, in which it purportedly admitted that it violated GAAP in every one of its Class Period financial statements and that its misclassification of the Tysabri royalty stream caused more than $1 billion in errors. Id. ¶¶ 7, 22 n.1.

### D. Procedural History

***6** Plaintiffs filed the Amended Complaint on June 21, 2017. ECF No. 89. The FAC contains four counts: (1) for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; (2) for violations of Section 20(a) of the Exchange Act against the Director Defendants and Brown; (3) for violations of Section 14(e) of the Exchange Act against all Defendants; and (4) for violations of the Israel Securities Law, 1968, brought by the TASE Investor Class against all Defendants for purchases made on the TASE. FAC ¶¶ 282-301. Defendants filed the instant Motion to Dismiss on August 21, 2017.

## II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court's role on a 12(b)(6) motion is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 302 (3d Cir. 2011).

In addition to the customary pleading requirements under Rule 8, plaintiffs must meet the heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for Exchange Act claims sounding in fraud. See City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 168 (3d Cir. 2014). To allege fraud under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). At a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

**III. DISCUSSION**

**A. Exchange Act Claims**

The Complaint asserts securities fraud predicated on violations of Section 10(b), Section 14(E), and Section 20(A) of the Exchange Act. Section 14(E) is modeled after Section 10(b) and Section 20(A) is a derivative claim predicating on a finding of liability under Section 10(b). Thus, the analysis of the Section 10(b) claims is a threshold determination for analyzing whether the remaining Exchange Act claims will proceed.

Section 10(b) punishes fraud in connection with the sale of securities. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014). For purposes of this motion, only the first two elements–material misrepresentation or omission and scienter–are at issue.

***7** The PSLRA imposes additional burdens with respect to allegations involving forward looking statements. The PSLRA's safe harbor provision, 15 U.S.C. § 77z-2, "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 254 (3d Cir. 2009). However, this safe harbor provision does not apply to a " 'mixed present/future statement ... with respect to the part of the statement that refers to the present.' " Id. at 255 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 705 (7th Cir. 2008) ). As such, "to the extent plaintiffs [ ] challenge defendants' alleged omission of present facts with respect to the challenged statements, PSLRA's safe harbor does not apply." Mallen v. Alphatec Holdings, Inc., 861 F. Supp.2d 1111, 1126 (S.D. Cal. 2012) (concluding that defendants' statements that the company had "already begun to realize synergies from the Scient'x acquisition" and "we anticipate that our revenues throughout the balance of 2010 will continue to grow" were not protected by the PSLRA safe harbor for "forward-looking" statements, but dismissing the case on other grounds); see also In re Majesco Securities Litig., 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) (noting "allegations based upon omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor") (quoting In re MobileMedia Securities Litig., 28 F. Supp. 2d 901, 930 n.18 (D.N.J. 1998) ).

Section 14(e) of the 1934 Exchange Act provides a cause of action for material misrepresentations and omissions made in connection with a tender offer. This provision "is modeled after SEC rule 10b-5, and is designed to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision whether or not to tender their shares." Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir.1981). The elements of a Section 14(e) claim are the same as a 10b-5 claim, the only difference being that Section 14(e) arises in connection with a tender offer, while rule 10b-5 arises in connection with a purchase or sale of a security. In re ValueVision Int'l Inc. Sec. Litig., 896 F. Supp. 434, 448 (E.D. Pa. 1995); see also P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp., 47 F. Supp. 2d 546, 560-61 (D.N.J. 1999) (holding that the elements of a claim under Section 14(e) of the Exchange Act are "virtually identical"); see also In re Digital Island Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004) (holding that "scienter is an element of a Section 14(e) claim" and explaining that "Section 14(e) is modeled on the antifraud provisions of § 10(b) of the [Exchange] Act and Rule l0b-5 ..., which require proof of scienter").

Section 20(a), in turn, provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

Section 20(a) is a derivative cause of action, predicated upon § 10(b) liability by a "controlled person," such that a "plaintiff cannot maintain a claim under § 20(a) without meeting the pleading requirements for a primary violation of the Act." In re Aetna, Inc. Sec. Litig., CIV.A. 07-4451, 2009 WL 1619636 *28 (E.D.Pa. June 9, 2009) aff'd in part, 617 F.3d 272 (3d Cir.2010) (citations omitted). "If no controlled person is liable, no controlling person liability exists." Belmont v. MB Inv. Partners, Inc., CIV.A. 09-4951, 2010 WL 2348703 *9 (E.D.Pa. June 10, 2010) aff'd, 708 F.3d 470 (3d Cir.2013) (citations omitted). "[A] plaintiff can survive a motion to dismiss a controlling person claim upon a showing of a primary violation of the federal securities laws by a controlled person and control of the primary violator by the defendant." Id. at *10.

***8** Here, Defendants assert that Plaintiffs have failed to adequately allege either material misrepresentations or omissions or scienter with regard to the Tysabri royalty stream, generic prescription pricing, organic growth, or the Omega integration. Defendants contend that these deficiencies defeat all of Plaintiffs Exchange Act claims. The Court agrees in part and disagrees in part.

**1. Misrepresentations**

To demonstrate a material misrepresentation or omission, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, the statement must have been misleading at the time it was made, as "liability cannot be imposed on the basis of subsequent events." In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d 2002). A misstatement or omission is material if "there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]." In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7 F.3d 357, 369 (3d Cir. 1993) (alterations in original) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) ). In other words, a misstatement or omission is material if the information "would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (internal quotations and citations omitted).

"Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism...." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000). Such statements " 'constitute no more than 'puffery' and are understood by reasonable investors as such.' " In re Advanta Corp. Sec. Litig., 180 F.3d at 538 (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1428 n. 14 (3d Cir.1997) ).

Because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citation omitted). The Third Circuit has warned that the task of determining materiality can be especially difficult when the statement at issue contains "soft" information, i.e., statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts. Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989). However, "complaints alleging securities fraud often contain claims

of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." In re Burlington, 114 F.3d at 1426.

**a. Tysabri Royalty Stream**

The alleged misrepresentations regarding the Tysabri royalty stream fall into two categories: misrepresentations about fair value exceeding carrying value and misrepresentations arising from statements of GAAP compliance.

**i. Fair Value Exceeding Carrying Value**

***9** Plaintiffs claim that Defendants consistently misrepresented that the fair value of the Tysabri royalty stream exceeded carrying value, even while the fair value plummeted due to known adverse clinical and competitive developments. Defendants contend that the alleged misrepresentations are inactionable because the truth was transmitted to the market in a timely manner through publicly available information, thereby giving rise to a "truth on the market defense." The Court disagrees with Defendants.

"The 'truth on the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market." The Winer Family v. Queen, No. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004) aff'd sub nom, Winer Family Tr. v. Queen, 503 F.3d 319 (3d Cir. 2007). Defendants must demonstrate that "the market was aware of curative information" and that the corrective information "has been conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig., No. 05-1151, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989) ). "To prevail on a 'truth on the market' defense at th[e] [motion to dismiss] stage of the litigation ... defendants must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint[.]" In re Res. Am. Sec. Litig., No. 98-5446, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000). As a general matter, the truth on the market defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." Enzymotec, 2015 WL 8784065, at *16 (quoting Ganino v. Citizens Util. Co., 228 F.3d 154, 167 (2d Cir. 2000) ).

Each of Perrigo's quarterly reports filed in 2016 on Form 10-Q claimed to have assessed the current fair value of the Tysabri royalty stream, and each reported to investors that "fair value exceeded the carrying value." Am. Compl. ¶¶ 219, 221, 223. On each of these measurement dates, Plaintiffs allege–and Defendants now admit–the actual fair value was far less than the carrying value. Id. ¶¶ 247-249. Defendants contend that the market was aware of the royalty stream's decreased value because Defendants had issued warnings regarding the stream's depreciation and the potential negative impact of new competition entering the market. ECF No. 114.7 at 10; ECF No. 114.26 at 36, 46. Analysts purportedly took these warnings into consideration when reporting on the royalty stream and lowered the stream's value accordingly. Based on these reports, Defendants contend that the truth was sufficiently conveyed to the market.

The Court is unconvinced. As alleged, Defendants maintained their claim that the royalty stream's fair value exceeded its carrying value, even after their own warnings and the issuance of the analysts' reports discussed above. Keeping in mind the fact specific nature of the inquiry, it can hardly be said that Defendants have demonstrated curative information was "conveyed ... with a degree of intensity and credibility sufficient to counter-balance effectively" their continuing statements regarding fair value. *Merck*, 2011 WL 3444199, *35 (internal quotation omitted). Dismissal based on immateriality, therefore, is inappropriate at this juncture.

**ii. GAAP Violations and Statements of Compliance**

***10** Plaintiffs claim that Defendants: (1) reported inaccurate financial results to investors by including the royalty stream in Perrigo's operating results; (2) omitted the fair market value of the Tysabri royalty stream; and (3) failed to record mark-to-market changes (i.e. changes in value relating to market price) at the end of each quarter, all of which were done in violation of GAAP and concealed billions of dollars of deterioration. Id. ¶¶ 206, 208, 210, 212, 214, 216, 218, 220, 222, 224. Consequently, Plaintiffs allege that Defendants' statements of GAAP compliance were misrepresentations. Defendants respond that the truth was conveyed to the market through both Defendants' statements identifying the stream as a financial asset and through the company's financial disclosures, thereby undermining materiality. Moreover, Defendants argue that statements of GAAP compliance are inactionable opinions.

A company may not avoid GAAP requirements by disclosing underlying data to the market. See Dudley, 2013 WL 1845519, at *12-13 (that company met "other disclosure obligations does not absolve it of its obligation to comply with GAAP"). Thus, the contention that Perrigo's underlying financial statements and Defendants' disclosures showed the royalty stream was an operating asset—rather than an intangible asset as categorized—is unavailing.

Defendants' argument that their statements of GAAP compliance are inactionable opinions is more compelling. Statements about GAAP compliance are frequently deemed opinions because "GAAP standards are often subjective" and "involve a range of possible treatments." In re Hertz Glob. Holdings, Inc. Sec. Litig., No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017). "While certain GAAP rules have objective application such that compliance would be a statement of fact," Plaintiffs do not identify any objective rules here, arguing only that Defendants' objectively believed the categorization of the royalty stream was erroneous. Defendants' May 22, 2017 Form 10-K notes that the asset's accounting was changed after an "extensive evaluation of the facts **and circumstances and the judgments**" required to determine the appropriate classification, which belies the notion that the accounting treatment was a purely objective decision. Am. Compl. ¶ 123 (emphasis added).

Even if they are opinions, the certifications of GAAP compliance are still actionable if they do not reflect the speaker's subjective belief or if they omit known material information undermining that belief. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1327-1331 (2015). Defendants repeatedly claimed that the Tysabri royalty stream was a financial asset both before and during the Class Period. Plaintiffs attempt to construe these statements as Defendants' admissions that they "understood the royalty stream to be a financial asset not an intangible asset, but nonetheless recorded it as an intangible asset." Pl's. Br. at 50. As discussed in the Court's scienter analysis below, however, this argument fails. Plaintiffs have failed to plead facts which would create a strong inference that Defendants knew their financials were not GAAP compliant and they have failed to plead that Defendants knowingly or recklessly omitted that fact from their statements.

**b. Generic Drug Pricing**

Plaintiffs allege that Defendants included hundreds of millions of dollars of collusive revenue in operating results, falsely represented that the Generic Rx segment was on track to achieve an 8%-12% organic growth rate despite growing regulatory scrutiny, made affirmative misrepresentations falsely describing the competitive environment, and made misleading statements indicating a "flat to up slightly" pricing strategy despite implementing price hikes of 300%-500% in collusive drug markets. Defendants respond that, as a threshold matter, Plaintiffs have failed to adequately allege any illegal collusion and, more specifically, that the "flat to up slightly" pricing strategy was true with regard to the entire portfolio of products. The Court agrees with Plaintiffs.

***11** "When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016), reconsideration denied, No. 14-CV-3251, 2016 WL 2642223 (S.D.N.Y. May 6, 2016). Evidence of parallel conduct, standing alone, is insufficient to state a plausible claim for underlying misconduct. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555. "To adequately plead an agreement [to fix prices], a plaintiff must plead either direct evidence of

an agreement or circumstantial evidence." Burtch v. Milberg Factors, Inc., 662 F. 3d 212, 225 (3d Cir. 2011).[3] The Third Circuit considers a non-exhaustive list of "plus factors" that tend to demonstrate the existence of collusion.[4] See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 321-22 (3d Cir. 2010). The "plus factors" include: "(1) evidence that the defendant had a motive to enter into a ... conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." Ins. Brokerage, 718 F.3d at 321-22.

Plaintiffs have pled a motive to collude by describing the downward pricing pressure in competitive generic drug markets, quantifying the market concentration for each impacted drug, establishing that there were high barriers of entry due to FDA requirements, and demonstrating that demand was both theoretically inelastic and actually inelastic in that changes in price would not affect the quantity demanded. Am. Compl. ¶¶ 68-71, 77, 81, 85, 87, 98. These market specific factors are sufficient to demonstrate motive. See In re Propranolol Antitrust Litig., 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).[5]

Under the second factor, the Amended Complaint alleges that Perrigo's dramatic price increases would have left it vulnerable to market share loss to competitors in the absence of collusion. ¶¶ 68-69, 73-74, 82, 86, 90; see also In re Propranolol, 249 F. Supp. at 719 (finding that prices increases were against defendants' self-interest because of both the magnitude of the price increases and because the generic drug at issue was identical across manufacturers and, therefore, a "rational competitor therefore should have kept its price stable and vastly increased its market share"). Notably, Defendants fail to provide any explanation for the price hikes that would not render them against self-interest for a seller in the generic market.

Pursuant to the third factor, the Amended Complaint alleges weekly informational exchanges regarding pricing through third-party data services, ¶ 70, and participation with competitors in trade meetings immediately preceding the tandem price hikes, ¶¶ 72-73, 78, 82, 86, 88, 90. Without more, participation in trade meetings does not weigh in favor of finding a conspiracy. See Twombly, 550 U.S. at 557 n.12 (suggesting that membership in a trade association is insufficient to establish coordination); In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 409 (3d Cir. 2015) (opining, on summary judgment, that defendants' collective presence at trade show meetings was "insufficient to support a reasonable inference of concerted activity"). However, here, the timing of the price hikes in relation to the trade meetings, the allegations of motive, the unexplained assertion that the price hikes were contrary to Perrigo's interests absent collusion, and the reference to a recent civil complaint brought by the attorneys general of forty states alleging that trade meetings are used to "sow the seeds for ... illegal agreements," lend greater significance to Defendants' participation in the trade meetings as evidence of conspiracy. See Connecticut v. Aurobindo Pharma USA, Inc., No. 3:16-cv-02056, Amended Complaint, ¶ 7 (D. Conn. Mar. 1, 2017);[6] see also In re Propranolol, 249 F. Supp. at 722 (crediting a similar allegation in a complaint brought by the attorneys general of twenty states to support a finding of interfirm communications). The Court finds there are sufficient allegations to demonstrate underlying misconduct, even when viewed through the PSLRA's heightened standard, and that dismissal is inappropriate at this juncture.

***12** Defendants' next argue that, even assuming there are sufficient allegations to state a plausible claim for underlying misconduct, any alleged statements identifying Perrigo's pricing for generics as "flat to up slightly" are not misrepresentations when viewed in the context of the entire portfolio of products and that statements regarding the competitive market in the Generic Rx division are puffery. Plaintiffs contend, and the Court agrees, that once Defendants' chose to speak about generic drug pricing, they could not "omit material facts related to that issue so as to make the disclosure misleading." PTC Therapeutics, 2017 WL 3705801, at *14 (quotation and citation omitted). Whether a disclosure is required is "best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact." Enzymotec, 2015 WL 8784065, at *15. Here, Plaintiffs argue that "average" pricing was inflated by enormous and unsustainable price spikes in drugs and that these products contributed $271.8 million in collusive revenue in 2015 and $291.5 million in collusive revenue in 2016–more than a quarter of all Generic Rx revenues. Thus, according to Plaintiffs, the scheme necessarily masked serious price deterioration in products subject to normal competitive forces if the price spikes only resulted

in "flat to up slightly" pricing overall. See ¶¶ 76, 80, 84, 86, 88, 90. Giving Plaintiff the benefit of all favorable inferences, the Court will not dismiss the statements regarding "flat to up slightly" pricing at this juncture.

As for the argument of puffery, the Court finds that Defendants' statements regarding competitiveness in the generic market and pricing pressures are likewise actionable. In re Sotheby's Holdings, Inc. Sec. Litig., 00 Civ. 1041 (DLC), 2000 WL1234601, at *3 (S.D.N.Y. Aug. 30, 2000) (statement that competition was "intense" despite colluding with competitor was actionable); Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010) ("The CCAC also adequately alleges that [d]efendants made express representations to the contrary in multiple public filings, specifically and repeatedly stating that their market share and earnings were the result of their ability to compete on price, service and quality in a 'highly competitive' packaged ice industry. Thus, the CCAC alleges a direct nexus between the allegedly illegal conduct and the Defendants' allegedly materially false and misleading statements."). Here, the Complaint similarly alleges a direct nexus between the illegal conduct and Defendants' allegedly materially false and misleading statements. See, e.g., Am. Compl. ¶¶ 178 (quoting Defendant Papa stating, "Obviously, it's a competitive market out there"); 184 (noting that Perrigo's August 13, 2015 Annual Report stated the Generic Rx division 'operate[d] in a highly competitive environment' and 'face[d]' vigorous competition"). The allegations here and the misrepresentations and omissions identified in the Amended Complaint concerning collusive pricing are sufficient to withstand a motion to dismiss.

**c. Organic Growth**

Defendants contend the Complaint fails to allege any misrepresentations related to Perrigo's organic growth rate. Plaintiffs respond that Defendants told "half-truths" by failing to disclose the company's deterioration in organic growth preceding the Class Period and touted misleading growth projections by relying on revenue improperly derived from the Tysabri royalty stream and the collusive pricing scheme in the Generic Rx division. The Court agrees with Plaintiffs.

Plaintiff's arguments center on Defendants' assertions that Perrigo had "grown about 8% organically," FAC ¶ 161, that organic growth had been "consistent," id. ¶ 151, Perrigo had "demonstrated a reliable ability to grow organically," id. ¶ 166, and that Perrigo had "the ability to keep delivering" organic growth rates of 5%-10%, id. ¶ 151, 153, 155. Plaintiffs contend, without dispute, that Perrigo's organic growth had slowed in the six months preceding the Class Period, even becoming negative at times. Id. ¶ 64.

Defendants respond by arguing that their organic growth statements were factually accurate and therefore inactionable. They point to their consistent practice of "provid[ing] compound annual growth rates over a rolling three-year period." ECF No. 114.34 at 7. Relying on this consistent practice, Defendants' argue that they have consistently had compound annual growth rates within the 5-10% range, as they claim in the contested representations. See In re Sofamor Danek Grp., Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); see also Galata v. Commerce Bancorp. Inc., 220 F. App'x 97, 102 (3d Cir. 2007) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").

***13** Whether statements regarding Perrigo's past performance are factually accurate does not change the fact that Perrigo was experiencing difficulty maintaining those growth rates at the time Defendants made the contested statements. The law does not permit corporate executives to mislead investors through half-truths. By putting the issue of organic growth "in play," Defendants "acquire[d] a duty to disclose information relating to that topic." In re Viropharma, Inc., Sec. Litig., 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014); see also In re PTC Therapeutics, Inc. Sec. Litig., 2017 WL 3705801, at *14 (D.N.J. Aug. 28, 2017); Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017) ("[O]nce a company has chosen to speak on an issue −even an issue it had no independent obligation to address−it cannot omit material facts related to that issue so as to make the disclosure misleading.") (quoting Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 490-91 (3d Cir. 1994) ) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation to communicate any additional or qualifying information,

then known, the absence of which would render misleading that which was communicated”). In touting their consistent ability to maintain organic growth rates in the 5-10% range and proclaiming that their “strong durable base” would allow for continued consistent growth, Perrigo assumed a duty to disclose that recent performance fell substantially below the target range. See Am. Compl. ¶¶ 151, 153, 155, 157, 159, 161, 166. Thus, even if the Court determines the past-looking statements are accurate and the forward-looking statements are protected, it would not shield the representations of present success and present ability to deliver on organic growth goals from potential liability. These statements are the heart of Plaintiffs’ claim.

Finally, Defendants argue that they did indeed disclose the downturn in performance preceding the Class Period. Defendants point to a single bar on a graph disclosed to investors and to a statement from a conference call with investors. The graph indicates that organic growth declined between 2013 and 2014. As already noted, this type of truth on the market defense is highly fact specific and rarely a basis for dismissal. Moreover, the title of the cited page claims that Perrigo had a “Unique Platform In Place to **Continue to Deliver** M&A Upside to Organic Growth.” ECF Nos. 114.15 at 10; 114.18 at 23. (emphasis added). As for the statements in the conference call, while Defendant Papa did respond to a question regarding organic growth and “what happened in the last 12-18 months,” he discussed performance generally and never disclosed the severe slowdown in organic growth. ECF No. 114.42 at 5. Neither of these alleged disclosures “conveyed [corrective information] ... with a degree of intensity and credibility sufficient to counter-balance effectively” the misrepresentations regarding Perrigo's current ability to meet its growth goals. *Merck*, 2011 WL 3444199, *35 (internal quotation omitted). As a result, the Court will not dismiss the claims regarding to organic growth misrepresentations and omissions.

### d. Omega Integration

Defendants argue that the Complaint fails to plead any false statement or omission regarding Omega. In particular, Defendants contend that they disclosed the acquisition was still in its early stages, that it was too early to tell whether integration would be successful, and that the integration might prove unsuccessful. Plaintiffs respond that Defendants described the integration in entirely positive terms, pointing to statements such as that Perrigo had “delivered on [its] Omega integration plans” and that Omega “has been accretive to our growth rate,” while omitting known extensive problems that brought key integration processes to a halt by mid-2015. Am. Compl. ¶¶ 133, 141. Plaintiffs also identify statements claiming integration milestones, such as the “[b]ack office is working smoothly” and “[w]e supplemented Omega's contracted manufacturing with our manufacturing infrastructure.” Id. ¶¶ 143, 145. The Court agrees with Plaintiff.

Defendants’ first present a multi-year defense, claiming that the Perrigo disclosed it was expecting synergies from the Omega transaction “by year four.” Consequently, the statements describing the integration as successful and Omega as accretive are examples of “status reports,” not “victory laps.” Def's. Reply Br. at 5. Under these circumstances, Defendants argue that “[n]o reasonable investor could have been under the impression that the integration had been successfully completed in just four months, more than three and a half years ahead of schedule.” Id. at 6.

***14** As noted earlier, “once a company has chosen to speak on an issue–even an issue it had no independent obligation to address–it cannot omit material facts related to that issue so as to make the disclosure misleading.” PTC Therapeutics, 2017 WL 3705801, at *14. Here, many of Papa and Brown's statements regarding the success of the merger and its accretive effect are actionable representations of present success. See e.g., In re Cigna Corp. Sec. Litig., No. CIV.A. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (finding statement that company was “on track” actionable because the allegations in the complaint cast serious doubt on whether it would meet its previously represented schedule benchmark); In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (finding defendants’ claims that the integration of two companies were “successful” and “on track” could not be dismissed in light of the alleged, serious problems including, among other things, computer system incompatibility); see also In re Akorn, Inc. Sec. Litig., 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (finding statement that a company was “on track” to meet its integration goals was a materially misleading statement of present fact in light of plaintiff's allegations that serious problems hindered integration).

The Amended Complaint alleges serious, present problems with integration that were omitted from Defendants' statements. The materiality of these omissions is not founded in the notion that a reasonable investor would have believed the merger was completed four years ahead of schedule—as Defendants attempt to paint the issue—but rather in the fact that disclosure of the known impediments to successful integration would have significantly altered the mix of information available to a reasonable investor. The Court cannot determine that these problems are so obviously unimportant to an investor that reasonable minds could not differ on the question of materiality. See In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999).

Next, Defendants contend that Defendant Coucke's statements describing the Omega integration are inactionable puffery. The Court agrees. Plaintiffs challenged Defendant Coucke's June 2015 description of Omega's management team as "exceptional" and "best-in-class," and his statement that "[o]ver the last three years as a private company," Omega: (1) "optimized its commercial infrastructure to deliver superior results"; (2) "streamlined [its] operations"; and (3) "instituted an efficient management structure with real efficient direct short reporting lines between Omega Pharma leadership team and country management." Am. Compl. ¶ 137. The Court finds that these statements constitute inactionable puffery because they are either statements of opinion that do not alter the mix of information available to investors. EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000). Indeed, it appears Plaintiffs concede materiality with respect to all but one statement —Defendant Coucke's representation regarding Omega's efficient management structure. [7]

Courts routinely find statements regarding efficiency to be immaterial because the concept of efficiency inherently requires a "relative and subjective judgment and can neither be quantified nor specified in any way." In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 180 (D.D.C. 2007) (citation and quotation marks omitted); see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 537-39 (3d Cir. 1999) (dismissing claims based on statement that defendant "is among the most efficient producers in the credit card industry"), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308 (2007).

Plaintiff's sole citation in opposition is readily distinguishable. In In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529 (D.N.J. 2002), the defendants allegedly misled investors by representing that Lucent's optical networking product line was driving its growth when, according to the plaintiff's allegations, "demand had shifted dramatically away from Lucent's existing optical networking products" to a competitor's products, and the company was losing customers rather than winning new business. Id. at 545. Unlike in Lucent, where the challenged statement was determinate and quantifiable (i.e., whether Lucent's optical networking products in fact contributed to its growth), Defendant Coucke's alleged statement that Omega had an "efficient management structure" is inherently qualitative and, thus, not measurable. [8]

***15** Additionally, Defendants claim they provided meaningful risk disclosures, warning stockholders about the exact issues that Plaintiffs now claim hampered the integration process, thereby coming within the protection of the safe harbor. See ECF No. 114.14 at 45 (describing the integration as "a complex, costly, and time-consuming process"); id. (stating that Perrigo's "ability to realize the anticipated benefits of the Omega acquisition will depend, to a large extent, on its ability to integrate the Perrigo and Omega businesses"); ECF No. 114.16 at 23-24 (stating there was "no assurance that [it] will be able to successfully integrate Omega or otherwise realize the expected benefits of the Omega acquisition").

Despite Defendants' warnings with regard to the success of the integration, the PSLRA does not protect statements of present facts. See In re Aetna, 34 F. Supp. 2d at 946 (finding that the bespeaks caution doctrine does not apply to presently known facts and, therefore, does not cover defendant's statement that the company was "on track" to meet all the objectives of the integration). As a result, Defendants cannot rely on safe harbor to shield themselves from liability for statements such as "[Omega] **has been** accretive to our growth", "[b]ack office **is** working smoothly", "we ... **are** ... in line with our going online integration process,"

Perrigo has "**delivered** on our integration plans," and "[w]e **supplemented** [Omega] with our manufacturing infrastructure." Am. Compl. ¶¶133, 139, 141, 141, 144, 145 (emphasis added). However, with regard to purely forward-looking statements, or portions of statements, the Court finds that the warnings were sufficient to insulate Defendants' projections regarding synergies and potential revenue from liability. [9]

In conclusion, the Court not dismiss Plaintiffs' actionable statements regarding the present success of the integration. The Court will, however, dismiss the claims related to Defendant Coucke's statements and the purely forward-looking revenue and synergy projections described in the Amended Complaint.

**2. Scienter**

To adequately allege scienter, plaintiffs must plead with particularity that each defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." In re Hertz Glob Holdings, Inc. Sec. Litig., 2017 WL 1536223, at *15 (D.N.J. Apr. 27, 2017). In the Third Circuit, "[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud. In re Anadigics, Inc., Sec. Litig., 2011 WL 4594845, at *32 (D.NJ. Sept 30, 2011), aff'd, 484 F. App'x 742 (3d Cir. 2012).

Scienter allegations must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). A court considers the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see also Avaya, 564 F.3d at 273. The inference of scienter is sufficiently strong to survive a Rule 12(b)(6) motion to dismiss only if, in light of all of the allegations in the complaint, it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 323-24. Under this standard, therefore, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. at 324.

***16** Before discussing Plaintiffs' specific scienter allegations, the Court will first consider whether certifications under the Sarbanes-Oxley Act ("SOX") and the Irish Takeover Rules are probative of scienter–an assertion which arises frequently throughout the Amended Complaint. Courts have found that SOX certifications themselves are not actionable and, that to support an inference of scienter, something more is needed. See Zucco Partners, LLC v. Digimarc Corp., No. 06-35758, 2009 WL 311070, at *18 (9th Cir. Feb.10, 2009); Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66 (11th Cir.2006) (finding a SOX certification probative of scienter only if plaintiffs show that the person signing the certification was "severely reckless" in certifying the accuracy of its financial statements); In re Intelligroup, 527 F.Supp.2d at 356-57 (stating that SOX certifications establish scienter only if the complaint asserts facts indicating that, at the time of certification, the defendants actually knew or at least turned a "blind eye" to information indicating that the certifications were erroneous).

The Court finds no reason to deviate from these holdings with regard to either the SOX certifications or the certifications under the Irish Takeover Rules here. [10] Such certifications do not in themselves give rise to an inference of recklessness absent accompanying circumstantial evidence of conscious or reckless behavior. Consequently, throughout its analysis of scienter, the Court will not consider arguments related to these certifications unless there are accompanying circumstantial allegations giving rise to a cogent and compelling inference of scienter. [11] See In re Radian Sec. Litig., 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) ("Nothing in the [complaint] otherwise specifically suggests that the defendants knew or turned a 'blind eye' to the fact that [the company's] accounting or disclosure practices were insufficient or that the boilerplate certifications signed by the defendants were actually erroneous. The mere fact that the defendants signed GAAP and SOX certifications, accordingly,

does not support the plaintiffs' claim that the defendants knew or must have known that their actions presented a danger of misleading buyers or sellers."). [12]

**a. Motive and Opportunity**

***17** Plaintiffs contend that Defendants Papa and Brown—but none of the other Individual Defendants—made "large and irregular" stock sales in the 12 months preceding the Class Period, which "support an inference of scienter." Am. Compl. ¶ 272. Plaintiffs also contend that Defendants were motived by the desire to fend off the Mylan bid. Defendants contend there are no allegations setting forth a personalized motive for the alleged fraudulent behavior. The Court agrees with Defendants.

Motive is not "an independent means of establishing scienter." In re Anadigics, Inc., Sec. Litig., 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011). Scienter will "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least a likely as not that defendants acted with scienter." Avaya, 564 F.3d at 277. Nevertheless, the Third Circuit has determined that a failure to demonstrate that individual defendants had a motive for their wrongful conduct is "significant." Rahman v. Kid Brands, Inc., 736 F.3d 237, 245 (3d Cir. 2013). Thus, while motive is neither sufficient nor necessary to finding scienter, its presence can assist the Court's determination and its absence can raise a "compelling inference against scienter." In re Adolor Corp. Sec. Litig., 616 F. Supp. 2d 551, 573 (E.D. Pa. 2009).

With regard to stock sales, Defendants respond that these sales were not unusual compared to Papa and Brown's conduct in the 25 months prior to the Class Period. [13] Defendants additionally claim that Papa and Brown actually increased their stock holdings during the Class Period. Plaintiffs counter that any increase in stock holdings was a result of Defendants receiving restricted stock that they could not sell. See Am. Compl. ¶ 113. The Court will not, at this time, resolve the dispute regarding stock holdings.

However, it appears undisputed that Papa and Brown sold greater or comparable amounts of Perrigo stock in the 25 months prior to the Class Period than they did during the Class Period. This is indicative of a lack of scienter. In re Pixar Sec. Litig., 450 F. Supp. 2d 1096, 1104-05 (N.D. Cal. 2006) (sale by insider of 150,000 shares during five month class period was not unusual because not "dramatically out of line with ... prior trading practices," where insider sold 100,000 shares in the two quarters before the class period). Moreover, it is telling that Plaintiffs fail to allege any unusual sales by any Individual Defendant other than Defendants Papa and Brown. The fact that only two of the Individual Defendants are alleged to have made insider sales undermines Plaintiff's claim that there was a motive to commit fraud. [14] Martin v. GNC Holdings, Inc., No. 2:15-CV-01522, 2017 WL 3974002, at *15 (W.D. Pa. Sept. 8, 2017); see also Advanta, 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported."). [15]

***18** As for Plaintiffs' argument that motive is demonstrated by Defendants' alleged desire to fend off the Mylan bid, the Court is similarly unconvinced. This type of motive does not contribute to an inference of scienter because it does not suggest any "concrete and personal benefit to the individual defendants resulting from th[e] fraud[,]" as opposed to the types of "motives that are generally possessed by most corporate directors and officers" that "do not suffice." Rahman v. Kid Brands, Inc., 736 F.3d 237, 245-46 (3d Cir. 2013). Insofar as "[m]ost, if not all publicly traded companies are interested in ... avoiding hostile takeovers," the allegation that executives sought "to avoid a hostile takeover falls woefully short of demonstrating scienter under federal securities law." In re Goodyear Tire & Rubber Co. Sec. Litig., 1993 WL 130381, at *16 (E.D. Pa. April 22, 1993); see also Plevy v. Haggerty, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998) (rejecting motive to "raise the price of [company] stock to prevent a takeover" as "insufficient as a matter of law" to plead scienter). [16]

If anything it appears that the absence of a particularized motive weighs against finding scienter. However, as discussed, a plaintiff need not necessarily demonstrate motive and opportunity to adequately support a finding of scienter. The Court will move on to consider alleged circumstantial evidence of conscious or reckless behavior regarding the alleged misrepresentations in connection with the Tysabri royalty stream, the collusive pricing scheme, and the Omega integration.

**b. Circumstantial Evidence of Conscious Misbehavior or Recklessness**

A plaintiff alleging a strong inference of scienter from circumstantial evidence must sufficiently plead "defendants' knowledge of facts or access to information contradicting their public statements.... [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 599 (D.N.J.2001). However, where plaintiffs choose to establish scienter through circumstantial evidence of conscious misbehavior or recklessness, the strength of the circumstantial allegations must be even greater. Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517, 553 (D.N.J. 2010) (citing Intelligroup, 527 F.Supp.2d at 285).

"Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.' " Aviva Partners LLC v. Exide Techs., No. 05-3098, 2007 WL 789083, at *12 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of it." In re Digital Island Sec. Litig., 357 F.3d 322, 332 (3d Cir. 2004). A misrepresentation must be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." Id.

**i. Tysabri Royalty Stream**

Plaintiffs' circumstantial scienter allegations rest on (1) contemporaneous reports contradicting Defendants' claims regarding the royalty stream's carrying value, (2) the obviousness of the correcting accounting treatment, (3) the massive size of Perrigo's restatement, (4) the concentrated nature of the alleged fraud, (5) Defendant Brown's resignation, (6) motive created by Defendants readying the royalty stream for sale and (7) the prolonged span of the accounting fraud. Defendants, in addition to addressing each of these claims, point to the fact that an independent accounting company—Ernst & Young ("EY")—audited their financial statements repeatedly throughout the Class Period and issued unqualified opinions. [17]

***19** The Court will first consider EY's unqualified opinion. Contrary to Plaintiff's assertion, the Court may take into account the role and responsibilities of an independent auditor in the context of a motion to dismiss. See Phillips, 2016 WL 4523849, at *3 (taking into account on motion to dismiss that company's disclosures "were reviewed and approved by PricewaterhouseCoopers LLP"); In re Hansen Nat. Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (at motion to dismiss stage, "Deloitte & Touche LLP's unqualified opinion [is] highly probative of an absence of scienter"). [18] These unqualified opinions raises a strong inference that any "errors were not so obvious that their publication demonstrates an intent to defraud investors." Phillips v. Harvest Nat. Res., Inc., 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016). [19] However, a clean audit opinion does not categorically insulate a defendant from liability, and the Court will consider Plaintiff's other allegations as to scienter.

First, Plaintiffs contend that Defendants had contemporaneous access to information contradicting their claim that the royalty stream's "fair value exceeded carrying value." Indeed, Defendants' briefing in support of their Motion to Dismiss supports this contention, as it cites to several publicly available analysts' reports indicating that the estimated worth of the royalty stream was substantially less than the value claimed by Perrigo. See Defs.'s Br. at 44. However, here—and as a general matter—the Amended Complaint does not plead particularized facts showing that Defendants actually knew their representations were false or that

they acted with an intent to defraud. There are no internal reports, documents, or communications that point to Defendants' knowledge of or conduct concerning either Perrigo's accounting practices or its valuation of the royalty stream. Additionally, there are no confidential witnesses addressing these issues. The mere fact that these reports existed is not as compelling as the competing inference raised by EY's unqualified opinions.

Second, Plaintiffs contend that the obviousness of the correct accounting treatment suggests that Defendants' must have known their categorization of the stream as an intangible asset was erroneous. Against, Defendants' briefing provides some support for this notion, citing to multiple instances where Defendant Papa and independent analysts referred to the royalty stream as a financial asset. However, the fact that EY "did not detect, observe, or otherwise note any improprieties" in Perrigo's accounting is "significant." In re Iconix Brand Grp., Inc., No. 15-4860, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017). "This is particularly true given [Plaintiff's] claim that [Perrigo's] accounting errors involve 'basic' accounting principles.' " Id. Based on the unqualified opinions, a "compelling inference arises that [Perrigo's] accounting errors were not obvious or unreasonable," especially in light of Plaintiff's failure to allege that EY was in any way "complicit in, or aware of, the alleged accounting fraud." Id. The Amended Complaint does not contain well-pled facts suggesting why Perrigo's executives "would have been so familiar" with the applicable accounting rules "so as to see a problem in the company's accounting before [Perrigo's] auditors did." Pension Trust Fund for Operating Eng'rs v. Kohl's Corp., 2017 WL 3085083, at *10 (E.D. Wis. Jul. 20, 2017). [20]

***20** Next, Plaintiffs allege that the massive size of Perrigo's restatement and the concentrated nature of the accounting fraud support an inference of scienter. As to the size of the restatement, "[t]he magnitude of any given misstatement or overstatement may help support an inference of scienter ..., but magnitude alone will not suffice." Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V., No. 00-5965, 2005 WL 1366025, at *8 (D.N.J. June 8, 2005) (citations omitted). However, Plaintiffs provides no legal supports for its contention that the "concentrated nature" of the alleged fraud is a basis for inferring scienter. Thus, the Court will consider the size of the alleged fraud as some probative evidence in its collective analysis.

Plaintiffs also point to Defendant Brown's resignation, which "came the same day that Perrigo announced it was investigating 'historical revenue recognition practices' regarding the Tysabri royalty stream" and announced it would sell the stream for substantially less than it had been valued by Perrigo, as indicative of her scienter. Am. Compl. ¶ 271. Defendants contend that Brown's resignation, without more, adds little to Plaintiff's scienter allegations. See In re Hertz Glob. Holdings, Inc. Sec. Litig., No. 13-7050, 2015 WL 4469143, at *21 (D.N.J. July 22, 2015) cf. In re Intelligroup Sec. Litig., 527 F.Supp.2d 262, 347-48 (D.N.J.2007) (finding that the sole fact of officers' resignations was insufficient to support a strong inference of scienter and that "such bare allegations cannot operate even as a meaningful piece of additional evidence" of scienter); see also In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 F. App'x 465, 470 (3d Cir.2004) (no indication that resignation of officer was related to restatement of financials and accounting irregularities). However, given the timing of the announcement, the Court finds some probative value in Brown's resignation, albeit less value than if Brown's departure was involuntary or accompanied by some form of corporate sanction. See W. Palm Beach Police Pension Fund v. DFC Glob. Corp., No. CIV.A. 13-6731, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) ("However, when considering the totality of Plaintiffs' scienter allegations, the Court concludes that the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior.").

Finally, Plaintiffs allege that "the fact that Defendants were readying the royalty stream for sale ... provides a motive for Perrigo to claim an inflated fair value, so as not to dissuade potential buyers" and that Perrigo's use of the erroneous accounting categorization "for years" supports an inference of scienter. Pl's. Br. at 53-53. The fact that Perrigo used the same accounting treatment for years–from the time it purchased the royalty stream in December 2013 until it announced the correction in 2017–undercuts any alleged motive that may have been created by Defendants preparing the stream for sale. Additionally, as discussed above, the fact that Perrigo used the same accounting treatment long enough for their financial statements containing the asset classification to be audited multiple times over three different fiscal periods similarly undermines any inference of scienter.

In sum, Perrigo's classification of the Tysabri royalty stream as a financial asset over multiple years and fiscal periods, with the approval of an independent auditor, is strongly probative of a lack of scienter. Plaintiff's various arguments to the contrary, which are unsupported by internal reports, confidential witnesses, or other specific facts, fail to create an equally plausible inference of scienter. In light of this fact, the Court will dismiss Plaintiff's claims regarding the Tysabri royalty stream without prejudice. See In re Iconix, 2017 WL 4898228, at *17-19 (granting dismissal despite plaintiffs assertion that scienter could be inferred from (i) "numerous GAAP violations," (ii) accounting errors that "occurred over an extended period of time and relate[d] directly to the company's core operations," (iii) "the nature and magnitude of the ... financial restatements," and (iv) "suspiciously timed resignation of [multiple] senior ... executives" because (i) the "financial statements and accounting judgments were subject to audit by ... an independent public accounting firm," which "did not detect, observe, or otherwise note any improprieties ... over three consecutive audit years," (ii) plaintiffs "cite[d] no internal reports, documents, ... communications," or confidential witnesses as to defendants' knowledge of misconduct involving the company's accounting practices, and (iii) the complaint lacked "particularized facts connecting the resigning executives to fraudulent conduct.").

**ii. Generic Drug Pricing**

***21** Plaintiffs allege that (1) Defendants Papa and Brown indicated their personal knowledge of the price fixing scheme by repeatedly speaking to investors on the subject, that (2) the size of the scheme is indicative of scienter, that (3) there was a parallel criminal proceeding, and that (4) Douglas Booth's—the executive in charge of the Generic Rx division—resignation is temporally and circumstantially linked to the scheme. Defendants contend that none of the allegations are sufficient to support an inference of scienter. The Court disagrees with Defendants.

With regard to Plaintiff's allegation that Papa and Brown's repeatedly answered analysts' questions regarding the pricing of generic drugs, Defendants contend that all alleged misstatements require a defendant to speak out on an issue and, therefore, merely addressing question related to a topic is insufficient to demonstrate scienter. The "content and context" of Defendants' responses to these questions may, however, weigh in favor of finding scienter. In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (quoting Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 269 (3d Cir. 2009) ). Rather than merely speaking on the issue, Papa and Brown—both of whom were high-ranking executives allegedly involved in the pricing decisions at issue—repeatedly responded to pointed analyst questions regarding pricing pressure in the Generic Rx division. Am. Compl. ¶¶ 178, 182, 186, 190, 192. Moreover, their answers indicated personal knowledge of the subject. See, e.g., ¶178 (Papa stating that: "Obviously, it's a competitive market out there" and discussing "what I've tried to do with pricing at Perrigo in the eight years."); ¶196 (Brown analyzing "planned pricing strategies" and "competitive dynamics"); see also In re PTC Therapeutics, Inc. Sec. Litig., 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) (finding that the statements of two executives "implied that they had first-hand knowledge" of the matter at issue, which, while not conclusive, bolstered an inference of scienter).

"In the context of specific inquiries ... defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors.' " Id. (quoting Avaya). Additionally, these repeated inquiries would have made Defendants aware of the importance of generic pricing to the investing public. See New Orleans Employees Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 (2d Cir. 2011) (finding that executives had reason to focus on the subject of alleged misrepresentations because it was a "subject about which investors and analysts often inquired."). Here, accepting Plaintiff's allegations as true regarding the price-fixing scheme, Papa and Brown's statements and omissions are evidence of scienter.

Plaintiffs also argues that the size of the scheme, from which Perrigo reaped hundreds of millions of dollars, supports an inference of scienter. The Court agrees. see Avaya, 564 F. 3d at 271 (finding that the "magnitude of the alleged discounting ... strengthens the inference of scienter.").

Defendants do not dispute that the Department of Justice raided Perrigo's offices as part of a criminal price-fixing probe. Am. Compl. ¶ 21. While the existence of a criminal investigation is not sufficient to give rise to a strong inference of scienter, it can be considered as evidence of scienter. Washtenaw Cty. Employees Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (collecting cases and holding the same). However, Defendants note that there are no allegations that any of the Individual Defendants knew about the raid and point out that it occurred after both Papa and Brown left the company. There mere fact of the investigation is somewhat probative of scienter.

***22** Turning to the allegations regarding Douglas Boothe, the Court finds little if any probative value in the fact of his resignation. While Plaintiffs attempts to link the resignation to the collusive pricing scheme by noting that it came only months after Defendant Papa's resignation and preceded private antitrust litigation against Perrigo by two months, Am. Compl. ¶ 268, the Court is not convinced. The Amended Complaint does not indicate, for example, "whether [Boothe] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1002 (9th Cir. 2009), as amended (Feb. 10, 2009) (finding the "bare fact" of an executive's retirement immediately prior to the disclosure of alleged misconduct during his tenure "cannot support [plaintiff's] allegations of scienter."). Moreover, Douglas Boothe is not a Defendant in this action, making the fact of his resignation more inconsequential than Defendant Brown's discussed above. See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 162 (D. Conn. 2007) ("[I]t is hard to see how the resignation of [a non-defendant] executive ... could create an inference of scienter with respect to the ... individuals who have been named."), aff'd, 312 F. App'x 400 (2d Cir. 2009). Thus, Mr. Boothe's departure contributes little to demonstrating a cogent and compelling inference.

Despite the deficiencies in certain elements of Plaintiffs' scienter analysis, the Court must view the allegations collectively in reaching its conclusion. Considering the totality of the allegations, the Amended Complaint raises a strong inference of Defendants' scienter regarding the collusive pricing in the Generic Rx division by noting Papa and Brown's statements implying firsthand knowledge, their responses to specific questioning, the magnitude of the scheme as measured by millions of dollars in revenue, and the existence of a parallel criminal investigation. Although competing plausible inferences that are "at least as likely" must be considered, see Tellabs, 551 U.S. at 328, defendants have failed to make "good faith explanations for these misstatements such as to make the inference of scienter less than strong." See Frater v. Hemispherx Biopharma, Inc., 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014). The inference of scienter is sufficient to withstand dismissal on the claims against Papa and Brown, in large part due to the context and substance of their response to questioning, but insufficient to withstand dismissal as to the other Individual Defendants against whom the allegations of scienter are far weaker.

### iii. Organic Growth

Defendants contend there are no specific allegations of scienter related to the organic growth statements. The Court agrees.

Plaintiffs provide two arguments for scienter: (1) independent observers concluded that Defendants misrepresented the truth, (2) Defendants' repeated discussions concerning organic growth implying personal knowledge, and (3) the Director Defendants certified, under the Irish Takeover Rules, that they had undertaken a personal review of the organic growth representations. The Court has already rejected the third argument as a sufficient basis to plead scienter.

With regard to the independent observers, the Amended Complaint identifies several analysts, all of whom identified the growth projections as misleading. See ¶¶ 11 (Jim Cramer: Papa's overvaluation of Perrigo "was clearly untrue"); ¶ 232 (Wells Fargo: "Perrigo management set unrealistic and aspirations earnings guidance in its effort to defend against Mylan's hostile bid."); ¶ 239 (Starboard: "In order to convince Perrigo shareholders to reject Mylan's offer, management and the Board made aggressive promises"). These after-the-fact, generalized assertions are insufficient to plead scienter with regard to any of the Defendants. Plaintiffs fail to identify any cases where such threadbare allegations were accepted as creating a cogent and compelling inference of conscious misbehavior or recklessness.

As for Plaintiffs' argument that Defendants repeatedly spoke about the subject and implied firsthand knowledge, the Court is not convinced. Although such allegations can constitute evidence of scienter, the statements here are not as demonstrative of firsthand knowledge as those related to pricing pressures and competitiveness in the Generic Rx division discussed above or those related to the Omega integration discussed below. Moreover, even if the answers did indicate some level of knowledge, the collective scienter allegations are weaker than the scienter allegations related to the price-fixing scheme, which themselves narrowly surpassed the bar for pleading scienter. There, in addition to demonstrating repeated answers to analysts' questions regarding pricing pressure and policy in the generic division, Plaintiffs noted a parallel investigation and sizeable revenue derived from the fraudulent scheme. Here, Plaintiffs fail to provide similarly strong allegations when viewed collectively. Consequently, the Court will dismiss the claims related to organic growth without prejudice.

**iv. Omega Integration**

***23** Plaintiffs allege that (1) Defendants knew information contradicting their statements to investors regarding the Omega integration as evidence by Defendants own statements and by employee-witnesses, that (2) Omega is a "core operation," and that (3) there is no competing inference. Defendants respond that scienter cannot be inferred from the employee-witnesses and that the core business doctrine is not an adequate basis to plead scienter.

Plaintiffs first allege that Defendants Papa and Brown own statements about the status of the Omega integration are indicative of personal knowledge regarding the alleged problems. See Am. Compl. ¶ 256. As discussed above, these statements implying personal knowledge support an inference of scienter. PTC Therapeutics, 2017 WL 3705801, at *17-18. Defendants' arguments and case citations do not address the situation here, where Papa and Brown implied firsthand knowledge of the integration. Rather, they discuss instances where courts rejected reliance on vague allegations regarding corporate officers' general awareness of a company's business and on confidential witnesses' unsubstantiated descriptions of corporate officers' knowledge.

Plaintiffs next cite to various former employees who allegedly confirmed that Papa and Brown were aware of problems with Omega integration undermining their statements to investors. The problems discussed by these former employees included Omega's underperformance in several key markets and impediments to integration, including technological disparities, the decentralized structure of Omega, and management resistance. Am. Compl. ¶¶ 140, 142. Defendants' first contention in opposition to scienter is that none of these alleged problems were inconsistent with Papa and Brown's statements regarding the success of the Omega integration because none were so severe as to throw off the multi-year plan for achieving synergies. This argument is not convincing for the actionable statements discussing the present success of integration.

Next, Defendants contend that none of the former employees alleging integration problems had contact with the Individual Defendants. "To plead scienter, it is not sufficient to allege that the integration was problematic ... [t]he key issue is what the individual Defendants knew about the integration problems.... or whether [the problems] were so obvious that the Defendants must have been aware of them." Witriol v. Conexant Sys., Inc., No. 04-6219, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006). In the case of confidential witness allegations, the court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Avaya, 564 F.3d at 263. Both parties agree that there need not be a "direct link" between the allegations and the Defendants to sustain a finding of scienter, id. at 269, but Defendants contend there is no link whatsoever between the statements of former employees and Defendants' knowledge of alleged integration problems.

Based on a review of the allegations, the Court finds that the former-employee witnesses, "whose positions afforded them firsthand knowledge of the underlying facts," provide circumstantial evidence of at least reckless behavior. DFC Glob. Corp.,

No. CIV.A. 13-6731, 2015 WL 3755218, at *16 (crediting the statements of the "Head of Compliance" for the company, a "store supervisor and manager," and "[o]the confidential witnesses," despite no indication of direct contact with any of the individual defendants. [21] ). The one named former employee, Christine Kincaid, served as acting Chief Security Officer, reporting directly to Perrigo's Chief Information Officer, and oversaw IT integration projects in Europe. Am. Compl. ¶ 57. Ms. Kincaid recounted a variety of problems with IT integration and learned of "discord" between Omega CEO and CFO and the top executives of Perrigo, including the Individual Defendants. Id. ¶ 58. Ms. Kincaid also explained that EU regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain. Id. ¶ 59. The Court also considers probative Ms. Kincaid's allegation that Defendant Papa chose to hire an additional representative to bridge communication gaps between Perrigo's U.S. operations and Omega. Am. Compl. ¶ 60. [22] Additionally, various unnamed former employees spoke to issues within their sphere of knowledge. For example, a Senior Marketing Manager for Omega in Turkey from January 2015 to December 2016 reported high turnover, declining business, and lack of direction from Omega headquarters. Id. ¶ 62a. An HR Corporate Director between October 2014 and August 2015, who reported directly to the Omega CFO, recalled that Defendant Coucke and other Omega managers were not cooperating with Perrigo in the integration. Id. ¶62c. [23] These allegations may not necessarily demonstrate conscious behavior or direct knowledge, but they do support a strong inference of at least reckless behavior.

***24** Finally, Defendants contend that Plaintiffs may not use the allegation that Omega is a "core operation" to demonstrate scienter. Although such allegations are "not sufficient in and of themselves to show scienter," the Court "keeps them in consideration when viewing the entirety" of the Amended Complaint. In re: Enzymotec Sec. Litig., 2015 WL 8784065, at *18 (D.N.J. Dec. 15, 2015); see also Mill Bridge V. Inc. v. Benton, No. 08-2806, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("[W]hile a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.").

Considering Plaintiff's allegations collectively, the Court that Papa and Brown's decision to speak on the issue and imply firsthand knowledge, the "core business" allegations, and the former-employee witnesses all support a strong inference of scienter on the part of Papa and Brown. Defendants fail to articulate an innocent basis for their ignorance of the roadblocks facing integration at the time they made statements regarding the success of the acquisition. [24]

### III. Conclusion

The Court **GRANTS** Defendant Coucke's Motion to Dismiss and **GRANTS** in part and **DENIES** in part the remaining Defendant's Motion to Dismiss without prejudice.

### All Citations

Not Reported in Fed. Supp., 2018 WL 3601229

## Footnotes

1 Perrigo calculates "organic growth" as the year-over-year change in net sales after deducting sales attributable to acquisitions made in the twelve months preceding the given period. See Am. Compl. ¶ 63 n.9.

2 Plaintiff's expert calculated Perrigo's organic growth rates by first calculating Perrigo's Net Sales without the Tysabri royalty stream, discussed infra, then deducting the sales attributable to acquisitions that were made during the preceding

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

year. FAC ¶ 64. Finally, the expert deducted organic revenues from revenues reported in the prior year quarter to determine organic revenue growth and expressed that as a percentage. Id.

3 While Defendants correctly note that actionable Section 10(b) claims often stem from a public admission of guilt, such a public admission is not a prerequisite to bringing a securities claim based on underlying illegal activity.

4 Defendants contend, in a footnote, that the plus factors are irrelevant under the heightened pleading standards applicable to securities fraud cases. Beyond this conclusory statement, Defendants provide no support for their contention. Rather than finding the plus factors irrelevant, courts in other jurisdictions that analyze the issue similarly require plaintiffs to plead the plus factors with particularity, an approach the Court will follow here. See, e.g., In re Tyson Foods, Inc. Sec. Litig., 275 F. Supp. 3d 970, 992 (W.D. Ark. 2017).

5 Defendants correctly note that In re Propranolol is not binding on this Court, but fail to meaningfully distinguish its reasoning on closely analogous facts.

6 Perrigo is not currently named as a defendant in Connecticut v. Aurobindo, but the amended complaint's allegations describing the nature of these trade meeting is nonetheless relevant to Plaintiff's contentions here.

7 Plaintiffs failed to respond to the puffery argument with respect to the other claims in their Reply Brief.

8 Additionally, Plaintiffs fail to demonstrate that Defendant Coucke's statements, which pertained to Omega's efforts in the years leading up to its acquisition by Perrigo, were false. The reports by former Omega employees concern the post-merger Perrigo-Omega integration. Because Plaintiffs fail to allege specific evidence of scienter with regard to any other statements on the part of Defendant Coucke, the Court will grant his Motion to Dismiss in its entirety.

9 Even if the warnings were not sufficiently tailored, the Court would reach the same conclusion because the scienter allegations−discussed below−do not demonstrate actual knowledge. See In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 402 (D.N.J. 2010) ("Consequently, plaintiff's failure to plead with specificity the facts showing that defendant's forward-looking statements were made by the defendant with defendant's actual knowledge that these statements were false precludes plaintiff's claim, and plaintiff's allegation that the defendant was reckless in defendant's projections is insufficient.").

10 While the Irish Takeover Rules require directors to certify that projections are prepared with "scrupulous care, accuracy, and objectivity," Am. Compl. ¶ 4, that standard is not synonymous with an extreme departure from the standards of ordinary care "approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." S. Cherry St., LLC v. Hennessee Grp., LLC, 534 F. Supp. 2d 405, 414-15 (S.D.N.Y. 2007), aff'd, 573 F.3d 98 (2d Cir. 2009) ("[E]ven an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes.").

11 The Court will also disregard facts regarding the Irish Takeover Panel's determination that certain Perrigo statements were misleading, given that none of the statements are at issue here. Plaintiffs attempt to use this determination to establish that Defendants were on notice to make accurate statements, Am. Compl. ¶ 263, but this concept is unrelated to whether the challenged statements were inaccurate.

12 As discussed more fully throughout the scienter analysis, the Court finds that Plaintiffs have failed to plead any facts demonstrating scienter on behalf of the Individual Defendants apart from Papa and Brown. Rather, Plaintiffs rely on the SOX certifications and certifications under the Irish Takeover Rules, which are insufficient in themselves to create a strong inference of scienter. Consequently, the claims against Individual Defendants apart from Papa and Brown will be dismissed without prejudice. See In re Par Pharm. Sec. Litig., 2008 WL 2559362, at *10 (D.N.J. June 24, 2008) ("Each

individual's participation and scienter must be pled separately and with particularity."); Witriol, 2006 WL 3511155, at *3 (dismissing § 10(b) claim where complaint "d[id] not speak to what a particular Defendant knew, or when.").

13 Given that the Class Period is 25 months, the Court will consider the 25 months preceding the Class Period–as argued by Defendants–rather than the 12 months preceding the Class Period–as proposed by Plaintiffs.

14 The failure to allege any particularized motive further bolsters the Court's conclusion that Plaintiffs' generalized scienter allegations are insufficient to support a cause of action against any Individual Defendants other than Papa and Brown.

15 Defendants also contend that Perrigo's stock buyback is indicative of an absence of scienter. However, the Court finds that Perrigo's stock repurchase plan "weighs neither in favor of nor against an inference of scienter." In re Viropharma Inc. Sec. Litig., 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014); see also Kohut v. KBR, Inc., No. H-14-1287, 2015 WL 11995250, at *17 n.11 (S.D. Tex. Sep. 3, 2015) (same).

16 Plaintiffs' alleged motive for the price fixing scheme fails for a similar reason. While Plaintiffs claim that there was a financial and legal motive for hiding the scheme from the public, they do not demonstrate any "concrete and personal benefit" to the Defendants. Rahman, 736 F.3d at 245-46 (3d Cir. 2013).

17 A "clean" or "unqualified" opinion is "the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles." In re Bio-Tech Gen. Corp., No. 02-6048, 2006 WL 3068553, at *1 n. 2 (D.N.J. Oct.26, 2006) (quoting In re WorldCom. Inc. Sec. Litig., 346 F.Supp.2d 628, 643 n. 17 (S.D.N.Y.2004) ).

18 The cases cited by Plaintiffs to support the proposition that it is inappropriate to draw any inference from an audit opinion are readily distinguishable. First, the court in In re Diamond Foods, Inc., recognized that "[a] clean audit opinion may possibly support the conclusion that defendant did not act with scienter" but held that conclusion was not dispositive where the complaint alleged that the company had "scrubbed its financial statements before providing them to the auditor." 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012). In In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig., (S.D.N.Y. Jan. 27, 2014), there were well-pled facts that "the auditors had a history of employment with other Chinese companies with accounting irregularities and failed to follow GAAP." 2014 WL 285103, at *5. Here, the Amended Complaint does not allege any reason to doubt Perrigo's communications to EY or EY's role in preparing the unqualified opinions. Finally, in Okla. Firefighters Pension & Ret. Sys. v. Ixia, the court did not reach the auditor issue. 50 F. Supp. 3d 1328, 1365 (C.D. Cal. 2014).

19 Plaintiffs contend that Perrigo's 2016 Form 10-Q, which included the alleged misrepresentation that "fair value exceeded the carrying value," was not audited. However, EY did audit Perrigo's February 2016 Form 10-KT, which contained an identical statement. ECF No. 114.24 at 35.

20 Plaintiffs point to Perrigo's alleged admission of material weaknesses in its internal controls to demonstrate scienter. However, "these allegations are improperly based on hindsight and therefore are inactionable" because Plaintiffs fail to allege any facts demonstrating Defendants' knowledge of the weakness in internal controls at the time of the alleged misstatements. Southeastern Pa. Transp. Auth. V. Orrstown Fin. Servs., Inc., 2015 WL 3833849, at *46 (M.D. Pa. June 22, 2015) (subsequent recognition of ineffective internal controls did not establish that when defendants stated internal controls were effective they knew otherwise).

21 Defendants correctly identify that another of the confidential witnesses "recalled several high-level conference calls" with company management, and they attempt to distinguish DFC Global Corp. on that basis. However, the court in

DFC Global Corp. neither put special emphasis on this particular allegation nor found the other confidential witnesses' failure to identify a clear link to the individual defendants particularly meaningful. Consequently, the Court finds its scienter analysis persuasive here.

22 The Court, however, finds little probative value in the allegations regarding the hiring of a forensic team to determine whether confidential information was shared with Mylan, given its attenuated connection to any claims regarding the integration itself.

23 The Court will not credit the allegations regarding underperformance in individual markets because the Amended Complaint fails to allege any specific misrepresentations in connection with underperformance and fails to quantify the importance of these markets in any meaningful way. Am. Compl. ¶ 62e. The Court also finds little probative in the allegations regarding diversion of resources to fight the takeover bid. Id. ¶ 62d.

24 For the same reasons discussed throughout, the Court will not dismiss Plaintiffs' Section 20(a) control person liability claim against Defendants Papa and Brown. Defendants one independent basis for dismissal—the alleged lack of culpable participation—is unavailing. See Aeterna Zentaris, 2016 WL 827256, at *4 (finding that "the overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss"). Likewise, the Court will not refuse to exercise supplemental jurisdiction over the Israeli law claim articulated in Count Four given the remaining federal claims.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT R

2016 WL 6699284
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Edward TODD
v.
STAAR SURGICAL COMPANY, et al.

Case No. CV–14–05263–MWF–RZ
|
Signed 04/12/2016

**Attorneys and Law Firms**

Jeremy A. Lieberman, Marc I. Gross, Michael J. Wernke, Pomerantz LLP, New York, NY, Lionel Zevi Glancy, Robert Vincent Prongay, Kevin F. Ruf, Glancy Prongay and Murray LLP, Los Angeles, CA, Patrick V. Dahlstrom, Pomerantz LLP, Chicago, IL, for Edward Todd.

Dan E. Marmalefsky, Kai S. Bartolomeo, Morrison and Foerster LLP, Los Angeles, CA, for STAAR Surgical Company, et al.

**Proceedings (In Chambers):** ORDER DENYING DEFENDANTS' MOTION TO DISMISS [96]

The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

***1** Before the Court is Defendants' Motion to Dismiss Plaintiff's Corrected Second Amended Complaint for Failure to State a Claim (the "Motion"), filed on September 21, 2015. (Docket No. 96). Lead Plaintiff Edward Todd submitted an Opposition to the Motion on October 19, 2015, and Defendants' Reply followed on November 2, 2015. (Docket Nos. 109, 118). The Court read and considered the parties' submissions, and held a hearing on **November 16, 2015**.

The Motion is **DENIED**. Lead Plaintiff alleges with particularity that Defendants misled the investors of STAAR Surgical Company, Inc. ("STAAR" or the "Company") into believing that the Company was in compliance with FDA regulations. Viewed in the light most favorable to Lead Plaintiff and the putative class, Defendants' public announcements could be deemed to create a false impression that STAAR's pending application for FDA approval of a major product would not encounter any serious impediments. Lead Plaintiff's allegations are also sufficient to create a reasonable inference that Defendants knew of the Company's regulatory violations at the time they made their optimistic statements.

## I. BACKGROUND

Lead Plaintiff Todd filed this security class action on behalf of investors who acquired STAAR securities between November 1, 2013 and June 30, 2014 ("Class Period"). (*See* Second Amended Complaint ("SAC") ¶ 1 (Docket No. 88); Order Appointing Lead Plaintiff (Docket No. 22)). The SAC asserts violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 arising from Defendants' alleged statements that STAAR was in compliance with FDA regulations when, in fact, the FDA had observed serious compliance violations. (SAC ¶ 2). According to Lead Plaintiff, the misleading statements artificially inflated the value of STAAR securities, which declined sharply once the results of the FDA investigation became public. (*Id.*).

The following background is based on the allegations of the SAC:

STAAR designs, manufactures, and sells implantable lenses used in corrective and cataract eye surgery. (*Id.* ¶ 2). The company is relatively small, with 335 employees and, until recently, four manufacturing facilities worldwide. (*Id.* ¶¶ 3, 20). STAAR's

major product is the Implantable Collamer Lens ("ICL") that consists of three models: one to treat myopia, one to treat myopia with astigmatism, and one to treat hyperopia. (*Id.* ¶ 21). All three models have been marketed overseas for years, but only the myopic version ("MICL") received FDA approval in the United States. (*Id.*). The Toric ICL ("TCIL"), used to cure myopia with astigmatism, is currently under review with the FDA. (*Id.*).

The FDA classifies the ICL as a "Class III" medical device, or a product deemed to pose the greatest risk to health and to require most extensive regulation. (*Id.* ¶ 35). One aspect of such regulation is an inspection of the manufacturing facilities to ensure that the production of a Class III device is done in accordance with the approved specifications. (*Id.* ¶¶ 39, 42); *see* 21 C.F.R. § 820.20, *et seq.* The FDA, of course, does not prescribe in exacting detail the production process of every possible device but only establishes a framework within which the manufacturers must operate. (SAC ¶ 45); 21 C.F.R. § 820.20. As is pertinent here, the regulations require manufactures to create "design controls," which safeguard the quality of the device from its inception to obsolescence. (*Id.* ¶ 47); 21 C.F.R. § 820.20–30. Manufacturers are mandated, moreover, to "establish and maintain a [Design History File] for each type of device. The DHF [must] contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of this part." (SAC ¶ 51); 21 C.F.R. § 820.30(j). If a company fails to comply with such regulations, the FDA may refuse any pending requests for product approval. (SAC ¶ 41).

**A. STAAR's Past Non–Compliance with FDA Regulations**

***2** STAAR has experienced difficulties in obtaining FDA approval of its devices ever since its first attempt at penetrating the U.S. market. Although the FDA Ophthalmic Devices Panel recommended approval of MCIL in as early as October 2003, the authorization process experienced significant delays after an FDA inspector observed numerous deficiencies in STAAR's California manufacturing facility. (*Id.* ¶ 68). The inspector identified the regulatory violations in a Form 483, which is used to notify the establishment's top management of any objectionable conditions uncovered during FDA inspections. (*Id.* ¶¶ 63, 69). Although the violations threatened to postpone the much-anticipated approval of MICL, STAAR did not disclose the contents of Form 483 to its investors. (*Id.* ¶ 69).

In December 2003, the FDA issued a Warning Letter to STAAR memorializing the same violations. (*Id.* ¶ 70). A Warning Letter is used only for "violations of regulatory significance, i.e., those that may actually lead to an enforcement action if the documented violations are not promptly and adequately corrected." (*Id.* ¶ 65); FDA, *Regulatory Procedures Manual* at 4.1 (July 2012) ("RPM"), *available at* http://www.fda.gov/iceci/compliancemanuals/regulatoryproceduresmanual/default.htm. The agency's own policy states that a "Warning Letter should not be issued if the agency concludes that a firm's corrective actions are adequate and that the violations that would have supported the letter have been corrected." *RPM* at 4.1–3. Despite the obvious significance of the Letter, STAAR again failed to disclose its existence to the investors. (SAC ¶ 70).

A month later, the FDA published the Warning Letter on its website. (*Id.* ¶ 71). STAAR's stock price dropped 17.5% the same day. (*Id.*). Almost immediately thereafter, the company held a conference call where analysts criticized STAAR for withholding such important information. (*Id.* ¶ 73). One analyst lamented that any violations that "could delay the approval of [MICL] ... seems to be pretty material to me, material information." (*Id.*). As a follow-up to the Warning Letter, the FDA conducted a re-audit of the California facility and issued a second Form 483 containing 36 observed deviations from the FDA requirements. (*Id.* ¶ 74). This time, STAAR disclosed the identified violations, followed by another 38% hit to the Company's shares. (*Id.*). After numerous additional delays, the FDA finally approved the MICL in December 2005. (*Id.* ¶ 77).

A separate securities class action was previously brought in this District. *Yanek v. Staar Surgical Co.* ("*STAAR I*"), 388 F. Supp. 2d 1110 (C.D. Cal. 2005). After filing an unsuccessful motion to dismiss, STAAR settled the case. (Opposition at 6).

**B. STAAR's Conduct During the Class Period**

In 2006, STAAR began the same approval process for the TICL. (*Id.* ¶ 78). FDA approval of the TICL is of outmost importance to the company due to the dearth of similar products in the U.S. market. (*Id.* ¶¶ 24, 79). Indeed, TICL sales in foreign markets account for approximately 50% of STAAR's revenue. (*Id.* ¶ 79). STAAR itself acknowledged in a SEC filing that "[w]ithout the Toric ICL, the ICL product line is not likely to reach its full market potential in the U.S." (*Id.* ¶ 80).

Between 2007 and 2013, STAAR kept its investors informed of its compliance with FDA regulations and any events that may affect the anticipated approval of TICL. (*Id.* ¶¶ 81–84). In the Company's 2009, 2010, and 2011 Form 10–Ks filed with the SEC, STAAR disclosed inspections of its manufacturing facilities, the results of those inspections, and the issuance of Form 483s and Warning Letters. (*Id.* ¶¶ 86–88). STAAR even provided a summary of its oral communications with an FDA inspector. (*Id.* ¶ 90). In other words, STAAR embarked on an "era of transparency," consistent with its legal duties. (*Id.* ¶ 85).

***3** But things began to change in 2013 when STAAR decided to consolidate its manufacturing operations into one facility in California. (*Id.* ¶ 93). The consolidation process significantly exacerbated the pre-existing deficiencies in STAAR's quality assurance practices. (*Id.* ¶¶ 93, 94). STAAR's California facility, for example, turned into a "workplace of chaotic decision-making in which no one seemed to know what was going on, and manufacturing during this period became very disorganized." (*Id.* ¶ 94). Two confidential witnesses reported substantial defects in lenses that were supposed to be ready for shipment, including the presence of glass in the bottles of some products. (*Id.* ¶¶ 94–95).

STAAR's Swiss facility experienced similar difficulties prior to the completion of consolidation. (*Id.* ¶ 96). In August 2013, FDA inspectors observed deviations from FDA regulations in the manufacturing process. (*Id.*). The inspectors memorialized their observations in a Form 483 that was provided to and discussed with management on August 3, 2013. (*Id.*). The management nonetheless failed to correct the identified deficiencies, which persisted even after the transfer of manufacturing operations to California in October 2013. (*Id.*).

In February 2014, the FDA began inspecting STAAR's California facility. (*Id.* ¶ 97). Despite the inspector's numerous requests, the Company could not produce the Design History File for the ICL, which is necessary to ensure proper and safe manufacturing of STAAR's medical devices. (*Id.* ¶ 98). Instead, the management provided certain summary information that the FDA immediately deemed inadequate. (*Id.*). Without proper documentation, "STAAR was manufacturing the MICL and other products, which were being surgically implanted into patients' eyes, without ensuring that the sign used to manufacture the lenses was correct, that the actual manufacturing of the lenses was using the correct materials, or according to any approved designs." (*Id.* ¶ 102).

After the investigation came to an end on March 23, 2014, the FDA inspector held a close-out meeting where he presented a Form 483 identifying STAAR's myriad violations to a senior regulatory compliance person. (*Id.* ¶ 101). As the inspector explained, STAAR failed to establish, maintain, and implement design controls under 21 C.F.R. § 820.30(a)–(j). (*Id.* ¶ 102). To the extent such design controls existed at all, the necessary documentation—the Design History File—was never transferred to the California facility from Switzerland. (*Id.*). In all, the FDA identified fifteen separate violations of FDA regulations, which culminated in a Warning Letter issued on May 21, 2014. (*Id.* ¶¶ 103–107).

Lead Plaintiff alleges that STAAR made the following statements concerning its products and facilities:

- **November 1, 2013:** In a Form 10–Q, STAAR noted that a "key operational metric" was managing "the manufacturing consolidation with no material disruption to customer supply requirements or quality" and that "our consolidation efforts continue to proceed according to our plan." (*Id.* ¶ 109).

- **March 12, 2014:** In a Form 10–K, STAAR stated that it "believes that it is substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting regulations." The company also reiterated that "our consolidation efforts continue to proceed substantially according to our plan." (*Id.* ¶¶ 113, 115).

- **March 14, 2014:** STAAR CEO Defendant Caldwell told an independent advisory panel to the FDA that the company had improved its regulatory compliance, and that only one of four inspections of the company's various facilities in previous years resulted in negative observations by the FDA. And even those observations, Caldwell stated, did not "warrant regulatory follow-up at this time." (*Id.* ¶ 118).

***4** • **March 17, 2014:** STAAR announced that the advisory panel recommended approval of the TICL. (*Id.* ¶ 120).

- **May 5, 2014:** STAAR filed a Proxy Statement, stating, "STAAR's standing with the FDA and other regulators, and its reputation with customers depends on maintaining a corporate culture that emphasizes compliance at all levels, and STAAR aims for continuous improvement in the quality of its processes and products." (*Id.* ¶ 124).

- **May 13, 2014:** STAAR stated that the financial information contained in its Form 10–Q was accurate and disclosed material changes to the company's internal control over financial reporting. STAAR further reiterated that the "consolidation efforts are proceeding according to plans and we expect this to continue through completion in the middle of 2014." (*Id.* ¶ 126).

Investors did not learn of the results of the FDA investigation until the agency published the Warning Letter on June 30, 2014. (*Id.* ¶ 129). The FDA identified the deficiencies discovered at the California facility and advised that any pending applications for Class III devices, such as the TILC, "will not be approved until the violations have been corrected." (*Id.* ¶¶ 130–31). STAAR's shares dropped almost 17.5% in value within two days of the FDA's announcement on heavy trading volume. (*Id.* ¶ 132). Lead Plaintiff filed this class action approximately a week later.

## II. LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege (i) a material misrepresentation (or omission); (ii) scienter (a wrongful state of mind); (iii) a connection with the purchase or sale of a security; (iv) reliance (also known as "transaction causation"); (v) economic loss; and (vi) loss causation (a causal connection between the material misrepresentation and the loss). *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

Allegations of securities fraud are held to the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rule of Civil Procedure 9(b). *See* *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires plaintiff to plead with particularity "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The complaint must also state sufficient "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The requisite state of mind must be a "departure from the standards of ordinary care that presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations and citations omitted).

In sum, a complaint "must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (affirming the dismissal of a securities fraud class action on the ground that optimistic statements made eight months before merger and conclusory allegations that statements were false when made were insufficient to raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors). "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the complaint must be dismissed." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) (internal quotations and citations omitted). These heightened requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are

deceitful." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). On the other hand, "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." *Id.*

## III. JUDICIAL NOTICE

***5** Defendants request this Court to take judicial notice of publicly-available SEC filings, materials issued by federal regulatory agencies, and press releases. (Requests for Judicial Notice (Docket Nos. 97, 119)); *see* *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) ("[The court] may consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings."); *Wilson v. Frito–Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1146 n.3 (N.D. Cal. 2013) (taking judicial notice of FDA warning letters); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 817 (C.D. Cal. 2004) ("[T]he Court may take judicial notice of press releases.").

Defendants' requests are **GRANTED.**

## IV. DISCUSSION

Defendants challenge two elements of Lead Plaintiff's claim: the existence of an actionable misstatement and scienter:

As to the existence of an actionable misstatement, Defendants argue that Lead Plaintiff "impermissibly copies allegations from FDA forms and letters that are nothing more than non-final observations of possible non-compliance with FDA rules." (Motion at 2). The allegations comprising observations of confidential witnesses should be also ignored, argue Defendants, because none of the witnesses were employed during the Class Period. (*Id.*). And in any event, the alleged misstatements are "inactionable puffery" or "forward-looking statements" protected under PLSRA's "safe harbor." (*Id.*).

As to scienter, Defendants argue that the SAC does not allege sufficient facts showing that either of individual Defendants—CEO Barry Caldwell and Global Quality Assurance Vice President John Santos—acted with the intent to deceive investors. (*Id.*).

### A. Material Misstatements or Omissions

To give rise to an actionable claim for securities fraud, a statement or omission "must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). In general, "whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (superseded by statute on other grounds) (citing *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)). "[O]nly if the adequacy of the disclosure ... is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id.* (internal quotations omitted).

The alleged misrepresentations listed in the SAC can be divided into three categories: (1) statements affirming the accuracy of STAAR's financial reports; (2) statements about STAAR's compliance with FDA regulations, and (3) statements concerning the Company's consolidation efforts.

As to the first category, the SAC alleges that STAAR falsely assured investors in SEC filings that its reported financial information was correct and up-to-date. (SAC ¶¶ 109–15). Lead Plaintiff claims that Defendants reiterated STAAR's "previously reported financial and operational results" and represented that STAAR's financial reports were "accurate and disclosed any material changes to the Company's internal control over financial reporting." (*Id.* ¶ 109). But as Defendants point out, the SAC does not specify the manner in which the Company's financial results and reports were false or misleading in any quarter during

the Class Period. (Motion at 10); *see* *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007) (dismissing action because the plaintiff failed to allege, among other things, "why the statements were false [and] the amount by which the financial statements were misstated"). Lead Plaintiff conceded at the hearing that such allegations are insufficient to state a claim for securities fraud. Accordingly, the alleged statements regarding STAAR's financial reporting are not actionable.

***6** The SAC's allegations falling into the remaining two categories are more compelling. On March 12, 2014, while acknowledging that the "ability to continue [ ] U.S. business depends on the continuous improvement of [ ] quality systems and constant vigilance in [ ] compliance with FDA regulations," STAAR expressed its "belief" that "it is substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting regulations." (SAC ¶ 113). STAAR reiterated the same sentiment two days later when it informed an independent panel to the FDA that the Company improved its regulatory compliance and that only one of four inspections resulted in negative observations by the agency. (*Id.* ¶ 118). On March 17, 2014, the Company announced that the panel recommended market approval for the TILC, bringing the product closer to the long-awaited U.S. launch. (*Id.* ¶ 120).

Equally important, STAAR assured investors in both March and May 2014 that a "key operational metric" was managing "the manufacturing consolidation with no material disruption to customer supply requirements or quality." (*Id.* ¶¶ 115, 126). Recognizing that noncompliance with FDA regulations could result in the postponement of manufacturing at STAAR's only remaining facility post-consolidation, STAAR claimed to have "placed a priority on maintaining the continuity and quality of our product supply." (*Id.* ¶ 116). STAAR further stated that "[t]o satisfy ... [FDA] regulations, we must follow strict protocols to confirm that products made at a new site are equivalent to those made at the currently approved site." (*Id.*).

The Court is satisfied that a trier of fact could find those statements misleading at the time they were made. STAAR's representations created an impression that the California manufacturing facility was in compliance with FDA rules such that there would be no disruption in the supply of STAAR's products and no hiccups in the approval process for the TICL. But this impression might be deemed deceiving because the FDA observed numerous violations of its regulations before STAAR made any of its positive announcements. (*Id.* ¶ 92). The very fact that the FDA identified those issues risked delaying FDA approval of STAAR's highly profitable product. The trier of fact could therefore conclude that, contrary to STAAR's statements, the Company was not "in compliance with FDA regulations," that the news regarding the FDA panel's recommendation were misleadingly optimistic, and that the manufacturing consolidation was, in fact, experiencing "material disruptions." In sum, the SAC's allegations that the reality facing STAAR was bleaker than the picture the Company painted for its investors are sufficient to satisfy the PSLRA and Rule 9(b).

The district court in *STAAR I* reached the same result under similar circumstances. 388 F. Supp. 2d at 1129. The district court determined that statements such as "we are extremely pleased with the panel's recommendation and vote of confidence and look forward to working with the FDA staff to complete review of the ICL" and "we look forward to the commercialization of the ICL in the U.S." were false and misleading. *Id.* As the court explained, "STAAR's ICL business strategy required prompt FDA approval of the ICL device .... Thus, Defendants' omission of facts suggesting a possible delay in approval was misleading." *Id.* This result is common sense: STAAR may not lead its investors to believe that it is in compliance with FDA regulations while knowing that an FDA inspector concluded otherwise. As discussed below, Defendants' arguments to the contrary are unavailing.

### 1. *Reliance on Statements From FDA Forms and Letters*

Defendants first argue that the SAC may not rely on FDA inspections and observations to support its claims. (Mot. at 7; Reply at 5). Defendants fault Lead Plaintiff for copying statements from Form 483s and the Warning Letter, instead of conducting his own investigation into alleged violations of FDA regulations. (Mot. at 8). Given the lack of validation of the FDA's findings and the "absence of independent factual support," Defendants urge the Court to ignore the SAC's allegations of deficiencies in STAAR's manufacturing and quality assurance processes. (*Id.* at 8).

***7** In support of their contention, Defendants cite cases where courts disregarded allegations copied from the SEC's complaints in parallel enforcement actions. In *In re Connetics Corp. Securities Litigation*, for instance, the district court held that "it would make little sense that an attorney 'somehow can rely on the analysis of attorneys in **_different actions_** and who are presumably from different law firms.' " 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (emphasis in original) (citations omitted). A court in this District similarly noted that the SEC's allegations of the "very same pattern of abuse" cannot bolster the claims of fraud in a private securities class action. *ScripsAmerica, Inc. v. Ironridge Global LLC*, No. CV1403962MMMAGRX, 2015 WL 4747807, at *32 (C.D. Cal. Aug. 11, 2015). In such circumstances, an independent inquiry is necessary to establish facts on which to ground the complaint. *Kyung Cho v. UCBH Holdings*, Inc., 890 F.Supp.2d 1190, 1203 (N.D. Cal. 2012).

But Defendants' argument misses the mark. In all cases on which Defendants rely, the plaintiffs attempted to use facts taken from SEC investigations to state their own claims for relief. Lead Plaintiff does not do so here. Instead, Lead Plaintiff relies on **_the very existence_** of FDA investigations and observations to show that STAAR's statements were misleading. An analogy to the evidentiary hearsay rule comes to mind. The SAC does not purport to rely on the accuracy of the FDA's conclusions but rather that Defendants were aware of those conclusions when they made the statements at issue. As courts have recognized, representations of compliance with FDA rules may be misleading in light of the FDA's contrary position, even if that position is later determined to lack merit. *See, e.g., Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 982 (8th Cir. 2012) (upholding a complaint based on FDA inspection reports and stating that the "issuance of a Form 483 represents a risk that the FDA may take corrective action against a company, and thus a company is obligated to assess the seriousness of the risk and disclose such information to potential investors if it also represents it is in compliance with FDA regulations and cGMP"); *STAAR I*, 388 F. Supp. 2d at 1129 (finding the FDA's issuance of a Form 483 a material "fact[ ] bearing on possible delays in FDA approval of the ICL").

The allegations show, moreover, that Lead Plaintiff's counsel **_did_** conduct an independent investigation into STAAR's alleged violations of FDA regulations. (SAC ¶ 30). The SAC provides detailed testimony from three confidential witnesses "who worked at STAAR, either as an employee, contract employee or consultant, and had experience with STAAR's policies, practices, and methods of manufacture, storage, and quality control and quality assurance methods." (*Id.*). The SAC describes the witnesses, as well as their roles and responsibilities, with a large degree of specificity. (*Id.* ¶¶ 31–33). Each witness's statements are based on personal knowledge, not hearsay, and involve various problems they observed in the manufacturing process at STAAR's California facility. (*See, e.g., id.* ¶ 93); *see also Zucco*, 552 F.3d at 996 (statements of confidential witnesses must be based on their personal knowledge).

Defendants nonetheless urge the Court to disregard such allegations because the witnesses left STAAR before November 2013 and are "unable to allege a single observed violation of FDA regulations, or management's response thereto, during the Class Period." (Reply at 5). It is, of course, true that the witnesses' descriptions of FDA violations preceding the Class Period do not—by themselves—give rise to securities fraud. Lead Plaintiff sensibly does not argue otherwise. But it simply does not follow that the Court must completely shut its eyes to such allegations when examining the overall context in which the statements at issue were made. *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period, [since] any information that sheds light on whether class period statements were false or materially misleading is relevant.") (internal quotation marks and citations omitted). Because the witnesses' descriptions certainly bear on STAAR's knowledge of purported violations and intent to deceive its investors, the Court gives these allegations their due weight.

### 2. *Statements of Puffery*

***8** Next, Defendants contend that "most of the alleged misstatements are inactionable puffery." (Motion at 11–12). In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (concluding that CEO's statements that company was expecting "solid" loan origination and acquisition in the forthcoming year were mere puffery not actionable as material misrepresentations); *see also* *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations ... investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation.").

The Court is not persuaded that the representations at issue are no more than "generalized statements of optimism" that are "not capable of objective verification." (Motion at 11). The accuracy of the following statements, for example, is contingent on historical facts that can be easily verified:

- STAAR's basis for "believing" that "it is substantially in compliance with the FDA's Quality System Regulations and Medical Device Reporting regulations" (SAC ¶¶ 111–113) could be compromised by the FDA's observations of regulatory violations.

- STAAR's announcement that an "independent advisory panel on Food and Drug Administration recommended marketing approval for its TILC, bringing it closer to a long-awaited U.S. launch" (*id.* ¶ 120) could be misleading if the FDA observed noncompliance with its rules that would delay approval of the TILC.

- Whether a "key operational metric" is "[m]anag[ing] the manufacturing consolidation with no material disruption to customer supply requirements or quality" (*id.* ¶¶ 109, 115) depends on the existence of actual disruption in manufacturing, such as noncompliance with FDA regulations.

- Whether "consolidation efforts are proceeding according to plans" (*id.* ¶ 126) is contingent on the existence of regulatory violations, unless STAAR's "plans" include noncompliance with FDA rules.

Those statements, while certainly optimistic, are capable of objective verification and do not constitute "puffery." *See, e.g.,* *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("[O]ptemistic statements about alfimeprase's path to regulatory approval" are misleading because "they concealed or downplayed known present risks related to regulatory approval"). The cases Defendants cite, by contrast, involved vague statements incapable of verification. *See* *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) (holding "we are very pleased with our progress to date on key strategic initiatives" to be puffery); *Glen Holly Ent., Inc. v. Tektronix, Inc.* 352 F.3d 367, 379 (9th Cir. 2003) ("[S]tatements —generally describing the 'high priority' Tektronix placed on product development and alluding to marketing efforts—do not state an actionable fraud ... claim"); *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) (holding as non-actionable puffing the phrases " 'we're doing well and I think we have a great future' " and " 'business will be good this year' "). Accordingly, reasonable investors would be expected to rely on STAAR's alleged misrepresentations in their decision to purchase the Company's securities.

### 3. *Statements of Opinion*

Defendants take issue with the statement "[STAAR] believes it is substantially in compliance with the FDA's [regulations]," arguing that it constitutes an inactionable opinion. (Motion at 12). But as the Supreme Court recently noted, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has

formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015). Indeed, *Omnicare* addressed this precise situation, stating,

> ***9** Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." ... [I]f the issuer made the statement ... with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain.

*Id.* Simply inserting the word "believe" in front of a statement of fact does not, therefore, immunize Defendants from liability. A reasonable investor presented with STAAR's representation would justifiably feel misled if STAAR failed to mention that the FDA observed numerous violations of its regulations during a month-long inspection. STAAR's statement of belief is therefore actionable.

Defendants challenge the Court's conclusion on two grounds:

*First*, Defendants distinguish *Omnicare* because it involved claims under Section 11 of the Securities Act, which—unlike Section 10(b) claims here—do not require a showing of scienter. (Reply at 11). But the issue of scienter is separate from whether the statements in question are misleading. Defendants' argument is more appropriately addressed with the Court's discussion of Defendants' alleged knowledge and intent to deceive.

***Second***, Defendants claim that the statement of opinion was not based on false facts when made. (*Id.* at 8). Defendants point out that "the Form 483 disclosing FDA's observations of possible deficiencies at the Monrovia facility was not provided to STAAR until March 21, 2014, ***after*** the representations at issue." (*Id.* (emphasis in original)). While that is undoubtedly so, the FDA inspectors identified violations of the regulations both in August 2013 (at the Switzerland facility) and February 2014 (at the California facility)—***before*** the optimistic announcement was made. It was not necessary to wait for the official Form 483 to realize that FDA inspectors observed violations of FDA regulations. The SAC successfully alleges, therefore, that the statement of opinion was based on false facts.

Defendants retort that the SAC is simply wrong that STAAR violated FDA rules by failing to produce the Design History Files. (*Id.* at 10). In Plaintiffs' view, "STAAR maintained the files at its Swiss facility and existing regulations did not require STAAR to maintain duplicate original Design History Files in multiple locations." (*Id.*). But whether the Design History Files were even in existence is question of fact that may not be resolved on this Motion. While Defendants point out that the FDA's Warning Letter includes citations to "DHF," thus indicating that the files do exist, the Letter also states that "your firm's design plans that describe the design and development activities for the Visian ICL/MICL Lenses, prior to July 2005, do not exist, or could not be located by your firm." (Declaration of Dan Marmalefsky ("Marmalefsky Decl."), Ex. K (Docket No. 96–2)). But more fundamentally, it is simply irrelevant whether the FDA was correct in concluding that STAAR failed to "establish procedures for design controls, as required by 21 CFR § 820.30(a)" and was "unable to locate the design files for the Visian ICL/MICL." (*Id.*). Far more important is Defendants' alleged failure to disclose to its investors that the FDA ***did*** come to that conclusion, which could postpone approval of the much-anticipated TICL.

***10** In response, Defendants argue that STAAR's belief of compliance was genuine and not misleading because FDA observations prior to issuance of a Warning Letter do not represent a final agency determination. (Reply at 11–12). But it is undisputed that STAAR's business requires prompt FDA approval of its products, and any facts indicating delay of such approval are crucial to the investors. FDA observations may not constitute a "final agency determination" but they certainly represent a risk that the investigated company is violating FDA regulations that would postpone any pending approval applications. As *STAAR I* explained, "[W]hile Defendants note that the Form 483 did not represent a final FDA determination regarding STAAR's compliance, the nature of those problems ... raises a strong inference that STAAR had actual knowledge that these problems could delay or jeopardize the ICL's approval." 388 F. Supp. 2d 1130; *see* *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 481, n.2 (D.N.J. 2007) ("While the observations contained in a Form 483 report do not constitute a final agency determination regarding the facility's compliance with applicable laws and regulations, corrective action by the

inspected company is expected.”). The Court agrees with this analysis—STAAR's opinion that it substantially complied with FDA regulations is misleading without disclosure of FDA observations to the contrary.

### 4. *True Statements*

Defendants also contend that some statements at issue are “literally true.” (Motion at 13; Reply at 10). Falling into that category are statements to STAAR's investors that the FDA's independent panel had recommended approval of the TICL. (Motion at 12–13).

But as Lead Plaintiff rightly notes, the representations need not be false to be actionable under Section 10(b). (Opposition at 15). Rather, they must only “affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.” *Brody*, 280 F.3d at 1006; *Omnicare*, 135 S. Ct. at 1327 (“[T]he omission of a fact can make a statement of opinion ..., even if literally accurate, misleading to an ordinary investor.”). Here, STAAR's statements created an impression that TILC was one step closer to reaching the market and that there would be no serious impediments to FDA approval. The impression was false, however, since the FDA had observed multiple violations of its regulations that could delay the selling and marking of the TICL in the United States.

### 5. *PSLRA Safe Harbor*

Defendants further assert that Lead Plaintiff's statements are non-actionable forward-looking statements. (Motion at 14). Under the PSLRA's safe harbor, forward-looking statements are not actionable if either (1) they are identified as such and accompanied by meaningful cautionary language, or (2) the plaintiff fails to allege particularized facts demonstrating that the statements were made with actual knowledge of their falsity. 15 U.S.C. § 78u–5(c)(1); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010). Defendants argue that the relevant statements are “forward-looking statements [ ] accompanied by detailed, meaningful cautionary statements.” (Motion at 14).

Defendants are mistaken that the representations at issue are “forward-looking statements.” The SAC alleges an omission of historical facts that misled STAAR's investors. One court noted that “to the extent Plaintiffs [ ] challenge Defendants' alleged ***omission of present facts*** with respect to the challenged statements, the PSLRA's safe harbor does not apply.” *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (emphasis added) (concluding that defendants' statements that the company had “already begun to realize synergies from the Scient'x acquisition” and “we anticipate that our revenues throughout the balance of 2010 will continue to grow” were not protected by the PSLRA safe harbor for “forward-looking” statements, but dismissing the action on other grounds). “The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements.” *In re CV Therapeutics, Inc.*, No. 03–03709 SI, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004).

***11** By a way of example, the statement “[STAAR] believes that it is substantially in compliance with the FDA's [regulations]” is not concerned with future projections or predictions but is stating a belief regarding a then-existing fact. An investor exposed to such an announcement would reasonably conclude that STAAR's activities were not violating FDA rules at that point in time, and a warning about possible future noncompliance would do little to protect the investor. The statement “consolidation efforts are proceeding according to plans” is similarly based on allegedly misleading historical facts. The consolidation, according to the SAC, was not proceeding according to plans since it was resulting in violations of FDA regulations. STAAR is not entitled to safe harbor for such representations. *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (“[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.”).

### 6. *Disclosure of the Warning Letter*

Even if Defendants did not view the statements as misleading at the time they made them, they arguably knew that their representations would deceive reasonable investors when the FDA issued its Warning Letter. The Warning Letter made clear that "a premarket approval application for Class III devices to which [the regulations] are reasonably related will not be approved until the violations have been corrected." (SAC ¶ 131). Since the Warning Letter was based on the observations made in February 2014, STAAR should have realized that its announcements subsequent to the FDA investigation were misleading when made.

The SAC therefore sufficiently alleges that Defendants should have disclosed the Warning Letter to dispel the investors' expectations of forthcoming approval. *See, e.g., Coble v. Broadvision Inc.*, 2011 WL 31093589, at *7 (N.D. Cal. Sept. 11, 2002)2011 WL 31093589, at *7 (N.D. Cal. Sept. 11, 2002) ("A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made."). Defendants retort that STAAR "was permitted to withhold disclosure for a 'reasonable time' " to investigate the cited deficiencies. (Motion at 20–21). But even if STAAR's subsequent investigation established that the FDA was wrong and that the company committed no violations, the Letter should still have been disclosed since it directly impacted the timing of STAAR's application for TICL approval. While STAAR did not have to disclose the Warning Letter within seconds of receipt, STAAR provides no support that it was free to delay as along as it did.

### 7. *Section 10(b) Claim as to Defendant Santos*

Defendants urge the Court to dismiss the claims as to Defendant Santos because Lead Plaintiff "fails to allege that Mr. Santos made ***any*** statements." (Motion at 6 (emphasis in original)). Courts have recognized, however, that "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1355 (C.D. Cal. 2014) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004)). The allegations connecting an officer to a statement include "allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* In *IXIA*, the district court rejected Section 10(b) claims against individual corporate defendants because the allegations established only that the officers "possessed the authority to control the contents of the reports; received copies of them; and because of their positions within Ixia knew that the adverse facts specified in the complaint had not been disclosed." *Id.* at 1355–56 (internal quotation marks omitted).

***12** The allegations here, on the other hand, are more detailed. The SAC claims that Defendant Santos "has served as the Company's Vice President, Global Quality Assurance, Regulatory and Clinical Affairs since November 2008." (SAC ¶ 27). "As V.P. of Regulatory Affairs, Santos was consulted and responsible for any statements concerning FDA regulatory compliance." (*Id.*). Defendant Santos, moreover, served as "the FDA's point of contact at the Company and the person responsible for responding to the FDA's requests for information and documents during inspection." (*Id.* ¶ 99).

It is admittedly a close call whether these allegations are sufficient to establish that Defendant Santos participated in the formulation of the statements at issue. The Court ultimately concludes, however, that the SAC adequately states a claim against Defendant Santos due his unique role as liaison between the FDA and STAAR. Such facts support the allegation that Defendant Santos is "responsible for any statements concerning FDA regulatory compliance." As the company's officer responsible for overseeing compliance with FDA rules, it is reasonable to infer that the statements at issue were initially made by Defendant Santos or at least with his advice and consent. The Court is thus not prepared to dismiss Defendant Santos at this juncture.

**B. Scienter**
In addition to falsity, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To satisfy the requisite state of mind element, "a complaint must allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991.

In *Tellabs*, the Supreme Court clarified the inquiry for determining whether a plaintiff's allegations are sufficient to establish scienter. 551 U.S. at 321. Accepting all factual allegations in the complaint as true, a district court must "consider the complaint in its entirety," and determine "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in original). Under the *Tellabs* analysis, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, *i.e.*, knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement." *In re* *Apple Comp., Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002). In this case, the relevant corporate officers are Defendants Caldwell and Santos.

At the hearing, Defendants argued emphatically that Defendants Caldwell and Santos could not have acted with scienter because the FDA had not issued the Form 483 and the Warning Letter at the time they made most of the alleged misstatements. But neither a Form 483 nor a Warning Letter is necessary to impute knowledge of the violations observed during an FDA inspection. The SAC alleges sufficient facts to infer that Defendants Caldwell and Santos—individuals well-versed in FDA procedures (SAC ¶¶ 26–27)—were aware of the adverse observations in February 2014, well before any of the announcements at issue were made. To be more specific, the following allegations create an inference of scienter at least as compelling as an inference of innocent conduct:

***13** • After the August 2013 inspection of the Swiss facility, the FDA provided "management" with a Form 483. (SAC ¶ 92). Form 483s are "intended for use in notifying the inspected establishment's ***top management*** in writing of significant objectionable conditions ...." (*Id.* ¶ 62 (emphasis added)). Management failed to correct a deficiency identified in the Form 483, which appeared again during the inspection of STAAR's California facility in February 2014, after manufacturing had been transferred from Switzerland. (*Id.* ¶ 96).

• During the February 2014 inspection of the California facility, the FDA inspector made numerous requests for the Design History File, which "management" failed to produce. Defendant Santos, who reported directly to senior management, was the person responsible for maintaining the Design History Files. (*Id.* ¶¶ 98–99). The Warning Letter itself recognized that the "firm's management" informed the investigator that it was "unable to locate the design files." (Marmalefsky Decl., Ex. K). Defendant Santos reported to senior management. (SAC ¶ 146).

• The FDA inspector discussed other violations with "multiple firm management." (*Id.* ¶ 100).

• "[T]he FDA had been inspecting the Monrovia facility since February 10, 2014 and had repeatedly alerted ***management*** to severe violations of cGMP and Quality System Regulations relating to ICL/MILC." (*Id.* ¶ 93 (emphasis added)).

• Pursuant to FDA policy, inspectors "make every reasonable effort to discuss all observations with the ***management of the establishment*** ... on a daily basis." (*Id.* ¶ 61 (emphasis added)).

• Defendant Caldwell has a "long history managing FDA regulated companies that manufacture and market ophthalmology products, Caldwell has a comprehensive understanding of FDA procedures specific to STAAR's industry." (*Id.* ¶ 26).

These allegations show that Defendants Santos and Caldwell were more likely than not aware of the problems identified during the February inspection before the issuance of Form 483 in March 23, 2014 and the Warning Letter on May 21, 2014. It is reasonable to infer that the FDA inspector's communications with "management" either were conducted directly with Defendants Santos and Caldwell or were at least reported to them. A trier of fact could conclude that Defendant Santos and Caldwell acted with scienter when they made the allegedly misleading statements on March 12–17, 2014.

The inference of scienter is further bolstered by the importance of both the TICL and the smooth operation of the California facility to STAAR's business. The SAC alleges that "[a]pproval of TICL in the U.S. was of the utmost importance to STAAR.... In the foreign markets in which the MICL and TICL were in commercial use approximately 40% of the units and approximately 50% of the revenue were the TICL version." (*Id.* ¶ 79). It is reasonable to infer that the CEO of STAAR (a relatively small company with only 335 employees) would be involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone the approval of TICL. The Ninth Circuit has recognized that such circumstances permit inference of scienter. *See* *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (holding that inference of scienter is proper "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter").

STAAR's alleged history of noncompliance further supports the inference that Defendants Caldwell and Santos kept a close watch on possible violations of FDA regulations. After significant damage to STAAR's stock from the December 2003 Warning Letter and subsequent lawsuit (*see id.* ¶ 70), it would be reasonable for STAAR's top management to closely monitor any possible violations of FDA regulations, particularly after consolidating all manufacturing operations into one facility. While Defendants point out that most of that history pre-dates Defendant Caldwell's arrival, his SEC filings show a deep awareness of the regulatory issues (*id.* ¶¶ 86–90), thus making it reasonable that Defendant Caldwell at least reviewed the Company's past violations of FDA regulations.

***14** Finally, Defendants' failure to timely disclose the Form 483 and the Warning Letter creates a further inference of intentional deceit. At that time, Defendants knew the agency's position regarding STAAR's noncompliance with FDA regulations. Defendants nonetheless failed to disclose any relevant facts to the investors who were under the impression that the FDA would approve the TICL without serious impediments. While it is of course true that the FDA would have disclosed the Warning Letter independent of STAAR's actions, Defendants silence in light of their prior statements is telling.

Defendants retort that even if they were aware of the investigator's observations in February 2014, Lead Plaintiff fails to allege that Defendant Caldwell "knew that a Warning Letter was imminent, what it would say and that it would be material." (Motion at 23). *STAAR I* addressed a similar argument as follows:

> Defendants claim that Plaintiffs must show Defendants "knew that the FDA would find STAAR's September 29, 2003 written response inadequate, knew that the FDA would ultimately issue a Warning Letter, and knew that the Warning Letter would state that the FDA would not approve any new STAAR devices until STAAR's 'quality system' deficiencies were corrected." However, Defendants attempt to raise the standard for scienter far beyond what is required by the PSLRA. Although the PSLRA was enacted to end the practice of pleading "fraud by hindsight," the PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future.

388 F. Supp. 2d at 1130. The Court agrees with the district court's analysis. Knowledge of FDA observations alone may raise an inference of scienter since such observations produce a sufficiently great possibility of a future Warning Letter. If Lead Plaintiff were required to allege that Defendants "knew a Warning Letter was imminent," then it would be virtually impossible to establish scienter at the pleading stage.

In sum, the SAC creates a strong inference that Defendants understood at the time the statements in question were made that the FDA had unearthed violations of its regulations. Defendants nonetheless misled STAAR's investors into believing that the company was in compliance with the law. Such conduct gives rise to an inference of scienter.

### C. Section 20(a) Claim

Since the SAC establishes a primary violation, Defendants' argument against the Section 20(a) claim for control person liability is unavailing. *See* *Zucco*, 552 F.3d at 990.

## III. CONCLUSION

The Motion is **DENIED.** Defendants shall answer the Second Amended Complaint by **May 2, 2016. IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2016 WL 6699284

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT S

2017 WL 1169629
United States District Court, S.D. New York.

Megan VILLELLA, Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
CHEMICAL & MINING CO. OF CHILE INC., Patricio Contesse,
Patricio De Solminihac, and Ricardo Ramos, Defendants.

15 Civ. 2106 (ER)
|
Signed 03/28/2017

**Attorneys and Law Firms**

Robbins Geller Rudman & Dowd LLP, Aelish M. Baig, Matthew S. Melamed, John H. George, San Francisco, CA, Samuel H. Rudman, Melville, NY, Sabrina E. Tirabassi, Boca Raton, FL, for Plaintiff.

Grant Richard Mainland, Wachtell, Lipton, Rosen & Katz, Scott Alexander Edelman, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

***1** This action is brought as a putative class action against Chemical and Mining Company of Chile Inc. (a/k/a Sociedad Química y Minera de Chile S.A.) ("SQM" or "Defendant") and individual SQM executives [1] alleging violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder. Before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis of *forum non conveniens*, or alternatively, for failure to state a claim.

For the reasons set forth below, Defendant's motion is DENIED in part and GRANTED in part.

## I. BACKGROUND [2]

### A. The Parties

SQM is a producer and worldwide distributor of specialty fertilizers and industrial chemicals, based in Chile. Corrected Consolidated Complaint for Violation of the Securities Laws ("Consolidated Complaint") ¶ 18. SQM's Series B American Depository Shares ("shares") have been listed on the New York Stock Exchange ("NYSE") since 1993, under the ticker symbol "SQM." *Id.* This class action is brought on behalf of all persons who purchased SQM's shares traded on the NYSE between June 30, 2010 and June 18, 2015 (the "Class Period"). *Id.* at ¶ 1. Lead Plaintiff, the Council of the Borough of South Tyneside, acting in its capacity as the Administering Authority of the Tyne and Wear Pension Fund ("Plaintiff"), is located in South Shields, Tyne and Wear, England. *Id.* at ¶ 17. Plaintiff alleges that it purchased a total of 376,521 shares and suffered damages in excess of $4.4 million during the Class Period as a result of Defendant's securities violations. *Id.*

### B. Factual Background

On February 24, 2015, the Attorney General of Chile ("AG") announced an investigation of a bribery and tax-evasion scandal involving the financial firm Banco Penta, which embroiled numerous politicians across the country's political spectrum. *Id.* at ¶¶

2, 5. The scheme involved the creation of fake expense receipts used to lower Banco Penta's taxable income, all for the purpose of funding illegal payments to political candidates. *Id.* Two days later, on February 26, 2015, SQM issued a press release divulging that an extraordinary Board meeting had been held at the request of SQM's Chairman to "analyze" this escalating political scandal. *Id.* at ¶ 25. The Board resolved at the meeting to establish a special committee ("Ad-Hoc Committee") comprised of three SQM Board members and the New York office of the law firm Shearman & Sterling, to conduct an investigation. *Id.* at ¶¶ 9 n.1, 25. Around the same time, the press started to report that SQM was being investigated by the AG for misconduct similar to Banco Penta's—using fake invoices and phony services to illegally fund politicians. *Id.* at ¶ 23.

***2** On March 11, 2015, SQM disclosed that its Board would meet the next day to evaluate a request from the Public Prosecutor that SQM deliver accounting records and other information in connection with the investigation into the political contributions scandal. *Id.* at ¶¶ 26-27. After the Board meeting on March 12, 2015, SQM issued a press release stating that the Board resolved (i) to request an independent report with respect to a March 6, 2015 letter from the AG requesting certain information from SQM, (ii) to schedule another extraordinary Board meeting on March 16, to analyze the independent report and decide whether to comply with the AG's request, (iii) to ratify its willingness to cooperate with the Public Prosecutor's investigation and request for information, and (iv) to inform the AG of the Board's plan in response to his March 6, 2015 letter. *Id.* at ¶ 27. Four days later, on March 16, SQM issued a subsequent press release announcing that the Board had unanimously voted to terminate its Chief Executive Officer ("CEO") Patricio Contesse, who had attempted to block the Board's decision to turn the information over to the IRS. *Id.* at ¶ 32. The Board subsequently voted to designate Patricio Solminihac Tampier ("Solminihac") as the new CEO of SQM. *Id.*

On March 18—just two days after the press release—SQM announced that three SQM Board members from the Canadian stakeholder Potash Corporation of Saskatchewan, Inc. ("Potash Directors")—SQM's largest noncontrolling shareholder—had resigned from the Board. *Id.* at ¶¶ 210-11. SQM disclosed in a press release that day that the Potash Directors had resigned because they could not ensure an adequate investigation of SQM and that their "emphatic requests" that SQM cooperate fully with the authorities had been rejected by a majority of the Board. *Id.* at ¶ 36. Plaintiff alleges that as a result of SQM's disclosures, as of March 17, 2015, SQM shares dropped more than 15% from its price on February 25, 2015. *Id.* at ¶ 11. SQM shares also fell an additional 15% after the Potash Directors' resignation. *Id.*

In late March and early April 2015, both the Chilean tax regulatory agency (a/k/a Servicio de Impuestos Internos) ("SII") and the securities regulator (Superintendencia de Valores y Seguros) ("SVS") initiated criminal proceedings against SQM Board members and representatives. The five individuals were criminally charged with, among other offenses, participation in tax fraud and "failure to provide the market with information that could be relevant for investment decisions" in violation of the Chilean corporations code. *Id.* at ¶¶ 39, 45. The charges were brought based on numerous declarations from the recipients of SQM's payments, who admitted that they submitted invoices to SQM without having provided services. *Id.* at ¶¶ 47, 50, 56. The investigation also led to an admission by SQM's Chief Financial Officer ("CFO") Ricardo Andres Ramos Rodriguez that SQM made 1,000 payments to companies without any consideration of whether they were based on services rendered. *Id.* at ¶ 57. In September, the SII updated its complaint against Contesse to include allegations that he authorized the submission of 91 additional false invoices for expenses totaling more than CLP 309 million.

On December 15, 2015, SQM filed a Form 6-K with the Securities Exchange Commission ("SEC") summarizing the findings of the Ad-Hoc Committee's investigation. The Committee found that payments were made on invoices that lacked supporting documentation, that SQM's books did not accurately reflect questioned transactions and that SQM lacked sufficient controls over expenses managed by Contesse. *Id.* at ¶ 75. The Committee also stated that it found no evidence demonstrating that the payments were made in order to induce a public official to act or refrain from acting. *Id.* at ¶ 76. Plaintiff nevertheless claims that the "illegal acts perpetrated by SQM's top executives acting on [SQM's] behalf, extended its sphere of influence throughout Chile's political system." *Id.* at ¶ 78.

### C. The Disclosures

Throughout the Class Period, SQM filed financial reports with the SEC and issued press releases detailing the company's financial performance, including its revenue, gross margins, and earnings per share. *Id.* at ¶ 80. In its Annual Reports filed during the Class Period, SQM also made the following representations:

***3 • Legal Compliance**

> There are currently no material legal or administrative proceedings pending against the Company with respect to any regulatory matter, except as discussed under 'Safety, Health and Environmental Regulations' below, and we believe that we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business.

**• Internal Controls and Procedures**

> Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Exchange Act Rules 13(a)-15(b), as of the end of the period covered by this Annual Report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures are effective in providing reasonable assurance that material information is made known to management and that financial and non-financial information is properly recorded, processed, summarized and reported.

**• Code of Ethics**

> We have adopted a Code of Business Conduct that applies to the Chief Executive Officer, the Chief Financial Officer and the Internal Auditor, as well as, to all our officers and employees. Our Code adheres to the definition set forth in Item 16B of Form 20-F under the Exchange Act.

The Annual Reports also assured its shareholders that its financial statements were prepared in accordance with Chilean Generally Accepted Accounting Principles ("GAAP") and reported net and paid income tax pursuant to the U.S. GAAP. *See e.g.*, *id.* at ¶¶ 86-87.

In its 2014 Annual Report (filed on May 18, 2015), SQM reported a contract dispute with the Chilean government organization Corporacion de Fomento de la Produccion de Chile ("Corfo") which had issued SQM a lease to mine the valuable Salar de Atacama region—the source of 40% of SQM's revenue. *Id.* at ¶¶ 11, 193. SQM explained that any breaches of the lease were technical and that Corfo was allowed to terminate the agreement only for a material breach. The disclosure further stated that:

> SQM Salar [3] in consultation with external counsel believes that it is likely it will prevail in the arbitration proceeding. However, an adverse ruling awarding damages sought by Corfo or permitting early termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash flows and results of operations. We cannot assure you that Corfo will not use this arbitration proceeding to seek to renegotiate the terms of the Lease Agreement in a manner that is not favorable to SQM Salar. Although the parties are currently discussing potential resolutions, we cannot assure you such discussions will be successful or that Corfo will not take other actions in the future in relation to the Lease Agreement that are contrary to our interests.

*Id.* at ¶ 193.

***4** Plaintiff alleges that SQM's disclosures were materially false and/or misleading, because they failed to disclose: (i) that money from SQM was illegally channeled to bribe Chilean politicians and political parties, (ii) that SQM had filed fictitious tax

receipts in order to conceal these bribe payments, (iii) that SQM lacked adequate internal controls over its financial reporting, and (iv) that, as a result, SQM's financial statements were materially false and misleading and not prepared in accordance with applicable accounting principles. *Id.* at ¶¶ 2-12. Plaintiff further claims that SQM's negotiation with Corfo was "put at risk" at least in part by SQM's inadequate corporate governance. *Id.* at ¶ 11.

On January 13, 2017, SQM agreed to pay a $15 million criminal penalty and $15 million civil penalty to resolve parallel criminal and civil cases brought by the U.S. Department of Justice and SEC, respectively. (Doc. 64, Ex. A-E) In the deferred prosecution agreement ("DPA") with the Department of Justice, SQM admitted that it "knowingly and willfully failed to maintain internal accounting controls," that Contesse authorized and directly paid funds to Chilean politicians and candidates in violation of "Chilean tax law and/or campaign finance limits, and caused payments of those funds to be falsely recorded in the SQM's books and records." (Doc. 64, Ex. B) The SEC Order similarly stated that SQM made improper payments to Chilean politicians and political candidates and that the "payments were not supported by documentation that those vendors provided services to SQM. Virtually all of the improper payments" were directed and authorized by a senior SQM executive." (Doc. 64, Ex. E).

### D. Procedural Background

On March 19, 2015 and April 14, 2015, two separate class actions were filed—the Villella action and the Molinaro action, respectively—seeking damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. (Doc. 1); (No. 15 Civ. 2884, Doc. 1). As required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(A), Villella's counsel published notice over *Globe Newswire* on March 19, 2015, announcing that a securities class action had been filed against SQM and the individual defendants, and advising SQM shareholders that they had until May 18, 2015 to file a motion for appointment as lead plaintiff. *See* Decl. Jeremy A. Lieberman Supp. Villella Mot. for Consol., Appt. as Lead Pl. & Approval of Counsel (Doc. 14, Ex. A).

On May 18, 2015, six motions were filed seeking consolidation of the Villella and Molinaro Actions, with each movant seeking appointment as lead plaintiff and approval of the movant's selected counsel as lead counsel. (Docs. 7-23) On October 14, 2015, the Court issued an Opinion and Order consolidating the two actions, appointing Tyne and Wear as lead plaintiff, and approving Tyne and Wear's selected counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel. (Doc. 31) Plaintiff filed the Consolidated Complaint on February 9, 2016. (Doc. 40)

The instant motion, which Defendant filed on March 30, 2016, seeks dismissal on two alternative grounds. (Doc. 42) First, Defendant argues that pursuant to the doctrine of *forum non conveniens*, the Consolidated Complaint should be dismissed because the claims can be addressed more adequately in Chile. Alternatively, Defendant claims that the Consolidated Complaint should be dismissed for failure to state a claim under the securities laws.

## II. Legal Standards

### A. *Forum Non Conveniens*

The doctrine of *forum non conveniens* allows a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (quoting *Carey v. Bayerische Hypo–und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)). "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court." *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996). The Second Circuit has "outlined a three-step process to guide the exercise of that discretion." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d. Cir. 2005) (citing *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) (en banc)). First, "a court determines the degree of deference properly accorded the plaintiff's choice of forum." *Id.* Second, "it considers whether the

alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute." *Id.* And third, "a court balances the private and public interests implicated in the choice of forum." *Id.*

**B. Rule 12(b)(6)**

***5** Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch*, 699 F.3d at 145. However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also* *id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Beyond the requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.,* *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)). Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See* *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 251-52 (S.D.N.Y. 2014). Like Rule 9(b), the PSLRA requires that securities fraud complaints " 'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)); *see also, e.g.,* *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## III. Discussion

**A. *Forum Non Conveniens***

### i. Degree of Deference to Plaintiff's Choice of Forum

A defendant who invokes *forum non conveniens* generally bears "a heavy burden" in opposing plaintiff's chosen forum. *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). When reviewing a *forum non conveniens motion*, courts start with "a strong presumption" in favor of the plaintiff's forum choice. *Norex*, 416 F.3d at 154 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). In applying this presumption, however, " 'the degree of deference to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

be given to a plaintiff's choice of forum moves on a sliding scale' depending on the convenience reflected by the given choice." *Palacios*, 757 F. Supp. 2d at 352, (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001)). The Second Circuit in *Iragorri* explained the sliding-scale analysis:

> [T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*.... On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons ... the less deference the plaintiff's choice commands[.]

***6** *Iragorri*, 274 F.3d at 71-72. In short, courts give greater deference to a plaintiff's chosen forum when that choice is motivated by convenience and give less deference when the plaintiff is merely seeking a tactical advantage. When applying this sliding-scale analysis, courts are guided by *Iragorri*'s convenience and forum shopping factors. *Norex*, 416 F.3d at 154-55. *Iragorri*'s convenience factors are: "(1) the convenience of the plaintiff's residence in relation to the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the defendant's amenability to suit in the forum district, (4) the availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense." *Norex*, 416 F.3d at 155 (quoting *Iragorri*, 274 F.3d at 72). Conversely, *Iragorri*'s forum shopping factors are: "(1) attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, (2) the habitual generosity of juries in the United States or in the forum district, (3) the plaintiff's popularity or the defendant's unpopularity in the region, or (4) the inconvenience and expense to the defendant resulting from litigation in that forum." *Norex*, 416 F.3d at 155 (quoting *Iragorri*, 274 F.3d at 72).

Here, the Court finds that some deference should be given to Plaintiff's choice of forum. First, Plaintiff is a pension fund located in South Shields, England. Thus, Plaintiff's "overseas residence vitiates any presumption that [it] would find the U.S. forum convenient." *Banculescu v. Compania Sud Americana De Vapores, SA*, No. 11 Civ. 2681 (ALC), 2012 WL 5909696, at *6 (S.D.N.Y. Nov. 26, 2012). Though Plaintiff highlights that the majority of the class are U.S. investors, because Plaintiff is bringing this action in its representative capacity, its chosen forum is entitled to less weight. *See* *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006), *aff'd*, 233 Fed.Appx. 83 (2d Cir. 2007) ("Though the fact that a plaintiff sues as a representative of a putative class does not mean that his choice of forum is deprived of all deference, plaintiffs in such cases generally 'have only a small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions.' ") (quoting *DeYoung v. Beddome*, 707 F. Supp. 132, 138 (S.D.N.Y. 1989)); *see also* *Lasker v. UBS Sec. LLC*, 614 F. Supp. 2d 345, 358 (E.D.N.Y. 2008) (noting that even though lead plaintiff resides in the chosen forum, "his choice of forum is given less weight than if he were an individual plaintiff"). Nevertheless, the Court notes Plaintiff's contention that the trip from England to New York is unquestionably shorter, and thus much more convenient, than the trip from England to Chile.

Second, the availability of witnesses or evidence in the forum district does not strongly weigh in favor of either party's choice of forum. Defendant correctly argues that most, if not all, of the relevant evidence and witnesses are outside of the U.S.—either in Chile or Canada. Memorandum of Law in Support ("Def. Memo") (Doc. 42) at 11. Specifically, Contesse and Ramos are in Chile; and the Potash Directors are in Canada. However, and importantly, SQM's Ad-Hoc Committee included U.S. lawyers and engaged U.S. forensic accountants to conduct an investigation and as a result, more than 3.5 million documents have been collected in the U.S. Memorandum of Law in Opposition ("Pl. Opp.") (Doc. 49) at 20. Moreover, though the "core operative facts"—the illegal financing of electoral campaigns and politicians—occurred in Chile, the alleged misleading documents were filed with the SEC in the U.S. and relied upon by investors to purchase ADSs on the NYSE. *See* *DiRienzo v. Philip Servs.*

*Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (finding that plaintiffs' choice of forum in a federal securities fraud case should be accorded deference where "defendants sought out business opportunities in this country by registering stock on American exchanges, filing statements with the SEC and conducting the bulk of its business in the United States).

***7** Third, the consideration of "the defendant's amenability to the suit in the forum district" weighs in favor of according deference to Plaintiff. There is no question that Defendant is subject to jurisdiction in New York because of its listing on the NYSE. Similarly, for the fourth factor, the fact that Plaintiff brings solely federal securities claims further supports Plaintiff's choice of a U.S. forum. *See* *DiRienzo*, 294 F.3d at 28 (finding that the U.S.'s "interest in having [U.S.] courts enforce [U.S.] securities laws" was a "valid reason for litigating in federal court"). Further, Plaintiff argues that the language barrier significantly influenced its decision to bring the action in the U.S. Pl. Opp. at 17.

The Court also notes, however, that Plaintiff's choice of forum may have been, in part, motivated by tactical reasons. As Plaintiff concedes, Chile does not allow for securities class actions, Pl. Opp. at 22, thus, Plaintiff's decision to pursue this action on behalf of a class seems to indicate that it was trying to take advantage of the U.S.'s class action device. *See* *Gilstrap*, 443 F. Supp. 2d at 481 (affording plaintiffs' choice of forum less deference, in part, because "some indicia of forum-shopping" was present because plaintiffs admitted that "their decision to sue here rather than in England was, at least in part, motivated by the availability of contingent fees and class actions, procedural devices not available in England").

On balance, the Court finds that some deference should be given to Plaintiff's choice of forum.

### ii. Adequate Alternative Forum

The Court's deference to Plaintiff's forum choice does "not necessarily preclude *forum non conveniens* dismissal." *Norex*, 416 F.3d at 157. Rather, it "simply recalibrate[s] the balance for purposes of the remaining analysis." *Id.* To be successful on a motion to dismiss on *forum non conveniens* grounds, "a movant must demonstrate the availability of an adequate alternative forum." *Id.* (citing *Pollux*, 329 F.3d at 75). In order for an alternative forum to be adequate, it must satisfy two requirements. First, all defendants must be amenable to service of process in the alternative forum. *Norex*, 416 F.3d at 157; *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042 (RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) (for an alternative forum to be adequate, "a court must satisfy itself that the litigation may be conducted elsewhere against *all defendants*") (citing *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998)) (emphasis added). And second, the alternative forum must permit litigation of the subject matter of the dispute. *Norex*, 416 F.3d at 157. However, " 'the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies." *Id.* (quoting *PT United*, 138 F.3d at 74).

Plaintiff does not contest that Defendant, a Chilean company, is amenable to service of process in Chile. Thus, at issue here is solely whether Chile permits litigation "of the subject matter of the dispute." Defendant claims that Articles 53 and 55 of the Chilean Securities Law "together provide for a private right of action for stockholders who claim they have suffered injury as a result of a company's false or misleading disclosures." Def. Memo at 10; Declaration of Pedro Pablo Vargas ("Vargas Decl.") (Doc. 45) at ¶ 13. Article 53 provides, in pertinent part, that "[n]o person shall carry out any transaction or induce or try to induce the purchase or sale of securities, overseen or not by this law, by means of any action, strategy, mechanism or artifice that is false or misleading." Article 55 further provides for a private right of action for those who have suffered damages as a result of an entity's violation of Article 53. *Id.* Though Chile does not permit class actions, it does not impose restrictions on the number of claimants who can join a securities suit. *Id.*

***8** Plaintiff argues that Articles 53 and 55 do not, in fact, provide an adequate remedy for its losses because the laws only provide for a remedy for fraudulent inducement or fictitious transactions, which are not alleged here. Pl. Opp. at 18. Plaintiff further contends that Defendant has not identified (nor can it) any cases in which damages were awarded to shareholders pursuant to Article 53 for losses caused by misrepresentations or omissions made in SEC filings. *Id.* at 19. Plaintiff also notes an official order of the SVS stating that "considering that the inscription, offering, listing and trading of ADRs is developed abroad, it will be necessarily regulated by the foreign legislation, so its reach and compliance is beyond the scope of competence of this Institution." Declaration of Andres Jana L. ("Jana Decl.") (Doc. 51) at ¶ 18. Though Defendant attempts to qualify the SVS's order by stating that it only referred to unsponsored ADSs and described the SVS's inability to regulate the registration and filing requirements for unsponsored ADSs, Defendant does not include a copy of the SVS's order.

The Court finds that Defendant has met its burden to establish that Chile is an adequate forum, but barely. Though Defendant cites statutes that appear at first blush to apply to Plaintiff's claims, Defendant provides no examples of cases—and Plaintiff asserts that there are none—in which a plaintiff has actually brought suit pursuant to the cited statutes against a Chilean company for financial statements registered in foreign jurisdictions.

### iii. Private and Public Interest Factors

After finding that Chile is an adequate alternative forum, this Court's inquiry turns to the balance of private and public interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissing the action. *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667 (NRB), 2006 WL 3247363, at *7 (S.D.N.Y. Nov. 8, 2006). That is, a defendant must demonstrate that "trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience," or that litigating in the chosen forum is inappropriate upon consideration of the public interests. *Sinochem*, 549 U.S. at 429 (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447-448 (1994)) (alterations omitted). Defendants bear the burden of establishing that "the balance of private and public interest factors tilts heavily in favor of the alternative forum." *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 135 (2d Cir. 2005); *PT United.*, 138 F.3d at 74.

This Court first considers "the private interest factors—those which reflect the convenience with which the parties may litigate here." *Kirch*, 2006 WL 3247363, at *7. The private interest factors include: (1) the relative ease of access to sources of proof, (2) the cost of obtaining attendance of willing witnesses, (3) availability of compulsory process for attendance of unwilling witnesses, and (4) all other problems that make the trial of a case easy, expeditious, and inexpensive. *Iragorri*, 274 F.3d at 73-74.

Here, as the Court already noted, most of the relevant documentary evidence and material witnesses are located in Chile. The invoices and challenged disclosures were prepared in Chile, and Contesse, presumably the most relevant witness, is under house arrest in Chile. Moreover, Contesse, the Chilean political candidates, the Potash directors, and other potential witnesses, are third-party witnesses, and therefore, this Court would not be able to compel their appearance. However, as Plaintiff argues, witness testimony can be procured through letters rogatory, which Plaintiff's expert persuasively explains is not overwhelmingly tedious or oppressive. Jana Decl. ¶¶ 26-28. Further, a significant amount of evidence has already been gathered in the U.S and SQM's current employees, including Ramos, can be compelled by this Court.

Next, the Court turns to the public interest factors: "(1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community." *Iragorri*, 274 F.3d at 74.

***9** Here, though Chile's interest in this case is significant, the U.S. also has a strong interest in upholding its federal securities laws. *See* *DiRienzo*, 294 F.3d at 28. Second, Defendant claims that the Court will have to interpret a novel issue of Chilean law because a Chilean court has not determined whether Contesse's actions constitute a criminal tax violation. [4] Def. Memo. at 13. However, Plaintiff alleges strictly federal securities violations—to which SQM has already admitted. Thus, at this stage, it is unclear to what extent the Court will need to apply or interpret Chilean law. Third, there is no question that jurors have an interest in ensuring that financial institutions that are traded on American stock exchanges do not mislead investors. Thus, the Court finds that the balance of private and public factors do not heavily tilt in favor of trial in Defendant's choice of forum.

Accordingly, because the Court finds that Plaintiff's choice of forum is entitled to some deference, and the private and public factors do not tilt heavily in favor of Defendant, Defendant's motion to dismiss on the basis of *forum non conveniens* is denied.

### B. Failure to State a Claim

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or ... omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)). To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura*, 544 U.S. at 341-42; *see also, e.g.,* *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). Defendant argues that Plaintiff fails to adequately plead (1) an actionable misstatement or omission and (2) scienter.

#### i. Material Misstatement or Omission

In order to survive a motion to dismiss, Plaintiff must establish that Defendant "made a statement that was '*misleading* as to a *material* fact.' " *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made.*" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 Fed.Appx. 62 (2d Cir. 2015) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)) (emphasis in original). The Second Circuit has repeatedly indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate with specificity why ... that is so." *Rombach*, 355 F.3d at 174.

Where the alleged violations of Section 10b and Rule 10b-5 are based on allegations that the defendant "omitted to state a material fact necessary to make the statement ... not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "[I]f an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

***10** Plaintiff alleges that Defendant made material misstatements with respect to its (1) compliance with applicable law and effectiveness of internal controls; (2) code of ethics; and (3) financial reporting and accounting. Plaintiff also claims that

Defendant made a material omission in its statements regarding its lease negotiations with Corfo. The Court will address each claim in turn.

First, Plaintiff claims that Defendant's representations that it was in compliance with all applicable laws and that it had effective internal controls were false when made. Consolidated Complaint ¶¶ 195-96. In response, Defendant does not contest the statements' objective falsity but rather argues that the statements were statements of opinion and that Plaintiff has not sufficiently alleged that Defendant believed they were false when made. Def. Memo at 15-16. To bring a fraud claim based on an alleged misstatement in an *opinion*, a plaintiff must plausibly assert that "defendants did not [subjectively] believe the statements ... at the time they made them." *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (emphasis added); *see also* *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1321 (2015) (holding that a statement of opinion qualifies as an untrue statement of fact. "if the opinion expressed was not sincerely held"). "A reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1329). Here, the Annual Reports for the fiscal years 2009-2013 stated that SQM "believe[d]" that it was in compliance with applicable laws and that based upon an evaluation the CEO and CFO concluded that SQM's internal controls were adequate. Consolidated Complaint ¶¶ 82, 103, 125, 147, 172. These statements are indeed statements of opinion. However, the Court finds that Plaintiff has sufficiently alleged that Defendant knew or should have known that the statements were false when made.

Plaintiff claims that top SQM executives, including Contesse, the former CEO, and Ramos, the CFO, should have known of and in many cases authorized the payments of false invoices throughout the relevant time period. As an initial matter, Plaintiff claims —and the investigations in Chile allegedly uncovered—that more than $11 million in payments without sufficient supporting documentation originated from Contesse's office. *See* Consolidated Complaint ¶ 42. The SII investigation also revealed that Contesse had authorized at least 90 false invoices from 2012-2014. *Id.* at ¶ 63. Plaintiff also alleges that Contesse received an email in August 2012 regarding contributions to a number of political candidates and asking about submitting invoices to SQM and that Contesse directed SQM attorney Enrique Olivares to contribute to those campaigns. Additionally, as part of the SII investigation, Ramos admitted that SQM made 1,000 payments to political campaigns "without any consideration of whether they were based on any services rendered." *Id.* at ¶ 57. Solminihac, SQM's current CEO, further declared that the payments were "ordered and approved by Contesse." *Id.* at ¶ 64. These allegations are sufficient to show that Defendant did not believe its statements regarding compliance with all relevant regulations and that its disclosure controls were effective in ensuring that "financial and non-financial information [was] properly recorded ... and reported."

***11** The Court also finds that SQM's statements regarding its legal compliance and the efficiency of its internal controls are not mere puffery. Def. Memo at 17-18. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). "Puffery is frequently comprised of statements that are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.' " *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016). Here, SQM's statements do not communicate an aspiration or a desire to comply with all relevant laws or implement efficient controls. The statements in the Annual Reports relay positive assurances that SQM believed it was in compliance with all applicable laws and regulations and that based on an evaluation, the CEO and CFO concluded that SQM's controls were effective. *See* *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15 Civ. 7199 (JMF), 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (finding "easily" that plaintiff plausibly alleged that defendant's statements that it was substantially in compliance with relevant global requirements were actionable); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 726-27 (S.D.N.Y. 2015) (holding that the statement that "the Company believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations," was an actionable statement of opinion); *see also* *Omnicare*, 135 S. Ct. at 1326 ("And so too the statement about legal compliance ('I believe

our marketing practices are lawful') would falsely describe her own state of mind if she thought her company was breaking the law.").

Second, Plaintiff claims that Defendant's statements regarding its code of ethics were misleading in that it failed to report or acknowledge that its CEO and CFO were engaging in illegal activity. Consolidated Complaint ¶ 197. In this regard, the Court finds Plaintiff's argument unavailing. Courts have found that a defendant's mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance with the code, is not misleading. *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) ("[A] code of ethics," he noted, "is inherently aspirational; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory.") (quoting *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 964-66 (N.D. Cal. 2014)). Plaintiff does not allege that SQM assured its investors that its employees were in fact complying with the adopted code. *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016) (dismissing claim regarding defendant's compliance with its code of ethics because "[a]lthough the Company's codes of ethics prohibit[ed] bribery and other forms of fraudulent conduct, they do not claim that PetroChina's officers are abiding by them"). Accordingly, Plaintiff's misrepresentation claim with respect to Defendant's code of ethics is dismissed.

Third, Plaintiff claims that Defendant's statements regarding its financial reporting and accounting statements were false or misleading because they were not prepared in accordance with U.S. or Chilean GAAP. Consolidated Complaint ¶¶ 86-87. Defendant argues that Plaintiff's claim fails because Plaintiff did not adequately identify the financial standards that were violated. Def. Memo at 20. However, the Consolidated Complaint specifically alleges that SQM's purportedly illicit conduct violated "FASB Conceptual Framework for Financial Reporting; Statement of Financial Accounting Standards ("SFAS") No. 109 and *Accounting for Income Taxes*; International Accounting Standards ("IAS") No. 1, *Presentation of Financial Statements*; and IAS No. 12, *Income Taxes*" by, among other things, failing to disclose the amount of taxes payable and tax liabilities. Consolidated Complaint ¶ 199.

Defendant further argues that any inaccuracies in its statements were not material. Def. Memo at 19. "The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 27 (S.D.N.Y. 2016) (quoting *ECA*, 553 F.3d at 197). The Second Circuit has cautioned that because materiality is a mixed question of law and fact, in the context of a Rule 12(b)(6) motion, " 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

***12** When assessing materiality, courts must fully analyze "all relevant considerations." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). The SEC's Staff Accounting Bulletin ("SAB") No. 99, provides that "a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality." *United States Sec. & Exch. Comm'n v. DiMaria*, No. 15 Civ. 7035 (GHW), 2016 WL 4926200, at *6 (S.D.N.Y. Sept. 15, 2016) (citing 64 Fed. Reg. 45150, 45151 (Aug. 19, 1999)). In addition to quantitative factors, courts are required to consider any relevant qualitative factors. Sufficient qualitative factors "can turn a quantitatively immaterial statement into a material statement." *IBEW Local Union No. 58 Pension Trust Fund and Annuity Fund v. The Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015). SAB No. 99 provides a non-exhaustive list of the relevant qualitative factors a court should consider, including whether the misstatement "affects the registrant's compliance with regulatory requirements" or "involves concealment of an unlawful transaction," and the "volatility of the price of a registrant's securities in response" to the disclosures. *See* SAB 99, 64 Fed. Reg. at 45152.

Defendant claims that the financial inaccuracies were quantitatively immaterial because the allegedly $13 million in payments made over the six-year period only understated SQM's net income by $2.2 million per year, or about 0.5% of SQM's average

annual income during that period. Def. Memo at 19. Defendant further asserts that SQM's $7 million in back taxes attributable to the same period, resulted in an understatement of tax liability of only $1.2 million per year, or about 0.8% of SQM's average annual paid income tax. *Id.* These losses are significantly below the 5% threshold. However, even assuming that these calculations are accurate, the Court finds that the qualitative factors are sufficient to allege materiality at this stage.

Here, Plaintiff alleges that Contesse improperly funneled money to politicians by authorizing SQM to pay false invoices. SQM's disclosures of these actions resulted in a decrease of over 15% in the price of ADSs, from $26.17 per share on February 25, 2015 to $22.10 on March 17. Consolidated Complaint ¶¶ 204-09. By March 19, 2015, the price for ADSs had fallen to $17.87 per share. *Id.* The disclosures also impacted SQM's reputation. Plaintiff alleges that companies like Santander and Miller Tabak & Co., LLC issued analyst reports in which SQM was given an "underperform" rating or stripped of its "Buy" rating due to the investigations and the resulting issues with corporate governance. *Id.* at ¶¶ 211-13. Plaintiff further alleges SQM's actions violated Chilean tax law and subjected SQM to regulatory penalties. *Id.* at ¶ 44. The SVS—Chile's securities regulator—found that SQM failed to provide investors "with information that could be relevant for investment decisions" in violation of securities laws and fined SQM's directors. *Id.* at ¶ 8. Additionally, SQM agreed to pay a $15 million penalty to settle the SEC's charges and a $15.5 million penalty as part of the DPA with the DOJ regarding its improper payments to Chilean polticians. Taking these allegations as true—and acknowledging that materiality is generally not an appropriate basis for dismissal at this stage—the Court finds that Plaintiff has sufficiently alleged materiality.

Lastly, Plaintiff alleges that Defendant misled its investors by "expressing confidence in its position" in the Corfo arbitration, despite knowing that its illegal payments to politicians could potentially jeopardize the lease. Consolidated Complaint at ¶¶ 193, 200. Plaintiff claims that the concealed risk materialized when Corfo rejected the settlement due to "poor corporate governance." *Id.* Challenging Plaintiff's claim, Defendant argues that its statements were "forward-looking" and that they were accompanied by meaningful cautionary language and are thus not actionable. Def. Memo at 20-21.

***13** The PSLRA safe harbor provision provides that no liability attaches to certain forward-looking statements that are identified as such and "accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward looking statements." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 400 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78u-5(c)). The bespeaks caution doctrine, similarly "refers to the use of cautionary language aimed at warning investors of potential risks that may occur in the future" and provides that where "*no reasonable investor* could have been misled about the nature of the risk when he invested," a claim for securities fraud fails. *Id.* (emphasis in original). "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see also* *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 400 (explaining that under the bespeaks caution doctrine, "effective, cautionary language needs to warn of, or directly relate to, the risk that brought about the plaintiff's loss").

Here, Defendant represented that it would "likely ... prevail in the arbitration proceeding" with Corfo. It also warned investors that "an adverse ruling awarding damages sought by Corfo or permitting early termination of the Lease Agreement would have a material adverse effect on our business, financial condition, cash flows and results of operations." Plaintiff alleges that before SQM's disclosures, the arbitration primarily focused on SQM's failure to meet its payment obligations. Plaintiff cites to an analyst's report which claims that Corfo ultimately rejected settlement discussions and opted for early termination of the lease (set to expire in 2030) due to ethical reasons, including "corporate governance, unfair related parties transactions, unfair transfer prices, lack of disclosure and environmental rules breakage." Consolidated Complaint ¶ 217.

The Court finds that Plaintiff has failed to adequately allege that SQM's statement regarding the Corfo arbitration is actionable. Defendant's expression of confidence in the arbitration is a forward looking statement. The statement is also accompanied by cautionary language which warned its investors of the risk that settlement discussions would not be successful and that an adverse ruling might result in early termination of the lease. This language warned investors of the risk that ultimately

transpired—early termination of the lease. Though Plaintiff argues that SQM failed to disclose the risk that its illicit conduct could negatively affect the arbitration, it does not allege that SQM's conduct was in fact the basis for Corfo's rejection of the arbitration and the termination of the lease.

### ii. Scienter

Section 10(b) and Rule 10b-5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also, e.g.,* *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004). To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (internal quotation marks omitted). As Supreme Court precedent dictates, a "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added). This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Id.*

***14** A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *see also* *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006). The relevant inquiry for the Court "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291-92 (S.D.N.Y. June 23, 2014) (citing *Tellabs*, 551 U.S. at 322-23) (emphasis original); *see also* *ECA*, 553 F.3d at 198; *Medis Inv. Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint."), *aff'd*, 328 Fed.Appx. 754 (2d Cir. 2009) (summary order). "According to the Supreme Court, the critical inquiry is: '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?' If so, then scienter has been adequately pleaded. If not, the case may be dismissed." *Medis Inv. Grp.*, 586 F. Supp. 2d at 141 (citing *Tellabs*, 551 U.S. at 326).

"When the defendant is a corporate entity ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The "most straightforward way to raise such an inference for a corporate defendant" in most cases is "to plead it for an individual defendant," however, there may be some instances where a plaintiff may allege scienter as to a corporate defendant without also alleging scienter as to an individual defendant. *Id.*; *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) ("[A] plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment.") (internal citation omitted). "A strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.' " *In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 384 (S.D.N.Y. 2013) (citing *Vining*, 2010 WL 3825722, at *13).

Defendant argues that Plaintiff has neither alleged a motive nor alleged sufficient facts to constitute circumstantial evidence of conscious misbehavior or recklessness. Def. Memo at 21. While the Court agrees that Plaintiff has not alleged motive, the Court finds that taking the facts as a whole, Plaintiff has adequately alleged facts creating an inference of scienter. With respect to Defendant's statements regarding its legal compliance and effectiveness of internal controls, the Court applies the same reasoning as it did for its finding of subjective falsity. Because the Court finds that Plaintiff has sufficiently alleged that Defendant knew or should have known that the statements were false or misleading when made, the Court also finds that Plaintiff has sufficiently pled scienter with respect to those statements. *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004) ("[I]n false statement of opinion cases ... the falsity and scienter requirements are essentially identical"). Moreover, Defendant in the DPA and SEC order admitted that it knowingly and willfully made misrepresentations in its SEC filings.

Accordingly, Defendant's motion to dismiss Plaintiff's claims that Defendant made material misstatements regarding its compliance with applicable law, effectiveness of internal controls, and financial reporting and accounting in its SEC filings is denied. The Court grants Defendant's motion to dismiss Plaintiff's claim as to SQM's statements regarding its code of ethics and its lease negotiations with Corfo.

## IV. CONCLUSION

***15** For the reasons set forth above, Defendant's motion to dismiss on grounds of *forum non conveniens* is DENIED. Defendant's motion to dismiss for failure to state a claim is DENIED in part and GRANTED in part. Specifically, Defendant's motion to dismiss Plaintiff's claims that SQM made material misstatements in its SEC filings regarding its (1) compliance with applicable law, (2) effectiveness of internal controls, and (3) financial reporting and accounting is DENIED. Defendant's motion to dismiss Plaintiff's claims that SQM made material misrepresentations with respect to its statements regarding its code of ethics and its lease negotiations with Corfo is GRANTED. The parties are directed to appear for an initial pre-trial conference on **Thursday, April 13, 2017 at 10:00 AM**. The Clerk of Court is respectfully directed to terminate the motions, Docs. 42, 59.

It is SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 1169629, Fed. Sec. L. Rep. P 99,665

### Footnotes

1 On November 13, 2015, the parties stipulated to the dismissal without prejudice of the individual SQM executives. (Doc. 38)

2 The following facts are drawn from allegations contained in the Corrected Consolidated Complaint ("Consolidated Complaint") (Doc. 40), which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also takes judicial notice of the Deferred Prosecution Agreement entered into between SQM and the Department of Justice and SQM's settlement with the SEC on January 13, 2017. *See Sullivan v. Barclays PLC*, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of deferred prosecution with Department of Justice).

3 SQM Salar is a subsidiary of SQM. *See* Consolidated Complaint ¶ 50 n.15.

4 Defendant's expert states that "[p]rominent Chilean lawyers with expertise in civil and criminal tax matters have stated that the conduct alleged against SQM is not criminal in nature, but rather presents a civil tax matter concerning the appropriate treatment of tax expense." Vergara Decl. ¶ 34.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.